1  Patricia Barbosa (SBN 125685)
2  pbarbosa@barbosagrp.com
   Ayman Mourad (SBN 304161)
3  amourad@barbosagrp.com
4  **BARBOSA GROUP**
   8092 Warner Avenue
5  Huntington Beach, CA 92647
   Phone: (714) 465-9486
6
7  (Appearances continued on next page.)

8              **IN IN THE UNITED STATES DISTRICT COURT**
9
10             **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

11

12  ROY PAYAN, PORTIA MASON, THE          ) Case No.:  2:17-cv-01697
    NATIONAL FEDERATION; OF THE          ) <u>**Civil Rights**</u>
13  BLIND, INC., and THE NATIONAL        )
    FEDERATION OF THE BLIND OF           )
14  CALIFORNIA, INC.,                    ) **AMENDED COMPLAINT FOR**
                                         ) **DECLARATORY RELIEF,**
15                                       ) **INJUNCTIVE RELIEF, AND DAMAG**
16               Plaintiffs,             ) **FOR DISABILITY DISCRIMINATION**
                                         ) **IN VIOLATION  OF TITLE II OF TH**
17  vs.                                  ) **ADA, AND SECTION 504 OF THE**
                                         ) **REHABILITATION ACT**
18                                       )
    LOS ANGELES COMMUNITY                )
19  COLLEGE DISTRICT,                    )
                                         )
20                                       ) <u>**DEMAND FOR JURY TRIAL**</u>
               Defendant.                )
21                                       )
22                                       )
                                         )
23                                       )
                                         )
24                                       )
                                         )
25                                       )
                                         )
26                                       )

27  _____

28  _____
    Amended Complaint:  ADA; 1973 Rehabilitation Act
    Case No.:  2:17-cv-01697

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Daniel F. Goldstein
dfg@browngold.com
Sharon Krevor-Weisbaum
skw@browngold.com
Joseph B. Espo
jbe@browngold.com
Jean M. Zachariasiewicz
jmz@browngold.com
**BROWN, GOLDSTEIN & LEVY LLP**
120 E. Baltimore Street Suite 1700
Baltimore, Maryland 21202
Phone: (410) 962-1030

*Attorneys for Plaintiffs*

Plaintiffs ROY PAYAN ("Mr. Payan"), PORTIA MASON ("Ms. Mason"), and the NATIONAL FEDERATION OF THE BLIND ("NFB"), by and through undersigned counsel, file this complaint against Defendant the Los Angeles Community College District ("LACCD") for denying the blind equal access to LACCD's programs and activities in violation of federal law.  They allege as follows:

## INTRODUCTION

1.      Roy Payan is a student at Los Angeles City College ("LACC"). Mr. Payan is pursuing a degree in rehabilitation services for the disabled, with the plan of transferring to a four-year institution once he has received his Associate in Arts ("AA") degree.  He first enrolled at LACC in Fall 2015, is currently enrolled, and plans to enroll again for the Fall 2017 semester.  Mr. Payan is blind.

2.      Portia Mason was a student at LACC in Fall 2015 and Spring 2016. Ms. Mason is pursuing a certificate in drug and alcohol counseling and plans to return to LACC in Fall 2017.  After obtaining her certificate, she intends to enroll in a four-year institution to obtain her Bachelor of Arts in social work.  Ms. Mason is blind.

3.      To access printed content Mr. Payan and Ms. Mason use a variety of tools, such as Braille, audio books, and screen-reading software.

4.      LACCD has consistently failed to provide Mr. Payan and Ms. Mason with digital and physical course materials in accessible formats.

5.      When digital textual content is properly formatted, it is universally available to sighted and blind alike and does not require the re-creation of text in a separate format.  Unlike printed content, digital content is not inherently visual, audible, or tactile, but must be converted to be accessible to any or all of those senses.  Thus, for example, this Complaint is formatted as a particular type of PDF

that without modification can be read both by those with sight using their eyes and by blind persons using screen access software.

6.      Recognized standards exist for the preparation and presentation of universally designed mainstream digital content.  For example, the International Digital Publishing Forum has established the ePub 3 standard for published digital content, and the World Wide Web Consortium has promulgated Web Content Accessibility Guidelines 2.0 AA.  Accessible math content, critical to Mr. Payan's course of study, is best presented in MathML.  Free open-source software has been written to make it easy to convert equations from the language in which they are typically written (LaTex) into MathML.  When source files are not available, equations can be pasted into Microsoft Word and then, with the aid of an inexpensive (approximately $30) plug-in, can be exported from Word into MathML.

7.      Universities use a wide array of software programs to distribute project assignments, homework, tests, grades, financial aid documents, and other communications between and among students, faculty, and administrators. Software programs are also used to make available research and library materials. Although content delivery systems designed for universal mainstream accessibility are commercially available, LACCD has repeatedly acquired inaccessible software. Consequently, LACCD has forced on Mr. Payan and Ms. Mason less effective and segregated communication and research methods, which have made it gratuitously harder to not only acquire such information as the content of assignments but also to complete those assignments.

8.      Like a public accommodation that decides to create unneeded entrance steps and no ramp, accessibility problems arise when an educational provider makes, as LACCD has, procurement decisions about digital content without

Amended Complaint:  ADA; 1973 Rehabilitation Act
Case No.:  2:17-cv-01697

considering whether students with disabilities will have integrated access to the content. LACCD compounds that failure by not converting inaccessible content to accessible content in alternative formats so those students can have access to course-related content at the same time as their nondisabled peers.

9. LACCD's failure to provide Mr. Payan and Ms. Mason an equal opportunity to access the content, classroom learning, and activities in their courses has forced them in each instance to choose between withdrawing from a course or achieving a grade well below one that would accurately reflect their intelligence, aptitude, and industry and instead reflects only the learning barriers LACCD erected. LACCD's failure to afford Mr. Payan and Ms. Mason an equal opportunity to compete at a level commensurate with their capabilities has caused them (1) to expend tuition, fees, and expenses in exchange for an educational experience inferior to that which LACCD has offered their sighted peers, and (2) severe emotional distress. Moreover, by impairing their opportunity to secure admission to four-year institutions, LACCD has caused Mr. Payan and Ms. Mason irreparable harm.

10. Mr. Payan and Ms. Mason relied on LACCD's assurances of equal access and have upheld their end of the bargain by enrolling, paying tuition, and working to the best of their abilities. LACCD, far from providing an equal opportunity to access educational benefits, has offered Mr. Payan, Ms. Mason, and other blind students an experience of unfair disadvantage and an unequal educational experience.

## JURISDICTION AND VENUE

11. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343 because Mr. Payan's, Ms. Mason's, and the NFB's claims arise under the Americans with Disabilities Act ("ADA"), 42 U.S.C.

§§ 12131, et seq., and Section 504 of Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. § 794.

12.     Mr. Payan and Ms. Mason are both residents of the County of Los Angeles, California, and are eligible to attend campuses owned and operated by LACCD.  The nine campuses owned and operated by LACCD are located in Los Angeles County, California, and the acts and injuries complained of herein occurred in Los Angeles, California.

13.     Venue in this Court is proper pursuant to 28 U.S.C. §1391(b) because Defendant does business in this district, the acts constituting violations of the ADA and Section 504 occurred in this district, and Mr. Payan and Ms. Mason reside in this district.

## THE PARTIES

14.     Plaintiff ROY PAYAN is a former Los Angeles police officer and United States reserve officer.  In 2003, while working overseas, Mr. Payan contracted a virus that attacked his vision.  He underwent several surgeries in an attempt to stabilize his vision, but it continued to deteriorate, and Mr. Payan is now blind.  In 2007 Mr. Payan returned to school in an effort to retrain in another discipline.  Mr. Payan plans to enroll at a four-year college and earn his Bachelor of Arts degree.

15.     Plaintiff PORTIA MASON had glaucoma as a child and lost her sight at age 14.  She obtained a two-year degree in Business Administration in 1992.  In 2015 she went back to school in order to fulfill her professional goal of obtaining a certificate in drug and alcohol counseling and eventually earning a Bachelor of Arts in social work.

16.     Plaintiff the NATIONAL FEDERATION OF THE BLIND ("NFB"), the oldest and largest national organization of blind persons, is a 501(c)(3) non-

Amended Complaint:  ADA; 1973 Rehabilitation Act
Case No.:  2:17-cv-01697

profit corporation duly organized under the laws of the District of Columbia and headquartered in Baltimore, Maryland.  It has affiliates in all 50 states, Washington, D.C., and Puerto Rico.  The NFB and its affiliates are widely recognized by the public, Congress, executive agencies of state and federal governments, and the courts as a collective and representative voice on behalf of blind Americans and their families. The organization promotes the general welfare of the blind by assisting the blind in their efforts to integrate themselves into society on terms of equality and by removing barriers that result in the denial of opportunity to blind persons in virtually every sphere of life, including education, employment, family and community life, transportation, and recreation.  As part of its mission and to achieve these goals, the NFB actively pursues litigation to ensure that the blind receive equal access to the opportunities, facilities, services, programs, and activities offered by institutions of higher education.

17.    The NFB devotes substantial resources to accessible post-secondary education.  It supports a division, the National Association of Blind Students, that brings students together to discuss barriers and solutions to equal access to education.  For over forty years, the NFB has been directly involved in the development of technology that helps blind people, including post-secondary students, access print materials. In the 1970's, it collaborated with Ray Kurzweil to develop the Kurzweil Reading Machine, the first machine to use optical character recognition to convert text to speech. More recently, the NFB led the team that evolved this revolutionary technology into an app for smartphones, making it more universally available to blind and other print-disabled people.  To promote the development of uniform practices by colleges for print-disabled students, the NFB persuaded Congress to create a federal Advisory Commission for Accessible Instructional Materials in Postsecondary Education for Students with Disabilities

("AIM Commission") that examined the barriers faced by students and faculty with disabilities in gaining access to instructional materials and made recommendations. Currently, the NFB is working with the Association of American Publishers and the American Council on Education to support federal legislation that would authorize a Federal Advisory Commission for Accessible Instructional Materials in Postsecondary Education for Students with Disabilities.  The NFB has established a Center of Excellence in Nonvisual Access (CENA) to Education, Public Information, and Commerce with support from the Maryland Department on Disability through a Non-Visual Access Initiative Grant that offers Accessibility Boutiques (introductions to accessibility) that are free of charge and open to the public. Boutiques on topics relevant to higher education include: tactile graphics, document accessibility, web accessibility, accessible PDF, Amazon accessibility, Google apps, digital books, and HTML.  It also conducted day-long web accessibility training conferences in 2014 and 2015.  The NFB also developed the Higher Education Accessibility Online Resource Center that provides links to accessibility standards and guidelines, guidance on how to create nonvisually accessible documents, links to federal guidance documents, and links to settlement agreements with institutions of higher education. Currently it is developing best practices for institutions of higher education that cover policies on accessibility, procurement procedures, accessibility audits and corrective action plans, and training of faculty, staff, volunteers, and students. In addition, the Self-Advocacy in Higher Education Toolkit was developed to help blind students better understand the higher education accommodation request process, mitigate access barriers on campus, and ultimately to succeed as a student.  To educate the university community, the NFB routinely makes presentations on accessibility organizations of institutions of higher education including EDUCAUSE, the Association of

Amended Complaint:  ADA; 1973 Rehabilitation Act
Case No.:  2:17-cv-01697

1    Independent Colleges and Universities in Massachusetts (AICUM), the Tennessee

2    Board of Regents, and at the 2015 Accessible Instructional Materials and

3    Technology in Higher Education Summit.  Two NFB staff members are currently

4    participating on the Maryland Legislative Workgroup on Accessibility Concepts in

5    Computer Science, Information Systems, and Information Technology Programs in

6    Higher Education. The purpose of the workgroup is to evaluate the extent to which

7    accessibility is incorporated into the curriculum of computer science, information

8    systems, and information technology programs in Maryland institutions of higher

9    education and to make recommendations.  In addition, through collaboration,

10   negotiation, complaints with the Office of Civil Rights of the Department of

11   Education or litigation, the NFB has assisted students in resolving issues and

12   reaching comprehensive agreements addressing access to educational content and

13   software at Penn State University, Arizona State University, Florida State

14   University, University of Miami, University of Montana, Atlantic Cape Community

15   College, Maricopa County Community College, and Wichita State University.

16         18.    Plaintiff the NATIONAL FEDERATION OF THE BLIND OF

17   CALIFORNIA ("NFB of California") is a 501(c)(3) non-profit corporation duly

18   organized under the laws of California, and is the California State affiliate of the

19   NFB.  The NFB of California's mission is to promote the vocational, cultural, and

20   social advancement of the blind; to achieve the integration of the blind into society

21   on a basis of equality with the sighted; and to take any other action that will

22   improve the overall condition and standard of living of the blind.  The NFB of

23   California sues in furtherance of its extensive efforts and expenditure of resources

24   in advancing its mission to improve independence of the blind.  Discrimination

25   against blind individuals frustrates the mission of the NFB of California and results

26   in the diversion of its resources to address Defendant's discriminatory practices.

27

28

Amended Complaint:  ADA; 1973 Rehabilitation Act
Case No.:  2:17-cv-01697

19.     Defendant LOS ANGELES COMMUNITY COLLEGE DISTRICT is a public educational entity organized and existing pursuant to the laws of the State of California, Cal. Ed. Code § 70900, *et seq.*  Therefore, it is a government entity under Title II of the ADA, 42 U.S.C. § 12131, *et. seq.*

20.     LACCD receives federal financial assistance in many forms, including, but not limited to, direct grants of assistance as well as student financial aid, and is therefore required to comply with Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794.

21.     As a condition of receiving federal funds from the Department of Education, LACCD annually signs a Certificate of Compliance certifying that it is in compliance with Section 504 of the Rehabilitation Act.

## STATEMENT OF FACTS

### I.      Plaintiff Roy Payan

### A.      Prior to Enrollment at LACC

22.     Mr. Payan first enrolled at an LACCD institution in Fall 2007 when he began taking courses at East Los Angeles College ("ELAC").  Although returning to school with a new disability was not easy, Mr. Payan persevered and ultimately completed most of his courses with little difficulty, earning a 3.85 grade point average.  Along the way he attained several certificates and recognitions, including making the Dean's and President's Honors Lists.

23.     In Fall 2010, Mr. Payan enrolled in Math 125 – Advanced Algebra, which is a requirement for students seeking to transfer to a four-year institution after receiving an AA degree.  Mr. Payan was not given an accessible version of the Math 125 textbook, and the software required to complete homework and quizzes was inaccessible, as well.

24.     Mr. Payan turned to his professor for guidance, but the only accommodation she offered to him was to allow an extra 20 minutes for him to complete tests and quizzes.  Mr. Payan noted that extra time would not make the required text and software accessible, and his professor responded that ELAC was not geared to accommodate a blind student.  She suggested he instead enroll at LACC, apparently assuming its proximity to the Braille Institute Los Angeles would render it better suited to assisting blind students.

25.     Mr. Payan contacted the LACC Office of Special Services ("OSS"), which provides support services and accommodations to students with disabilities. OSS recommended that, prior to enrolling at LACC, Mr. Payan become familiar with Job Access with Speech ("JAWS"), a screen-reading software.

26.     Mr. Payan enrolled with the California Department of Rehabilitation Blind Services Division to acquire training in the use of JAWS.  He also enrolled in classes at the Los Angeles Braille Institute in typing, JAWS screen-reading, and Braille.

27.     Once Mr. Payan had become proficient in typing and reading with JAWS and Braille, he moved forward with enrolling at LACC with the hopes that he could finally complete the remaining requirements for his AA and then transfer to a four-year college.

**B.     Spring 2016 Semester at LACC**

28.     Mr. Payan enrolled at LACC in the summer of 2015 for classes that would start in Fall 2015.  As required, he first registered with OSS prior to registering for classes and complied with LACC's requirements for requesting accommodations and modifications of school policies where necessary in order to have an opportunity to succeed equal to that of non-disabled students.  However, on information and belief, LACC has routinely failed to notify Mr. Payan's instructors

Amended Complaint:  ADA; 1973 Rehabilitation Act
Case No.:  2:17-cv-01697

prior to the start of classes that Mr. Payan would be in their classes and would require accommodations and/or modifications in order to participate in class on an equal basis.  Even after the start of classes, Mr. Payan's instructors often failed to make in-class written and graphic material available and accessible to Mr. Payan, thereby excluding him from class activities and preventing him from participating in class discussions.

29.     Mr. Payan initially enrolled in Math 125 in the Fall 2015 semester, but was discouraged by the professor of that class, who told Mr. Payan that the class would move too quickly for a blind student and thus would impair his grade point average.  The professor advised Mr. Payan to instead wait until Spring 2016 and enroll in Math 124A, and then Math 124B in Fall 2016, two classes that had been created specifically to assist students unable to keep up with the speed of the Math 125 course.

30.     Although Mr. Payan did not want to extend this one course requirement to two semesters, he took the professor's advice and enrolled in Math 124A for Spring 2016.  In addition, Mr. Payan enrolled in a non-credit math refresher course over the Winter 2015-2016 semester to become familiar with the material and to improve his chances of doing well in Math 124A.  Mr. Payan did very well in the non-credit class and felt confident about his chances of succeeding in Math 124A.

## 1.     Inaccessibility of Class Materials in Math 124A

31.     Mr. Payan began Math 124A on February 8, 2016.  On the first day, he learned that both a textbook and software program were required for the class.  Mr. Payan purchased the textbook and took it to OSS in order to obtain a digitized version of the text.  However, OSS only had a digital copy of the textbook

formatted as an image PDF, thus making it unreadable by the JAWS software that most blind students, including Mr. Payan, use to access printed content.

32.    The version of MyMathLab, the software required to complete online homework assignments and take online quizzes in Math 124A, that LACC licensed also proved to be inaccessible to Mr. Payan because it was incompatible with JAWS.  Thus, MyMathLab misread most questions and many times would not read them at all.

33.    It quickly became apparent to Mr. Payan that he would neither be able to read the required textbook assignments nor read or answer any questions on the MyMathLab website without the assistance of a sighted person every time he chose to read the textbook or do the required homework and quizzes for Math 124A.  This situation put Mr. Payan at a great disadvantage, as it prevented him from doing homework or taking quizzes at the time of his choosing at home on nights and weekends, though he had paid for the right to use the required textbook and MyMathLab software like every other student.

34.    Mr. Payan took his concerns to OSS and worked with staff in the High Technology Center there for several days in an attempt to find a solution to the problems with the Math124A textbook and MyMathLab software, but OSS was unable to resolve the inaccessibility issues.

35.    Mr. Payan ultimately spent approximately $1500 of his own money to hire a notetaker and tutor for Math 124A because he was unable to access the course materials independently.

**2.    LACC Fails to Respond to Mr. Payan's Requests for Accommodation in Math 124A**

36.    On February 18, 2016, ten days after he began taking Math124A, Mr. Payan reached out to the chair of the Math Department at LACC, Kian Kaviani, to resolve his accessibility issues with the class.  Mr. Kaviani claimed that he had

never heard of blind students having trouble obtaining accommodations in the Math Department at LACC.  However, Mr. Payan knew of other blind students who had experienced the same lack of accessibility in math classes at LACC and had not received the necessary accommodations.

37.     Mr. Kaviani offered to have Mr. Payan's Math124A instructor write out assigned math problems in large print as an accommodation.  Because Mr. Payan is blind, math formulas written in large print are just as inaccessible as those contained in an inaccessible textbook or software program.  Therefore, Mr. Payan asked Mr. Kaviani to contact the textbook publisher and the MyMathLab software developers to obtain accessible versions of their educational materials used by LACC.  Mr. Kaviani responded that he would not do so because there were too few blind math students at LACC to require such accommodations.  When Mr. Payan noted that, under federal law, he has a right to accommodations for his disability, Mr. Kaviani advised Mr. Payan to contact a lawyer and take legal action, because the Math Department would not provide him with an accessible textbook and software application as he requested.

38.     After Mr. Payan's unsuccessful meeting with Mr. Kaviani, he reached out to Thelma Day, the Dean of the Mathematics Department at LACC.  Mr. Payan informed Ms. Day of the lack of access for blind students to required Math 124A materials and of LACC's failure to accommodate his need for accessible materials. Mr. Payan also asked Ms. Day to contact the textbook and software vendors in order to obtain accessible versions of the Math 124A materials.

39.     Ms. Day told Mr. Payan that she could not tell or force a vendor to do anything and suggested he look into how other blind students had accommodated themselves in the past.  Mr. Payan responded that other blind students had enrolled with the Department of Rehabilitation Blind Services Division and requested

Amended Complaint:  ADA; 1973 Rehabilitation Act
Case No.:  2:17-cv-01697

personal readers and notetakers, but he had been unable to obtain assistance from the Department due to its limited resources.

40.     Ms. Day dismissed Mr. Payan's request for help and then tried to intimidate him by asking for his full name and student ID number so that she could contact the President of LACC about him.  She also asked Mr. Payan if he had talked to anyone else about his concerns and whether he had contacted an attorney.  Mr. Payan responded that he had not yet spoken with an attorney but was willing to do so if LACC continued to deny him equal access to educational content for his classes.  Ms. Day then abruptly terminated the conversation.

### 3.     LACC Fails to Provide Mr. Payan with Testing Accommodations for Math 124A

41.     Despite the inaccessibility of both his textbook and the MyMathLab software, Mr. Payan completed Math 124A and prepared to take the final exam.

42.     All students at LACC who require exam accommodations due to their disabilities must pre-schedule a specific time to take their exams with OSS.  OSS has proctors who are trained to assist students with disabilities with taking exams.  All of the OSS proctors are hired on a part-time basis.  On information and belief, OSS only has four proctors who are generally available to assist blind students, and only two of those proctors are qualified to give math tests.  During midterm and final exam periods at LACC, students with disabilities often have difficulty scheduling and taking their exams because OSS has an insufficient number of qualified proctors to meet the students' needs.

43.     At the end of the Spring 2016 semester, Mr. Payan scheduled his Math 124A exam with OSS for 9 a.m. on the allotted testing day.

44.     When Mr. Payan arrived at OSS at 9 a.m. on the given day, he was told that there was no proctor available to assist him with taking his exam.   Mr. Payan

Amended Complaint:  ADA; 1973 Rehabilitation Act
Case No.:  2:17-cv-01697

waited for a proctor until 2:00 p.m., at which point the OSS staff told him that no proctor would be available to assist him that day.  Mr. Payan therefore rescheduled his exam for 11:00 a.m. the following day.

45.    Although his exam was scheduled for 11:00 a.m., Mr. Payan arrived at OSS at 9 a.m. in case the proctor was available early.  Mr. Payan was again kept waiting until 1:30 p.m., at which point he demanded that he be permitted to take his Math 124A final exam.  The OSS staff told him he would be given his exam, but that he only had one hour to complete it because the office closed at 2:30.  Although Mr. Payan should have been given time-and-a-half to complete his exam as an accommodation for his disability, he felt he had no other choice, so he agreed and had to rush through his Math 124A final in one hour, to his detriment.

46.    Mr. Payan was thus forced to wait a day-and-a-half to take his Math 124A final exam, and was then denied the necessary accommodation of extra time in which to complete it.

47.    As a result of LACC's refusal to provide Mr. Payan with accessible class materials, auxiliary aids and services, and required accommodations, Mr. Payan received a "C" in Math 124A.  This grade does not reflect his ability but rather LACC's failure to provide Mr. Payan with equally effective communication of the educational content available to his non-disabled classmates.

## C.    Fall 2016 Semester at LACC

### 1.    Math 124B

48.    To fulfill his math requirements, Mr. Payan enrolled in Math 124B in Fall 2016.

49.    As with Math 124A, the section of Math 124B in which Mr. Payan registered required that students use MyMathLab.

Amended Complaint:  ADA; 1973 Rehabilitation Act
Case No.:  2:17-cv-01697

16

50.     One day early in the semester, Mr. Kaviani pulled Mr. Payan out of class, told him that he did not belong in that section of Math 124B, and said he should be in the section of the class that did not use computers.

51.     Mr. Payan switched to the section of Math 124B that did not use MyMathLab.  However, he still needed an in-class notetaker and reader to assist him.  Because LACC did not provide any notetakers or readers, and Mr. Payan had already expended substantial personal funds hiring a notetaker and tutor for Math 124A, Mr. Payan had to ask his in-home support services worker to come to class with him and take notes.  Unlike a trained notetaker, Mr. Payan's in-home support services worker did not know how to take comprehensive notes and needed Mr. Payan to tell him what to write down.

52.     When the Math 124B professor gave an in-class quiz, he told Mr. Payan to go to an empty classroom next door with his in-home support services worker to take the quiz.  Because Mr. Payan's in-home support services worker was not qualified to proctor a math quiz, Mr. Payan failed.  Mr. Payan explained the problem to the professor, who allowed Mr. Payan to retake the quiz with an OSS proctor.  When Mr. Payan took the quiz for a second time with a trained proctor, he received a B.

53.     At the end of the semester, Mr. Payan experienced the same issues taking his Math 124B exam as he had with his Math 124A exam.  When he arrived to take the exam on the originally scheduled day and time, he waited a long time before being told that no proctor was available.  Once again, Mr. Payan had to reschedule his exam.

54.     As a result of LACC's refusal to provide Mr. Payan with auxiliary aids and services and required accommodations, Mr. Payan received a "C" in Math 124B.  This grade does not reflect his ability, but rather LACC's failure to provide

Mr. Payan with equally effective communication of the educational content available to his non-disabled classmates.

### 2. Introduction to Psychology

55.    Mr. Payan also took Introduction to Psychology in Fall 2016.  Before registering for a class, he went to speak with one of the psychology professors about the class and its requirements.

56.    The professor, David Sedghi, told Mr. Payan that he uses MyEtudes in his class, an online learning management system.  Mr. Payan told Mr. Sedghi that MyEtudes is not accessible to blind students, because it is not compatible with JAWS.  Mr. Sedghi responded, "that is your problem, not mine."

57.    Mr. Payan ultimately enrolled in a different section of Introduction to Psychology.  This professor, too, used MyEtudes, but when Mr. Payan explained to her that the program was inaccessible to him, she accommodated him by allowing Mr. Payan to submit assignments to her directly in Microsoft Word, rather than requiring that he post them on the class MyEtudes site.  The professor also downloaded other students' assignments and responses from MyEtudes and provided them to Mr. Payan in Microsoft Word.  While Mr. Payan was thus able to complete his Psychology coursework, the inaccessibility of the MyEtudes software used by LACC created additional burdens and hurdles for both Mr. Payan and his professor to overcome.  Moreover, the inaccessibility of the MyEtudes software used by LACC prevented Mr. Payan from engaging and collaborating with his classmates on an equal basis, in real-time.

58.    On information, professors in other subjects at LACC routinely use MyEtudes, as well.

Amended Complaint:  ADA; 1973 Rehabilitation Act
Case No.:  2:17-cv-01697

### D.  Spring 2017 Semester at LACC

59.     Mr. Payan is currently enrolled in Statistics 227 at LACC.  He must complete a statistics course in order to graduate.

60.     The Statistics 227 professor often writes on the board during class.

61.     Mr. Payan is unable to see what the professor writes, and thus unable to take notes himself.

62.     LACC will not provide Mr. Payan with a notetaker or reader for Statistics 227.  Mr. Payan is therefore forced to ask his fellow students for their notes.  While they do sometimes give Mr. Payan their notes, they often forget to follow through and send them.

63.     As a result of LACC's refusal to provide Mr. Payan with auxiliary aids and services and required accommodations, Mr. Payan is falling further and further behind in Statistics 227, and is concerned that he may fail the class.  Mr. Payan's performance does not reflect his ability, but rather LACC's failure to provide Mr. Payan with equally effective communication of the educational content available to his non-disabled classmates

### II.     Plaintiff Portia Mason

### A.     Fall 2015 Semester at LACC

64.     Ms. Mason first enrolled at LACC to take classes in Fall 2015.  Prior to enrolling, she registered with OSS and complied with LACC's requirements for requesting accommodations and modifications of school policies where necessary in order to have an opportunity to succeed equal to that of non-disabled students.

65.     Although Ms. Mason's educational counselor knew that she was blind and would need accommodations to access in-class written material on the board, in PowerPoint presentations, and in physical handouts, LACC offered her only a tape recorder to use in class.  LACC did not provide Ms. Mason with a notetaker or

reader, nor did the school ensure that Ms. Mason received all in-class written material in an accessible format before it was used in class so she could follow along with the other students.

66.     On information and belief, LACC also failed to notify Ms. Mason's instructors prior to the start of classes that Ms. Mason would be in their classes and would require accommodations and/or modifications in order to participate in class on an equal basis.  Even after the start of classes, Ms. Mason's instructors routinely failed to make in-class written and graphic material available and accessible to Ms. Mason, thereby excluding her from class activities and preventing her from participating in class discussions.

67.     When Ms. Mason asked other students with disabilities about notetakers and readers specifically, they told her that LACC did not offer either. Because she knew it would be a futile gesture, Ms. Mason did not request that LACC provide her with a notetaker or reader.

### 1.     Introduction to Psychology

68.     Ms. Mason took Introduction to Psychology in Fall 2015, a requirement for completing her certificate in drug and alcohol counseling.

69.     April Pavlick, Psy.D., who taught Ms. Mason's Introduction to Psychology class, routinely used PowerPoint slides during class lectures that relied on graphic material but did not describe or label the graphics.  Thus, Ms. Mason was often prevented from understanding Dr. Pavlick's lectures because she could not see the slides used.

70.     Ms. Mason attempted to solve this accessibility problem herself by downloading Dr. Pavlick's PowerPoint slides to her computer, but because they downloaded as unformatted PDF pages, Ms. Mason still could not understand the graphics used by Dr. Pavlick.

71.     Ms. Mason feared retaliation if she complained too much to the instructor who graded all of her work in Introduction to Psychology.

72.     As a result of Dr. Pavlick's use of inaccessible in-class materials and failure to accommodate Ms. Mason, Ms. Mason was unable to fully learn the class material and received a "D" in the class.

### B.     Spring 2016 Semester at LACC
### 1.     Abnormal Psychology

73.     During Spring 2016, Ms. Mason registered for Abnormal Psychology, which was taught by instructor Blythe Daniels.

74.     Ms. Daniels regularly used handouts in class that included unlabeled graphic material.  She did not utilize a website where students could review and download in-class materials, and she also did not use email, which made it very difficult for Ms. Mason to communicate with her.

75.     Although Ms. Daniels knew that Ms. Mason was blind and did not have a notetaker or reader, she did nothing to accommodate Ms. Mason's inability to see the graphics used in class.  Ms. Daniels also failed to provide Ms. Mason with in-class materials ahead of time so that Ms. Mason could convert them to an accessible format.  Further, Ms. Daniels did not permit students to talk in class, which prevented Ms. Mason from asking her fellow students to describe the graphic material used in class.

76.     Ms. Daniels also required that students use library and research materials that were not accessible to screen readers.  This requirement, which Ms. Daniels did not modify for Ms. Mason, resulted in Ms. Mason being unable to complete required research assignments.

77.     Ms. Mason followed protocol for students needing exam accommodations at LACC and pre-scheduled her Abnormal Psychology midterm

exam with an OSS proctor.  When Ms. Mason arrived to take the exam, she learned that Ms. Daniels had refused to email or walk the exam over to OSS.  Ms. Mason had to reschedule taking the exam, and was also excluded from the next class lecture discussing the correct answers to the exam questions because she had not been able to take the test at the same time as the rest of the class.

78.     When it came time for the final exam in Abnormal Psychology, Ms. Daniels once again failed to send a copy of the test to OSS for Ms. Mason. Moreover, staff at OSS refused to contact Ms. Daniels and request a copy of the final exam, and instead told Ms. Mason that she had to obtain a copy of the exam herself.

79.     As Ms. Mason feared, Ms. Daniels at first refused to give her a copy of the exam.  Ms. Daniels finally did so grudgingly, warning Ms. Mason that she would check with OSS, and intimating that she thought Ms. Mason would somehow cheat by virtue of having a copy of the exam, even though the very reason Ms. Mason needed a copy of the exam for OSS was that she could not read the exam by herself.

80.     Although Ms. Mason was ultimately able to take her Abnormal Psychology final exam, she was not able to do so as originally scheduled, and Ms. Daniels's uncooperative behavior and refusal to simply email the exam to OSS caused Ms. Mason a great deal of unnecessary emotional stress and anxiety.

81.     As a result of Ms. Daniels's use of inaccessible in-class materials, failure to accommodate Ms. Mason, and failure to modify policies and procedures, Ms. Mason received a "D" in Abnormal Psychology.

## 2.     Introduction to Psychology

82.     During the Spring 2016 semester Ms. Mason also re-enrolled in Introduction to Psychology in the hopes of earning a passing grade in the course.

83.     Once again, Ms. Mason was faced with a lack of accessible class material, including PowerPoint presentations, that prevented her from pursuing the course on equal footing with her peers.

84.     In addition, Ms. Mason had the added stress of a lack of accommodations in test-taking.  One of the tests given in the class required that students draw their answer to one of the questions.  The instructor had failed to send OSS an exam with an alternate question that did not require drawing in order to accommodate Ms. Mason's disability.  The OSS proctor told Ms. Mason to skip the question and said she would talk to the instructor about the inaccessible question. Ms. Mason was never provided an alternate question that would have permitted her to earn credit for a correct answer.

85.     Due to her concern that she would fail Introduction to Psychology again because the course materials and tests were inaccessible, Ms. Mason did extra credit work that she would not have felt compelled to complete if she had been provided with the necessary accommodations.

86.     Ms. Mason ultimately received a "C" in the course.  LACC's failure to provide her with accessible materials, a notetaker, and a reader deprived her of an equal opportunity to master the content of the class and as a consequence, her grade did not reflect the industry, intelligence, and skill she had to bring to the material.

87.     LACC's denial of accessible educational materials and auxiliary aids and services to Ms. Mason and its failure to modify its policies and procedures to prevent discrimination denied her equal access to its programs and activities, and failed to provide her with equally effective communication, thereby having a detrimental effect on Ms. Mason's ability to succeed in her educational pursuits.

1

## C.   LACC Fails to Provide Accessible Technology

2

3    88.    As with most modern institutions of higher learning, many of LACC's

4    campus library and research materials are accessed online.  However, LACC has

     failed to convert the vast majority of research material into accessible formats.

5

6    89.    Many of LACC's psychology instructors use a research database called

7    the Behavioral Psychology Database for research assignments.  The database is

8    accessed remotely by signing onto it online from a computer.  The software for

     signing onto the Behavioral Psychology Database and doing research is not

9    accessible to screen-readers like JAWS.

10

11    90.    Because she needed to use the Behavioral Psychology Database for

12    class assignments, Ms. Mason contacted the LACC IT department to ask for access

     to the database.  The IT staff person with whom she spoke told Ms. Mason to go to

13    OSS to request access.  However, OSS has no ability to make the research materials

14    such as the database accessible and took no action.

15

16    91.    In addition, the version of JAWS installed in the main campus library

17    at LACC is a "test version" that is not fully functional and closes down after 45

     minutes of use.

18

19    92.    On information and belief, Defendant knows that the library JAWS

20    program is a test version, and that much of the material at the library is not

     formatted to be read by screen readers.  Despite this knowledge, Defendant has

21    failed to convert online materials into accessible formats or buy a complete version

22    of JAWS for use on library computers.

23

24    93.    Similarly, on-campus computers in the administration building, the

     financial aid office, class labs, and other educational facilities at LACC are not

25    equipped with screen-reading software or other modifications that would enable

26

27

28

Amended Complaint:  ADA; 1973 Rehabilitation Act
Case No.:  2:17-cv-01697

blind students to access the computers and the concomitant services that those offices provide.

94.     On information and belief, all students with disabilities at LACC are told to seek help from OSS when they have problems related to technology accessibility, even when the request at issue has nothing to do with the specific services offered by OSS.  This discriminatory policy and practice denies students with disabilities equal access to and benefit from LACC services and programs.

**III.    LACCD's Deliberate Indifference to Equal Educational Opportunity**

95.     As technology and digital content has permeated post-secondary education, there has been an extraordinary opportunity for students with print disabilities to have equal and mainstream access to the same content at the same time as everyone else.  Unfortunately, at some institutions, like LACCD, the failure to insist on accessible technology and content, and the failure of leadership to require faculty to provide accessible copies of assignments, graphics that will be displayed in class, and class notes has resulted in greater inequality of access than existed when everything was printed on paper.  This failure then requires vastly inferior alternate auxiliary aids and services, such as assistants/notetakers/readers who, under the best of circumstances, produce less effective communications and who, more often, are insufficiently trained and insufficiently available.

96.     Through a combination of assiduous advocacy, education and litigation, the NFB and other disability rights groups and state and federal agencies have attempted to focus the attention of post-secondary education on meeting the legal and moral imperatives raised by these developments.  The Departments of Justice and Education wrote the presidents of all American post-secondary institutions in June 2010 to advise them that

> Requiring use of an emerging technology in a classroom environment when the technology is inaccessible to an entire population of

Amended Complaint:  ADA; 1973 Rehabilitation Act
Case No.:  2:17-cv-01697

individuals with disabilities – individuals with visual disabilities – is discrimination prohibited by the Americans with Disabilities Act of 1990 (ADA) and Section 504 of the Rehabilitation Act of 1973 (Section 504) unless those individuals are provided accommodations or modifications that permit them to receive all the educational benefits provided by the technology in an equally effective and equally integrated manner.

97.   In 2000 – ten years prior to the letter from the Departments of Justice and Education – the Chancellor's Office of California Community Colleges issued guidelines for ensuring that instructional materials are accessible to blind students. Those guidelines note that, under the ADA, a community college must "take appropriate steps to ensure that communications with persons with disabilities are as effective as communications with others."  As part of this obligation, "colleges are required to provide access to all instructional materials or other information resources regardless of whether the source material is in printed, electronic, or some other form."

98.   Unfortunately, despite this longstanding knowledge of its legal obligation to provide equally effective communication to all students, LACCD has expanded to every aspect of education its use of emerging technology that is inaccessible to an entire population of individuals with a disability, who, like Mr. Payan and Ms. Mason, cannot see, and without giving them the auxiliary aids and services that would permit them to receive all the educational benefits provided by the technology, much less in an equally effective and equally integrated manner.

99.   On information and belief, LACCD has taken no action to identify and replace inaccessible technology and digital content with accessible technology and content.

## IV.   Impact of Discrimination on Mr. Payan and Ms. Mason

100.   Mr. Payan's and Ms. Mason's experiences have been humiliating and demoralizing.  They have not been given an equal and independent opportunity to

learn. The grades they have received do not accurately reflect their knowledge and skill, but instead reflect only the discrimination they have suffered.

101. As a result of the barriers LACCD has forced Mr. Payan and Ms. Mason to encounter their graduation dates will be delayed. This means that their ability to transfer to four-year institutions and complete their courses of study has been delayed, as well.

102. Mr. Payan and Ms. Mason are emotionally exhausted, angry, depressed, and anxious from their battles with LACCD for the right to an equal opportunity to learn.

103. Mr. Payan and Ms. Mason have paid tuition for an inferior educational experience while LACCD has failed to uphold its obligations. LACCD has breached its promise to Mr. Payan and Ms. Mason to be "affordable, accessible and practical," as stated on its website. LACCD has failed to train them in an equally effective manner and prepare them to enter the job market alongside their sighted classmates.

## COUNT I
### Violations of Title II of the Americans with Disabilities Act
### 42 U.S.C. § 12131 et seq.

104. Plaintiffs incorporate the allegations in the preceding paragraphs, as if alleged herein.

105. The Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq., guarantees equal access for qualified individuals to the benefits of the services, programs, or activities of a public entity. 42 U.S.C. § 12132 et seq.

106. Title II of the ADA mandates, inter alia, that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

107.   Furthermore, such public entities "shall furnish appropriate auxiliary aids and services where necessary to afford individuals with disabilities, including applicants, participants, companions, and members of the public, an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity of a public entity."  28 C.F.R. § 35.160(b)(1).

108.   Under Title II of the ADA, it is discrimination to require use of an emerging technology in a classroom environment when the technology is inaccessible to blind individuals.

109.   LACCD, as a state-chartered and directed community college district, is a public entity under Title II of the ADA.

110.   Classes and facilities at LACCD campuses are services, programs, or activities provided by LACCD.

111.   Mr. Payan and Ms. Mason are individuals with disabilities under the ADA.

112.   Mr. Payan and Ms. Mason were admitted based on all general requirements to be students at LACCD and thus are qualified individuals entitled to the protections of the ADA.

113.   The NFB and the NFB of California are organizations of blind persons who seek equal access to educational opportunities at LACCD.

114.   LACCD has failed and is failing to meet its obligations to provide blind students with educational opportunities that are equal to those provided to students without disabilities.  LACCD has excluded and continues to exclude blind students, including Mr. Payan and Ms. Mason, from participation in, denied them the benefits of, or otherwise discriminated against them in its facilities, services, programs, or activities.

115.   LACCD's actions constitute intentional discrimination on the basis of a disability in violation of the ADA, in that LACCD: (1) has failed to maintain policies and procedures to ensure compliance with Title II, specifically policies that provide equal access and effective communication to individuals with disabilities; (2) has failed to ensure that communications with blind students, specifically Mr. Payan and Ms. Mason, are as effective as communications with non-disabled peers; (3) has failed to provide auxiliary aids and services or to modify policies and procedures to prevent discrimination; (4) has failed to provide reasonable modifications of policies, practices, and procedures; (5) has purchased and deployed new equipment and software that is inaccessible to blind students, including Mr. Payan and Ms. Mason, after the effective date of the ADA; (6) has failed to provide educational opportunities and educational information in a manner that is timely, equally effective, and equally integrated; and (7) has otherwise discriminated against blind students, including Mr. Payan and Ms. Mason.

116.   As a result of LACCD's actions, Mr. Payan and Ms. Mason have suffered and continue to suffer irreparable harm.  They have suffered and continue to suffer from discrimination and unequal access to LACCD's programs and activities, and will not be graduated and enter the job market on-time, and with the credentials they could have earned had they been given an equal opportunity.  They have been and continue to be denied full access to the knowledge intended to be communicated in their classes.

117.   The actions by LACCD were done intentionally or with deliberate indifference to the protected rights of blind students, including Mr. Payan and Ms. Mason.

118.   LACCD's failure to meet its obligations to provide blind students with educational opportunities equal to those provided to students without disabilities

constitutes an ongoing and continuous violation of the ADA and its supporting regulations.  Unless restrained from doing so, LACCD will continue to violate the ADA.  Unless enjoined, LACCD's conduct will continue to inflict injuries for which Plaintiffs have no adequate remedy at law.

119.   Unless the requested relief is granted, Mr. Payan and Ms. Mason and other blind students at LACCD will continue to be discriminated against and denied equal access to the educational opportunities, facilities, services, programs, or activities of LACCD, and will be unlawfully burdened in their pursuit of higher education.

120.   The ADA authorizes injunctive relief as appropriate to remedy acts of discrimination against persons with disabilities. 42 U.S.C. § 12188(a)(1).

121.   Mr. Payan and Ms. Mason are entitled to injunctive relief, as well as compensatory damages and reasonable attorney's fees and costs.

**COUNT II**
**Violations of § 504 of the Rehabilitation Act of 1973**
**29 U.S.C. § 794 et seq.**

122.   Plaintiffs incorporate by reference all allegations contained in the preceding paragraphs, as if alleged herein.

123.   Section 504 of the Rehabilitation Act mandates that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  29 U.S.C. § 794(a).

124.   Section 504 defines "program or activity," in pertinent part, as "a college, university, or other postsecondary institution or a public system of higher education[]."  *Id*. § 794(b)(2)(A).

Amended Complaint:  ADA; 1973 Rehabilitation Act
Case No.:  2:17-cv-01697

125.   Such federally funded programs and activities must provide aids and services that "afford handicapped persons equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement, in the most integrated setting appropriate to the person's needs."  45 C.F.R. § 84.4(b)(2).

126.   Under Section 504, it is discrimination to require use of an emerging technology in a classroom environment when the technology is inaccessible to blind individuals.

127.   LACCD receives federal grants, contracts, and other financial assistance, thereby subjecting itself to the requirements of Section 504.

128.   Mr. Payan and Ms. Mason are blind and were admitted based on all general requirements to be students at an LACCD campus.  They are therefore qualified individuals with a disability under Section 504.

129.   The NFB and the NFB of California are membership organizations whose blind members seek equal access to the educational opportunities of LACCD.

130.   LACCD has, solely by reason of their disabilities, excluded blind students, including Mr. Payan and Ms. Mason, from participation in, denied them the benefits of, and otherwise discriminated against them in its facilities, services, programs, or activities.  LACCD's violation of Section 504 and its regulations has denied and continues to deny blind students, including Mr. Payan and Ms. Mason, an equal opportunity to access the educational benefits LACCD offers as a public community college district.

131.   LACCD's actions constitute intentional discrimination on the basis of a disability in violation of Section 504, in that LACCD: (1) has failed to maintain policies and procedures to ensure compliance with Section 504, specifically policies that provide equal access and effective communication to individuals with

disabilities; (2) has failed to ensure that communications with blind students, specifically Mr. Payan and Ms. Mason, were as effective as communications with non-disabled students; (3) has failed to provide auxiliary aids and services or to modify policies and procedures to prevent discrimination; (4) has failed to provide reasonable modifications of policies, practices, and procedures; (5) has purchased and deployed new equipment and software that is inaccessible to blind students, including Mr. Payan and Ms. Mason, after the effective date of Section 504; (6) has failed to provide educational opportunities and educational information in a manner that is timely, equally effective, and equally integrated; and (7) has otherwise discriminated against blind students, including Mr. Payan and Ms. Mason.

132.   As a result of LACCD's actions, Mr. Payan and Ms. Mason have suffered irreparable harm.  They have suffered and continue to suffer from discrimination and unequal access to LACCD's programs and activities, and likely will not be graduated and enter the job market on-time, nor with the credentials they might have earned had they been granted an equal opportunity.  Furthermore, as a result of LACCD's actions, Mr. Payan's and Ms. Mason's grades do not accurately reflect their knowledge and skills, and they have been and continue to be denied full access to the knowledge intended to be communicated in their classes.

133.   The actions by LACCD were done intentionally or with deliberate indifference to the protected rights of blind students, including Mr. Payan and Ms. Mason.

134.   By failing to meet its obligations to provide blind students with educational opportunities that are equal to those provided to students without disabilities, LACCD is subjecting Mr. Payan and Ms. Mason and other blind students to discrimination and/or excluding them from participation in and denying them the benefit of the educational opportunities, facilities, services, programs, or

activities offered by LACCD.  All Plaintiffs are entitled to injunctive relief, as well as reasonable attorneys' fees and costs.  Mr. Payan and Ms. Mason are also entitled to compensatory damages.

## CLAIMS FOR RELIEF

135.   WHEREFORE, Plaintiffs Mr. Payan, Ms. Mason, the NFB, and the NFB of California demand judgment against the Defendant as follows:

(a)   A permanent injunction (1) prohibiting LACCD from violating Title II of the ADA and the Rehabilitation Act, and (2) requiring LACCD to provide fully accessible textbooks, course materials, and software in a timely manner;

(b)   A declaration that Defendant has and continues to violate Title II of the ADA and the Rehabilitation Act;

(c)   An award to Mr. Payan and Ms. Mason of compensatory damages;

(d)   An award to Plaintiffs of their reasonable attorneys' fees and costs; and

(e)   An award of such other and further relief as the Court may deem just.

Dated:  March 31, 2017                 **BARBOSA GROUP**

By:   _P Barbosa_____
      Patricia Barbosa, Esq.
      Ayman Mourad, Esq.

**BROWN GOLDSTEIN & LEVY, LLP**

By:   _____/s/_____
      Daniel F. Goldstein, Esq.
      Sharon Krevor-Weisbaum, Esq.
      Joseph B. Espo, Esq.
      Jean M. Zachariasiewicz, Esq.

      *Attorneys for Plaintiffs*

Amended Complaint:  ADA; 1973 Rehabilitation Act
Case No.:  2:17-cv-01697

33

1

## **DEMAND FOR JURY TRIAL**

2
Plaintiffs hereby demand a jury trial for all claims for which a jury is permitted.

3

4
Dated:  March 31, 2017                    **BARBOSA GROUP**

5

6
By: _____

7
Patricia Barbosa, Esq.
Ayman Mourad, Esq.

8

9
*Attorneys for Plaintiffs*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Amended Complaint:  ADA; 1973 Rehabilitation Act
Case No.:  2:17-cv-01697

34