Patricia Barbosa (SBN 125685)
pbarbosa@barbosagrp.com
**BARBOSA GROUP**
8092 Warner Avenue
Huntington Beach, California 92647
Phone: (714) 465-9486

Sharon Krevor-Weisbaum
skw@browngold.com
Joseph B. Espo
jbe@browngold.com
Jean M. Zachariasiewicz
jmz@browngold.com
**BROWN, GOLDSTEIN & LEVY LLP**
120 East Baltimore Street, Suite 1700
Baltimore, Maryland 21202
Phone: (410) 962-1030

*Attorneys for Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

ROY PAYAN, PORTIA MASON, THE NATIONAL FEDERATION OF THE BLIND, INC., and THE NATIONAL FEDERATION OF THE BLIND OF CALIFORNIA, INC.,

Plaintiffs,

vs.

LOS ANGELES COMMUNITY COLLEGE DISTRICT,

Defendant.

Case No.: 2:17-cv-01697-SVW(SKx)
**Civil Rights**

**TRIAL TESTIMONY DECLARATION OF PETER BOSSLEY**

Pretrial Conference Date: 2/12/2018
Time: 3:00 p.m.
Location: 350 W. 1st Street
Los Angeles, CA 90012
Courtroom 10A

**Trial Date: Feb. 20, 2018**

My name is Peter Bossley. I am more than 18 years old, am competent to be a witness, and testify from my own personal knowledge regarding the facts set forth in this Declaration.

I. Qualifications

1. I am the Director of the Ohio State University's ("OSU") Digital Accessibility Center, a position I have held since November, 2016.[1] In that position, under the general direction of the University ADA coordinator/Section 504 Compliance Officer, I lead the campus digital accessibility compliance program. I am the primary technical expert on digital accessibility issues on campus and lead accessibility evaluation and remediation efforts for digital information and services that are being developed by campus units, being considered for purchase, or already implemented on campus.

2. OSU is a major research university with approximately 90,000 undergraduate and graduate students.

3. In my position I maintain, recommend changes to, and implement OSU Digital Accessibility Policy and select technical standard(s) for use in ensuring the university complies with applicable Federal and State laws and regulations. Current standards are based on the Web Content Accessibility Guidelines (WCAG) 2.0 at Level AA. Those standards are further explained below.

4. I guide vendors and developers of digital information and services including web and mobile applications, computer software, and other digital classroom content, e.g. audio and video, to bring them in compliance with digital accessibility standards and accessible development practices.

[1] The term Accessible, when used in this report, means the ability of a person with a disability to acquire the same information, engage in the same interactions, and enjoy the same services as a person without a disability in an equally effective and equally integrated manner, with substantially equivalent ease of use.

5. I design and implement training and purchasing controls to assist campus units in compliance with university standards.

6. I advise campus units of their obligations under the university Digital Accessibility Policy. I assist campus units in seeking temporary exceptions when remediation is not currently possible including the formation of accommodation plans, with the goal of providing equally effective access to the digital information or service with equivalent ease of use.

7. I lead the selection and implementation of campus-wide accessibility tools and training and supervise accessibility specialist support staff.

8. From August 2013 until beginning my current position I was an accessibility analyst at OSU. In that position I led the effort to adopt and implement a strategy to address accessibility in enterprise level deployed systems, applications, software, and related items. I planned evaluations based on system risk and usage – that is, evaluations were prioritized to make sure that those with a high risk of inaccessibility and those most frequently used were addressed first. I developed a process for accessibility evaluations of new purchases and existing systems and provided consulting services to internal and external development teams on compliance with accessibility standards to improve on functional accessibility of user interfaces.

9. In collaboration with the Director of the OSU Web Accessibility Center, I evaluated major enterprise systems for compliance with the OSU Minimum Web Accessibility Standards, which govern the OSU Web Accessibility Policy Standards based on WCAG 2.0 AA and Section 508. Major systems evaluated included the enterprise human resources and student information systems including People Soft Campus Solutions. I implemented processes to insure that accessibility language, requirements, and questions were added to all RFP bid templates, so that new purchases could be evaluated for accessibility compliance prior to acquisition. I also

assisted campus units in the formation of IT Accessibility exemptions with accommodation plans for partially inaccessible systems as a bridge to allow equivalent ease of use for university constituents with disabilities and served as subject matter expert to University ADA Coordinator/Section 504 Compliance officer to recommend approval or denial of exemption requests.

10. From 2006 through August 2013 I was a system developer and engineer at OSU's Office of Research Information Systems.

11. I am also the President of Accessibility Ally, Inc., a company that provides consulting services to organizations on development of accessible websites, applications, and online content. In that role I provide training to web and application developers on designing, coding, and testing of user interfaces for functional accessibility and usability for persons with disabilities.

12. For Accessibility Ally, Inc. I have provided remediation advice, evaluations, and code reviews for existing websites, web applications, and mobile applications for functional usability/accessibility and conformance with accepted industry standards for digital accessibility (WCAG 2.0 Levels A and AA and Section 508). I assist clients in selection of accessible content management platforms and other web-based and digital systems.

13. I hold the following certifications: Certified Professional in Accessibility Core Competencies; International Association of Accessibility Professionals and the Certified Professional in Web Accessibility; Microsoft Certified IT Professional; Enterprise Administrator, Windows Server 2008; Microsoft Certified Technology Specialist: Windows Server 2008 Network Infrastructure, Windows Server 2008; Applications Infrastructure, Configuration, Windows Server 2008 Active Directory, Configuration; and Microsoft Certified Systems Engineer, (MCSE) Windows Server 2003.

14. A copy of my full CV is attached as Exhibit 1.

15. I am one of Plaintiffs' experts in this matter.

16. I have previously served as a consulting expert in litigation but have not previously testified.

II. Use of Computers by Individuals Who Are Blind

17. Generally, blind computer users access information through the use of a class of software known as a screen reader, of which JAWS (an acronym for Jobs Access With Speech) is the most common.

18. JAWS converts digital code to either synthesized speech or braille on a refreshable braille display, or both, as the user chooses.

19. In order for JAWS to work, however, the underlying program or web page must be coded to certain standards that permit the content and interactions to be available to JAWS. Absent coding to the proper standards, JAWS will not properly read pages.

20. Making websites or other software usable by blind individuals also requires that "form fields," which are fields where a user might enter his name, select something from a drop-down menu, or perform a similar activity, must be properly labeled. Without such form fields being properly labeled, upon getting to a form field a JAWS user would either only hear the words "edit box," or something similar, instead of a meaningful description of the field.

21. Because screen readers are unable to describe graphics other than to announce that a graphic is present, web developers have the ability to add alternative text ("alt text") to describe a graphic so that screen readers and other assistive technologies can present that information to users. For example, a developer could provide alt text in a daily newspaper that would say "photograph of President Trump."

22. When information is presented to screen reader users in table format, the screen readers rely on what are called header ID associations to determine what data

cell is associated with what data grouping. Web developers can associate each data cell with both the column and row title so that screen reader users navigating the data cells can determine the appropriate data and content relationships. As a simple illustration, when a JAWS user's cursor moves through a table layout of a calendar that has marked across the top "Day of the Week" and down the side "Date," each box will announce both the day of the week and the date of the month, instead of just the date. Without such a layout, a screen reader user would only know that the box he was in is labeled the 9th, without knowing the day of the week.

23. A group known as the World Wide Web Consortium ("WC3") has adopted a set of standards for programming to achieve accessibility for web-based programs. Violations of WCAG present functional barriers for persons with disabilities and impact their ability to acquire the same information, engage in the same interactions, and enjoy the same services as a person without a disability in an equally effective and equally integrated manner, with substantially equivalent ease of use.

24. I have personally performed at least 200 evaluations of software and websites for accessibility over the past 4 years.

III. Work In This Case

25. In my work on this case I reviewed the following depositions:

- Deposition transcript of Barbara Vasquez, Monday, July 31, 2017
- Deposition transcript of John Al-Amin, Ph.D., Wednesday, August 9, 2017
- Deposition transcript of Kian Kaviani, Tuesday, August 1, 2017
- Deposition transcript of Juan Mendoza, Wednesday, August 30, 2017
- Deposition transcript of Donna Morley, Wednesday, August 30, 2017
- Deposition transcript of Randy Anderson, Tuesday, September 5, 2017
- Deposition transcript of Blythe Daniel, Wednesday, September 6, 2017
- Deposition transcript of David Sedghi, Tuesday, August 15, 2017

- Deposition transcript of Daniel Wayne Walden, Ph.D., Wednesday, August 9, 2017
- Deposition transcript of Kelvin Luong, Wednesday, August 2, 2017
- Deposition transcript of Robert Dominick, Friday, August 4, 2017
- Deposition transcript of Roy E. Payan, Friday, September 8, 2017
- Deposition transcript of Ryan Kushner, Wednesday, September 6, 2017
- Deposition transcript of Jorge Mata, Wednesday, September 26, 2017
- Deposition transcript of Thelma Day, Thursday, September 7, 2017
- Defendant Los Angeles Community College District's Responses to Plaintiff Portia Mason's First Set of Interrogatories
- Defendant Los Angeles Community College District's Responses to Plaintiff Roy Payan's First Set of Interrogatories
- The Ohio State University Minimum Web Accessibility Standards
- The Ohio State University Request for Alternative Access Exception
- University of Washington IT Accessibility Guidelines
- Miami University Accessible Technology Policy (MUPIM 19.7)
- Tennessee Board of Regents Accessibility Initiative
- Joint "Dear Colleague" Letter: Electronic Book Readers, United States Department of Education, Office for Civil Rights, June 29, 2010
- Los Angeles Community College District Administrative Regulation B-33 Web Accessibility Standards and Guidelines
- LACCD Administrative Regulation B-34 ADA Self-Evaluation and Transition Plan 2015
- Los Angeles Community College District Administrative Regulation E-100
- Amended Complaint
- Los Angeles City College (LACC) Alternate Media Production Policy

26. In my role as an expert in this case, I also reviewed software deployed at LACCD for student use ("student facing"), including PeopleSoft Campus Solutions (a Student Information Systems application), the LACCD website, MyMathLab and, Etudes.

27. In my capacity as an expert, I evaluated the functional accessibility to blind students of digital content in use at the Los Angeles Community College District ("LACCD"), including websites, web applications, and online documents. In addition to code reviews, evaluation was complemented by testing with current screen readers in common use by blind students, including VFO Group (formerly Freedom Scientific) JAWS for Windows, and Non Visual Desktop Access from NV Access. The reviews below were conducted on publically available websites, access provided through discovery, or through the use of Plaintiffs' logon credentials. The software was tested against standards set by the World Wide Web Consortium Web Content Accessibility Guidelines (WCAG) 2.0 at conformance level AA. The goal of those standards is to make sure that online content is functionally accessible to individuals with disabilities. Violations of the WCAG standards create barriers for persons with disabilities and interfere with their ability to acquire the same information, engage in the same interactions, and enjoy the same services as a person without a disability in an equally effective and equally integrated manner, with substantially equivalent ease of use.

28. In my opinion, to a reasonable degree of professional certainty, all of the student-facing software applications I tested present accessibility barriers for blind students using screen readers. A discussion of each follows.

A. PeopleSoft Campus Solutions

29. PeopleSoft Campus Solutions is a popular Student Information Systems (SIS) application used by educational institutions. Its role in campus life can vary

from institution to institution but it is commonly used for some of the most important interactions a student needs to complete:

- Course registration
- Viewing grades
- Viewing class schedules
- Financial aid (both applying for and accepting)
- Paying fees
- Reviewing holds (issues ranging from minor to serious, but nearly all requiring action on the student's part).

i. General Issues

30. Based on examination I was able to determine that the application has a minimal heading and landmark structure, making effective navigation by screen reader-reliant users impossible.

31. The navigation menus at the top of the screen, My Profile and Actions, are not accessible to screen reader users. While it is possible for screen-reader users to open the menu, they are not notified that the menu has opened and are not placed on the first item in this list of options. See screen shot below.




32. The Academics and Finances menus have the same issues as above.

33. Interfaces that are linked from the dashboard make heavy use of tables for layout, making efficient navigation and understanding of organization of content impossible for screen reader users.

34. Samples of other discovered issues are listed below, this list is not exhaustive, and similar issues are likely to be present throughout other interfaces of this application that were not reviewed.

ii. My Dashboard

35. Screen reader users are unable to access the links to any holds presented in the dashboard view; in fact, they are entirely unaware of their existence.




This page lacks any landmark structure and has minimal heading structure.

36. The table in the "My Account" section (below) has improper header ID association, leading to screen reader users being confused as to the content relationships in the table.



iii. Search Classes

37. Many of the fields throughout this interface, such as the one depicted below, lack properly associated labels, leading to screen reader users being unable to identify their purpose.




38. The Select Subject interface (below) is inaccessible to screen reader users because the links to select a subject are all "select." Screen reader users would be unable to determine what they were selecting.




39. The Additional Search criteria expand/collapse (below) is not usable by screen reader users because it does not report its state, e.g. expanded or collapsed, to screen reader users.




40. The Class Search results page (below) relies on tables for layout purposes, leading to significant issues for screen reader navigation. Beyond this, each class section is arranged in a table of its own, making comparison between available options impossible or extremely difficult for screen reader users.




B. Canvas

41. The Canvas Learning Management System (LMS) itself is generally accessible, but the institution must take care to implement it properly to fully ensure that the entire experience for students is accessible.

42. Canvas supports a wide variety of third party integrations through Learning Tools Interoperability (LTI). LTI is a standard created by the IMS Global

Learning Consortium with the purpose of allowing educational tools to be integrated in a LMS. The accessibility of any given LTI tool is not guaranteed, and institutions should evaluate these integrations for their accessibility prior to implementing them.

43. Canvas allows faculty and instructors to upload a variety of types of digital documents, as well as allowing them to imbed audio and video content in their courses. As a result, institutions must implement appropriate training for instructional staff such that they understand their obligation to provide accessible digital content and appropriate accommodations, for example, audio description for videos, as applicable, as well as resources to enable them to meet those obligations.

C. LACCD Website

44. Based on my review of 7 of the pages, it is my opinion that the website in general lacks a robust heading and landmark structure. Where headings do exist, they are usually not sufficient to provide a screen reader user with a robust navigation aid to the content of the page. In addition, headings sometimes do not descend logically, leading to additional confusion as to the organization and relationship of content areas. Most pages in the site lack any landmark structure.

45. I am able to reach that opinion from my selection of pages tested because most websites are built from templates, to which others put information. It is more likely than not that the same defective templates on the pages I tested are used throughout the LACCD website. A few templates are very often responsible for a large number of individual pages. That applies to the rest of my opinions relating to LACCD, other than those that come directly from my tests.

46. Throughout the site, logical semantic structuring of content is not used to allow screen reader users to have information about content relationships and robust navigation mechanisms. For example, the news items on the home page should be a single unordered list of the news items such that screen reader users know where the

news articles begin and end. Instead, each item is its own list, leading to potential confusion for screen reader users navigating the content.




47. Some links on the homepage lack any descriptive alternative text, leading to the inability of screen reader-reliant users to interpret the purpose destination of the link, e.g. the links to the DCOC annual report.




This report is an untagged, unstructured PDF that presents navigation and understandability issues for blind users.

48. The expand/collapse that provides access to "Our Nine Colleges" is not accessible to blind users because it does not report its state (expanded or collapsed) to screen readers.




D. MyMathLab

i. Pearson Home Page

49. The following issues are present with this page's landmark structure:

- The "Pearson | MyLab | Mastering" graphic logo is contained within a navigation landmark although it does not denote a navigation region. Navigation landmarks are reserved for identifying groups of links intended for website navigation.
- The "Browse By Discipline" search button is contained within a landmark of type navigation, although it does not serve that purpose (see above). The more appropriate landmark identification for this region would be a search landmark as it relates directly to a search function.
- This page lacks a main landmark that denotes the beginning of the main content.

50. The heading structure presents the following accessibility issues:

- The "Improving results" heading is an <h2> while the heading below it, "Engage students effectively…" is an <h1>. The <h1> should denote the beginning of the main content and this leads to confusing navigation for screen reader-reliant users.
- There is a "Site Map" <h1> that is not visible and intended for screen reader-reliant users only. As it does not denote the beginning of the main

content, it should not be an <h1> because it is disorienting and confusing to screen reader-reliant users during navigation.

- The “Improving results” heading is a focusable element. Text elements should not be focusable because they confuse screen reader-reliant users due to the expectation that focusable elements are interactive (e.g., form controls, buttons, and links).




- Many links lack descriptive link text and for these links, it is not possible to determine their purpose from the link text alone, e.g., “Learn more”, “Student”, “More”, “Students”, “Thousands of Educators.” The link doesn’t tell you what you can learn more about.




ii. Sign In Page

51. It is not possible for screen reader-reliant users to access the "Username or Password" link for forgotten credentials. This makes it impossible for a screen reader-reliant user to recover forgotten usernames or passwords.




iii. "My Courses from Pearson" Page

52. The My Courses from Pearson page lacks any heading structure.

53. The controls at the top right of the interface to view account information, sign out, and get help present several accessibility issues. The "Hi, <Student>" button and "Help" link are visually similar but semantically different; as menu buttons, they do not fully adhere to the appropriate design pattern and this causes

many issues for those reliant on a keyboard for navigation. For example, it is not possible to close the associated menus with these controls via keyboard alone. Also, it is possible for screen reader-reliant users to lose their place in these submenus.




54. The tab panel that presents a single panel of content at a time (i.e., “Active,” “Inactive,” “Announcements”) presents the following accessibility issues for screen reader-reliant users, ranging from minimally impactful to critical:

- When selecting a tab heading (e.g., “Active,” “Inactive,” “Announcements”), no notification is provided to screen reader-users that the panel has changed.
- When a tab heading is selected and a screen reader user wishes to move into the panel’s content, the focus moves back to the first tab heading (“Active”) rather than the content in the panel. Such a user must then tab through all of the tab headings again to reach the desired content. This is cumbersome and inefficient for screen reader-reliant users. Furthermore, it is likely that users would be unable to determine how to reach the desired content.




- All tab panels lack a heading structure for navigation.
- Other general issues:
    - On the "Active" and "Inactive" tabs, the popup button to display more information associated with the "Search all my courses" input box lacks a descriptive label. When screen reader users discover this button, they hear "clickable tooltip button collapsed".




    - When a course is entered into the "Search all my courses" text box, no notification is provided to screen reader-reliant users as to the success/failure of the search.



- It is possible for screen reader-reliant users to create course categories to organize their courses. However, it is not possible for such users to use this functionality fully due to the inability to move a course to the desired category via keyboard alone. Categories may only be assigned by using a mouse to physically move a course to the desired category.
- The expandable "Details" region associated with each course does not report whether it is expanded or collapsed to screen reader-reliant users.




iv. MyMathLab Home Page (for 2017 Fall Math 125 course)

55. In the MyMathLab home page for the 2017 Fall Math 125 course a banner landmark is inappropriately used to identify the main content of the page, instead of a main landmark.

56. The navigation region contains a list of links. Some links (e.g., "Chapter Contents," "Student Success," "Course Tools") change what is displayed in the navigation region. When screen reader-reliant users navigate to these links, no notification is provided that anything has happened.




57. During calendar navigation of course-related events, there is no notification provided to screen reader-reliant users regarding the success of their navigation to the next/previous week. In addition, each day is represented as a button, implying to screen reader users that activating these buttons should take some action. However, these buttons do nothing.




58. No notification is provided to screen reader-reliant users when any homework link under the “What to Work on Next” is activated.




59. Under the "Welcome to MyMathLab" heading, there is a link titled "How to Enter Answers" that leads to a separate webpage. This webpage contains multiple links to videos associated with entering answers, doing homework, entering math symbols, etc. The following issues were found with these video tours:

- Each video link opens a separate webpage and each page does not have an orienting, descriptive title that describes the page (e.g., Video tour for entering math symbols). The webpage title for each such page is "Created by Camtasia Studio 8."
- Once a video tour link is activated, it is nearly impossible for a screen reader-reliant user to know that a video is on the webpage because there is no descriptive label for the video (screen reader users hear "Created by Camtasia Studio 8 link" - link to what?). If such a user were to somehow know to press the ENTER or SPACEBAR keys, the video would begin playing.




- All videos lack audio description tracks so blind users won't know what is being displayed.
- When watching a video tour, it is not possible for screen reader-reliant users to change the volume, view a video's table of contents, or change the playback speed. Their only option is to pause/play the video.



v. MyMathLab Assignments Page (for 2017 Fall Math 125 course)

60. The My MathLab Assignments page presents a tabular representation of a student's homework and tests. Due to the lack of proper coding, this information is difficult to navigate efficiently for screen reader-reliant users.




61. As shown below, no notification is provided to screen reader-reliant users that the page has changed when selecting a homework link, leading to user confusion as to the success or failure of their desired action or navigation.




62. When answering a homework question:

- Questions containing mathematical expressions do not use MathML and are represented in text for screen reader-reliant users. This makes it impossible for a screen reader user to navigate a mathematical expression by individual element, which is essential for proper understanding of more complex mathematics. Use of MathML allows a screen reader user to focus on one portion of a complex equation at a time, making solving the problem easier.




- Input boxes where answers are entered do not have descriptive labels as to their purpose (e.g., "Edit" - edit what?). This becomes especially problematic when more than one input textbox is required to be filled as part of an answer, or there is additional contextual information for the question (e.g., "Type an integer or a decimal"). This, in combination with the lack of MathML for mathematical expressions, makes it reasonably certain that a screen reader user would not be able to independently navigate/answer homework questions in this system.



- The text descriptions that represent complex graphs are not sufficient for students to efficiently understand the layout of the graph. In addition to a text description, the graphing data should be presented in an accessible grid or table so that screen reader users are able to explore and understand the path of more complex graphs.




- It is not possible for screen reader-reliant users to use the graphing tool.




- The "Home Overview" window lacks a descriptive label for the button to close the window (it reads as "X button").
- If a user enters an answer and activates the "Check Answer" button, a window appears with feedback (e.g., "Fantastic!", "Sorry, that's not correct"). Once a screen reader-reliant user dismisses this message, she is not oriented to a logical location of the page to continue working.

63. Based on the findings above, it is my opinion to a reasonable degree of professional certainty that MyMathLab is not accessible to blind users. It would not be possible for a blind user to work with MyMathLab independently or with the same efficiency and ease of use as sighted users have.

E. Etudes

i. General Issues

64. When navigating within each sub-area throughout the Etudes application, e.g., within the discussion and private messages; assignments, tests, and surveys; announcements; and modules, etc., no notification is provided to screen reader users of the success of most of their actions or navigation to different screens within each sub-area. Only when moving to another subsection is there notification that something has occurred.




65. Etudes lacks any landmark structure and has minimal heading structure. In addition, where headings do exist, they are oftentimes not logically arranged to convey the hierarchy of content on the page, as they are intended.

66. Many interfaces throughout Etudes make use of HTML tables, but even where a table would be appropriate to organize the presentation of information, the tables lack proper header association and row tables to enable screen reader users to navigate the content. Additionally, some content is presented in tables for layout

purposes only, and the application does not properly tag these tables as presentation, leading to screen readers treating them as data tables.

ii. Dashboard Page

67. The Etudes dashboard page lacks any landmark structure, and contains a single <h1> on the page with no additional headings to provide users context of the structure of the content on the page.

iii. Course Homepage

68. The Etudes course homepage has no landmark structure, contains multiple <h1s> denoting work sites, tools, and content, but does not contain any additional headings of appropriate level to provide users context of the structure of the additional content on the page.

iv. Discussion and Private Messages

69. The Etudes table that contains private messages does not contain proper header and row title associations, leading to difficulty for screen reader users in navigating message lists.

70. As shown below the checkboxes for selecting all, or selecting individual messages lack properly associated labels, making it difficult for screen reader users to determine which message(s) they are checking.




71. When taking actions on messages, for example marking as read, adding follow-up flags, deleting, etc., no notification is provided to screen reader users of the success or failure of their actions.

72. When screen reader users trigger a sort function on the list of messages, no notification is provided regarding the success or failure of their actions.




73. When opening a private message to read it, no notification is provided to screen reader users of the success of their actions, and focus is left at the bottom of the page, not at the top of the newly loaded page, as would be expected.

74. When composing a new private message, screen reader users are not notified that the new message screen has been loaded, and their focus location remains in a random location, not at the new message screen. Additionally, the fields for to whom to send the message, the subject, and the message itself, lack labels, leading to the inability of screen reader users to determine what needs to be entered into the fields.




75. When submitting a message to be sent, no notification is provided to screen reader users that their action was successful; in addition, the user's focus is placed at the bottom of the screen, not near the top of the interface, as would be expected.

76. Based on the findings detailed above, it is my opinion to a reasonable degree of professional certainty that Etudes is not accessible to blind students.

## IV. How Higher Education Institutions Can Meet Their Obligations to Provide Accessibility in Online and Digital Content

77. As an employee of a university I know that the fact that attention needs to be paid to accessibility has been communicated by the Federal government to this

and other institutions. For example, on June 29, 2010, a joint "Dear Colleague Letter" was sent to College and University Presidents from Thomas E. Perez, Assistant Attorney General, Civil Rights Division, U.S. Department of Justice, and Russlynn Ali, Assistant Secretary for Civil Rights, U.S. Department of Education. This letter reminded institutions of their obligations under the non-discrimination provisions of current federal law.

78. In order to make certain that colleges deploy only accessible technology it is my opinion, to a reasonable degree of professional certainty that a staff member should be delegated the responsibility and authority for ensuring that the college or university complies with their obligations for technology accessibility. This person should be granted sufficient authority and resources to implement a robust proactive compliance program. This person must either possess sufficient knowledge and skill to evaluate technology for conformance with accepted accessibility standards and best practices or should have appropriate staff with this expertise. Compliance programs have a mix of the below elements:

- A policy defining technical standard(s) for technology accessibility. All staff and faculty should be made aware of the policy, but special attention should be given to those responsible for web and application development, technology purchasing, educational technology, and instructional design.
    - Annual training on the policy, based on a faculty or staff member's role in the organization. The training should include, at minimum:
        - Information on the institution's obligations under applicable non-discrimination provisions of state and federal regulations and laws.
        - The institution's expectations of all faculty and staff related to these obligations.

    - o Any other policy expectations specific to the individual's role in the organization.

- Guidance on obtaining or conducting evaluations of prospective purchases, or internally developed technology, for compliance with accessibility standards.
- Procurement controls requiring that technology being purchased be evaluated for compliance with the accessibility policy prior to purchase.
    - ▪ Contract practices requiring that vendors who do meet accessibility standards continue to do so for the life of the agreement.
- A clearly defined exception process when inaccessible software is considered for purchase or is otherwise discovered via user complaints. This process should include:
    - ▪ Information regarding the access barriers in the software, their severity, and the estimated impacted population(s).
    - ▪ Information regarding the availability of a more accessible alternative.
    - ▪ A plan for bringing the software into compliance over time. Exceptions should be temporary in nature, unless compliance is not technically possible or would present an undue hardship to the institution.
        - o Note: undue hardship should be considered in the context of the budget and resources of the entire institution, as opposed to a single department or unit, as the regulatory mandate applies to the institution as a whole.
        - o Exceptions granted for software with a plan to move toward future compliance should be monitored for progress

towards compliance; provisions for moving away from use of the software or product should be made if insufficient progress is made toward accessibility.

- In all cases, exceptions should be periodically reviewed on the effectiveness of their equally effective alternative access plan and their validity in light of emerging accessible technology development practices.

▪ An equally effective alternative access plan that ensures that the student is provided an equal opportunity to the educational benefits of the software, with substantially equivalent ease of use, and with equal treatment in the use of the alternative.

▪ If it is determined that no equally effective alternative is possible, the exception should be denied, and the technology should not be used, or approved for purchase, as appropriate.

- A complaint process for internal resolution of discovered accessibility issues. This process should include:
  - A communications plan to ensure that faculty, staff, and students are aware of the process and have the necessary information to make use of the process.
  - A timeline for the institution to respond to a complaint.
  - A timeline for completing an investigation.
    - Investigations of the accessibility of a website, document, or software should be conducted by staff members or consultants with sufficient knowledge and skill to apply the technical standard(s) for accessibility.
  - A resolution process for correcting any policy violations.

- The accessibility policy should be periodically reviewed, along with the technical standard(s) adopted to ensure that considerations for new and emerging technologies are accounted for in the policy.
- A plan to conduct periodic reviews of existing and legacy software and websites in use by the institution should be established to monitor ongoing compliance with policy, or when the technical standards or accessible development practices evolve.

79. Disability Services/Office of Accessibility: student-facing offices responsible for providing reasonable accommodations for students with disabilities should have strong relationships with the Web/Digital Accessibility Coordinator, and the complaint and exception processes should be available through this office and should be triggered when accessibility issues are brought to the attention of the office or institution.

- When students with disabilities enroll in a class, the disability services office should ensure that any technology planned for use in the class has been evaluated for compliance with the institution's accessibility policy. If software planned for use in the class was not evaluated, or inaccessible software is being used that does not already have an exception and equally effective alternative access plan, the instructor(s)should be informed that they will need to comply with applicable provisions of the institution's accessibility policy, including an evaluation of the software, establishing an equally effective alternative access plan, and seeking an exception for the use of the software from the Web/Digital Accessibility Coordinator, as appropriate.
- Since these issues may be discovered close to the beginning of a term, or during a class term, extreme priority should be put on rapidly initiating the process to determine if an equally effective alternative access plan can be

established. Use of the software should be suspended pending the design and implementation of an equally effective alternative access plan, and ultimately disallowed if the ability to implement an equally effective alternative access plan is determined to be impossible.

- A grievance process should be available to any student who is dissatisfied with the performance of the Disability Services/Office of Accessibility. The process should be administered by a campus administrator who is not directly involved in the day-to-day operations of the office who has sufficient authority to adjudicate the dispute.
    - Students should be informed of the existence of this process through a communications plan, intake interviews, and through regular communications throughout their association with the institution.
    - While this process should not replace more informal dispute resolution methods, in the case where a dispute cannot be resolved, a formal process, including a formal documented investigation and resolution, is a best practice.

V. Conclusions

80. It is my opinion, to a reasonable degree of professional certainty, that:

- Notwithstanding LACCD's written policy on website accessibility (Regulation B-33), the software and website described above present significant accessibility barriers that prevent students with disabilities, including blind students, from having access to the information, transactions, and benefits available from these sources equal to that available to their non-disabled peers;

- LACCD lacks the necessary procedures and policies to ensure that the software and website are, in fact, accessible and that they will be maintained in an accessible fashion;
- Notwithstanding LACCD Administrative Regulation B-34, LACCD lacks a robust, proactive compliance program necessary to ensure that web and digital technology, including educational technology required for success in the classroom, acquired, purchased, developed, or otherwise managed by or on behalf of the college, is accessible to students with disabilities, including blind students;
- LACCD has failed to meet its obligation to provide equally effective alternative access to inaccessible educational technologies in order for students with disabilities, including blind students, to have an equal opportunity to obtain the educational benefits of the technology, even when the institution is notified of the inaccessibility of such technology;
- LACCD has failed to sufficiently train its faculty and staff on the institution's obligations under applicable non-discrimination provisions of the Americans with Disabilities Act and Section 504.
- I declare under penalty of perjury that the foregoing is true and correct.

Dated: February 05, 2018 By: Peter Bossley

Peter Bossley