Patricia Barbosa (SBN 125685)
pbarbosa@barbosagrp.com
**BARBOSA GROUP**
8092 Warner Avenue
Huntington Beach, California 92647
Phone: (714) 465-9486

Sharon Krevor-Weisbaum
skw@browngold.com
Joseph B. Espo
jbe@browngold.com
Jean M. Zachariasiewicz
jmz@browngold.com
**BROWN, GOLDSTEIN & LEVY LLP**
120 East Baltimore Street, Suite 1700
Baltimore, Maryland 21202
Phone: (410) 962-1030

*Attorneys for Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ROY PAYAN, PORTIA MASON, THE NATIONAL FEDERATION OF THE BLIND, INC., and THE NATIONAL FEDERATION OF THE BLIND OF CALIFORNIA, INC.,<br><br>Plaintiffs,<br><br>vs.<br><br>LOS ANGELES COMMUNITY COLLEGE DISTRICT,<br><br>Defendant. | Case No.: 2:17-cv-01697-SVW(SKx)<br>**Civil Rights**<br><br>**TRIAL TESTIMONY DECLARATION OF JON GUNDERSON, Ph.D.**<br><br>Pretrial Conference Date: 2/12/2018<br>Time: 3:00 p.m.<br>Location: 350 W. 1st Street<br>Los Angeles, CA 90012<br>Courtroom 10A<br><br>**Trial Date: Feb. 20, 2018** |

1. My name is Jon Gunderson. I am more than 18 years old, am competent to be a witness, and make this Declaration on personal knowledge.

2. Since 1996 I have been employed at the University of Illinois in Champaign/Urbana as the Coordinator of Accessible IT Group, Division of Disability Resources and Education Services ("DRES").

3. I earned B.S. and M.S. degrees in Electrical and Computer engineering from the University of Wisconsin-Madison in 1980 and 1985, respectively. I earned my Ph.D. in Industrial Engineering from the University of Wisconsin-Madison in 1992, with an emphasis in Human Factors.

4. Human factors is the practice of using the knowledge of human abilities and limitations to design systems, organizations, jobs, machines, tools, and consumer products for safe, efficient, and comfortable human use.

5. During my time at UW-Madison in the 1980s, I worked on augmentative communication technology and computer accessibility at the Trace Research and Development Center. I was a consultant to the State of Wisconsin Department of Rehabilitation Services for two years providing training to blind staff in the use of screen reader technology. I also helped the Department of Rehabilitation Services design its case management software to be compatible with screen readers.

6. After graduating with my Ph.D., I accepted a position as a Visiting Assistant Professor at the University of Illinois as part of a Rehabilitation Services Administration (RSA)-sponsored rehabilitation engineering training program.

7. In my current position at DRES, I am responsible for providing information technology-related accommodations for students with disabilities, providing assistive technologies to campus computers, and helping the University of Illinois understand the accessibility issues of its online administrative and instructional resources. I work with campus IT professionals and instructors to improve accessibility of resources created by the University. I also work with

University vendors to help them understand the accessibility issues of their products and services. I work closely with our text conversion and media captioning staff to provide equally effective communication of electronic instructional materials to University of Illinois students with disabilities.

8. I am a past chair of the W3C User Agent Working Group and currently a participant in the W3C WAI ARIA working group. These are organizations that create standards for development of digital information that is equally accessible to individuals with disabilities as to others. I am particularly interested in the development of the Accessible Rich Internet Application (ARIA) authoring practices and ARIA implementation testing in browsers.

9. I lead the development of open source web accessibility evaluation tools, including AInspector Sidebar add-on for Firefox browser, Functional Accessibility Evaluator (FAE) 2.0, and Accessibility Bookmarklets for use in most modern browsers. I am the primary software developer of the open source OpenAjax Accessibility Evaluation library used in AInspector Sidebar and FAE 2.0 to evaluate web content for W3C Web Content Accessibility Guidelines (WCAG) 2.0 Level A and AA requirements.

10. I have taught numerous courses and workshops on accessible web design, including courses on using the W3C ARIA specifications to create accessible web applications. I make presentations at national conferences on information technology to promote web accessibility. I participate and lead both regional and national consortiums of higher educational institutions to promote and work together on improving information technology access in higher education. We are currently offering a set of competency based online courses to help developers, designers, and quality assurance testers understand how to evaluate and design accessible online resources using web standards.

11. I have received a number of awards over the years. They are: Campus Academic Professional Excellence (CAPE) Award (2007); AHS Academic Professional Excellence Award (2007); ALS Academic Professional Excellence Award (2000); McBurney Disability Resource Center Outstanding Volunteer Award (1992); General Electric Forgivable Loan (1991); IBM Research Fellowship (1990).

12. Over the course of my career I have authored or co-authored over 45 papers for conference proceedings in the area of technology and disability. I also have published about six book chapters.

13. I have received approximately 30 grants and gifts to support work in accessibility. I also have presented or taught at more than 100 workshops and other presentations. I am currently teaching online courses for developers to learn about using W3C Accessible Rich Internet Application (ARIA) and HTML5 technologies to create accessible web resources.

14. I have developed a number of open-source tools to test for accessibility in web sites and web-based materials including the Functional Accessibility Evaluators 2.0, AInspector Sidebar for the Firefox Browser, and Accessibility Bookmarklets.

15. In connection with my work on this case I reviewed the following:

- Deposition of Barbara Vasquez, Los Angeles City College (“LACC”) (Dated July 31st, 2017)
- Deposition of Everett Turner, LACC (Dated March 6th, 2017)
- Deposition of Kian Kaviani, LACC (Dated August 1st, 2017)
- Deposition of Kelvin Luong, LACC (Dated August 2nd, 2017)
- Deposition of Robert Dominick, LACC (Dated August 4th, 2017)
- Deposition of John Al-Amin, LACC (Dated August 9th, 2017)
- Deposition of Daniel Wayne Walden, LACC (Dated August 9th, 2017)
- Deposition of Randy Anderson, LACC (Dated September 5th, 2017)

- Deposition of Ryan Kuschner, LACC (Dated September 6th, 2017)
- Deposition of Blythe Daniel, LACC (Dated September 6th, 2017)
- Deposition of Roy Payan (Dated September 8th, 2017)
- Deposition of Jorge Mata, Los Angeles Community College District ("LACCD") (Dated September 26th, 2017)
- LACCD: Administrative Regulations B-33 & B-34
- Academic transcripts and accommodation information for Roy Payan
- Academic transcripts and accommodation information for Portia Mason
- Administration Regulation E-100: Criteria for Serving Students with Disabilities
- LACC Alternative Media Production Policy
- The LACC website, including:
    - OSS: Frequently Asked Questions for Faculty
    - OSS: Alternate Text Production Center
    - OSS: High Technology Center
    - Evaluating a sample of 100 pages of the LACC website using the Functional Accessibility Evaluator.

16. For the reasons set out below, it is my opinion to a reasonable degree of professional certainty that LACC and LACCD lack sufficient policies, procedures, and training to ensure that blind students are provided equally effective and timely communication of print and electronic instructional materials and online administrative resources.

17. For blind students to be on an equal footing with their sighted peers, they need to have accessible versions of course-related books, handouts, assignments, and any other instructional materials. Instructors should provide these accessible versions to blind students at the same time, or in many cases before, sighted students receive them so blind students can be equally prepared to participate in classroom discussions

or ask questions during class lectures. In-class materials, including PowerPoint slides or information written on the board by the instructor or other students during class, are equally as important for blind students to have in an accessible format. Audio recordings are another typical accommodation provided to enable blind students to take class notes. The student can listen to the recording at a later time(s) to supplement any notes taken during class. In order for audio recordings to be effective, instructors must be trained to describe any information they write on the board during class. When faculty learn to correctly describe what they write during class, it helps most students' understanding of the instructional content, whether they are blind or sighted.

18. Accessible, as used in this Declaration, means the ability of a person with a disability to acquire the same information, engage in the same interactions, and enjoy the same services as a person without a disability in an equally effective and equally integrated manner, with substantially equivalent ease of use.

19. It is clear from my reading of the depositions that instructors at LACC do not fully understand their responsibilities in ensuring that their course materials and in-class activities allow blind students an equal opportunity to participate and succeed. The instructor depositions that I reviewed suggested that they do not understand that they have a responsibility for providing or supporting the timely provision of accessible versions of class handouts or online materials to blind students at the same time such materials are available to their sighted peers. For example, Professor Blythe Daniel testified that she often announces during class what part of a handbook students are going to read and discuss in that same class. Such a practice is problematic for students with print disabilities, including blind students, for two reasons. First, depending on the format of the accessible version of the document, it may be difficult for a blind person to find the part referred to. Second,

the time required for a blind student to read the article for discussion may be longer than that for sighted students.[1]

20. Similarly, Roy Payan reported that both the Math Department chair Kian Kaviani and the dean above him refused to ask publishers for an accessible version of the text book and software used in Math 124A. In my opinion, this is the easiest and most important action a faculty member can make, even if an accessible version is not available. Publishers need to understand that instructors make purchasing decisions about text books and software used in their classes value accessibility. When an instructor asks a publisher if their book or software is accessible or if there are alternative accessible versions, the faculty member is telling the publisher that accessibility is important to them and that they want accessible materials used in their classes. If more instructors would take this relatively simple step, publishers would make accessibility a higher priority. The companies that improve accessibility will gain a competitive advantage over other publishers.

21. None of the deposition testimony that I reviewed indicated that LACCD faculty are trained or encouraged to describe what they write on the board during class. In fact, at least one of Mr. Payan's instructors did not permit the accommodation of recording lectures at all, despite it being one of the academic accommodations listed on his accommodations form. Mr. Payan reported the course as being Math 125 taught by a Professor Polachek. This is clearly a violation of the faculty member's responsibility to provide access to lectures. Rather than instruct the professor to allow Mr. Payan to record lectures, LACC encouraged Mr. Payan to switch to a different section of the course with an instructor who would allow recording, thus placing the burden on Mr. Payan to adjust his schedule to meet his educational goals.

[1] It should be noted that blind students are not the only students with reading disabilities. Though other students may have "invisible" disabilities, they often have similar issues as blind students in terms of needing extra time to read before participating in a class discussion.

22. LACC's Office of Special Services, which is the on-campus resource for students with disabilities, also does not specify in student case notes in what format an accessible textbook should be provided, though formatting has a major impact on accessibility, especially in math.[2] An e-book was an accommodation for Mr. Payan in both Math 124A and Math 124B, but not in Math 227. None of the deponents explained why Math 227 was treated differently.

23. Even though LACCD has written policies generally requiring that course materials be accessible to students with disabilities (see LACC Alternative Media Production Policy), there are no clear procedures or practices requiring faculty to provide instructional materials to blind students in an accessible format at the same time non-disabled students receive the information, or to timely provide it to OSS so that the materials can be made accessible in advance of class. Instead, the procedures described in the depositions place the burden on blind students to either go to the library to use assistive technologies to convert the materials on their own or take the materials to the High Technology Center for conversion. Using library resources is problematic for blind students because often course handouts have complex visual layouts that will not convert to readable text, or they are of poor quality and the resulting text is incomplete and/or inaccurately converted, making the document unusable. Based on the testimony of Barbara Vasquez, the Director of the LACC Library, library staff are not familiar with how the available assistive technologies work. For instance, library staff are not trained in the accessibility features of PDF documents, including how to convert an untagged PDF document to a tagged PDF document. Thus, students are on their own to try to learn the software or problem-solve issues with the available technologies, unless Ryan Kushner of the OSS High Technology Center is available. Taking resources to the High Technology Center for conversion is similarly inadequate, because it requires additional time for blind

[2] The DAISY audio book format and Microsoft Word with the MathType plug-in are two ways to provide accessible math e-books.

students to get access to instructional materials. While sighted students can use the assigned instructional materials immediately to help them with course assignments, blind students have to wait an undetermined amount of time for the same opportunity. This puts blind students at a clear disadvantage to non-disabled students at LACCD.

24. LACC and LACCD behaviors related to information technology accessibility lead me to conclude that they assume all electronic materials are accessible to blind students, unless they receive a complaint from a student trying to use the materials. Instructors and administrators assume that assistive technology software like JAWS and ZoomText can be used to make any software or website accessible, and they do not understand the role the software or website plays in assuring accessibility. In cases where software or a website is partially accessible, blind students may believe they have all of the information related to a course but may be missing important pieces that are not available to a screen reader. A complaint-driven process will not capture those accessibility issues. Moreover, this exclusively complaint-driven approach is detrimental to student learning and success because it places the burden on blind students to determine whether electronic resources are accessible to them at the same time they are trying to use the resources to learn course content. This takes away from the amount of time blind students have to learn course material or complete required homework and assignments. Sighted students do not have these time burdens. Further, when sighted students have problems with accessing electronic instructional materials visually, they often can ask fellow students, tutors, or instructors for help, while depositions indicate that the primary person that can help blind students with technology accessibility problems is Mr. Kushner.

25. When inaccessible software is identified in an exclusively complaint-driven process, it is usually too late in the semester to make the relevant software accessible. Blind students therefore do not gain the benefit of the software used by

other students, reducing their educational opportunities, and they are often provided with inferior or ad hoc alternatives to the educational technology. For instance, the primary means of accommodating blind students at LACCD appears to be to encourage and facilitate a blind student moving to another section of the course that does not use the inaccessible technology. Thus, the blind student must forego the benefit that a sighted student derives from the technology in question. Moreover, with certain courses there may be no technology-free alternative section. This lack of appropriate accommodation denies blind students equal opportunity and equally effective communication.

26. Similar accessibility issues were found for online resources at the LACC library. According to deposition testimony, there are some 60 online databases that are always available to LACC students and that can be used inside or outside the library facilities. There are two parts to the accessibility of online library bibliographic databases at LACC. The first part consists of search facilities to find books, articles, or other materials related to a topic of interest. The user interface for the search provides an electronic form to specify a set of search terms and media result options. After a user submits a search request, the database returns a summary of the search results, typically the titles of books, articles, and other media, and in many cases an abstract of the articles. The summary information is designed to help determine if a resource is relevant enough to read the full text. The second part is the accessibility of the identified resources, which are often provided in a PDF or other image format. For a database to be accessible, both the search and summary interface and the full text articles and books must be accessible.

27. The process Ms. Vasquez uses to determine the accessibility of library databases is to ask Mr. Kushner to evaluate the available databases and determine which ones to recommend for use by blind students. However, in Mr. Kushner's deposition, he stated that he did not feel he is qualified to perform such accessibility

evaluations. Despite that fact, Mr. Kushner did assess the library databases and send an informal report by e-mail to Barbara Vasquez indicating that some databases were more accessible than others. It was not clear if he tested only the search engine and results interfaces for the various databases, or if he also tested the accessibility of the online source materials. Apparently blind students are guided to use the more accessible databases, even if less accessible databases are more appropriate for a specific search topic. This results in blind students having access to a smaller group of materials than their sighted peers for learning about a topic, writing papers, and completing homework assignments.

28. The LACC library primarily uses the accessibility information provided by Mr. Kushner to steer blind students to databases that appear, based on Mr. Kushner's admittedly imperfect assessment, to be more accessible. The depositions I reviewed did not indicate that the issues with some of the databases identified by Mr. Kushner were ever sent to the database publishers to make them aware of the accessibility issues and request that they fix the problems. Moreover, nothing I have reviewed indicates that LACC library staff have ever notified publishers that online source materials they publish are inaccessible (even if the search platform is accessible) and asked that they make those materials accessible.

29. The use of PeopleSoft and the LACC website also give rise to accessibility concerns. With respect to PeopleSoft, Mr. Kushner testified that he has helped between five and ten blind students do the basic task of registering for classes. Having to help so many blind students should have caused him to realize that the software has significant accessibility issues that he should convey to the responsible authority – if LACCD had a policy directing the reporting of accessibility barriers and a procedure identifying to whom those barriers should be reported. There does not appear to be such a policy.

30. A scan of the LACC website using FAE 2.0, an automated tool for checking accessibility, found a number of basic accessibility issues in the website in use at the time this report was written. The following is a list of easily identifiable accessibility issues with the website:

- 191 pages with a form control missing a label. This means that the form will be inaccessible to blind students, because the screen reading software cannot determine the meaning of that form control.
- Data tables missing header cells. Without header cells, a blind user cannot link the contents of a data cell with the column and row in which it appears. This makes the content of the table unusable to the blind user.
- No use of the MAIN landmark, which is the modern way to provide a means for screen reader users to find the main content of a page. Other landmarks are also missing, like BANNER, CONTENTINFO, NAVIGATION, and COMPLEMENTAR. When used correctly, landmarks are a powerful way to provide screen reader users a similar overview of the content of a page as the visual layout and separation of content helps sighted users group content into functional groups of information.
- Interactive elements are not identified with a widget role. This means that elements were found on the page that normally do not have any keyboard or mouse behaviors that now have behaviors. The first step in making these accessible to screen reader users is to give these elements a proper role and then verify that the keyboard behaviors for the elements match user expectations for the role. For example, a "menu" role users would expect to be able to use the cursor keys to navigate the menu item.
- The website uses the ARIA "menubar" and "menuitem" roles in an inappropriate manner making the navigation of links on the page more

confusing since the keyboard interaction associated with these roles was not implemented.

- The evaluation of six randomly selected PDF documents linked to the website found that only one of the six was accessible through proper tagging of document content. Two PDF documents had tags but the tags did not represent the actual structure and relationships of the content in the documents, making them difficult or impossible to read with a screen reader, and the other three documents contained no tags at all, so they are not accessible to screen reader users.

31. John Al-Amin testified that the contract for developing the new LACC website required that it be accessible, but there was no reported verification that the website was accessible when it was delivered.

32. The depositions of Jorge Mata (Chief Information Officer for Information Technology, (LACCD), Daniel Walden (Vice President of Academic Affairs), John Al-Amin (Vice President of Administrative Services), and Ms. Vasquez demonstrated a lack of understanding of LACC's own requirements for the purchasing of accessible electronic instructional and administrative resources. The requirements are defined in the LACC Alternative Media Production Policy which, based on viewing the PDF document properties, was first available in 2008. The first statement of the policy is very clear:

> All instructional resources or materials purchased or leased from a third-party provider or created or substantially modified "in-house" must be accessible to students with disabilities, unless doing so would fundamentally alter the nature of the instructional activity or result in undue financial and administrative burdens on the district.

33. Additional requirements were defined in February 2014 through the LACCD Administrative Regulation B-33 on Web Accessibility Standards and Guidelines.

34. Despite these directives, I did not see any procedures that describe how accessibility of instructional technology is evaluated as part of the procurement process or whether accessibility is even considered in procuring technology. Moreover, none of the deponents testified that they report accessibility issues back to the vendors to make them aware of the issues that need to be addressed.

35. Mr. Al-Amin testified that he had not received any training in the Americans with Disabilities Act (ADA) even though in his position as Vice President of Administrative Services he is responsible for the accessibility of LACC facilities and purchasing of electronic services. In addition, none of the deposed faculty and staff reported that they ever attempted to observe blind students actually trying to use specific technologies to better understand the difficulties with accessibility experienced by the students. Instead, they rely on reports from Mr. Kushner, who stated in his deposition that he did not feel he was qualified to evaluate online services for conformance to accessibility standards. While Mr. Kushner testified that he is familiar with the JAWS screen reader and some other assistive technologies, he said he was not familiar with the automated tools used to evaluate accessibility of online resources, or with the manual test techniques and tools that are needed to identify accessibility features required by either the Federal Section 508 or W3C Web Content Accessibility Guidelines (WCAG 2.0). The reports that he did make to administrators were ad hoc in nature and consisted of e-mail opinions or personal conversations with the people requesting the evaluations.[3] Mr. Kushner testified that he sometimes reported accessibility problems with software to the vendor, but such

[3] It should also be noted that Mr. Kushner was able to give very few examples of inaccessible resources; he mostly reported that the resources evaluated were difficult to use.

reporting seems to be at his discretion. No information was provided regarding what, if anything, vendors have done with the information Mr. Kushner provided regarding accessibility issues.

36. Mr. Mata, Mr. Walden, Mr. Al-Amin, and Ms. Vasquez also all testified that they operate under the erroneous assumption that electronic resources are accessible unless they are advised to the contrary. In my experience, the opposite is almost always true – most electronic resources have accessibility problems, and the people creating and licensing those resources have little knowledge of accessibility. These vendors need clients, including LACCD, to clearly state their requirements that products be accessible and receive specific feedback on the problems people with disabilities are having with their products and services. An important way to help companies understand accessibility issues is for company representatives to actually observe blind people trying to use their products. The frustration that entails on the part of the blind user usually elicits empathy from the representatives, which spurs them to try to find effective solutions to the accessibility issues. Yet the depositions indicated that there is no systematic process to evaluate the accessibility of vended products during the purchasing process, including verifying vendor VPATs or other claims of accessibility. There also appears to be no systemic feedback to vendors regarding the accessibility issues actually experienced by students. Without this type of administrative accountability, vendors will not prioritize accessibility issues.

37. The LACC administrators deposed assumed any accessibility issues were handled by a district-level committee making purchasing decisions. Mr. Mata, the CIO of LACCD, stated that responsibility for the purchasing of accessible IT resources was the responsibility of the ADA coordinator. The primary discussion that Mr. Mata could recall on accessibility in any district-wide IT meetings was on the issue of closed captioning and making sure classroom projectors and other

technology can display captions. He could not recall any discussions on the accessibility of technologies used by LACCD for blind people using screen readers.

38. From the review of documents and deposition testimony, I was unable to identify any person with training and knowledge who is responsible for ensuring that the policy requiring accessible technology and content is being implemented in practice, any policies or procedures to ensure that accessibility barriers are timely identified and addressed, or any training to ensure that faculty and administrators know of the policies and procedures and their roles in connection with those policies and procedures. Under these circumstances LACCD will continue to be unable to deliver equal access or engage in equally effective communication.

39. In my opinion, to a reasonable degree of professional certainty, the following policies, procedures, and training are required at LACCD to provide timely and equally effective communication to blind students:

a) LACCD Administrators and instructors must observe students who are having problems with specific technologies so that administrators and technical staff have a better understanding of the accessibility issues. This information allows staff to directly discuss the accessibility issues with vendors or district staff who make purchasing decisions;

b) LACCD must video record blind students using technologies to demonstrate to vendors the accessibility issues of their software. Seeing users struggling to use their products is one of the most effective ways to get vendors to make changes to their software;

c) LACCD must develop policies and training for faculty to provide accessible electronic versions of handouts in class and prioritize the use of textbooks that are available in accessible formats, so that blind students are not put at a disadvantage compared to other students who can use print materials or the course website;

d) LACCD must develop policies and training for faculty to ensure that class materials are provided in an accessible format to blind students and other students with accommodations in time for them to use the class materials at the same time as the other students in the course;

e) LACCD must ensure that blind students and other students with reading disabilities are given accessible versions of any in-class materials before class, since they need extra time or need access to assistive technologies to assist them with reading and understanding the material;

f) LACCD must develop policies and training for faculty to improve their multimodal teaching style for students recording lectures, as well as improved notes for OSS students that are available for use when faculty are lecturing or presenting material visually on a blackboard, whiteboard, or PowerPoint;

g) LACCD must develop policies and training to make sure that instructional technologies being considered or used in courses are accessible to students with disabilities, and to provide vendors with information on accessibility problems when they are reported by staff or students;

h) LACCD must develop policies to encourage faculty to discuss accessibility of instructional resources with publishers, asking them how their products and services can help them in meeting the educational needs of students with disabilities;

i) LACCD must provide training to students using assistive technology in the use of instructional technology;

j) LACCD must develop policies, training, and procedures for administrators and IT professionals to:

- Develop standardized practices for evaluating software and websites for accessibility before they are developed, purchased, or renewed.
- Implement accessible procurement practices.
- Work with vendors to help them understand the accessibility issues of their products.
- Be able to test the effectiveness of accessibility improvements made by vendors.
- Work with vendors to develop road maps and timelines for improving accessibility for products being used that have accessibility issues.

k) LACCD must perform an audit of current educational technology and digital content to determine where accessibility problems lie;

l) LACCD must develop and implement a remediation plan to address the accessibility issues identified in the audit;

m) LACCD must ensure that e-books are provided in a format that is compatible with the course content (e.g. math) and the needs of a student (e.g. screen reader, ZoomText, Kurzweil 3000, or Read & Write Gold);

n) LACCD must provide training to staff and instructors, including staff in the library, on how to create and maintain accessible content, including converting PDF documents into an accessible format;

o) LACCD must ensure that college libraries convert articles and other inaccessible resources to an accessible format for blind students when requested.

I declare under penalty of perjury that the foregoing is true and correct.

Date: February 5, 2018

Jon Gunderson, Ph.D.