UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | 2:17-cv-01697-SVW-SK | Date | April 23, 2019 |
| Title | *Roy Payan, et al v. Los Angeles Community College District, et al.* | | |

| | |
|---|---|
| Present: The Honorable | STEPHEN V. WILSON, U.S. DISTRICT JUDGE |

| | |
|---|---|
| Paul M. Cruz | N/A |
| Deputy Clerk | Court Reporter / Recorder |
| Attorneys Present for Plaintiffs: | Attorneys Present for Defendant: |
| N/A | N/A |

**Proceedings:** ORDER GRANTING IN PART PLAINTIFFS' SECOND RENEWED MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO LIABILITY [169]

On January 7, 2019, the Court denied Plaintiffs' renewed motion for partial summary judgment as to liability. Dkt. 167. The Court gave Plaintiffs the opportunity to file a second renewed motion for partial summary judgment, applying the correct legal framework for Plaintiffs' claims of disability discrimination through disparate treatment and/or disparate impact under Title II of the Americans with Disabilities Act, 42 U.S.C. §§ 12131 *et seq.* (the "ADA" or "Title II"), and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 ("Section 504"). *Id.* at 5-6.

On January 28, 2019, Plaintiffs filed a second renewed motion for partial summary judgment in accordance with the Court's directives. *See* Dkt. 169. For the reasons set forth below, the Court GRANTS Plaintiffs' motion in part.

The parties are familiar with the factual record at summary judgment, as outlined in the Court's prior Order denying Plaintiffs' first motion for partial summary judgment. *See* Dkt. 155. The Court refers the parties to the facts and legal standards set forth in that Order and need not repeat them here.

## I. Definition of the Program or Service

In applying the framework for claims of disability discrimination through disparate impact under the ADA and Section 504, the parties raise a renewed dispute over the proper scope of review of

:

Initials of Preparer PMC

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | 2:17-cv-01697-SVW-SK | Date | April 23, 2019 |
| Title | *Roy Payan, et al v. Los Angeles Community College District, et al.* | | |

Plaintiffs' claims. Specifically, Plaintiffs contest the Court's prior reference to the standard set forth in *Cohen v. City of Culver City*, 754 F.3d 690 (9th Cir. 2014), that Title II's emphasis on "program access" required an analysis of a public entity's programs and services "in their entirety." *See id.* at 694-95; *see also* Dkt. 155 at 14, 23 (citing *Cohen*). Plaintiffs argue that *Cohen*'s "in their entirety" language is derived from 28 C.F.R. § 35.150(a), which applies to Title II claims pertaining to physical barriers to access by disabled individuals, and that instead the correct scope of review for Plaintiffs' claims of inaccessible technology should be more granular under 28 C.F.R. § 35.160, which mandates that disabled individuals must receive equal opportunity and effective communication. Defendant Los Angeles Community College District ("LACCD") responds that § 35.150(a) should apply to Plaintiff's Title II claims nonetheless, and the proper scope of the programs or services at issue should be the Los Angeles City College ("LACC") education program as a whole, *i.e.*, "whether the Los Angeles City College's entire program of policies, procedures, and available resources are readily accessible and usable by sight-impaired individuals." Dkt. 172 at 21.

Plaintiffs are correct that 28 C.F.R. § 35.150(a) and its "in its entirety" standard does not apply to the instant case. *Cohen* and other cases cited by the parties that rely on § 35.150(a) are cases involving physical barriers to program access, rather than deficiencies in the public entity's programs or services themselves. *See Cohen*, 754 F.3d at 697-701 (reversing district court's granting of summary judgment to the defendant because the plaintiff made a prima facie showing of disability discrimination through the inability to access a curb ramp); *Ass'n for Disabled Americans v. City of Orlando*, 153 F. Supp. 2d 1310, 1320 (M.D. Fla. 2001) (ruling in favor of the defendant on claims that a performing arts center and entertainment arena were inaccessible to wheelchair users); *Pascuiti v. N.Y. Yankees*, 87 F. Supp. 2d 221, 223-24 (S.D.N.Y. 1999) (determining that the correct standard of review is whether Yankee Stadium was accessible to wheelchair users "in its entirety" under § 35.150(a) and noting that "[w]hile proving that particular barriers exist might not be sufficient to establish Title II liability, each barrier is a building block for a finding that the Stadium, viewed in its entirety, is not readily accessible"); *Huezo v. L.A. Cmty. College Dist.*, 2007 WL 7289347, at *8-11 (C.D. Cal. Feb. 27, 2007) (applying § 35.150(a) to the plaintiff's claims that Pierce College, one of LACCD's schools, maintained "unnecessary structural barriers"); *see also Californians for Disability Rights, Inc. v. Cal. Dep't of Transp.*, No. C 06–5125 SBA, 2009 WL 2987115, at *1-2 (N.D. Cal. Sept. 15, 2009) (noting that § 35.150 covers only "existing facilities" constructed prior to January 26, 1992 and was intended to provide flexibility when retrofitting facilities for disability access).

The Fourth Circuit addressed this question directly in *National Federation of the Blind v. Lamone*, 813 F.3d 494 (4th Cir. 2016). There, the defendants argued that the proper scope of the

:

Initials of Preparer PMC

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:17-cv-01697-SVW-SK | Date | April 23, 2019 |
|---|---|---|---|
| Title | *Roy Payan, et al v. Los Angeles Community College District, et al.* | | |

"program" at issue for purposes of the plaintiffs' ADA claim, targeted at the inaccessibility of the state of Maryland's absentee voting program to blind individuals, should not be the absentee voter program specifically but instead should be whether blind individuals can participate in Maryland's voting program in its entirety, including in-person voting. *Id.* at 503. The court declined to apply 28 C.F.R. § 35.150(a)'s "in its entirety" standard to the plaintiffs' claims, finding the defendants' argument to be "in some immediate tension with the text of the ADA." *Id.* at 503-04. The court explained that § 35.150 "is targeted principally at physical accessibility and allows a public entity to provide accessibility alternatives that would not require large-scale architectural modifications of existing facilities." *Id.* at 504. The court focused on other regulations implementing Title II's prohibition against disability discrimination, specifically 28 C.F.R. § 35.130(b)(7), which "clearly contemplates a focus on accessibility at a more granular level than entire government programs." *Id.* at 504-05. In the end, the court concluded that "Maryland's absentee voting program is the appropriate subject of our ADA analysis." *Id.* at 505.

The same analysis in *Lamone* can be applied to the instant case. LACCD's reliance on 28 C.F.R. § 35.150(a) has no relevance to Plaintiffs' claims of disability discrimination through inaccessible technology and course materials. Plaintiffs do not seek to hold LACCD responsible to retrofit or otherwise renovate any physical structures or facilities to allow Plaintiffs' to access the programs offered by LACCD; instead, the focus is on LACCD's programs themselves and whether Plaintiffs are afforded equal opportunity to succeed in courses as compared to sighted students. *See* 28 C.F.R. § 35.160(b)(1). As with *Lamone*'s assessment of § 35.130(b)(7), a regulation which is also applicable in this case, § 35.160(b)(1) contemplates a narrower focus into whether "auxiliary aids and services" are "necessary" to ensure that disabled students receive the same benefits as their peers.

Adopting LACCD's definition of the program at issue, LACC's education program as a whole, would preclude a meaningful analysis of whether the needs of individual blind students are being satisfied in particular courses. As the Court noted in its October 16, 2018 Order, the Supreme Court cautioned that the "benefit" being offered to disabled individuals "'cannot be defined in a way that effectively denies otherwise qualified handicapped individuals the meaningful access to which they are entitled.'" Dkt. 155 at 16 (quoting *Alexander v. Choate*, 469 U.S. 287, 301 (1985)); *see also Disabled in Action v. Bd. of Elections in City of N.Y.*, 752 F.3d 189, 198 (2d Cir. 2014) (holding that disabled voters must be able to cast a private ballot on election days to participate fully in the voting program because "to assume the benefit is anything less—such as merely the opportunity to vote *at some time and in some way*—would render meaningless the mandate that public entities may not afford persons with disabilities services that are not equal to that afforded others.") (internal quotation marks and alterations

: 

Initials of Preparer PMC

omitted) (emphasis added). LACCD's definition of the benefit at issue improperly redirects the focus onto the general services LACCD already provides for blind students, rather than whether there remain other barriers for blind students in the manner in which LACCD provides specific resources to students or conducts its individual programs.

Although § 35.150(a) does not apply to Plaintiffs' claims, it is still unclear to the Court what is the proper scope of the "program" or "service" Plaintiffs challenge as inaccessible and discriminatory. Some of Plaintiffs' alleged lack of access is specific to a particular course at LACC, such as in-class handouts, textbooks, assignments, and educational software programs. Other aspects of Plaintiffs' claims address broader issues with LACC's student administration practices and procedures throughout the campus generally. The Court believes it appropriate to analyze each of Plaintiffs' theories of LACCD's disability discrimination separately to determine whether the alleged barrier to access precludes Plaintiffs from enjoying "meaningful access" to the particular program or service in which the barrier lies. *See Choate*, 469 U.S. at 301. Importantly, regardless of the scope of the program or service at issue, *Choate*'s "meaningful access" standard endures as the ultimate standard by which Plaintiffs' claims are to be assessed.

## II. Analysis

As noted in the Court's prior Order, the only element at issue in Plaintiffs' claims under Title II and Section 504 is whether Plaintiffs were discriminated against at LACCD. *See* Dkt. 155 at 19.

A plaintiff can allege disability discrimination either on a theory of disparate treatment or impact or on a theory of a denial of reasonable modifications or accommodations. *Atayde v. Napa State Hosp.*, 255 F. Supp. 3d 978, 1000-01 (E.D. Cal. 2017) (citing *Fortyune v. Am. Multi-Cinema, Inc.*, 364 F.3d 1075, 1086 (9th Cir. 2004); *Dunlap v. Ass'n of Bay Area Gov'ts*, 996 F. Supp. 962, 965 (N.D. Cal. 1998); *McGary v. City of Portland*, 386 F.3d 1259, 1266 (9th Cir. 2004)). Plaintiffs proceed in this motion on a theory of disparate impact,[1] which requires that Plaintiffs allege that "a facially neutral

[1] The Court instructed Plaintiffs to refile the motion at issue in this Order precisely because, in Plaintiffs' first renewed motion for partial summary judgment, Plaintiffs had failed to show disability discrimination via a failure to make reasonable accommodations and instead advanced arguments more suited for a disparate impact theory. *See* Dkt. 167 at 2-5. Although Plaintiffs' current motion properly addresses the framework for discrimination through disparate impact, LACCD oddly devoted the majority of its arguments in opposition to Plaintiffs' "failure to accommodate" theory, ignoring the Court's Order on Plaintiffs' first renewed summary judgment motion as well as the arguments contained in Plaintiffs' instant motion.

policy has a significantly adverse or disproportionate impact on disabled persons." *Id.* (citing *Lawman v. City & County of San Francisco*, 159 F. Supp. 3d 1130, 1148 n. 11 (N.D. Cal. 2016)); *see also Crowder v. Kitagawa*, 81 F.3d 1480, 1483 (9th Cir. 1996) (noting that "Congress intended to prohibit outright discrimination, as well as those forms of discrimination which deny disabled persons public services disproportionately due to their disability" and that therefore the ADA covers "at least some so-called disparate impact cases of discrimination"). In the context of the ADA, "a person with a disability may be the victim of discrimination precisely because she did not receive disparate treatment when she needed accommodation." *Presta v. Peninsula Corridor Joint Powers Bd.*, 16 F. Supp. 2d 1134, 1136 (N.D. Cal. 1998) (citation omitted). Therefore, "equal treatment may not beget equality, and facially neutral policies may be, in fact, discriminatory if their effect is to keep persons with disabilities from enjoying the benefits of services that, by law, must be available to them." *Id.*; *see also Rodde v. Bonta*, 357 F.3d 988, 998 (9th Cir. 2004) ("[S]tate action that disproportionately burdens the disabled because of their *unique needs* remains actionable under the ADA.") (emphasis added).

Ultimately, however, "courts should not dwell on distinctions between intentionally discriminatory practices and those that are merely 'thoughtless,' but should instead 'assess whether disabled persons were denied "meaningful access" to state provided services.'" *United States v. County of Los Angeles*, No. CV 15-05903 DDP (JEMx), 2016 WL 2885855, at *5 (C.D. Cal. May 17, 2016) (quoting *Crowder*, 81 F.3d at 1484); *see also Choate*, 469 U.S. at 302. Notably, a plaintiff may maintain a claim under Title II and Section 504 simply by showing a violation of one of the implementing regulations, "if such violation denied the plaintiff meaningful action to a public benefit." *A.G. v. Paradise Valley Unified Sch. Dist. No. 69*, 815 F.3d 1195, 1204 (9th Cir. 2016) (citing *Mark H. v. Hamamoto*, 620 F.3d 1090, 1096 (9th Cir. 2010)).

Moreover, once disability discrimination through disparate impact is established, liability can only be found if the public entity can make "reasonable modifications" in its policies, practices, or procedures that are "necessary" to avoid or remedy the discriminatory impact. 28 C.F.R. § 35.130(b)(7)(i); *see also Crowder*, 81 F.3d at 1485 (addressing the plaintiffs' requirement to propose reasonable modifications as part of the defendant's motion for summary judgment).[2] The burden to

---

Plaintiffs are not moving for summary judgment on its "failure to accommodate" theory and instead represent that they intend to pursue that theory at trial if necessary. *See* Dkt. 169 at 4 n. 3.

[2] It is quixotic that a plaintiff would be required to establish the existence of reasonable modifications as part of the plaintiff's prima facie case of liability under Title II, rather than merely as part of the inquiry into whether and to what extent injunctive relief is appropriate. Nevertheless, the Ninth Circuit in *Crowder* appeared to dictate such a result. Indeed, the Ninth Circuit noted the existence of a genuine dispute of material fact precluding summary judgment as "whether the plaintiffs'

identify reasonable modifications initially falls on the plaintiff. *See Crowder*, 81 F.3d at 1485 (analyzing the sufficiency and reasonableness of the plaintiffs' proposed modifications under § 35.130(b)(7)). Then, under § 35.130(b)(7)(i), the burden shifts to the public entity to "demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7)(i).

Plaintiffs categorize their allegations of ADA violations by LACCD into five separate categories: (1) inaccessible in-class materials, (2) inaccessible textbooks, (3) inaccessible educational technology, (4) inaccessible websites and other computer applications, and (5) lack of access to resources in the LACC library. The Court notes that the issues of inaccessible textbooks and inaccessible educational technology are intertwined and apply concurrently to Plaintiff Roy Payan's enrollment in two math courses at LACC; therefore, the Court considers those two categories of discrimination to be one in the same. The Court will address each of the categories of discrimination Plaintiffs identify in turn to determine whether, as a matter of law, Plaintiffs' were discriminated against through disparate impact at LACC and whether Plaintiffs have identified the existence of a reasonable modification.[3]

**A. In-Class Materials**

Plaintiffs put forward uncontested evidence at the summary judgment stage that they were not provided with in-class materials, including handouts and PowerPoint presentations, in accessible formats at the same time as their classmates. In Philosophy I, Payan's professor did not provide Payan with in-class handouts in a digital, readable format. Dkt. 48-5 at 134:21-135:21. During class, Payan was deprived of the utility of the material on the handouts, unlike the rest of his sighted classmates, and was unable to follow along in class whenever the professor referenced the handouts. Plaintiff Portia Mason corroborated Payan's evidence, stating that she never received handouts ahead of class for any of the

---

proposed modifications to Hawaii's quarantine amount to 'reasonable modifications' which should be implemented, or 'fundamental[ ] alter[ations],' which the state may reject." 81 F.3d at 1485 (alterations in original). Because a public entity has a right to reject fundamental alterations to its programs, even if those programs effectively discriminate against individuals with disabilities, it logically follows that a public entity would not be liable for disability discrimination under Title II in the first instance if no reasonable modifications to the public entity's programs exist.

[3] Despite numerous opportunities to advance an argument that any of Plaintiffs' proposed modifications are not reasonable or would fundamentally alter the nature of the programs or services offered at LACC, LACCD again fails to do so. Without any such argument before the Court, the only focus of the analysis regarding the "reasonable modifications" requirement is whether Plaintiffs have met their prima facie burden to identify a reasonable modification to LACCD's policies, practices, or procedures that would cure the alleged discrimination against blind students.

courses she took during her two semesters at LACC. Dkt. 48-7 at 47:10-18. Mason also had to use a handbook in Abnormal Psychology for in-class discussion, but the professor never informed students ahead of time as to what sections of the handbook would be addressed in class. As a result, Mason could not follow along in class and had to read the relevant sections of the handbook using her digital audio player when she got home. *Id.* at 116:10-14. Lastly, Mason testified that Dr. April Pavlik, the instructor for Mason's Introduction to Psychology course, utilized PowerPoint presentations for nearly every class session, but Mason was unable to download the PowerPoint slides into an accessible version after class because of the extent of graphics used on the PowerPoint slides with no explanatory text that JAWS could read. *Id.* at 124:23-125:3, 126:11-127:3.

Without access to handouts or other materials used for in-class lectures, blind students are negatively impacted in their ability to absorb the substantive course materials and to communicate effectively with their professors and classmates during class sessions. Blind students are unable to follow along with all of the material in class and are at a disadvantage regarding in-class student participation compared to their sighted classmates, who can read the handouts or PowerPoint slides and discuss the material without assistance. Therefore, the inequity in access to all course materials may deprive blind students an equal opportunity to succeed in the class. In this case, Plaintiffs had to read the handouts provided to them in class after the class session on their own time, including the obligation to travel to the Office of Student Services ("OSS") in order to obtain an accessible version of the handout. If Plaintiffs were unable to follow along with the discussion of the handouts in class, Plaintiffs would be disadvantaged when trying to learn the materials from the handouts in the first instance, without being able to rely on classmates or the professor for clarification or discussion of complex topics. Handouts and PowerPoint slides that expand class discussions are an important part of the course curriculum, and blind students receiving these materials during class in an inaccessible format are excluded from that portion of the educational experience.

However, based on the limited information provided by Plaintiffs about the extent of their lack of access to handouts or other materials used in class session, the Court cannot conclude at this stage that Plaintiffs' lack of access to in-class materials rises to the level of a deprivation of "meaningful access" to the benefits of the individual courses in which Plaintiffs received those materials. Without more specificity, any conclusions that may be drawn from Plaintiffs' lack of access to in-class materials would merely be conjecture or speculation.

For instance, it is unclear to the Court the frequency in which Plaintiffs received inaccessible handouts in any particular course, and neither have Plaintiffs provided sufficient detail about the extent

to which those handouts were used during class. Certainly, if a professor relied on in-class handouts to fuel class discussions for each session, then a blind student without access to those handouts has been deprived of an equal opportunity to participate in class discussions throughout the entirety of the course, which would be a deprivation of "meaningful access" as a matter of law. But conversely, if handouts were distributed only once or twice in a particular class, or if handouts were seldom discussed during class to elucidate the curriculum, then a blind student would not be without meaningful access to that particular course as a whole. In this regard, the scope of analysis precludes the Court from considering whether LACCD continually and routinely deprives blind students access to in-class materials in all courses generally; the focus is on each course individually.

Similarly, the extent of Mason's lack of access to PowerPoint slides in Dr. Pavlik's course has not been sufficiently elucidated at this stage. Mason avers that she could not download an accessible version of the PowerPoint slides, but Mason does not explain in her deposition the role these PowerPoint slides played in the assigned curriculum for the course. It is also unclear whether Mason was provided access to a digital version of the PowerPoint slides, *i.e.*, before or after the class session, which materially impacts whether Mason was able to participate meaningfully during the lecture. And if there is any doubt, Mason's deposition testimony alone is insufficient to create an undisputed fact that Dr. Pavlik's PowerPoint slides were inaccessible to blind students; Dr. Pavlik testified that she used "alt text" in her digital PowerPoint files to describe the graphics embedded in the slides, and she offered to blind students the choice to have Dr. Pavlik or another student in the class describe the handouts or slides in detail during the lecture. Dkt. 54-14 at 84:9-13, 91:25-92:9. This creates a genuine dispute of fact as to the accessibility of Dr. Pavlik's PowerPoint slides and the significance of access to those slides as it pertains to Mason's ability to enjoy "meaningful access" to the materials in Dr. Pavlik's psychology course.

In sum, Plaintiffs have not provided sufficient factual information about the full extent of their lack of access to in-class handouts or other course materials and how that lack of access impaired Plaintiffs' ability to receive meaningful access to the benefits of their courses. Therefore, the Court is unable to conclude that summary judgment is warranted on the issue of LACCD's liability under Title II and Section 504 for LACCD's failure to ensure all in-class materials are accessible to blind students. Without a finding that LACCD discriminated against Plaintiffs as a matter of law in terms of handouts, the Court need not address Plaintiffs' proposed reasonable modifications to resolve Plaintiffs' lack of access at this time.

________ : ________

Initials of Preparer PMC

### B. Educational Technology and Textbooks

Next, Plaintiffs take issue with two programs utilized in courses in which Payan enrolled, which were inaccessible to blind students and impaired Payan's ability to follow along with course material or participate in class discussions. One program is MyMathLab, which the Court analyzed extensively in its prior Order on Plaintiffs' initial motion for partial summary judgment. *See* Dkt. 155 at 5-7. Plaintiffs argue that, even though LACCD attempted to offer Payan the same educational benefits as MyMathLab through math problems from a textbook, LACCD failed to ensure that Payan received accessible versions of the relevant portions of the textbook in a timely manner to allow Payan to follow the course curriculum.

The other program, which the Court also addressed previously, is Etudes, used in the General Psychology course Payan took in the Fall 2016 semester. *See id.* at 7. Plaintiffs acknowledge via a footnote that LACCD no longer uses Etudes at LACC, and instead LACCD uses a program called Canvas, which is a learning management system that allows professors to upload documents for student use and review. *See* Dkt. 48-37 at 8. The discontinued use of Etudes at LACC may affect whether injunctive relief would be available on mootness grounds, but because Plaintiffs also seek a jury finding of deliberate indifference to support a monetary award, the Court will analyze the underlying issue of whether LACCD discriminated against blind students through the use of Etudes.[4]

For both of these educational technologies, the scope of the "program" offered by LACCD is the specific courses at LACC in which those programs were used.

[4] As to Canvas, Plaintiffs' expert Peter Bossley analyzed the accessibility of Canvas to blind individuals using screen-reader software such as JAWS and concluded that Canvas is "generally accessible" but poses risks of inaccessibility if documents uploaded to Canvas by faculty or instructors are not properly formatted in an accessible manner. Dkt. 48-37 at 8. Plaintiffs have not alleged in its motion how LACCD discriminated against blind students through the use of Canvas, which Plaintiffs' expert admits is accessible technology on its own. Therefore, the Court will not discuss Canvas in this Order, and Plaintiffs may attempt to show at trial how LACCD's use of Canvas for courses at LACC deprived Plaintiffs of meaningful access to the benefits of those courses in which Canvas was utilized.

1. *Discrimination*

i. *MyMathLab and Math Textbook*

The undisputed record at the summary judgment stage reveals that Payan was unable to access the benefits of the MyMathLab program. Plaintiffs' expert Mr. Bossley enumerated significant barriers to accessibility to MyMathLab when using the JAWS program. *See* Dkt. 48-37 at 10-19. Mr. Bossley noted difficulties navigating the MyMathLab program using the screen reader software, in part due to a lack of notifications when actions were taken, which prevented blind students from locating the necessary course materials. *Id.* at 12-15. In the absence of an effective notification system, blind students were not able to access videos, complete assignments, or use important features of the program such as the graphing tool. *Id.* at 15-20. Payan corroborated in his deposition that he encountered these same difficulties when attempting to use the MyMathLab program. Dkt. 48-5 at 54:11-55:11, 62:20-64:2. Ms. Dietrich, LACCD's expert, agreed with Mr. Bossley's findings that MyMathLab was inaccessible. *See* Dkt. 48-29 at 69:18-70:3.

The compatibility issues between MyMathLab and JAWS alone does not necessitate a finding that Payan did not receive an equal opportunity to participate in the math class compared to his peers. It is unclear to the Court the full slate of educational benefits potentially offered by MyMathLab, which appears to be primarily a tool for accessing and completing assignments containing math problems. Based on the undisputed evidence advanced by Plaintiffs, the only use for MyMathLab in Math 124A was a repository for homework assignments. If those same homework assignments could be provided to Payan in an accessible format outside of the MyMathLab program, then Payan would still receive the same benefits as all other sighted students who are freely able to use MyMathLab, and LACCD would meet its obligations under Title II and Section 504 to ensure equal opportunity to Payan and other blind students.

LACCD did attempt to provide Payan with the benefits of the MyMathLab program through math problems from the course textbook. After Payan reported his inability to use MyMathLab to Ryan Kushner at OSS, Mr. Kushner spoke with Payan's professor, and they determined that the solution would be to assign Payan math problems from the course textbook. Defendant's Additional Undisputed Material Facts, Dkt. 54-1 ("DSUF"), ¶ 78; Dkt. 48-12 at 48:1-16. But Payan was required to have the textbook problems converted to an accessible format on his own initiative, by bringing the textbook to OSS himself for conversions on an ad hoc basis. Dkt. 48-5 at 73:5-75:23. OSS could not digitize the textbook fast enough to keep up with the course, so Payan received his accessible assignments late. *Id.*

:

Initials of Preparer PMC

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | 2:17-cv-01697-SVW-SK | Date | April 23, 2019 |
| Title | *Roy Payan, et al v. Los Angeles Community College District, et al.* | | |

LACCD's undisputed failure to ensure that Payan received his equivalent math textbook assignments prior to or at the same time that sighted students received their MyMathLab assignments constituted disability discrimination as a matter of law. It was necessary for Payan to receive these assignments in a timely manner so that Payan could maintain the same pace in the curriculum as sighted students. This is particularly true for a math class, which requires cumulative comprehension of past concepts in order to apply those concepts in new manners over the duration of a course. Without access to the assignments in a timely manner, Payan understandably fell behind in his math classes. Dkt. 48-5 at 75:8-11. Payan's sighted classmates did not encounter any of these same difficulties. There is no question that a student without timely access to the textbook and homework assignments for a course is denied meaningful access to the benefits of that course.

LACCD first points out that MyMathLab was previously tested for accessibility with JAWS, and that the math department at LACC routinely tests math software to ensure the software is "up to par" and accessible. DSUF ¶ 58. But prior testing for accessibility is immaterial if the technology is currently inaccessible, as Mr. Bossley's expert report reveals. LACCD has provided no rebuttal to the findings of Mr. Bossley regarding the barriers to access found in MyMathLab, and LACCD's own expert agrees with the conclusions in Mr. Bossley's report. There is simply no basis to conclude that merely testing technology for accessibility once is enough to shield LACCD from liability for any accessibility issues that arise in the future.

LACCD next argues that Payan requested conversion of his math textbook in a tardy manner, weeks after the semester had begun. Dkt. 172; DSUF ¶ 84. LACCD thus seeks to place the blame on Payan for his untimely receipt of digitalized assignments. However, it is irrelevant whether Payan may have sought out help from OSS after the course had already started. LACCD was affirmatively obligated under Title II and Section 504 to provide Payan with accessible versions of these materials *without* requiring Payan to be responsible to initiate a clear need for accommodation on his own accord. Simply offering a solution to blind students that is insufficient to provide those students with equal access as their peers does not absolve LACCD from taking any further action. And in any event, requiring blind students such as Payan to seek affirmative assistance for their disabilities through repeated conversion requests and trips to OSS is itself a disparate burden imposed upon blind students, rendering their educational experience for a particular class inferior to those of their peers. *See Cal. Council of the Blind v. County of Alameda*, 985 F. Supp. 2d 1229, 1239 (N.D. Cal. 2013) ("[R]equiring blind and visually impaired individuals to vote with the assistance of a third party, if they are to vote at all, at best provides

: 

Initials of Preparer PMC

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | 2:17-cv-01697-SVW-SK | Date | April 23, 2019 |
| Title | *Roy Payan, et al v. Los Angeles Community College District, et al.* | | |

these individuals with an inferior voting experience 'not equal to that afforded others.'") (quoting 28 C.F.R. § 35.130(b)(1)(ii)).

LACCD's existing accommodations for blind students failed to provide Payan with reasonable alternatives to the MyMathLab program, *i.e.*, a digitized version of the course textbook in a timely manner, that would have enabled Payan to gain the same educational benefits from the class as his peers. Nothing more is required for the Court to conclude as a matter of law that LACCD's facially-neutral practices, policies, and/or procedures requiring ad hoc conversions of course materials upon request by a student with disabilities disparately impacted Payan and denied Payan meaningful access to his math courses. *See, e.g.*, *Disabled in Action*, 752 F.3d at 201 (finding that defendant elections agency's "*ad hoc* policy of remedying barriers to access as they occur is inadequate, especially as [defendant] does not respond to many accessibility issues even after they are brought to its attention"); *Am. Council of the Blind v. Paulson*, 463 F. Supp. 2d 51, 59 (D.D.C. 2006) (finding discrimination against blind individuals regarding the use of currency where a blind individual "cannot accurately identify paper money without assistance"), *aff'd*, 525 F.3d 1256 (D.C. Cir. 2008); *see also* Dkt. 48-18 (the Chancellor's Guidelines issued in 2000 noting that "courts have held that a public entity violates its obligations under the ADA when it only responds on an ad hoc basis to individual requests for accommodation" and stressing the "affirmative duty to develop a comprehensive policy in advance of any request for auxiliary aids or services"). Accordingly, summary judgment is warranted in favor of Plaintiffs on the issue of LACCD's discrimination against Payan on account of Payan's disability in Payan's math courses.

ii. *Etudes*

There is no genuine dispute that Payan could not access the benefits of the Etudes program in his General Psychology course taken in the Fall 2016 semester. Plaintiffs' Statement of Undisputed Facts, Dkt. 48-2 ("PSUF"), ¶ 73.

Payan's psychology professor used Etudes for posting assignments and required students to submit those completed assignments through the Etudes program. Dkt. 48-5 at 212:1-7. Etudes also included a discussion forum where students could submit comments or questions to other students and participate in a discussion about the course material as a class. *Id.* Mr. Bossley's expert report identified numerous problems with the program that hindered the effectiveness of screen reader programs like JAWS. Specifically, Etudes had poor landmarking of its pages and inadequate notifications when actions were taken, which makes it difficult for blind users to navigate through the program. *See* Dkt. 48-37 at 20-21. Mr. Bossley also revealed that the messages system on Etudes was particularly

:

Initials of Preparer PMC

inaccessible, since the program did not have descriptive text explaining the entry fields that users had to fill out when composing a message. *Id.* at 21. Payan confirmed at his deposition that the Etudes program did not work for him personally. Dkt. 48-5 at 207:10-13, 212:8-12. LACCD's expert, Ms. Dietrich, concurred with Mr. Bossley's conclusion that Etudes was inaccessible. Dkt. 48-29 at 69:18-70:3.

Prior to enrolling in a psychology course, Payan informed faculty in the psychology department that he was unable to use Etudes because of its incompatibility with JAWS, and the professor responded that it was Payan's problem, and that he should speak to OSS. Dkt. 48-5 at 207:7-15. Payan's professor attempted to accommodate Payan during the general psychology course by emailing Payan the assignments posted on Etudes in Microsoft Word format and allowing Payan to turn in his completed assignments by email. *Id.* at 210:5-11, 211:2-5. This was sufficient to ensure that Payan received access to the important course materials, specifically those that constitute graded assignments, and Plaintiffs do not seem to argue that the school needed to do more to make sure that Payan received his assignments. Plaintiffs also do not claim that Payan received his assignments from the professor in a tardy manner. Thus, the LACCD provided Payan meaningful access to the assignments posted on Etudes.

However, the accommodations provided by Payan's professor did not address Payan's inability to access the class discussion forums on Etudes. Based on the undisputed evidence before the Court, Payan's inability to use Etudes deprived him of the opportunity to participate in these class discussions, placing Payan at a potential disadvantage compared to his sighted peers regarding his ability to comprehend complex philosophy subjects. Payan also was denied effective communication in the course, as he was excluded from a setting for discussing the course material with his peers. Payan testified that he was excluded from this educational experience, and Payan's inability to access Etudes was not an "isolated" incident of negligence on the part of LACCD—because the software was unusable with JAWS, all of the inherent features of Etudes continued to be unavailable to Payan during the entire duration of the course.

Nevertheless, as with the above analysis of inaccessible in-class materials, Payan's testimony is insufficient to establish as a matter of law that Payan was denied "meaningful" access to his psychology course through the inability to access the discussion forums on Etudes. The Court does not have a sufficient factual record at this stage to determine how often the discussion forums were utilized by students, whether participation in these discussions was encouraged or required by the professor, or whether any activity on the discussion forums was discussed during class sessions. Although Payan's inability to access Etudes likely denied Payan with equally effective communication and an equal opportunity to participate in the psychology course, see 28 C.F.R. §§ 35.160(a)(1), (b)(1), the

outstanding factual questions preclude the Court from concluding that the lack of equal opportunity equates to a finding of a deprivation of meaningful access to the benefits of the psychology course. Therefore, summary judgment is not warranted at this time regarding the Etudes program, and the Court will proceed to analyze Plaintiffs' proposed reasonable modifications to avoid discrimination against blind students regarding only the MyMathLab program and OSS's ad hoc textbook conversions.

2. *Reasonable Modifications*

Plaintiffs identify two reasonable modifications that would remedy Payan's lack of meaningful access to MyMathLab and accessible versions of math textbooks.

First, Plaintiffs suggest that LACCD could cease using MyMathLab as a way to overcome the technological difficulties with the program. Dkt. 172 at 19. The Court agrees that this would be a reasonable solution to avoid discrimination against blind students, but such a modification is not "necessary" to accomplish that goal.

The fact that JAWS is incompatible with MyMathLab does not render MyMathLab unusable in any class at LACC. Instead, the school is simply required to make sure that, if it decides to use a program such as MyMathLab in a particular course, all of the educational benefits offered by the program can still be obtained by students with disabilities. As noted above, blind students may be able to receive the same benefits from MyMathLab—namely, access to homework assignments—through equally effective alternatives, such as digitized versions of math problems from a textbook provided to blind students in a timely manner. If Payan was given an accessible version of his math problems at the same time that the rest of the class was assigned problems on MyMathLab, Payan would enjoy the same access to the course materials without any temporal disadvantage. Tools like MyMathLab certainly enhance the educational experience for students that gainfully utilize them to complete math problems, but in the absence of such tools, students may still be able to learn the material in the same manner and with the same effectiveness by completing equivalent math problems out of a textbook.[5] Therefore, while removing MyMathLab from LACC until it is proven to be accessible to blind students would be a

[5] Although equally effective alternatives exist for MyMathLab as it was used in Payan's Math 124A course, the same might not be true for Etudes, since blind students would not be able to access and participate in class discussion forums on a software program outside of that software program. In such a case, it may be that the only reasonable modification available to avoid discriminating against blind students would be the discontinued use of the software program entirely. The Court need not reach this question, however, because Plaintiffs did not carry their burden at summary judgment to establish as a matter of law that Payan was discriminated against through his exclusion from the Etudes program.

reasonable manner to avoid discriminating against blind students, it does not necessarily constitute a "necessary" modification under 28 C.F.R. § 35.130(b)(7).

Second, Plaintiffs recommend that LACC's Alternative Media Production Policy, Dkt. 48-21 (the "Media Policy"), should explicitly be expanded to apply not only to "instructional resources or materials" but also to accessible course textbooks. In relevant part, the Media Policy sets forth several listed items constituting "Basic College Responsibility for Providing Alternative Media." *Id.* at 1. These basic responsibilities are the following:

- All instructional resources or materials purchased or leased from a third-party provider or created or substantially modified "in-house" must be accessible to students with disabilities, unless doing so would fundamentally alter the nature of the instructional activity or result in undue financial and administrative burdens on the district. The Dean of Educational Technology will review all instructional equipment purchase requisitions and contract requests to ensure compliance with federal and state regulations regarding the purchasing and leasing of instructional materials.
- The instructional resources or materials used in each course will be reviewed and revised as necessary when the course undergoes curriculum review pursuant to Title V every six years as part of the accreditation process. In the event that a student with a disability enrolls in a course before this review is completed, the college will be responsible for acting in a timely manner to make instructional materials or resources used in the course accessible, unless doing so would fundamentally alter the nature of the instructional activity or result in undue financial and administrative burdens on the district.
- Faculty members are encouraged to make textbook selections as far in advance as possible and to avoid changing the selection unless there are compelling reasons. The bookstore should remind faculty members about the need to place orders as early as possible and should process the orders promptly once they are received. In order to provide adequate time for the production of information in alternate media faculty members are asked to

make book selections by the middle of the fall and spring semesters for the subsequent semester/session.

- Faculty are also asked to provide syllabi, handouts and other materials as far in advance as possible and to utilize E-text when available. To allow adequate time for the production of this information in alternate media, faculty members are encouraged to make available course syllabi, handouts and other course materials by the middle of the fall and spring semesters for the subsequent semester/session. Course materials received after that time will be produced in alternate media as quickly as possible but may not be available for the beginning of the semester/session.

*Id.* at 1-2. Plaintiffs believe that LACCD's enforcement of the Media Policy, specifically with regard to textbooks, would resolve the problems Payan faced when attempting to use MyMathLab and when seeking to obtain a digitized version of his math textbook from OSS. Dkt. 169 at 17.

By virtue of the fact that LACCD already adopted the Media Policy, requiring LACCD to enforce it fully is certainly a reasonable modification to LACCD's current practices, to the extent that the Media Policy is not being followed at LACC. Specifically, Mr. Bossley's expert report and Payan's experience in his math courses confirms that MyMathLab, a third-party software acquired by LACCD for use in math classes at LACC, is not accessible to blind students, meaning that LACCD failed to ensure that "[a]ll instructional resources or materials purchased or leased from a third-party provider . . . [are] accessible to students with disabilities." Dkt. 48-21 at 1.[6] Similarly, during the years in between LACCD's mandatory review of LACC course curriculum under Title V as part of LACC's accreditation process, LACCD is "responsible for acting in a *timely manner* to make instructional materials or resources used in the course accessible," *id.* (emphasis added), which the undisputed record shows was not the case regarding OSS's conversion of Payan's math textbook. Ensuring that LACCD procures only fully accessible third-party software, and if such software is not available, requiring LACCD to supply all blind students with accessible versions of equivalent textbooks or other materials prior to or at the same time that sighted students access the software program, would not fundamentally change the nature of any of LACC's offered courses. At least, LACCD has not argued to the contrary. Therefore, strict adherence to these aspects of the Media Policy would prevent the discrimination experienced by Payan

---

6 Informative to LACCD's failure to ensure all technology acquired is accessible to blind students is the fact that LACCD does not currently have a Dean of Educational Technology, which was last filled in 2007 at the latest. *See* PSUF ¶¶ 18-19.

in his math classes and would ensure that blind students continue to receive equal opportunity in their courses and meaningful access to course materials.

Other aspects of the Media Policy are non-binding and would have no impact on Payan's ability to receive meaningful access in his math classes at LACC. Simply "encouraging" or "asking" LACC's instructors to provide their selected textbooks and other course curriculum "as far in advance as possible" would not guarantee that instructors actually do so. Dkt. 48-21 at 1. Plaintiffs effectively seek a modification of these advisory aspects of the Media Policy to *require* professors to select textbooks sufficiently early to allow for LACCD to obtain accessible versions of textbooks before the material is used in the class. *See* Dkt. 169 at 17. The Court agrees that shifting the onus in part onto instructors can be an effective method of detecting accessibility issues before a class begins, which would give LACCD an opportunity to address those accessibility issues proactively at the appropriate time.

LACCD's argument in defense is that it would be "inherently not feasible" for LACC to convert all textbooks used by professors for any class to have digital versions of those textbooks available for blind students before any requests are made. Dkt. 172. LACCD provides no evidence in support of its position. LACCD does not explain the amount of time or financial resources it might take to digitalize textbooks commonly used in courses at LACC, let alone the number of textbooks it would need to convert to an accessible format. LACCD plainly failed to satisfy its burden to "demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity," 28 C.F.R. § 35.130(b)(7)(i), which in any event does not appear to contemplate economic burdens in coming into compliance with Title II. Indeed, LACCD has not, and cannot credibly, make an argument that its classes would be fundamentally altered if professors were required to provide accessible versions of math problems to blind students *at the same time* it assigns problems on MyMathLab to sighted students. Whatever additional effort faculty or professors would be required to exert in the accommodations process, such efforts would not "fundamentally alter" the nature of the course.

Furthermore, LACCD misunderstands the scope of Plaintiffs' claims by arguing that Plaintiffs' requested relief would require LACC to make textbooks compatible for students "with a multitude of different disabilities" without knowing whether students with those disabilities were even enrolled at the school. Plaintiffs' requested relief pertains only to discrimination against blind students, not any student with any disability qualifying for protection under Title II and Section 504. If LACCD is not meeting its federal obligations with regard to students with disabilities other than sight impairment, then those questions can be resolved in separate proceedings. Moreover, LACCD would have ample notice and opportunity to digitize textbooks for blind students in advance of the courses in which those students

enroll, during the time between when a blind student signs up for a particular course and the first day of class. Blind students also submit accommodations forms when they enroll at LACC, refuting LACCD's suggestion that the school is caught by surprise whenever a blind student requires a textbook conversion for a particular class. Ultimately, in making such an argument, LACCD ignores its affirmative obligations under Title II and Section 504 to ensure in the first instance that all services and materials offered to students with disabilities are provided in an accessible format at the same time as all other students.

* * * * *

Based on the above, the Court GRANTS summary judgment for Plaintiffs' regarding LACCD's failure to provide Payan with access to MyMathLab or, as an alternative, timely access to textbook assignments in an accessible format. Plaintiffs have clearly shown that reasonable modifications exist that could remedy the discrimination against Payan and other students with sight impairment, without constituting a fundamental alteration of the math courses in which Payan was enrolled.

**C. Websites and Other Computer Applications**

1. *Discrimination*

Plaintiffs submitted declarations affirming that they could not access the PeopleSoft program—a student information system used throughout LACCD's schools to allow students to access materials regarding their enrollment—or other aspects of the LACC website. Payan stated that, "[s]ince the Spring of 2017 I have had trouble navigating the LACC website because JAWS will only read some parts of the website," and as a result Payan was unable to download his transcript or register for classes. *See* Dkt. 48-39 ¶¶ 2-4. Mason corroborated Payan's declaration, averring that "I was unable to search for particular classes using JAWS [on the LACC website] because the [PeopleSoft] system did not indicate what search criteria I should input." Dkt. 48-38 ¶ 4.

Mr. Bossley confirmed that the use of PeopleSoft rendered the LACC website inaccessible through JAWS. *See* Dkt. 48-37 at 4-7. Mr. Bossley noted that the uses for PeopleSoft include course registration, viewing grades and class schedules, applying for and accepting financial aid, paying fees, and reviewing holds on a student's enrollment. *Id.* at 4. Mr. Bossley found numerous landmarking issues and lack of notifications through the PeopleSoft application, as well as deficiencies in PeopleSoft's search function when attempting to search for classes and selecting courses in which to enroll. Dkt. 48-

37 at 4-7. Mr. Bossley also found a lack of a robust heading and landmark structure on the LACC website generally, including the absence of descriptive alternative text for links on LACC webpages, which causes confusion and precludes navigability amongst screen reader users. *Id.* at 8-9.

Without access to these programs, Plaintiffs were deprived of an equal opportunity to enroll in classes and access important information about their enrollment at LACC compared to their peers. While sighted students are able to perform these tasks online from the comfort of their own home, blind students without reliable access to the LACC website require assistance from school administrators. Blind students are materially impacted in their educational trajectory at LACC to the extent that their inability to access the LACC website affects when blind students are able to enroll for classes. If class signups are conducted in a "priority" system based on arbitrary enrollment times for different groups of students, blind students are placed at a disadvantage if they are unable to utilize their signup time in an optimal manner. However, Plaintiffs do not provide any further detail about the negative repercussions of being unable to access the LACC website. It would be mere conjecture for the Court to conclude, based on the factual record, that Plaintiffs' inability to enroll for classes on the LACC website meaningfully impaired Plaintiffs' ability to sign up for the classes they wanted to take.

Nevertheless, based on the Court's analysis above, the proper scope of the "program or service" at issue here is the LACC website itself. A holistic view of the service as the student's enrollment at LACC generally would preclude any tangible review of whether any of LACC's particular benefits offered to all enrolled students differentiate between sighted students and blind students. LACC has made its website open and available to all students enrolled at LACC, signifying that the ability to sign up for classes on the website and to view important enrollment information is itself a "service" warranting protection under Title II and Section 504. There is no broader context of a particular class or course that encompasses the LACC website, so any benefits offered to students on the website itself must be viewed in isolation from any other benefits afforded to blind students throughout the LACC campus.

When analyzing the LACC website in this manner, it is clear that blind students are denied meaningful access to the LACC website through its incompatibility with JAWS. Blind students are required to take additional steps to sign up for classes and view enrollment information than sighted students, including receiving assistance from third-party counselors or administrators. By making the accessibility of enrollment management resources dependent on third-party assistance, LACCD discriminates against its blind students regarding their ability to manage their education independently. *See, e.g.*, *Disabled in Action*, 752 F.3d at 200 (rejecting an argument that further accommodations for

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | 2:17-cv-01697-SVW-SK | Date | April 23, 2019 |
| Title | *Roy Payan, et al v. Los Angeles Community College District, et al.* | | |

handicapped individuals at voting polls was not required because "[t]he right to vote should not be contingent on the happenstance that others are available to help"); *Cal. Council of the Blind*, 985 F. Supp. 2d at 1239 (holding that a county "cannot fulfill its obligation to ensure effective communication by providing third party assistants to blind and visually impaired voters").

As with MyMathLab, LACCD argues that PeopleSoft was tested for accessibility to blind users in 2015. DSUF ¶ 59. But again, simply testing technology for accessibility once does not satisfy LACCD's obligations under Title II and Section 504 to ensure that technology *remains* accessible to blind students. LACCD also fails to provide any further detail about the prior testing of PeopleSoft in 2015, including whether the test results revealed that PeopleSoft is accessible to JAWS users in contradiction to Mr. Bossley's findings. LACCD's reliance on the fact that prior testing of PeopleSoft occurred, without more information about the results of that testing, is immaterial to LACCD's liability for deploying deficient technology throughout campus.

LACCD does not challenge Plaintiffs' inability to use PeopleSoft or the LACC website in any other manner, arguing only that Plaintiffs' requested reasonable modifications are insufficient. Therefore, the Court holds that Plaintiffs have established as a matter of law that LACCD discriminated against blind students by denying blind students meaningful access to important enrollment management information on the LACC website.

2. *Reasonable Modifications*

Plaintiffs identify two proposed modifications to LACCD's practices that would remedy blind students' lack of meaningful access to the LACC website.

First, Plaintiffs request that LACCD implement "active compliance programs, monitoring, and oversight procedures," as recommended by their expert witness Mr. Bossley. Dkt. 48-35 ¶ 13; *see also* Dkt. 48-37 at 22-23. Plaintiffs, and Mr. Bossley, elaborate that these procedures would include the designation of a "Web/Digital Accessibility Coordinator," a position with responsibility and authority to ensure that LACC complies with its obligations under federal law to make all technology accessible. Dkt. 48-35 ¶¶ 14-15; *see also* Dkt. 48-37 at 23-24 (describing in greater detail important features of a suitable compliance program).

The thrust of this proposed remedy would be to institute a framework of sufficient controls to prevent future accessibility obstacles for technology used throughout the LACC campus, but Plaintiffs

: 

Initials of Preparer PMC

do not specifically mention how these controls would resolve the barriers blind students face when attempting to access the current version of the LACC website. LACCD correctly notes that the mere hiring of an accessibility coordinator to institute foundational changes to LACC's practices regarding accessible technology does not necessarily cure the lack of access to PeopleSoft in the short-term. And Plaintiffs' proposed modification would be far-reaching, affecting all technology used throughout the entire school, rather than narrowly limited to the discriminatory violation at issue regarding the LACC website.

Next, Plaintiffs reference LACCD's Administrative Regulation B-33, issued on February 10, 2014, which establishes requirements for website accessibility applicable to LACCD's schools in accordance with the ADA and Section 508 of the Rehabilitation Act, 29 U.S.C. § 794d.[7] *See* Dkt. 48-19. Regulation B-33 makes "[c]ontent providers" responsible for maintaining timely and accurate information on their assigned areas of the LACC webpages and for ensuring that the website reflects a "consistent look and feel across all pages" to allow for "ease of use for site visitors." *Id.* at 2. Where LACCD contracts to develop, maintain, or host websites, Regulation B-33 makes LACCD's coordinating employee responsible to ensure that the contracting party "meets accessibility standards and that accessibility standards are addressed within the contract." *Id.* Regulation B-33 explicitly notes that it "does not stipulate a specific set of design principles but strives to ensure that the most current criteria are used." *Id.* Regulation B-33 continues by acknowledging that it may be "technologically unfeasible" to provide accessible versions for all documents that users wish to access on the LACC website, and therefore LACCD commits to "provid[ing] alternative methods of ensuring accessibility of this material." *Id.* at 2-3. Plaintiffs argue that LACCD should be ordered to enforce Regulation B-33, to the extent that LACCD does not currently adhere to its measures. *See* Dkt. 169 at 22.

Regulation B-33 does not appear to impose binding obligations on the part of LACCD and serves merely as a policy directive to seek the maximum accessibility of the LACC website as is possible. For this reason, a court order requiring LACCD to comply with Regulation B-33 would be illusory and would have no impact on LACCD's obligations under Title II and Section 504. Neither would adherence to Regulation B-33's vague standards cure the barriers to access faced by Plaintiffs by virtue of the use of PeopleSoft on the LACC website.

---

7 Amended in 1998, Section 508 imposes requirements on federal departments and agencies to ensure that all electronic and information technology is accessible to individuals with disabilities, including both federal employees and members of the public. *See* 29 U.S.C. § 794d(a).

Lastly, Plaintiffs argue that LACCD should be required to conduct an "accessibility audit," with the goal of replacing inaccessible technology used on campus or requiring vendors to provide accessible technology per their contractual obligations. Dkt. 169 at 22. Plaintiffs further suggest that professors using websites unaffiliated with LACCD as part of their course materials should be required to adhere to "accessibility standards," without defining what those standards should be. *Id.*

This proposed modification may remedy the compatibility issues between PeopleSoft and JAWS, to the extent that LACCD procured PeopleSoft from a third-party vendor contractually obligated to ensure that PeopleSoft is screen-reader compatible. But the parties have not presented sufficient information about how PeopleSoft came to be acquired by LACCD, whether a contract exists between LACCD and a third-party vendor for PeopleSoft, or whether such a contract contains a requirement for the vendor to ensure that PeopleSoft is compatible with screen reader programs. But even if this is the case, Plaintiffs' alleged lack of access extends beyond PeopleSoft into portions of the LACC website itself, which, as far as the Court can tell, was not created pursuant to a contract with any third party. Thus, Plaintiffs' proposed modification, even if feasible, would only resolve the accessibility issues with PeopleSoft, not the LACC website as a whole. As to the wide-reaching "accessibility audit" Plaintiffs propose, this modification again reaches well beyond the scope of LACCD's discrimination against blind students through the LACC website, which is unwarranted. The same is true for Plaintiffs' request that professors adhere to vague, undefined "accessibility standards" when using outside websites during class, which is wholly untethered to the LACC website specifically.

In sum, the Court cannot conclude that any of Plaintiffs' proposed modifications designed to remedy blind students' lack of access to the LACC website constitutes a "reasonable" modification, particularly since "the determination of what constitutes reasonable modification is highly fact-specific, requiring case-by-case inquiry." *Crowder*, 81 F.3d at 1486 (citing *Chalk v. U.S. Dist. Court*, 840 F.2d 701, 705 (9th Cir. 1988)). Plaintiffs have not met their burden to provide sufficient facts about what would be necessary to fix the accessibility barriers on PeopleSoft or the LACC website generally, or even whether those barriers can be fixed at all through reasonable means. Instead, Plaintiffs' proposals are vague, excessively broad, and not tailored to LACCD's discriminatory acts regarding the LACC website. Therefore, the Court is unable to conclude as a matter of law that reasonable modifications exist to the LACC website that would cure discrimination against blind students, and summary judgment is not warranted on the question of whether LACCD is liable under Title II and Section 504 for its discrimination against blind students through the LACC website.

:

Initials of Preparer PMC

**D. LACC Library Resources**

1. *Discrimination*

The LACC library offers various electronic databases for student use, which can be accessed by students on the internet outside of the library itself. *See* Dkt. 48-28 at 22:1-4. Barbara Vasquez, chair of the LACC library, testified at deposition that OSS tests these databases periodically to determine whether blind students are able to access those databases independently without assistance. *Id.* at 22:5-18. However, Ms. Vasquez acknowledges that databases are only tested when a blind student reports difficulty accessing that database, meaning that OSS's testing policy amounts to a complaint-driven process. *Id.* at 22:19-25. Ms. Vasquez only identified one database, called Gale, as accessible to blind students following OSS testing. *See id.* at 23:1-25. Robert Dominick, a counselor at OSS, confirmed that OSS does not "get involved" with checking for the accessibility of software or other technology used at LACC until there is an "issue with accessibility" after the technology is required and deployed on campus. Dkt. 48-17 at 47:16–48:4. Mr. Kushner with OSS also confirmed that technology is only examined for accessibility on a complaint-driven basis. Dkt. 48-12 at 39:19-22.

LACC's ad hoc testing policy for accessibility of library databases materially impacted Mason in her attempt to utilize those databases for her coursework. Mason testified that, in her Introduction to Psychology and Abnormal Psychology courses taken in the Spring 2016 semester, Mason was unable to access more than one article from the LACC library's psychology databases due to accessibility issues. *See* Dkt. 48-7 at 26:14-28:20. These problems persisted both on LACC's library computers and on Mason's own computer at home. *Id.* at 28:17-25. Mason also reported additional difficulty attempting to utilize these databases from the LACC school computers because the JAWS software installed on those computers was an outdated version and would time out after being in use for too long, which would require the user to restart the whole system. *Id.* at 28:25–29:25. As a result, Mason was unable to complete her paper for Professor Blythe Daniel's Abnormal Psychology course. *Id.* at 69:6:20.

Like the LACC website analyzed above, the LACC library databases themselves constitute a "program or service" offered to all students enrolled at LACC. Thus, LACCD was obligated to ensure that blind students have meaningful access to the library databases in an equally effective manner as the access afforded to sighted students. The undisputed evidence offered by Plaintiffs establishes that Mason did not have meaningful access to the library databases, either from Mason's home computer or on LACC's library computers directly. LACCD offers no substantive response to challenge Plaintiffs' undisputed facts about Mason's lack of access to LACC library databases, instead addressing only

Plaintiffs' proposed reasonable modifications to LACCD's library database policies. Therefore, LACCD discriminated against blind students as a matter of law by failing to ensure that the LACC library databases were equally accessible to blind students through JAWS as they were to sighted students.

2. *Reasonable Modifications*

For proposed modifications to LACC's library databases, Plaintiffs rely on the report from their expert, Dr. Jon Gunderson, who recommends that LACCD conduct an audit of current educational technology and digital content to determine any accessibility issues for JAWS users and, following the audit, develop and implement a "remediation plan" to address any identified accessibility concerns. Dkt. 48-34 at 10. As noted above, a wide-sweeping audit of all technology at LACC exceeds the bounds of LACCD's discrimination against blind students regarding the LACC library databases. Nevertheless, the Court agrees that an audit and remedial plan to resolve accessibility issues specifically with LACC's library databases would be a reasonable action to ensure that no *future* barriers to accessibility arise that would deny blind students meaningful access to the library databases in a timely manner, on par with the access afforded to sighted students.

However, as with the LACC website, Plaintiffs have not provided sufficient factual specificity to warrant a finding as a matter of law that Dr. Gunderson's vague proposal to institute a remediation plan for accessibility issues would be a reasonable method of avoiding *current* discrimination against blind students. Other, more narrow solutions than a full-scale technology audit may exist, and to determine what would be "reasonable" under the circumstances would require additional factual information about the quantity and type of library databases utilized at LACC, the extent of blind students' inability to use library databases, and even the probability that blind students might reasonably be expected to access any or all of the other inaccessible library databases as part of the courses in which they enroll. *See Crowder*, 81 F.3d at 1486. For the avoidance of doubt, Plaintiffs' expert Mr. Bossley does not even analyze the LACC library databases for accessibility, meaning that, although Mason's testimony is sufficient to find that she was unable to access the library databases, more would be required in connection with Plaintiffs' request for a modification of LACCD's practices to ensure those databases are fully accessible to blind students.

Accordingly, Plaintiffs have not satisfied their burden at summary judgment to establish as a matter of law that reasonable modifications exist to resolve the barriers to accessibility regarding LACC's library databases.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | 2:17-cv-01697-SVW-SK | Date | April 23, 2019 |
| Title | *Roy Payan, et al v. Los Angeles Community College District, et al.* | | |

## III. Conclusion

For the reasons set forth above, the Court GRANTS in part Plaintiffs' second renewed motion for partial summary judgment. The Court holds that LACCD violated Title II and Section 504 as a matter of law by failing to provide Payan with meaningful access to his course materials in the math classes in which Payan enrolled, either through the MyMathLab software program or via equivalent accessible assignments from a math textbook in a timely manner. The Court also holds that LACCD discriminated against blind students as a matter of law by failing to provide blind students with meaningful access to the LACC website and LACC library databases, although a finding of liability is not warranted at this stage because Plaintiffs have failed to meet their evidentiary burden to identify reasonable modifications that would remedy the discrimination blind students face.

The Court DENIES Plaintiffs' motion for summary judgment as to Plaintiffs' claims of inaccessible in-class handouts and other course materials, because Plaintiffs have failed to satisfy their evidentiary burden to show that the lack of access to those materials deprived blind students of meaningful access to the courses in which they enrolled. The Court also DENIES Plaintiffs' motion for summary judgment on Plaintiffs' claim pertaining to the Etudes software program for similar reasons.

Plaintiffs may file a motion for permanent injunction as to Plaintiffs' claim pertaining to Payan's math courses within 21 days of this Order. Plaintiffs are advised to ensure that the proposed injunctive relief is appropriately tailored to the Court's specific findings of liability as set forth above in this Order.

IT IS SO ORDERED.

:

Initials of Preparer PMC