**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ROY PAYAN, PORTIA MASON, THE NATIONAL FEDERATION OF THE BLIND, INC., and THE NATIONAL FEDERATION OF THE BLIND OF CALIFORNIA, INC., <br><br> Plaintiffs, <br> vs. <br><br> LOS ANGELES COMMUNITY COLLEGE DISTRICT, <br><br> Defendant. | Case No.: 2:17-cv-01697-SVW-SK <br><br> **FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

## I.  Introduction

On May 14, 2019, the Court held a bench trial in this action as to the issue of whether Defendant Los Angeles Community College District ("LACCD") was liable under Title II of the Americans with Disabilities Act, 42 U.S.C. §§ 12131 *et seq.* (the "ADA" or "Title II"), and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 ("Section 504"). In advance of trial, Plaintiffs Roy Payan and Portia Mason submitted declarations containing their witnesses' direct testimony, as required by the Court's Standing Order for non-jury trials, while LACCD submitted deficient declarations setting forth only the topics about which its witnesses intended

to testify at trial. The parties presented their witnesses at trial, at which time the Court engaged in its own questioning of each witnesses and allowed subsequent cross-examination and re-direct questioning by the parties. Having carefully reviewed and considered the evidence presented at trial, the Court issues the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

## II.    Findings of Fact

For all findings of fact set forth below, in making any credibility determinations regarding witness testimony, the Court has considered, among other things, the manner in which the witnesses testified, their interest in the outcome of the case, and the reasonableness of their testimony in light of all of the evidence. The Court has also considered the relevant factors in Section 1.14 of the Manual of Model Civil Jury Instructions for the District Courts of the Ninth Circuit (2017 Edition), located at http://www3.ce9.uscourts.gov/jury-instructions/sites/default/files/WPD/Civil_Instructions_2018_9_0.pdf.

### A.    Etudes

In the Spring 2016 semester at Los Angeles City College ("LACC"), Plaintiff Payan enrolled in Introduction to Psychology I taught by Professor Yaneli Sedghi. Professor Sedghi utilized the Etudes program in her course as a means to provide students with assignments. As part of the participation in the course, Professor Sedghi also divided students into study groups of between 4-5 students and required each group to complete a project during the semester. For the project, Professor Sedghi instructed each group to describe a concept in the psychology textbook and create a video of the group acting out or recreating the psychology concept. Professor Sedghi would view all videos submitted by the study groups herself, without showing the videos to the class as a whole.

The group project necessitated that the group members maintain communication with each other outside of class sessions. To facilitate these discussions, Professor Sedghi required each group to communicate with each other on discussion boards embedded in the Etudes program. In these discussion boards, a group member would be able to post a question or comment about his or her group project or the subject of the project. Other group members

would be able to comment in response to the post, and each group member's post or comment would be visible by the other group members. However, students in other study groups would not be able to see the posts or comments made by students outside of their study groups. In other words, the discussion boards were limited to each separate study group, and the discussion boards did not allow for class-wide discussions about the course materials. Professor Sedghi was able to view the discussions occurring in each group's discussion board and, during class sessions, Professor Sedghi provided feedback to each group to guide the group to the correct topic of discussion. However, Professor Sedghi did not comprehensively explain to the class the substantive discussions that had occurred on each group's Etudes discussion board.

One limited exception to the use of the Etudes discussion boards only for study groups is the first assignment of the course that Professor Sedghi assigned during the first week of class. In this first assignment, Professor Sedghi required each student in the class to post on a class-wide discussion board on Etudes, the subject of which Professor Sedghi described as the students "getting to know each other" and "explaining behavior." The purpose of the assignment was to allow all students to read each other's responses to learn about each other at the beginning of the semester-long class. Then, in the class sessions held during the first week of the course, Professor Sedghi engaged in a similar class exercise designed to enable the students to become familiar with each other.

When Professor Sedghi assigned this first assignment to post on a class-wide discussion board on Etudes, Payan spoke with Professor Sedghi and informed her that Payan was unable to use the Etudes program for this purpose. Professor Sedghi accommodated Payan's difficulty accessing the class-wide discussion board by allowing Payan to email his response to the prompt directly to Professor Sedghi. By emailing his response to Professor Sedghi directly, Payan was unable to read the other students' responses and was unable to have the other students read his response.

As the semester progressed, Payan raised his inability to access the Etudes discussion board for his study group with Professor Sedghi. Professor Sedghi agreed to go to the Office of Student Services ("OSS") with Payan to seek accommodations for Payan's accessibility

problems. At OSS, Payan and Professor Sedghi met with Ryan Kushner. During the meeting, Payan demonstrated his difficulties with Etudes, and Kushner concluded that the Etudes program was too difficult for Payan to use effectively. Professor Sedghi testified that she and Kushner agreed to accommodate Payan's lack of access to Etudes by establishing a group email thread between Payan and his study group members, with Professor Sedghi copied on all emails, to allow Payan to communicate with his group members outside of the Etudes program. Kushner testified that, although he did not recall specifically discussing any discussion boards on Etudes with Professor Sedghi, he did recall a "private integrated mail system" like email embedded in the Etudes program, which was used for assignments generally. Kushner confirmed that he and Professor Sedghi provided accommodations for Payan regarding this Etudes mail system by allowing Payan to utilize his private email address for the necessary communications.

The Court finds the testimony of Professor Sedghi regarding Payan's accommodation to be credible and supported by the testimony of both Payan and Kushner. Any statements by Payan about his inability to communicate with his group members are contradicted by Professor Sedghi's testimony and Kushner's recollection of the accommodations OSS provided for Payan in the psychology course.

**B.    In-Class Materials**

1.    *Plaintiff Payan*

Payan testified that, in Professor Sedghi's psychology course, students were often given hard-copy handouts at the beginning of class sessions, which were to be used to facilitate class discussions. Professor Sedghi testified that she did not recall giving handouts to students before class as part of the psychology course in which Payan enrolled. The Court finds Payan's testimony to be more credible in this regard, particularly because Professor Sedghi testified that she may have handed out her class syllabus to students at the beginning of the course in paper format. *See* Pls.' Ex. 15.

Payan also testified that he had difficulty accessing the PowerPoint presentations taught by Professor Sedghi in the psychology course. Payan stated that Professor Sedghi attempted to send Payan notes about the PowerPoint slides used in the class session later the same day or the

following morning. However, there is little evidence as to whether the PowerPoint notes Professor Sedghi sent to Payan were in a format accessible to Payan. Professor Sedghi confirmed that she used PowerPoint slides for all of her lectures, but averred that she always described all images on screen through basic and descriptive words and consistently verbalized all text appearing on each slide so that Payan or other sight-impaired students would be able to comprehend the material contained on the slide. Professor Sedghi also stated that she sometimes asked sighted students to assist with descriptions of images or other material contained on PowerPoint slides for the benefit of blind students, and Professor Sedghi worked with Payan specifically to explain the content of her PowerPoint presentations during class where possible.

### 2. *Plaintiff Mason*

In the Spring 2016 semester at LACC, Plaintiff Portia Mason enrolled in an Introduction to Psychology course taught by Dr. April Pavlik and an Abnormal Psychology course taught by Blythe Daniel. The Court will outline the facts adduced at trial for each course separately.

### i. *Dr. Pavlik*

Mason testified that, in Dr. Pavlik's course, Dr. Pavlik provided hard-copy handouts to students during class on approximately 5 occasions. Dr. Pavlik created these handouts herself and used the handouts as part of the curriculum and to facilitate in-class discussions, or alternatively the handouts were provided as an in-class assignment or quiz. However, Mason only recalls the subject of one such handout, which was a personality test. *See* Pls.' Ex. 43. Mason could not complete the personality test herself and had to ask for assistance from a sighted student, who read each question aloud to Mason and recorded Mason's answers. Mason stated that Dr. Pavlik did not provide any accommodations for Mason's inability to access any in-class handouts, and Mason never received those handouts after class in an accessible format. Dr. Pavlik testified at deposition that she did not recall whether she gave paper handouts to students in Mason's psychology course in Spring 2016. The Court finds Mason's testimony more credible in this regard and finds that Dr. Pavlik did provide students with at least one paper handout in class as part of the Introduction to Psychology course.

Mason recalled one instance where Dr. Pavlik issued a quiz to students that required students to draw a neuron. Mason took this quiz to OSS's testing center for assistance, which was an accommodation provided to her via her accommodations form. While attempting to complete the quiz at OSS's testing center, Mason informed the exam proctor that she was unable to draw a neuron as required for the quiz. Mason stated that the proctor told Mason to leave the question blank and that the proctor would write a note to Dr. Pavlik explaining Mason's inability to complete that portion of the quiz. After completing the quiz, Mason received her graded quiz back from Dr. Pavlik, which contained handwritten grades and comments from Dr. Pavlik providing feedback on Mason's performance. *See* Pls.' Ex. 42. Because Dr. Pavlik's comments were handwritten and not accessible via JAWS, Mason was unable to read any of Dr. Pavlik's feedback on her quiz.

Mason testified that Dr. Pavlik utilized PowerPoints throughout the semester as part of her in-class lectures and for in-class discussions. Mason averred that Dr. Pavlik did not describe what appeared on each PowerPoint slide in a manner that Mason could understand, because Mason could not know whether there were any pictures or graphs appearing on the slides. Ultimately, Mason was unable to follow along with the PowerPoint presentations during class, although Mason admitted that she fell asleep in Dr. Pavlik's class on at least 4 occasions during the semester.

After each lecture, Dr. Pavlik would upload to her class website the PowerPoint presentation used in class and other information discussed in class, as a "reward" for students who attended the lecture. Mason stated that she never received accessible versions of Dr. Pavlik's PowerPoint presentations after class, because the digital versions provided by Dr. Pavlik could not be converted properly for effective use by the JAWS speech-to-text software. Specifically, Mason identified an issue with JAWS attempting to describe images used in Dr. Pavlik's PowerPoint presentations. However, Mason admitted that she never spoke with Dr. Pavlik about Mason's inability to understand the images used in Dr. Pavlik's PowerPoint presentations, and Mason never took any documents from Dr. Pavlik's course to OSS for conversions or assistance with accessibility issues.

At her deposition, Dr. Pavlik testified that she attempted to format her PowerPoint documents to be accessible for blind students, based on training she received from LACCD. This entailed the use of "alt text" to describe pictures or graphics in words so that a screen reader such as JAWS can read aloud the description when a blind student is reviewing the digital version of the PowerPoint presentation. Dr. Pavlik also stated that she stopped using "random pictures" that did not provide necessary narrative for the information in the PowerPoint presentation to avoid accessibility issues with those pictures. Dr. Pavlik testified that she did not send any PowerPoint documents or other class materials directly to OSS herself for conversions into an accessible format, unless a student's accommodations form requested that Dr. Pavlik do so. Dr. Pavlik routinely sent tests or quizzes to OSS as part of blind students' accommodations, and Dr. Pavlik testified that she never received any testing materials back from OSS with the representations that those materials were inaccessible. However, Dr. Pavlik never sent handouts or PowerPoint presentations to OSS for formatting assistance, testifying that students at LACC "are encouraged to be their own activists in terms of getting information and taking it [to OSS]." Dr. Pavlik averred that she has never received any complaints from sight-impaired students as to the inaccessibility of her digital PowerPoint presentation files provided to students after class sessions. The Court finds that Dr. Pavlik's deposition testimony is credible and contradicts Mason's assertions that Dr. Pavlik does not adequately explain her PowerPoint slides for the benefit of blind students.

Mason also testified that Dr. Pavlik wrote on the chalkboard in the classroom on at least 5 occasions during the semester. Mason stated that Dr. Pavlik did not narrate what she was writing on the chalkboard, so Mason could not follow along with what was being written. Mason acknowledged that she used her own recording device to record Dr. Pavlik's lectures, but Mason stated that the recording device did not sufficiently capture audio from Dr. Pavlik when she was writing on the chalkboard, because Dr. Pavlik was facing away from the class while speaking.

### ii.  *Professor Daniel*

Mason testified that, in Professor Daniel's course, Mason received in-class handouts in paper format at least 4 times during the semester. Mason testified that she never was informed of

the material on the handouts during class; instead, Professor Daniel had students describe what they saw on the paper handout.

Professor Daniel refuted Mason's testimony. First, Professor Daniel stated that she only distributes one paper handout to students during the semester, which contains drawings made by children who were victims of sexual abuse. *See* Pls.' Ex. 34. Second, Professor Daniel testified that she orally explains the content of the handout in detail for all students prior to allowing for class discussions about the pictures, and that, in total, the handout is used for approximately 15 minutes of class time. The Court finds Professor Daniel's testimony to be more credible than Mason's testimony about the frequency and use of handouts in Professor Daniel's class.

Mason testified, to the best of her recollection, that Professor Daniel used PowerPoint presentations in every lecture of Abnormal Psychology. On cross-examination, Mason corrected her testimony by stating that she does not recall Professor Daniel utilizing PowerPoint during class sessions. Professor Daniel testified that she never has, and never will, use PowerPoint presentations for any course she teaches. Professor Daniel stated her strong preference for giving "straight lectures" from her own notes, rather than relying on technology for assistance. The Court finds Professor Daniel's testimony more credible than Mason's contradictory testimony, which Mason recanted in any event.

Mason testified that Professor Daniel issued a handbook to all students in her Abnormal Psychology course, a handbook which Professor Daniel created herself. Mason stated that the handbook was only provided to students in hardcopy format, and Professor Daniel did not provide Mason with an accessible version of the handout. Professor Daniel acknowledged that the handbook has never been tested for accessibility, but that the handbook is only used during class sessions and not for any course assignments. Professor Daniel also testified that, during each class session, she thoroughly verbalized each page of the handbook relevant to that discussion in a manner that blind students such as Mason could comprehend. The Court finds Professor Daniel's testimony about the use of the handbook in the Abnormal Psychology course to be credible.

Mason testified that she recalled Professor Daniel writing on the chalkboard during class sessions on at least 4 occasions. Mason conceded that Professor Daniel attempted to vocalize whatever Professor Daniel was writing on the chalkboard so that Mason could orally internalize the information. Mason utilized an audio recorder in Professor Daniel's class, but Mason stated that the recorder did not adequately pick up what Professor Daniel was saying while writing on the chalkboard, because Professor Daniel was facing away from the class.

**C.     LACC Website**

The undisputed evidence adduced at summary judgment already established that Payan and Mason could not access the LACC website starting sometime in the winter of 2017, when LACCD released a new version of the LACC website.

The LACC website allowed students enrolled at LACC to access information about their education and enrollment, including grades and transcripts. Students were also able to sign up for classes for future semesters on the LACC website. These functions were housed in a program embedded in the LACC website called PeopleSoft, a student information system used throughout all of LACCD's schools. Sighted students were able to access these resources on the LACC website through any computer, but Payan and Mason could not access the website through JAWS. Therefore, Payan and Mason had to go to OSS or rely on other sighted individuals for assistance with class enrollment and for assistance with obtaining transcripts. There is no indication in the record that Plaintiffs' reliance on sighted individuals for class enrollment caused Plaintiffs to be unable to enroll in any classes they wished to take at LACC.

In addition to these education administration resources, the LACC website also published information about campus activities, including events and seminars being held on campus. Based on the record presented at trial, it is unclear whether information about campus activities was contained within the PeopleSoft program embedded in the LACC website, or whether such information was housed on a separate page of the LACC website that did not utilize the PeopleSoft software.

As the Court previously held, Payan and Mason could not access the LACC website and the PeopleSoft program within the website due to technical issues with JAWS, as articulated in

the expert of Peter Bossley, Plaintiffs' expert witness regarding technology accessibility. At trial, Payan testified that, on one occasion, he was unaware of a disability seminar occurring on LACC's campus until the day of the seminar, when a classmate informed him about the event. Payan asked the classmate about how students were notified of the event ahead of time, and the classmate responded that the information for the seminar had been posted on the LACC website.[1] Therefore, Payan represented that he was unable to attend the seminar as desired because of his inability to access the information about the seminar on the LACC website.

Bossley testified at trial that reasonable modifications exist to resolve blind students' lack of access to the LACC website through JAWS. Specifically, Mr. Bossley testified that PeopleSoft has made available different Application Programming Interfaces ("APIs") to allow its customers to build a custom website or mobile application-based interface different from the default interface accompanying the PeopleSoft program. Existing APIs produced by software vendors are compatible with JAWS and would remedy the accessibility problems found on PeopleSoft's default interface, which the records shows was the interface used by LACC on its website. Furthermore, Mr. Bossley testified that LACC could create its own API on PeopleSoft that would be accessible with JAWS. These solutions would allow Plaintiffs and other blind students to access transcripts and other information about their grades, as well as sign up for classes, without assistance from a sighted individual.

As to the LACC website itself, Mr. Bossley testified that LACC could revise the website to make the website accessible under the Web Content Accessibility Guidelines ("WCAG"). Deficiencies in the formatting of LACC's website that preclude access by text-to-speech users do not conform with WCAG standards and could theoretically be remedied through changes in the website's coding. LACCD offered no evidence to rebut or contradict Mr. Bossley's testimony about reasonable modifications to the LACC website.

---

[1] Although this statement appears to the Court to be inadmissible hearsay, neither party objected to its introduction during trial. In any event, this evidence is not dispositive of any legal issues resolved in this Order.

### D.     LACC Library Databases

As part of Professor Sedghi's psychology course, students were required to conduct research in support of a term paper. To conduct this research, Payan went to the LACC library and attempted to access the library databases acquired by LACCD. These library databases are also available on the LACC website and can be accessed remotely on any computer, through a program called Kentico. Payan does not recall which specific databases he attempted to use in connection with research for the term paper for Professor Sedghi's course, but Payan recalls that he chose to research autism as the subject of his term paper.

When Payan attempted to access the library databases, Payan encountered difficulties determining what resources were available on a given topic of research and was required to ask for assistance from a sighted person. Payan recalled speaking with Barbara Vasquez, the Library Department Chairperson, regarding Payan's inability to access the library databases. Vasquez does not specifically recall interacting with Payan or Mason, although she acknowledged that she routinely answers any questions students might have about the library databases, including accessibility issues raised by blind students.

Similarly, Mason was required to complete term papers for each of her psychology courses with Dr. Pavlik and Professor Blythe, respectively. For Professor Blythe's term paper, Mason chose to write about Attention Deficit Hyperactive Disorder. Mason had similar difficulties as Payan experienced when attempting to access the available library databases on this subject. Like Payan, Mason was unable to identify which particular databases she attempted to access at the LACC library.

Vasquez testified that library databases are not tested regularly at LACC to ensure that those databases are accessible through JAWS. Instead, testing is a complaint-driven process that occurs whenever blind students express to library staff members that a particular database is inaccessible. Vasquez recalled that in July 2017, LACC tested some of the "Gale" databases through OSS, and once those databases were determined to be accessible with JAWS, Vasquez assumed that the other Gale databases were also accessible. However, Vasquez does not recall receiving written reports from OSS regarding any accessibility testing; the only feedback

Vasquez received was "high-level" oral comments from OSS and Kushner. Other than Gale, Vasquez acknowledged that some PDF documents on the databases called EBSCO or JSTOR were inaccessible through JAWS, and Vasquez noted that Films on Demand, a film database, did not have any audio narration of non-verbal actions in the films stored on the database. Vasquez also referred to a program used at LACC called Stellarium, which LACC acquired at the request of a particular professor at LACC. Vasquez noted that, since her deposition in this case in July 2017, Vasquez has learned that Stellarium is not accessible to blind students through JAWS. Indeed, Vasquez admitted that technology and programs requested by professors are not tested for accessibility with JAWS prior to acquisition by LACC.

Vasquez also testified that some computers at the LACC library are equipped with a program called Kurzweil. Kurzweil is a text-to-speech program similar to JAWS, except Kurzweil translates printed documents rather than digital ones. The record is unclear as to whether it would be feasible for blind students to print out any inaccessible PDFs on the LACC library databases and use Kurzweil to translate those printed documents into text format.

At trial, Plaintiffs presented no evidence of any reasonable modifications to the inaccessibility of LACC's library resources. Mr. Bossley did not testify about the library databases and did not conduct an assessment of whether those databases were accessible as part of his expert report. Neither did Dr. Jon Gunderson, whose expert report was limited to Payan's inaccessibility in his math courses, a subject not at issue during the bench trial. During Plaintiffs' closing argument, Plaintiffs identified three categories of "modifications" that Plaintiffs asserted would avoid discrimination against blind students regarding the LACC library databases: (1) LACCD could conduct an audit of library resources to determine what documents on library databases are inaccessible, because LACCD does not presently know the extent of any accessibility issues without conducting such an audit; (2) LACCD could resolve the known issues with some databases, without explaining how LACCD could do so; and (3) LACCD could convert or obtain accessible alternatives to inaccessible materials, documents, or software, without explaining what accessible alternatives, if any, exist. Plaintiffs also suggest that LACCD

could ensure that the LACC library is staffed "at all times" so that blind students can receive the same access to inaccessible library databases with the help of a sighted individual.

III.     **Conclusions of Law**

For the applicable legal standards governing a public entity's liability under Title II and Section 504 under a theory of disparate treatment or impact, the theory of liability which Plaintiffs advance here, the Court refers the parties to the legal standards set forth in the Court's prior Orders regarding Plaintiffs' motions for partial summary judgment as to liability. *See* Dkt. 155 at 13-19; Dkt. 183 at 4-6. Furthermore, the Court reminds the parties of its prior analysis of the proper scope of the "program or service" at issue for each of Plaintiffs' allegations of LACCD's violations. *See* Dkt. 183 at 1-4.

**A.     Etudes**

As the Court previously analyzed, the proper scope of Plaintiffs' claims regarding the Etudes program is whether Payan's lack of access to Etudes deprived Payan of meaningful access to the benefits of Professor Sedghi's psychology course, which is the "program or service" for which Etudes was used. *See* Dkt. 183 at 1-4, 13-14.

The evidence presented at trial establishes that, although Etudes was inaccessible to Payan, OSS and Professor Sedghi accommodated Payan's lack of access by providing Payan with an equally effective alternative to communicate with his study group members outside of the Etudes program. Payan had access to emails outside of Etudes and had the opportunity to contact his group members by email instead of by using the discussion board for his study group on Etudes. The fact that Payan had to make time to meet with his study group after class or in between classes was what Professor Sedghi intended for the study groups; the group assignments were meant to be completed outside of class time and required communications outside of the classroom. Therefore, because LACCD provided Payan with a reasonable accommodation for Payan's lack of access to the Etudes study group discussion boards, Payan received an equal opportunity to communicate with his study group members in an effective manner, and LACCD did not discriminate against Payan by using Etudes in Professor Sedghi's psychology course.

As to the first assignment of Professor Sedghi's course, where students were required to post on a class-wide discussion board on Etudes, Payan's lack of access to that assignment did not deprive Payan of meaningful access to the benefits of the psychology course. Professor Sedghi testified that the assignment was meant to be a mechanism for students to become familiar with each other, as opposed to a substantive assignment for students to gain knowledge about the curriculum taught in the psychology course. Professor Sedghi also testified that she conducted a similar exercise in class during the first week of the course to allow students to get to know each other, undercutting the significance of the assignment to post on the Etudes discussion board. Furthermore, Payan was accommodated for this assignment through the ability to email his response directly to Professor Sedghi, and Payan was able to participate equally with his peers during the initial in-class exercises held by Professor Sedghi. For these reasons, Payan's inability to participate on the class-wide discussion board does not rise to the level of a deprivation of "meaningful access" to the benefits of the psychology course, and LACCD did not discriminate against Payan through the use of Etudes discussion boards for the first assignment of class.

**B.      In-Class Materials**

As the Court previously explained, the proper scope of Plaintiffs' claims regarding in-class materials, including handouts and PowerPoint presentations, is whether Plaintiffs' lack of access to in-class materials deprived Plaintiffs of meaningful access to the benefits of the particular courses in which Plaintiffs enrolled. *See* Dkt. 183 at 1-4, 7-8. The Court will analyze separately each course in which Plaintiffs claim they were denied access to in-class materials.

1.      *Plaintiff Payan*

Plaintiffs have not met their burden to show by a preponderance of the evidence that Payan was denied meaningful access to PowerPoint presentations during Professor Sedghi's psychology course. During class sessions, Professor Sedghi explained all of the content on the PowerPoint slides in a manner that Payan could comprehend, meaning that Payan was able to receive the same access to the PowerPoint slides as the other sighted students in the course at the time the presentations were given. Professor Sedghi also testified that she provided one-on-one

assistance to Payan in class to ensure that Payan was able to understand the PowerPoint materials. Payan also received electronic copies of the PowerPoint slides after class, and it is unclear from the record whether sighted students were provided with these PowerPoint slides. Payan has not articulated any specific difficulties when attempting to access the PowerPoint slides Professor Sedghi sent to him after class. Therefore, Professor Sedghi accommodated Payan's disability regarding PowerPoint slides used in class sessions, and LACCD did not discriminate against Payan by using PowerPoint presentations in Professor Sedghi's psychology course.

Plaintiffs also have not met their burden to show by a preponderance of the evidence that Payan was denied meaningful access to in-class handouts in Professor Sedghi's course. Plaintiffs have not identified any specific handouts that were used as part of the curriculum in the psychology course; the only document identified was the syllabus for the psychology course which Professor Sedghi provided to students during the first week of class, which Professor Sedghi represented was also made available to students in digital format. Without a factual basis to conclude that Payan was not able to have the same access to any curriculum-based in-class handouts as his sighted peers, the Court holds that LACCD did not discriminate against Payan regarding in-class handouts in Professor Sedghi's psychology-course.

### 2. *Plaintiff Mason*

#### i. *Dr. Pavlik*

Based on the findings of fact above, the Court holds that LACCD did not discriminate against Mason in Dr. Pavlik's psychology course through the use of PowerPoints, in-class handouts, or lectures featuring writing on the chalkboard. Plaintiffs have not met their burden to establish by a preponderance of the evidence that Mason was denied meaningful access to any course materials in Dr. Pavlik's class.

Mason received digital versions of PowerPoint slides from Dr. Pavlik, which, even if inaccessible, was still usable with JAWS for all non-graphic text included on the slides. Dr. Pavlik testified that she made efforts to ensure that any digital versions of PowerPoint presentations accessible through JAWS, and that she ensured that all PowerPoints used during

15

class sessions were fully explained to sight-impaired students. The Court finds Dr. Pavlik's deposition testimony in this regard to be credible. To the extent that Plaintiffs' legal position is that Mason cannot access graphic materials equally as sighted students, that lack of access is a function of Mason's disability, not LACCD's failure to accommodate that disability. Instead, LACCD submitted persuasive evidence that Dr. Pavlik made reasonable and sufficient attempts to include "alt text" in all digital versions of PowerPoint slides, which adequately explained the graphics used in the presentation.

Based on the testimony at trial, Mason was not deprived of meaningful access to any paper handouts in class, because Mason was able to complete quizzes or other in-class assignments in an effective manner. Although Mason received inaccessible handwritten comments from Dr. Pavlik regarding a quiz Mason completed at OSS, Mason could have requested for clarification directly from Dr. Pavlik regarding Mason's performance on the quiz and any necessary feedback Dr. Pavlik provided to assist Mason with future quizzes or assignments. Even so, Mason's inability to access handwritten comments independently in connection with one quiz assigned in Dr. Pavlik's course does not mean that Mason was denied meaningful access to the benefits of the psychology course as a whole.

Mason's inability to comprehend Dr. Pavlik's vocalization of text written on the chalkboard was not a denial of meaningful access, particularly where Mason was able to ask Dr. Pavlik for clarification during class and because Mason was able to record the audio of each class session, even if the audio recording may not have been the best quality. The evidence establishes that Dr. Pavlik provided Mason with sufficient accommodations during the psychology course such that Mason maintained meaningful access to the psychology course on a similar level as provided to sighted students. Therefore, LACCD did not discriminate against Mason through the use of in-class material in Dr. Pavlik's psychology course.

ii.     *Professor Daniel*

Plaintiffs have satisfied their burden to establish by a preponderance of the evidence that Mason was denied meaningful access to the handbook assigned in Professor Daniel's Abnormal Psychology course. While sighted students were given access to the handbook in an accessible

format outside of class, Mason was given only a paper copy of the handbook without an accessible digital version that was compatible with JAWS. Professor Daniel testified that she did not assign any readings or assignments from the handbook outside of class, and the Court finds Professor Daniel's testimony about the use of the handbook only for in-class purposes to be credible. Nevertheless, Mason was deprived of the opportunity to review the handbook before or after class to clarify her understanding of the material already discussed or attempt to prepare for future class sessions. Even without knowing which specific sections of the handbook would be discussed in any given class session, and unlike her sighted peers, Mason was unable to access the handbook in any capacity outside of class, which may be necessary to allow Mason to prepare for any exams in the course or otherwise beneficial to ensure that Mason is comprehending the curriculum.

Plaintiffs have also met their burden to establish by a preponderance of the evidence that reasonable modifications existed to avoid the discrimination imposed on Mason—namely, LACCD could have ensured that Mason receive an accessible version of Professor Daniel's handbook at the same time as sighted students received a hard-copy of the handbook. LACCD was obligated under Title II and Section 504 to ensure that Mason receive the same access to the same course materials at the same time as sighted students. Requiring Mason to seek assistance from OSS, when both Professor Daniel and OSS know that Mason requires accommodations to be able to access the handbook, deprives Mason of meaningful access to participate on the same level as her peers in the course. Therefore, because Mason did not receive an accessible version of Professor Daniel's handbook at the same time as sighted students, LACCD violated Title II and Section 504 by discriminating against Mason in Professor Daniel's Abnormal Psychology class.

Conversely, LACCD did not discriminate against Mason with regard to any other materials used during class sessions. The evidence establishes that Professor Daniel did not use PowerPoint presentations during class sessions, and Professor Daniel adequately explained and verbalized the only handout distributed to students during one particular class session to allow for Mason to participate in the discussion in a meaningful manner compared to her sighted peers.

The Court finds Professor Daniel's testimony regarding her aversion to technological aids during class sessions and her explanations of the handout used in class to be credible. As with Dr. Pavlik's course, the few times that Professor Daniel wrote on the chalkboard did not deprive Mason of meaningful access to what Professor Daniel was writing merely because Mason had difficulty hearing Professor Daniel verbalize the information. Mason was capable of asking for clarification as to what Professor Daniel wrote on the chalkboard, which not only would allow Mason to comprehend the material in the short term but would allow for a clearer audio recording of Professor Daniel's explanation as necessary to allow Mason to listen to the lecture at a later date while studying for the course.

In summary, LACCD violated Title II and Section 504 by discriminating against Mason through the use of an inaccessible handbook in Professor Daniel's course by failing to provide Mason with an accessible version of the handbook at the same time as sighted students.

**C.     LACC Website**

The Court previously held that the LACC website is itself a "service" offered to students on campus, and that, because the website was inaccessible to blind students through JAWS, LACCD discriminated against Plaintiffs by utilizing the LACC website in a manner that only sighted students could access. Dkt. 183 at 18-20. The Court now holds that Plaintiffs have met their burden to show by a preponderance of the evidence that reasonable modifications exist that would remedy Plaintiffs' lack of access to the LACC website.

Mr. Bossley identified reasonable methods to make the LACC website, and the PeopleSoft program embedded in the website, accessible to JAWS users. LACCD did not present evidence to rebut Mr. Bossley's conclusions, but to the extent that LACCD argues that Plaintiffs were sufficiently accommodated by receiving assistance with class enrollment and accessing transcripts at OSS, such accommodations do not provide Plaintiffs with meaningful access to the benefits of the LACC website offered to sighted students. As noted in the Court's prior Order granting partial summary judgment for Plaintiffs on the issue of LACCD's discrimination against blind students through the LACC website, making the accessibility of the LACC website resources contingent upon third party assistance does not allow blind students to

manage their education independently in the same manner as sighted students. *See* Dkt. 183 at 19-20.

Therefore, LACCD discriminated against Plaintiffs by denying Plaintiffs meaningful access to the LACC website, which could be avoided through reasonable modifications to the LACC website or the PeopleSoft program.

### D. LACC Library Databases

Similar to the LACC website, the Court previously held that the LACC library databases constitute a "service" offered to students enrolled at LACC, and that therefore LACCD discriminated against Plaintiffs by making available library databases that were inaccessible for blind students through JAWS. *See* Dkt. 183 at 23-24. The Court now holds that Plaintiffs have met their burden to show by a preponderance of the evidence that reasonable modifications exist to remedy Plaintiffs' lack of access to the LACC library databases.

The evidence presented at trial confirms that Payan and Mason were unable to access certain library databases when they attempted to conduct research for the term papers assigned by their psychology professors, even though Plaintiffs have not identified which specific databases were inaccessible. Vasquez further admitted having knowledge that some databases procured by the LACC library contained documents that were inaccessible through JAWS. Allowing sighted students to use these documents, while Plaintiffs could not access the documents, constitutes discrimination by denying Plaintiffs meaningful access to an important resource necessary for their education and completion of class assignments.

As previously noted, the burden is on Plaintiffs to identify any modifications to LACCD's policies, practices, or procedures that are necessary to avoid or remedy the discriminatory impact imposed upon blind students. 28 C.F.R. § 35.130(b)(7); *see also Crowder v. Kitagawa*, 81 F.3d 1480, 1485 (9th Cir. 1996). Plaintiffs' suggestion that LACCD could conduct an accessibility audit of library resources does not amount to a remedy to discrimination; merely identifying further accessibility issues, without more, provides no solution to granting blind students access to those inaccessible resources. Nevertheless, Plaintiffs' implicit argument

1  is that LACCD could simply remove all inaccessible resources it identifies from student use to
2  avoid granting resources to sighted students that blind students cannot access.

3      The Court has noted in its prior Orders on summary judgment that the ADA and Section
4  504 do not necessarily require discontinued use of inaccessible technology if blind students can
5  be accommodated for their inability to use that technology in a different manner. Here, there is
6  no indication in the record that blind students could be accommodated with respect to the
7  inaccessible documents contained in the library databases by any technological means.
8  Therefore, if no alternate accommodations exist that could allow Plaintiffs to access the benefits
9  of the inaccessible LACC library databases, it would indeed be a reasonable modification to
10 require LACCD to avoid using any inaccessible library databases it identifies until those
11 databases are proven to be accessible, a principle which the Court considers to be self-evident.
12 Therefore, despite the vagueness of Plaintiffs' arguments and the lack of specific
13 accommodations identified that could provide Plaintiffs with equal access to the library
14 databases as sighted students, the Court holds that reasonable modifications exist to LACCD's
15 policies, practices, and procedures regarding acquisition and use of LACC library databases that
16 would eliminate and avoid discrimination against blind students.

17 **IV.    Conclusion**

18      Based on the Court's findings of fact and conclusions of law set forth above, the Court
19 holds that LACCD violated Title II and Section 504 by discriminating against Plaintiffs through
20 (1) the inaccessible handbook issued in Professor Daniel's course, (2) the inaccessible LACC
21 website, and (3) the inaccessible LACC library databases.

22      The Court acknowledges the possibility of a Jury Trial to determine whether LACCD
23 was deliberately indifferent toward blind students for the violations of Title II and Section 504
24 identified above, as well as LACCD's liability with respect to Payan's math courses as the Court
25 previously held in Plaintiffs' motion for partial summary judgment. *See* Dkt. 183 at 10-12, 14-
26 18. However, in light of the above findings of fact and conclusions of law, the Court ORDERS
27 the parties to file, on or before May 27, 2019, documents indicating what additional testimony
28 the parties intend to present to the jury on the issue of whether LACCD was deliberately

indifferent. The parties are not to explain any evidence of Plaintiffs' damages; the Court is only concerned with the facts underlying LACCD's notice of discrimination and actions taken in response to that notice. Each party should either identify particular relevant portions of deposition testimony for any witnesses it intends to call that were previously deposed, or, alternatively, submit additional declarations for its witnesses setting forth the actual testimony of those witnesses, in an admissible format with proper evidentiary foundation. The parties are not to state merely the topics about which its witnesses intend to testify, but instead must provide the actual testimony of those witnesses in written format. Importantly, the parties are not to re-argue any findings of fact or law contained in this Order; the parties are to provide their supporting evidence pertaining only to whether LACCD was deliberately indifferent with regard to any of the violations of Title II and Section 504 the Court has held to date.

As noted on the docket on May 20, 2019, see Dkt. 266, the Jury Trial is continued to June 11, 2019 at 9:30 a.m. pending the parties' filings regarding the evidence intended to be presented regarding deliberate indifference.


IT IS SO ORDERED.


Date: May 21, 2019

_____
HON. STEPHEN V. WILSON
UNITED STATES DISTRICT JUDGE