IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

ROY PAYAN, PORTIA MASON,      )
THE NATIONAL FEDERATION       )
OF THE BLIND, INC., and       )
THE NATIONAL FEDERATION       )
OF THE BLIND OF               )
CALIFORNIA, INC.,             )
                              )
            Plaintiffs,       )
                              )
       vs.                    )        Case No.
                              ) 2:17-cv-01697-SVW(SKx)
LOS ANGELES COMMUNITY         )
COLLEGE DISTRICT,             )
                              )
            Defendant.        )
_____)

VIDEOTAPED 30(b)(6) DEPOSITION OF LOS ANGELES

COMMUNITY COLLEGE DISTRICT, JOHN AL-AMIN, Ph.D.

WEDNESDAY, AUGUST 9, 2017

LONG BEACH, CALIFORNIA

REPORTED BY:  Judith E. Thiel, CSR 2618, CP, RPR

Case 2:17-cv-01697-SVW-SK   Document 483-1   Filed 02/03/23   Page 2 of 72   Page ID
#:11078
30(b)(6) of LACCD                    Los Angeles Community College District                    1115479

1

2                    IN THE UNITED STATES DISTRICT COURT

3                 FOR THE CENTRAL DISTRICT OF CALIFORNIA

4

5    ROY PAYAN, PORTIA MASON,     )
     THE NATIONAL FEDERATION      )
6    OF THE BLIND, INC., and      )
     THE NATIONAL FEDERATION      )
7    OF THE BLIND OF              )
     CALIFORNIA, INC.,            )
8                                 )
                  Plaintiffs,     )
9                                 )
          vs.                     )           Case No.
10                                ) 2:17-cv-01697-SVW(SKx)
     LOS ANGELES COMMUNITY        )
11   COLLEGE DISTRICT,            )
                                  )
12                Defendant.      )
     ─────────────────────────────)

13

14

15

16          The videotaped 30(b)(6) deposition of

17          Los Angeles Community College District,

18          JOHN AL-AMIN, Ph.D., a witness herein,

19          taken on behalf of the plaintiffs at 111 West

20          Ocean Boulevard, Long Beach, California,

21          commencing at the hour of 9:50 a.m., Wednesday,

22          August 9, 2017, before Judith E. Thiel, CSR

23          2618, CP, RPR, pursuant to Notice of Taking

24          Deposition.

25

2

Case 2:17-cv-01697-SVW-SK   Document 483-1   Filed 02/03/23   Page 3 of 72   Page ID
#:11079
8/9/2017 - Volume 1 - William Payan
30(b)(6) of LACCD                    Los Angeles Community College District                    1115479

```
 1    APPEARANCES OF COUNSEL:

 2

 3    For Plaintiffs:

 4            BARBOSA GROUP
              BY:  PATRICIA BARBOSA
 5                 Attorney at Law
              8092 Warner Avenue
 6            Huntington Beach, California 92647
              (714) 465-9486
 7            pbarbosa@barbosagrp.com

 8

              BROWN GOLDSTEIN LEVY
 9            BY:  JOSEPH B. ESPO
                   Attorney at Law
10            120 East Baltimore Street, Suite 1700
              Baltimore, Maryland 21202
11            (410) 962-1030
              jbe@browngold.com

12

13    For Defendant:

14            HAIGHT, BROWN & BONESTEEL LLP
              BY:  RICHARD E. MORTON
15                 Attorney at Law
              2050 Main Street, Suite 600
16            Irvine, California 92614
              (714) 426-4600
17            rmorton@hbblaw.com

18    Also present:

19            GARRETT ESTORGA, Videographer

20

21

22

23

24

25
```

**Kusar** Keeping Your Word Is Our Business℠

Case 2:17-cv-01697-SVW-SK   Document 483-1   Filed 02/03/23   Page 4 of 72   Page ID
#:11080
30(b)(6) of LACCD                 Los Angeles Community College District                    1115479

```
 1                        I N D E X

 2   WITNESS:            EXAMINATION                    PAGE

 3   JOHN AL-AMIN        BY MR. ESPO                      6

 4

 5        EXHIBITS PREVIOUSLY MARKED AND REFERENCED HEREIN

 6                  (Retained by counsel)

 7   EXHIBIT      DESCRIPTION

 8   Exhibit 1    Plaintiff's Amended 30(b)(6) Notice
                  of Deposition to the Los Angeles
 9                Community College District
                  (8 pages)
10
     Exhibit 2    Los Angeles Community College District
11                Administrative Regulations B-33 and
                  B-34
12                (15 pages)

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Case 2:17-cv-01697-SVW-SK   Document 483-1   Filed 02/03/23   Page 5 of 72   Page ID
#:11081
30(b)(6) of LACCD                  Los Angeles Community College District              1115479

```
 1        WEDNESDAY, AUGUST 9, 2017, LONG BEACH, CALIFORNIA

 2                          9:50 A.M.

 3                            ***

 4

 5        THE VIDEOGRAPHER:  Good morning.

 6              We're going on the record at 9:50 a.m.

09:50:13   7        This is Media Unit 1 of the video

09:50:17   8  deposition of the 30(b)(6) witness, Dr. John

09:50:23   9  al-Amin, taken by the plaintiffs in the matter of

09:50:27  10  Roy Payan, et al., versus Los Angeles Community

09:50:32  11  College District, filed in the United States

09:50:36  12  District Court for the Central District of

09:50:39  13  California, Case Number 2:17-cv-01697-SVW(SKx).

09:50:52  14        This deposition is being held at 111 West

09:50:56  15  Ocean Boulevard in Long Beach, California 90802, on

09:51:02  16  August 9th, 2017.

09:51:05  17        My name is Garrett Estorga, and I'm a

09:51:08  18  certified legal video specialist.

09:51:10  19        The court reporter is Judy Thiel.

09:51:14  20        We're both here representing Kusar Court

09:51:16  21  Reporters & Legal Services.

09:51:18  22        Counsel and all present will now state

09:51:21  23  their appearance and affiliation for the record,

09:51:23  24  after which the court reporter will swear in the

09:51:26  25  witness.
```



09:51:27  1          MR. ESPO:  Joseph Espo from Brown, Goldstein &

09:51:29  2   Levy on behalf of the plaintiffs.

09:51:32  3          MS. BARBOSA:  Patricia Barbosa on behalf of the

09:51:34  4   plaintiffs.

09:51:36  5          MR. MORTON:  Richard Morton, Haight, Brown &

09:51:38  6   Bonesteel, on behalf of defendant and the deponent.

09:51:41  7

09:51:43  8                        JOHN AL-AMIN,

09:51:43  9    the witness herein, having been first duly sworn, was

09:51:43 10            examined and testified as follows:

09:51:43 11

09:51:43 12                        EXAMINATION

09:51:55 13   BY MR. ESPO:

09:52:01 14       Q.  Dr. al-Amin, as you just heard, my name is

09:52:03 15   Joe Espo.  I represent the plaintiffs in this

09:52:08 16   lawsuit, and I'm going to take your deposition this

09:52:11 17   morning, which just means I'm going to ask you

09:52:14 18   questions, in your case, on certain designated

09:52:18 19   topics for which you have been identified by the

09:52:21 20   Los Angeles Community College District.

09:52:26 21          It's important for the court reporter and

09:52:29 22   the videographer that only one of us be speaking at

09:52:32 23   a time.  So I will do my best to finish my question

09:52:35 24   and let you finish your answer before I start

09:52:38 25   speaking again, and ask that you let me finish my

6



Case 2:17-cv-01897-SVW-SK   Document 483-1   Filed 02/03/23   Page 7 of 72   Page ID
#:11083
30(b)(6) of LACCD                    Los Angeles Community College District                    1115479

09:52:43  1    question before you begin your answer.

09:52:45  2            Okay?

09:52:45  3        A.   Yes.

09:52:47  4        Q.   It's also important that we communicate

09:52:49  5    with words and not pointing at an exhibit or some

09:52:54  6    other gesture, also for the court reporter and for

09:52:58  7    the lawyers, who, you know, three months from now

09:53:01  8    when we read the transcript, and it says,

09:53:04  9    "I'm pointing at this (indicating)," we won't know

09:53:08  10   what it means.  All right?

09:53:10  11       A.   Okay.

09:53:11  12       Q.   If you don't understand my question or

09:53:14  13   can't hear me, please let me know.  All right?

09:53:18  14       A.   Okay.

09:53:18  15       Q.   And if you need a break at any time,

09:53:21  16   just -- just let me know.  The only thing I ask is

09:53:27  17   that you -- if there's a question pending, that you

09:53:30  18   answer the question before we take the break.  All

09:53:33  19   right?

09:53:34  20       A.   Sure.

09:53:42  21       Q.   My understanding is that you are here to

09:53:44  22   talk about Topics 2, 4, 5, and 12 on the deposition

09:53:50  23   notice that is in front of you, marked as Exhibit 1.

09:53:57  24            Is that also your understanding?

09:54:00  25       A.   That is correct.

Kusar ® Keeping Your Word Is Our Business℠

Case 2:17-cv-01697-SVW-SK   Document 483-1   Filed 02/03/23   Page 8 of 72   Page ID
#:11084
30(b)(6) of LACCD                        Los Angeles Community College District                        1115479

09:54:24  1        Q.  Can you describe your formal education,

09:54:25  2    beginning with high school.

09:54:27  3        A.  Yes.  I attended McClymonds High School in

09:54:34  4    Oakland.

09:54:36  5        THE REPORTER:  What's the name?

09:54:36  6        THE WITNESS:  McClymonds High School in

09:54:36  7    Oakland.

09:54:40  8             I then attended and received my bachelor's

09:54:43  9    degree from the University of California at

09:54:45  10   Riverside.

09:54:48  11             I followed that with my master's degree in

09:54:52  12   education at the University of California at

09:54:54  13   Riverside.

09:54:56  14             And I earned a Ph.D. in management at

09:54:59  15   California Pacific University in San Diego.

09:55:04  16   BY MR. ESPO:

09:55:11  17        Q.  And do you generally prefer to be referred

09:55:14  18   to as "Mr. al-Amin" or "Dr. al-Amin"?

09:55:18  19        A.  "Dr. al-Amin" is preferred.

09:55:19  20        Q.  Okay.  In what year did you -- First, did

09:55:25  21   you go directly from high school to college?

09:55:28  22        A.  Yes, sir, I did.

09:55:29  23        Q.  Okay.  In what year did you earn your B.A.?

09:55:32  24        A.  I earned my B.A. in 1998.

09:55:38  25        Q.  And what's your date of birth?

 Kusar® Keeping Your Word Is Our Business℠

| | | |
|---|---|---|
| 09:55:39 | 1 | A.  My date of birth is March 9th, 1967. |
| 09:55:47 | 2 | Q.  Did you go -- Did you then go on to earn |
| 09:55:50 | 3 | your master's degree directly from undergraduate -- |
| 09:55:54 | 4 | A.  Yes, I did. |
| 09:55:55 | 5 | Q.  -- or was there a period of work in |
| 09:55:57 | 6 | between? |
| 09:55:57 | 7 | A.  I entered a doctoral program almost |
| 09:56:01 | 8 | immediately after graduation. |
| 09:56:06 | 9 | Q.  And what year did you earn your master's |
| 09:56:08 | 10 | degree? |
| 09:56:09 | 11 | A.  I earned my master's degree in 2000. |
| 09:56:15 | 12 | Q.  And then after you earned your masters, did |
| 09:56:17 | 13 | you continue as a student full time for your Ph.D., |
| 09:56:20 | 14 | or did you work? |
| 09:56:22 | 15 | A.  No.  I went to work for the State of |
| 09:56:23 | 16 | California in the Department of Finance in |
| 09:56:26 | 17 | Sacramento, California. |
| 09:56:28 | 18 | Q.  How long did you work there? |
| 09:56:29 | 19 | A.  I worked for the Department of Finance from |
| 09:56:33 | 20 | approximately 2000 to 2004. |
| 09:56:38 | 21 | Q.  And, generally, what were your job duties? |
| 09:56:42 | 22 | A.  My assignment as a staff budget analyst, I |
| 09:56:47 | 23 | was responsible for the budget and policy management |
| 09:56:51 | 24 | for the Attorney General's office, for the Office of |
| 09:56:55 | 25 | Administrative Law, for the Department of Industrial |

9



09:56:58  1    Relations, the California Gambling Control

09:57:01  2    Commission, California Peace Officers Standards and

09:57:05  3    Training.

09:57:06  4         And at my initial assignment, when I went

09:57:09  5    to the Department of Finance, was with the

09:57:10  6    California Department of Corrections, and I was

09:57:13  7    assigned the Northern California division.

09:57:19  8         Q.  And then what did you do when you left the

09:57:22  9    Department of Finance in 2004?

09:57:24  10   A.  When I left the Department of Finance, I

09:57:26  11   took a position with Laney College in Oakland as

09:57:29  12   their business and administrative services manager,

09:57:33  13   which is essentially the equivalent of the position

09:57:35  14   which I hold now.

09:57:37  15   Q.  Now, sir, it's Laney College?

09:57:38  16   A.  Laney College in Oakland.

09:57:44  17   Q.  How long did you stay at Laney College?

09:57:48  18   A.  I was at Laney College for approximately

09:57:49  19   two years, and then received an opportunity to go to

09:57:56  20   Grossmont College in San Diego, where I served as

09:58:00  21   the vice president for administrative services.

09:58:11  22   Q.  When did you leave Grossmont?

09:58:13  23   A.  I left Grossmont in approximately 2008.

09:58:23  24        I was offered an opportunity to become the

09:58:25  25   vice president of business services in Oxnard



| | | |
|---|---|---|
| 09:58:28 | 1 | College at the Ventura Community College District. |
| 09:58:36 | 2 | Q.  And, generally speaking, what did you do in |
| 09:58:39 | 3 | that position? |
| 09:58:41 | 4 | A.  As a vice president of administrative |
| 09:58:43 | 5 | services or as of business services, I've been |
| 09:58:47 | 6 | responsible for auxiliary services, which include |
| 09:58:50 | 7 | book store, food service operations, facilities, |
| 09:58:56 | 8 | facilities rental, vending operations, as well as |
| 09:59:00 | 9 | any other revenue-generating activities for the |
| 09:59:04 | 10 | college. |
| 09:59:04 | 11 | I've also been responsible for facilities |
| 09:59:07 | 12 | direction and management, which includes regular, |
| 09:59:10 | 13 | routine maintenance, custodial and grounds |
| 09:59:14 | 14 | operations, as well as the construction management |
| 09:59:16 | 15 | program. |
| 09:59:17 | 16 | I also have been responsible for all the |
| 09:59:19 | 17 | procurement, risk management, contract operations, |
| 09:59:23 | 18 | accounts payable, and, of course, issues related to |
| 09:59:28 | 19 | human resources, which include personnel and |
| 09:59:30 | 20 | payroll. |
| 09:59:32 | 21 | And all of these areas have come under my |
| 09:59:34 | 22 | supervision in each of the positions I've held. |
| 09:59:39 | 23 | Q.  But -- I just want to make sure I |
| 09:59:41 | 24 | understand -- not the academic program? |
| 09:59:43 | 25 | A.  The academic programs have not been my |

**Kusar**®  Keeping Your Word Is Our Business℠

Case 2:17-cv-01697-SVW-SK   Document 483-1   Filed 02/03/23   Page 12 of 72   Page ID
#:1098
30(b)(6) of LACCD                    Los Angeles Community College District                    1115479

| 09:59:45 | 1 | responsibility. |
| 09:59:49 | 2 | Q. How long -- Or when did you leave Oxnard? |
| 09:59:52 | 3 | A. I left Oxnard in approximately 2012 to take |
| 09:59:58 | 4 | a position as a vice chancellor of administrative |
| 10:00:03 | 5 | services at the Contra Costa Community College |
| 10:00:06 | 6 | District. |
| 10:00:10 | 7 | Q. And what -- what is the difference |
| 10:00:16 | 8 | between -- when you say vice president for the -- |
| 10:00:22 | 9 | of -- for the chancellor, does that mean you were |
| 10:00:26 | 10 | responsible for more than one campus? |
| 10:00:28 | 11 | A. A vice chancellor serves roughly -- it's a |
| 10:00:33 | 12 | District level presidential equivalent position at |
| 10:00:37 | 13 | the District level. |
| 10:00:38 | 14 | And at that level I was responsible for all |
| 10:00:41 | 15 | of District operations, and not just one particular |
| 10:00:44 | 16 | campus. |
| 10:00:47 | 17 | Q. But still keeping on the sort of list of |
| 10:00:50 | 18 | topics that you described just a moment ago? |
| 10:00:53 | 19 | A. List of topics, which, for this case, |
| 10:00:57 | 20 | expanded to contracts, which includes the requests |
| 10:01:04 | 21 | for proposal or requests for quotes process. |
| 10:01:09 | 22 | So basically having to have bids, formally |
| 10:01:13 | 23 | let, came under my supervision, whereas as a vice |
| 10:01:16 | 24 | president on a college campus, that responsibility |
| 10:01:21 | 25 | normally is handled and directed at the District. |

Kusar® Keeping Your Word Is Our Business℠

Case 2:17-cv-01697-SVW-SK   Document 483-1   Filed 02/03/23   Page 13 of 72   Page ID
30(b)(6) of LACCD                Los Angeles Community College District                #:11089
                                                                                      1115479

10:01:23  1        So it was an expansion of my current duties

10:01:26  2   for all of the campuses which were under the

10:01:29  3   District guidance.

10:01:32  4        Q.  When did you leave the vice chancellor

10:01:36  5   position?

10:01:36  6        A.  I left Contra Costa in approximately --

10:01:40  7   almost close to the end of 2013 to return back to a

10:01:46  8   campus.  I just didn't enjoy the centralized

10:01:50  9   District experience.  My experience primarily has

10:01:53 10   been on a campus working with students.

10:01:56 11        And the vice chancellor position, while it

10:01:58 12   was a good experience for me, I wanted to return

10:02:02 13   back to a college campus, which I did.

10:02:04 14        Q.  What college campus did you return to?

10:02:06 15        A.  I returned -- Initially, I did some

10:02:08 16   consulting down at Riverside for Riverside City

10:02:11 17   College prior to taking the full-time position that

10:02:14 18   I have at Los Angeles City College, which occurred

10:02:17 19   in 2014.

10:02:25 20        Q.  When did you earn your Ph.D. in that?

10:02:30 21        A.  I earned my Ph.D. -- it was conferred in

10:02:34 22   2009.

10:02:36 23        Q.  Did you write a thesis?

10:02:37 24        A.  Yes, I did.

10:02:38 25        Q.  What was the topic of the thesis?


Kusar® Keeping Your Word Is Our Business℠

Case 2:17-cv-01697-SVW-SK   Document 488-1   Filed 02/03/23   Page 14 of 72   Page ID
#:11090
30(b)(6) of LACCD                      Los Angeles Community College District                      1115479

10:02:40   1        A.  The topic of my dissertation was wage gap

10:02:43   2    inequality between black and white males, looking at

10:02:47   3    a period from the 1940s to 1970s.

10:03:10   4        Q.  And since you -- since you earned your

10:03:12   5    doctorate, have you had any additional formal

10:03:16   6    training, formal education?

10:03:18   7        A.  Outside of professional development

10:03:20   8    opportunities, I have not gone back to receiving

10:03:26   9    additional or any -- performed any post-graduate

10:03:30  10    work, no.

10:03:31  11        Q.  What kinds of professional development

10:03:33  12    training have you had?

10:03:36  13        A.  I attend the National Association of

10:03:39  14    College and University Business Officials annual

10:03:42  15    meeting.

10:03:43  16            There, we earn continuing professional

10:03:45  17    education credits in a variety of subjects, which

10:03:48  18    range from budget and financial management,

10:03:51  19    auditing, accounting, risk management, facilities

10:03:56  20    management.

10:03:56  21            There are a number of topics which I've

10:03:59  22    participated in sessions and earned professional

10:04:02  23    education credits for attendance.

10:04:07  24        Q.  And have there been other professional

10:04:08  25    education that you have attended outside of that



Case 2:17-cv-01697-SVW-SK   Document 483-1   Filed 02/03/23   Page 15 of 72   Page ID
#:11091
30(b)(6) of LACCD                    Los Angeles Community College District                    1115479

10:04:13   1    conference?

10:04:15   2        A.   Normally, each district requires us to take

10:04:18   3    annual mandated training in certain subjects,

10:04:21   4    whether it be sexual harassment, Title 9 training,

10:04:28   5    the supervision of employees, employee evaluations,

10:04:33   6    how to discipline employees.

10:04:35   7           Those are various topics which I've also

10:04:39   8    had training on in my various experiences with the

10:04:42   9    several districts in which I've worked.

10:04:46   10       Q.   Have you ever attended any training about

10:04:51   11   compliance with the Americans with Disabilities Act

10:04:55   12   as it relates to students?

10:04:58   13       A.   No.

10:05:01   14       Q.   And have you attended any training related

10:05:07   15   to compliance with the Rehabilitation Act of 1973 as

10:05:12   16   it relates to students?

10:05:13   17       A.   No.

10:05:15   18       Q.   Have you attended any training in

10:05:17   19   connection with any State of California laws that

10:05:21   20   deal with the rights of students with disabilities

10:05:26   21   in college education?

10:05:29   22       A.   No.

10:05:36   23       Q.   Have you ever been deposed before?

10:05:39   24       A.   No.

10:05:41   25       Q.   Have you ever been a plaintiff or a



Case 2:17-cv-01697-SVW-SK   Document 483-1   Filed 02/03/23   Page 16 of 72   Page ID
#:11092
30(b)(6) of LACCD                    Los Angeles Community College District                    1115479

| | | |
|---|---|---|
| 10:05:43 | 1 | defendant in a lawsuit? |
| 10:05:48 | 2 | A.  No. |
| 10:05:51 | 3 | Q.  Have you ever testified in -- |
| 10:05:53 | 4 | A.  May I clarify? |
| 10:05:54 | 5 | Q.  Sure. |
| 10:05:55 | 6 | A.  When you say "lawsuit," what do you refer |
| 10:05:57 | 7 | to? |
| 10:05:58 | 8 | Q.  A civil matter.  Could be an auto accident. |
| 10:06:02 | 9 | A divorce, I suppose, is a civil matter. |
| 10:06:05 | 10 | At least under the law it's described that way. |
| 10:06:12 | 11 | MR. MORTON:  It's usually not civil. |
| 10:06:14 | 12 | THE WITNESS:  Well, as you define it from that, |
| 10:06:15 | 13 | I am divorced.  So in that case, yes, I have been a |
| 10:06:18 | 14 | plaintiff -- |
| 10:06:19 | 15 | MR. ESPO:  Okay. |
| 10:06:19 | 16 | THE WITNESS:  -- in a divorce proceeding. |
| 10:06:20 | 17 | BY MR. ESPO: |
| 10:06:20 | 18 | Q.  All right. |
| 10:06:24 | 19 | And was there any other ambiguity in your |
| 10:06:26 | 20 | understanding of that, that is, if -- |
| 10:06:29 | 21 | A.  No. |
| 10:06:30 | 22 | Q.  Okay.  Have you ever been convicted of a |
| 10:06:34 | 23 | crime? |
| 10:06:36 | 24 | MR. MORTON:  You mean a felony? |
| 10:06:37 | 25 | MR. ESPO:  No.  I mean any crime. |

16

Case 2:17-cv-01697-SVW-SK   Document 483-1   Filed 02/03/23   Page 17 of 72   Page ID
#:11093
30(b)(6) of LACCD                    Los Angeles Community College District                    1115479

10:06:39   1          MR. MORTON:  Any crime?  Misdemeanor?  Felony?

10:06:41   2          MR. ESPO:  Misdemeanor, felony.

10:06:41   3          MR. MORTON:  Okay.

10:06:43   4          THE WITNESS:  Yes.

10:06:43   5   BY MR. ESPO:

10:06:43   6          Q.  What crime or crimes have you been

10:06:45   7   convicted of?

10:06:50   8          A.  Penal Code 1- -- I believe 189(A).  It was

10:06:56   9   voluntary manslaughter.

10:06:59  10          Q.  And when did that happen?

10:07:02  11          A.  In 1988.

10:07:06  12          Q.  So you were 21?

10:07:12  13          A.  That's correct.

10:07:16  14          Q.  And what is the underlying conduct that

10:07:22  15   gave rise to the conviction?

10:07:25  16          A.  I was involved in a physical altercation

10:07:27  17   where I went to defend myself, and the individual

10:07:31  18   was seriously injured as a result of that

10:07:33  19   altercation.

10:07:36  20          Q.  Did someone die?

10:07:38  21          A.  They subsequently died from their injuries,

10:07:40  22   yes.

10:07:43  23          Q.  And was there a trial, or did you enter a

10:07:45  24   plea of guilty?

10:07:47  25          A.  I entered a plea of no contest.



Case 2:17-cv-01697-SVW-SK   Document 483-1   Filed 02/03/23   Page 18 of 72   Page ID
#:11094
30(b)(6) of LACCD                    Los Angeles Community College District                    1115479

10:07:50  1        Q.   Okay.   What court -- In what court was the

10:07:55  2    plea entered?

10:07:57  3        A.   Alameda County Superior Court.

10:08:04  4        Q.   And what was the sentence?

10:08:06  5        A.   The sentence was six years, with a two-year

10:08:11  6    enhancement.

10:08:13  7        Q.   And did you serve -- Were you incarcerated

10:08:20  8    for a period of time?

10:08:21  9        A.   I was.   I served approximately four years.

10:08:25 10        Q.   And has whatever period of parole,

10:08:30 11    probation, or supervised release ended?

10:08:35 12        A.   Yes.   And I received a certificate of

10:08:37 13    discharge since that time.

10:08:46 14        Q.   Have you ever spoken with Roy Payan?

10:08:50 15        A.   No.

10:08:51 16        Q.   Do you -- Other -- Other than seeing the

10:08:56 17    name in connection with this lawsuit, do you know

10:08:59 18    who Mr. Payan is?

10:09:00 19        A.   No.

10:09:04 20        Q.   Do you know Portia Mason?

10:09:06 21        A.   No.

10:09:15 22        Q.   What, if anything, did you do to prepare

10:09:18 23    for today's deposition?

10:09:19 24        A.   I met with counsel to discuss preparation

10:09:24 25    for the dep- -- for this hearing today.



Case 2:17-cv-01697-SVW-SK   Document 483-1   Filed 02/03/23   Page 19 of 72   Page ID
#:11095
30(b)(6) of LACCD                    Los Angeles Community College District                    1115479

10:09:30  1        Q.  In connection with your -- with the

10:09:34  2   deposition today, did you review any documents?

10:09:37  3        A.  The documents that I've reviewed are the

10:09:40  4   same documents which you have in front of me today,

10:09:43  5   and that's the subject matter of today's deposition.

10:09:48  6        Q.  Did you speak with anyone to get

10:09:51  7   information to allow you to testify about the topics

10:09:56  8   that are noted on the deposition notice and

10:09:59  9   identified as yours?

10:10:01 10        MR. MORTON:  You mean other than counsel?

10:10:03 11        MR. ESPO:  Well, I think if he got information

10:10:04 12   from you, I'm entitled to know that.  Whether --

10:10:07 13   Whether I'm entitled to know what it was --

10:10:11 14        MR. MORTON:  I don't necessarily disagree with

10:10:13 15   that, but let's just see where we go.

10:10:15 16        MR. ESPO:  Okay.

10:10:16 17        THE WITNESS:  No.

10:10:16 18   BY MR. ESPO:

10:10:16 19        Q.  I'm sorry?

10:10:17 20        A.  No.

10:10:23 21        Q.  Okay.  You identified -- In connection with

10:10:33 22   your -- You identified your existing employment,

10:10:35 23   described it.

10:10:39 24            Do you have any job responsibilities

10:10:41 25   currently with respect to the Americans with


Kusar®  Keeping Your Word Is Our Business℠

Case 2:17-cv-01697-SVW-SK   Document 488-1   Filed 02/03/23   Page 20 of 72   Page ID
#:11096
30(b)(6) of LACCD                     Los Angeles Community College District                     1115479

```
10:10:43   1    Disabilities Act as it relates to students?

10:10:47   2        A.  Yes.

10:10:49   3        Q.  When did you begin those responsibilities?

10:10:53   4        A.  Approximately November of 2016.

10:11:00   5        Q.  And what are those duties?

10:11:02   6        A.  I serve as the campus ADA coordinator.

10:11:10   7        Q.  And what does that entail?

10:11:13   8        A.  That entails dealing with ADA accommodation

10:11:16   9    requests, and responding to students, as well as

10:11:22   10   staff ADA facility needs.

10:11:33   11       Q.  Does that position entail any

10:11:40   12   responsibility for ADA as it relates to educational

10:11:50   13   materials?

10:11:52   14       A.  No.

10:11:53   15       Q.  Does it relate to the ADA as it relates to

10:11:57   16   the acquisition of technology that's used by

10:12:01   17   students?

10:12:04   18       A.  Yes.

10:12:08   19       Q.  And what is the nature of that piece of the

10:12:12   20   position?

10:12:14   21       A.  Not as ADA coordinator, but as the vice

10:12:17   22   president of administrative services, all purchase

10:12:19   23   requests and contract documents come to my office

10:12:23   24   for review and signature prior to purchase.

10:12:40   25       Q.  Does that include -- Are the contracts that
```



Case 2:17-cv-01697-SVW-SK   Document 483-1   Filed 02/03/23   Page 21 of 72   Page ID
#:11097
30(b)(6) of LACCD                    Los Angeles Community College District                    1115479

10:12:43  1    come to you for signature -- Does -- Strike that.

10:12:49  2            Do the contracts that come to you for

10:12:51  3    signature include textbook purchases?

10:12:57  4        A.  No.  But if they are purchased by the

10:13:03  5    Office of Student Services, and not as a part of my

10:13:06  6    bookstore, then that request would come across my

10:13:09  7    office.

10:13:11  8            But that's only if the textbook purchase

10:13:15  9    came through the Office of Student Services or for

10:13:18  10   any of the student services units.

10:13:28  11       Q.  Are there written purchasing regulations

10:13:32  12   for the Los Angeles County College District?

10:13:36  13       A.  Yes.

10:13:37  14       Q.  Where are those found?

10:13:39  15       A.  Those are found on both the college

10:13:41  16   website, and they are also found on the District

10:13:44  17   website, which are accessible through our District

10:13:47  18   intranet.

10:13:51  19       THE REPORTER:  "Intranet"?

10:13:52  20       THE WITNESS:  Intranet.

10:13:52  21   BY MR. ESPO:

10:13:53  22       Q.  And do they have a citation topic number,

10:14:01  23   regulation number, something like that?

10:14:04  24       A.  The board policy that they have for

10:14:06  25   purchasing does specify the authority and the



```
10:14:10   1    guidelines for which they operate, but the

10:14:12   2    purchasing and procurement guidelines that are used

10:14:15   3    by the colleges and, on particular, at city college

10:14:17   4    are located on our website, which are consistent to

10:14:20   5    the policies that are published on the District

10:14:23   6    website.

10:14:24   7          We basically mirror and follow the policy

10:14:26   8    of the District.

10:14:27   9          Q.  I'm asking whether there is a policy

10:14:30   10   number, if you look at the document.

10:14:34   11         A.  It merely states "Purchasing Procurement

10:14:37   12   Guidelines."

10:14:46   13         Q.  And who set those out?

10:14:49   14         A.  The purchasing guidelines are published or

10:14:51   15   set out by the District office.

10:14:59   16         Q.  And would the purchase of technology be

10:15:09   17   covered by those guidelines?

10:15:12   18         A.  Yes.

10:15:29   19         Q.  Do the regulations set any -- out any

10:15:33   20   provision with respect to -- Well, let me back up.

10:15:39   21   I'll start at the beginning.

10:15:41   22         Did you have a chance, in your review of

10:15:43   23   the notice of today's deposition, to read the set of

10:15:46   24   definitions that begins at page 1?

10:15:49   25         A.  Yes.
```



Case 2:17-cv-01697-SVW-SK   Document 483-1   Filed 02/03/23   Page 23 of 72   Page ID
#:1009
30(b)(6) of LACCD                    Los Angeles Community College District                    1115479

10:15:50   1         Q.   Okay.   And do you understand, as it's used

10:15:57   2    in that document, the definition of "accessible"?

10:16:04   3         A.   Yes.

10:16:06   4         Q.   That blind students can use -- can

10:16:09   5    independently, basically, use the same electronic

10:16:14   6    technology as sighted students?

10:16:18   7         MR. MORTON:   And, Counsel, just for the record,

10:16:19   8    you are referring to Definition Number 1?

10:16:22   9         MR. ESPO:   Yes.

10:16:23  10         MR. MORTON:   Okay.

10:16:24  11         THE WITNESS:   Yes.

10:16:25  12    BY MR. ESPO:

10:16:25  13         Q.   And did you also understand the other

10:16:29  14    definition, which follows at paragraph 2, which

10:16:33  15    refers to a variety of standards?

10:16:36  16         A.   Yes.

10:16:38  17         Q.   And are you familiar with the definition

10:16:44  18    2-A?

10:16:50  19         A.   I am familiar with what it sets as a

10:16:59  20    standard, yes.

10:17:03  21             Also I am familiar with 2-B.

10:17:04  22             But the rest, I am not familiar with.

10:17:07  23         Q.   Okay.   Did you make any effort to ask

10:17:15  24    anybody at the college what 2-C through -G are

10:17:20  25    about?



**Kusar**® Keeping Your Word Is Our Business℠

Case 2:17-cv-01697-SVW-SK   Document 488-1   Filed 02/03/23   Page 24 of 72   Page ID
30(b)(6) of LACCD                    Los Angeles Community College District                    1115479
#:11100

```
10:17:23   1        A.  No.

10:17:41   2        Q.  Is there -- For what does LACCD send out

10:17:54   3   requests for proposals?

10:17:57   4        MR. MORTON:  There's a foundational issue

10:17:59   5   there.  He's here to speak on behalf of LACC, not

10:18:04   6   necessarily the District.

10:18:07   7        MR. ESPO:  Well --

10:18:08   8        MR. MORTON:  To the extent you can respond, go

10:18:09   9   ahead.

10:18:10  10        MR. ESPO:  I will recognize that the question

10:18:11  11   was not very artfully asked, and I'll try a new one,

10:18:14  12   but not on that basis, Mr. Morton.  The defendant --

10:18:16  13        MR. MORTON:  I understand.

10:18:16  14        MR. ESPO:  -- who was requested to produce was

10:18:18  15   for the LACCD.

10:18:20  16        MR. MORTON:  I know.  But all of these issues

10:18:22  17   involve LACC, and Dr. al-Amin is on campus at LACC.

10:18:29  18   So there might be other people, District-wide, that

10:18:34  19   might be more responsive.  But we're not there yet.

10:18:37  20        MR. ESPO:  Well, this is the one you have

10:18:38  21   identified.  So I'm asking him the questions --

10:18:42  22        MR. MORTON:  I understand.

10:18:43  23        MR. ESPO:  -- that I am.

10:18:43  24        MR. MORTON:  I'm just objecting.

10:18:44  25        MR. ESPO:  That's fine.
```


Kusar® Keeping Your Word Is Our Business℠

Case 2:17-cv-01697-SVW-SK   Document 488-1   Filed 02/03/23   Page 25 of 72   Page ID
#:11101
30(b)(6) of LACCD                    Los Angeles Community College District                    1115479

| 10:18:44 | 1 | BY MR. ESPO: |
| 10:18:48 | 2 | Q.  What types of products and services are |
| 10:18:54 | 3 | purchased through the use of a request for |
| 10:18:57 | 4 | proposals? |
| 10:19:01 | 5 | A.  Pursuant to Public Contract Code, any items |
| 10:19:05 | 6 | that are above the stated threshold, which changes |
| 10:19:11 | 7 | year to year, require a formal bid for purchase. |
| 10:19:14 | 8 | And normally, I believe that number at |
| 10:19:16 | 9 | this point is above $88,000.  Anything less than |
| 10:19:21 | 10 | $88,000 does not require a formal bid proposal, |
| 10:19:24 | 11 | which means that the individual units, if they went |
| 10:19:28 | 12 | to go and procure items or services, if they are |
| 10:19:31 | 13 | above a threshold of $5,000, are required to go out |
| 10:19:35 | 14 | and get three formal quotes. |
| 10:19:37 | 15 | So between the 5,000 and $88,000 threshold, |
| 10:19:42 | 16 | individual units, if they wish to go procure |
| 10:19:46 | 17 | supplies, equipment, or services, are required to |
| 10:19:48 | 18 | get three individual quotes. |
| 10:19:59 | 19 | Q.  Is there -- For items that are purchased |
| 10:20:04 | 20 | through the initial use -- use of a request for |
| 10:20:08 | 21 | proposal, is there standard contract language |
| 10:20:12 | 22 | regarding accessibility as it relates to student use |
| 10:20:18 | 23 | of whatever is being sought? |
| 10:20:21 | 24 | MR. MORTON:  The question is vague and no |
| 10:20:23 | 25 | foundation. |



Case 2:17-cv-01697-SVW-SK   Document 488-1   Filed 02/03/23   Page 26 of 72   Page ID
#:11202
30(b)(6) of LACCD                    Los Angeles Community College District                    1115479

| | | |
|---|---|---|
| 10:20:23 | 1 | Go ahead. |
| 10:20:25 | 2 | THE WITNESS:  I would say I don't know. |
| 10:20:26 | 3 | Because the question if it's specifically related to |
| 10:20:31 | 4 | the procurement of ADA or technology equipment to |
| 10:20:36 | 5 | assist blind students, to my knowledge, we have not |
| 10:20:39 | 6 | done an RFP to purchase or procure equipment for |
| 10:20:44 | 7 | blind students or to assist them with any related |
| 10:20:47 | 8 | technology.  To my knowledge, we have not done so. |
| 10:20:50 | 9 | BY MR. ESPO: |
| 10:20:50 | 10 | Q.  What about students -- What about software |
| 10:20:54 | 11 | for student use that is for everyone on campus? |
| 10:20:58 | 12 | A.  A software purchase would be necessarily |
| 10:21:01 | 13 | addressed through our -- my technology -- |
| 10:21:04 | 14 | information technology unit. |
| 10:21:06 | 15 | And they -- if it was a District-wide or if |
| 10:21:09 | 16 | it was a college-wide software, they would review |
| 10:21:12 | 17 | the request for purchase, which normally would rise |
| 10:21:15 | 18 | from the Office of Special or Student Services, |
| 10:21:19 | 19 | which deals with our disabled student population, |
| 10:21:22 | 20 | which includes our blind students. |
| 10:21:25 | 21 | And that would be a software request that |
| 10:21:27 | 22 | they would purchase, and it wouldn't necessarily be |
| 10:21:29 | 23 | a purchase done through the college -- the college |
| 10:21:34 | 24 | technology unit per se. |
| 10:21:36 | 25 | Q.  Are you -- |

26

**Kusar**  Keeping Your Word Is Our Business℠

| | | |
|---|---|---|
| 10:21:40 | 1 | A. I'm differentiating between -- because the |
| 10:21:42 | 2 | DSPS unit on our campus is the unit that's |
| 10:21:46 | 3 | specifically assigned to deal with our disabled |
| 10:21:49 | 4 | student population, which means that they procure |
| 10:21:52 | 5 | equipment and provide the software necessary for |
| 10:21:55 | 6 | their success, including the purchasing of software |
| 10:21:59 | 7 | or the recommendation for software that would allow |
| 10:22:02 | 8 | for them to participate in and complete their |
| 10:22:06 | 9 | academic classwork. |
| 10:22:10 | 10 | Q. Let me -- Let me just use an example. |
| 10:22:13 | 11 | A. Okay. |
| 10:22:13 | 12 | Q. I'll try to find an example that we can |
| 10:22:16 | 13 | use. |
| 10:22:16 | 14 | Are you familiar with a software called |
| 10:22:18 | 15 | MyMathLab? |
| 10:22:19 | 16 | A. No. |
| 10:22:21 | 17 | Q. Are you familiar with a software known as |
| 10:22:24 | 18 | Canvas? |
| 10:22:25 | 19 | A. Yes. |
| 10:22:29 | 20 | Q. Canvas, as I understand it, is a learning |
| 10:22:32 | 21 | management system; is that right? |
| 10:22:34 | 22 | A. It's used for our District's distance |
| 10:22:39 | 23 | education program, yes. |
| 10:22:42 | 24 | Q. Is it -- Isn't it also used by at least |
| 10:22:45 | 25 | some professors for classes taught on campus? |

27



Case 2:17-cv-01697-SVW-SK   Document 488-1   Filed 02/03/23   Page 28 of 72   Page ID
#:11004
30(b)(6) of LACCD                    Los Angeles Community College District                    1115479

10:22:52  1      A.  I don't know.

10:22:55  2      Q.  It is not specifically used or acquired for

10:23:00  3  the use of blind students; correct?

10:23:05  4      MR. MORTON:  No foundation.

10:23:05  5          Go ahead.

10:23:10  6      THE WITNESS:  I don't know.

10:23:11  7  BY MR. ESPO:

10:23:11  8      Q.  Let me -- Let me -- Let me ask it the other

10:23:14  9  way.

10:23:15 10          Is it software that is acquired for the use

10:23:19 11  of all students?

10:23:21 12      A.  Yes.

10:23:21 13      Q.  Okay.

10:23:25 14          In the process of acquiring Canvas, was

10:23:31 15  there a request for proposals?

10:23:35 16      A.  I don't know.

10:23:39 17      Q.  In the process of acquiring Canvas, was

10:23:43 18  there anything -- any language in the ultimate

10:23:49 19  purchase agreement, whatever that -- whatever the

10:23:51 20  form that took, that required accessibility for

10:23:57 21  blind students?

10:23:58 22      MR. MORTON:  That question is vague and no

10:24:00 23  foundation.

10:24:00 24          Go ahead.

10:24:02 25      THE WITNESS:  I don't know.  And the reason

28



Case 2:17-cv-01697-SVW-SK   Document 483-1   Filed 02/03/23   Page 29 of 72   Page ID
#:11105
30(b)(6) of LACCD                 Los Angeles Community College District                    1115479

10:24:04  1    being is that because we use piggyback contracts

10:24:08  2    from the State.  Etudes, which is also noted in your

10:24:14  3    complaint, is an example.  Etudes is a system

10:24:17  4    software which we use as a part of the California

10:24:23  5    Community College Consortium.

10:24:25  6         So they actually would do the formal bid,

10:24:27  7    and not the college or the District.  And we utilize

10:24:31  8    those contracts in order to procure some services.

10:24:34  9    BY MR. ESPO:

10:24:35  10        Q.  What contracts are those?

10:24:37  11        A.  It all would depend.

10:24:40  12        We have various master -- Or there are

10:24:42  13   various master agreements that we use to purchase

10:24:45  14   things such as custodial supplies, computers, office

10:24:49  15   equipment.  They aren't necessarily done through an

10:24:52  16   RFP from the District.

10:25:01  17        But in my experience, those contracts or

10:25:03  18   those proposals normally do include language that

10:25:05  19   refers to making sure that products or services are

10:25:09  20   accessible.

10:25:28  21        MR. ESPO:  Could you provide Dr. al-Amin with

10:25:30  22   Exhibit 2.

10:25:33  23        THE REPORTER:  (Indicating.)

10:25:55  24   BY MR. ESPO:

10:26:04  25        Q.  Dr. al-Amin, you were just given what's --



Case 2:17-cv-01697-SVW-SK   Document 488-1   Filed 02/03/23   Page 30 of 72   Page ID
30(b)(6) of LACCD                    Los Angeles Community College District                    1115479
#:11106

10:26:06  1    what was previously marked as Exhibit 2, which are

10:26:12  2    Administrative Regulations B-33 and -34.  I'm going

10:26:17  3    to ask you some questions.  Take as much time as you

10:26:21  4    need to review it first.

10:26:22  5         A.  Uh-huh.

10:27:52  6         Q.  Okay.  Are you -- Have you seen Regu- --

10:27:54  7    Administrative Regulations B-33 and -34 previously?

10:28:00  8         A.  Yes.

10:28:01  9         Q.  And are you familiar with them?

10:28:03 10         A.  Yes.

10:28:04 11         Q.  And do they set out the policy of LACCD

10:28:12 12    with respect to the acquisition of student use

10:28:16 13    technology?

10:28:18 14         A.  Yes, they do.

10:28:20 15         Q.  And how does LACCD implement the policy

10:28:41 16    with respect to the acquisition of student use

10:28:46 17    software?

10:28:47 18         MR. MORTON:  No foundation.

10:28:48 19              But go ahead.

10:28:49 20         THE WITNESS:  On my campus, the Office of

10:28:51 21    Special Services, if there's software that is

10:28:56 22    necessary for a student to complete an assignment or

10:29:02 23    participate in a program -- and I'll use your MyMath

10:29:06 24    21 example -- if software was required, then the

10:29:12 25    process has been for students to notify the Office



30

Case 2:17-cv-01697-SVW-SK  Document 488-1  Filed 02/03/23  Page 31 of 72  Page ID
#:11707
30(b)(6) of LACCD                    Los Angeles Community College District                    1115479

| 10:29:15 | 1 | of Student Services that they are in a class that |
| 10:29:20 | 2 | they need access to information, or accessibility. |
| 10:29:24 | 3 | And then that department works with the |
| 10:29:27 | 4 | specific academic program department or instructors |
| 10:29:30 | 5 | in order to make sure that the materials that the |
| 10:29:32 | 6 | student is -- is necessary for the student to |
| 10:29:36 | 7 | complete the course is provided.  And that is the |
| 10:29:39 | 8 | process on the Los Angeles City College campus. |
| 10:29:44 | 9 | Q.  Are you -- First, is there a -- is there a |
| 10:29:50 | 10 | person who has the title "dean of technology"? |
| 10:29:55 | 11 | A.  No. |
| 10:29:57 | 12 | Q.  Okay.  Is there a -- somebody denoted as a |
| 10:30:03 | 13 | dean who has a role in making sure that educational |
| 10:30:13 | 14 | materials acquired by LACCD are accessible to |
| 10:30:21 | 15 | students, outside of OSS? |
| 10:30:27 | 16 | A.  I don't know. |
| 10:30:30 | 17 | Q.  With respect to the technology that is |
| 10:30:40 | 18 | acquired for student use, do you understand or do |
| 10:30:46 | 19 | you have any knowledge -- Let me strike that and |
| 10:30:53 | 20 | start over. |
| 10:30:54 | 21 | Let me use MyMathLab again as an example. |
| 10:30:57 | 22 | A.  Uh-huh. |
| 10:31:03 | 23 | Q.  Isn't it true that the basic installation |
| 10:31:09 | 24 | of MyMathLab has to be designed so that it will work |
| 10:31:15 | 25 | with screen readers in order for blind students to |

**Kusar** Keeping Your Word Is Our Business℠

Case 2:17-cv-01697-SVW-SK   Document 488-1   Filed 02/03/23   Page 32 of 72   Page ID
#:11108
30(b)(6) of LACCD                    Los Angeles Community College District                    1115479

| 10:31:20 | 1  | be able to use it? |
| 10:31:24 | 2  | MR. MORTON:  No foundation.  Objection. |
| 10:31:24 | 3  | Go ahead. |
| 10:31:26 | 4  | THE WITNESS:  I don't know. |
| 10:31:28 | 5  | BY MR. ESPO: |
| 10:31:31 | 6  | Q.  Has anybody ever told you that that was |
| 10:31:34 | 7  | true? |
| 10:31:40 | 8  | A.  Can you restate your question. |
| 10:31:42 | 9  | Q.  Sure. |
| 10:31:43 | 10 | In connection with the -- Well, strike |
| 10:31:49 | 11 | that.  I'll defer it for the moment. |
| 10:31:54 | 12 | What types of technology does the -- does |
| 10:32:01 | 13 | OSS acquire for blind students? |
| 10:32:08 | 14 | A.  They have made purchases for audio |
| 10:32:12 | 15 | recorders. |
| 10:32:15 | 16 | They have notified me of software issues |
| 10:32:23 | 17 | with other agencies that I interceded on their |
| 10:32:28 | 18 | behalf to allow blind or other students to access |
| 10:32:33 | 19 | outside web sites, which had, again, no control by |
| 10:32:36 | 20 | the college. |
| 10:32:39 | 21 | Those are just a couple examples of what |
| 10:32:42 | 22 | OSS has served as in order to help facilitate |
| 10:32:47 | 23 | students' success, in addition to providing |
| 10:32:54 | 24 | note-takers and other student assistance that is |
| 10:33:01 | 25 | needed or is available. |

Kusar ® Keeping Your Word Is Our Business℠

Case 2:17-cv-01697-SVW-SK   Document 488-1   Filed 02/03/23   Page 33 of 72   Page ID
#:11109
30(b)(6) of LACCD                    Los Angeles Community College District                    1115479

| 10:33:25 | 1 | Q. If you could turn to Regulation B-34, which |
| 10:33:31 | 2 | is contained in Exhibit 2. |
| 10:33:35 | 3 | A. Uh-huh. |
| 10:33:36 | 4 | MR. MORTON: What page is it on? |
| 10:33:37 | 5 | MR. ESPO: It begins -- It's separately |
| 10:33:40 | 6 | paginated. I'm looking -- specifically page 13 of |
| 10:33:44 | 7 | 23 is what it says at the bottom. |
| 10:33:48 | 8 | MR. MORTON: Great. Thank you. |
| 10:33:49 | 9 | THE WITNESS: (Indicating.) |
| 10:34:04 | 10 | BY MR. ESPO: |
| 10:34:16 | 11 | Q. And specifically I'm looking -- I want to |
| 10:34:19 | 12 | ask you about paragraph H-1. |
| 10:34:24 | 13 | A. Uh-huh. |
| 10:34:31 | 14 | Q. Are you familiar with that paragraph? |
| 10:34:33 | 15 | A. Yes. |
| 10:34:34 | 16 | Q. It says, "The District will evaluate its |
| 10:34:37 | 17 | process for all future computer hardware and |
| 10:34:39 | 18 | software purchases with potential public access for |
| 10:34:44 | 19 | their combat- -- compatibility with |
| 10:34:47 | 20 | accessibility-related adaptive equipment and |
| 10:34:50 | 21 | software." |
| 10:34:51 | 22 | Do you see that sentence? |
| 10:34:52 | 23 | A. Yes. |
| 10:34:54 | 24 | Q. And what has been done, if anything, to |
| 10:34:58 | 25 | implement that language? |


Kusar  Keeping Your Word Is Our Business℠

Case 2:17-cv-01697-SVW-SK   Document 488-1   Filed 02/03/23   Page 34 of 72   Page ID
#:11110
30(b)(6) of LACCD                    Los Angeles Community College District                    1115479

10:35:02  1        A.  On my campus, we recently just redesigned

10:35:06  2   our college website, and we redesigned it consistent

10:35:11  3   with ATAG 2.0, which is referred to in Exhibit 1.

10:35:23  4        So as part of our website, which is

10:35:27  5   available not only to students and to the public, we

10:35:31  6   made sure that the software and the materials that

10:35:34  7   are posted there can be accessible for all,

10:35:37  8   including the blind.

10:35:42  9        Q.  And from that, did you develop an

10:35:47 10   understanding that there were things that needed to

10:35:51 11   be -- to be done with the underlying website in

10:35:58 12   order to allow JAWS to read it properly?

10:36:04 13        MR. MORTON:  Well, no foundation.  Also an

10:36:06 14   incomplete hypothetical.

10:36:07 15        Go ahead.

10:36:12 16        THE WITNESS:  I am familiar with JAWS.  I am

10:36:16 17   not aware that our current or our past website was

10:36:19 18   incompatible with JAWS, and no -- no one had brought

10:36:23 19   that to my attention.  So I -- no, I do not know.

10:36:27 20   BY MR. ESPO:

10:36:28 21        Q.  I don't -- I don't think I was saying that

10:36:29 22   it was incompatible, but let me try to clarify.

10:36:34 23        JAWS is a screen reader?

10:36:37 24        A.  I'm familiar.

10:36:38 25        Q.  Okay.  And the WCAG -- W-C-A-G -- 2.0



Kusar® Keeping Your Word Is Our Business℠

Case 2:17-cv-01697-SVW-SK   Document 488-1   Filed 02/03/23   Page 35 of 72   Page ID
#:11111
30(b)(6) of LACCD                    Los Angeles Community College District                    1115479

```
10:36:50   1    standard that you referred to in a previous

10:36:53   2    answer --

10:36:54   3         A.  Uh-huh.

10:36:55   4         Q.  -- are -- is a standard for designing

10:36:57   5    websites; correct?

10:37:01   6         A.  I do not know as I'm not a website

10:37:03   7    designer.

10:37:15   8         Q.  How do you know that the new website is

10:37:19   9    accessible to blind users?

10:37:22  10         A.  The web designer who we recently hired

10:37:25  11    works for my informational technology director,

10:37:28  12    and one of the specific directions that they were

10:37:32  13    given with the reconstruction of the website is so

10:37:37  14    that it is accessible and can be usable by all,

10:37:40  15    including the blind.  And those were specific

10:37:43  16    directions which I provided.

10:37:45  17         Q.  Was that contained -- Were those directions

10:37:47  18    contained in whatever contract existed between LACCD

10:37:53  19    and the web designer?

10:37:56  20         A.  In the contract which the college had with

10:37:59  21    our web designer, those were part -- those were part

10:38:03  22    of the instructions that they were given in terms of

10:38:05  23    the development of the site.

10:38:10  24         Q.  And who's the person -- You referred to

10:38:19  25    someone in your side as -- the directions you gave
```



Case 2:17-cv-01697-SVW-SK   Document 488-1   Filed 02/03/23   Page 36 of 72   Page ID
#:11112
30(b)(6) of LACCD                Los Angeles Community College District                    1115479

```
10:38:25   1    to a technology person.  What was that title?

10:38:28   2        A.  Juan Mendoza is our director of college

10:38:31   3    informational technology, and Mike Bilz is our new

10:38:39   4    web designer.

10:38:41   5            Mike Bilz, and his last name is B-i-l-z.

10:38:50   6        Q.  Are you familiar with -- Let me just ask

10:39:04   7    you a -- ask you a couple of other specifics about

10:39:06   8    the regulation.

10:39:08   9            If you turn to page 18 --

10:39:16  10        A.  (Indicating.)

10:39:21  11        Q.  Actually, it's page 19.  Sorry.

10:39:25  12        A.  (Indicating.)

10:39:29  13        Q.  If you go to Section P, paragraph 6,

10:39:42  14    regarding "Training in website design and updates

10:39:45  15    for employees," is that done at LACCD?

10:40:07  16        A.  As this reads, "Training in website design

10:40:09  17    and updates for employees will include training on

10:40:12  18    websites accessibility."

10:40:14  19            As we do updates or changes to the website,

10:40:18  20    we do provide training and information on the

10:40:28  21    changes which are occurring to the website.

10:40:31  22            Normally, there is a task force or a work

10:40:33  23    group that discuss the potential changes, and we

10:40:36  24    work with individuals, as needed, to make them aware

10:40:39  25    of what those changes will be prior to implementing.
```



Case 2:17-cv-01697-SVW-SK   Document 488-1   Filed 02/03/23   Page 37 of 72   Page ID
#:11113
30(b)(6) of LACCD                     Los Angeles Community College District                        1115479

| | | |
|---|---|---|
| 10:41:02 | 1 | Q.  Did the District evaluate its process for |
| 10:41:10 | 2 | assessing computer software and hardware |
| 10:41:13 | 3 | compatibility with adaptive aids following the |
| 10:41:18 | 4 | adoption of Regulation B-34? |
| 10:41:28 | 5 | And I'm sorry, that's in paragraph H-1, |
| 10:41:30 | 6 | also on page 13. |
| 10:41:33 | 7 | A.  Okay.  So if you can restate to make sure |
| 10:41:39 | 8 | that I understand exactly -- because I know you're |
| 10:41:42 | 9 | referring to the District, but as a college |
| 10:41:44 | 10 | representative, I can't speak on behalf of what the |
| 10:41:47 | 11 | District does.  I can speak on behalf of what the |
| 10:41:50 | 12 | college does. |
| 10:41:52 | 13 | So let me make -- I want to make sure I |
| 10:41:54 | 14 | understand your question correctly as how we've |
| 10:41:57 | 15 | implemented this regulation on our campus. |
| 10:42:06 | 16 | Q.  Well, since you're here, I'll listen to the |
| 10:42:09 | 17 | answer. |
| 10:42:10 | 18 | A.  Okay. |
| 10:42:11 | 19 | Q.  But through no fault of you, you are not |
| 10:42:13 | 20 | apparently the either proper witness or properly |
| 10:42:17 | 21 | prepared. |
| 10:42:20 | 22 | MR. MORTON:  Well, I disagree with that.  I |
| 10:42:21 | 23 | also object to it. |
| 10:42:23 | 24 | But go ahead. |
| 10:42:26 | 25 | I mean, the students here are LACC |



Case 2:17-cv-01697-SVW-SK   Document 483-1   Filed 02/03/23   Page 38 of 72   Page ID
#:11194
30(b)(6) of LACCD                    Los Angeles Community College District                    1115479

| | | |
|---|---|---|
| 10:42:28 | 1 | students.  He's with LACC. |
| 10:42:30 | 2 | MR. ESPO:  And the notice is for LACCD -- |
| 10:42:33 | 3 | MR. MORTON:  I understand. |
| 10:42:34 | 4 | MR. ESPO:  -- which is the defendant. |
| 10:42:37 | 5 | MR. MORTON:  I understand. |
| 10:42:37 | 6 | MR. ESPO:  But that's why I said it's through |
| 10:42:40 | 7 | no fault of the witness.  I don't want him to think |
| 10:42:43 | 8 | I'm blaming him. |
| 10:42:45 | 9 | MR. MORTON:  Well, he's going to answer. |
| 10:42:46 | 10 | BY MR. ESPO: |
| 10:42:46 | 11 | Q.  But with respect to how you've defined the |
| 10:42:47 | 12 | question, what has LACC done to implement paragraph |
| 10:42:51 | 13 | H-1 of Regulation B-34? |
| 10:43:15 | 14 | A.  On our campus, computer hardware and |
| 10:43:22 | 15 | software purchases, adaptive aids, devices, |
| 10:43:27 | 16 | controls, et cetera, are purchased by the Office of |
| 10:43:30 | 17 | Special Services upon an assessment of the student |
| 10:43:35 | 18 | needs. |
| 10:43:37 | 19 | As that office submits the requests, the |
| 10:43:41 | 20 | requests are reviewed by our informational |
| 10:43:43 | 21 | technology unit to ensure that these aids and |
| 10:43:47 | 22 | devices are compatible with our servers and software |
| 10:43:53 | 23 | prior to it coming to my office. |
| 10:43:55 | 24 | At that point, my review is to make sure |
| 10:43:59 | 25 | that the purchasing and procurement guidelines, |

38


Kusar® Keeping Your Word Is Our Business℠

Case 2:17-cv-01697-SVW-SK   Document 488-1   Filed 02/03/23   Page 39 of 72   Page ID
#:11115
30(b)(6) of LACCD                    Los Angeles Community College District                    1115479

```
10:44:01  1    which require individual units to go out and to get

10:44:07  2    quotes from more than one vendor so that we can

10:44:10  3    compare for likeness, quality, price, and in that

10:44:18  4    same time frame, see which would be the best product

10:44:21  5    to implement with our system.

10:44:24  6            So we do a regular evaluation of our

10:44:28  7    purchasing and procurement policies, and those

10:44:31  8    procurement policies govern how these purchases are

10:44:34  9    made.

10:44:36  10           But the determination of what the

10:44:39  11   appropriate software or device or aid is done by the

10:44:43  12   Office of Special Services, and it's compliant based

10:44:47  13   upon either a general need or an individual student

10:44:49  14   need.

10:44:50  15           And once they make that determination, then

10:44:52  16   we go through, and we make the appropriate purchase.

10:44:56  17       Q.  Are you familiar with a new Student

10:44:59  18   Information System that is being rolled out at

10:45:02  19   LACCD?

10:45:03  20       A.  Yes.

10:45:05  21       Q.  Okay.  And that is a PeopleSoft program --

10:45:11  22       A.  Yes.

10:45:11  23       Q.  -- is that right?

10:45:13  24           And it is supposed to be accessible to

10:45:20  25   blind users who are using JAWS; correct?
```



```
10:45:24  1        A.  I do not know.

10:45:25  2        Q.  You don't know if it's supposed to be

10:45:27  3   accessible?

10:45:27  4        A.  I don't know.  I'm not a member or do I

10:45:30  5   participate in the implementation of that project.

10:45:33  6        Q.  Well, isn't it covered by the regulation

10:45:35  7   that is B-34?

10:45:37  8        A.  It would be covered under the purchase

10:45:39  9   requirements which are followed by the District,

10:45:41 10   yes, in that respect.

10:45:44 11        Q.  So in that respect, it should be accessible

10:45:47 12   to blind students as well as sighted students?

10:45:52 13        MR. MORTON:  Well, that's argumentative.

10:45:53 14            But go ahead.

10:45:55 15        THE WITNESS:  Theoretically, yes.

10:45:57 16   BY MR. ESPO:

10:45:58 17        Q.  What has been done to make sure that it is,

10:46:01 18   in fact, accessible?

10:46:03 19        A.  As I am not a member of that implementation

10:46:06 20   team nor did I participate in that purchase process,

10:46:09 21   I do not know.

10:46:23 22        Q.  Do you have any understanding as to whether

10:46:29 23   JAWS will operate in connection -- in conjunction

10:46:34 24   with any -- Strike that.

10:46:37 25            Do you have any understanding as to whether
```



Case 2:17-cv-01697-SVW-SK   Document 488-1   Filed 02/03/23   Page 41 of 72   Page ID
#:11717
30(b)(6) of LACCD                    Los Angeles Community College District                    1115479

| 10:46:39 | 1 | JAWS will work in conjunction with all software? |
| 10:46:45 | 2 | A. "All software" is pretty vague -- or is |
| 10:46:49 | 3 | pretty broad.  Excuse me. |
| 10:46:52 | 4 | Q. Meant to be. |
| 10:46:54 | 5 | A. Okay.  I do not know. |
| 10:46:58 | 6 | Q. Do you know whether JAWS works with -- |
| 10:47:03 | 7 | Well, strike that. |
| 10:47:04 | 8 | Have you received any reports or |
| 10:47:08 | 9 | information about whether JAWS will or will not work |
| 10:47:14 | 10 | with any specific computer program in use by LACCD? |
| 10:47:25 | 11 | A. No, I have not. |
| 10:47:27 | 12 | Q. Okay.  Have you received any reports, |
| 10:47:43 | 13 | either by students or -- reports originating with |
| 10:47:56 | 14 | students, let's say, that might have come to you |
| 10:47:58 | 15 | through another -- through a faculty member or |
| 10:48:01 | 16 | someone else on the college staff, that there are |
| 10:48:04 | 17 | some inaccessible programs in use at LACCD? |
| 10:48:10 | 18 | A. No, I have not, as it pertains to my |
| 10:48:18 | 19 | campus. |
| 10:48:21 | 20 | Q. Has any of the student-use technology been |
| 10:48:25 | 21 | tested by LACCD for accessibility to blind students? |
| 10:48:39 | 22 | A. I do not know. |
| 10:48:57 | 23 | Q. Was that one of the topics on which you |
| 10:49:00 | 24 | were identified as a witness? |
| 10:49:03 | 25 | A. And that would be under? |



Kusar®  Keeping Your Word Is Our Business℠

Case 2:17-cv-01697-SVW-SK   Document 488-1   Filed 02/03/23   Page 42 of 72   Page ID
#:11118
30(b)(6) of LACCD                      Los Angeles Community College District                      1115479

```
10:49:06   1          MR. MORTON:   4.

10:49:07   2          MR. ESPO:   Exhibit 1, Number 4.

10:49:13   3          MR. MORTON:   Both he and Juan Mendoza were

10:49:15   4    identified, I think, in the Category 4.

10:49:17   5          MR. ESPO:   I think that's right.

10:49:18   6          MR. MORTON:   Yeah.

10:49:20   7          THE WITNESS:   Exhibit 1, Number 4, as it

10:49:23   8    relates to "Learning Management System," deals with

10:49:26   9    "software applications, whether used in single

10:49:29   10   courses, by a department, by college, or by a

10:49:31   11   school, or across LACCD."

10:49:35   12         The issue with this definition is that if

10:49:38   13   it is a course or department, or, in this case, it's

10:49:45   14   not a college-wide software or learning management

10:49:48   15   system that is used in the informational technology

10:49:51   16   unit, where my office wouldn't necessarily see it.

10:49:55   17   And in some cases, in the math example, that would

10:49:59   18   be software that essentially would have been

10:50:02   19   purchased either by the math department or by OSS.

10:50:04   20   Whether it was done or not, I do not know.

10:50:06   21   BY MR. ESPO:

10:50:07   22        Q.   Okay.   Let me direct you out of the

10:50:12   23   "Definitions" section, which I think is the

10:50:14   24   paragraph 4 you were just looking at --

10:50:17   25        A.   Yeah.
```

**Kusar** Keeping Your Word Is Our Business℠

Case 2:17-cv-01697-SVW-SK   Document 488-1   Filed 02/03/23   Page 43 of 72   Page ID
30(b)(6) of LACCD                    Los Angeles Community College District                 #:11119
                                                                                        1115479

| | | |
|---|---|---|
| 10:50:18 | 1 | Q. -- and to the -- There's another page 1 -- |
| 10:50:22 | 2 | A. Oh, I'm sorry. My apologies. |
| 10:50:23 | 3 | Q. -- which has the heading that says, |
| 10:50:25 | 4 | "Designation of Subject Matter." |
| 10:50:28 | 5 | A. Oh, I'm sorry. Whether we have conducted |
| 10:50:29 | 6 | any testing? |
| 10:50:30 | 7 | Q. Yes. |
| 10:50:36 | 8 | A. I do not know. |
| 10:50:39 | 9 | Q. You don't know if you were designated on |
| 10:50:41 | 10 | that topic? |
| 10:50:42 | 11 | A. No. I believe I was designated on that |
| 10:50:44 | 12 | topic. |
| 10:50:48 | 13 | The -- As far as testing is concerned, when |
| 10:50:50 | 14 | we implement any software, we implement software |
| 10:50:55 | 15 | when it has been proven that it can coexist with our |
| 10:50:59 | 16 | existing server- -- servers and sym- -- and systems. |
| 10:51:05 | 17 | Q. And does that mean that it is -- as a |
| 10:51:08 | 18 | matter of policy, new software is tested for |
| 10:51:11 | 19 | interaction with JAWS? |
| 10:51:13 | 20 | A. I do not know. |
| 10:51:54 | 21 | Q. Is there a person above you in the |
| 10:52:09 | 22 | organizational ladder who is charged with assuring |
| 10:52:15 | 23 | compliance with Regulations B-33 and B-34? |
| 10:52:23 | 24 | A. That would -- That would be -- We have a |
| 10:52:30 | 25 | District ADA coordinator, and it's my understanding |



Kusar® Keeping Your Word Is Our Business℠

Case 2:17-cv-01697-SVW-SK   Document 483-1   Filed 02/03/23   Page 44 of 72   Page ID
#:11120
30(b)(6) of LACCD                    Los Angeles Community College District                    1115479

| | | |
|---|---|---|
| 10:52:43 | 1 | that that person no longer is with the District. |
| 10:52:47 | 2 | Q.  Who was it? |
| 10:52:52 | 3 | A.  David Serrano. |
| 10:52:57 | 4 | Q.  And is there an acting -- Is there a person |
| 10:52:59 | 5 | acting with his departure? |
| 10:53:02 | 6 | A.  It's my understanding his departure just |
| 10:53:04 | 7 | was recent.  So I do not know who the replacement |
| 10:53:09 | 8 | is. |
| 10:53:15 | 9 | Q.  As part of your role as the ADA coordinator |
| 10:53:22 | 10 | at LACC, do you have plans, as you sit here today, |
| 10:53:34 | 11 | to learn more about accessibility as it relates to |
| 10:53:39 | 12 | blind students? |
| 10:53:42 | 13 | A.  Yes. |
| 10:53:43 | 14 | Q.  And what are those plans? |
| 10:53:47 | 15 | A.  I've relied upon the expertise of our |
| 10:53:51 | 16 | Office of Special Services, who basically deal with |
| 10:53:54 | 17 | our blind students on a daily basis. |
| 10:53:57 | 18 | My function is -- regards for facility |
| 10:54:01 | 19 | concerns are to make sure that our facilities are |
| 10:54:03 | 20 | ADA compliant so that all students can use them |
| 10:54:07 | 21 | appropriately, in relation to and including paths of |
| 10:54:10 | 22 | travel for blind students. |
| 10:54:12 | 23 | That for us has been a primarily issue of |
| 10:54:15 | 24 | concern, which one I've worked to address. |
| 10:54:19 | 25 | Now, in terms of adaptive aids and |

Kusar® Keeping Your Word Is Our Business℠

Case 2:17-cv-01697-SVW-SK   Document 483-1   Filed 02/03/23   Page 45 of 72   Page ID
#:11121
30(b)(6) of LACCD                    Los Angeles Community College District                    1115479

```
10:54:21  1    equipment, this is something that we have relied

10:54:23  2    upon the Office of Student Services to do.

10:54:26  3         My plan is to work with them a little bit

10:54:28  4    more diligently in order to ensure that, in fact,

10:54:33  5    the testing, which I know occurs in other areas -- I

10:54:38  6    need to confirm that that is, in fact, part of their

10:54:42  7    process, which I do not know or can comment on.

10:54:52  8         Q.  When you say "facilities," you're talking

10:54:56  9    about buildings and that type of thing?

10:55:06 10         A.  Facilities and accessibility, whether it's

10:55:09 11    parking, building use, building construction.

10:55:12 12         Q.  Okay.  And what is the policy at LACCD

10:55:19 13    about marking paths of travel for blind students?

10:55:27 14         MR. MORTON:  Well, no foundation.  Beyond the

10:55:30 15    scope of the subject matter of the deposition.

10:55:34 16         But go ahead, to the extent you can,

10:55:37 17    subject to those objections.

10:55:39 18         THE WITNESS:  We provide ample notification

10:55:41 19    both to the Braille Institute, who is one of our

10:55:44 20    partners, next door.  Information is also provided

10:55:46 21    to the Office of Student Services, who then work

10:55:49 22    with the individual students to ensure that the

10:55:52 23    paths of travel are known and that assistance, if

10:55:56 24    any, is provided.

10:56:09 25    BY MR. ESPO:
```



45

10:56:20  1        Q.  Can you turn to the deposition notice and

10:56:27  2   look at Topic Number 5.

10:56:30  3        A.  (Indicating.)

10:57:00  4            Yeah.

10:57:02  5        Q.  Has LACCD undertaken any evaluation to

10:57:07  6   determine if providing accessible technology would

10:57:16  7   result in -- either a -- in a fundamental alteration

10:57:23  8   of its services or programs?

10:57:27  9        MR. MORTON:  Could I have that read back,

10:57:28  10  please.

10:57:29  11       MR. ESPO:  Pardon?

10:57:30  12       MR. MORTON:  I'm asking her to read it back.

10:57:32  13       MR. ESPO:  Oh, I'm sorry.

10:57:33  14       MR. MORTON:  That's okay.

10:57:34  15           (The record is read by the reporter.)

10:57:51  16       MR. MORTON:  I just missed the technology part

10:57:51  17  of it.  I wasn't sure --

10:58:01  18       THE WITNESS:  With the implementation of any

10:58:04  19  new software or hardware program, we do an

10:58:06  20  evaluation as to whether or not -- what changes

10:58:09  21  would need be to made in order to make that

10:58:13  22  implementation.  And an assessment is done as to

10:58:18  23  either the costs or the changes that would be

10:58:21  24  required in order to implement the new software

10:58:24  25  system.


Kusar  Keeping Your Word Is Our Business℠

Case 2:17-cv-01697-SVW-SK   Document 483-1   Filed 02/03/23   Page 47 of 72   Page ID
#:11123
30(b)(6) of LACCD                    Los Angeles Community College District                    1115479

```
10:58:25  1          That's done routinely as a part of any

10:58:28  2   implementation of a new system or software.

10:58:31  3   BY MR. ESPO:

10:58:33  4      Q.  Has there -- With respect to technology,

10:58:36  5   has there been technology acquired -- educational

10:58:49  6   technology acquired --

10:58:51  7      A.  Yeah.

10:58:52  8      Q.  -- that is inaccessible, but for which

10:58:56  9   LACCD has determined that acquiring the same

10:59:01 10   technology in an accessible fashion would

10:59:04 11   fundamentally alter a service or program of the

10:59:08 12   school?

10:59:09 13      MR. MORTON:  Well, that question is vague.

10:59:11 14          But go ahead, to the extent you can.

10:59:16 15      THE WITNESS:  I don't understand the question.

10:59:18 16   BY MR. ESPO:

10:59:20 17      Q.  Let me try, then --

10:59:21 18      A.  Yeah.

10:59:21 19      Q.  -- to fix that.  Obviously, you can't

10:59:24 20   answer that.

10:59:27 21      A.  No.  I can answer --

10:59:28 22      Q.  You can't answer a question that I can't --

10:59:30 23      A.  -- but you're --

10:59:30 24      Q.  -- that you don't understand, is what I

10:59:32 25   meant.
```

47


Kusar  Keeping Your Word Is Our Business℠

Case 2:17-cv-01697-SVW-SK   Document 488-1   Filed 02/03/23   Page 48 of 72   Page ID
#:11124
30(b)(6) of LACCD                    Los Angeles Community College District                    1115479

10:59:33   1          A.   Whenever you implement something new, the

10:59:37   2   design itself is that it alters a program or

10:59:40   3   service.   That's the intent.

10:59:42   4          The intent is to make a programmatic change

10:59:45   5   or technological advancement to improve the service

10:59:49   6   or program that you deliver.

10:59:51   7          It's not with the intent that you don't

10:59:53   8   implement it, and it doesn't serve all the students

10:59:57   9   who you need it to serve.

10:59:58   10          So that's why the question is confusing.

11:00:00   11   Because it -- when you implement something new, the

11:00:05   12   intent is to alter a program or service.

11:00:10   13          Q.   And -- And as you use the word "alter" in

11:00:14   14   that answer, what do you mean?

11:00:16   15          A.   Change.   Improve.   Better.   Enhance.

11:00:22   16   Supplement.

11:00:31   17          Q.   Have there been -- Has LACCD undertaken any

11:00:39   18   study or inquiry into whether the acquisition of any

11:00:48   19   particular piece of technology so that blind

11:00:53   20   students can use it would result in a fundamental

11:00:59   21   alteration to the District services or programs?

11:01:05   22          A.   I would say I don't know.

11:01:09   23          Q.   Has LACCD undertaken an evaluation to

11:01:15   24   determine whether providing accessible educational

11:01:23   25   technology to its students would result in an undue



Case 2:17-cv-01697-SVW-SK   Document 488-1   Filed 02/03/23   Page 49 of 72   Page ID
#:11125
30(b)(6) of LACCD                Los Angeles Community College District                1115479

| 11:01:28 | 1 | financial burden? |
| 11:01:31 | 2 | A. On my campus, we provide services to all |
| 11:01:37 | 3 | students, irrespective of the financial burden or |
| 11:01:40 | 4 | cost. |
| 11:01:42 | 5 | And in this particular case, the department |
| 11:01:45 | 6 | of student programs and services, who deal with both |
| 11:01:49 | 7 | our blind and our deaf students, consistently runs a |
| 11:01:55 | 8 | budget deficit annually, which means that we absorb |
| 11:02:01 | 9 | the additional costs of their implementation of |
| 11:02:06 | 10 | aids, services, and other programmatic needs to |
| 11:02:11 | 11 | assist these students in completing their academic |
| 11:02:15 | 12 | coursework. |
| 11:02:24 | 13 | Q. Has the -- Has LACCD ever conducted a study |
| 11:02:30 | 14 | or evaluation to determine whether simply deciding |
| 11:02:36 | 15 | not to acquire some technology because it is |
| 11:02:40 | 16 | inaccessible to blind students -- |
| 11:02:43 | 17 | MR. MORTON: No foundation. Argumentative |
| 11:02:45 | 18 | question. |
| 11:02:45 | 19 | MR. ESPO: I haven't finished yet. |
| 11:02:48 | 20 | MR. MORTON: Don't take a breath, then. I |
| 11:02:50 | 21 | thought you were. I'm sorry. |
| 11:02:52 | 22 | MR. ESPO: Let me start over. |
| 11:02:57 | 23 | MR. MORTON: That's going to make it compound, |
| 11:02:58 | 24 | but go ahead. |
| 11:02:58 | 25 | BY MR. ESPO: |


Kusar® Keeping Your Word Is Our Business℠

Case 2:17-cv-01697-SVW-SK   Document 488-1   Filed 02/03/23   Page 50 of 72   Page ID
#:11126
30(b)(6) of LACCD                    Los Angeles Community College District                    1115479

11:02:59  1        Q.  Well, I'm going to start over.  We will see

11:03:01  2    if I can do this.

11:03:02  3            Has LACCD undertaken any evaluation to

11:03:05  4    determine whether declining to acquire specific

11:03:09  5    educational technology because it is inaccessible to

11:03:14  6    the blind would result in a funda- -- fundamental

11:03:17  7    alteration to its services or programs?

11:03:22  8        MR. MORTON:  That is vague.  It's also an

11:03:23  9    incomplete hypothetical.

11:03:24 10            But go ahead, to the extent you can.

11:03:27 11        THE WITNESS:  If I am understanding you

11:03:28 12    correctly, are you asking would we go purchase

11:03:31 13    something that we knew was not accessible for blind

11:03:35 14    students, even though we know we're going to -- we

11:03:38 15    need it to serve them, but we would purchase or

11:03:41 16    implement something that would not serve them

11:03:45 17    that -- and it would alter our program -- just so

11:03:49 18    that I am understanding you correctly --

11:03:50 19    BY MR. ESPO:

11:03:51 20        Q.  Sure.

11:03:51 21        A.  -- is that what you're asking?

11:03:52 22        Q.  No.  I'm not asking it as a hypothetical,

11:03:59 23    you know, "would you."

11:04:01 24            You know, I'm asking has there been an

11:04:05 25    occasion in the past --


Kusar  Keeping Your Word Is Our Business℠

Case 2:17-cv-01697-SVW-SK   Document 488-1   Filed 02/03/23   Page 51 of 72   Page ID
#:11127
30(b)(6) of LACCD                      Los Angeles Community College District                    1115479

11:04:07  1        A.  Uh-huh.

11:04:08  2        Q.  -- that LACCD determined or attem- -- or

11:04:16  3    evaluated whether -- Strike that.  Let me -- Maybe I

11:04:25  4    can do it piece by piece.

11:04:28  5            Has LACCD ever evaluated, prepurchase,

11:04:31  6    educational technology and decided not to buy it

11:04:38  7    because it is inaccessible to blind students?

11:04:46  8        A.  To my knowledge, no.

11:04:52  9            And if I could clarify, have we declined

11:04:54  10   not to purchase something because it was

11:04:57  11   inaccessible to blind students?

11:04:59  12       Q.  That was the question.

11:05:00  13       A.  That was the question.

11:05:02  14            To my knowledge, we have never declined not

11:05:04  15   to purchase anything because it was inaccessible to

11:05:07  16   blind students.

11:05:08  17       Q.  Now, I'm confused because there's a double

11:05:10  18   negative in there.

11:05:12  19       A.  Well, if I can clarify your question, have

11:05:13  20   we purchased technology and equipment so that it

11:05:16  21   would be accessible to blind students?  Then the

11:05:19  22   answer is yes.

11:05:20  23       Q.  No.  That -- That's fine.  But that's not

11:05:23  24   really the question.

11:05:24  25       A.  Okay.

51



```
11:05:25   1        Q.  The question is, has there been an occasion

11:05:30   2   in the past in which LACCD purchased inaccessible

11:05:41   3   student-use technology because, in LACCD's opinion,

11:05:49   4   failing to do so would fundamentally alter a program

11:05:54   5   or service of the college?

11:05:56   6        MR. MORTON:  There's no foundation there, and

11:05:58   7   it has become an incomplete hypothetical now.

11:06:01   8            Go ahead.  Respond if you can.

11:06:02   9        THE WITNESS:  I don't know.

11:06:22  10        MS. BARBOSA:  Let's take a break.

11:06:22  11        MR. ESPO:  There's been a request for a break.

11:06:26  12        MR. MORTON:  Granted.

11:06:27  13        MS. BARBOSA:  I will return.  I just need to --

11:06:27  14        MR. ESPO:  That's fine.  You don't need to

11:06:27  15   explain, either.

11:06:27  16        THE VIDEOGRAPHER:  This is the end of Media

11:06:32  17   Unit 1.

11:06:33  18            The time 11:06 a.m.

11:06:35  19            We're now off the record.

11:24:19  20            (A recess is taken from 11:06 a.m. to

11:24:19  21            11:24 a.m.)

11:24:24  22        THE VIDEOGRAPHER:  This marks the beginning of

11:24:25  23   Media Unit 2 in the continuing deposition of the

11:24:29  24   30(b)(6) witness, Dr. John al-Amin.

11:24:33  25            Today's date is August 9th, 2017.
```

52



Case 2:17-cv-01697-SVW-SK   Document 488-1   Filed 02/03/23   Page 53 of 72   Page ID
#:11129
30(b)(6) of LACCD                    Los Angeles Community College District                    1115479

| | | |
|---|---|---|
| 11:24:37 | 1 | The time is 11:24 a.m. |
| 11:24:39 | 2 | We are back on the record. |
| 11:24:41 | 3 | BY MR. ESPO: |
| 11:24:48 | 4 | Q.  Dr. al-Amin, you said one of your duties |
| 11:24:51 | 5 | now is as ADA coordinator -- |
| 11:24:55 | 6 | A.  Yes. |
| 11:24:56 | 7 | Q.  -- is that right? |
| 11:24:58 | 8 | In that capacity -- And that began in |
| 11:25:01 | 9 | November 2016? |
| 11:25:02 | 10 | A.  Yes. |
| 11:25:02 | 11 | Q.  In that capacity, what have you done? |
| 11:25:08 | 12 | A.  I have reviewed requests for facility and |
| 11:25:14 | 13 | parking accommodations. |
| 11:25:17 | 14 | I have received requests for ergonomic |
| 11:25:21 | 15 | reviews. |
| 11:25:27 | 16 | And as part of the role of -- or filling in |
| 11:25:32 | 17 | the role of the director of college facilities, I |
| 11:25:36 | 18 | sit in on construction meetings and planning where |
| 11:25:39 | 19 | we discuss ADA accessibility for the current and |
| 11:25:45 | 20 | future construction and modernization projects. |
| 11:25:51 | 21 | Q.  Are the ergonomics issues, issues with |
| 11:25:55 | 22 | employees? |
| 11:25:56 | 23 | A.  Yes. |
| 11:25:58 | 24 | Q.  Are the parking accommodations for |
| 11:26:07 | 25 | employees? |

53



| | | |
|---|---|---|
| 11:26:08 | 1 | A.  Yes. |
| 11:26:15 | 2 | Q.  Have you had referred to you, since |
| 11:26:19 | 3 | November, any issues relating to students and the |
| 11:26:24 | 4 | ADA? |
| 11:26:25 | 5 | A.  No. |
| 11:26:35 | 6 | Q.  I think you also talked a little bit about |
| 11:26:39 | 7 | paths of travel.  Do you remember that? |
| 11:26:42 | 8 | A.  Yes. |
| 11:26:45 | 9 | Q.  The map of the campus that's on the |
| 11:26:48 | 10 | website -- Strike that. |
| 11:26:53 | 11 | The map of the LACC campus that is on its |
| 11:26:57 | 12 | website is not accessible to blind students, is it? |
| 11:27:04 | 13 | A.  I do not know. |
| 11:27:08 | 14 | Q.  Does -- And the college -- LACC doesn't |
| 11:27:12 | 15 | provide tactile maps to blind students, does it? |
| 11:27:17 | 16 | A.  No. |
| 11:27:28 | 17 | Q.  Are the specific LACCD policies with |
| 11:27:34 | 18 | respect to accessibility and software online, or is |
| 11:27:39 | 19 | it only their existence that's referred to online? |
| 11:27:47 | 20 | A.  The policies and procedures, including |
| 11:27:50 | 21 | these regulations (indicating) which we've |
| 11:27:54 | 22 | discussed, are available online. |
| 11:28:05 | 23 | Q.  We -- We talked a little bit about |
| 11:28:21 | 24 | purchasing, various acquisition decisions, and |
| 11:28:29 | 25 | whether some might or might not require a |

Kusar® Keeping Your Word Is Our Business℠

| | | |
|---|---|---|
| 11:28:33 | 1 | fundamental alteration. |
| 11:28:36 | 2 | Do you recall, generally, that discussion? |
| 11:28:39 | 3 | A.  Yes. |
| 11:28:40 | 4 | Q.  Okay.  Can you define what a fundamental |
| 11:28:47 | 5 | alteration is with respect to LACCD? |
| 11:28:55 | 6 | MR. MORTON:  No foundation.  Might call for |
| 11:28:57 | 7 | speculation. |
| 11:28:57 | 8 | THE WITNESS:  I -- I actually would ask you to |
| 11:29:00 | 9 | define, what do you mean -- what do you consider to |
| 11:29:03 | 10 | be a fundamental alteration? |
| 11:29:05 | 11 | BY MR. ESPO: |
| 11:29:08 | 12 | Q.  Is part of your role in determining |
| 11:29:13 | 13 | requests for accommodations making -- making a |
| 11:29:23 | 14 | determination as to whether the request would |
| 11:29:26 | 15 | require a fundamental alteration? |
| 11:29:29 | 16 | MR. MORTON:  Again, vague and ambiguous.  No |
| 11:29:30 | 17 | foundation. |
| 11:29:31 | 18 | Go ahead. |
| 11:29:34 | 19 | THE WITNESS:  I would need for you to specify, |
| 11:29:36 | 20 | what do you mean by, "What is a fundamental |
| 11:29:38 | 21 | alteration?"  It's subjective. |
| 11:29:40 | 22 | BY MR. ESPO: |
| 11:29:41 | 23 | Q.  So is it accurate that, as you sit here |
| 11:29:45 | 24 | today, you don't have in your own mind a working |
| 11:29:52 | 25 | definition that you use in your capacity as ADA |



Case 2:17-cv-01697-SVW-SK   Document 483-1   Filed 02/03/23   Page 56 of 72   Page ID
#:11192
30(b)(6) of LACCD                    Los Angeles Community College District                    1115479

11:29:56  1    coordinator of what a fundamental alteration is?

11:30:01  2        MR. MORTON:  Well, that question is

11:30:01  3    argumentative.  You are asking him to speculate.

11:30:05  4        It wasn't defined in your depo notice, I

11:30:08  5    don't think.

11:30:10  6        MR. ESPO:  The term?

11:30:12  7        MR. MORTON:  Yeah.

11:30:12  8        MR. ESPO:  No, it wasn't.

11:30:14  9        MR. MORTON:  Okay.

11:30:14 10        THE WITNESS:  An alteration is simply a change.

11:30:17 11        Now, whether you consider it to be

11:30:19 12    fundamental or not -- That's why I ask, what is your

11:30:22 13    definition of a fundamental alteration?

11:30:25 14        Because anytime someone asks for an

11:30:27 15    accommodation, it automatically generates a change.

11:30:30 16    Now, whether it's fundamental or substantial or not

11:30:34 17    is subjective.  A change is a change.

11:30:35 18        So if someone came to me, in this case --

11:30:38 19    For example, I had a professor who was an amputee.

11:30:41 20    They needed a parking spot which was closer than the

11:30:44 21    current parking space which we provide for our

11:30:47 22    faculty.

11:30:49 23        Now, that's not a substantial change or an

11:30:51 24    alteration in where they park, but it is an

11:30:54 25    alteration.

Kusar® Keeping Your Word Is Our Business℠

```
11:30:55   1   BY MR. ESPO:

11:30:58   2        Q.  You referred a number of times, I think, to

11:31:16   3   a -- what you referred to as a technology unit.

11:31:21   4            Do you recall that?

11:31:23   5        A.  We have an informational technology unit

11:31:26   6   that reports to my office.

11:31:28   7        Q.  And who is the direct report to you from

11:31:30   8   the information and technology unit?

11:31:33   9        A.  Juan Mendoza, who is the director of

11:31:35  10   college informational technology.

11:31:43  11        Q.  And do you generally -- Well, have -- have

11:31:50  12   any issues come to you about tech- -- the

11:31:59  13   accessibility of technology?

11:32:03  14        MR. MORTON:  That question is vague.

11:32:04  15            Go ahead, if you can.

11:32:05  16        THE WITNESS:  No.

11:32:06  17   BY MR. ESPO:

11:32:07  18        Q.  I think you might have also referred to a

11:32:12  19   technology task force.

11:32:16  20            Do you recall that?

11:32:17  21        A.  Yes.

11:32:18  22        Q.  What is the technology task force?

11:32:22  23            Might as well wait for the siren.

11:32:24  24        A.  Sure.

11:32:25  25            (Interruption in the proceedings from
```

57



Case 2:17-cv-01697-SVW-SK   Document 488-1   Filed 02/03/23   Page 58 of 72   Page ID
#:11134
30(b)(6) of LACCD                    Los Angeles Community College District                    1115479

11:32:25  1          11:32 a.m. to 11:32 a.m.)

11:32:30  2          MR. ESPO:  I'm told we're okay.

11:32:32  3          THE WITNESS:  Okay.  The technology --

11:32:32  4   District-wide technology task force is a group made

11:32:37  5   up of District-wide members who consist of

11:32:41  6   informational technology, student services, academic

11:32:45  7   affairs, the academic senate, and the administrative

11:32:49  8   services units.

11:32:50  9          And this task force has been working on a

11:32:59 10   District-wide assessment of improving all of our

11:33:02 11   technology resources on all of the campuses and the

11:33:06 12   District office.

11:33:07 13   BY MR. ESPO:

11:33:08 14          Q.  Who chairs that task force?

11:33:12 15          A.  It currently -- It was chaired by our past

11:33:15 16   executive vice chancellor, Dr. Adriana Barrera.  It

11:33:20 17   is now chaired by Dr. Ryan Cornner, who is a vice

11:33:24 18   chancellor for educational services.

11:33:28 19          Q.  And are there delegates or people from LACC

11:33:36 20   who participate in that task force?

11:33:39 21          A.  Yes.  Juan Mendoza and I are the delegates

11:33:41 22   from City College.

11:33:43 23          Q.  And do you regularly attend its meetings?

11:33:47 24          A.  I regularly attend, yes.

11:33:50 25          Q.  Has there been a discussion of the



| | | |
|---|---|---|
| 11:33:55 | 1 | PeopleSoft program in any of those meetings? |
| 11:33:58 | 2 | A.  The -- The PeopleSoft project is a separate |
| 11:34:03 | 3 | project from the assessment, which has been done, in |
| 11:34:07 | 4 | which the District-wide task force was responsible |
| 11:34:10 | 5 | for review and implementation of that assessment. |
| 11:34:14 | 6 | Q.  Was there a written report of that |
| 11:34:15 | 7 | assessment? |
| 11:34:17 | 8 | A.  Yes, it was. |
| 11:34:18 | 9 | Q.  Is that available somewhere? |
| 11:34:30 | 10 | A.  The campuses, we each have our own |
| 11:34:33 | 11 | individual copy. |
| 11:34:34 | 12 | Is it a public document?  If it's posted, |
| 11:34:45 | 13 | it would be posted under our board -- Well, |
| 11:34:49 | 14 | actually, it wouldn't. |
| 11:34:50 | 15 | That document itself would be a part of or |
| 11:34:53 | 16 | referenced to as part of minutes for facilities -- |
| 11:34:55 | 17 | for the board facilities master planning group.  But |
| 11:35:01 | 18 | it is a working document. |
| 11:35:04 | 19 | Q.  Does that mean it's not posted on the |
| 11:35:06 | 20 | website? |
| 11:35:07 | 21 | A.  I do not know. |
| 11:35:10 | 22 | Q.  In connection with that assessment, were -- |
| 11:35:19 | 23 | was the technology in use at LACCD tested for |
| 11:35:26 | 24 | accessibility? |
| 11:35:28 | 25 | A.  That assessment was to go over our |



Case 2:17-cv-01697-SVW-SK   Document 483-1   Filed 02/03/23   Page 60 of 72   Page ID
#:11136
30(b)(6) of LACCD                    Los Angeles Community College District                    1115479

11:35:32  1    functional servers, our wireless, our security, and

11:35:37  2    other aspects of our technology operation.

11:35:42  3         Q.  Did that include accessibility to blind

11:35:45  4    users?

11:35:46  5         A.  I do not recall.

11:35:56  6             The website was not one of the -- As I

11:35:59  7    recall, the website was not one of the items of

11:36:02  8    concern.

11:36:02  9             It was our fundamental backbone of our

11:36:05 10    technology, which includes our servers, our

11:36:08 11    processors, our data backup, firewall controls,

11:36:13 12    other items of informational technology which do not

11:36:18 13    include the website.

11:36:47 14         Q.  You, I think, in response to a question I

11:36:49 15    asked about Regulation B-34 -- you, I think,

11:36:57 16    testified that there had been some training of staff

11:37:00 17    about accessibility.

11:37:03 18             Is that correct?

11:37:10 19         A.  There's training -- If I recall, the

11:37:13 20    comment was about training regarding website design

11:37:17 21    and websites.

11:37:19 22             And, specifically, we have provided

11:37:21 23    individuals with information on the website and

11:37:24 24    worked with groups in order to assist in its design

11:37:26 25    so that it would be functional for all users.



Case 2:17-cv-01697-SVW-SK   Document 488-1   Filed 02/03/23   Page 61 of 72   Page ID
#:11197
30(b)(6) of LACCD                    Los Angeles Community College District                    1115479

11:37:34   1        Q.  Did that -- Was that training offered to

11:37:42   2   teaching faculty?

11:37:44   3        A.  Teaching faculty were a part of the group

11:37:48   4   which considered the website design and

11:37:52   5   enhancements.

11:37:55   6        Q.  Was that training mandatory for teaching

11:38:02   7   faculty?

11:38:11   8        A.  The training was for individuals -- Well,

11:38:14   9   okay.

11:38:16  10        As related to this (indicating), this was

11:38:17  11   basically the changing over of the website.  The

11:38:21  12   website, for the most part, is -- as with most

11:38:25  13   websites, is pretty self-explanatory.

11:38:28  14        The training that we provide, which means

11:38:29  15   that you have to click on boxes, you go to access

11:38:33  16   certain information, you have a search engine which

11:38:35  17   allows you to view or to access certain information.

11:38:38  18        So the individuals who participated -- the

11:38:41  19   faculty and members who participated on this working

11:38:43  20   group came up with suggestions and ideas for how the

11:38:46  21   website could be fully utilized and would be easy to

11:38:50  22   use.

11:38:50  23        And they were shown how those documents,

11:38:52  24   how those dropboxes, and how that individual -- the

11:38:55  25   website itself would work prior to us rolling it



Kusar  Keeping Your Word Is Our Business℠

Case 2:17-cv-01697-SVW-SK   Document 488-1  Filed 02/03/23   Page 62 of 72   Page ID
#:11138
30(b)(6) of LACCD                    Los Angeles Community College District                    1115479

| | | |
|---|---|---|
| 11:38:58 | 1 | out. |
| 11:38:59 | 2 | So was it mandatory for all faculty?  No. |
| 11:39:02 | 3 | But for the faculty who chose to |
| 11:39:04 | 4 | participate in the design process, then, yes, they |
| 11:39:07 | 5 | did attend the meetings and provided input and |
| 11:39:09 | 6 | guidance to assist us based upon the student and the |
| 11:39:12 | 7 | staff needs. |
| 11:39:15 | 8 | Q.  Some faculty have their own websites on |
| 11:39:22 | 9 | which they post information related to their |
| 11:39:25 | 10 | classes; correct? |
| 11:39:25 | 11 | A.  I do not know.  It is possible, but I do |
| 11:39:29 | 12 | not know. |
| 11:39:29 | 13 | Q.  Does LACCD have a policy about whether any |
| 11:39:36 | 14 | faculty-designed websites have to be accessible to |
| 11:39:43 | 15 | blind students? |
| 11:39:45 | 16 | A.  If it is a college website, then they must |
| 11:39:47 | 17 | be consistent with our college website policy. |
| 11:39:50 | 18 | If a professor or instructor has a private |
| 11:39:53 | 19 | website, we do not maintain control or guidance over |
| 11:39:57 | 20 | that site. |
| 11:39:58 | 21 | If it is a college site, then it must meet |
| 11:40:00 | 22 | our web requirements, which include accessibility. |
| 11:40:04 | 23 | Q.  And I want to try to see -- If a professor |
| 11:40:14 | 24 | comes into class on the first night of class -- |
| 11:40:16 | 25 | A.  Uh-huh. |

62



Case 2:17-cv-01697-SVW-SK   Document 488-1   Filed 02/03/23   Page 63 of 72   Page ID
#:11199
30(b)(6) of LACCD                     Los Angeles Community College District                    1115479

11:40:17  1        Q.  -- and says, "Here's a website.  It's

11:40:21  2   www.professor," dot something, but it's not an LACCD

11:40:31  3   domain, and the professor says, "I'm going to put

11:40:37  4   the syllabus on that.  I'm going to put some extra

11:40:39  5   reading material for anybody who's interested.  It's

11:40:42  6   got my office hours.  It's got," you know, whatever.

11:40:46  7            Is that a private website, or is that a

11:40:48  8   college website?

11:40:50  9        MR. MORTON:  You are asking him to speculate.

11:40:51 10   There's no foundation.  That's also an incomplete

11:40:52 11   hypothetical.

11:40:53 12            To the extent you can respond, go ahead.

11:40:56 13        THE WITNESS:  As academic affairs is not my

11:40:59 14   area, that would be a question that would be

11:41:00 15   appropriate for the vice president of academic

11:41:03 16   affairs, who provides directions to faculty into

11:41:06 17   where their content, their syllabi, their course

11:41:08 18   lecture notes, and everything should be posted.

11:41:11 19            It's my understanding, however, we

11:41:13 20   discourage faculty from using their personal

11:41:16 21   websites and instruct them to use the college

11:41:19 22   website in order to post this information, in which

11:41:21 23   we can then ensure that it is accessible for all

11:41:25 24   students.

11:41:26 25            But, again, that's a question that would be

Kusar® Keeping Your Word Is Our Business℠

| 11:41:28 | 1 | more appropriately directed toward Dr. Walden and |
| 11:41:31 | 2 | not towards myself. |
| 11:41:37 | 3 | I do not supervise faculty. |
| 11:41:42 | 4 | Q. Have ever read the Complaint in this case? |
| 11:41:46 | 5 | A. No. |
| 11:42:17 | 6 | Q. Are there copy machines at LACCD that are |
| 11:42:22 | 7 | for student use? |
| 11:42:25 | 8 | MR. MORTON: Are you on Category 12? |
| 11:42:27 | 9 | MR. ESPO: Yes. |
| 11:42:29 | 10 | THE WITNESS: Yes. |
| 11:42:30 | 11 | BY MR. ESPO: |
| 11:42:31 | 12 | Q. Approximately how many? |
| 11:42:38 | 13 | A. I do not know. There were -- There are in |
| 11:42:42 | 14 | excess of over -- There are in excess of over 50 |
| 11:42:48 | 15 | copy machines located in various areas throughout |
| 11:42:51 | 16 | the campus. |
| 11:42:56 | 17 | Q. Are the copy machines for student use |
| 11:42:59 | 18 | usable by blind students? |
| 11:43:03 | 19 | A. I do not know. |
| 11:43:06 | 20 | Q. Do you know, are -- when students use the |
| 11:43:09 | 21 | student-use copy machine, do they have to pay for |
| 11:43:12 | 22 | their copies? |
| 11:43:13 | 23 | A. Yes. |
| 11:43:14 | 24 | Q. And how do they do that on the existing |
| 11:43:17 | 25 | copy machines? |


Kusar® Keeping Your Word Is Our Business℠

Case 2:17-cv-01697-SVW-SK   Document 488-1 Filed 02/03/23   Page 65 of 72   Page ID
#:11111
30(b)(6) of LACCD                    Los Angeles Community College District                    1115479

11:43:21   1        A.   I believe the card readers either take

11:43:23   2   credit card or coin.

11:43:26   3            And I believe they're only -- there's

11:43:28   4   probably a handful of them.  They're located in the

11:43:31   5   library and in the student union.

11:43:35   6        Q.   And do you know whether the various

11:43:42   7   controls -- double-sided, one page, three copies,

11:43:48   8   whatever they might be -- are on a touch pad or --

11:43:53   9   are they on a touch pad?

11:43:56  10        A.   Yes.

11:43:57  11        Q.   Is there anything tactile that would inform

11:44:02  12   a blind student where to push on the touch pad for

11:44:07  13   instructions?

11:44:09  14        A.   I do not know.

11:44:13  15        Q.   Who would know?

11:44:23  16        A.   We have various copier contracts.  The

11:44:26  17   copier contracts, Juan Mendoza may be able to answer

11:44:31  18   that specific question.

11:44:35  19        Q.   Are the copier contracts ones that you

11:44:37  20   would have reviewed when they were signed?

11:44:41  21        A.   I review the copier contact -- contracts

11:44:44  22   for content, legalese, and to make sure that they

11:44:47  23   are pursuant to our -- our normal, traditional,

11:44:50  24   standard contract language.

11:44:53  25            The specifications for each of the copier

Kusar®  Keeping Your Word Is Our Business℠

Case 2:17-cv-01697-SVW-SK   Document 488-1   Filed 02/03/23   Page 66 of 72   Page ID
#:11192
30(b)(6) of LACCD                    Los Angeles Community College District                    1115479

11:44:55  1    machines are not always included as part of the

11:45:00  2    contract.

11:45:00  3            The type and model of the copier is

11:45:03  4    included.

11:45:04  5            Whether or not it has a touch pad which

11:45:06  6    includes tactile devices, that's not included.

11:45:12  7            What I have seen, however, in most cases,

11:45:14  8    is that is not a function which is available on some

11:45:18  9    of the copy machines that we have been able to

11:45:21  10   procure.

11:45:24  11       Q.  Have you ever direct- -- In response to

11:45:28  12   receiving a contract for the purchase of copy

11:45:33  13   machines for student use, have you ever inquired as

11:45:38  14   to whether the copy machines were accessible to

11:45:41  15   blind users?

11:45:42  16       A.  We do not purchase copy machines; we lease

11:45:45  17   them.

11:45:46  18            We have, in the past, purchased copy

11:45:48  19   machines prior to my arrival.  Whether or not that

11:45:51  20   question was ever made, I do not know.

11:45:55  21            As far as when we go to lease copier

11:45:57  22   machines at this point, has the question been asked?

11:46:01  23   I do not know.

11:46:12  24       Q.  Is asking that question a requirement of

11:46:17  25   Regulation B-34?



Case 2:17-cv-01697-SVW-SK   Document 488-1 Filed 02/03/23   Page 67 of 72   Page ID
#:11143
30(b)(6) of LACCD                    Los Angeles Community College District                    1115479

11:46:20  1      A.  If the technology is available, we make the

11:46:22  2   request.  If the technology is not available, or not

11:46:25  3   provided by the vendor, which in some cases it's

11:46:29  4   not, then that's not a part of the contract nor the

11:46:32  5   lease agreement which we enter into.

11:46:34  6      Q.  Well, how do you know it's not available

11:46:35  7   from some of your vendors?

11:46:37  8      A.  We recently just had an RFP for a contract.

11:46:40  9   We recently just went over some of the devices which

11:46:43  10  were available for use by the college district.

11:46:46  11       None of the devices, that I am aware of,

11:46:48  12  had any tactile function.  However, the new copier

11:46:51  13  machines, which I do believe they have now

11:46:54  14  available, now I believe have some type of voice

11:46:57  15  recognition.

11:46:57  16       But, again, I am not totally 100 percent

11:47:01  17  sure.  But the copy machines which we currently have

11:47:03  18  in use, because of their age, do not have the

11:47:06  19  capability to provide a tactile reader for a blind

11:47:09  20  student.

11:47:10  21     Q.  Well, what is the most recent, most -- What

11:47:19  22  is the date of the most recently leased or purchased

11:47:24  23  copy -- student-use copy machine on campus?

11:47:27  24     A.  For students?  I do not know.

11:47:30  25       For staff, we just signed off on a lease


Kusar ® Keeping Your Word Is Our Business℠

Case 2:17-cv-01697-SVW-SK   Document 483-1   Filed 02/03/23   Page 68 of 72   Page ID
30(b)(6) of LACCD                    Los Angeles Community College District                    1115479
#:11144

```
11:47:33  1    agreement with Ricoh as of two weeks ago.  But those

11:47:36  2    are for faculty and staff use, not for student use.

11:47:40  3          The student copiers, again, predate my

11:47:42  4    arrival on campus.  So the contract for them and

11:47:50  5    however it was negoti- -- I do not know.

11:47:52  6       Q.  So with respect to the student-use copy

11:47:55  7    machines, you don't know what, if any, inquiries

11:47:58  8    were made about accessibility?

11:48:00  9       A.  I do not know, because I did not

11:48:02  10   participate in that process.

11:48:31  11         MR. ESPO:  Let me go off the record for a

11:48:32  12   minute.

11:48:33  13         THE VIDEOGRAPHER:  The time 11:48 a.m.

11:48:35  14             We're now off the record.

11:49:10  15             (A discussion is held off the record from

11:49:10  16             11:48 a.m. to 11:49 a.m.)

11:49:39  17         THE VIDEOGRAPHER:  The time is 11:49 a.m.

11:49:41  18             We're back on the record.

11:49:43  19         MR. ESPO:  And I have no further questions.

11:49:48  20         MR. MORTON:  Very well.  We're finished.

11:49:51  21         MR. ESPO:  Go off the video record.

11:49:54  22         THE VIDEOGRAPHER:  Okay.  This concludes --

11:49:54  23   This concludes the video deposition of Dr. -- the

11:49:58  24   30(b)(6) witness, Dr. John al-Amin, consisting of

11:50:04  25   two media units.
```



Case 2:17-cv-01697-SVW-SK   Document 488-1   Filed 02/03/23   Page 69 of 72   Page ID
#:11115
8/2/2017 - Layla al-Amin, Ph.D.
30(b)(6) of LACCD                    Los Angeles Community College District                    1115479

11:50:05   1            The original media of today's proceedings

11:50:08   2   will remain in the custody of Kusar Court Reporters

11:50:11   3   & Legal Services.

11:50:12   4            We're going off the record at 11:50 a.m.

11:51:57   5            (A discussion is held off the record from

11:51:57   6            11:50 a.m. to 11:52 a.m.)

11:52:01   7        MR. MORTON:  Thank you.

11:52:01   8            I want a rough.

11:52:03   9        MR. ESPO:  And we're actually going to need it

11:52:03  10   expedited.

11:53:08  11            (A discussion is held off the record from

11:53:08  12            11:53 a.m. to 11:53 a.m.)

11:53:18  13        MR. MORTON:  We had an off-the-record

11:53:19  14   discussion relative to Dr. al-Amin's review of the

11:53:24  15   transcript of the deposition and have agreed that,

11:53:26  16   assuming we get everything timely, that it will be

11:53:29  17   reviewed, corrections made, if necessary, and

11:53:32  18   counsel notified of any errata and his signature

11:53:35  19   within 21 days of today's date.

11:53:44  20        THE REPORTER:  But we're holding the original

11:53:45  21   here?

11:53:45  22        MR. MORTON:  Well, the --

11:53:45  23        MS. BARBOSA:  Generally, the stipulation is to

11:53:45  24   go ahead and have the original and stipulate that we

11:53:45  25   can take a copy --



```
11:53:49    1          MR. MORTON:  Yeah.  We'll -- I'll -- I'll take

11:53:50    2    custody of the original, and it will be produced

11:53:53    3    upon reasonable request.

11:53:54    4          If something happens to it and it can't be

11:53:56    5    produced, then a certified copy can be used as if it

11:53:59    6    were the original.

11:54:01    7          MS. BARBOSA:  So stipulated.

11:54:03    8          MR. ESPO:  Off the record.

            9          (Proceedings concluded at 11:53 a.m.)

           10                            ***

           11

           12

           13

           14

           15

           16

           17

           18

           19

           20

           21

           22

           23

           24

           25
```

Kusar   Keeping Your Word Is Our Business℠

DECLARATION

I hereby declare I am the deponent in the within matter; that I have read the foregoing deposition and know the contents thereof; and I declare that the same is true of my knowledge except as to the matters which are therein stated upon my information or belief, and as to those matters, I believe them to be true.

I declare under the penalties of perjury of the State of California that the foregoing is true and correct.

Executed this _____ day of _____, 20 _____, at _____, California.

_____
JOHN AL-AMIN, Ph.D.



Case 2:17-cv-01697-SVW-SK   Document 483-1   Filed 02/03/23   Page 72 of 72   Page ID
#:11148
30(b)(6) of LACCD                    Los Angeles Community College District                    1115479

1       I, Judith E. Thiel, CSR 2618, CP, RPR, do
hereby declare:

2

3       That, prior to being examined, the witness
named in the foregoing deposition was by me duly
sworn pursuant to Section 30(f)(1) of the Federal

4  Rules of Civil Procedure and the deposition is a
true record  of the testimony given by the witness.

5

6       That said deposition was taken down by me in
shorthand at the time and place therein named and
thereafter reduced to text under my direction.

7

8  _X__   That the witness was requested to review
the transcript and make any changes to the
transcript as a result of that review pursuant to

9  Section 30(e) of the Federal Rules of Civil
Procedure.

10

11     _____   No changes have been provided by the
witness during the time period allowed.

12     _____   The changes made by the witness are
appended to the transcript.

13

14     _____   No request was made that the transcript
           be reviewed pursuant to Section 30(e) of
           the Federal Rules of Civil Procedure.

15

16       I further declare that I have no interest in
the event of the action.

17       I declare under penalty of perjury under the
laws of the United States of America that the

18  foregoing is true and correct.

19       WITNESS my hand this 15th day of August, 2017.

20

21

22

23  _____
    Judith E. Thiel, CSR 2618, CP, RPR

24

25

