IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

ROY PAYAN, PORTIA MASON,          )
THE NATIONAL FEDERATION           )
OF THE BLIND, INC., and           )
THE NATIONAL FEDERATION           )
OF THE BLIND OF                   )
CALIFORNIA, INC.,                 )
                                  )
            Plaintiffs,           )
                                  )
      vs.                         )          Case No.
                                  ) 2:17-cv-01697-SVW(SKx)
                                  )
LOS ANGELES COMMUNITY             )
COLLEGE DISTRICT,                 )
                                  )
            Defendant.            )
_____ )

VIDEOTAPED 30(b)(6) DEPOSITION OF LOS ANGELES

COMMUNITY COLLEGE DISTRICT, ROBERT DOMINICK

FRIDAY, AUGUST 4, 2017

LONG BEACH, CALIFORNIA

REPORTED BY:  Judith E. Thiel, CSR 2618, CP, RPR

```
 1

 2                 IN THE UNITED STATES DISTRICT COURT

 3               FOR THE CENTRAL DISTRICT OF CALIFORNIA

 4

 5   ROY PAYAN, PORTIA MASON,    )
     THE NATIONAL FEDERATION     )
 6   OF THE BLIND, INC., and     )
     THE NATIONAL FEDERATION     )
 7   OF THE BLIND OF             )
     CALIFORNIA, INC.,           )
 8                               )
                  Plaintiffs,    )
 9                               )
          vs.                    )          Case No.
10                               ) 2:17-cv-01697-SVW(SKx)
     LOS ANGELES COMMUNITY       )
11   COLLEGE DISTRICT,           )
                                 )
12                  Defendant.   )
     _____ )
13

14

15

16        The videotaped 30(b)(6) deposition of

17        LOS ANGELES COMMUNITY COLLEGE DISTRICT,

18        ROBERT DOMINICK, a witness herein, taken on

19        behalf of the plaintiffs at 111 West Ocean

20        Boulevard, Long Beach, California, commencing

21        at the hour of 10:09 a.m., Friday, August 4,

22        2017, before Judith E. Thiel, CSR 2618, CP,

23        RPR, pursuant to Notice of Taking Deposition.

24

25
```

Kusar® Keeping Your Word Is Our Business℠

Case 2:17-cv-01697-SVW-SK   Document 485-1   Filed 02/03/23   Page 3 of 100   Page ID
#:11326
30(b)(6) of LACCD                    Los Angeles Community College District                    1115477

```
 1    APPEARANCES OF COUNSEL:

 2

 3    For Plaintiffs:

 4            BARBOSA GROUP
              BY:  PATRICIA BARBOSA
 5                 Attorney at Law
              8092 Warner Avenue
 6            Huntington Beach, California 92647
              (714) 465-9486
 7            pbarbosa@barbosagrp.com

 8

              BROWN GOLDSTEIN LEVY
 9            BY:  JOSEPH B. ESPO
                   Attorney at Law
10            120 East Baltimore Street, Suite 1700
              Baltimore, Maryland 21202
11            (410) 962-1030
              jbe@browngold.com

12

13    For Defendant:

14            HAIGHT, BROWN & BONESTEEL LLP
              BY:  BRUCE CLEELAND
15                 Attorney at Law
              2050 Main Street, Suite 600
16            Irvine, California 92614
              (714) 426-4600
17            bcleeland@hbblaw.com

18

19    Also Present:

20            KIRILL DAVIDOFF, Videographer

21

22

23

24

25
```

**Kusar** ® Keeping Your Word Is Our Business℠

Los Angeles Community College District

```
 1                          I N D E X

 2    WITNESS:              EXAMINATION              PAGE

 3    ROBERT DOMINICK       BY MR. ESPO                 7

 4
                      EXHIBITS FOR IDENTIFICATION
 5
      PLAINTIFF       DESCRIPTION                    PAGE
 6
      Exhibit 9    Cover page of Application for       9
 7                 Services, Office of Student
                   Services
 8                 (1 page)

 9    Exhibit 10   Academic Accommodation             22
                   Authorization for Roy Payan
10                 (2 pages)

11    Exhibit 11   Handwritten notes                  66
                   (1 page)
12
      Exhibit 12   Academic Accommodation             74
13                 Authorization for Roy Payan
                   (2 pages)
14
      Exhibit 13   Student History Report for         91
15                 Portia Mason

16

17      EXHIBITS PREVIOUSLY MARKED AND REFERENCED HEREIN

18                     (Attachments)

19    EXHIBIT      DESCRIPTION

20    Exhibit 1    Plaintiff's Amended 30(b)(6) Notice
                   of Deposition to the Los Angeles
21                 Community College District
                   (8 pages)
22

23

24

25
```



|       |    |                                                          |
|-------|----|----------------------------------------------------------|
|       | 1  | FRIDAY, AUGUST 4, 2017, LONG BEACH, CALIFORNIA           |
|       | 2  | 10:09 A.M.                                               |
|       | 3  | ***                                                      |
|       | 4  |                                                          |
| 10:09:09 | 5  | THE VIDEOGRAPHER:  We're going on the record at       |
| 10:09:12 | 6  | 10:09 a.m.                                             |
| 10:09:14 | 7  | This is the Media Unit 1 in the video                 |
| 10:09:18 | 8  | deposition of Robert Dominick, taken by the           |
| 10:09:22 | 9  | plaintiff counsel in the matter of Roy Payan versus   |
| 10:09:29 | 10 | Los Angeles Community College District, filed in the  |
| 10:09:34 | 11 | United States District Court for the Central          |
| 10:09:37 | 12 | District of California, Case Number                   |
| 10:09:40 | 13 | 2:17-cv-01697-CVW -- sorry -- SVW (SKx).              |
| 10:09:53 | 14 | This deposition is being held at 111 West             |
| 10:09:56 | 15 | Ocean Boulevard, Suite 1200, Long Beach, California   |
| 10:10:01 | 16 | 90802, on April 4th, 2017.                            |
| 10:10:07 | 17 | My name is Kirill Davidoff.  I'm a legal              |
| 10:10:10 | 18 | video specialist.                                      |
| 10:10:12 | 19 | The court reporter is Judy Thiel.                     |
| 10:10:15 | 20 | We're both here representing Kusar Court              |
| 10:10:18 | 21 | Reporters & Legal Services, headquartered in          |
| 10:10:21 | 22 | Long Beach, California.  Please note that audio and   |
| 10:10:24 | 23 | video recording will take place, unless all parties   |
| 10:10:29 | 24 | agree to go off the record.                           |
| 10:10:30 | 25 | The microphones are very powerful, and they           |

Kusar ® Keeping Your Word Is Our Business℠

Case 2:17-cv-01697-SVW-SK  Document 485-1  Filed 02/03/23  Page 6 of 100  Page ID
#:11329
30(b)(6) of LACCD                    Los Angeles Community College District                    1115477

| 10:10:33 | 1 | pick up whispers, private conversations, and cell |
| 10:10:36 | 2 | conversations. |
| 10:10:37 | 3 | Counsel and all present will now state |
| 10:10:40 | 4 | their appearance and affiliation for the record, |
| 10:10:44 | 5 | after which the court reporter will swear in the |
| 10:10:46 | 6 | witness. |
| 10:10:48 | 7 | MR. ESPO:  Joseph Espo on behalf of plaintiffs. |
| 10:10:50 | 8 | But in the read-in, I think I heard you say |
| 10:10:53 | 9 | that the date today is April 4th.  And -- |
| 10:10:57 | 10 | THE VIDEOGRAPHER:  August 4th. |
| 10:10:58 | 11 | MR. ESPO:  -- it's August 4th. |
| 10:11:00 | 12 | THE VIDEOGRAPHER:  Yes.  Thank you for |
| 10:11:01 | 13 | correction. |
| 10:11:02 | 14 | MS. BARBOSA:  Patricia Barbosa representing |
| 10:11:05 | 15 | plaintiffs. |
| 10:11:06 | 16 | MR. CLEELAND:  Good morning.  Bruce Cleeland on |
| 10:11:08 | 17 | behalf of the defendant Los Angeles Community |
| 10:11:10 | 18 | College District. |
| 10:11:15 | 19 | THE WITNESS:  Robert Dominick.  I'm an academic |
| 10:11:17 | 20 | counselor at Los Angeles City College assigned to |
| 10:11:20 | 21 | the Office of Special Services. |
| 10:11:22 | 22 | (Continued on following page.) |
| 10:11:22 | 23 | |
| | 24 | |
| | 25 | |


Kusar  Keeping Your Word Is Our Business℠

Case 2:17-cv-01697-SVW-SK   Document 485-1   Filed 02/03/23   Page 7 of 100   Page ID
#:11360
30(b)(6) of LACCD                    Los Angeles Community College District                    1115477

| | | |
|---|---|---|
| 10:11:23 | 1 | ROBERT DOMINICK, |
| 10:11:23 | 2 | the witness herein, having been first duly sworn, |
| 10:11:23 | 3 | was examined and testified as follows: |
| 10:11:23 | 4 | |
| 10:11:23 | 5 | EXAMINATION |
| 10:11:36 | 6 | BY MR. ESPO: |
| 10:11:38 | 7 | Q.  Good morning.  As you just heard, my name |
| 10:11:40 | 8 | is  Joe Espo.  I'm going to ask you some questions |
| 10:11:43 | 9 | this morning while taking your deposition and ask |
| 10:11:47 | 10 | that you answer them as best you can. |
| 10:11:50 | 11 | All right? |
| 10:11:50 | 12 | A.  Yes. |
| 10:11:52 | 13 | Q.  Do you go by "Dr." or "Mr."? |
| 10:11:55 | 14 | A.  Robert. |
| 10:11:56 | 15 | Q.  That's a very in- -- I'm beginning to learn |
| 10:11:59 | 16 | that it's very informal.  But for court -- |
| 10:12:02 | 17 | compliance with the court rules, I need to use your |
| 10:12:05 | 18 | last name.  So -- |
| 10:12:06 | 19 | A.  Dominick is my last name. |
| 10:12:08 | 20 | Q.  Do you prefer "Dr." or "Mr." |
| 10:12:09 | 21 | A.  "Mr." |
| 10:12:10 | 22 | Q.  Okay.  Thank you.  You have been identified |
| 10:12:19 | 23 | as a designee witness pursuant to a deposition |
| 10:12:27 | 24 | notice. |
| 10:12:28 | 25 | If the court reporter could hand you |

7

Kusar ® Keeping Your Word Is Our Business℠

| | | |
|---|---|---|
| 10:12:30 | 1 | Exhibit 1, that you are -- it's my understanding |
| 10:12:43 | 2 | that you will be testifying about Topics 8 -- You |
| 10:12:54 | 3 | haven't found it, sir? |
| 10:12:55 | 4 | A.  (Nods head in the affirmative.) |
| 10:12:56 | 5 | Q.  -- 8, 14, 22, 23, and 24? |
| 10:13:03 | 6 | A.  (Nods head in the affirmative.) |
| 10:13:03 | 7 | Q.  Is that your understanding as well? |
| 10:13:07 | 8 | A.  Yes. |
| 10:13:10 | 9 | MR. CLEELAND:  And I apologize. |
| 10:13:11 | 10 | But for clarification purposes, he'll be |
| 10:13:13 | 11 | testifying on those topics if you ask him questions |
| 10:13:15 | 12 | on those topics.  We don't know that you're going to |
| 10:13:17 | 13 | be asking questions on all those topics, but he's |
| 10:13:21 | 14 | being offered on those topics. |
| 10:13:24 | 15 | MR. ESPO:  Okay. |
| 10:13:24 | 16 | BY MR. ESPO: |
| 10:13:24 | 17 | Q.  Did I leave any topics off the list? |
| 10:13:27 | 18 | A.  You want to repeat them? |
| 10:13:29 | 19 | Q.  Sure.  8, 14, 19, 22, 23, and 24. |
| 10:13:41 | 20 | A.  Yes. |
| 10:13:44 | 21 | Q.  Yes, I left one off the list? |
| 10:13:46 | 22 | A.  I can testify to those. |
| 10:13:48 | 23 | Q.  Okay.  Are there any other topics that you |
| 10:13:56 | 24 | are prepared to testify about today? |
| 10:13:59 | 25 | A.  No. |

8



Case 2:17-cv-01697-SVW-SK   Document 485-1   Filed 02/03/23   Page 9 of 100   Page ID
#:11982
30(b)(6) of LACCD                    Los Angeles Community College District                    1115477

| | | |
|---|---|---|
| 10:14:10 | 1 | Q.  Do you have any close personal friends or |
| 10:14:13 | 2 | family members who are blind? |
| 10:14:23 | 3 | A.  No. |
| 10:14:30 | 4 | Q.  What did you do, if anything, to prepare |
| 10:14:32 | 5 | for today's deposition? |
| 10:14:35 | 6 | A.  I received the notice (indicating), made |
| 10:14:37 | 7 | arrangements to come down here early to get here on |
| 10:14:40 | 8 | time. |
| 10:14:41 | 9 | And I told my staff I would be down here at |
| 10:14:44 | 10 | the deposition today. |
| 10:14:45 | 11 | Q.  Did you review any documents? |
| 10:14:47 | 12 | A.  No. |
| 10:14:49 | 13 | Q.  Did you speak with anybody at LACCD to get |
| 10:14:54 | 14 | additional information about the topics you'll be -- |
| 10:14:58 | 15 | A.  No. |
| 10:14:58 | 16 | Q.  -- be -- You know, I apologize.  I didn't |
| 10:15:02 | 17 | sort of go through the -- the usual beginning |
| 10:15:05 | 18 | explanation. |
| 10:15:06 | 19 | Because the court reporter is taking |
| 10:15:08 | 20 | everything down, it's important that only one of us |
| 10:15:11 | 21 | be speaking at a time.  So if you would let me |
| 10:15:14 | 22 | finish my questions before you start your answer, |
| 10:15:18 | 23 | that would be helpful.  I will do my best to do the |
| 10:15:22 | 24 | same; that is, let you finish answering the question |
| 10:15:26 | 25 | before I move on to another one. |

Kusar® Keeping Your Word Is Our Business℠

Case 2:17-cv-01697-SVW-SK   Document 485-1   Filed 02/03/23   Page 10 of 100   Page ID
#:11393
30(b)(6) of LACCD                        Los Angeles Community College District                    1115477

```
10:15:29   1              All right?  Is that okay?
10:15:34   2         A.  (Indicating.)
10:15:36   3              Yes.
10:15:37   4         Q.  The other thing is we have to communicate
10:15:39   5    with words and not with points or shrugs, for the
10:15:44   6    same reason.  The court reporter doesn't know how to
10:15:47   7    interpret movements and can't really record them.
10:15:53   8    So oral communication is what is required today.
10:15:59   9              If you need a break at any time, just let
10:16:01  10    us know.  The only thing I ask is that if there is a
10:16:06  11    question pending, you answer the question before we
10:16:09  12    take a break.  All right?
10:16:12  13         A.  Yes.
10:16:22  14         Q.  I believe you were deposed in March of this
10:16:26  15    year in another case; is that correct?
10:16:31  16         A.  Yes.
10:16:33  17         Q.  Has anything about your education changed
10:16:37  18    since then?
10:16:43  19         A.  Clarify.
10:16:44  20         Q.  Sure.  Have you obtained any additional
10:16:47  21    degrees since March of 2017?
10:16:49  22         A.  No.
10:16:50  23         Q.  Have you obtained any certificates or
10:16:55  24    licenses since March of 2017?
10:17:00  25         A.  No.
```


Kusar ® Keeping Your Word Is Our Business℠

```
10:17:01  1        Q.  Other than the March 2017 deposition, have
10:17:05  2   you ever been deposed before?
10:17:07  3        A.  No.
10:17:08  4        Q.  Have you ever testified in court?
10:17:12  5        A.  No.
10:17:15  6        Q.  Have you ever been a party to a lawsuit?
10:17:19  7        A.  No.
10:17:22  8        Q.  Have you ever been convicted of a crime?
10:17:24  9        A.  Yes.
10:17:25 10        Q.  What crime?
10:17:27 11        A.  It was a solicitation.  It was a sexual
10:17:33 12   solicitation.
10:17:34 13        Q.  When was that?
10:17:35 14        A.  It was in 1995.
10:17:42 15        Q.  And where was the conviction?
10:17:46 16        A.  In Orange County.
10:17:53 17        Q.  And what is the name of the court in which
10:17:56 18   the case was held?
10:17:58 19        A.  It was in Orange County Superior Court.
10:18:08 20        Q.  Has any sentence that was imposed expired?
10:18:12 21        A.  Yes.
10:18:19 22        Q.  Going back to preparation, I think you
10:18:28 23   testified you didn't speak with anyone to gather
10:18:31 24   information; correct?
10:18:34 25        A.  Correct.
```



Kusar®  Keeping Your Word Is Our Business℠

10:18:34   1      Q.   Did you review any documents to prepare for

10:18:36   2   today's deposition?

10:18:38   3      A.   No.   I just -- I spoke to my staff, and we

10:18:41   4   talked about the dates and times that we were coming

10:18:44   5   down here.   But we didn't discuss the case in

10:18:47   6   specifics.

10:18:47   7      Q.   Okay.   Other than that discussion with your

10:18:49   8   staff, and leaving out any discussions you may have

10:18:53   9   had with any of LACCD's lawyers, have you discussed

10:18:58  10   the case or the deposition with anyone else?

10:19:01  11      A.   No.

10:19:03  12      Q.   Since the case was filed, have you

10:19:05  13   discussed it with anyone else?

10:19:08  14      A.   No.

10:19:15  15      Q.   When you reviewed the deposition notice for

10:19:18  16   today, did you read the "Definitions" section?

10:19:25  17      A.   I reviewed them.

10:19:28  18         What section would that be?

10:19:29  19      Q.   It begins on --

10:19:34  20      A.   Okay.   I see them.   1 through 9?

10:19:37  21      Q.   Well, the copy I have is paginated a little

10:19:39  22   differently --

10:19:40  23      A.   Uh-huh, I see them.

10:19:41  24      Q.   -- but they are Definitions 1 through 9.

10:19:47  25         Did you -- Do understand those?


Kusar® Keeping Your Word Is Our Business℠

Case 2:17-cv-01697-SVW-SK   Document 485-1   Filed 02/03/23   Page 13 of 100   Page ID
#:11336
30(b)(6) of LACCD                    Los Angeles Community College District                    1115477

| | | |
|---|---|---|
| 10:19:48 | 1 | A.   Yes. |
| 10:20:07 | 2 | Q.   Do you know Roy Payan? |
| 10:20:08 | 3 | A.   Yes. |
| 10:20:09 | 4 | Q.   How do you know Mr. Payan? |
| 10:20:11 | 5 | A.   He's a student at Los Angeles City College. |
| 10:20:17 | 6 | Q.   And you are employed at Los Angeles City |
| 10:20:20 | 7 | College? |
| 10:20:21 | 8 | A.   Yes.  As an academic counselor. |
| 10:20:24 | 9 | Q.   What does that mean you do? |
| 10:20:27 | 10 | A.   I'm assigned to the Office of Special |
| 10:20:28 | 11 | Services, which is our disabled student services |
| 10:20:32 | 12 | program.  We serve students with disabilities -- a |
| 10:20:34 | 13 | variety of disabilities. |
| 10:20:36 | 14 |         My main function is to provide academic |
| 10:20:39 | 15 | advisement, student education plans, accommodations, |
| 10:20:45 | 16 | referrals, working with faculty, outside agencies, |
| 10:20:49 | 17 | working with staff, and interacting with students |
| 10:20:52 | 18 | with issues. |
| 10:21:00 | 19 | Q.   And have you provided those services to |
| 10:21:08 | 20 | Mr. Payan over the course of his tenure at LACC? |
| 10:21:14 | 21 | A.   Yes. |
| 10:21:14 | 22 | Q.   Once a student -- Well, let me get just a |
| 10:21:19 | 23 | little bit of background:  How does a student end up |
| 10:21:22 | 24 | getting served by the -- and I have trouble with the |
| 10:21:25 | 25 | name -- Office of Special Services? |

13



Case 2:17-cv-01697-SVW-SK   Document 485-1   Filed 02/03/23   Page 14 of 100   Page ID
#:11387
30(b)(6) of LACCD                    Los Angeles Community College District                    1115477

10:21:27  1       A.   Yeah.  OSS.

10:21:30  2            Students matriculate -- Students with

10:21:32  3  disabilities, they matriculate in to

10:21:34  4  Los Angeles City College just like any other

10:21:36  5  students.

10:21:37  6            And at some point in time they come down to

10:21:39  7  the Office of Special Services, and they are given

10:21:41  8  an application for OSS services, along with a brief

10:21:46  9  orientation about OSS.

10:21:48 10            They are asked to complete the application,

10:21:51 11  the orientation quiz, and to bring in verification

10:21:55 12  of their disability.

10:21:57 13            They schedule a one-hour intake appointment

10:22:00 14  with a counselor.  We have two counselors in our

10:22:03 15  office presently.

10:22:07 16       Q.   And you are one of those counselors?

10:22:09 17       A.   Yes.

10:22:10 18       Q.   And who is the other?

10:22:13 19       A.   Everett Turner.

10:22:42 20       MR. ESPO:  Why don't we mark this as the next

10:22:45 21  exhibit.

10:22:47 22            (The aforementioned document is marked

10:22:47 23            by the reporter as Defense Exhibit 9

10:22:47 24            for identification and is attached hereto.)

10:23:37 25            (A discussion is held off the record from



Case 2:17-cv-01697-SVW-SK   Document 485-1   Filed 02/03/23   Page 15 of 100   Page ID
#:1308
30(b)(6) of LACCD                    Los Angeles Community College District                    1115477

```
10:23:37   1              10:22 a.m. to 10:23 a.m.)

10:23:44   2    BY MR. ESPO:

10:23:45   3        Q.  Do you recognize Exhibit 9?

10:23:47   4        A.  This is the cover page of the application.

10:23:48   5    It's a four-page application.

10:23:52   6        Q.  And that's the application that you were --

10:23:55   7    you spoke of that students fill out to get OSS

10:24:00   8    services?

10:24:01   9        A.  Yes.

10:24:01  10        Q.  And this is Mr. Payan's?

10:24:05  11        A.  (Nods head in the affirmative.)

10:24:06  12            Yes.

10:24:11  13        Q.  Once Mr. -- And were you the first

10:24:16  14    counselor to speak with Mr. Payan?

10:24:19  15        A.  I'd have to see page 4 to see who signed

10:24:22  16    him in.  On page 4, this application has a signature

10:24:26  17    page on it.

10:24:35  18        Q.  We'll perhaps be able to accomplish that

10:24:38  19    later in the morning.

10:24:51  20            (A discussion is held off the record from

10:24:51  21            10:24 a.m. to 10:25 a.m.)

10:25:21  22    BY MR. ESPO:

10:25:23  23        Q.  But in any event, whether it was -- Who --

10:25:23  24    So Mr. Payan would have interacted either with you

10:25:30  25    or Mr. Turner?
```

15



```
10:25:31  1        A.  There's four people that could possibly

10:25:33  2   sign him in.  We have two LD specialists and two OSS

10:25:36  3   counselors.

10:25:37  4        THE REPORTER:  Two what?  "LD"?

10:25:37  5        THE WITNESS:  LD, learning disability

10:25:37  6   specialists and two academic counselors, OSS

10:25:42  7   counselors.

10:25:42  8   BY MR. ESPO:

10:25:43  9        Q.  And if what you refer to as an LD

10:25:46 10   specialist signed a student in who doesn't have a

10:25:50 11   learning disability, would that student then be

10:25:54 12   directed to one of the counselors?

10:25:56 13        A.  Yeah.  Rare occasions LD may get a

10:25:59 14   referral, but the student doesn't have a learning

10:26:01 15   disability.  So they are referred back to academic

10:26:04 16   counseling, to one of us counselors.

10:26:07 17        Q.  Okay.  Once a student signs in and is

10:26:10 18   assigned to a counselor, does the student then deal

10:26:13 19   with that same counselor thereafter?

10:26:15 20        A.  They have an option when they come in who's

10:26:17 21   ever available.  My case loads, my -- my SARS

10:26:22 22   schedule, which is our -- S-A-R-S -- my SARS

10:26:25 23   schedule, which we schedule appointments, it gets

10:26:28 24   filled up.  So I'm -- I can be booked up anywhere

10:26:32 25   from a week to three weeks in advance.  So it could
```

16



Case 2:17-cv-01697-SVW-SK  Document 485-1  Filed 02/03/23  Page 17 of 100  Page ID
#:11340
30(b)(6) of LACCD                    Los Angeles Community College District                    1115477

10:26:34  1    can be Everett or I, whoever a student can get in to

10:26:38  2    see sooner.

10:26:42  3        Q.  Approximately how many non-LD clients of

10:26:48  4    OSS are there?

10:26:52  5        A.  Last I heard, to the best of my knowledge,

10:26:54  6    it was around 800 students in our program.  I'd say

10:27:00  7    a couple hundred of them would be LD, 200.  The

10:27:04  8    other -- remaining would have other disabilities.

10:27:13  9        Q.  Has the staff of the OSS been constant,

10:27:17 10    let's say, over the last five years?

10:27:21 11        A.  We've had some re- --

10:27:23 12        Q.  And by "constant," I mean in numbers, not

10:27:25 13    necessarily the same people staying.

10:27:27 14        A.  Yeah.  We've had some reductions.  We've

10:27:29 15    had some retirements.

10:27:33 16        Q.  As best you can recall, what was the peak

10:27:38 17    staffing?

10:27:43 18        A.  Number-wise or --

10:27:45 19        Q.  Number-wise.

10:27:52 20        A.  I couldn't tell an exact number.  That --

10:27:54 21    I'd have to guess at that.

10:27:56 22        Q.  Well, can you give an estimate?

10:27:58 23            What's -- Let me ask it this way:  What's

10:28:00 24    the last number you -- you can remember that was

10:28:03 25    larger than two?



```
10:28:06   1         A.  Well, right now we have more than two

10:28:08   2    people on our staff.

10:28:09   3         Q.  Okay.  What's the last number you can

10:28:13   4    remember that was larger than -- Is four the right

10:28:16   5    number to use, speaking of counselors?

10:28:20   6         A.  Oh, counselors?

10:28:21   7              We have -- We have two counselors.  As far

10:28:24   8    as our total staff, we probably have about -- I'll

10:28:28   9    say a little bit below/a little bit over ten, and

10:28:33  10    that just talks -- that's -- that's our staff.

10:28:34  11              It doesn't count our -- our support groups

10:28:37  12    that come in as far as our student workers and CGCAs

10:28:42  13    and so forth.

10:28:43  14              CGCA, which is a graduate student.  They

10:28:45  15    can come in and work on our staff.

10:28:52  16         Q.  Okay.  Let me -- My mistake in the

10:28:54  17    questioning.

10:28:55  18         A.  Yeah.

10:28:59  19         Q.  Has the number of counselors shrunk over

10:29:03  20    the last, say, five years?

10:29:06  21         A.  At the time I was hired in 2010, we had two

10:29:09  22    full-time counselors.  We reduced down to one, and

10:29:15  23    an adjunct since then, adjunct meaning a person

10:29:18  24    comes in and works -- a counselor, a full-time

10:29:22  25    counselor, works 35 hours a week.  An adjunct
```


Kusar® Keeping Your Word Is Our Business℠

Case 2:17-cv-01697-SVW-SK   Document 485-1   Filed 02/03/23   Page 19 of 100   Page ID
#:13442
30(b)(6) of LACCD                    Los Angeles Community College District                    1115477

```
10:29:25  1    counselor would come in -- I think our present
10:29:27  2    adjunct works 23 hours a week.
10:29:30  3         Q.  Is that in addition to you and Mr. Turner?
10:29:32  4         A.  It's Mr. Turner is the adjunct, and I'm
10:29:36  5    full time -- Everett Turner is the adjunct.
10:29:40  6         Q.  Okay.
10:29:48  7              Have you asked anybody in the college
10:29:52  8    district for additional staff?
10:29:56  9         A.  No.  Personally, no.
10:30:02  10        Q.  To whom do you report?
10:30:04  11        A.  We have a dean, Randy Anderson.  He's the
10:30:07  12   dean of OSS.
10:30:26  13        Q.  Do you have an estimate of how many times
10:30:32  14   you have spoken with Mr. Payan?
10:30:37  15        A.  It's been multiple times.  I could give you
10:30:39  16   a more accurate reading -- We have a student file.
10:30:42  17   When students come in, we keep their information in
10:30:45  18   a student file.
10:30:46  19              There's a log in there.  So each time they
10:30:49  20   come in, we enter the date they've spoken to us or
10:30:51  21   come in for a counseling visit.
10:30:55  22        Q.  And do -- In terms of your practice, if a
10:30:59  23   student, let's say, calls you for information, do
10:31:04  24   you note that in the log?
10:31:08  25        A.  If a student emails me or calls me about a
```

19



Case 2:17-cv-01697-SVW-SK  Document 485-1  Filed 02/03/23  Page 20 of 100  Page ID
#:11343
30(b)(6) of LACCD          Los Angeles Community College District          1115477

```
10:31:12   1    general question, no.

10:31:13   2          But if they email me or call me or come in

10:31:16   3    for what we call one of our drop-ins for a

10:31:19   4    counseling service, that needs to be recorded in the

10:31:21   5    log and also on our computer system for MIS

10:31:24   6    reporting to the State.

10:31:26   7          Q.  What does MIS stand for?

10:31:28   8          A.  MIS is -- It's just a -- It's the database

10:31:32   9    system that community colleges collect that they

10:31:36  10    send a report up to the State of -- they send it up

10:31:40  11    to the chancellor's office in Sacramento.  And

10:31:42  12    through those contacts, students enrolled in an

10:31:45  13    academic class, financial aid contacts, OSS

10:31:56  14    contacts, counseling contacts for general

10:31:58  15    counseling.  All those contacts we report that to

10:32:02  16    the State in an annual report.

10:32:04  17          And from that, that's how we get our

10:32:06  18    funding back each year for the following year.

10:32:12  19          The acronym MIS, I don't know the exact

10:32:16  20    name of it.  That's -- Yeah.

10:32:19  21          Q.  Do you know Portia Mason?

10:32:21  22          A.  I do.

10:32:21  23          Q.  How do --

10:32:23  24          A.  She's a student at Los Angeles City

10:32:24  25    College.
```



| | | |
|---|---|---|
| 10:32:32 | 1 | Q. And is it also the case that you -- you |
| 10:32:36 | 2 | wouldn't know how -- how often or how many times you |
| 10:32:39 | 3 | have spoken with Ms. Mason without reviewing the |
| 10:32:41 | 4 | log? |
| 10:32:42 | 5 | A. If I had the log, I could give you a better |
| 10:32:44 | 6 | idea, sure. |
| 10:32:58 | 7 | Q. The application that you have for OSS |
| 10:33:01 | 8 | for -- for Mr. Payan, is that generally the same for |
| 10:33:07 | 9 | everyone? |
| 10:33:08 | 10 | A. Yes. |
| 10:33:10 | 11 | Q. Is that available in an accessible |
| 10:33:16 | 12 | electronic format for blind students? |
| 10:33:19 | 13 | A. It's on our Word -- It's on our website, |
| 10:33:20 | 14 | and I believe it's in a PDF file and a Word document |
| 10:33:25 | 15 | file. |
| 10:33:29 | 16 | Q. How long has it been on the website? |
| 10:33:34 | 17 | A. I don't keep the website updated for OSS. |
| 10:33:37 | 18 | I -- I wouldn't know that answer. |
| 10:33:42 | 19 | Q. Well, do you know if it was re- -- Are you |
| 10:33:43 | 20 | aware of a recent sort of redoing of the website? |
| 10:33:48 | 21 | A. Yeah. We just went to a new computer |
| 10:33:50 | 22 | system. We're going to a PeopleSoft system in |
| 10:33:52 | 23 | the -- in the fall. So we're all getting up to |
| 10:33:55 | 24 | speed on a new SIS system, new database system. |
| 10:33:58 | 25 | And we also updated our -- our LACC |



Kusar® Keeping Your Word Is Our Business℠

Case 2:17-cv-01697-SVW-SK   Document 485-1   Filed 02/03/23   Page 22 of 100   Page ID
30(b)(6) of LACCD                Los Angeles Community College District                    1115477
#:1345

```
10:34:02  1    website.  So it's a -- it's got new features, and
10:34:05  2    it's a new format.
10:34:07  3         Q.  Was the application for services available
10:34:10  4    on the website before the change to PeopleSoft and
10:34:15  5    the new website that was --
10:34:16  6         A.  Yes.
10:34:17  7         Q.  -- recently posted?
10:34:36  8             (A discussion is held off the record from
10:34:36  9             10:34 a.m. to 10:34 a.m.)
10:35:11 10             (A document is marked by the reporter as
10:35:11 11             Defense Exhibit 10 for identification and
10:35:11 12             is attached hereto.)
10:35:14 13    BY MR. ESPO:
10:35:14 14         Q.  Can you identify what's been marked as
10:35:16 15    Exhibit 10.
10:35:17 16         A.  It's an accommodation letter.
10:35:21 17         Q.  And this one is for Mr. Payan?
10:35:25 18         A.  This is for Roy.  It's signed by Everett
10:35:27 19    Turner, our adjunct counselor.
10:35:31 20         Q.  And is this -- Not asking about what's
10:35:38 21    checked or the names, but is this what's given to
10:35:43 22    students who come in for services and -- and who are
10:35:46 23    found to be eligible for them?
10:35:48 24         A.  Yeah.  When a student -- Yes.
10:35:50 25             Students use accommodation letters -- What
```

22



Case 2:17-cv-01697-SVW-SK   Document 485-1   Filed 02/03/23   Page 23 of 100   Page ID
#:11346
30(b)(6) of LACCD                 Los Angeles Community College District                     1115477

10:35:52  1    we do is when they come in for an accommodation

10:35:54  2    letter, we fill the letter out.  We keep a copy in

10:35:56  3    the student file.  We make two copies for the

10:35:59  4    student.

10:35:59  5          They take those two letters to their

10:36:01  6    instructor.  The instructor keeps one, and the

10:36:04  7    instructor signs the back of the accommodation

10:36:07  8    letter.  It's possible sometimes they make

10:36:11  9    modifications.

10:36:12  10         And they -- that signed letter by the

10:36:14  11   student, that the professor signed, is brought back

10:36:17  12   to the OSS office.

10:36:19  13         It's kept on file for accommodations for

10:36:21  14   future use, if the student wants to test in OSS or

10:36:25  15   if we want to verify that the accommodations were

10:36:27  16   agreed upon by the counselor, the student, and the

10:36:30  17   instructor.

10:36:33  18      Q.  Okay.  And is there an electronic

10:36:40  19   accessible version of accommodation letters

10:36:44  20   available to OSS?

10:36:46  21      A.  Yes.  Our -- Our LD specialists, I know

10:36:50  22   they do them electronically.

10:36:53  23         I do accommodation letters on a regular

10:36:55  24   basis.  I scan, and I put them into a PD- -- PDF

10:36:59  25   format, and I can send those off electronically to

23

| | | |
|---|---|---|
| 10:37:02 | 1 | instructors or to students. |
| 10:37:05 | 2 | Q.  When you say you scan them, how do you scan |
| 10:37:08 | 3 | them? |
| 10:37:08 | 4 | A.  I have a scanner on my desk, and I scan |
| 10:37:11 | 5 | them into PDF format.  And -- And I can attach it to |
| 10:37:14 | 6 | an email and send it off. |
| 10:37:16 | 7 | Q.  Have you ever tested the output of that |
| 10:37:18 | 8 | scanning to determine whether it is compatible with |
| 10:37:22 | 9 | JAWS? |
| 10:37:22 | 10 | A.  Probably not in a PDF file.  So if that |
| 10:37:25 | 11 | would be the case, the document would be sent to |
| 10:37:27 | 12 | the -- our High Tech Center, our computer lab, and |
| 10:37:31 | 13 | from there they could put it into an accessible |
| 10:37:34 | 14 | format for a student requesting accessibility to the |
| 10:37:38 | 15 | document. |
| 10:37:38 | 16 | Q.  Okay.  So your scanned copy isn't |
| 10:37:42 | 17 | accessible, as far as you know? |
| 10:37:46 | 18 | MR. CLEELAND:  Excuse me.  Misstates the |
| 10:37:48 | 19 | testimony of the witness.  Object to the form of the |
| 10:37:50 | 20 | question. |
| 10:37:50 | 21 | But if you understand, sir, you are welcome |
| 10:37:52 | 22 | to respond. |
| 10:37:54 | 23 | THE WITNESS:  Repeat. |
| 10:37:55 | 24 | BY MR. ESPO: |
| 10:38:01 | 25 | Q.  Your -- What -- The version of the |



```
10:38:03   1    letter -- of an accommodations letter that you scan

10:38:06   2    in would not be accessible; correct?

10:38:11   3         MR. CLEELAND:  I'm assuming the same objections

10:38:13   4    to that.

10:38:14   5         MR. ESPO:  That's fine.

10:38:15   6         MR. CLEELAND:  Thank you very much.

10:38:16   7         THE WITNESS:  Accessible for who?

10:38:17   8    BY MR. ESPO:

10:38:18   9         Q.  For a blind student in -- who used -- uses

10:38:22  10    JAWS.

10:38:22  11         A.  Correct.  That's right.

10:38:24  12         Q.  Okay.

10:38:25  13         A.  Yeah.

10:38:25  14         Q.  There would have to be another step, which

10:38:27  15    would be sending to it the High Tech Center?

10:38:29  16         A.  If a student -- Yeah.  If a blind student

10:38:31  17    requested accessibility to the accommodation letter,

10:38:35  18    we could put that into a format that would be

10:38:38  19    accessible to the student, correct.

10:38:40  20         Q.  But that's not done as a routine matter?

10:38:44  21         A.  Normally, our students come into our

10:38:45  22    office, and we hand them their accommodation

10:38:48  23    letters.

10:38:49  24             We fill them out in front of the students.

10:38:50  25    We talk about the accommodations, and we hand the
```



Kusar  Keeping Your Word Is Our Business℠

| | | |
|---|---|---|
| 10:38:52 | 1 | accommodations to the student, who forwards them on |
| 10:38:55 | 2 | to the instructors. |
| 10:38:56 | 3 | But I do on occasion receive phone calls |
| 10:39:00 | 4 | and emails requesting accommodation letters, or |
| 10:39:02 | 5 | there may be a course being taken online that we |
| 10:39:05 | 6 | send a -- an accommodation letter to a professor |
| 10:39:09 | 7 | because of distance education. |
| 10:39:15 | 8 | Q.  But as a routine matter, OSS doesn't |
| 10:39:21 | 9 | provide blind students with accessible copies of |
| 10:39:26 | 10 | their accommodation letters; correct? |
| 10:39:27 | 11 | A.  No. |
| 10:39:31 | 12 | Q.  Okay.  And would there be -- For a student |
| 10:39:44 | 13 | getting services from OSS, would there be, to the |
| 10:39:47 | 14 | extent he or she needed them, an accommodations |
| 10:39:50 | 15 | letter for each class for each semester? |
| 10:39:54 | 16 | A.  They can request accommodation letters for |
| 10:39:57 | 17 | each class that they are enrolled in, correct. |
| 10:40:21 | 18 | Q.  Does it ever happen that there is a |
| 10:40:22 | 19 | disagreement between a counselor in OSS and a |
| 10:40:29 | 20 | student about what is an appropriate accommodation? |
| 10:40:36 | 21 | A.  I -- I believe Title 5 regulations say that |
| 10:40:41 | 22 | the accommodation has to be reasonable.  So we -- we |
| 10:40:44 | 23 | take that into account, and we give accommodations |
| 10:40:47 | 24 | to what we practice on a regular basis (indicating). |
| 10:40:52 | 25 | Q.  Okay.  What is Title 5? |

26



Case 2:17-cv-01697-SVW-SK   Document 485-1   Filed 02/03/23   Page 27 of 100   Page ID
#:11350
30(b)(6) of LACCD                    Los Angeles Community College District                1115477

```
10:40:55  1        A.   Title 5 is the guidelines from the State of

10:40:58  2   California from the chancellor's office.  Title 5

10:41:01  3   guidelines are rules that you follow based on

10:41:06  4   laws -- federal and state laws.  And those are sent

10:41:08  5   to your districts, and they are sent out to your

10:41:11  6   campuses, and that's how we come up with our

10:41:14  7   policies to institute our practices and our program.

10:41:18  8        Q.   Do you know what -- Title 5 of what?  Do

10:41:21  9   you know what the -- Does it come from a statute or

10:41:24  10  from a regulation?

10:41:25  11       A.   I believe it comes from the Ed Code.  It

10:41:28  12  comes from ADA regulations.

10:41:41  13       Q.   I understood your answer, but if -- if a

10:41:46  14  student believes she's entitled to Accommodation X,

10:41:51  15  and the counselor believes that that -- based on the

10:41:57  16  circumstances and -- and whatever policy and

10:42:01  17  regulations he is applying, believes it's not an

10:42:05  18  appropriate accommodation, is there a process for

10:42:09  19  resolving that issue?

10:42:12  20       A.   If a student didn't agree to an

10:42:14  21  accommodation or they were asking for something that

10:42:15  22  wasn't available that we offer, they could go ahead

10:42:19  23  and contest it.  Or they could -- they could grieve

10:42:22  24  it to an administrator.

10:42:24  25       Q.   To a particular administrator?
```



| | | |
|---|---|---|
| 10:42:26 | 1 | A.  They would probably first take it to our |
| 10:42:28 | 2 | dean of OSS, who would be Randy Anderson. |
| 10:42:33 | 3 | Q.  And is there a further step? |
| 10:42:37 | 4 | A.  From there, they would -- they may take it |
| 10:42:38 | 5 | to a senior administrator on campus, which would be |
| 10:42:41 | 6 | a vice president or a president. |
| 10:42:43 | 7 | And then I believe we have a -- we have a |
| 10:42:49 | 8 | coordinator at the District that oversees the DSPS |
| 10:42:53 | 9 | program, policies and regulations and accommodations |
| 10:42:56 | 10 | for students. |
| 10:42:58 | 11 | Q.  Do you know who that person is? |
| 10:42:59 | 12 | A.  Not off the top of my head, no. |
| 10:43:09 | 13 | Q.  On how many occasions has OSS either moved |
| 10:43:18 | 14 | or recommended to a student that he or she move |
| 10:43:22 | 15 | from one section of a class to another because the |
| 10:43:26 | 16 | original professor would not permit an accommodation |
| 10:43:32 | 17 | that was -- that was identified by OSS? |
| 10:43:40 | 18 | A.  That I'm not -- I wouldn't know. |
| 10:43:43 | 19 | One of our practices, though, is that we do |
| 10:43:45 | 20 | move students from class to class for a variety of |
| 10:43:47 | 21 | reasons. |
| 10:43:49 | 22 | Could be initiated by the tutor, the |
| 10:43:52 | 23 | instructor, our staff, or perhaps the student.  But |
| 10:43:56 | 24 | we do try to put students in the -- the best |
| 10:43:58 | 25 | environment possible to be successful. |

Kusar® Keeping Your Word Is Our Business℠

10:44:01  1        Q.  So you just mentioned it -- it might

10:44:06  2   happen -- a move might take place at the student's

10:44:12  3   request?

10:44:12  4        A.  Sure.

10:44:13  5        Q.  Might take place at -- as a decision by

10:44:16  6   OSS?

10:44:18  7        A.  Could be OSS, somebody on our staff.  Our

10:44:21  8   accommodations office.  It could be a tutor.  Could

10:44:25  9   be somebody in the High Tech Center.  A counselor.

10:44:29  10       Q.  What tutors?

10:44:31  11       A.  We have specialized OSS tutoring in the OSS

10:44:38  12   office.

10:44:39  13            There's general tutoring on campus.  The

10:44:42  14   English department, math department, they have large

10:44:44  15   tutoring programs.

10:44:46  16            We also offer a specialized tutoring that

10:44:48  17   takes place in OSS.  So we bring students in --

10:44:51  18   They're -- They're peer tutors.  We bring them in

10:44:55  19   from the English department and math department,

10:44:57  20   highly recommended by professors.  And they come in,

10:44:59  21   and they give individualized, specialized tutoring

10:45:03  22   to our -- our students with disabilities.

10:45:09  23       Q.  I want to come back to -- Well, if a

10:45:12  24   tutor -- Strike that.  I will try -- I will try it

10:45:22  25   another way.


Kusar® Keeping Your Word Is Our Business℠

Case 2:17-cv-01697-SVW-SK   Document 485-1   Filed 02/03/23   Page 30 of 100   Page ID
#:11353
30(b)(6) of LACCD                    Los Angeles Community College District                    1115477

```
10:45:23   1          In what circumstances has a tutor

10:45:27   2    recommended that a student be moved from one faculty

10:45:31   3    member or one section of a class to another because

10:45:34   4    of the -- because the faculty member was not

10:45:42   5    providing the accommodation that was set up by OSS?

10:45:48   6        A.  Possible example might be an instructor

10:45:49   7    gets a student in class, the class begins, and a

10:45:53   8    professor can see the progress of a student.

10:45:56   9          They may recommend -- For instance, in this

10:45:59  10    math situation, our math department, we -- we divide

10:46:02  11    up math courses.  So semester-long math courses, we

10:46:05  12    can stretch those out to a full year.

10:46:09  13          Good example would be Math 125.  It's

10:46:11  14    called intermediate algebra.  That's offered over a

10:46:15  15    semester.  It's a five-unit class.  Because of the

10:46:19  16    rate -- There's -- There's ten chapters in the book,

10:46:21  17    and because of the rate that's going on, the student

10:46:23  18    may not be able to keep up.

10:46:25  19          So at that point in time the math

10:46:27  20    department, they divide that class into Math 124A

10:46:31  21    and -B.

10:46:31  22          So it's the same book, it's the same class,

10:46:33  23    but it's offered over two semesters.  And that gives

10:46:36  24    the student a little bit better chance to process

10:46:38  25    the information.
```

Kusar ®  Keeping Your Word Is Our Business℠

10:46:38  1        So that could be a recommendation that came

10:46:40  2   from a professor to say that "It might be in the

10:46:42  3   best interests of this student to split and get into

10:46:45  4   the Math 124A and -B."

10:46:53  5        Q.  And what other circumstances -- In what

10:46:55  6   other circumstances might it happen that a student

10:46:59  7   is moved from one -- a student with a disability is

10:47:03  8   moved from one class section to another because the

10:47:07  9   faculty member would not permit an accommodation?

10:47:11 10        A.  Could be -- Some examples are kinesiology,

10:47:13 11   our activity classes.

10:47:16 12        I get feedback from instructors all the

10:47:18 13   time stating that there are certain activities that

10:47:21 14   will take place in class, and they may want to move

10:47:23 15   the student to another section.

10:47:25 16        It might be for safety issues, or it might

10:47:26 17   just be for issues for a certain time of the day.

10:47:29 18   The student may have a certain health problem.  They

10:47:32 19   function better at a certain time of day.

10:47:34 20        So I -- I get -- I get feedback on a

10:47:36 21   constant basis from professors.  And we -- we

10:47:39 22   work -- there's a two-way avenue of communication

10:47:42 23   between our office and our faculty.

10:47:46 24        Q.  And would all of those -- all of that

10:47:49 25   communication be documented in the OSS file?



```
10:47:58    1         A.  If it's just a short conversation with an

10:48:00    2    instructor, probably not.  But if the situation is a

10:48:03    3    student comes in, and they sit down, and there's an

10:48:05    4    issue we're trying to resolve, there's a good chance

10:48:09    5    it would be documented.

10:48:15    6         Q.  How many times has a student been moved

10:48:17    7    from one section to another -- I'm going wait for

10:48:22    8    the siren.

10:48:23    9             (Interruption in the proceedings from

10:48:23   10             10:48 a.m. to 10:48 a.m.)

10:48:30   11    BY MR. ESPO:

10:48:31   12         Q.  How many times has a student been moved

10:48:33   13    from one section of a class to another section of

10:48:36   14    the same class because the professor wouldn't allow

10:48:42   15    recording, even though it had been approved as an

10:48:45   16    accommodation?

10:48:46   17         A.  Allow what?

10:48:47   18         Q.  Recording.

10:48:48   19         A.  Recording?

10:48:49   20         Q.  Audio recording.

10:48:52   21         A.  I don't have knowledge to that.

10:48:58   22         Q.  How -- If you were to try to obtain that

10:49:01   23    knowledge, how would you go about it?

10:49:03   24         A.  It would probably come -- I'd -- Most

10:49:05   25    likely, something like that would probably go to our
```

32



| 10:49:08 | 1 | dean, and they would probably try to resolve it with |
| 10:49:10 | 2 | the department chair of that particular academic |
| 10:49:13 | 3 | department that the student was in. |
| 10:49:15 | 4 | But something like that, that comes back |
| 10:49:17 | 5 | at -- I've filled out the accommodation, and if the |
| 10:49:21 | 6 | professor is refusing the accommodation, it would |
| 10:49:24 | 7 | probably go to the next level. |
| 10:49:27 | 8 | Q.  In your personal experience, how many times |
| 10:49:29 | 9 | has a professor refused an accommodation? |
| 10:49:35 | 10 | A.  I don't know the exact number.  It's -- |
| 10:49:37 | 11 | It's happened on occasion. |
| 10:49:44 | 12 | Q.  Are there -- Are blind students, in |
| 10:49:48 | 13 | particular, sometimes steered from one section of a |
| 10:49:53 | 14 | class, because a professor uses inaccessible |
| 10:50:00 | 15 | technology, to another section of the class, where |
| 10:50:03 | 16 | that professor does not use the technology? |
| 10:50:08 | 17 | A.  It's possible, yes. |
| 10:50:11 | 18 | Q.  How many time do you remember that? |
| 10:50:13 | 19 | A.  I -- I would have no idea. |
| 10:50:16 | 20 | Q.  And, again, if you wanted to figure that |
| 10:50:18 | 21 | out, how would you do that? |
| 10:50:20 | 22 | A.  I would most likely probably have to talk |
| 10:50:22 | 23 | to my staff, unless the student came directly back |
| 10:50:25 | 24 | to me. |
| 10:50:26 | 25 | Usually when a situation like that happens, |

33



Kusar   Keeping Your Word Is Our Business℠

| 10:50:28 | 1 | we try to intervene with our -- our High Tech Center |
| 10:50:31 | 2 | and our staff.  They would go out and speak with the |
| 10:50:33 | 3 | professor.  If there's something that's not |
| 10:50:35 | 4 | accessible, we try to get them up to speed. |
| 10:50:38 | 5 | Q.  Sorry.  Who's the "he" in that?  We try to |
| 10:50:41 | 6 | get them up to speed?  Who's -- |
| 10:50:43 | 7 | A.  In our High Tech Center, we have three |
| 10:50:47 | 8 | people.  There's Cheryl Morrison, Ryan Kushner, and |
| 10:50:52 | 9 | Kelvin Luong. |
| 10:50:58 | 10 | Q.  And what would the request to the High Tech |
| 10:51:04 | 11 | Center be in a case where a faculty member is using |
| 10:51:07 | 12 | inaccessible software? |
| 10:51:11 | 13 | A.  Accessibility, access. |
| 10:51:11 | 14 | So on the student's part, is there some |
| 10:51:13 | 15 | type of modality that they need, or do we need to |
| 10:51:16 | 16 | get to the professor and find out what the materials |
| 10:51:18 | 17 | are and how do we make them accessible to our |
| 10:51:21 | 18 | students. |
| 10:51:22 | 19 | Q.  Has it ever come to your attention that a |
| 10:51:24 | 20 | faculty member is using software that the High Tech |
| 10:51:33 | 21 | Center could not make accessible? |
| 10:51:36 | 22 | A.  I -- I hear about inaccessibility.  I'm not |
| 10:51:41 | 23 | involved with it directly, but I hear it indirectly. |
| 10:51:45 | 24 | And it's the responsibility of students and |
| 10:51:48 | 25 | professors to notify us, and we -- to the best of |

**Kusar** ® Keeping Your Word Is Our Business℠

| | | |
|---|---|---|
| 10:51:52 | 1 | our ability, we will try to make those materials |
| 10:51:55 | 2 | accessible to the students. |
| 10:52:03 | 3 | There's occasions where we have told our |
| 10:52:06 | 4 | faculty they have got update their materials or get |
| 10:52:08 | 5 | into another modality.  They may be using something |
| 10:52:12 | 6 | that's outdated, or they never had the opportunity |
| 10:52:15 | 7 | to have a certain student come into class where they |
| 10:52:18 | 8 | can't get accessibility to their products, or they |
| 10:52:21 | 9 | put on something new, and they don't have access |
| 10:52:23 | 10 | to -- to learning material. |
| 10:52:25 | 11 | So at that point in time, we would have to |
| 10:52:27 | 12 | intervene or -- or let the professor know those |
| 10:52:32 | 13 | materials were not accessible to the student. |
| 10:52:37 | 14 | Q.  Does -- Sort of bureaucratically within the |
| 10:52:41 | 15 | organization, does the either OSS or the High Tech |
| 10:52:47 | 16 | Center have the ability to tell a faculty member, |
| 10:52:51 | 17 | "You can't use this piece of technology"? |
| 10:52:54 | 18 | A.  It's -- It's the responsibility of the |
| 10:52:56 | 19 | instructor to make their materials accessible.  It |
| 10:53:00 | 20 | becomes a burden to us when we get one, two, three, |
| 10:53:03 | 21 | four different types of issues that come back to us, |
| 10:53:06 | 22 | and we have to go ahead and convert those materials. |
| 10:53:09 | 23 | It puts a real burden on our -- our High Tech |
| 10:53:11 | 24 | Center. |
| 10:53:12 | 25 | So it -- our professors know that, you |

Kusar ® Keeping Your Word Is Our Business℠

10:53:14  1    know, they should be ADA compliant when they get up

10:53:17  2    and go live on their websites.  Education has really

10:53:21  3    changed in the last ten years.  Professors use

10:53:24  4    websites, and they post materials.  And that's where

10:53:28  5    some of the issues come up sometimes, and that's

10:53:30  6    where our High Tech Center will intervene.

10:53:34  7         Q.  Let me ask specifically:  Have you ever

10:53:36  8    heard that MyMathLab is inaccessible to blind

10:53:40  9    students?

10:53:41  10        A.  It's a challenge.  Teaching math to the

10:53:43  11   blind is probably one of the biggest challenges up

10:53:46  12   and down the State of California.

10:53:47  13             I think that's exactly why Roy came over

10:53:50  14   from East L.A. College to Los Angeles City College,

10:53:52  15   for us to assist him with the math.  He finishes

10:53:55  16   math, he'll go back and graduate at East Los Angeles

10:53:55  17   College.  That's his home college.

10:54:03  18        Q.  You said you think the reason Mr. Payan

10:54:05  19   came to LACC -- you lost me -- LACC --

10:54:12  20        A.  Uh-huh.

10:54:13  21        Q.  -- has a -- What's different about the two

10:54:15  22   campuses?

10:54:16  23        A.  I guess we have a reputation.  People come

10:54:19  24   over to L.A. City College, to the OSS office, and

10:54:23  25   they get into our High Tech Center, and, hopefully,



Case 2:17-cv-01697-SVW-SK   Document 485-1   Filed 02/03/23   Page 37 of 100   Page ID
#:11360
30(b)(6) of LACCD                    Los Angeles Community College District                    1115477

| 10:54:27 | 1 | they -- they get the accessibility that they need. |
| 10:54:31 | 2 | If you look at Mr. Payan's transcript, he's |
| 10:54:34 | 3 | taken the majority of his units at East Los Angeles |
| 10:54:37 | 4 | college.  He's taken a few units over at |
| 10:54:39 | 5 | Los Angeles City College; specifically he's taken |
| 10:54:41 | 6 | most of his math. |
| 10:54:42 | 7 | And right now we're at Math 227 with him. |
| 10:54:45 | 8 | He -- He's taking it for the first time.  He didn't |
| 10:54:48 | 9 | pass it.  So we're trying for the second time to |
| 10:54:51 | 10 | take Math 227 in the fall of 2017. |
| 10:54:59 | 11 | Q.  Do -- To your knowledge, do other campuses |
| 10:55:03 | 12 | steer or recommend that blind students go to LACC? |
| 10:55:10 | 13 | A.  We got the reputation because we're next to |
| 10:55:13 | 14 | the Braille Institute.  I think a lot of people have |
| 10:55:15 | 15 | the idea, well, since we're next to the Braille |
| 10:55:17 | 16 | Institute -- And we do partner with the Braille |
| 10:55:19 | 17 | Institute.  So that -- that's an advantage to us. |
| 10:55:21 | 18 | And a lot of our students that come to Los Angeles |
| 10:55:24 | 19 | City College, they're clients of the Braille |
| 10:55:26 | 20 | Institute.  So we do partnership with orientation |
| 10:55:29 | 21 | and mobility and other types of services. |
| 10:55:31 | 22 | Q.  Okay.  But I'm asking whether, to your |
| 10:55:34 | 23 | knowledge, academic or other counselors at other |
| 10:55:38 | 24 | campuses -- that is, campuses of LACCD, other than |
| 10:55:43 | 25 | East -- other than LACC -- recommend to their |

Kusar ® Keeping Your Word Is Our Business℠

Case 2:17-cv-01697-SVW-SK   Document 485-1   Filed 02/03/23   Page 38 of 100   Page ID
#:11361
30(b)(6) of LACCD                 Los Angeles Community College District                    1115477

10:55:47  1    students that they go to LACC?

10:55:49  2        A.   That, I don't know.

10:55:51  3            A lot of times I've asked students, you

10:55:53  4    know, "What brought you here?"

10:55:55  5            And a lot of it is just word of mouth.

10:55:57  6    They've heard it from other students, or they've

10:55:58  7    gotten it from another source, and they decided to

10:56:00  8    come to our campus and try our services.

10:56:04  9        Q.   All right.  I'm going to circle back to

10:56:06  10   MyMathLab.

10:56:07  11       A.   Sure.

10:56:08  12       Q.   Do you have an understanding as to whether

10:56:13  13   it is -- whatever accessibility issues it has can be

10:56:17  14   fixed by the High Tech Center?

10:56:20  15       A.   I don't think it's our issue.  I think it's

10:56:22  16   more of a publisher issue.

10:56:24  17            I do know our math department, our

10:56:26  18   department chair, Professor Kaviani, he did come

10:56:29  19   back and give us policy in OSS.

10:56:32  20            He said that any visually impaired or blind

10:56:35  21   student that could --

10:56:35  22       THE REPORTER:  "Any visually impaired" --

10:56:39  23       THE WITNESS:  Any visually impaired student

10:56:39  24   could come back and pencil-and-paper their -- their

10:56:43  25   tests and quizzes in OSS.



10:56:45  1          So it -- it's not so much the math that's

10:56:47  2   a challenge; it's -- it's the MyMathLab that's the

10:56:50  3   challenge of working on that system.  Not only for

10:56:53  4   visually impaired, but for other students, too, with

10:56:56  5   disabilities.

10:56:57  6   BY MR. ESPO:

10:57:24  7       Q.   What types of statistics or -- I'll use

10:57:29  8   that.

10:57:30  9          What types of statistics does OSS keep

10:57:34 10   about the population it serves?

10:57:37 11       A.   I think we have to report on an annual

10:57:40 12   basis.  We have -- We send up MIS reports.  So we

10:57:42 13   have to, you know, demographically break down our

10:57:47 14   contacts with students, services that we provided,

10:57:49 15   and the -- the percentage of populations of

10:57:53 16   disabilities of students that we serve.

10:57:55 17          But I -- I know there's an annual report

10:57:57 18   that we complete.

10:57:58 19       Q.   Okay.  And so the report would include a

10:58:00 20   statistical breakdown of what disabilities students

10:58:07 21   come with?

10:58:08 22       A.   Yeah.  Whether it's a disability or

10:58:10 23   multiple disabilities.

10:58:12 24       Q.   Yeah.  And would it -- Does it identify the

10:58:19 25   accommodations that are given in any fashion?


Kusar  Keeping Your Word Is Our Business℠

| | | |
|---|---|---|
| 10:58:24 | 1 | A.  I don't know. |
| 10:58:26 | 2 |    That's a good question. |
| 10:58:27 | 3 | Q.  Who -- Do you know who does the report? |
| 10:58:31 | 4 | A.  I think our IT does it, and it's with |
| 10:58:33 | 5 | the -- from the direction of our -- our dean, Randy |
| 10:58:35 | 6 | Anderson.  But they compile -- Every time we put |
| 10:58:39 | 7 | information into our computer system, whether you |
| 10:58:42 | 8 | visit the High Tech Center or you visit |
| 10:58:44 | 9 | accommodations or if you visit a counselor, that |
| 10:58:47 | 10 | data is collected in the computer.  And there's a |
| 10:58:50 | 11 | report run at the end of the year, and I think it's |
| 10:58:52 | 12 | reviewed by our -- our dean. |
| 10:58:58 | 13 | Q.  I want to come back to the question of |
| 10:59:08 | 14 | reasons why students might be shifted from one |
| 10:59:13 | 15 | faculty member to another. |
| 10:59:15 | 16 |    Are you familiar with a system -- my French |
| 10:59:19 | 17 | is terrible -- |
| 10:59:19 | 18 | A.  Okay. |
| 10:59:19 | 19 | Q.  -- and I think it's supposed to be "Etude," |
| 10:59:22 | 20 | but -- |
| 10:59:23 | 21 | A.  "Etudes." |
| 10:59:25 | 22 | Q.  -- it might be Etudes? |
| 10:59:26 | 23 | A.  Etudes, yes. |
| 10:59:26 | 24 | Q.  E-t-u-d-e-s. |
| 10:59:29 | 25 | A.  Yeah.  Etudes. |



Case 2:17-cv-01697-SVW-SK   Document 485-1   Filed 02/03/23   Page 41 of 100   Page ID
#:11364
30(b)(6) of LACCD                    Los Angeles Community College District                    1115477

| 10:59:33 | 1 | MR. CLEELAND: We're California. So... |
| 10:59:35 | 2 | BY MR. ESPO: |
| 10:59:35 | 3 | Q. Good. Well, that makes it easier for me to |
| 10:59:37 | 4 | pronounce. Are you familiar with Etudes? |
| 10:59:40 | 5 | A. Yes. |
| 10:59:40 | 6 | Q. And what is it? |
| 10:59:41 | 7 | A. It's a website used on a regular basis by |
| 10:59:44 | 8 | our instructors. They put their information, their |
| 10:59:49 | 9 | protocol, their syllabus, their assignments on this |
| 10:59:54 | 10 | particular system, and students interact with that |
| 10:59:56 | 11 | system and complete their assignments. |
| 11:00:02 | 12 | Q. Have you heard from blind students that |
| 11:00:06 | 13 | Etudes is not accessible? |
| 11:00:10 | 14 | A. Not -- Not directly. Indirectly. I'm -- I |
| 11:00:14 | 15 | attend staff meetings. So I hear some of the issues |
| 11:00:17 | 16 | that come up with technology. |
| 11:00:22 | 17 | Q. Have you heard from anyone -- any student |
| 11:00:28 | 18 | that -- Strike that. |
| 11:00:32 | 19 | Is one of the functions that some |
| 11:00:34 | 20 | professors use Etudes for the submission of |
| 11:00:38 | 21 | homework, exams, and papers? |
| 11:00:40 | 22 | A. Correct. |
| 11:00:41 | 23 | Q. Okay. And are you familiar -- or are you |
| 11:00:45 | 24 | aware of complaints that that function on Etudes is |
| 11:00:50 | 25 | inaccessible to blind students? |

41


Kusar · Keeping Your Word Is Our Business℠

| 11:00:52 | 1 | A. Not directly. |
| 11:00:53 | 2 | Q. Have you heard that? |
| 11:00:54 | 3 | A. Yes. Indirectly, I have. |
| 11:00:56 | 4 | Q. Okay. And is a professor's use of Etudes |
| 11:01:14 | 5 | another reason why a student might be moved from one |
| 11:01:18 | 6 | section to another; so that he or she doesn't have |
| 11:01:21 | 7 | to use that system? |
| 11:01:23 | 8 | A. I haven't been privy to that, no. |
| 11:01:27 | 9 | Q. But you also haven't sort of spoken with |
| 11:01:30 | 10 | Mr. Turner about that? |
| 11:01:32 | 11 | A. No. |
| 11:01:33 | 12 | Q. Or anyone else? |
| 11:01:38 | 13 | A. No. |
| 11:02:11 | 14 | Q. Has there been training of faculty about |
| 11:02:28 | 15 | what their expected response to an accommodations |
| 11:02:31 | 16 | letter from OSS is? |
| 11:02:33 | 17 | A. We have a -- it's called a New Faculty |
| 11:02:38 | 18 | Institute when professors begin to work there at |
| 11:02:40 | 19 | Los Angeles City College. |
| 11:02:41 | 20 | And they stay in there for their first |
| 11:02:44 | 21 | year, and we try to bring in as many people as |
| 11:02:47 | 22 | possible to discuss the landscape of the campus. |
| 11:02:49 | 23 | We- -- We're invited in there twice a year to talk |
| 11:02:53 | 24 | to professors. We specifically bring in our |
| 11:02:55 | 25 | accommodation letters. We -- We pass those out to |

42

11:02:57  1    the professors so they are familiar with them, and

11:02:59  2    they know they are going to be coming in.

11:03:02  3            And on occasions, I've had adjunct

11:03:05  4    professors come to campus, and I've sent an

11:03:08  5    accommodation letter.  They are not familiar with

11:03:10  6    it.  So they will contact us, and we'll get them up

11:03:13  7    to speed on what we're -- we're trying to accomplish

11:03:16  8    with the accommodations letter.

11:03:20  9        Q.  And has any of them ever said, "I'm not

11:03:22 10    doing that"?  The "that" being whatever the

11:03:28 11    accommodation letter --

11:03:29 12        A.  I've had some students come back and say

11:03:31 13    that "My instructor refuses to sign my accommodation

11:03:34 14    letters."

11:03:35 15            Now, it might have been for some reasons:

11:03:38 16            They brought the accommodation letter the

11:03:39 17    day of the test.

11:03:42 18            They weren't given enough time -- Professor

11:03:44 19    wasn't given enough time to prepare for the

11:03:46 20    accommodation letter.

11:03:50 21            Could have been some other issues.

11:03:52 22            And if a professor straight out refuses the

11:03:56 23    accommodation letter, then that's sent to our -- our

11:03:58 24    administrator.

11:04:01 25        Q.  And that being Mr. Anderson or --



```
11:04:04   1        A.  It would start with Randy Anderson, our

11:04:07   2   dean of OSS.

11:04:10   3        Q.  And are there -- To your knowledge, is

11:04:14   4   there a file or statistical compilation or letters

11:04:19   5   about how -- how many such instances of that

11:04:23   6   behavior there have been in the last five years?

11:04:26   7        A.  I wouldn't know that.  No.

11:04:34   8        Q.  You spoke about the New Faculty

11:04:39   9   Institute --

11:04:42  10        A.  Yeah.

11:04:42  11        Q.  -- and training new faculty members get

11:04:47  12   about accommodations.

11:04:49  13        A.  (Nods head in the affirmative.)

11:04:49  14        Q.  Is there similar or -- Well, is there

11:04:55  15   training for existing faculty?

11:04:56  16        A.  Yeah.  There's a faculty handbook that we

11:04:59  17   have.  It's -- It's on our website.  It's accessible

11:05:01  18   to all our faculty.

11:05:03  19            We have welcome-back activities every year,

11:05:10  20   and we go out, as OSS faculty, and we speak to our

11:05:16  21   faculty about OSS services and any changes that

11:05:18  22   we've had and so forth.

11:05:31  23        Q.  Is OSS involved in the decisions about

11:05:41  24   acquisition of educational technology, other than

11:05:44  25   its own?
```

44



Case 2:17-cv-01697-SVW-SK   Document 485-1   Filed 02/03/23   Page 45 of 100   Page ID
#:11368
30(b)(6) of LACCD                    Los Angeles Community College District                    1115477

```
11:05:47   1        A.   We -- We do make referrals.  If students

11:05:51   2   come to us, and there's a possibility they can

11:05:53   3   obtain an -- an apparatus or some software or some

11:05:57   4   type of modality, and it's going to be paid by an

11:06:00   5   organization, we can write them a support letter

11:06:02   6   saying that we think it's in the best interest of

11:06:04   7   the student's learning and their educational goal

11:06:06   8   that they get this product," or whatever they're

11:06:08   9   requesting.

11:06:10  10        Q.   Does OSS have a consultative role with the

11:06:13  11   academic departments about what software they choose

11:06:19  12   for their academic programs?

11:06:24  13        A.   It -- I do know there's a faculty senate,

11:06:26  14   and they do talk about ADA compliance.  So when they

11:06:30  15   talk about purchasing textbooks or purchasing

11:06:32  16   materials, that it should be screened for ADA

11:06:36  17   compliance.

11:06:37  18             On everybody's syllabus -- When the

11:06:39  19   semester starts and they pass out a syllabus to

11:06:42  20   their students the first day of class, we request,

11:06:44  21   on the syllabus -- and, in fact, I think it's

11:06:47  22   mandated by our vice president of student

11:06:49  23   services -- that there be a -- a statement about

11:06:53  24   OSS.

11:06:53  25             That if you do have a disability, you need
```



11:06:55  1    accommodation letters, they state that they follow

11:06:58  2    through and get their accommodation letters.

11:07:04  3        Q.  Is there -- Is there a formal process for

11:07:12  4    academic departments to seek the advice of OSS about

11:07:21  5    purchasing of technology?

11:07:23  6        A.  We have a person that's in our High Tech

11:07:24  7    Center, Ryan Kushner, and Ryan's -- he works very

11:07:29  8    closely with our academic senate president.  And he

11:07:34  9    works -- he attends academic senate meetings, and

11:07:37 10    he's kind of our guru that goes out on campus if

11:07:40 11    there's an issue with a computer in the library, or

11:07:42 12    if there's an issue with accessing a website, Ryan

11:07:45 13    works closely with our faculty.

11:07:47 14            In fact, Ryan is paid -- his budget is paid

11:07:51 15    out of Equity, which comes out of academics.

11:07:54 16        Q.  What is Equity?

11:07:55 17        A.  It's just a funding that comes down from

11:07:57 18    the State of California, and the Equity funds mean

11:08:00 19    that if you have any disadvantaged populations, that

11:08:03 20    there's special services that are given to those

11:08:06 21    students, not just students with disabilities.  It

11:08:08 22    could be any groups of campuses -- any groups of

11:08:11 23    students on campus.

11:08:12 24            And with that equity money, there's courses

11:08:15 25    that are offered, there's services that are offered.

46

Case 2:17-cv-01697-SVW-SK   Document 485-1   Filed 02/03/23   Page 47 of 100   Page ID
#:11370
30(b)(6) of LACCD                    Los Angeles Community College District                    1115477

| 11:08:18 | 1 | We invest money in certain areas, just to make sure |
| 11:08:22 | 2 | populations that we think are disadvantaged or not |
| 11:08:25 | 3 | being served identified by the State are -- are |
| 11:08:27 | 4 | given quality services through education. |
| 11:08:34 | 5 | Q.  When academic departments are considering |
| 11:08:38 | 6 | what textbooks or technology to purchase, are they |
| 11:08:43 | 7 | required to check with OSS about accessibility of |
| 11:08:51 | 8 | that? |
| 11:08:53 | 9 | A.  I don't know that.  I -- I do know that |
| 11:08:56 | 10 | there's a process of purchasing a book.  It goes |
| 11:08:58 | 11 | through your department chair, and I think they have |
| 11:09:00 | 12 | to put in a requisition to purchase the book. |
| 11:09:03 | 13 | And during that time, somewhere along the |
| 11:09:06 | 14 | way, I believe they check to see if the book's ADA |
| 11:09:09 | 15 | compliant. |
| 11:09:09 | 16 | Q.  But -- But OSS is not involved in that, as |
| 11:09:12 | 17 | far as -- |
| 11:09:13 | 18 | A.  We usually -- |
| 11:09:13 | 19 | Q.  -- you know? |
| 11:09:13 | 20 | A.  We usually get involved after an issue |
| 11:09:15 | 21 | comes out on the campus.  There's not an issue -- |
| 11:09:15 | 22 | THE REPORTER:  Excuse me? |
| 11:09:15 | 23 | THE WITNESS:  I'm sorry. |
| 11:09:15 | 24 | THE REPORTER:  "We usually get involved |
| 11:09:15 | 25 | after" -- |

47



Case 2:17-cv-01697-SVW-SK   Document 485-1   Filed 02/03/23   Page 48 of 100   Page ID
#:13711
30(b)(6) of LACCD                    Los Angeles Community College District                    1115477

```
11:09:25  1        THE WITNESS:  Yeah.  We'll -- we'll get

11:09:26  2   involved in an issue usually after something is

11:09:27  3   purchased.  If there's an issue with accessibility,

11:09:30  4   we would probably get involved with it, yeah.

11:09:34  5   BY MR. ESPO:

11:09:50  6        Q.  Oh, you said the syllabi are supposed to

11:09:53  7   have something on them about the availability of OSS

11:09:59  8   for students?

11:10:00  9        A.  I believe it's looking at the material on

11:10:06 10   our -- on our just general website for faculty.

11:10:09 11            When they pass out their syllabus to class,

11:10:14 12   when -- when the classes begin, I'm -- I'm positive

11:10:17 13   there's a -- it's a directive sent out by our vice

11:10:20 14   president of student services that there should be a

11:10:23 15   statement in there about OSS.

11:10:25 16        Q.  And in your capacity as an OSS counselor,

11:10:32 17   you get copies of student sylla- -- syllabi, at

11:10:37 18   least when they need alternative texts; correct?

11:10:43 19        A.  I believe when you request eText, you are

11:10:48 20   asked to fill out a form, and you bring it into our

11:10:52 21   High Tech Center.

11:10:53 22            And I think you submit the syllabus.

11:10:55 23   That's one of the requirements, along with the

11:10:57 24   purchase of the book, the book, and your class

11:11:00 25   schedule.
```

Kusar® Keeping Your Word Is Our Business℠

Case 2:17-cv-01697-SVW-SK   Document 485-1   Filed 02/03/23   Page 49 of 100   Page ID
#:13372
30(b)(6) of LACCD                    Los Angeles Community College District                    1115477

```
11:11:00   1        Q.  But -- But as an academic counselor, you

11:11:03   2    are not in that -- in that particular loop?

11:11:05   3        A.  I'm not.  The only thing I would do is --

11:11:09   4    On their student education contract, it talks about

11:11:11   5    their functional limitations and about

11:11:13   6    accommodations.  I would put down "eText."  I would

11:11:17   7    fill out a referral, send it to the High Tech

11:11:19   8    Center, and tell the student, "You are eligible for

11:11:22   9    all media."

11:11:27  10        Q.  I was -- The reason I was asking is, do you

11:11:30  11    have other reasons to see syllabi?

11:11:33  12        A.  As a counselor?

11:11:35  13        Q.  As a counselor.

11:11:35  14            Do you generally see student syllabi?

11:11:38  15        A.  No.

11:11:40  16        Q.  Okay.  Is what's been -- I think we have

11:11:55  17    talked about some of this, but what's been marked as

11:11:58  18    Exhibit 10 is an example of what goes to a faculty

11:12:04  19    member to inform him or her of the accommodation for

11:12:10  20    a student?

11:12:11  21        A.  Correct.

11:12:12  22        Q.  Okay.

11:12:12  23            And then -- And then the process is the

11:12:20  24    instructor is supposed to sign it?

11:12:23  25        A.  Correct.  On the back of the accommodation
```


Kusar  Keeping Your Word Is Our Business℠

Case 2:17-cv-01697-SVW-SK   Document 485-1   Filed 02/03/23   Page 50 of 100   Page ID
#:13973
30(b)(6) of LACCD                Los Angeles Community College District                1115477

11:12:25  1    letter, there's -- they would tell us how they're

11:12:29  2    going to follow the protocol, the testing

11:12:31  3    procedures, and they let our accommodations staff

11:12:34  4    know how the logistics will happen with the test,

11:12:38  5    and they sign off on it at the bottom.

11:12:41  6         Q.  Okay.  And is what's based numbered as page

11:12:45  7    USDC/LACCD, a bunch of leading zeros, and then 31 on

11:12:52  8    the actual form, the back?

11:12:54  9         A.  Yes.  Yeah.  We put it back to back.

11:12:57 10         Q.  Okay.

11:12:57 11         A.  So we copy it back to back, yeah.

11:12:59 12         Q.  Okay.  And then the professor is supposed

11:13:03 13    to sign it?

11:13:04 14         A.  Correct.

11:13:05 15         Q.  And who returns it?

11:13:07 16         A.  The student.

11:13:12 17             We ask the student to bring the

11:13:13 18    accommodation letter back to our -- our

11:13:15 19    accommodations office.

11:13:16 20             And at that point in time, they are given

11:13:18 21    the proper instructions of how to come down and

11:13:21 22    schedule their test.

11:13:23 23         Q.  That's for students who are getting --

11:13:26 24         A.  If they need testing accommodations.

11:13:28 25             In this case, Roy's got testing

Kusar ® Keeping Your Word Is Our Business℠

| | | |
|---|---|---|
| 11:13:30 | 1 | accommodations. |
| 11:13:31 | 2 | And here's an example of where we have |
| 11:13:33 | 3 | taken Roy off of MyMathLab, and there's actually |
| 11:13:36 | 4 | going to be a reader and a scribe, that they are |
| 11:13:40 | 5 | going to pencil-and-paper this test. |
| 11:13:42 | 6 | Q.  So with respect to Exhibit 10, the |
| 11:13:50 | 7 | test-taking accommodations that are identified -- at |
| 11:13:53 | 8 | least three of them -- reader, Scantron assistance, |
| 11:13:59 | 9 | and a scribe -- are accommodations that Mr. Payan |
| 11:14:04 | 10 | needs because -- because of the accessibility issues |
| 11:14:08 | 11 | of MyMathLab? |
| 11:14:09 | 12 | A.  Yes.  And it was given -- The -- The |
| 11:14:12 | 13 | department chair of math gave us permission for our |
| 11:14:14 | 14 | visually impaired and blind students so we can |
| 11:14:18 | 15 | pencil-and-paper the exams. |
| 11:14:20 | 16 | Q.  And what's Scantron? |
| 11:14:22 | 17 | A.  Scantron would just be a document that you |
| 11:14:24 | 18 | would put answers down on.  So it's just usually a |
| 11:14:30 | 19 | strip, and you mark bubbles in and so forth. |
| 11:14:32 | 20 | So there's a possibl- -- possibility on the |
| 11:14:33 | 21 | test, part of your test may be Scantron, where you |
| 11:14:36 | 22 | have to answer a set of maybe -- say, ten questions, |
| 11:14:39 | 23 | multiple choice, and you would -- you would bubble |
| 11:14:40 | 24 | in those answers. |
| 11:14:50 | 25 | Q.  What, if any, follow-up does -- Strike |



```
11:14:56   1    that.
11:14:56   2            What, if any, follow-up, that's not driven
11:15:00   3    by a complaint from a student, does OSS do to make
11:15:05   4    sure that the accommodations set out in an
11:15:11   5    accommodation letter are, in fact, provided to the
11:15:14   6    student?
11:15:14   7        A.  It would probably be feedback from the
11:15:16   8    student.
11:15:17   9            Could be from the professor or one of my
11:15:20  10    staff members.
11:15:22  11            We could change and modify the
11:15:24  12    accommodation letter if it needed to be changed.
11:15:26  13            I get contacted by instructors on a regular
11:15:29  14    basis.
11:15:30  15            Students come in, and, "Oh, by the way, I'd
11:15:33  16    like to use a calculator on this test.  Could you
11:15:35  17    modify my accommodation letters," and we could do
11:15:38  18    that for the student.
11:15:39  19            So we give initial letters out, but we do
11:15:44  20    make revisions along the way.  A lot of times, we'll
11:15:46  21    get feedback from our instructors, and if they think
11:15:50  22    best practice is to help that student in that
11:15:52  23    situation, they'll ask for revisions on the
11:15:54  24    accommodation letter to the advantage of the
11:15:56  25    student.
```



| | | |
|---|---|---|
| 11:16:01 | 1 | Q.  I see on Exhibit 10 it -- in the paragraph |
| 11:16:08 | 2 | just above the line that says Part I -- says that, |
| 11:16:12 | 3 | "All videos or films shown in class or on campus |
| 11:16:18 | 4 | must be closed captioned." |
| 11:16:20 | 5 | Do you see that? |
| 11:16:21 | 6 | A.  Yeah. |
| 11:16:24 | 7 | MR. ESPO:  Did you hear that? |
| 11:16:25 | 8 | THE REPORTER:  I did. |
| 11:16:25 | 9 | BY MR. ESPO: |
| 11:16:26 | 10 | Q.  Okay.  Is there a requirement that videos |
| 11:16:29 | 11 | or films shown in class -- on class first -- be -- |
| 11:16:35 | 12 | get audio narration for blind students? |
| 11:16:41 | 13 | A.  I think that closed caption right there is |
| 11:16:43 | 14 | probably for our deaf -- deaf population. |
| 11:16:45 | 15 | Q.  No.  I understand that. |
| 11:16:46 | 16 | So that's why I'm asking, is there a |
| 11:16:49 | 17 | requirement that there be audio description for |
| 11:16:52 | 18 | blind students? |
| 11:17:01 | 19 | A.  I wouldn't be privy to that. |
| 11:17:06 | 20 | Q.  Excuse me.  I don't know what Math 227 -- |
| 11:17:13 | 21 | the particulars of Math 227 are, but -- |
| 11:17:16 | 22 | A.  Statistics, yeah. |
| 11:17:17 | 23 | Q.  -- is there -- I don't see, as one of |
| 11:17:25 | 24 | the -- at least I don't think I see -- as one of the |
| 11:17:31 | 25 | offered accommodations, a talking calculator. |



Case 2:17-cv-01697-SVW-SK   Document 485-1   Filed 02/03/23   Page 54 of 100   Page ID
#:11377
30(b)(6) of LACCD                    Los Angeles Community College District                    1115477

```
11:17:40   1          Does OSS have talking calculators to loan

11:17:46   2   to students who need them?

11:17:48   3      A.  Yes.

11:17:49   4      Q.  How many?

11:17:51   5      A.  I'm not privy to that.

11:17:55   6          We also have some students that have that

11:17:57   7   apparatus.

11:17:58   8      Q.  On their own?

11:17:59   9      A.  On their own, yeah.

11:18:06  10      Q.  Does OSS regularly survey its students to

11:18:16  11   ask them whether they're receiving the

11:18:22  12   accommodations they think they need?

11:18:26  13      A.  We do periodic surveys.

11:18:29  14          We may have some type of report.

11:18:32  15          We may have some type of request, where

11:18:37  16   we're asked to bring in a -- a group of students or

11:18:42  17   just to send out -- perhaps students complete a

11:18:44  18   general survey, collect that data, and use it for

11:18:47  19   the reason that we're asked to submit the -- the

11:18:50  20   information.

11:18:51  21      Q.  I guess I -- Is there -- For lack of a

11:18:58  22   better term --

11:18:59  23      A.  Yeah.

11:18:59  24      Q.  -- is there customer satisfaction surveying

11:19:03  25   going on?
```



Case 2:17-cv-01697-SVW-SK   Document 485-1   Filed 02/03/23   Page 55 of 100   Page ID
#:13178
30(b)(6) of LACCD          Los Angeles Community College District                    1115477

```
11:19:04  1        A.  I don't believe we have that, but we have

11:19:06  2   an open-door policy.  Students are welcome to come

11:19:10  3   in and talk to anybody in our staff.

11:19:18  4        MR. ESPO:  Why don't we take a short break.

11:19:21  5        THE VIDEOGRAPHER:  This marks the end of Media

11:19:23  6   Number 1 in the deposition of Robert Dominick.

11:19:27  7             We're going off the record at 11:19 a.m.

11:28:17  8             (A recess is taken from 11:19 a.m. to

11:28:17  9             11:32 a.m.)

11:32:16 10        THE VIDEOGRAPHER:  We're back on the record at

11:32:18 11   be 11:32 a.m., and this marks the beginning of Media

11:32:23 12   Number 2 in the deposition of Robert Dominick.

11:32:28 13             Please continue.

11:32:29 14   BY MR. ESPO:

11:32:29 15        Q.  Excuse me.

11:32:30 16             Mr. Dominick, in answer to an earlier

11:32:35 17   question, you made reference to a class.  I think

11:32:40 18   you said kinesiology?

11:32:42 19        A.  It's physical education.  They have

11:32:45 20   changed.  P.E. is now called kinesiology.

11:32:49 21        Q.  Oh, okay.

11:32:50 22             And I think you said that there might be

11:32:55 23   discussion of -- or issues about activities that

11:33:01 24   were too dangerous for particular students who might

11:33:07 25   be enrolled.
```

55



Case 2:17-cv-01697-SVW-SK   Document 485-1   Filed 02/03/23   Page 56 of 100   Page ID
#:11979
30(b)(6) of LACCD                    Los Angeles Community College District                    1115477

| | | |
|---|---|---|
| 11:33:08 | 1 | Is that right? |
| 11:33:09 | 2 | A.  I've had instructors contact me for various |
| 11:33:13 | 3 | reasons. |
| 11:33:13 | 4 | We had a basic swimming class where you |
| 11:33:16 | 5 | would try to get water safe.  A gentleman had a |
| 11:33:20 | 6 | stroke on one side of his body.  There was a real |
| 11:33:22 | 7 | concern about him being in the pool and about his |
| 11:33:25 | 8 | safety. |
| 11:33:25 | 9 | So I -- I get professors that contact me on |
| 11:33:28 | 10 | a regular basis that are concerned about the safety |
| 11:33:31 | 11 | of students in kinesiology classes.  And so we come |
| 11:33:34 | 12 | up with some type of way of making sure the student |
| 11:33:40 | 13 | gets a chance to take the class, or we modify it. |
| 11:33:43 | 14 | Or there may be times that we actually change the |
| 11:33:46 | 15 | activity, where the student can still get their P.E. |
| 11:33:50 | 16 | credit for graduation requirements. |
| 11:33:52 | 17 | Q.  Have -- Have any of those instances |
| 11:33:54 | 18 | involved blind students? |
| 11:33:58 | 19 | A.  I've had a couple blind students in |
| 11:34:00 | 20 | kinesiology classes where I've gotten feedback from |
| 11:34:03 | 21 | the instructors, yes. |
| 11:34:04 | 22 | Q.  And what has the feedback -- What was the |
| 11:34:07 | 23 | feedback? |
| 11:34:09 | 24 | A.  I had a student that wanted an attendant |
| 11:34:11 | 25 | for the class.  They wanted -- The student was |


Kusar  Keeping Your Word Is Our Business℠

11:34:13  1    requesting an attendant that could move them around

11:34:17  2    class.

11:34:20  3           Before we got any further on that, concern

11:34:22  4    about the student safety going through stages of an

11:34:26  5    exercise (indicating) activity, I believe the

11:34:31  6    student ended up withdrawing from the class.  So we

11:34:33  7    never got to the point of trying to resolve that

11:34:36  8    issue.

11:34:37  9           Q.  Any other examples of blind students?

11:34:41  10          A.  I've had instructors call me where they

11:34:43  11   have had multiple blind students in the class, and

11:34:46  12   having concerns about having maybe three students in

11:34:50  13   class and the activity taking place, and trying to

11:34:54  14   find some resolution.

11:34:55  15          So we've -- we worked with the instructor,

11:34:57  16   and the students ended up staying in the class, and

11:35:01  17   there were some modifications made.

11:35:04  18          Sometimes in the accommodation letter, I'll

11:35:07  19   send the student to class.  And because of the

11:35:08  20   disability, I'll ask them if they can stay in the

11:35:12  21   class and be limitations on certain parts of the

11:35:15  22   class and certain activities, if they can be exempt

11:35:18  23   from that, or they can have some type of alternative

11:35:20  24   activity.

11:35:21  25          And that's usually agreed upon between the



**Kusar** Keeping Your Word Is Our Business℠

Case 2:17-cv-01697-SVW-SK   Document 485-1   Filed 02/03/23   Page 58 of 100   Page ID
#:11391
30(b)(6) of LACCD                    Los Angeles Community College District                    1115477

11:35:23  1    instructor, myself, and the student.

11:35:26  2        Q.  In the case of the -- of this class, where

11:35:29  3    there were three blind students, were the blind --

11:35:33  4    were the three students -- did the three students

11:35:38  5    participate in the discussions about whether their

11:35:41  6    presence was problematic?

11:35:44  7        A.  No.  Their -- Their concern was -- The

11:35:47  8    instructor wanted to make sure they had the -- the

11:35:50  9    proper safety in class.  They understood what the

11:35:54  10   qualifications were to be in the class and what it

11:35:57  11   was to pass the class.

11:35:58  12            And when I got the feedback on it, I felt

11:36:01  13   comfortable having all three in there.  We had

11:36:03  14   talked about maybe splitting them up and putting

11:36:06  15   them in different sections.  It would still be the

11:36:08  16   same activity, but we agreed upon that they could

11:36:11  17   stay together as the three, and it worked out well.

11:36:14  18            They all ended up getting satisfactory

11:36:16  19   grades.  But I think the instructor was just taken

11:36:18  20   back when they -- when three blind students happened

11:36:20  21   to show up for a class.  And they called me, and

11:36:22  22   they had some reservations about it.

11:36:25  23       Q.  What were the instructors' reser- -- excuse

11:36:26  24   me -- reservations?

11:36:28  25       A.  They -- They were just concerned about



58

Case 2:17-cv-01697-SVW-SK   Document 485-1   Filed 02/03/23   Page 59 of 100   Page ID
#:11382
30(b)(6) of LACCD                    Los Angeles Community College District                    1115477

11:36:28  1    the -- the safety, how would they go into -- just to

11:36:31  2    get into class.  Would they go into the locker room?

11:36:34  3    How were they going to change?  How were they going

11:36:37  4    to access -- Some concerns about how they would get

11:36:39  5    into the building, get into the facility to change

11:36:44  6    into their clothes to participate in the activity,

11:36:49  7    how they would access their locker.  There were two

11:36:52  8    males and a female in the situation, and then once

11:36:55  9    they got to class, there was some concerns about the

11:36:58 10    activities that they would participate in.

11:37:00 11            So we went over the activities.  There were

11:37:03 12    a couple activities that they would be exempt from,

11:37:07 13    and the instructor, Professor Gevanyan, she went out

11:37:17 14    of her way to accommodate the students and worked

11:37:19 15    with them in class and did a little classroom

11:37:22 16    activity outside the kinesiology activity to help

11:37:25 17    the students.

11:37:26 18            It was a positive experience for both the

11:37:28 19    professor and the students, but I think initially

11:37:30 20    the instructor was take back by the fact that three

11:37:33 21    blind students came into a kinesiology class, and a

11:37:36 22    red flag went up.  And she called me, not because

11:37:39 23    she was trying to discourage the students, but she

11:37:41 24    goes, "How do I handle the situation?"

11:37:49 25        Q.  Did she -- Do we -- Did she express concern

Kusar  Keeping Your Word Is Our Business℠

Case 2:17-cv-01697-SVW-SK   Document 485-1   Filed 02/03/23   Page 60 of 100   Page ID
#:13983
30(b)(6) of LACCD                    Los Angeles Community College District                    1115477

```
11:37:51  1   to you that the students would be unable to change

11:37:55  2   their clothing independently?

11:37:58  3       A.  There was just some concern that the

11:37:59  4   students brought up that, "Where is the locker

11:38:03  5   room"?  And you got to get to a locker.  You have to

11:38:06  6   change your combination, open it and close it, and

11:38:09  7   put your clothes in there and so forth.  So there

11:38:11  8   were some concerns about the -- the logistics, but

11:38:13  9   those -- those were resolved.

11:38:17 10           We have people that work in the facility,

11:38:18 11   and they were able to work both with two male

11:38:21 12   students and the two female students.

11:38:24 13       Q.  Oh, so there were four?

11:38:26 14       A.  No.  There were three students.  There were

11:38:26 15   two male and one female student.

11:38:29 16       Q.  Oh, okay.

11:38:29 17       A.  But we had staff, one in the female locker

11:38:33 18   room, and one in the male locker room that were able

11:38:36 19   to accommodate the students.

11:38:38 20       Q.  And what were the activities that the

11:38:55 21   professor was concerned about?

11:38:56 22       A.  It was an aerobics class where they would

11:39:00 23   just do different types of movement, dance

11:39:04 24   movements, apparatuses where you'd step up and step

11:39:07 25   down and so forth.
```



Kusar® Keeping Your Word Is Our Business℠

Case 2:17-cv-01697-SVW-SK   Document 485-1   Filed 02/03/23   Page 61 of 100   Page ID
#:11384
30(b)(6) of LACCD                    Los Angeles Community College District                    1115477

11:39:08  1           It was just a chance to get your heart rate

11:39:11  2    up and go through an aerobic activity.

11:39:14  3           Q.  What was the safety concern that the

11:39:16  4    professor had?

11:39:17  5           A.  Just to make sure they were located in

11:39:20  6    class in a place that was safe for them.  There were

11:39:27  7    some concerns about their balance, if they were

11:39:30  8    being told to step high or step left and so forth.

11:39:33  9    There was concern about their balance.

11:39:36  10          They modified the activity where they

11:39:38  11   didn't maybe step as high as another student, but

11:39:41  12   they still went through the -- the routine of the

11:39:44  13   exercise.

11:39:44  14          And then when it came time to the step

11:39:47  15   bench, they were able to get acclimated to that and

11:39:51  16   go up and down and do a step-on-the-bench exercise.

11:39:56  17          I think there were a couple medicine balls

11:39:58  18   they had.

11:39:59  19          And there -- there were just some things

11:40:00  20   that they had to get acclimated to, and it would be

11:40:03  21   a different type of introduction and instruction you

11:40:06  22   would do with our blind students versus visually

11:40:08  23   students -- students that were visual.

11:40:11  24          Q.  So what is it about those students or

11:40:15  25   blindness, whichever it is, that -- that gave the --



```
11:40:17   1    the concern about how high the step should be?

11:40:21   2        A.  Well, it's just basic -- it's a basic step.

11:40:24   3    It's a platform (indicating), and you step up and

11:40:27   4    down on this platform, and you get an aerobic effect

11:40:30   5    out of it.

11:40:31   6            So there was just concern that they could

11:40:32   7    step up there in a safe manner, step with the other

11:40:35   8    foot, and step down with one, and step back down,

11:40:37   9    keep their balance, and there wouldn't be any safety

11:40:40  10    issues.

11:40:40  11            If they did happen to fall, were they in a

11:40:44  12    location where there was padding, and there was

11:40:46  13    protection for them in case.

11:40:48  14            So I think she was thinking outside the

11:40:49  15    box.  She was thinking about safety issues and so

11:40:51  16    forth.  She was thinking about the class a lot

11:40:53  17    differently than I was as a -- as a counselor.

11:41:07  18        Q.  Have you ever reported a faculty member to

11:41:14  19    Dean Anderson for the faculty member's noncompliance

11:41:19  20    with an accommodation letter?

11:41:20  21        A.  Well, what I'll do is, if there's an issue

11:41:22  22    with an accommodation letter, I'll discuss it with

11:41:25  23    the student; I'll discuss it with the professor.

11:41:31  24            Sometimes it's just the matter of

11:41:32  25    understanding the accommodation letter.
```

**Kusar**® Keeping Your Word Is Our Business℠

Case 2:17-cv-01697-SVW-SK   Document 485-1   Filed 02/03/23   Page 63 of 100   Page ID
#:11386
30(b)(6) of LACCD                    Los Angeles Community College District                    1115477

11:41:34  1          A professor might see a note of eText.

11:41:37  2   "Well, I'm not going to do that.  I refuse to sign

11:41:41  3   that."

11:41:41  4          Well, you're not responsible for the eText.

11:41:44  5   The eText is on there at the High Tech Center.

11:41:47  6          So a lot of times, it's just a

11:41:48  7   misunderstanding.  And if we can resolve it, the

11:41:52  8   professor will sign --

11:42:00  9      THE REPORTER:  Excuse me?

11:42:00  10     THE WITNESS:  Okay.  Where would you like me to

11:42:00  11  pick up?

11:42:00  12     THE REPORTER:  "If we can resolve it."

11:42:00  13     THE WITNESS:  So if we can resolve the issue --

11:42:02  14  I'll talk to the professor, and if they're willing

11:42:05  15  to sign accommodation letter, we'll move on.

11:42:09  16         If the professor refuses to sign the

11:42:11  17  accommodation letter, I'll usually advise the

11:42:13  18  student to -- to see the dean.

11:42:15  19  BY MR. ESPO:

11:42:17  20     Q.  So you don't report that to the dean

11:42:20  21  yourself?

11:42:21  22     A.  No.  I tell the student to contact our

11:42:23  23  dean.  Yes.

11:42:26  24     Q.  Why do it that way rather than contacting

11:42:30  25  the dean yourself?



63

Case 2:17-cv-01697-SVW-SK   Document 485-1   Filed 02/03/23   Page 64 of 100   Page ID
#:1387
30(b)(6) of LACCD                    Los Angeles Community College District                    1115477

```
11:42:32   1        A.  Just logistically.  Self-advocacy.  We want

11:42:36   2   our students to take the initiative, and they would

11:42:41   3   have direct dialogue with the dean versus me talking

11:42:44   4   to the dean and getting back to the student, and so

11:42:46   5   forth.

11:42:46   6        But that's the next step.  If somebody

11:42:48   7   refuses to sign an accommodation letter, it's got to

11:42:51   8   probably move to the administrative level.

11:42:57   9        Q.  Do you know if Mr. Turner adopts the same

11:43:00  10   practice?  That is, in instances, if there are any,

11:43:05  11   when a professor refuses to sign an accommodation

11:43:09  12   letter, does he tell the student to go to the dean?

11:43:17  13        A.  I don't know directly.  He -- I know

11:43:22  14   Everett relies on me a lot.  So if there's an issue,

11:43:24  15   he'll probably come over and ask me for advisement.

11:43:28  16   Yeah.

11:43:29  17        Q.  Who's the dean of educational technology?

11:43:58  18        A.  Our dean over IT?  I know our -- I know our

11:44:11  19   IT supervisor.  Our dean over technology?  I

11:44:17  20   wouldn't know that off the top of my head --

11:44:19  21        Q.  Okay.

11:44:19  22        A.  -- no.

11:44:19  23        MR. ESPO:  I just want to make sure, Counsel.

11:44:22  24   This witness is not testifying about Topic 13?

11:44:29  25        MR. CLEELAND:  Correct.  And most of your
```



Case 2:17-cv-01697-SVW-SK   Document 485-1   Filed 02/03/23   Page 65 of 100   Page ID
#:11368
30(b)(6) of LACCD                Los Angeles Community College District                    1115477

```
11:44:31  1   questions haven't been on any of the topics he's
11:44:34  2   here for, but I haven't stopped you.
11:44:36  3        MR. ESPO:  I just want to make --
11:44:40  4        MR. CLEELAND:  He's here for 8, 14, 19, 22, 23,
11:44:46  5   and 24.
11:44:47  6        But, again, I haven't stopped you
11:44:49  7   because --
11:44:52  8        MR. ESPO:  I'm trying to stay somewhat to
11:44:54  9   the -- this.
11:44:58 10   BY MR. ESPO:
11:44:58 11        Q.  Let's move on, then, to Topic 19, which is
11:45:04 12   all communications between Mr. Payan and LACCD
11:45:11 13   regarding his requests for accommodations.
11:45:17 14        What are those communications?
11:45:33 15        A.  So this is "The LACCD policies and
11:45:35 16   procedures for blind students to receive digital
11:45:38 17   copies of textbooks"?  19?
11:45:41 18        MR. CLEELAND:  Number 19.
11:45:42 19        THE WITNESS:  16.  Okay.  That's 16.  Now I'm
11:45:43 20   looking up these numbers.
11:45:44 21        MR. ESPO:  Oh, good.
11:45:44 22        THE WITNESS:  19.  Excuse me.
11:45:44 23        "19.  All communications between Roy Payan
11:45:47 24   and LACC regarding his requests for accommodations."
11:45:50 25        Okay.
```



65

Case 2:17-cv-01697-SVW-SK   Document 485-1   Filed 02/03/23   Page 66 of 100   Page ID
#:11389
30(b)(6) of LACCD                    Los Angeles Community College District                    1115477

```
11:45:51   1   BY MR. ESPO:
11:45:53   2       Q.  So what can you tell me about those
11:45:57   3   requests?
11:46:05   4            Tell you what, I'll withdraw the question
11:46:08   5   for now.  Let's go off the record a moment.
11:46:10   6            THE VIDEOGRAPHER:  Off the record at 11:46 a.m.
11:46:18   7            (Interruption in the proceedings from
11:54:39   8            11:46 a.m. to 11:55 a.m.)
11:54:39   9            (The aforementioned document is marked
11:54:39  10            by the reporter as Defense Exhibit 11
11:54:39  11            for identification and is attached hereto.)
11:54:51  12            THE VIDEOGRAPHER:  We're back on the record at
11:54:52  13   11:55 a.m.
11:54:54  14            Please continue.
11:54:55  15   BY MR. ESPO:
11:54:57  16       Q.  Sorry for the delay.
11:54:59  17            Mr. Dominick, can you identify what's been
11:55:02  18   marked as Exhibit 11?
11:55:04  19       A.  It's one of the sheets that go into the
11:55:06  20   student log.
11:55:08  21       Q.  And this doesn't have a name on it.  Do you
11:55:14  22   have any way of recognizing what student this goes
11:55:18  23   to?
11:55:19  24       A.  It's got Everett's name on it.  Initials as
11:55:22  25   far as the people that saw the student, it's got
```


Kusar  Keeping Your Word Is Our Business℠

11:55:24   1    Everett and myself.  Since we have Roy's

11:55:31   2    accommodation letter (indicating), and we have Math

11:55:34   3    124A and -B on here (indicating).

11:55:47   4        MR. CLEELAND:  Could you read the question

11:55:48   5    please.

11:55:49   6          (The record is read by the reporter.)

11:56:07   7    BY MR. ESPO:

11:56:11   8        Q.  I think the court reporter was not writing

11:56:11   9    when you finally answered.  She was reading when you

11:56:14 10    were answering.

11:56:14 11          So the question was, do you have any way of

11:56:17 12    identifying this?

11:56:26 13        A.  I know these comments were filled out by

11:56:29 14    both Everett and myself.  I don't have the student's

11:56:32 15    name on the log.

11:56:33 16        Q.  And, typically, for student logs in OSS,

11:56:39 17    are there --is each -- does each page have the

11:56:48 18    student's name?

11:56:53 19        A.  The log is a back-to-back document.

11:56:57 20          So on one side, it's got -- The front side

11:57:01 21    has a place for the name, but on the backside of the

11:57:03 22    log, it wouldn't have a place for a name.

11:57:11 23        Q.  Well, let's do what we can with this.

11:57:16 24          Which sets of initials are Mr. Turner's

11:57:20 25    on --



```
11:57:20   1        A.   "ET."

11:57:21   2        Q.   -- Exhibit 11?

11:57:22   3        A.   Yeah.  "ET."

11:57:22   4        Q.   So that's the first two sets of initials?

11:57:32   5        A.   A total of five.  I see Everett's marked

11:57:35   6   this five times with his initials.

11:57:37   7        Q.   Well, I want to make sure we can tell whose

11:57:40   8   is whose.

11:57:40   9             So the first two sets of initials on the

11:57:42  10   page are Mr. Turner's?

11:57:44  11        A.   Correct.

11:57:45  12        Q.   And the next one is -- The next -- Which

11:57:49  13   ones are yours?

11:57:49  14        A.   The next three are "Dominick."

11:57:51  15        Q.   Okay.

11:57:53  16        A.   Next one is Turner.

11:57:54  17        Q.   Okay.

11:57:55  18        A.   Next one is Dominick.

11:57:57  19             Last one is Turner.

11:57:59  20        Q.   Okay.

11:58:15  21             Other than the log -- not -- not saying

11:58:23  22   Exhibit 11 is the right one -- but other than the

11:58:27  23   student log, do you have any knowledge of the

11:58:33  24   contents of communications between Mr. Payan and

11:58:37  25   OSS?
```



```
11:58:40   1        MR. CLEELAND:  Other than what he's previously

11:58:42   2   testified to?

11:58:43   3        MR. ESPO:  Yes.

11:58:44   4        MR. CLEELAND:  Thank you very much.

11:58:45   5        THE WITNESS:  A student can communicate with us

11:58:48   6   via telephone, email, student walk-in, which they

11:58:54   7   come up and sign the clipboard to see a -- a

11:58:58   8   counselor, or they can make a 30-minute counseling

11:59:02   9   appointment.

11:59:02  10   BY MR. ESPO:

11:59:06  11        Q.  But what I am asking you is whether,

11:59:09  12   independently of looking at -- at a log for

11:59:12  13   Mr. Payan, sitting here today and separate from

11:59:18  14   anything you have already testified about, do you

11:59:20  15   have an independent recollection of speaking with

11:59:24  16   Mr. Payan about OSS services?

11:59:30  17        A.  I can't recall the exact conversation, but

11:59:32  18   I've -- I've interacted with Roy.  I've conversed

11:59:35  19   with him.

11:59:35  20        Q.  Okay.  But what I'm trying to establish is

11:59:38  21   whether you have any memory of the specifics of any

11:59:41  22   of those conversations.

11:59:43  23        A.  Related to these comments or --

11:59:46  24        Q.  Separate from Exhibit 11.

12:00:04  25        A.  Just recollecting some of the conversations
```



Case 2:17-cv-01697-SVW-SK   Document 485-1   Filed 02/03/23   Page 70 of 100   Page ID
#:11393
30(b)(6) of LACCD                   Los Angeles Community College District                   1115477

```
12:00:06  1    where I believe we talked about math tutoring.

12:00:14  2         We talked about the math sequence that he

12:00:18  3    would attempt when he was at L.A. City College.

12:00:25  4         He mentioned doing some fundraising.  He

12:00:27  5    had the ability to fund raise and get some funds

12:00:31  6    into our OSS coffers for our student club.

12:00:35  7         We spoke about his relationship with the

12:00:40  8    Sheriff's Department.

12:00:49  9         I -- I would meet and greet Roy on a

12:00:51 10    regular basis within the office, or on campus at

12:00:57 11    times, but those are about the main specifics I

12:00:59 12    remember.

12:01:00 13         Q.  What do you remember about his --

12:01:03 14    Mr. Payan's relationship with the Sheriff's

12:01:06 15    Department?

12:01:07 16         A.  I believe he -- he was employed or he had a

12:01:11 17    desire to become employed by the Sheriff's

12:01:14 18    Department.

12:01:18 19         Q.  Do you remember anything other than that?

12:01:21 20         A.  Not specifics, no.

12:01:25 21         Q.  And I know I asked you this at the

12:01:27 22    beginning of the deposition, and I've already

12:01:30 23    forgotten the answer:  Did you review Mr. Payan's

12:01:33 24    file in preparation for the deposition?

12:01:36 25         A.  No.
```



| | | |
|---|---|---|
| 12:01:38 | 1 | Q.  Did you review Ms. Mason's file? |
| 12:01:41 | 2 | A.  No. |
| 12:01:56 | 3 | Q.  Do you use email in your work at LACC? |
| 12:02:04 | 4 | A.  On a regular basis.  Constantly. |
| 12:02:06 | 5 | Q.  Do you write emails about specific |
| 12:02:11 | 6 | students? |
| 12:02:15 | 7 | A.  I email students on a regular basis. |
| 12:02:18 | 8 | Q.  In preparation for today's deposition, did |
| 12:02:20 | 9 | you look for any emails between yourself and |
| 12:02:24 | 10 | Mr. Payan? |
| 12:02:24 | 11 | A.  No. |
| 12:02:26 | 12 | Q.  Have you at any time looked for email |
| 12:02:37 | 13 | communications between you and Mr. Payan? |
| 12:02:40 | 14 | A.  No. |
| 12:02:40 | 15 | Q.  Have you looked for email communications |
| 12:02:44 | 16 | between you and anyone about Mr. Payan? |
| 12:02:49 | 17 | A.  No. |
| 12:02:50 | 18 | Q.  Is that -- Would -- If there are such |
| 12:02:54 | 19 | communications, would -- would looking at those help |
| 12:02:58 | 20 | refresh your recollection about communications with |
| 12:03:02 | 21 | Mr. Payan? |
| 12:03:04 | 22 | MR. CLEELAND:  So you're asking him to |
| 12:03:06 | 23 | speculate as to whether he looked at a document that |
| 12:03:07 | 24 | he can't identify would assist him in recollections? |
| 12:03:12 | 25 | MR. ESPO:  I'm asking him whether, if there |



Case 2:17-cv-01697-SVW-SK   Document 485-1   Filed 02/03/23   Page 72 of 100   Page ID
#:1395
30(b)(6) of LACCD                    Los Angeles Community College District                    1115477

12:03:13  1    were emails that he could look at, would that assist

12:03:16  2    him in rec- -- recalling communications about Mr. --

12:03:22  3    with or about Mr. Payan?

12:03:24  4        MR. CLEELAND:  I think that's what I said.  It

12:03:25  5    would seem to call for speculation.  So object as to

12:03:27  6    the form of the question --

12:03:28  7        MR. ESPO:  That's fine.

12:03:28  8        MR. CLEELAND:  -- insofar as it calls for

12:03:29  9    speculation.

12:03:30  10        Can you answer his question?

12:03:32  11        THE WITNESS:  Are we talking about recent, in

12:03:35  12    the -- in the last couple days or couple weeks?

12:03:38  13    Or...

12:03:39  14    BY MR. ESPO:

12:03:41  15        Q.  Is there a time -- Well, is there a time

12:03:44  16    when you've looked for emails with or about

12:03:46  17    Mr. Payan?

12:03:51  18        A.  Not -- Not that I can recollect.

12:03:58  19        Q.  Okay.

12:04:16  20        Topic 22 is the reason Los Angeles

12:04:19  21    Community College District did not provide Mr. Payan

12:04:23  22    with a notetaker or reader for Statistics 227.

12:04:32  23        So let me ask you first:  Do you agree that

12:04:42  24    Mr. Payan was not provided a reader for Statistics

12:04:45  25    227?

72



| | | |
|---|---|---|
| 12:04:49 | 1 | A.  A reader or a notetaker? |
| 12:04:51 | 2 | Q.  I'm sorry.  A notetaker. |
| 12:04:59 | 3 | A.  I don't have -- I'm not privy to that |
| 12:05:03 | 4 | information.  I wouldn't know if he had a -- a |
| 12:05:05 | 5 | notetaker or not. |
| 12:05:06 | 6 | Q.  Who would know that? |
| 12:05:09 | 7 | A.  Mr. Payan. |
| 12:05:11 | 8 | Q.  Other than Mr. Payan, who would know |
| 12:05:13 | 9 | whether he had a notetaker? |
| 12:05:21 | 10 | A.  Somebody working with him.  Possibly his |
| 12:05:24 | 11 | tutor. |
| 12:05:31 | 12 | For the Stats 227 class, I know we provided |
| 12:05:34 | 13 | him with extensive tutoring. |
| 12:05:41 | 14 | Q.  Looking at -- If Mr. Payan believed he |
| 12:05:45 | 15 | needed a notetaker for Statistics 227, how would |
| 12:05:50 | 16 | he -- is that part of -- Strike that. |
| 12:05:58 | 17 | Is providing -- Let me start all over. |
| 12:06:01 | 18 | Is -- Is assisting in the provision of |
| 12:06:04 | 19 | notetakers to students part of OSS's job? |
| 12:06:09 | 20 | A.  We can assist students with acquiring |
| 12:06:13 | 21 | notetakers. |
| 12:06:14 | 22 | Q.  Okay.  And if Mr. Payan believed he needed |
| 12:06:18 | 23 | a notetaker for that class, where, if anywhere, |
| 12:06:24 | 24 | would that be noted in his OSS file? |
| 12:06:31 | 25 | A.  He would -- If he requested a notetaker, he |

73

Case 2:17-cv-01697-SVW-SK   Document 485-1   Filed 02/03/23   Page 74 of 100   Page ID
#:1397
30(b)(6) of LACCD                    Los Angeles Community College District                    1115477

| | | |
|---|---|---|
| 12:06:34 | 1 | would -- he would notify us that he was requesting |
| 12:06:37 | 2 | note-taking services. |
| 12:07:05 | 3 | (A document is marked by the reporter |
| 12:07:05 | 4 | as Defense Exhibit 12 for identification |
| 12:07:05 | 5 | and is attached hereto.) |
| | 6 | BY MR. ESPO: |
| 12:07:06 | 7 | Q.  Will you take a look at Exhibit 12, |
| 12:07:08 | 8 | Mr. Dominick.  Let me know when you've had a chance |
| 12:07:12 | 9 | to review it. |
| 12:07:13 | 10 | A.  I have. |
| 12:07:15 | 11 | Q.  This is an Academic Accommodations |
| 12:07:18 | 12 | Authorization -- No.  Actually, this isn't even the |
| 12:07:25 | 13 | same class. |
| 12:07:31 | 14 | (A discussion is held off the record from |
| 12:07:31 | 15 | 12:07 p.m. to 12:07 p.m.) |
| 12:07:37 | 16 | BY MR. ESPO: |
| 12:07:38 | 17 | Q.  This is a request for -- I'm sorry.  This |
| 12:07:41 | 18 | is a document noting the approval of certain |
| 12:07:44 | 19 | accommodations for Mr. Payan in a social- -- in a |
| 12:07:51 | 20 | sociology class; correct? |
| 12:07:52 | 21 | A.  Correct. |
| 12:07:52 | 22 | Q.  Okay.  And it notes on it that he has been |
| 12:07:56 | 23 | approved for note-taking assistance; correct? |
| 12:08:02 | 24 | A.  Correct. |
| 12:08:02 | 25 | And then if you come down and look at the |



Kusar ® Keeping Your Word Is Our Business℠

```
12:08:06  1   subtitles, looks like he can record (indicating).

12:08:10  2   Some of our students audio record; they visual

12:08:13  3   record.  In Roy's situation, he could audio record.

12:08:16  4        We give that -- We give out this

12:08:19  5   accommodation because some professors say, "There's

12:08:21  6   no recording in my class.  Please put your phones

12:08:23  7   away."

12:08:24  8        But if we give an accommodation to a

12:08:26  9   student, they're -- they're exempt.  They're allowed

12:08:29 10   to record in class.

12:08:35 11        Q.  If -- is -- If what the student requests is

12:08:40 12   a human notetaker --

12:08:42 13        A.  Okay.

12:08:42 14        Q.  -- rather than recording --

12:08:44 15        A.  Sure.

12:08:45 16        Q.  -- would that be noted somewhere on the --

12:08:47 17   assuming it's approved, would that be noted on the

12:08:49 18   accommodations authorization?

12:08:52 19        A.  Yes.  You could put that down.  I do that

12:08:54 20   on a regular basis with students that have

12:08:57 21   notetakers that go to class with them.

12:08:59 22        Q.  Okay.  And where specifically would it

12:09:01 23   be --

12:09:01 24        A.  At the bottom where it says, "Other," I

12:09:03 25   might have somebody go to class, say that there will
```



```
12:09:05  1   be a person in class taking notes.  Could be a

12:09:09  2   person that's associated with them, with the

12:09:11  3   Department of Rehabilitation, could be somebody we

12:09:13  4   assigned.  It's possible a classmate would take

12:09:18  5   notes for them.

12:09:19  6        And there's a place up there for classmate

12:09:21  7   notes also, if we get a volunteer notetaker in

12:09:25  8   class.

12:09:25  9        Q.  In 2016, did OSS provide notetakers to

12:09:35 10   Mr. Payan?

12:09:42 11        A.  What's the date again?

12:09:45 12        Q.  2016.

12:09:46 13        A.  Okay.  Would it be the winter --

12:09:49 14        Q.  Any portion --

12:09:49 15        A.  -- spring --

12:09:50 16        Q.  -- of 2016?

12:09:53 17        A.  -- summer, fall?

12:09:57 18        I -- I wouldn't have access to that

12:09:59 19   information at this time.

12:10:01 20        Q.  Well, in 2016, did OSS provide notetakers

12:10:15 21   to anybody at LACC?

12:10:20 22        A.  We have students on a regular basis that

12:10:22 23   have notetakers that go to class with them.

12:10:25 24        Q.  How are those notetakers selected?

12:10:27 25        A.  A variety of ways.
```



Los Angeles Community College District

```
12:10:29   1          We have students that are -- Many of our
12:10:34   2   blind students -- If you want to get specific with
12:10:36   3   our blind students, they're -- they're clients of
12:10:38   4   Department of Rehabilitation.  The Department of
12:10:41   5   Rehab will fund notetakers.  They'll pay $10 a hour
12:10:45   6   or 10.50 an hour for a student to go to class and --
12:10:48   7   and take notes with that student.
12:10:50   8          Or it could be an outside party that comes
12:10:52   9   in, and they get -- It's a third-party contract they
12:10:57  10   sign with the Department of Rehab, and they are paid
12:10:59  11   to take notes for students.
12:11:00  12          So I have students that go to class with
12:11:03  13   other people that are paid by rehab to take notes
12:11:05  14   for them in class.
12:11:08  15          It's possible a student gets a volunteer
12:11:10  16   just to go to class with them to take notes.  I'll
12:11:13  17   put that on the accommodation letter, that there
12:11:15  18   will be another student in class with that -- or
12:11:17  19   person in class with that student to take notes on a
12:11:19  20   volunteer basis.
12:11:21  21          And we have a note-taking procedure where
12:11:24  22   we give a -- a statement to the instructor to see if
12:11:28  23   they can find a volunteer in class to take notes for
12:11:31  24   the student.
12:11:33  25       Q.  Was there a time when LACCD paid
```

Kusar® *Keeping Your Word Is Our Business℠*

```
12:11:36   1    notetakers?

12:11:39   2        A.  I've been there since 2010.  So since my

12:11:42   3    time there, no.

12:11:58   4        Q.  If a student requests a notetaker and the

12:12:11   5    counselor doesn't believe it's warranted, would that

12:12:18   6    request be -- Strike that.

12:12:20   7            As a matter of policy, if a student

12:12:23   8    requests a notetaker and the OSS counselor doesn't

12:12:28   9    believe it's warranted, should that be documented in

12:12:31  10    the log?

12:12:34  11        A.  I would probably put something down.  I

12:12:37  12    would note it.

12:12:38  13            If a student wanted a notetaker, and we had

12:12:41  14    some other types of means to take notes, I would

12:12:45  15    probably go over some of the alternative ways to get

12:12:48  16    the notes, whether it be from -- directly from the

12:12:51  17    instructor, or if they could find another modality.

12:12:55  18            But we would -- we would offer alternatives

12:12:58  19    for notetakers.  But if they specifically wanted a

12:13:00  20    notetaker, then we would try to assist them to

12:13:04  21    obtain a notetaker.

12:13:05  22        Q.  Well, as a -- Let me ask it more generally.

12:13:09  23            As a general matter, if a student wants an

12:13:13  24    accommodation that the OSS counselor just thinks

12:13:18  25    isn't appropriate, for whatever reason, is the
```

Kusar ® Keeping Your Word Is Our Business℠

Case 2:17-cv-01697-SVW-SK   Document 485-1   Filed 02/03/23   Page 79 of 100   Page ID
#:11402
30(b)(6) of LACCD                    Los Angeles Community College District                1115477

12:13:24  1   request noted in the log, even though, because the

12:13:28  2   counselor doesn't think it's appropriate, it's not

12:13:31  3   actually listed on the Academic Accommodations

12:13:34  4   Authorization letter?

12:13:36  5       A.  If I was consulting a student, and I had

12:13:39  6   him in my office, and something like that came up, I

12:13:41  7   would -- I would probably put a note of that, sure

12:13:44  8   (indicating).

12:13:49  9       Q.  Is there an office policy that sets out

12:13:55 10   what information is supposed to be put into the log?

12:14:06 11       A.  Our log is basically for our edifice as

12:14:11 12   counselors.  A student come in, it's -- I like to

12:14:16 13   open up their log and go back to see what I've

12:14:18 14   worked with them in the past so I can hopefully stay

12:14:22 15   in some sequential advisement with them.

12:14:29 16           Is there any protocol that we follow for

12:14:32 17   taking notes?  Basically, the log is -- it's a

12:14:36 18   document that our staff has access to and,

12:14:40 19   basically, it's for your -- it's for a counselor.

12:14:44 20       Q.  I understand that.  But in -- in the

12:14:47 21   training of OSS employees, is there -- are -- are

12:14:55 22   they told, "Here's the kind of information that must

12:14:59 23   be in the log"?

12:15:09 24       A.  When a student comes in, I usually put the

12:15:12 25   date down, and I just try to put a few comments



Case 2:17-cv-01697-SVW-SK   Document 485-1   Filed 02/03/23   Page 80 of 100   Page ID
#:11403
30(b)(6) of LACCD                    Los Angeles Community College District                    1115477

12:15:15  1    about what was talked about at that particular

12:15:19  2    counseling session, whether it be one topic or

12:15:22  3    possibly more than one topic, and it's noted here on

12:15:25  4    the log.

12:15:26  5              As far as formal training for that, I've

12:15:28  6    never had any formal training.

12:15:31  7         Q.  Have you given any formal training to any

12:15:34  8    other counselor?

12:15:38  9         A.  On the log?

12:15:39 10         Q.  Yes.

12:15:39 11         A.  No.

12:15:40 12         Q.  Is there a form -- Is there a specific form

12:15:43 13    to fill out if an accommodation is refused?

12:15:50 14         A.  If a student was emphatic about the fact

12:15:54 15    that we were ref- -- refusing them an accommodation,

12:15:57 16    I would give them the -- the direction of how to go

12:16:02 17    ahead and appeal that, or they -- they could -- they

12:16:05 18    could grieve that.

12:16:08 19         Q.  And are they -- Are you familiar with the

12:16:38 20    OSS website?

12:16:43 21         A.  Yes.

12:16:44 22         Q.  With the contents of the website?

12:16:46 23         A.  Yes.

12:16:47 24         Q.  And are you familiar with the contents of

12:16:53 25    the process for note-taking?



Case 2:17-cv-01697-SVW-SK   Document 485-1   Filed 02/03/23   Page 81 of 100   Page ID
#:11404
30(b)(6) of LACCD                    Los Angeles Community College District                    1115477

12:16:57  1        A.   I believe there's a -- there's a statement

12:17:01  2   on there, our policy for requesting a notetaker.

12:17:05  3        Q.   And it begins with getting an accommodation

12:17:11  4   letter?

12:17:14  5        A.   I'd have to -- If I -- If I could view it,

12:17:16  6   I would have a better idea on it.

12:17:19  7        MR. ESPO:  Sure.  Let's unplug it.

12:17:28  8        MS. BARBOSA:  There you go (indicating).

12:17:31  9        MR. ESPO:  We're not going to -- We're not

12:17:33 10   going to mark this as an exhibit because Ms. Barbosa

12:17:37 11   would like to take it home with her.

12:17:39 12   BY MR. ESPO:

12:17:39 13        Q.   But let -- let me give you her computer.

12:17:54 14             When you've had a chance to look at it, let

12:17:56 15   me know.

12:17:57 16             Counsel, I'll wait for you, too.

12:18:04 17        MR. CLEELAND:  And it's specifically to the

12:18:05 18   note-taking services?

12:18:11 19        MR. ESPO:  Yes.

12:18:12 20        MR. CLEELAND:  Thank you.

12:18:13 21        MR. ESPO:  That's what I am going to be asking

12:18:14 22   him about.

12:18:46 23        THE WITNESS:  Okay.

12:18:46 24   BY MR. ESPO:

12:18:46 25        Q.   Have you had --



Case 2:17-cv-01697-SVW-SK   Document 485-1   Filed 02/03/23   Page 82 of 100   Page ID
#:11405
30(b)(6) of LACCD                          Los Angeles Community College District                          1115477

12:18:47    1          A.   Yes.

12:18:47    2          Q.   -- a chance to review that?

12:18:50    3               Counsel, are you ready?

12:18:51    4          MR. CLEELAND:  Yes.  Go right ahead.  Thank

12:18:52    5   you.

12:18:52    6   BY MR. ESPO:

12:18:52    7          Q.   Mr. Dominick, is the information that you

12:18:56    8   just looked at on the computer the current -- do you

12:19:02    9   recognize it as the current -- as a portion of the

12:19:06   10   current OSS website, web page?

12:19:09   11          A.   It looks like our website, yes.

12:19:11   12          Q.   Okay.  And it -- it has a "What to do if

12:19:14   13   you are approved for a notetaker"?

12:19:16   14          A.   Yeah.  If you're a student and you're

12:19:17   15   requesting a notetaker, this is our policy

12:19:20   16   (indicating).

12:19:20   17          Q.   And the policy is that the student is

12:19:22   18   supposed to approach the professor and ask for a

12:19:24   19   volunteer?

12:19:25   20          A.   Yes.  We give them -- In fact, we also give

12:19:27   21   them a handout.  They can give the handout to the

12:19:30   22   professor.  It's got the same information on here

12:19:31   23   (indicating).

12:19:32   24          Q.   Okay.  Does the policy say anything about

12:19:38   25   DVR notetakers?



Case 2:17-cv-01697-SVW-SK   Document 485-1   Filed 02/03/23   Page 83 of 100   Page ID
#:11406
30(b)(6) of LACCD                    Los Angeles Community College District                    1115477

| | | |
|---|---|---|
| 12:19:46 | 1 | A.  No. |
| 12:19:48 | 2 | Q.  Does the policy say what to do if there are |
| 12:19:51 | 3 | no volunteers in the class? |
| 12:20:01 | 4 | A.  Yes.  We -- We've done a good job of |
| 12:20:05 | 5 | resolving that, but it says if the instructor can't |
| 12:20:08 | 6 | find a volunteer notetaker, the student is to come |
| 12:20:11 | 7 | back and contact us in OSS.  And we have done a |
| 12:20:14 | 8 | pretty good job of resolving that, though. |
| 12:20:17 | 9 | Q.  And what do you mean "resolving that"? |
| 12:20:19 | 10 | A.  "Any of you want to volunteer to take notes |
| 12:20:21 | 11 | here?" |
| 12:20:21 | 12 | And nobody wants to raise their hand.  So |
| 12:20:24 | 13 | we -- we had an instructor come to us, and he said, |
| 12:20:26 | 14 | "You know, I was having issues with that." |
| 12:20:27 | 15 | He volunteered some extra credit for |
| 12:20:30 | 16 | students in class if they would volunteer to |
| 12:20:32 | 17 | note-take.  And he got about 30 hands up in the air. |
| 12:20:35 | 18 | So that took care of that. |
| 12:20:37 | 19 | But we -- we have professors that will |
| 12:20:39 | 20 | contact us and say, "I" -- "I've tried to get a |
| 12:20:41 | 21 | notetaker," and they're at wit's end.  So we try to |
| 12:20:44 | 22 | offer them the idea of maybe offering some extra |
| 12:20:47 | 23 | credit and get somebody in class.  Usually like to |
| 12:20:50 | 24 | get two volunteers in class, in case one person is |
| 12:20:53 | 25 | out. |

Kusar  Keeping Your Word Is Our Business℠

Case 2:17-cv-01697-SVW-SK   Document 485-1   Filed 02/03/23   Page 84 of 100   Page ID
#:11407
30(b)(6) of LACCD                    Los Angeles Community College District                    1115477

12:20:57   1            But that's our volunteer note-taking policy

12:21:01   2   (indicating).

12:21:02   3       Q.  Here, why don't we --

12:21:03   4       A.  Yeah.

12:21:03   5       Q.  -- move that to clean up the camera view.

12:21:20   6            So is it -- I just want to come back to

12:21:25   7   Topic 22.

12:21:30   8            Can you testify today about why LACCD did

12:21:35   9   not provide Mr. Payan with a notetaker or reader for

12:21:40  10   Statistics 227?

12:21:42  11       A.  No.

12:21:44  12       Q.  You -- You don't know the answer to that?

12:21:46  13       A.  (Shakes head in the negative.)

12:21:47  14       Q.  You have to verbal- --

12:21:49  15       A.  No, I don't know the answer to that.

12:21:50  16       Q.  Okay.

12:21:52  17            And why didn't LACCD provide Portia Mason

12:21:59  18   for -- with a notetaker for any of her classes?

12:22:06  19       A.  That, I'd have to take a look at her

12:22:08  20   student log and her accommodation letters.

12:22:10  21            I don't have enough information to answer

12:22:11  22   that question.

12:22:12  23       Q.  Okay.  And -- And is that also the case

12:22:15  24   with respect to why Ms. Mason was not provided with

12:22:20  25   a reader for any of her classes?

Kusar ® Keeping Your Word Is Our Business℠

Case 2:17-cv-01697-SVW-SK   Document 485-1   Filed 02/03/23   Page 85 of 100   Page ID
#:11408
30(b)(6) of LACCD                    Los Angeles Community College District                    1115477

```
12:22:25  1         A.   And what would the reader -- How would the

12:22:28  2    reader assist the student?

12:22:30  3         Q.   In -- In any -- For any purpose.

12:22:35  4         A.   To accompany the student to class?

12:22:39  5              Or are you talking about when she took an

12:22:41  6    exam, in OSS, that somebody would read the exam to

12:22:44  7    her?

12:22:44  8              We do have that accommodation.

12:22:47  9         Q.   Do you know whether that accommodation was

12:22:49 10    provided to Ms. Mason --

12:22:53 11         A.   I'd have to --

12:22:54 12         Q.   -- specifically?

12:22:55 13         A.   -- take a look at her -- I'd have to take a

12:22:57 14    look at her student education contract.  Again,

12:22:59 15    that's a contract that we first fill out and talk

12:23:02 16    about functional limitations and then approved

12:23:04 17    accommodations.

12:23:05 18              And from that, I would also have to take a

12:23:07 19    look at her accommodation let- -- for that

12:23:10 20    specific -- the accommodation letter for that

12:23:10 21    specific class.

12:23:12 22         Q.   Did you understand that you were going to

12:23:15 23    be asked to testify about the provision of readers

12:23:20 24    to -- I'm sorry -- the provision of a notetaker for

12:23:24 25    Mr. Payan today?
```



85

| | | |
|---|---|---|
| 12:23:27 | 1 | A.  I received -- I read this ahead of time |
| 12:23:29 | 2 | (indicating).  So I knew the statement here. |
| 12:23:31 | 3 | Q.  Okay. |
| 12:23:32 | 4 | And what, if anything, did you do so that |
| 12:23:34 | 5 | you would be able to answer that question? |
| 12:23:37 | 6 | A.  I didn't review anything; I just came here. |
| 12:23:41 | 7 | And I didn't pull out any files and review |
| 12:23:44 | 8 | any information. |
| 12:24:03 | 9 | MR. ESPO:  Go off the record. |
| 12:24:05 | 10 | THE VIDEOGRAPHER:  Going off the record at |
| 12:24:06 | 11 | 12:24. |
| 12:34:00 | 12 | (A recess is taken from 12:24. p.m. to |
| 12:34:00 | 13 | 12:34 p.m.) |
| 12:34:26 | 14 | THE VIDEOGRAPHER:  We're back on the record at |
| 12:34:35 | 15 | 12:34. |
| 12:34:36 | 16 | Please continue. |
| 12:34:37 | 17 | BY MR. ESPO: |
| 12:34:38 | 18 | Q.  Is -- Is there any form of electronic log |
| 12:34:49 | 19 | kept in OSS about its students, or is the paper log, |
| 12:34:53 | 20 | of which we have one page (indicating) -- or half of |
| 12:34:56 | 21 | as Exhibit 11, the only one? |
| 12:34:59 | 22 | A.  When a student comes into the office, |
| 12:35:03 | 23 | they're on the SARS schedule.  That's an electronic |
| 12:35:07 | 24 | scheduling device we use for counselors.  So |
| 12:35:11 | 25 | their -- their appointment is that they are |



12:35:14   1    scheduled.

12:35:15   2           And then when they show up, we click on

12:35:18   3    that they have shown up.  They come in for the

12:35:20   4    appointment.

12:35:22   5           We have a sign-in -- I have a -- a sheet on

12:35:25   6    my desk that I keep a daily log of every single

12:35:29   7    student that comes in my office that I serve, or if

12:35:31   8    I give them a counseling service via phone message

12:35:35   9    or email, they go onto that list.

12:35:38  10           We also go into our SIS system, our student

12:35:44  11    information system, and we log in the contact there

12:35:46  12    with various types of contacts and services we

12:35:49  13    provide students.  And that information that we put

12:35:52  14    into SIS, that's for our M- -- our MIS reporting to

12:35:55  15    the State of California.

12:35:58  16       Q.  Okay.  The SAR- -- Is the SARS schedule

12:36:05  17    retained?

12:36:06  18       A.  Yes.  There's a history on SARS.  You can

12:36:09  19    go back and look at SARS.

12:36:17  20           There may be one more electrical document

12:36:20  21    that we engage in that day.  We what we call a

12:36:22  22    student education plan where we put the student

12:36:25  23    education plan -- it's on an electronic program on

12:36:29  24    our computer.  It -- It's saved by counselor so we

12:36:32  25    can open it up, and then we usually produce a paper

Case 2:17-cv-01697-SVW-SK   Document 485-1   Filed 02/03/23   Page 88 of 100   Page ID
#:14111
30(b)(6) of LACCD                    Los Angeles Community College District                    1115477

12:36:35  1    copy and give to it the student.  Or we can save it

12:36:38  2    and email it to the student.

12:36:48  3         Q.  The lists that you keep on your desk, do

12:36:51  4    you retain those?

12:36:52  5         A.  Yes.  Those are kept up in our records

12:36:56  6    area.

12:37:08  7         Q.  And is there a way of retrieving the

12:37:12  8    information that's in the SIS?

12:37:17  9         A.  Yes.  Let's see.

12:37:19 10         The SIS system -- We can go into the SIS

12:37:24 11    system and look at all the contacts throughout

12:37:26 12    campus, whether they go to financial aid, OSS,

12:37:29 13    general counseling.  But there's -- there's a record

12:37:31 14    of contacts.  When they come in contact with us, we

12:37:34 15    enter that.  We enter it under the DSPS screen.

12:37:39 16         And the students are identified on DEC

12:37:44 17    screen 275.  That's the --

12:37:45 18         THE REPORTER:  "Deck"?

12:37:45 19         THE WITNESS:  DEC, D-E-C, DEC 275, and that's

12:37:48 20    our -- our disability screen where they're marked

12:37:50 21    with the disability or multiple disabilities.  That

12:37:53 22    let's them know they're part of the OSS or DSPS

12:37:57 23    office program.

12:37:58 24         And then there's another section that's got

12:38:01 25    contacts of what happened.



Case 2:17-cv-01697-SVW-SK   Document 485-1  Filed 02/03/23   Page 89 of 100   Page ID
#:14112
30(b)(6) of LACCD                    Los Angeles Community College District                    1115477

12:38:03  1          There could be a contact of just

12:38:05  2   counseling, advising.

12:38:07  3          We could have worked on an ed plan.

12:38:09  4          We could have done some other types of

12:38:11  5   services.

12:38:12  6          But there's a list of services we can input

12:38:14  7   electronically on -- on our DEC screen.

12:38:16  8      Q.  What is DSPS?

12:38:19  9      A.  DSPS, that's the common term that's used

12:38:22 10   throughout the State of California for colleges so

12:38:25 11   the disabled student services and programs.

12:38:29 12          We call our office -- A lot of the colleges

12:38:31 13   over the years have changed their DSPS office to a

12:38:35 14   different term.

12:38:36 15          So Cal State L.A., I think they use the

12:38:40 16   Office of Disability.

12:38:42 17          We use OSS, the Office of Special Services.

12:38:45 18          So it varies.  But DSPS is the acronym for

12:38:50 19   disabled student services.

12:38:54 20      Q.  Are emails among faculty -- referring now

12:38:59 21   to emails that include OSS somewhere in the chain --

12:39:04 22   about OSS students retained?

12:39:10 23      A.  I -- I have a history of my emails, yeah.

12:39:13 24          So I -- I -- I usually have to clean out my

12:39:17 25   emails once a year.  It says that my emails are


Kusar  Keeping Your Word Is Our Business℠

Case 2:17-cv-01697-SVW-SK   Document 485-1   Filed 02/03/23   Page 90 of 100   Page ID
#:11413
30(b)(6) of LACCD                    Los Angeles Community College District                    1115477

12:39:20  1    filled.  So I have to go ahead and clean out my

12:39:23  2    mailbox.

12:39:23  3            But I -- I usually carry my emails for

12:39:26  4    about a year.  Usually once a year it tells me

12:39:29  5    through Outlook that I need to -- my -- I get to my

12:39:31  6    capacity, and I have to delete my emails.

12:39:35  7        Q.  Do you know what the LACCD policy is on

12:39:43  8    retention of electronic information?

12:39:47  9        A.  No, I don't know that.

12:39:49 10        Q.  Do you know whether there are electronic

12:39:54 11    backups of historical --

12:39:57 12        A.  I believe so.

12:39:59 13        Q.  -- data?

12:39:59 14        A.  I think they -- they're able to retrieve

12:40:01 15    information I've deleted.  I just can't retain it in

12:40:05 16    my area because it tells me I'm getting to my

12:40:08 17    maximum capacity.

12:40:11 18        Q.  Yeah.  I'm -- I'm familiar with that.

12:40:16 19            Are copies of the handwritten logs ever

12:40:19 20    provided to students?

12:40:25 21        A.  If they request them, I'd give them a copy,

12:40:27 22    sure.  It's their file.

12:40:29 23            But the file is a confidential document

12:40:31 24    that we keep in our office.  We keep it under lock

12:40:33 25    and key during the day.



Kusar ® Keeping Your Word Is Our Business℠

| | | |
|---|---|---|
| 12:40:35 | 1 | We -- We go retrieve the file.  We use it. |
| 12:40:37 | 2 | And after the file is used by the student, we |
| 12:40:40 | 3 | usually walk back up to our file cabinet and put it |
| 12:40:43 | 4 | back into the cabinet. |
| 12:40:44 | 5 | We don't like to leave the information -- |
| 12:40:47 | 6 | I'll -- I'll pull my files out for the day.  I'll |
| 12:40:50 | 7 | keep them in a secluded area of my office, and I'll |
| 12:40:52 | 8 | pull them out one at a time as my students come in. |
| 12:40:55 | 9 | But after I see the student, I usually walk the file |
| 12:40:58 | 10 | out to the storage area. |
| 12:41:00 | 11 | Q.  I have, I think, one more document I want |
| 12:41:03 | 12 | to ask you about -- Hang on one second. |
| 12:41:06 | 13 | A.  Sure. |
| 12:41:53 | 14 | (A document is marked by the reporter |
| 12:41:53 | 15 | as Defense Exhibit 13 for identification |
| 12:41:53 | 16 | and is attached hereto.) |
| 12:41:56 | 17 | (A discussion is held off the record from |
| 12:41:56 | 18 | 12:41 p.m. to 12:43 p.m.) |
| 12:43:01 | 19 | BY MR. ESPO: |
| 12:43:02 | 20 | Q.  Okay.  Have you had a chance to look at |
| 12:43:03 | 21 | what's been marked as Exhibit 13? |
| 12:43:06 | 22 | A.  I did. |
| 12:43:06 | 23 | Q.  What is that? |
| 12:43:09 | 24 | A.  It's a log of -- LS43 is our assistive |
| 12:43:15 | 25 | technology class.  We teach a class called Learning |


Kusar® Keeping Your Word Is Our Business℠

```
12:43:19  1   Skills 43.  It's a one-unit class.  When students
12:43:21  2   come to L.A. City College, many of them aren't up to
12:43:25  3   speed.  Many of the students that come to
12:43:27  4   Los Angeles City College, they aren't up to speed on
12:43:30  5   technology, assistive technology, or just attributes
12:43:35  6   of being a college student.
12:43:37  7          And what we do is we try to -- to enroll
12:43:40  8   them in a course and at least get their feet wet and
12:43:43  9   introduce them to the college system.
12:43:45  10         So the Learning Skills 43 class can be
12:43:48  11  repeated as many times as you want to take it.
12:43:52  12         We may keep our students here (indicating)
12:43:55  13  for a number of semesters.  It's possible a student
12:43:59  14  gets pulled out of a class; they're not doing well.
12:44:02  15         It's not much the academic part; they're
12:44:05  16  just not up to speed on being a college student and
12:44:08  17  having the attributes to use technology and so
12:44:10  18  forth.
12:44:11  19         The 900, I'm not too sure about.  Is that
12:44:14  20  for -- That could be for tutoring, or that could
12:44:18  21  just be for going into the lab and putting in lab
12:44:21  22  time.
12:44:21  23         So if you go into our High Tech Center,
12:44:23  24  you're -- you are requested to sign in just to use
12:44:26  25  the High Tech Center.
```

Kusar  Keeping Your Word Is Our Business℠

| | | |
|---|---|---|
| 12:44:28 | 1 | The Learning Skills 43, that's a classroom |
| 12:44:30 | 2 | where you actually attend twice a week, an hour each |
| 12:44:33 | 3 | day or two hours. |
| 12:44:35 | 4 | It's possible -- These other contacts, I'm |
| 12:44:38 | 5 | not too familiar with.  They could either be for use |
| 12:44:39 | 6 | in the computer lab or they could possibly be for |
| 12:44:42 | 7 | tutoring.  I'm -- I'm not too sure. |
| 12:44:44 | 8 | Q.  But they -- but that Exhibit 13 doesn't |
| 12:44:49 | 9 | reflect, or does it reflect each time that Mr. Payan |
| 12:44:54 | 10 | came in for counseling? |
| 12:44:58 | 11 | MR. CLEELAND:  Certainly not this one.  It's |
| 12:44:59 | 12 | for Ms. Mason. |
| 12:45:00 | 13 | MR. ESPO:  Oh, I'm sorry.  Well -- |
| 12:45:01 | 14 | BY MR. ESPO: |
| 12:45:03 | 15 | Q.  Does that log reflect each time Ms. Mason |
| 12:45:06 | 16 | came in for counseling, or is that somewhere else? |
| 12:45:10 | 17 | A.  It's not counseling (indicating), no. |
| 12:45:12 | 18 | Q.  Okay. |
| 12:45:14 | 19 | If you could just turn back to Exhibit 11. |
| 12:45:24 | 20 | Now, I know we have a little trouble in |
| 12:45:27 | 21 | being 100 percent certain about what this is, |
| 12:45:30 | 22 | because we seem to be missing the first page. |
| 12:45:35 | 23 | But do -- Do you see that the top line is |
| 12:45:39 | 24 | dated March 16th, 2016? |
| 12:45:44 | 25 | A.  Yes. |



```
12:45:44   1        Q.  And the last entry is 5-22-2017; correct?

12:45:50   2        A.  Yes.

12:45:51   3        Q.  Is -- Is the -- Is the size of the -- for

12:46:01   4   the number of entries on Exhibit 11 typical, in your

12:46:09   5   understanding, of how often students come in?

12:46:12   6        A.  I'm perusing it now.  Looks like we went

12:46:15   7   from spring (indicating), start of summer, and into

12:46:21   8   fall, and into spring of the -- '17.

12:46:26   9            So I'm -- I'm looking at this by semester.

12:46:27  10   Students come in two or three times per a semester.

12:46:31  11   That could be considered normal.

12:46:33  12            I have students come in and see me ten

12:46:36  13   times a semester.  I have some students that email

12:46:38  14   me once and never come and see me.

12:46:40  15            So it -- there's a broad spectrum of

12:46:42  16   students as far as their independence.

12:46:45  17        Q.  And I -- Although it does not have his

12:46:47  18   name, I will represent to you that this was produced

12:46:50  19   by LACCD in this litigation.  So...

12:47:05  20            Do you -- Or is it the policy in the

12:47:07  21   department to record on the log email exchanges?

12:47:15  22        A.  Depends.  So if I receive a -- a phone call

12:47:17  23   just for an exchange of information, no.

12:47:19  24            If I receive an email and you're asking me

12:47:21  25   a question, I'll send you back the question.
```



```
12:47:23  1          If you call or if you email for services,
12:47:25  2  we have to actually print out an accommodation
12:47:28  3  letter, give you a TAP card for the -- T-A-P -- a
12:47:32  4  TAP card for Metro bus.
12:47:35  5          You're asking for a letter for the
12:47:37  6  Department of Rehabilitation, you're asking for any
12:47:40  7  type of service that we have to provide for you,
12:47:43  8  that needs to be documented.
12:47:45  9          So it's possible that you email me for your
12:47:48 10  accommodation letters, we never see eye to eye, but
12:47:50 11  it's -- it's recorded, and it's recorded in all
12:47:53 12  those areas I told you.
12:47:54 13      Q.  Okay.
12:47:55 14          And -- But you, as a matter of practice,
12:48:01 15  don't print out the email and stick that in with the
12:48:04 16  log?
12:48:05 17      A.  No.  It's -- It's recorded in the computer,
12:48:07 18  and it's -- I'll -- I'll delete the email I
12:48:12 19  received.  As soon as I send it, I'll delete the one
12:48:14 20  I received, and the sent one is the -- is the
12:48:18 21  official copy that I'll go back and refer to.
12:48:29 22      MR. ESPO:  Subject to discussion with counsel,
12:48:31 23  possibly at some other time about some of the --
12:48:38 24  whether some of the topics have been adequately
12:48:41 25  addressed, I have no additional questions at this
```



```
12:48:44  1   time.

12:48:45  2        MR. CLEELAND:  Thank you.

12:48:47  3        THE WITNESS:  Thank you.

12:48:49  4        MR. ESPO:  And I'm going to let the two of

12:48:51  5   you --

12:48:56  6        MS. BARBOSA:  At this time, I'd like to

12:48:57  7   stipulate to relieve the court reporter of her

12:48:59  8   responsibility to maintain the original documents.

12:49:02  9        The original transcript will go to defense

12:49:05 10   counsel, who will then provide it to the deponent.

12:49:10 11        Mr. Cleeland, can we have the two-week

12:49:13 12   turnaround time again?

12:49:16 13        MR. CLEELAND:  Do you want to go off the

12:49:17 14   videotape?

12:49:18 15        MR. ESPO:  Sure.

12:49:19 16        THE VIDEOGRAPHER:  We're going off the record

12:49:20 17   at 12:49.

12:49:24 18        MR. ESPO:  If you want to work this out

12:49:26 19   completely off the record, that's fine, too.

12:49:28 20        MR. CLEELAND:  Yeah.

12:49:28 21        MR. ESPO:  So we can go off the record.

12:49:30 22        (A discussion is held off the record from

12:49:48 23        12:49 p.m. to 12:49 p.m.)

12:49:50 24        MR. ESPO:  Back on the record.

12:50:23 25        THE VIDEOGRAPHER:  We're back on record at
```

96



Case 2:17-cv-01697-SVW-SK   Document 485-1   Filed 02/03/23   Page 97 of 100   Page ID
#:11420
30(b)(6) of LACCD                    Los Angeles Community College District                    1115477

12:50:24  1    12:50.

12:50:26  2        MS. BARBOSA:  To continue the stipulation, the

12:50:30  3    deponent, Mr. Dominick, agrees to give any changes,

12:50:34  4    if he has any changes to the transcript, two weeks

12:50:37  5    after receiving it.

12:50:39  6        We also stipulate that should the original

12:50:41  7    be lost or destroyed, the parties agree that we may

12:50:44  8    use the certified transcript as the original for any

12:50:47  9    purpose.

12:50:48 10        MR. CLEELAND:  Agreed.

12:50:49 11        MS. BARBOSA:  Thank you.

12:50:50 12        THE VIDEOGRAPHER:  This concludes the video

12:50:52 13    deposition of Robert Dominick consists -- consisting

12:50:55 14    of two media units.

12:50:58 15        The original media of today proceedings

12:51:01 16    will retain in the custody of Kusar Court Reporters

12:51:05 17    & Legal Services.

12:51:06 18        We are going off the record at 12:51.

12:51:11 19        Off the record.

12:51:12 20        MR. ESPO:  Thank you both.

12:51:20 21        THE REPORTER:  Mr. Cleeland, did you want a

12:51:23 22    copy or no copy?

12:51:41 23        (A discussion is held off the record from

12:51:41 24        12:51 p.m. to 12:51 p.m.)

12:51:53 25        MR. CLEELAND:  Yes.  And if you would direct

```
12:51:55   1    that to Ms. Davis.

           2              (Proceedings concluded at 12:51 a.m.)

           3                           ***

           4

           5

           6

           7

           8

           9

          10

          11

          12

          13

          14

          15

          16

          17

          18

          19

          20

          21

          22

          23

          24

          25
```

Kusar  Keeping Your Word Is Our Business℠

```
 1                        DECLARATION

 2

 3

 4        I hereby declare I am the deponent in the

 5   within matter; that I have read the foregoing

 6   deposition and know the contents thereof; and I

 7   declare that the same is true of my knowledge except

 8   as to the matters which are therein stated upon my

 9   information or belief, and as to those matters, I

10   believe them to be true.

11        I declare under the penalties of perjury of the

12   State of California that the foregoing is true and

13   correct.

14        Executed this _____ day of _____,

15   20 _____, at _____,

16   California.

17

18

19                    _____

                                      ROBERT DOMINICK
20

21

22

23

24

25
```



Case 2:17-cv-01697-SVW-SK   Document 485-1   Filed 02/03/23   Page 100 of 100   Page ID
#:11423
30(b)(6) of LACCD                    Los Angeles Community College District                    1115477

```
 1                   REPORTER'S CERTIFICATE

 2

 3        I, Judith E. Thiel, CSR 2618, CP, RPR, the

 4   undersigned Certified Shorthand Reporter, holding a

 5   valid and current license issued by the State of

 6   California, do hereby declare:

 7        That said proceedings were taken down by me in

 8   shorthand at the time and place therein set forth

 9   and thereafter transcribed under my direction and

10   supervision.

11        I further certify that I am neither counsel for

12   nor related to any party to said action nor in any

13   way interested in the outcome thereof.

14        Before completion of the deposition, review of

15   the transcript was requested.

16        The dismantling, unsealing, or unbinding of he

17   original transcript will render the Reporter's

18   certificate null and void.

19        IN WITNESS WHEREOF, I have subscribed my name

20   on this date: August 18, 2017.

21

22

23

24   _____

          Judith E. Thiel, CSR 2618, CP, RPR

25
```

