1              IN THE UNITED STATES DISTRICT COURT

2           FOR THE CENTRAL DISTRICT OF CALIFORNIA

3

4   ROY PAYAN, PORTIA MASON,
    THE NATIONAL FEDERATION OF
5   THE BLIND, INC., and THE
    NATIONAL FEDERATION OF THE
6   BLIND OF CALIFORNIA, INC.,

7                   Plaintiffs,

8        vs.                          CASE NO.
                                      2:17-cv-01697-SVW(SKx)
9   LOS ANGELES COMMUNITY
    COLLEGE DISTRICT,
10
                    Defendant.
11  ~~~~~~~~~~~~~~~~~~~~~~~~~~~~

12

13

14

15             VIDEOTAPED DEPOSITION OF

16                  APRIL PAVLIK

17

18              October 3, 2017

19                 10:31 a.m.

20

21             555 South Flower Street
                    45th Floor
22            Los Angeles, California

23

24          Dawn Schetne, CSR No. 5140

25



```
1                    APPEARANCES OF COUNSEL

2

3    For the Plaintiffs:

4            BARBOSA GROUP
             PATRICIA BARBOSA, ESQ.
5            8092 Warner Avenue
             Huntington Beach, California 92647
6            714.465.9486
             pbarbosa@barbosagrp.com
7

8    For the Defendant:

9            HAIGHT BROWN & BONESTEEL LLP
             BRUCE CLEELAND, ESQ.
10           2050 Main Street, Suite 600
             Irvine, California 92614
11           714.426.4600
             714.754.0826 Fax
12           bcleeland@hbblaw.com

13

     Also Present:
14
             James Koralek, Videographer
15

16

17

18

19

20

21

22

23

24

25
```



800.211.DEPO (3376)
EsquireSolutions.com

```
 1                    INDEX OF EXAMINATION

 2

 3    WITNESS:  APRIL PAVLIK

 4    EXAMINATION                                    PAGE

 5    By Ms. Barbosa                                    6

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



```
 1                          INDEX TO EXHIBITS

 2

 3    Exhibit              Description                  Page

 4      40        Plaintiffs' amended notice              8
                  of deposition to April Pavlik
 5
        41        Two-page document entitled             46
 6                Office of Special Services
                  Academic Accommodations
 7                Authorization

 8      42        One-page document with the             87
                  heading Quiz #2
 9
        43        One-page document with the             89
10                heading Personality Quiz

11      44        Two-page document with the             95
                  heading Pushing the Mood
12                Swings

13

14

15

16

17

18

19

20

21

22

23

24

25
```



```
1                    DEPOSITION OF APRIL PAVLIK

2                         October 3, 2017

3

4           THE VIDEO OPERATOR:  This is tape No. 1 to the

5    videotaped deposition of April Pavlik in the matter of

6    Roy Payan, et al. versus Los Angeles Community

7    District College, being heard before the United States

8    District Court, for the Central District of California,

9    Case No. 2:17-cv-01697-SVW(SKx).

10          This deposition is being held at 555 South

11   Flower Street, 45th Floor, Los Angeles, California 90071

12   on October 3rd, 2017, at 10:31 A.M.

13          My name is James Koralek, and I'm the

14   videographer.  The court reporter is Dawn Schetne.

15          Counsel, will you please introduce

16   yourselves and affiliations, and the witness will be

17   sworn.

18          MS. BARBOSA:  Good morning.  My name is

19   Patricia Barbosa, and I am one of plaintiffs' counsel in

20   this matter.

21          MR. CLEELAND:  Good morning.  Bruce Cleeland,

22   on behalf of the defendant.

23   ///

24   ///

25   ///
```



```
 1                    APRIL PAVLIK,
 2       having been first duly sworn, testifies as follows:
 3                    EXAMINATION
 4   BY MS. BARBOSA:
 5       Q.  Good morning, Ms. Pavlik.  I am Patricia
 6   Barbosa.
 7       A.  Can I change?  It's Dr. Pavlik.
 8       Q.  Totally fine.
 9       A.  Thank you.
10       Q.  Good morning, Dr. Pavlik.
11       A.  Thank you.
12       Q.  I am going to be asking you questions this
13   morning in this deposition setting.  Before we start, I
14   would like to ask you just a few questions this morning
15   to see -- just explain some of the processes of this.
16   Have you ever been deposed before?
17       A.  No.
18       Q.  And have you ever been a party to a lawsuit?
19       A.  No.
20       Q.  And if I may ask you to speak a little louder
21   because sometimes -- we have to make sure that
22   everything gets on the record.  Also, often people say
23   yes or no by shaking their heads or say uh-huh, yum.
24   It's important that we say the actual word.
25            Also, I will make an effort not to cut you off,
```



1  and I know that your counsel would also like you to wait

2  for me to finish my question before you answer.

3  Mr. Cleeland has the opportunity to make an objection if

4  he would like to make an objection on the record, but

5  unless he indicates to you that you are not to answer

6  based on whatever privilege he may raise, then the

7  objection is on the record, and then you still answer to

8  the best of your ability.

9       Also, in terms of a deposition, we are

10  attempting to get information on the various facts and

11  issues in this complaint, but what we are not wanting to

12  get you to do is to either make guesses as to what could

13  be the answer, to speculate on the answer, or to guess.

14  It is important, though, that if I ask you for your best

15  estimate and you have one, that you provide me that best

16  estimate.  And if you do not have the answer, that's

17  totally appropriate.  We just need to make sure that

18  it's not a guess or a speculation.

19       Also, in terms of this morning, I do not expect

20  this to go on all day, so if you do need a break, you

21  are welcome to have a break.  I understand that you have

22  some medical issues, so whatever you decide is going to

23  be sufficient for you, you can't go on or you need a

24  break or whatever, we're happy to do that.  Just let me

25  know.



```
 1       A.  Uh-huh.

 2       Q.  And we will take care of that for you.

 3            Also, we are going to be showing you some

 4   documents.  We are going to ask you if you have seen

 5   them or if you haven't, and then if you have, we'll talk

 6   about that a little bit.

 7            In terms of preparing for your deposition this

 8   morning, I'm going to give you a document, which is an

 9   amended notice.  And I'm going to give a copy to

10   counsel, and I'm going to give a copy to you, and it's

11   going to be marked as Exhibit No. 40 for purposes of

12   this deposition.

13            (Exhibit 40 was marked.)

14   BY MS. BARBOSA:

15       Q.  Ms. -- Dr. Pavlik, were you informed that you

16   were -- that you had been noticed for a deposition for

17   this morning?

18       A.  Yes.

19       Q.  Okay.  Just to verify that that's why you are

20   here and that you do understand that.  Have you ever

21   seen this document or a prior version of this document?

22       A.  Yes.

23       Q.  Okay.  Thank you.  You can go ahead and give it

24   to the court reporter, and that's all we have to do with

25   that.
```



1        Now, Dr. Pavlik -- and just, if you don't

2   mind -- I seem to have your name spelled both

3   P-a-v-l-i-c-k --

4        A.  No, just k.

5        Q.  Just k.  Okay.  Good.  Thank you.

6        Dr. Pavlik, prior to this morning, did you

7   review any documents or files in preparation for this

8   morning?

9        A.  Not in preparation for this morning, no.

10       Q.  Did you review any files or -- did you review

11  any files having to do with any issue raised in this

12  complaint?

13       A.  By issue, what do you mean?

14       Q.  By -- well, let me ask you a first question,

15  then.  Have you ever seen the complaint that was filed

16  by two former students?  There are --

17       A.  Yes.

18       Q.  Yes, you have seen the complaint?

19       A.  Yes.

20       Q.  So did you read the complaint?

21       A.  Yes.

22       Q.  Did you have any questions about the complaint

23  in terms of the allegations or the issues in terms of my

24  maybe making sure I -- I want to ask you questions that

25  you actually have information about, so my question,



 1   then -- let me just restate it again.

 2        A.   Uh-huh.

 3        Q.   Did you review any files having to do with any

 4   of the allegations raised in the complaint having to do

 5   with Portia Mason?  We'll narrow it.

 6        A.   Yes, I reviewed the files.

 7        Q.   And what files did you review?

 8        A.   The file that was sent over that had -- the one

 9   that looked like this, so I guess it's the court

10   document.

11        Q.   Well, let me ask you some questions that are

12   more -- let's see if we can get this a little clearer.

13   Tell me what some of the documents were that you

14   reviewed.  We talked about the complaint, and what I'm

15   asking you to tell me is what files having to do with

16   Portia Mason, but I'm not asking you of direct

17   communication with counsel.  So I don't know what was

18   said to you, so I'm trying to find out what you

19   reviewed.

20        MR. CLEELAND:  Well, my concern is if one of

21   her lawyers asked her to look at a specific document as

22   a result of that inquiry, request, or direction, she

23   looked at that, that would still be communication and

24   the results of communication.  I don't think you're

25   asking that.



1           MS. BARBOSA:  I'm asking what the documents
2    were, not any communications.  Identification of
3    documents from the files that she holds as her own
4    files.  Not files from the attorney.
5           Q.  Files that you looked at.  And let's go
6    backwards so that we're a little bit clearer here.
7           A.  Okay.
8           Q.  Did you review any of the exams that you had in
9    the --
10          A.  No.
11          Q.  -- in the fall class of 2016 with Portia Mason?
12          A.  No.
13          Q.  Did you review any of her homework assignments
14   that she provided to you as part of her class with you?
15          A.  I would not be able to do that, as she has all
16   copies of that.  I don't maintain any physical records
17   of the client.
18          Q.  Do you maintain any electronic records of your
19   class work?
20          A.  I have to maintain my grades, as required by
21   law --
22          Q.  Do you --
23          A.  -- and I have my tests.
24          Q.  Excuse me.  And just so that we're -- we need
25   to make sure we don't step over each other so I don't



1  misunderstand you.  So did you review -- you say you

2  reviewed -- you have tests that are electronically

3  maintained; is that correct?

4      A.  I have the scores of tests on a spreadsheet.

5  That is what I maintain.  I maintain the scores of

6  everything.  I do not maintain the original exams

7  because those are given back to the students.

8  Everything is returned to them.

9      Q.  The document which the student filled out as

10 part of the test?

11     A.  Yes.

12     Q.  What about the original test material, do you

13 maintain that?

14     A.  I have copies of tests.  They evolve over the

15 semesters.  If I sent it electronically so she could

16 take it in OSS, they do have a copy of that.

17     Q.  Okay.  But do you have a test of -- do you keep

18 copies of your tests for your classes as part of your

19 records?

20     A.  I keep a test bank and a copy of -- because I

21 change my tests every time, so I keep a copy of the test

22 bank, and if the test was sent to OSS, I have an

23 electronic record of it.

24     Q.  Of the test that you sent?

25     A.  Sure.



1    Q.  Okay.  And so for homework that is sent, do

2  you -- let me go backwards.  I think we need to get some

3  more background because I'm not quite sure how it is

4  that you do your classes.  So you have in terms of your

5  documents in your files -- there may be some electronic

6  exams there, there may be some test bank that you have

7  there, and there is a grade -- is it an Excel sheet of

8  some sort?

9    A.  Uh-huh.

10    Q.  All right.  So you have that.  In terms of

11  projects, do you have your students do projects for --

12  let's go back to just a specific class, which is --

13    A.  For my psych 1 class?

14    Q.  Psych 1 class.

15    A.  The only project they do is a paper that they

16  prepare on their own.  I give them a rubric for that

17  paper.  I also give them an example of what the paper

18  should include.  None of it has images.  It's all easily

19  transferable and readable.  That's the only project I

20  have in that class.

21    Q.  And we'll be talking about that a little bit

22  earlier.  So you have -- so my question, then, goes to

23  what you're maintaining.  Do you maintain an electronic

24  copy of the homework papers given to you?

25    A.  They are returned, as I said earlier.  They are



1    returned to the students.  I do not maintain copies of

2    homework.  I maintain copies of the scores that they

3    receive on that homework.  I am keeping what I am

4    required by law to keep.

5        Q.  So you're keeping the grades that you have, but

6    if a student -- well, let me ask you:  Do you accept

7    homework assignments electronically?

8        A.  I did not until I started using Canvas.  So

9    only this semester have I asked for them to turn in

10   things online.  Before that they handed it in to me by

11   paper.  I graded it and returned it to them the next

12   day, or the next -- within the next two sessions.

13       Q.  So the homework, at least at the time of 2016

14   when the psych 1 class that you had, the documents from

15   the students would have been in hard copy as to the

16   homework and to the paper project; would that be

17   correct?

18       A.  Sure.  Yeah.

19       Q.  All right.  So in terms of the documents that

20   you maintain, do you maintain notes on any of the

21   students as part of your files?

22       A.  No.

23       Q.  All right.  And in terms of your -- are all of

24   the documents that we talked about, the electronic

25   documents that you maintain -- are all of those on the



 1  server maintained by LACC?

 2      A.  Yeah, they all -- the grades have to be

 3  submitted, and they are -- yes.

 4      Q.  Okay.  So at least as to the electronic ones --

 5      A.  I think that you're -- I have my own Excel

 6  spreadsheet.

 7      Q.  Uh-huh.

 8      A.  The school maintains their own, and the student

 9  is supposed to maintain their own records.  So I'm

10  taking care of mine, and the school takes care of

11  theirs.

12      Q.  All right.  So in terms of the Excel

13  spreadsheet that you indicated, is that your personal

14  documents somewhere that you keep, or is that also part

15  of what LACC maintains?

16      A.  That is a document that I'm required to keep as

17  a professor.

18      Q.  All right.

19      A.  It's not a personal document.

20      Q.  I mean personal to you as the professor for the

21  class.

22      A.  It's a professional document.

23      Q.  And you maintain that where?

24      A.  In my office.

25      Q.  And in terms of your emails, do you exchange



1  emails with your students as part of your communication
2  with students?
3       A.  Sometimes, yes.
4       Q.  In fall of 2016, did you use emails to speak
5  with your -- or to communicate with your psych 1 class?
6       A.  Possibly.
7       Q.  Did you review any emails?
8       A.  I do not recall.
9       Q.  Do you maintain any emails in terms of the
10  communication with your students?
11       A.  I don't have a file of -- no.
12       Q.  So do you have an email address with LACC?
13       A.  Yes, I do.
14       Q.  How long have you had that email address?
15       A.  Since I've been working there.
16       Q.  What year is that?
17       A.  I started full time in 2000 and -- part time in
18  2001.  Full time in 2009.  '9, '10, '11, '12, '13 --
19  yeah, that's right.  2009.
20       Q.  So in 2016 do you recall whether or not you
21  communicated with students through the use of email?
22       A.  Students in general?
23       Q.  Well, your students.
24       A.  At this moment I can't recall a specific
25  instance.



1   Q.  And so do you give your students your email
2   address?
3   A.  Yes, I do.
4   Q.  And as part of the syllabus, do you provide
5   them information as to how to contact you?
6   A.  Yes.
7   Q.  And how is it -- let's go back.  Let's stick to
8   2016 for right now because I understand that there have
9   been some changes in the servers and issues at LACC.  In
10  2016 how did you inform students that they could contact
11  you?
12  A.  By text message, by phone, and by email.
13  Q.  And is that your office phone or cell phone?
14  A.  One is a cell phone.  There is an office phone
15  number, an office email.
16  Q.  And did you give your students in 2016 all of
17  those numbers or addresses?
18  A.  Everybody gets the syllabus, so yes.
19  Q.  And when do you give out the syllabus?
20  A.  On the first day of class.
21  Q.  So we were talking initially, before I get too
22  far out of it, in terms of what you have reviewed in
23  terms of LACC documents or emails prior to today.  Have
24  you reviewed any documents in regards to LACC policies
25  and/or Portia Mason prior to today?



1    A.  No.

2    Q.  Now, in 2016 what server -- excuse me.  I'm not

3  positive I'm saying this correctly, so I'm going to say

4  this again.  When you put homework assignments, did you

5  have some of those on a school website?

6    A.  I don't know if it was on a school website or

7  not.  At that time I don't know.

8    Q.  Did you have a personal website in 2016 that

9  you used --

10   A.  I maintain a personal website, yes.

11   Q.  Let me finish the question because it may be a

12 different answer.

13       Did you maintain a website, personal website,

14 in which you communicated with your students in terms of

15 work or assignments for the class in 2016?

16   A.  I did not use the website to communicate with

17 my students.

18   Q.  What did you use the website -- and we're

19 talking now about your personal website.  Can you tell

20 me what the address was, or if it still is?

21   A.  It's draprilpavlik.com.

22   Q.  And would that be the same one that you were

23 using in 2016?

24   A.  Uh-huh.

25   Q.  And is there a reason that you used this -- no,



1   let me go backwards.  So in 2016 you had

2   draprilpavlik.com as a website.  What did you put on

3   that website in terms of communication with your

4   students?

5       A.  I did not communicate with my -- I think I'm

6   misunderstanding or not knowing what you're meaning by

7   communicating with my students because a website doesn't

8   allow me to communicate with them.

9       Q.  You're right.

10      A.  So I don't know what you're asking.

11      Q.  We appear to have not a complete understanding

12  of when I'm saying communication.  When I say

13  communication, you provided information to your students

14  about something to do with the class.  I don't mean

15  one-on-one conversations with the student.

16      A.  I on my website provide access to presentations

17  that were done in class, study guides, and PDF handouts

18  of information that's in the class.

19      Q.  All right.  So let me -- and, by the way, now

20  that you understand by communications I'm talking about

21  information --

22      A.  Uh-huh.

23      Q.  So does that change any of your other answers?

24      A.  No, it does not.

25      Q.  Okay.  And I cut you off.  Were you going to



1    give another explanation?

2        A.   No, it's fine.   Thank you.

3        Q.   Okay.   So in terms of your communication -- and

4    by that I mean your ability to give information to your

5    students -- your draprilpavlik.com is where you would

6    provide documents that you had previously discussed,

7    study guides and PDF handouts.   When you talk about

8    documents or information that had been previously

9    provided to the class --

10       A.   Uh-huh.

11       Q.   -- can you explain to me what that means?

12       A.   So basically what I'm offering the students by

13   giving them access to the website is so they do not have

14   to take onerous notes in class.   What I provide to them

15   is a PowerPoint presentation that I have gone over in

16   class.   It's my lecture.   The handouts I give them so

17   they don't have to copy it.   I can just pull it off the

18   computer.   So everything that they're able to access via

19   electronic documents on my website are things that I

20   have gone over in class, that have been presented in

21   class, that I have talked about in class.

22       Q.   Okay.   And so let's start with just the

23   PowerPoint presentation.   Is that PowerPoint

24   presentation posted -- and I'm talking about 2016 now,

25   again.   Was that PowerPoint presentation that you



1   provided the students -- was that provided prior to the

2   discussion in class or after the discussion in class?

3   Are you confused?

4        A.   No, I'm not confused.  I'm thinking about your

5   question.  Thank you for asking.  In 2016 I put -- you

6   get the -- you get the presentation after you see the

7   lecture.  It's the reward for coming to the lecture.

8        Q.   Okay.  And that's all I'm trying to find out.

9   And would that be the same for the information that

10  you -- the other information that you put on the

11  website?  It would have been put on after it had been

12  discussed in class?

13       A.   Uh-huh.

14       Q.   Did you put on any -- any educational material

15  or communication with students on the website prior to

16  the time that you were going to -- that you had them?

17  So, for example, these are the following documents or

18  chapters or --

19       A.   That's what the syllabus is for.

20       Q.   So the syllabus provides you -- provides

21  information -- let me set that aside for a few minutes.

22            In terms of the aprilpavlik.com, is there a

23  reason that you used this personal website as opposed to

24  one offered by the school?

25       A.   Actually, yes.  Thank you for asking.  Etudes



1   is the platform that the school uses, so you actually

2   had to have training, and it was offered for only online

3   classes, so this was not an online class.  I was using

4   it as a hybrid class, which means that I'm trying to

5   give my students access to materials that they may not

6   be able to afford through giving it on a website.  So

7   once I was able to go to Etudes, I transitioned to

8   Etudes, and then I transferred to Canvas, so the

9   doctoraprilpavlik is not -- still I maintain the

10  website, but my students do not go there.

11      Q.  Okay.  Thank you.  So the -- I'm just trying to

12  see if I understood you correctly.  The Etudes

13  platform --

14      A.  Etudes.

15      Q.  -- which I understand was being used by LACC,

16  was it your understanding that the only instructors to

17  use Etudes were those who were specifically trained to

18  use Etudes?  Is that correct?

19      A.  That is what is in the contract and what our

20  school goes by.  Yes, you have to be trained to be on

21  Etudes.  You have to get the shell.  You go to Canvas;

22  the same thing happens.  They do not want instructors

23  who don't know how to use the system to be using it, so

24  once I was able to transition into that, I housed all of

25  my stuff there.



1    Q.  And when you were trained for -- to use the

2  Etudes, can you tell me what kind of training?  Was it

3  an online course?  Was it an in class?  What kind of

4  training was it?

5    A.  Online -- it was online and in person.  It was

6  a 40-hour training, I believe it was.

7    Q.  40 hours?

8    A.  Uh-huh.

9    Q.  And in those 40 hours, were you ever informed

10  about the accessibility to blind students to use Etudes?

11    A.  Yes.

12    Q.  And what were you informed?

13    A.  We were given a training on how to make things

14  more accessible.

15    Q.  I'm talking specifically about the platform

16  Etudes.  Were you --

17    A.  Yes.

18    Q.  Did you ever find out --

19    A.  Yes, we were told that we had to make sure that

20  information was accessible to a broad variety of

21  individuals with disabilities, including those with

22  visual disability.

23    Q.  And were you informed as to how to ensure that

24  the information you put on the website would be

25  accessible --



1     A.  Yes.

2     Q.  -- to blind students?

3     A.  Yes.

4     Q.  And what were you informed?

5     A.  We were told how to do the -- how to set up the

6  PowerPoint presentation so that the builds come out

7  correctly.  We're told how to put alt text on pictures.

8  We are told how to make sure that your captioning and

9  the flow works right with PDFs.  They gave us a pretty

10  broad -- would you like me to give you the entire talk

11  they gave?

12     Q.  I would like to hit the points that you said so

13  that we can --

14     A.  That's kind of what we talked specifically

15  about blind students, if that's what you're asking.

16     Q.  So let me go backwards a little bit.  When did

17  you take this Etudes training?

18     A.  Two years ago?  I can't remember the date.  I'm

19  sorry.

20     Q.  Did you take it prior to your 2016 psych 1

21  class?

22     A.  2016.  It depends on when the 2016 class was.

23     Q.  Fall of 2016.

24     A.  It was summer 2016.  No.  I don't recall the

25  date.  I'm sorry.  I would have to look it up.



1    Q.  All right.  So let me ask you, then:  In 2016,

2   for the psych 1 class -- that's the issue dealing with

3   Portia Mason -- you did not use the Etudes website?

4    A.  No, not for that class.

5    Q.  All right.  At some point you took training,

6   and then you actually began to use it; is that correct?

7    A.  Yes.

8    Q.  And for how long did you use it?  And I'm

9   talking about the Etudes.

10    A.  Until it was transitioned to Canvas.

11    Q.  Which is, I believe, this fall; would that be

12   correct?

13    A.  If that's the information you have.

14    Q.  I'm asking if you know.

15    A.  I don't.

16    Q.  When did you begin using Canvas?

17    A.  Canvas was two semesters ago.

18    Q.  So that would be --

19    A.  Sorry.  One of the things with chemo brain is

20   I'm not going to be able to give you accurate dates

21   because they don't track in my brain.  I'm sorry.  So if

22   that's what you're looking for, you're going to -- we're

23   going to keep -- I think it was about a year ago, and I

24   used it in the fall semester, so it would be fall of

25   2016 potentially or in '17.  I have been using it for



```
 1   about a year.
 2       Q.   Okay.  And I do want to -- I did not ask you a
 3   lot of personal questions about your medical state for a
 4   variety of reasons, but I do want to make sure that I do
 5   ask you -- and thank you for letting me know that this
 6   is an issue -- as to whether or not your medical
 7   condition keeps you from being able to fully answer the
 8   questions in regards to your -- the allegations in the
 9   complaint having to do with your psych 1 class or your
10   work with LACC.
11           MR. CLEELAND:  And I apologize for
12   interrupting, but, of course, she can't answer that
13   until she hears the question you're asking.
14   BY MS. BARBOSA:
15       Q.  Well, let me ask you:  Did you indicate -- let
16   me ask a few questions.  I'm trying not to be invasive
17   of your privacy.  In terms of your ability to remember,
18   has that been affected by your medical condition or
19   situation?
20       A.  Yes.
21       Q.  And you indicated earlier that you can't really
22   give exact dates, and very few people can give exact
23   dates, but you also indicated that you didn't use Etudes
24   until you had trained for it --
25       A.  Uh-huh.
```



1    Q.  -- and that you did not use it in 2016.

2    A.  Etudes was not in 2016, I don't believe, no.

3    Q.  And at some point you began to use Etudes?

4    A.  Yes.

5    Q.  The reason I'm asking, I'm trying to get the

6    dates set up is because I have information that that may

7    not be correct, so I'm trying to figure this out.  Do

8    you remember when Canvas -- when you began using Canvas

9    as a teaching platform or a website?

10   A.  It was within the last year.

11   Q.  Could it have been within this last fall

12   semester?

13   A.  Etudes, no.

14   Q.  No, no.  Canvas.

15   A.  Yeah.

16   Q.  I will ask you, just so we're not kind of at

17   odds -- if I ask you a question and you are unable to

18   remember something that you probably know, but at this

19   stage you don't feel you're remembering clearly, will

20   you let me know so that we're not --

21   A.  Uh-huh.

22   Q.  -- kind of going down the wrong path?  Thank

23   you.

24          Do you recall who taught the Etudes course that

25   you took?



1      A.  A gentleman from -- what's his name?  Bruce?  I
2  can't recall.  I'm sorry.
3      Q.  Do you know if it was someone that worked for
4  LACC?
5      A.  Not for LACC.  He works in the district.  He's
6  trained on Etudes for many years.  He's used by -- his
7  services are used by many of the colleges.
8      Q.  If you know, is he like an independent
9  contractor, or is he employed by the --
10      A.  Oh, I don't know.
11      Q.  Okay.  So the answer is no, you don't know if
12  he is an independent contractor?
13      A.  I do not know, no.
14      Q.  All right.  Now, when was the first time that
15  you had heard about the complaint filed by Roy Payan and
16  Portia Mason?
17      A.  I think it was this summer.
18      Q.  Summer of 2017.  I mean -- yes, summer of 2017.
19  And do you recall who was the first person that told
20  you?
21      A.  I got an email.
22      Q.  And was it an email from someone other than
23  your attorneys?
24      A.  No.
25      Q.  All right.



```
 1        A.  Who else would tell me about this?

 2        Q.  That's what I would like to know.

 3        A.  No.

 4        Q.  So your first information -- well, let me go

 5   backwards.  You first found out about the complaint this

 6   last summer, summer of 2017.  Did you receive an actual

 7   physical copy of the complaint?

 8        A.  Not that I recall, no.

 9        Q.  Have you ever seen an actual physical copy of

10   the complaint?

11        A.  No.

12        Q.  And what was your understanding of the

13   allegations of Ms. Mason in regards to the class that

14   you taught in the fall of 2016?  Psych 1, I believe it's

15   called.

16        A.  Honestly, at the time I was going through

17   chemotherapy, so I didn't read very much of it.  I

18   figured that by the time I got here into the deposition,

19   you would ask me what you needed to ask me and I could

20   answer.

21        Q.  All right.

22        A.  So this was not --

23        Q.  Anytime after the summer of -- when you first

24   found out about this, did you ask anyone other than

25   counsel, and by that I mean the attorneys for the
```



1  school, about issues in this complaint?

2      A.  No.

3      Q.  Did you speak to anyone other than like your

4  family about this complaint?

5      A.  I had to talk to my department chair because I

6  was going to miss a meeting the first time that this

7  deposition was called and then canceled.

8      Q.  Can you tell me who the department chair is?

9      A.  Dr. Rochelle Sechooler.  And I just said that I

10 was being deposed and that I needed to be in downtown

11 LA, and she said please go ahead.

12     Q.  And did you indicate to her that you were being

13 deposed in a lawsuit against LACC?

14     A.  No.

15     Q.  And did she ask you any questions?

16     A.  Questions about what?

17     Q.  About your being deposed.

18     A.  No, she did not ask me questions about my being

19 deposed.

20     Q.  Did she ask you anything in regards to the

21 allegations in the complaint regarding your psych 1

22 class?

23     A.  I do not recall, no.

24     Q.  Did you discuss with her anything having to do

25 with any of the allegations in the complaint in regards



1    to your psych 1 class?

2         A.   No.

3         Q.   And apart -- can you spell the last name,

4    please, of Dr. --

5         A.   S-e-c-h-o-o-l-e-r.

6         Q.   And you pronounce it how?

7         A.   Sechooler.

8         Q.   Okay.  And she is the department chair of

9    psychology?

10        A.   Uh-huh.

11        Q.   And apart from Dr. Sechooler, did you speak to

12   anyone else at LACC in regards to any of the issues in

13   the complaint?

14        A.   No.

15        Q.   And -- so in terms of your teaching at LACC,

16   you indicated that you started in 2001 part time; is

17   that correct?

18        A.   About 2000 -- 2002 part time.

19        Q.   And were you teaching -- what classes were you

20   teaching, if you can remember?

21        A.   Psychology 1 -- which classes have I taught, or

22   are you asking me to tell you what classes I taught in

23   each semester?

24        Q.   There's too many semesters.

25        A.   Thank you.



1   Q.  I wouldn't expect you to know it, but if you

2   can tell me the classes that you have been teaching at

3   LACC.

4   A.  Psychology 1, which is general psychology.

5   Psychology 2, which is biological psychology.

6   Psychology 3, which is personality psychology.

7   Psychology 14, which is abnormal psychology.

8   Psychology 74, which is research methods in the

9   behavioral sciences.  I've also taught psych 43, which

10  is group process 1, psych 44, which is group process 2.

11  Q.  And so you indicated that you thought in 2009

12  you started full time; is that correct?

13  A.  I think it was 2009 because I'm on eight years

14  right now.

15  Q.  How many classes do you generally teach a

16  semester?

17  A.  A full load is five classes contractually.

18  Q.  And I believe you indicated -- let me just ask

19  you.  Have you taught long distance -- I don't know if

20  it's called long distance, but online classes?

21  A.  Yes, I started teaching online classes.

22  Q.  When did you do that?

23  A.  This last year.  Fall of last year.

24  Q.  And just to make sure I have the right

25  terminology, are those called distance learning classes?



1      A.  No, they are called online classes.  They are

2   DE, which is distance education, which is different from

3   correspondence education.

4      Q.  Can you tell me what the difference is between

5   correspondence and distance?

6      A.  Distance education is actually mediated and

7   facilitated by the instructor.  A distance -- a

8   different -- like a correspondence course is basically

9   you could take this book, read it, take a test, learn

10  it, and I wouldn't have to be there.

11     Q.  And for the distance learning, do you actually

12  do lectures and things online?

13     A.  We have videotape lectures that you can use.

14  You can do audiotape stuff.  There's all kinds of stuff

15  that you can use online.

16     Q.  And that's called distance -- no, online --

17     A.  That's your online classes, yes.

18     Q.  Online classes.  What classes do you teach that

19  are online?

20     A.  Psych 1.

21     Q.  And in 2016 -- do you recall for the fall of

22  2016 what classes you taught?

23     A.  Psych 1 -- oh, psych 41 needs to be on that

24  list, which is life span psychology.

25     Q.  Okay.



1    A.  Psych 1, psych 41, psych 74.

2    Q.  And if I'm correct, all of these would be

3  in-person classes, meaning you're there with the

4  students; is that correct?

5    A.  Yeah.

6    Q.  All right.

7    A.  Except -- unless they're online classes, yes.

8    Q.  All right.  And so in -- how long have you been

9  teaching psych 1?

10    A.  Since the beginning.

11    Q.  Would that be in 2001?

12    A.  Uh-huh.

13    Q.  All right.  And in 2001 -- excuse me.  Let me

14  ask you a different question.  Are you involved in

15  either evaluating or choosing textbooks to be used in

16  the class?

17    A.  Yeah.  It's a departmental decision.

18    Q.  And can you describe to me what that process

19  is?

20    A.  Well, first, you get a number of textbooks from

21  the publishers or free options.  For instance, OpenStax.

22  You review these books as faculty members, rank them.

23  Students then are asked to come and evaluate the book,

24  different psych 1 classes, other classes.  They're given

25  a survey.  The survey is evaluated, and then we make a



 1   decision based on class to students, students'
 2   preferences, and ancillary services that are offered
 3   with the textbook.
 4       Q.  So in terms -- you indicated that it's a
 5   faculty decision; would that be correct?
 6       A.  Well, actually, every faculty member can choose
 7   to use their own textbook.  That's another thing that is
 8   protected.  So every person can use a different one.  So
 9   it's not a -- it's not a -- you can use whatever
10   textbook you want.
11       Q.  All right.  And that's actually where I was
12   going.  So in 2016 did you use any text that you
13   personally chose or ones that were part of the
14   evaluation and determined by the faculty?
15       A.  I feel like that question should be asked again
16   because I don't -- I could choose it, but in this case,
17   it's not a one or the other.  I participated in the
18   process, so I -- it's a different question.
19       Q.  You're right.  Let me ask that a different way,
20   then.  In 2016 in your psych 1, and let's stick with
21   psych 1 for right now, did the course -- did you use a
22   textbook?
23       A.  Yes.
24       Q.  And was that textbook one that you personally
25   chose for the class, or was that one of the ones chosen



1   by the department for psych 1?

2       A.   It's the same question.  I participated in a

3   process to choose the book.  I didn't personally choose

4   it, and I didn't just go with the department's decision.

5   I participated in the process.

6       Q.   So is the book that you used in 2016 one of the

7   ones that was either recommended or chosen as part of

8   the process of evaluating textbooks?

9       A.   Yes.

10      Q.   All right.  In 2016, apart from using the

11  textbook that we just discussed the process for, other

12  materials that you used -- I think you said you had

13  handouts; is that correct?

14      A.   Uh-huh.

15      Q.   And did you personally choose those handouts?

16  Are they part of a book?  How did you determine what

17  handouts to use?

18      A.   I created the handouts.

19      Q.   And would it be correct, then, that you

20  maintain copies of your handouts?

21      A.   As I mentioned earlier, if I have copies of the

22  handouts, they are on the website.  So it's a handout

23  for study guides, those things.  I do not maintain

24  copies of student work.

25      Q.   No, I understand.  I'm talking about your



1   prepared, created handouts.  Do you maintain a copy of
2   the handout that you prepare?
3        A.  In what form?
4        Q.  Whatever form that you maintain a hard copy.
5   Electronically.
6        A.  If I use it the next semester, yes, I maintain
7   it.  If I do not use the next semester, I do not
8   maintain it.
9        Q.  So you do not have a set either of hard-copy
10  files or digital files of created handouts that you used
11  in prior classes?
12       A.  I have -- sure, I have copies.
13       Q.  Would that include copies of handouts given in
14  the fall 2016 in your psych 1 class?
15       A.  Possibly, yes.  As I mentioned, they get
16  changed and removed, and I do not have a specific file
17  folder that says this section, these are all of the
18  PowerPoints I handed out.  If I had to maintain that for
19  every class, that would be a large amount of files, so I
20  evolve the files as we go.
21       Q.  And so in terms -- and I think you answered my
22  last question.  Do you prepare the PowerPoints that you
23  showed in your psych 1 class?
24       A.  Sometimes.
25       Q.  And where else would you receive this



1    information for the PowerPoints?

2         A.  One of the things that -- the book process,

3    when we choose a book, the ancillary materials that I

4    mentioned, part of that is your test bank, basic

5    PowerPoint presentations that you can go off of so that

6    your lectures are matching up with the textbook.

7         Q.  And in terms of your evaluation, you indicated

8    that textbooks are either sent to the publisher or they

9    could be online free ones; is that correct?

10        A.  Yeah, you can use any textbook.

11        Q.  And then the faculty individually does an

12   evaluation of books provided to them; would that be

13   correct?

14        A.  Sure.

15        Q.  You indicated that at some point you give

16   infor -- you give -- you allow students to evaluate the

17   books that are being reviewed; is that correct?

18        A.  Yeah.

19        Q.  And what is the process for choosing students

20   to evaluate these textbooks?

21        A.  I was not involved in choosing the students or

22   deciding which groups got selected, so I can't speak to

23   that.

24        Q.  Do you know who would do that process or who

25   would choose that?



1        A.   That would be something through the department

2   chair or our -- department chair.

3        Q.   In 20 -- do you know if in 2016 students

4   evaluated any of the textbooks that you were using in

5   your psych class?

6        A.   I do not recall.

7        Q.   And in terms of the work that you did for

8   Etudes -- pardon me.   In terms of the course that you

9   took to learn Etudes, did any of that information

10   provided to you indicate whether or not disabled

11   students also had an opportunity to see how Etudes

12   worked and whether or not they could use it?

13        A.   Can you repeat the question, please.

14        Q.   Yes.   You indicated that you had about a

15   40-hour course?

16        A.   Yes.

17        Q.   That must have been a pretty good course for

18   that amount of time.   As part of that material, were you

19   ever informed that disabled students had also been given

20   access to the Etudes platform to see if they could use

21   it?

22        A.   So you're asking me if I was told during the

23   training who they selected to test their program?

24        Q.   No.   I want to know whether or not anybody in

25   the Etudes training course ever told you that apart from



 1  teachers being trained on it, that students who were

 2  disabled had also evaluated the Etudes program.

 3      A.  I don't believe that -- no.  I don't --

 4      Q.  Do you know whether or not students also could

 5  receive training for the use of the Etudes?

 6      A.  Yeah, students can receive training.  It's on

 7  the LACC website.  Very easily found.

 8      Q.  And do you know how a screen reader works for a

 9  person who's blind in terms of reading information?

10      A.  I have not seen it done.  I have been told how

11  it works, but, no, I don't know.

12      Q.  And what do you understand about it?  Tell me

13  what you know, what you were told about it.

14      A.  Are you wanting me to paraphrase what I was

15  told?

16      Q.  Yes.

17      A.  That it takes a document, you feed it into the

18  screen reader, and then it reads it out to you based on

19  what it sees on the screen.

20      Q.  And were you informed as part of the

21  information -- well, excuse me.  Let me ask a different

22  question.

23          Do you know what types of documents a screen

24  reader can read?

25      A.  PDFs, Word documents, and they have been, I



1  believe, working with it to help it better read

2  PowerPoint presentations that aren't in PDF format.

3      Q.  And so --

4      A.  And it reads websites.

5      Q.  And do you know how it reads websites?

6      A.  I have no idea.  I'm not in that line of work.

7      Q.  I'm just asking if anybody ever communicated to

8  you.

9      A.  No.

10     Q.  Okay.  And do you know --

11     A.  I did not ask.

12     Q.  And do you know whether or not all PDFs can be

13  read by a screen reader?

14     A.  I would assume that they would tell me if they

15  couldn't.

16     Q.  And when you were informed that in terms of

17  the -- of your putting things on the website that we had

18  talked about earlier, one of the indications were that

19  you were told that you needed to give documents for a

20  broad range of students; is that correct?

21     A.  Will you ask the question again, because I'm

22  trying to figure out if you're asking me a specific

23  question or a global question?

24     Q.  I'm asking you a broader question, and then

25  we'll get into the more specifics.  When you were being



1  trained on the Etudes, you indicated that they informed
2  you that you needed to use documents that were
3  accessible to a broad range of students, including
4  students with disability; is that a correct statement?
5      A.  Yes.
6      Q.  All right.  So in terms of what they indicated
7  to you to the broad -- the disabled students, were you
8  provided information on how to communicate with
9  individual disabilities?  For example, a student who is
10  deaf, a student who is blind.  Were you provided
11  different ways of providing this information on the
12  website for students who are blind as opposed to someone
13  who could see?
14      A.  Yes.
15      Q.  What were you told, if anything, in terms of
16  how to prepare documents to be used on the website or
17  online?
18      A.  I don't recall.
19      Q.  Were you provided any training on how to turn a
20  PDF document into an accessible PDF document?
21      A.  I don't recall.
22      Q.  When you prepare your -- you indicate that you
23  prepare documents in Word and that you have PowerPoints
24  and that you also use PDF documents; is that correct?
25      A.  Uh-huh.



1   Q.  What type of PDF documents do you use in terms

2   of your educational information on websites?

3   A.  What kind of PDF?

4   Q.  Let me ask a more basic question.  Do you

5   understand that there are different formats of PDF?

6   A.  If I worked more in the Adobe Suite, yeah.

7   What I use for PDF is the converter tool in my -- in my

8   computer program it says export to PDF.  I do that.

9   Q.  All right.  And do you some -- well, let me --

10  so you use the PDF in the converter form on -- I guess

11  it's a Microsoft Office, something.  That's what it

12  probably is?

13  A.  Yeah.

14  Q.  All right.

15  A.  No, it's not.  It's the Window -- not Windows.

16  Mac version of it.  So it's not Word.  It's pages that

17  gets converted, but it also converts it to a Word

18  document.

19  Q.  And is part of your information -- let me go

20  backwards.  Do you ever take copies of either book

21  portions or information from a book and turn it into a

22  PDF to put on your website?

23  A.  No, that's illegal.

24  Q.  Do you ever do that with the text that you're

25  actually using with the students?



1      A.  No, I don't ever copy pictures.  No, I don't

2   believe so, no.

3      Q.  All right.  And so in terms of your -- your PDF

4   documents, is it turning a Word document into a PDF by

5   exporting it?  Is that what you're indicating to me?

6      A.  Uh-huh.

7      Q.  All right.  And so do you -- let me -- well,

8   we'll go further.  We'll go a little on that first.  So

9   in terms of PDF -- pardon me.  In terms of formatting

10  any of your materials, do you send any of your materials

11  to OSS to be formatted for accessibility for blind

12  students?

13     A.  No, I've never done that.  I know that they

14  offer that.

15     Q.  All right.  Is there a reason you've never done

16  that?

17     A.  Because the information that I've sent to OSS

18  in the past has not -- the students have been easily

19  able to utilize it and read it through the reader.  So

20  in 2016 I had already been working with OSS with several

21  blind students in my courses, and they had gotten the

22  same information, and it was utilized by OSS.

23     Q.  I'm sorry.  I'm misunderstanding something.

24  You indicated that in the fall of 2016 you did not send

25  any of your materials that you put on the web to OSS to



1   get formatted.

2        A.   Sorry.  I just saw this OSS right under your

3   paper, those agreements that we have with students.

4        Q.   Uh-huh.

5        A.   Right?

6        Q.   Uh-huh.

7        A.   So every semester I have students who either

8   have attentional disabilities, who have hearing

9   disabilities, who have some cognitive disorder, or a

10  visually impaired student who had used those forms.  I

11  provided my information to OSS for all of the years that

12  I have been there, and they have not indicated that it

13  wasn't accessible, so I did not take the course because

14  I assumed that everything was fine.

15       Q.   All right.

16       A.   I had never been given information that it

17  wasn't readable by the readers.

18       Q.   So let me go backwards a little.  You indicated

19  that you had at some point provided my information to

20  OSS.  Can you tell me what information you provided to

21  OSS?

22       A.   Where -- whatever is asked for on the form

23  right there.

24       Q.   Okay.  Let's go on the form, then, because

25  then --



1   A.  So it's test taking or --

2   Q.  -- I'll better understand what we're

3   talking about.  Let me tell you -- this is going to be

4   Exhibit No. 41, and I am providing a copy to you and a

5   copy to your counsel.

6        MR. CLEELAND:  Thank you.

7        (Exhibit 41 was marked.)

8   BY MS. BARBOSA:

9   Q.  You indicated that you recognize this form; is

10  that correct?

11  A.  Uh-huh.

12  Q.  And when you have a student who is disabled and

13  who is receiving services from OSS, they are required to

14  provide you this form if they want any accommodations;

15  is that correct?

16  A.  Yes, they are.

17  Q.  And you indicated that you provide information

18  to OSS, and then you indicated that you provide the

19  information in this document; is that correct?  Or this

20  form.

21  A.  Well, it would if the signature -- my signature

22  was on it.  So I have not signed this form.

23  Q.  And that was going to be my next question.

24  A.  So if this was not provided to me -- I sign it

25  in class, so if I do not have a signed copy of this or



 1   OSS doesn't have a signed copy of this, this is not a --
 2   how can I provide accommodations if I didn't sign it?
 3        Q.  Well, just to let you know, we have received
 4   this from -- from LACCD, but I do want to tell you that
 5   I believe there is a signed one of these because she
 6   received accommodations.  So with the understanding that
 7   you don't know that this is a signed document because
 8   you haven't seen it --
 9        A.  I don't know.
10        Q.  -- I want to ask you if some of the
11   information -- not particular accommodations that you
12   did or did not do for the student.  Okay?
13        A.  Sure.
14        Q.  All right.  And I understand.  I don't have the
15   signed copy, or I would have given it to you.
16            So the accommodations from OSS are listed on
17   the first page, at least for what the student gets; is
18   that correct?
19        A.  They are possible accommodations that a student
20   would receive based on an evaluation by a counselor.
21        Q.  And so if -- if the counselor has signed off on
22   it like it says here, Robert Dominick, 2-9-16, at least
23   to your understanding, that means that this counselor
24   approved these accommodations --
25        A.  Sure.



1       Q.  -- would that be correct?  All right.  I mean,

2    is that your understanding?

3       A.  That is my understanding.

4       Q.  All right.  In terms of the accommodations on

5    this page -- and you're correct.  These are potential,

6    possible accommodations.  Now, you do not give -- well,

7    let's start with the first one, test taking

8    accommodations.  It says double time.  It's my

9    understanding, and please correct me if I'm wrong, that

10   when this student, whoever the student is on these, goes

11   to OSS to take an exam, because that's where they take

12   it, they receive double time, and you understand that

13   they're receiving double time for the test?

14      A.  Yes.

15      Q.  All right.  And the rest of this test taking is

16   done at OSS because you do not give accommodations for

17   testing to disabled students in your class, do you?

18      A.  No.

19      Q.  That's done through OSS?

20      A.  Yep.

21      Q.  All right.  And is it your policy to email the

22   exams to OSS for the students to pick up and do there?

23      A.  Either email or drop off by hand copy and drop

24   it off.

25      Q.  Do you drop it off?



1    A.  It depends.  We have an office assistant in the

2    department who sometimes takes the tests or picks them

3    up.

4    Q.  And so they would be taken either by someone

5    from the department or you would email it to OSS; is

6    that correct?

7    A.  Uh-huh.

8    Q.  All right.  Now, I do understand that you're

9    not the person giving the testing accommodations.  How

10   about the classroom accommodations?  Do you see where

11   it's marked off as to lecture, record lectures?

12   A.  Uh-huh.

13   Q.  So that means that a person in that class is

14   allowed to tape the lectures; is that correct?

15   A.  Yes.

16   Q.  And it says assistive technology, high-tech

17   access in OSS.  That's not what you do.  That would be

18   OSS.  Preferential seating, I believe this is front

19   area.  So you would receive --

20   A.  Oh, yeah, she sat right in the front.

21   Q.  Okay.  So when you receive this, you would say

22   okay, this isn't a problem, she can sit in the front.

23        E-text in OSS, do you know what that means?

24   A.  I have no idea.

25   Q.  And have you ever seen this in terms of a



1    disabled student, E-text in OSS?

2         A.   Not that I recall.   I don't remember.

3         Q.   Okay.   If you'll turn to the second page, and I

4    understand this is not signed by you, so I'm not saying

5    you did any of this.   Now, if I understand you

6    correctly, you review this, you sign off on whatever you

7    believe is appropriate, and then this goes back to OSS

8    to understand that you have agreed to the

9    accommodations; is that correct?

10        A.   Uh-huh.

11        Q.   All right.   Now, none of this information that

12   I have seen, unless you know differently, has anything

13   to do with the educational material that you offer in

14   class, meaning PowerPoints or handouts or materials that

15   are online.   This accommodation form doesn't pertain to

16   any of those issues, does it?

17        A.   Technically, yes, because they're my instructor

18   notes, lecture notes.

19        Q.   I'm sorry.   Where are you looking?

20        A.   Copies made by OSS of lecture notes,

21   enlargements, font sizes.   The classroom accommodations

22   in the second column.   If something they want, then I

23   would provide them, and there's no indication that I

24   have to give copies of anything.

25        Q.   I am not certain I understand, so let me see if



1   I can unpack that a little bit.

2        A.  Right here.

3        Q.  In the classroom accommodations, that's

4   correct.  It says information --

5        A.  Smart phone images of boards or screen.  Copies

6   made by OSS, lecture notes, paper copies of whatever, or

7   enlargements.  None of that is copied, and that's where,

8   if someone were to ask for information, that I would

9   assume one would find the directive for that.

10       Q.  Oh, so -- just to make sure I understand you,

11  you're indicating that if --

12       A.  You asked -- sorry.

13       Q.  Lecture notes, paper color, or enlargements, if

14  that is not signed or marked off as an accommodation,

15  then that's not something you would deal with; is that

16  correct?

17       A.  I am not saying me in this situation.  You

18  asked me to look over this form that I didn't sign and

19  talk about where I would find -- you said that they made

20  no mention of lecture materials or information that I

21  passed out, so I referenced you back to the second

22  column, which is where -- if someone were to make those

23  recommendations, where you would find that.  And I as an

24  instructor, not being in Robert Dominick's counseling

25  session, would know that I need to make -- otherwise,



APRIL PAVLIK                                    October 03, 2017
PAYAN vs LOS ANGELES COMMUNITY COLLEGE                     52

 1   it's just she can have a note recorder.  There is

 2   nothing in there that makes me know that I need to give

 3   any other accommodations besides giving them the test

 4   and preferred seating.  That's it.

 5       Q.  And you're looking at the column that says in

 6   the middle of Exhibit 41 --

 7       A.  Which is not checked off.

 8       Q.  Which you're looking at the first page where it

 9   has copies made by OSS.  That's the portion you're

10   talking about; is that correct?

11       A.  Uh-huh.

12       Q.  All right.  So was it your understanding that

13   unless these were signed off, you were not required to

14   send anything to OSS?

15       A.  I am not talking about me.  I was telling you

16   where you could find it on the form, and if I were

17   looking at this, it would not seem to me that that had

18   been checked off.

19       Q.  All right.  So let's go back to what -- your

20   classroom processes and practices because I think -- I

21   agree with you.  This says copies made by OSS.  So --

22   and it's not checked off.  We had discussed earlier and

23   you indicated that you did not send materials to OSS for

24   disabled students.  Did I not understand you correctly?

25           MR. CLEELAND:  Objection.  Misstates the prior



1   testimony of the witness.

2   BY MS. BARBOSA:

3       Q.  That's what I'm asking.

4       A.  I did not say that.

5       Q.  All right.  So in 2016, did you send any

6   documents that were used in your classroom, psych 1, to

7   OSS for formatting for a blind student?

8       A.  I would have had to send the test.  If this is

9   a signed document and there is a signature of my

10  signing, then yes.  If I was not asked to send anything

11  to OSS by a student, I did not.

12      Q.  All right.  So in terms of the documents that

13  you used in 2016, was it your understanding that --

14  unless someone indicated to you the documents were not

15  accessible to a blind student, it was your assumption

16  they were accessible to a blind student?

17          MR. CLEELAND:  Objection.  Misstates the prior

18  testimony of the witness, but you're welcome to respond

19  if you'd like.

20          THE WITNESS:  What was the question?

21  BY MS. BARBOSA:

22      Q.  Did you believe in 2016 when you submitted --

23  when you used documents in your psych 1 class that those

24  documents as provided, either on the internet, handouts,

25  or however, would have been accessible to a blind



1  student using a screen reader?

2     A.  Based on my previous experience with blind

3  students in my class, I was under the assumption that it

4  was accessible.

5     Q.  Okay.  And prior to Ms. Mason attending your

6  psych 1 class, in the last five years, how many blind

7  students do you think you've taught?

8     A.  I can't accurately give you that number.

9     Q.  And I understand you cannot give me an exact

10 number.  In 2016 how many blind students did you teach?

11    A.  I'm going to respond in the same way.  I

12 can't -- I know a couple on my hand, but it's one of

13 those things that I can't remember.

14    Q.  And in terms of -- and now I'm talking about

15 fall of 2016.  Other than Portia Mason, did you teach

16 any blind students in any of the courses you taught?

17    A.  I don't recall.

18    Q.  And this year, the fall of 2017 -- yeah, this

19 is still the fall of 2017 -- do you have any blind

20 students in any of your classes?

21    A.  I do not.  Last semester I did.  This semester

22 I do not.

23    Q.  So last semester would have been the summer, or

24 are you talking about --

25    A.  Fall semester.  Or spring semester.  Winter,



1   spring, and fall is when I teach.

2       Q.  So winter, spring, and fall.  So in the spring

3   of 2017, did you have a blind student?

4       A.  I don't recall.  I'm not going to say yes or no

5   because I don't -- I'm not sure.  Without looking at my

6   class rolls, without looking at information in front of

7   me that corroborates it, I'm telling you I can't

8   remember specifics like that.

9       Q.  And I don't need specifics.  I'm not going to

10  ask the name, for example.

11      A.  I understand that, but this is specific enough

12  where I've taught for 10 years, that everything is

13  getting mixed up in what I'm trying to remember, so when

14  you ask me about a specific semester, a specific student

15  population, I can't give you a specific answer.  I'm

16  sorry.

17      Q.  Okay.

18      A.  Medically, I'm memory challenged, and this is

19  one of those areas.

20      Q.  Okay.  Thank you for letting me know that.  I

21  think we should take a little bit of a break so that we

22  can -- yeah, let's take a little -- let's take a

23  15-minute break, and then we'll come back.

24          THE VIDEO OPERATOR:  This marks the end of

25  media No. 1.  The time is 11:33 A.M.  We are off the



1   record.

2          (Recess.)

3          THE VIDEO OPERATOR:  This marks the beginning

4   of media No. 2.  The time is 11:57 A.M.  We are on the

5   record.

6   BY MS. BARBOSA:

7      Q.  Dr. Pavlik, do you feel well enough to

8   continue?

9      A.  I didn't feel unwell.

10     Q.  Okay.  Let's go back to the issue that we had

11  talked about before we took our break, which has to

12  do with documents sent or not sent to OSS.  Let me ask

13  you:  Are you personally acquainted with Robert Dominick

14  as the counselor for OSS?

15     A.  Do I know him?

16     Q.  Uh-huh.

17     A.  Sure, I know him.

18     Q.  Do you -- in the last five years -- no, in the

19  last two years.  In the last two years, have you had any

20  discussions with him in regards to accommodations for

21  any of your disabled students?

22     A.  Yeah.

23     Q.  And were any of those students blind students?

24     A.  It was a generalized conversation.

25     Q.  Okay.  So let me ask it a little bit more



1  particular.  In the last two years, have you had any

2  discussions in regards to specific accommodations for

3  any blind students in your classes?

4      A.  Have I had discussions in general or

5  discussions with this gentleman?

6      Q.  Discussions with Mr. Dominick in regards to

7  student accommodations --

8      A.  Specifically for blind students?

9      Q.  Yes.

10     A.  I do not recall.

11     Q.  Do you recall having -- ever having had

12  specific conversations with Robert Dominick in OSS about

13  accommodations for blind students attending your

14  classes?

15     A.  We -- I don't remember.

16     Q.  All right.  Did you ever have any discussions

17  about Ms. Mason with Robert Dominick at OSS?

18     A.  I don't recall.

19     Q.  Did you have any conversations about Ms. Mason

20  with Randy Anderson, the dean of OSS?

21     A.  I do not recall.

22     Q.  Have you spoken to Mr. Anderson about any

23  particular student accommodation issues in the last two

24  years?

25     A.  Particular student -- spoken to him about an



1   accommodation issue?

2        Q.  Yes, for any particular students.

3        A.  Usually you wouldn't take a particular student

4   issue to Mr. Anderson.  You'd take it to their person

5   who signed their thing.

6        Q.  And so when you say --

7        A.  So I haven't -- no, I do not recall.

8        Q.  And when you indicate you would take it to the

9   person who signed -- and you pointed down to Exhibit 41;

10  is that correct?

11       A.  Sure.

12       Q.  All right.  And just to make -- just to make

13  sure I understand it, when you say sure, does that mean

14  yes?

15       A.  Yes.

16       Q.  All right.  Thank you.  Now, in terms of your

17  training for Canvas, what type of training did you use

18  for Canvas?

19       A.  There was an @ONE training that was provided.

20       Q.  Can you tell me what that means?

21       A.  @ONE is a -- I guess you would call them an

22  online platform.  It's the same thing through Canvas.

23  Like, Canvas works with @ONE to help train people how to

24  use their platform so they can offer online classes.

25  Canvas is the statewide platform that they decided to



1  adopt a few years ago, after a senate bill came out that

2  pushed for this.  So we're using Canvas.  @ONE is the

3  trainer.  Like, they're a service, I suppose.

4      Q.  And was that a classroom setting?  Was that

5  individual study online?  How did you -- how were you

6  trained on @ONE?

7      A.  Well, if you're giving an online class, it is

8  appropriate to be trained online.  We did have one day

9  in person.

10     Q.  And approximately how many hours of time do you

11  think --

12     A.  About 40 hours.

13     Q.  Let me finish the question so we get it right.

14         So am I correct in understanding that you had

15  about 40 hours of training to get the Canvas -- to be

16  trained on Canvas?

17     A.  Yes, I was trained 40 hours to learn how to use

18  Canvas and appropriate online PDA coaching.

19     Q.  And can you tell me whether or not, like

20  Etudes, an instructor is not supposed to use Canvas

21  until he or she is trained?  Is that correct?

22     A.  There is training you have to take to be able

23  to access Canvas.

24     Q.  Okay.  And would all the training be the same

25  one from Act ONE that you've just discussed?



1      A.  I have no idea.

2      Q.  All right.

3      A.  It's @ONE, not Act ONE.  It's @ONE.

4      Q.  Okay.  Good.

5      A.  Not Act ONE.

6      Q.  Now, you indicated you believed that the Canvas

7    was being used statewide after the passage of a senate

8    bill.  How do you know that?

9      A.  Because I'm involved in the Academic Senate.

10   I'm also on the Statewide Academic Senate as a delegate

11   for our school.  And I am a foundation director for the

12   Academic Senate for Community Colleges Foundation Board.

13     Q.  And so can you describe what the senate bill

14   was?

15     A.  Actually, since I am not involved in that area,

16   I can't tell you specifically.  It's easily looked up,

17   though.  You can look it up on the ASCCC website under

18   legislation and impact with student programs.  But I do

19   know that Canvas was adopted statewide.  I'm not -- that

20   wasn't something that I'm guessing.

21     Q.  All right.  And so apart from the organizations

22   that you discussed, are you involved with any committees

23   at LACC?

24     A.  Yep.

25     Q.  What committees are you involved in?



APRIL PAVLIK                                      October 03, 2017
PAYAN vs LOS ANGELES COMMUNITY COLLEGE                    61

1      A.  I am the curriculum chair.  I'm the
2  vice-president of the Academic Senate.  I participate --
3      Q.  Can you say it a little bit slower so I don't
4  miss what you're saying?  You are the curriculum chair?
5      A.  Curriculum chair.
6      Q.  Uh-huh.
7      A.  I am the vice-president of the Academic Senate.
8  I'm on the SPC committee.
9      Q.  What is SPC?
10      A.  SPC -- I can't remember what the words are.
11      Q.  We'll come back to that.  Any other --
12      A.  Coming back to it probably won't help.  So --
13  I'm on a wide number of governance bodies on the campus.
14      Q.  So let's see if you can remember any other.
15  Curriculum chair, VP of the Academic Senate.  SPC is
16  some sort of committee?
17      A.  Yes, SPC is a committee.  Strategic planning
18  committee.
19      Q.  There you go.
20      A.  This is very difficult, and I would
21  appreciate -- the educational policies, planning, and
22  integrated planning committee, so that's EPIC.  I am on
23  COMPASS.  I have no idea what that one is, so please
24  don't ask.  I'd be happy to point you in the direction
25  to find the names of it.  What other one am I on?  I'm



 1   on program review and evaluation.  I am on PRE, district
 2   curriculum committee.  I think that's all of them.
 3   Staff and organizational development in the Professional
 4   Development College for the District Academic Senate.
 5   Yeah.
 6       Q.  Dr. Pavlik, what does the curriculum chair do?
 7       A.  I'm responsible for making sure that the
 8   curriculum is updated in a timely manner according to
 9   Title 5, that we follow all district and state
10   requirements for curricular updates, creating new
11   courses and programs, and I make sure that that happens
12   on campus.
13       Q.  How long have you been curriculum chair?
14       A.  My third year.
15       Q.  And as part of that work, does this committee
16   review and/or evaluate textbooks?
17       A.  No, we don't review or evaluate textbooks.
18   That's the faculty's job.  I don't do that because I'm
19   not a discipline expert in every discipline.
20       Q.  And so when you -- when you indicate that you
21   ensure that -- and I'm supposing LACC because that's
22   what you're working with, right, not the whole district?
23       A.  Being a part of the district curriculum
24   committee, I am part of districtwide curriculum
25   decisions, but I'm -- go ahead with your question.



1     Q.  All right.  There appears -- so you appear --

2  you're the curriculum chair for LACC; is that correct?

3     A.  Yes.

4     Q.  But you are part of the curriculum for the

5  district; would that be correct?

6     A.  Yes.

7     Q.  All right.  So in terms of ensuring that the

8  curriculum stays in compliance with Title 5, what does

9  that mean in terms of what you do?  What does the

10  committee do?

11     A.  We make sure that courses are updated according

12  to Title 5, which are the regulations from the state

13  about what we have to include in a course outline of

14  record.  There's a number of those things in Title 5

15  that directly relates to the update of our courses.

16     Q.  And do you know whether or not any of -- well,

17  excuse me.  Let me strike that.

18         As curriculum chair, do you also review whether

19  any of the curricula that's being updated is accessible

20  to --

21     A.  That was not part of my purview.

22     Q.  Let me finish the question.  Thank you.

23         Is the curriculum -- let me ask this a little

24  bit differently so we get this clear.  The curriculum

25  committee at LACC of which you are chair, does the



1  assurance that you comply with Title 5 and/or update the

2  curricula include any evaluation of the accessibility in

3  terms of the programs and services as part of the

4  curriculum for disabled students?

5       A.  So you're asking if I evaluate the materials

6  for the course?

7       Q.  I'm asking if the committee --

8       A.  No, I do not.  No, the committee does not.  We

9  do not -- all we look at is the course outline of

10  record, which is published on our website.  It has

11  information about the catalog description, top code, zip

12  code, all of those things that are state-mandated

13  information we have to have for every course.  My job as

14  the committee chair is an overview of the courses,

15  making sure that we -- making sure that we're updating

16  those.  According to state regulations, every five years

17  courses have to be updated.  Our purview is not to look

18  at textbooks or accessibility of courses based on

19  materials.

20       Q.  All right.  So that is not something that your

21  committee does.  Do you know whether any other committee

22  reviewing any of this curricula does take that --

23       A.  There's an entire -- sorry.

24       Q.  -- does do that, meaning evaluate those

25  programs that you have indicated for accessibility to



1  disabled students, other than your committee?

2      A.  It is not my committee, and I would assume that

3  it happens in the Office of Special Services.  They have

4  an entire program that they deal with students needing

5  specialized services.

6      Q.  Is it your understanding that OSS reviews the

7  curriculum that is being offered for accessibility?

8      A.  I did not say that, and I do not know what they

9  do.

10      Q.  All right.  So in terms of the -- you indicated

11  that the information that you just spoke about in terms

12  of the Title 5 and the curricula that's being evaluated

13  is on -- is it on the LACC website?

14      A.  Title 5 is -- what are you asking me?  If state

15  legislation is on LACC's website?

16      Q.  No.  I'm asking whether or not the work of the

17  committee in evaluating and ensuring compliance with

18  Title 5 -- are those materials on the website for LACC?

19      A.  I'm having trouble understanding what you're

20  asking me because -- so your question is about my

21  committee or other committees, because I do not know

22  anything about other committees and how they run?

23      Q.  No, I'm asking about the academic -- the

24  curriculum committee at LACC of which you are chair.  Do

25  you maintain records of the work that this committee



1 does in evaluating the curriculum and the programs for

2 compliance with Title 5?

3     A.  Of course we do.  Because we're a Brown Act

4 committee, I have agendas and minutes and approval

5 notes, yes.  I have an accurate recording of what we do

6 in our committee.

7     Q.  And where would those records be maintained?

8     A.  It's on the Los Angeles Community College

9 website.  If you go into faculty and staff, then you go

10 to academic -- academic affairs, and then Academic

11 Senate, and then the curriculum committee, and we have a

12 share point site that is there.

13     Q.  And is that a committee that is open to the

14 public or only --

15     A.  It's a Brown Act committee, so, yes, it's open

16 to the public.

17     Q.  Okay.  And you indicated that you're also the

18 VP of the Academic Senate.  Can you tell me what you do

19 as the VP of the Academic Senate?

20     A.  It's basically VP and curriculum chair, so the

21 bulk of my duties are curriculum chair.

22     Q.  All right.  And then you did the SPC, which is

23 strategic planning committee.  What is the purpose of

24 the SPC committee?

25     A.  It strategically plans the goals of the college



1   to make sure that they're in alignment with statewide

2   directives.

3       Q.  And are there minutes to those?

4       A.  There are minutes to all of these committee

5   meetings.  All of them are housed on the LACC website.

6       Q.  Excellent.  And so in terms of the strategic

7   planning committee, you indicated that -- well, let me

8   ask you.  As part of this -- how long have you been on

9   this committee, SPC?

10      A.  I've been chair of the curriculum department in

11  all of these things for approximately three years.

12      Q.  Okay.  In the three years that you have been

13  involved with SPC, have you as part of the committee

14  ever heard about a discussion in terms of evaluating the

15  curriculum and the services for students with

16  disabilities at LACC?

17      A.  I would not in that committee, no.

18      Q.  Tell me again what the purpose of that

19  committee is.

20      A.  It is looking at collegewide goals to determine

21  programs and goals that we have to hit statewide to make

22  sure that we are graduating an appropriate number of

23  students, we have services for students.  So it's --

24  they don't -- again, these are broader committees that

25  aren't going to deal with specific issues.  There are



1  specific committees that deal with the counseling, the

2  students with disabilities.  All of that is covered in a

3  different committee.  Each one of these committees have

4  a specific area of focus.

5      Q.  Would antidiscrimination at the college level

6  be one of the topics that would be discussed in

7  strategic planning committee?

8      A.  It could be.  Again, I'm not the chair, and I

9  do not direct that committee.

10     Q.  In terms of your attendance on this committee,

11  have you ever had any discussion or presentation in

12  regards to antidiscrimination policies to comply with

13  Title 5?

14     A.  I don't recall.

15     Q.  Do you recall whether or not as part of this

16  SPC this committee ever discussed the policy goals as

17  listed under the ADA, Americans with Disabilities Act?

18     A.  This is probably not the committee where it

19  would be discussed, but as I -- when we're looking at

20  targeted goals for the state, all students come into

21  play.

22     Q.  Okay.  My question is a little bit more

23  specific.  Have you ever heard or taken part of a

24  discussion at SPC in regards to meeting the policy goals

25  of the ADA?



1      A.  I don't recall.

2      Q.  Can you tell me what EPIC is and what the goal

3  of EPIC is, or the purpose of it?

4      A.  EPIC looks at program review.  So each

5  department has to do a review of what's going on in

6  their area for the year, and they create goals that are

7  very specific to the department to move student success

8  forward in their program.

9      Q.  So as part of the EPIC program, would you be

10  focused on the psychology department portion of the

11  goals and what they're trying to achieve at EPIC?

12      A.  Not -- not specifically, no.

13      Q.  Okay.  I thought I heard you say that EPIC was

14  much more specific to a department.  Did I misunderstand

15  that?

16      A.  Yeah.

17      Q.  All right.  So can you tell me what EPIC --

18  what is the purpose of EPIC?

19      A.  So EPIC, we do program reviews each year.  EPIC

20  gets those program reviews from each of the departments

21  each year.  They look at those reviews and provide a

22  collegewide look at where we're going in the next few

23  years based on department goals.

24      Q.  All right.  So that would be department goals,

25  and then EPIC looks at all of the department goals



1  because they're provided to them; correct?

2      A.  That's one facet of it, yes.

3      Q.  What other facets would there be for EPIC?

4      A.  I'm not -- other facets for EPIC would be

5  approval of new programs, looking at program

6  discontinuation, looking at -- those are the three major

7  things.

8      Q.  All right.  In any of the information that's

9  been provided by the departments in terms of the policy

10  planning, have you ever had or heard of any

11  discussion -- pardon me.  In terms of the educational

12  policy planning, EPIC, while you have been involved,

13  have you had any discussion or topics relating to

14  compliance with the ADA in terms of the college

15  policies?

16     A.  Yes.

17     Q.  In terms of EPIC.

18     A.  Yes.

19     Q.  And tell me what you recall about those

20  conversations.

21     A.  I know they were had.  I can't recall

22  specifics.  Again, this is -- it's very difficult for me

23  to recall specifics.  I can generally know that, yes,

24  that was an area of focus because some departments have

25  specific plans addressing that.



1    Q.  All right.

2    A.  I can't -- I won't be able to give you

3  specifics.  I'm sorry.

4    Q.  All right.  But this, like the other

5  committees, would have minutes and their agendas posted;

6  would that be correct?

7    A.  Yes.  So all of this can be accessed on the

8  website.

9    Q.  Okay.  Great.  I'm not going to ask you what

10  COMPASS stands for, but does COMPASS -- what's the focus

11  of the COMPASS committee?

12    A.  COMPASS committee looks at our -- basically how

13  we're doing with disproportionally impacted students.

14  They look at basic skills funding.  It's the side of the

15  house that is getting money for first-year experience,

16  for different student populations, basic skills

17  initiative.  They respond to accreditation stuff.  It's

18  more specific into how different students -- how we can

19  move their success forward in the college.

20    Q.  And in terms of the COMPASS program or

21  committee, do you recall any discussions in regards to

22  how to move students with disabilities as a student

23  population forward?

24    A.  Yes.  I just said that.

25    Q.  Students with disabilities?



1     A.  Disproportionally impacted students, which also

2   includes students with disabilities.  There's a broad

3   group of students that get disproportionally impacted,

4   either for reasons of disability, for disadvantage, for

5   first-generation college students, and specific

6   populations.

7     Q.  And do you recall what, if any, recommendations

8   or solutions have been proposed by COMPASS to assist

9   students with disabilities to move forward?

10    A.  Unfortunately, it's not COMPASS that makes

11  these recommendations.  It's different programs that

12  bring forward their recommendations, and COMPASS makes a

13  lot of those recommendations, which can be found on the

14  website in their minutes.

15    Q.  Okay.  Thank you for letting me know that, but

16  do you recall any conversations?

17    A.  I cannot recall.

18    Q.  All right.  You mentioned, if I wrote this

19  correctly, program review and evaluation committee; is

20  that correct?

21    A.  Yes.

22    Q.  What is the purpose of this committee?

23    A.  That committee is the one that helps get all

24  the program review information together for the

25  department so they can commit -- that they can do their



1   program review so that then they can go forward and give

2   it to EPIC and turn it in each year.

3        Q.  And these would be the different departments

4   providing information?

5        A.  Uh-huh.

6        Q.  All right.

7        A.  Yes.

8        Q.  The district curriculum committee, can you tell

9   me what the purpose of that is?

10       A.  So Los Angeles College District has nine

11  different colleges.  We all have curriculum chairs.  We

12  all meet at the district one time a month to make sure

13  that our curriculum is not impinging on the curriculum

14  of other people in the area.  We modify our board

15  regulations so that we are in compliance with any

16  legislative updates that we need to have, and then we

17  take information from the district side or the District

18  Senate back to our individual colleges if we have to do

19  anything.

20       Q.  Okay.  Thank you.  And then, finally, you said

21  staff and organization for Academic Senate?

22       A.  So it's a Professional Development College for

23  the District Academic Senate.

24       Q.  And when you say Professional Development, is

25  that like the nursing school?



1      A.  No.  It -- so there are initiatives, I guess,

2   in the college to make sure that staff and faculty get

3   trained.  I am involved in the district to create a

4   college for professionals who want to learn how to

5   teach, and so they take courses, get credit, and they

6   can be moved up in columns and steps.

7      Q.  Okay.  Thank you.  Moving forward.  I'm going

8   to give you a copy of a document that was previously

9   marked as Exhibit No. 2 in Barbara Vasquez's deposition,

10  and I will indicate to you that it is entitled

11  Los Angeles Community College District Administrative

12  Regulation B-33.  Topic:  Web Accessibility Standards

13  and Guidelines.  I'm going to ask you if you have ever

14  seen this information before.  If I can pass that over

15  to you.  I believe I have one for you as well.

16          MR. CLEELAND:  That's fine.

17          THE WITNESS:  Yeah, these are E regs -- or

18  B regs.  These are regulations that we then convert to

19  our practices in the district.

20  BY MS. BARBOSA:

21     Q.  And are these the documents -- pardon me.  Let

22  me go backwards.  Are these the policies that you would

23  be referring to when you talked about complying with the

24  policies of LACCD for the college, or one of them?

25     A.  That's a specific of a broad, general statement



1  that I made.  This is a regulation that is used for web

2  accessibility.  I have a set of regulations for

3  curriculum.

4      Q.  All right.  I guess -- maybe I misunderstood.

5  Yes, this is a copy of an administrative regulation for

6  web accessibility.  Have you ever seen this information

7  in any of your work at the college?  Meaning the policy

8  for web --

9      A.  Sure, I've run across it.

10      Q.  All right.  I'm not going to ask you any

11  specific questions on it, so you can go ahead and --

12  actually, give this back to me because she's already got

13  it.  Thank you.

14          I'm going to provide you with a document that

15  has also been previously marked, so I'm not going to

16  mark it again, but I will tell you that this is

17  Exhibit 27.  And let me go ahead -- excuse me.  It's not

18  Exhibit 27.  It was labeled as Exhibit 4.  So let me

19  give you a copy of this, and I will hand a copy to

20  counsel.

21          MR. CLEELAND:  Thank you.

22  BY MS. BARBOSA:

23      Q.  And I will ask you if you have seen this policy

24  previous to today.

25      A.  Where is this located?



1       Q.  On the website for LACC.

2       A.  LACC or LACCD?  They are two specifically

3    different websites.

4       Q.  Yes, they are.  It's for LACC.

5       A.  Oh, yeah, yeah, yeah.  Yeah.

6       Q.  When did you see this prior to today?

7       A.  Oh, I don't know when I saw it.  I know I saw

8    it because I read the information.

9       Q.  And if you don't mind, I do want to ask you a

10   couple of questions on it.

11      A.  Sure.

12      Q.  So if you want to hold onto that.  Although

13   this does say LACC, it does say equal --

14      A.  It doesn't say LACC at all.

15      Q.  If you look at the very top.

16      A.  Okay.

17      Q.  And just to let you know, the bottom is the

18   Bates stamp of this case.  That's why it has that

19   information on it.  Will you look at the second

20   paragraph beginning with basic college responsibility

21   for providing alternate media?

22      A.  Uh-huh.

23      Q.  Have you ever -- let me go backwards.  Do you

24   know who the dean of educational technology is for LACC?

25      A.  The dean of ed tech, no, I don't.  I can't



 1   recall the name.

 2       Q.  In the work that you have done in terms of your

 3   committee work, have you -- have any of the committees

 4   ever reviewed this policy in terms of what the

 5   requirements might be for their curriculum or programs?

 6       A.  This is actually an alternate media production

 7   policy.  It's not a curriculum policy.  This is provided

 8   in our training materials.

 9       Q.  So tell me -- what kind of training have you

10   received in terms of alternate media production?

11       A.  As I mentioned before, I've had training in the

12   Etudes course and in the Canvas course.

13       Q.  Were you informed on how to -- when alternate

14   media would need to be provided to students with

15   disabilities?

16       A.  When it's indicated on this form.

17       Q.  So will you read paragraph 3, please.

18       A.  Faculty --

19       Q.  You don't need to read it out loud, but if

20   you'll do the third paragraph.  If you can read it to

21   yourself because I would like -- it begins with the

22   instructional resources.

23       A.  Sure.  Uh-huh.

24       Q.  All right.  So in terms of -- paragraph 3

25   indicates that instructional material and resources will



1   be reviewed at least once every six years as part of the

2   accreditation process.  Have your materials -- and by

3   that I mean instructional resources and materials -- for

4   your psychology classes -- do you know if they've ever

5   been reviewed for -- pursuant to Title 5 in terms of the

6   accommodations for disabled students?

7        A.  I believe the faculty member is doing this when

8   they're turning in the course.  I don't -- in our

9   curriculum committee, as I mentioned before, we don't

10   review the materials or the textbook.  That's not my

11   purview.  That's the faculty member's individual

12   purview, and it looks like in this statement as well

13   that if that needs to happen, that the college is

14   responsible for acting in a timely manner to make sure

15   that those materials are reviewed, but that's for the

16   materials in the textbook.

17        Q.  I believe it's probably more than that.  It

18   says instructional resources or materials.  If you'll

19   look at that.

20        MR. CLEELAND:  There's no question pending.

21   BY MS. BARBOSA:

22        Q.  But let me ask you a question.  Do you know if

23   your instructional resources or materials have ever been

24   reviewed for accessibility for disabled students?

25        A.  Has there been an official review of my



 1  materials?

 2      Q.  I don't know what official or unofficial would

 3  be, so let's start with the official, and then we'll go

 4  the unofficial.

 5      A.  Well, actually, I'll go the other way first.

 6      Q.  Okay.

 7      A.  I mentioned before that I have used materials

 8  with OSS for a number of years, and those materials

 9  are -- there's no official review, but they have been

10  utilized by students for years and the OSS department,

11  and I haven't had issues.

12      Q.  So I think that there were several things I'd

13  like to address in that response.  First of all, am I

14  correct in understanding that, as far as you know, there

15  has not been a review to see whether or not they need to

16  be revised for accessibility?  For your instructional

17  materials or resources used in your courses.

18          MR. CLEELAND:  Objection.  Misstates the prior

19  testimony of the witness, but if you're able to

20  understand the question and respond, please feel free to

21  do so.

22          THE WITNESS:  If you want to restate the

23  question, I can try.

24  BY MS. BARBOSA:

25      Q.  Yes.  Do you know whether your instructional



1   resources or materials used in your courses have ever

2   been reviewed for accessibility for students with

3   disabilities, such as being blind?

4           MR. CLEELAND:  Objection.  Asked and answered,

5   but go ahead.

6           THE WITNESS:  Have they been reviewed?  Yes.

7   They've been looked at, reviewed.  People with

8   disabilities have used them.  I don't know what the

9   process is when you send your information to OSS.  I

10  don't know how they translate it to the materials that

11  the student gets.  I -- there's no official -- there has

12  been no request for my materials and an official review

13  of my materials.

14  BY MS. BARBOSA:

15     Q.  Okay.  And so -- then the next question I have

16  in terms of -- you said you send materials to OSS; is

17  that correct?

18     A.  Again, I send -- I'm sorry.  I should be very

19  specific when I say materials.  When I am asked to send

20  a test or quizzes, I do so, so those are the -- the

21  tests and quizzes I send have never been sent back or I

22  haven't been told that they are inaccessible.

23     Q.  Okay.  And the materials that you use in your

24  classrooms, other than the tests or quizzes, are those

25  ever sent to OSS for review?



1    A.  OSS does not -- why would they review my test?

2    Q.  No, not your test or your quizzes.  The other

3  materials that you are providing in your classroom --

4    A.  I don't provide other materials to OSS.  I

5  don't -- unless they -- I'm trying to understand what

6  you're asking.

7    Q.  Let me ask it again, then, so that it's not so

8  frustrating for you.  I am trying to find out whether

9  you send PowerPoint presentations to OSS to be --

10    A.  I don't send PowerPoint presentations to OSS to

11  be formatted.  I have not said that during this

12  deposition.

13    Q.  No, no.  That's a question.  So the answer is

14  no.  Do you send any of your handouts to OSS for

15  formatting for accessibility?

16    A.  I do not ask them to format my documents.  If

17  students need them, they request them from me, and they

18  get them and take them to OSS and get them translated

19  there.  Students are encouraged to be their own

20  activists in terms of getting information and taking it.

21  And instructors are directed to follow this to the

22  letter.

23    Q.  And so --

24    A.  "This" being Exhibit 41.

25    Q.  So would it be correct -- well, let me go



1   backwards.  Am I understanding you correctly that you do

2   not send documents prior to their use by a disabled

3   student to OSS for formatting?

4        A.  No.

5        Q.  Okay.

6        A.  That would --

7        Q.  I believe, if I understood you correctly, that

8   when you produce your handouts, you produce them in a

9   PDF form; would that be correct?

10       A.  Only if I'm trying to make them more accessible

11  on a website so that if you don't have the most latest

12  version of Word, but not in general.  I don't reformat

13  them.  I'd make them in a Word document.

14       Q.  And do you sometimes hand out -- give handouts

15  out during class?

16       A.  Not recently, no.

17       Q.  In 2016 did you give out handouts in your --

18       A.  I don't recall.

19       Q.  Let me finish the question.  In 2016 do you

20  remember whether or not you provided handouts in any of

21  your psychology classes?

22       A.  Again, I do not recall.

23       Q.  Okay.  Do you ever provide any materials in a

24  hard copy in class?

25       A.  Sometimes, yes.



1       Q.  What kind of materials do you provide?

2       A.  Handouts.

3       Q.  In terms of class, hard copies in class.

4       A.  Handouts.

5       Q.  Uh-huh.  I'm sorry.  You do give handouts out

6   in a hard copy in class sometimes; is that correct?

7       A.  Yes, I do.

8       Q.  All right.  But you don't remember whether in

9   2016 -- whether or not you did that in your psychology

10  class?

11      A.  I do not recall.

12      Q.  Okay.  But it's not unheard of for you to give

13  handouts in class?

14      A.  No, it's not unheard of.

15      Q.  All right.

16      A.  We have a very low copy budget, so it's hard.

17      Q.  Oh, you mean to give out documents to people?

18      A.  Yeah.  There's 40 people in class, and you have

19  to make all of those copies, and community colleges are

20  in a budget crisis.

21      Q.  So would it be correct that most -- well, let

22  me ask you.  Would most of the documents that you ask

23  the students to review for your classes or to look at

24  for your classes -- would they be mostly on the website?

25      A.  No.  They're in class.  I go over what I show



1   on the screen, which is everything in class.

2        Q.   Okay.

3        A.   There are no documents that I just say go find

4   it.  We put it up on class.  Students can copy and take

5   or use their audio recording to get a copy of what I'm

6   saying.  I go over all the PowerPoint presentations, and

7   so information is provided in class and explained

8   thoroughly in class.

9        Q.   And so in terms of your PowerPoint

10  presentations, what do you do, if anything, to make them

11  accessible to persons who cannot see?

12       A.   Alt text and describing what's being shown in a

13  picture if there's a picture.  And I also have stopped

14  using random pictures that don't really help provide a

15  narrative for the story because they're not as easily

16  accessible by everyone.

17       Q.   And do you -- when did you stop doing that

18  practice of giving out --

19       A.   I stopped doing -- go ahead.

20       Q.   When did you stop the process -- the procedure

21  of handing out or discussing photos or graphics that

22  everybody couldn't read or understand?

23       A.   Two questions.  The first one was when did I

24  stop giving handouts, and then the second one was when

25  did I change how I used photos?



1      Q.  When was the second one?  The second one.

2      A.  The second one?

3      Q.  Uh-huh.

4      A.  So with the second question, I don't recall

5   when that happened.  After one of the trainings, they

6   told us to make sure that we're using -- not just to

7   make the presentation flashy, but there needs to be a

8   reason for the pictures.

9      Q.  And so when did this training occur?

10     A.  I don't recall.

11     Q.  Do you know who gave this training?

12     A.  I do not recall.

13     Q.  Was it within the last five years?

14     A.  It could have been, but I do not recall.

15     Q.  Was it this year?

16     A.  No, it was not this year.

17     Q.  And you don't recall whether it was before

18   2016?

19     A.  No.

20     Q.  All right.  When you say you put descriptive

21   text, describe the process of doing that.  How do you do

22   that?

23     A.  It depends on what program you're in or how you

24   click on the picture.

25     Q.  I'm sorry.  PowerPoint.  On PowerPoint.



1      A.  So you can click on the picture, and it brings

2   up a label for alt text, so you can just put it right in

3   the text as you're creating the PowerPoint presentation.

4      Q.  In terms of your PowerPoint presentations --

5   you've indicated that you have had blind students in the

6   past.

7      A.  Uh-huh.

8      Q.  Excluding Ms. Mason, have any blind students

9   indicated to you that they were having trouble accessing

10  any of the materials you were providing?

11     A.  Huh-uh.

12     Q.  Have any of the blind students, excluding

13  Ms. Mason, ever indicated to you that they could not

14  access the website and use their screen reader to get

15  all the information off of your website?

16     A.  No.

17     Q.  Have you had any complaints in terms of how

18  blind students, again excluding Ms. Mason -- how they

19  can learn the material in your classroom for documents

20  that you're giving them?

21     A.  No.

22     Q.  Now, I'm going to give you a document that

23  we're going to label as 42.  It's a document provided

24  from Portia Mason, just to let you know.  Because she

25  can't see, she handed me a lot of documents, so I want



1  to find out, first of all, if this is a quiz that you

2  gave out.  If it isn't, we don't have to have any

3  discussion on it.  I believe this is Exhibit 42.

4         (Exhibit 42 was marked.)

5         MS. BARBOSA:  I'm going to give a copy to

6  counsel.

7         MR. CLEELAND:  Thank you.

8  BY MS. BARBOSA:

9     Q.  And I'm going to give a copy to the witness.  I

10 will tell you, Dr. Pavlik, that I did not put any of the

11 darker highlighted spots.  I also did not do any of the

12 writing.  This is exactly how it was provided to me.

13    A.  This does not look like --

14        MR. CLEELAND:  Wait for the question.

15        THE WITNESS:  Sorry.

16 BY MS. BARBOSA:

17    Q.  My question is, is this one of the exams -- or

18 one of the quizzes that you have used in one of your

19 classes?

20    A.  This doesn't look like a quiz that I used.  I

21 have multiple choice questions, and these are short

22 answer.

23    Q.  Will you look at the --

24    A.  These are -- these aren't quiz questions.

25 Actually, if she was taking a quiz, she wouldn't be



 1  taking it in my class.  She would be taking it in OSS,

 2  so these don't look like my questions.

 3      Q.  Can you tell me whether or not the handwriting

 4  looks like your handwriting?  Do you recognize the

 5  handwriting?

 6      A.  Not really.  It could be, but I don't recognize

 7  it.

 8      Q.  Would it be correct to say that if this was one

 9  of your quizzes that had been emailed to OSS, that it

10  would be in the system?

11      A.  If it was emailed to them, they would have a

12  record of it, yes.

13      Q.  All right.  And in your spreadsheet, would you

14  have information that would let us know whether or not

15  this was your quiz?

16      A.  Not -- not a specific quiz, no.

17      Q.  All right.

18      A.  It wouldn't say like version 22.  It doesn't

19  say that.  It just has scores.

20      Q.  So it wouldn't say quiz No. 2?

21      A.  It might say 2, but it wouldn't have the

22  questions or the breakdown on it.

23      Q.  All right.  Let me ask you -- if we could look

24  at the first quiz No. 2.  If we could look at the

25  bottom, it says -- No. 5 says draw and label the neuron.



1      A.   Uh-huh.

2      Q.   Do you see that?

3      A.   Uh-huh.

4      Q.   Do any of your quizzes or exams require the

5   students to draw or label a neuron?

6      A.   Yeah.

7      Q.   And do you recall whether or not Ms. Mason

8   indicated to you that she could not draw any information

9   on a quiz?

10     A.   No.

11     Q.   Do you recall whether or not anyone from OSS

12  asked you to provide an alternate question instead of

13  drawing and labeling a neuron?

14     A.   I don't remember being asked to give an

15  alternative question.

16     Q.   And do you recall any conversations with

17  Ms. Mason in regard to her problems she had in doing her

18  quizzes or exams because it was requiring some graphics

19  on her part?

20     A.   No.

21     Q.   I'm going to hand you another document.  This

22  is labeled Psychology 1 Personality Quiz.  I'm going to

23  mark it as Exhibit 43.

24          (Exhibit 43 was marked.)

25  ///



 1  BY MS. BARBOSA:

 2      Q.  And I'm going to ask you if this is one of your

 3  quizzes.  Here's a copy for counsel.

 4          MR. CLEELAND:  Thank you.

 5  BY MS. BARBOSA:

 6      Q.  Here you go.  And if you'll just, first of all,

 7  tell me whether or not you recognize this document.

 8      A.  Yeah.

 9      Q.  Is that yes?

10      A.  Yes.  I said yeah.

11      Q.  And is this a quiz that you hand out in your

12  psychology 1 classes?

13      A.  This was actually -- it's actually mislabeled.

14  It said quiz/homework, so it's an in-class activity that

15  they had a partner, that they were reading and figuring

16  out the letters for, because this is a big -- this 21 is

17  a lot of questions for a quiz, so it wasn't a quiz.  It

18  was an in-class activity.

19      Q.  So sometimes do you have in-class activities

20  with students working on either documents or information

21  provided by you?

22      A.  Occasionally, yeah.

23      Q.  And this document -- if you can remember, would

24  this document have been posted on your website after the

25  class?



1      A.  Quizzes don't get posted really, because

2   that's -- they're in a -- it's a test bank.  It's test

3   bank material, so you don't want your students to have

4   your quiz materials.  If it's a handout, yes, it would

5   be provided on the website.  But as a quiz, this was

6   handed out in class.

7      Q.  And do you pick these back up when they're

8   finished?

9      A.  Only to mark down if they've taken it or not.

10  Usually it's just a participation, as in 10 points out

11  of 10 points, so you were in class, you participated,

12  you worked with someone else or two other people.  You

13  get participation points for this.

14     Q.  And so when you handed out this in class, do

15  you have -- do you recall Ms. Mason in any of your

16  classes?

17     A.  Uh-huh.

18     Q.  And do you -- would you know how Ms. Mason

19  would have been able to take this personality quiz on a

20  hard copy?

21     A.  So you're going to keep calling it a

22  personality quiz, even though I said it was a handout

23  and an in-class activity.

24     Q.  I'm going to say Exhibit 43.

25     A.  Okay.  When I hand anything out to a visually



1  impaired student, I tell them what I'm handing to them

2  so they have an indication of it on the audio recording

3  that they have.  Then we talked about the idea that she

4  could do this later using her reader.  It's usually the

5  option I give, later.  And we can have either me in

6  class helping go through it, which I've offered before

7  to students, or I set them up with another student who

8  they're comfortable with who they will sit and do the

9  activity with, if she was awake.

10      Q.  Do you recall specifically giving any of those

11  choices to Ms. Mason for Exhibit 43?

12      A.  I don't recall specifically for this particular

13  exhibit, no.

14      Q.  And in terms of your training that we've talked

15  about, in terms of your training with disabled students,

16  did any of that training indicate to you how blind

17  persons take in information as opposed to someone who

18  can see?

19      A.  I'm sure it was covered.  I don't recall

20  specifics.

21      Q.  And do you know whether or not this Exhibit 43

22  would have been accessible for Portia Mason to work on

23  in class if it was handed in a hard-copy form?

24      A.  Do I understand that she probably wouldn't be

25  able to read it because she is visually impaired?  Yes.



1    Q.  And do you know whether or not someone reading

2    her 21 questions within another set of choices is

3    something that a visually impaired person would be able

4    to do in an equivalent manner to somebody seeing it?

5        A.  I would not assume, so that is why you would

6    need to approach it in a different fashion, which is --

7    question 1 is redirecting an impulse to a less

8    threatening object.  If you're working with a partner or

9    you're working with the instructor, we can go through,

10   and thinking about that question, let's talk about these

11   options.  Then the next question, then the next options.

12   So, yes, I understand that a visually impaired

13   individual would not be able to take this test in front

14   of them because they can't see the paper.

15       Q.  I'm asking -- I understand.  Thank you.  I'm

16   asking a little bit different question.  Do you know

17   how -- do you have any knowledge of how blind persons

18   learn audio by someone reading one question and then 21

19   choices, if that would be equally -- excuse me.  Let me

20   make that a different question.

21           Have you ever been informed or trained as to

22   how a blind person uses audio to learn large portions of

23   material?

24       A.  I don't recall.

25       Q.  And is it your understanding that having



1   someone read the question and then all of the choices

2   would be an equal communication as the students who

3   could see?

4       A.  Well, I feel like -- no.  I -- there's too many

5   answers to this question.  Are you -- can you ask me the

6   question again?

7           MS. BARBOSA:  Will you please read the question

8   back to her.

9           (Record read.)

10  BY MS. BARBOSA:

11      Q.  Equally effective, I should say.

12      A.  So if we're looking at perceptual abilities and

13  how one would visually digest the same information, you

14  would on the first one read all of the 20 choices.  Then

15  on the second one, you would read 19 because you had

16  picked one.  Then 3, you would do 17, 16, 15.  So you're

17  creating a list of ones that you can break off.  I don't

18  know specifically because I have not -- I'm not an

19  expert in that field.  I don't know the difference

20  between how one individual does that and another

21  individual, regardless of their visual capability or

22  not.  So based on my expertise, no, I don't -- I can't

23  give you a definitive answer on the differences between

24  how a student who is visually impaired is auditorily

25  learning versus another person, and I can't compare



1   those two people.

2       Q.  And by the comparing, we mean someone who is

3   visually capable of reading words.

4       A.  Or visually capable.  Somebody with ADD, ADHD.

5   I don't -- I can't tell how one individual is going to

6   process this type of information over another

7   individual.

8       Q.  Do you know whether or not audio reading of a

9   document is as equally effective for a blind student as

10  having it in a screen reader?

11      A.  I do not know the research on that.

12      Q.  I'm going to provide you with another document.

13  I believe this is in your class, but you have to let me

14  know whether or not it is or is not.

15      A.  No.

16      Q.  It is a two-page document.  I do not have a

17  stapler.  It is going to be No. 40 --

18          THE REPORTER:  44.

19          MS. BARBOSA:  44.

20          (Exhibit 44 was marked.)

21          MS. BARBOSA:  And I am going to give a copy to

22  counsel.

23          THE WITNESS:  Nope, this is not my class

24  material.

25  ///



 1  BY MS. BARBOSA:
 2      Q.  Well, then that is much easier.  I'll still
 3  give it to you, but I'm not going to ask you any
 4  questions on it.
 5          I'm going to hand you another document.  It is
 6  called Los Angeles City College Online Resources, and
 7  it's a yellow documentation.  It doesn't say who
 8  provided it, so I'm going to ask you whether or not this
 9  is one of the documents that you use in your classes.
10  And I'm going to give counsel another copy.
11          MR. CLEELAND:  Thank you.
12  BY MS. BARBOSA:
13      Q.  Have you ever seen this document before?
14      A.  I do not hand it out.  This is not my document.
15      Q.  All right.  Thank you.  I will take that back
16  if it's not your document.  Well, let me ask you:  Do
17  you use this document?
18      A.  That's not -- I don't use that document, no.
19      Q.  Okay.
20      A.  I don't print that out.  I don't even know
21  where they got that.
22      Q.  Okay.  As I said, I wasn't sure, so that's just
23  why I wanted to provide it to you.
24          I'm going to hand you another document and
25  indicate to you that this is a copy of the LACC website



1   for frequently asked questions.  I'm going to give a

2   copy -- what number is this now?

3        THE REPORTER:  45.

4   BY MS. BARBOSA:

5        Q.  Oh, I'm sorry.  This has previously been marked

6   as Exhibit 16, so I'm going to give you a copy that has

7   been previously identified.  And I'm going to give

8   counsel a copy.

9        MR. CLEELAND:  Thank you.

10  BY MS. BARBOSA:

11       Q.  Have you ever seen this website information?

12       A.  Yes.

13       Q.  Is that yes?

14       A.  I said yes.

15       Q.  Okay.  And can you tell me when you last saw

16  it?

17       A.  No.  I do not recall.

18       Q.  Okay.  And as part -- oh, let me go backwards.

19  What was the purpose of you reviewing this document or

20  seeing this material?  Did you have a purpose for

21  looking at this?

22       A.  It's part of my website for my job.

23       Q.  And do you review -- well, this is for the

24  Office of Special Services.  It's under their particular

25  tab, whatever that's called.  Have you seen all of the



1   information from the Office of Student Services on the

2   website?

3       A.  All of the information, no.

4       Q.  But you've seen the frequently asked questions?

5       A.  I've seen different pieces of information from

6   OSS.  I have not seen all of the information from OSS.

7       Q.  Okay.  I'm sorry.  I must not be asking the

8   question as clearly.  Have you seen this website

9   material on -- have you seen this frequently asked

10  questions on the LACC website?

11      A.  I indicated yes, I had seen this.

12      Q.  You don't recall when?

13      A.  I do not recall when.

14      Q.  Was it within the last year?

15      A.  I do not know.

16      Q.  Could it have been five years ago?

17      A.  I don't recall.  Probably not because this

18  looks like the new format for the website, so -- unless

19  they had the same information.

20      Q.  And so -- I'm sorry.  Unless they what?

21      A.  We had a new update of our website, and this

22  looks like the new information, new format of the

23  website, so I have definitely seen this in the last year

24  because it's the new format.

25      Q.  Okay.  Now, one of the projects that -- I



1    guess -- I think you said that you do have a project,

2    which is a report that you use for your psych 1 classes.

3         A.  It's an APA paper.

4         Q.  And can you describe what an APA paper is?

5         A.  A paper is a research paper that the students

6    have to produce according to the American Psychiatric

7    Association guidelines, the American Psychological

8    Association guidelines, for how we write and reference

9    papers.  So I teach them how to write a psychology paper

10   in class.

11        Q.  And do you provide a guidebook for them to

12   follow the formatting or the issues, how they have to do

13   it?

14        A.  No, I provide -- I don't provide a workbook for

15   that.  I provide a handout that says what I require from

16   it, and we go over it in class.

17        Q.  And that's a handout that discusses -- would it

18   discuss the formatting?

19        A.  Uh-huh.

20        Q.  Would it discuss the content?

21        A.  Content in terms of what I am looking for with

22   regard to APA format.

23        Q.  And I'm sorry.  I don't know what that means.

24   Content from the APA?

25        A.  No.  Content is what they research.



1    Q.   Uh-huh.

2    A.   Format is how they put it together.

3    Q.   Uh-huh.

4    A.   Formatting is according to a certain number of

5   APA guidelines, and so just like Chicago style or MLA,

6   there's certain things that I check off that a student

7   can do.

8    Q.   And for the content, do they get to choose

9   whatever they want?

10    A.   They can choose whatever they want.

11    Q.   Okay.  So they have basic --

12    A.   But it has to relate to psychology.

13    Q.   And do they need to check -- do they need to

14   get your approval before they take a topic?

15    A.   No.

16    Q.   And so the research, how do you direct them --

17   or do you direct them to do research?

18    A.   They are directed to do research through our

19   library.

20    Q.   And do you use JSTOR as one of the research

21   databases?

22    A.   Students can use whatever database they want.

23    Q.   And do you -- well, apart from JSTOR, do you

24   know what other databases they would be using to do your

25   class work?



1    A.  There is not just on JSTOR, but there's other

2    avenues in the library, and there's discipline-specific

3    search tools, so you can look in child development.  I

4    don't know that that's on JSTOR.

5    Q.  All right.  And do you know whether or not

6    JSTOR is accessible to screen readers?

7    A.  I do not know.

8    Q.  Do you know if any of the other research --

9    A.  I do not know.

10   Q.  -- platforms used at the library are accessible

11   to screen readers?

12   A.  I do not know.

13   Q.  And do you recall Ms. Mason telling you that

14   she could not access the research with her screen

15   reader?

16   A.  I do not recall that.

17   Q.  And apart from -- taking out Ms. Mason, has any

18   other student with a visual impairment or blind ever

19   indicated to you that they were having difficulty

20   accessing research material at the library?

21   A.  No.

22   Q.  And -- I'm not sure if I asked you.  Do you

23   teach psych 1 every semester?

24   A.  Not every semester because there are some

25   semesters I take off, and we have spring, summer,



1  winter, fall.  I don't teach it every semester.  I take

2  semesters off sometimes.

3      Q.  Okay.  But in your teaching specifically, do

4  you generally have psych 1 as one of your teaching

5  classes when you're teaching?

6      A.  Psych 1 is in one of the classes I teach, yes.

7      Q.  And are you teaching psych 1 this semester?

8      A.  Yes.

9      Q.  And what other classes are you teaching this

10  semester?

11      A.  Psych 74 and psych 41.

12      Q.  Oh, that's right.  You told me.  Sorry.  Okay.

13  So as part of the work that you -- as part of your

14  teaching, do you use a whiteboard?

15      A.  Not often.  I don't like the smell.

16      Q.  Do you have chalkboards anymore?  I don't even

17  know.

18      A.  Chalkboards, yes, we do have, and those are

19  even more irritating, so I use computers for that

20  reason.

21      Q.  And does that mean that you would project the

22  information?

23      A.  Uh-huh.

24      Q.  Like, in the front of the class?

25      A.  Uh-huh.



APRIL PAVLIK                                      October 03, 2017
PAYAN vs LOS ANGELES COMMUNITY COLLEGE                        103

1    Q.  And so it wouldn't be -- well, let me ask you.

2  If you were to tell me the percentage of the time you

3  would use a whiteboard, would it be 10 percent, 30

4  percent?

5    A.  One percent.

6    Q.  All right.  So not very much at all?

7    A.  No.

8    Q.  Okay.

9    A.  I do not like how it smells, and I don't --

10  there are classrooms that only have chalkboards in them.

11  Only.  And I don't like chalk.

12    Q.  But you instead use the computer that will

13  project the information; is that correct?

14    A.  Uh-huh.

15    Q.  All right.  And so in your psych 1 class, do

16  you ask the students to -- to review the different

17  sections of a neuron?

18    A.  We need to know the definitions of each part of

19  the neuron, yes.

20    Q.  And when you teach -- well, do you teach any

21  other portions of the brain in terms of being able to

22  label?

23    A.  Yes.

24    Q.  What other portions of the brain?

25    A.  Psych 2 is a biological psychology course, so



 1  we're labeling all parts of the brain that are

 2  appropriate for a community college level class.

 3      Q.  So let me get you back to psych 1, then.

 4  Psych 1, do you --

 5      A.  I'm telling you in psych 1 that is the chapter

 6  that we cover.  So psych 2 is biological psychology.

 7  That chapter is Chapter 2, and so it covers the brain,

 8  the nervous system, and the endocrine system, as well as

 9  technologies to view all of that.

10      Q.  When you say technologies to view all of

11  that --

12      A.  MRI, fMRI, PET scan.

13      Q.  All right.  And do you require the students to

14  be able to label portions of the brain?

15      A.  I require them to tell me what the parts of the

16  brain function as.

17      Q.  And to do that, do you use any graphics in

18  terms of explaining this information?

19      A.  There are pictures to provide location and

20  orientation, but with the brain, you can use the names

21  of the different structures to help describe their

22  location and relationship to each other.  It's very

23  important in describing how things work in the brain to

24  describe what other areas are around it, to describe

25  structure and function.  It's not geographically as



1  important.

2      Q.  And do any of your exams require your students

3  to actually draw any portion of the brain?

4      A.  No, they don't have to draw the brain.

5      Q.  And do they have to label any kind of graphic

6  that you have in exams?

7      A.  I stopped doing that first -- first or second

8  year, so sometimes they're asked to label a neuron.

9      Q.  All right.

10      A.  But not recently.

11      Q.  And for your blind students that you've had in

12  the past, excluding Ms. Mason, have you ever provided

13  any tactile graphics instead of an actual photo of a

14  neuron?

15      A.  So actual held -- what are those things called?

16  Model?

17          MR. CLEELAND:  I'll call it that.

18          THE WITNESS:  Models, right.  Yeah, they have

19  models.  We have an entire department full of neurons,

20  neurotransmitters, brains.  I bring brains into class so

21  students can look and feel and touch them.

22  BY MS. BARBOSA:

23      Q.  And do you understand when I said the term

24  tactile graphics?

25      A.  Tactile graphics?  No, I've never used tactile



1   graphics.

2       Q.  Do you know what it is?

3       A.  I've never used them.

4       Q.  I'm asking whether or not you know the

5   definition of what a tactile graphic is.

6       A.  Oh, I don't know the scientific definition of a

7   tactile graphic.  I wouldn't be able to say that to you.

8       Q.  Well, for purposes of this, let me tell you

9   what I understand a tactile graphic to see if ever

10  you've used any of these.  A tactile graphic is a

11  braille imprint which raises dots and labels on a flat

12  sheet so that a person who reads braille can with their

13  hand actually see the brain, but in a tactile manner.

14  Have you ever seen those?

15      A.  I have had no opportunity to see them, and I

16  wouldn't have any opportunity to produce them either.

17      Q.  In your class, part of the accommodation

18  form -- and we looked at that as Exhibit, I think, 40 --

19  one of them indicates that a person can request a

20  notetaker as one of the accommodations from OSS.  In the

21  last year, have any of your students requested a

22  notetaker for any of your classes?

23      A.  No.

24      Q.  In the last five years, have any of your

25  students requested a notetaker from any -- for any of



1  your classes?

2      A.  Huh-uh.

3      Q.  Do you know -- is that no?

4      A.  No.

5      Q.  Okay.  Do you know the policy that OSS has

6  established for obtaining notetakers for students with

7  disabilities?

8      A.  No.

9      Q.  Okay.  I'm going to provide you a document --

10  I'm going to provide you a document which I have as

11  Exhibit 27, and it is labeled LACC OSS Notetaking

12  Accommodations (for OSS internal use only).  I'm going

13  to ask you if you have seen this document before.

14      A.  No.  If it's for OSS internal use only, I

15  haven't seen it.

16      Q.  Well --

17      A.  I haven't seen it.

18      Q.  Okay.

19      A.  Thank you.

20      Q.  That's all I wanted to know.  So if you --

21  actually, that's fine.  So in terms of your blind

22  students, have any of them ever had notetakers in any of

23  your classes?

24      A.  I don't know.

25      Q.  Let me ask it a different way.  For any of your



1   blind students, has OSS ever asked you to request a

2   notetaker from one of the students in your class to

3   assist a blind student?

4       A.  As I mentioned before, I haven't been asked or

5   I haven't engaged in note-taking.  Like, no one has

6   asked me to provide a notetaker, to give a student a

7   name of a notetaker, to do anything about note-taking.

8       Q.  Okay.  You indicated you had started using

9   Canvas.  That was a new platform.  Do you know whether

10  any of the other research material -- and by this I mean

11  software that you may be using, such as the research at

12  the library or research for your own -- I'm sorry.

13  That's an awkward question.

14          Do you use any specific software as any of your

15  teaching materials in your class?

16      A.  I don't understand what you're asking.

17      Q.  So Canvas is a software.

18      A.  It's a services platform.  It's not software.

19      Q.  It's a services platform, but it also has

20  software.  JSTOR is a database, but it also uses

21  software.  Apart from those two, which is Canvas and

22  JSTOR, do you use any platform or software on the

23  internet that we haven't talked about?

24      A.  No.

25      Q.  Is it still your practice to hand out your cell



1   phone number and your email to the students as part of

2   your syllabus information?

3        A.   (The witness nodded her head.)

4        Q.   I'm going to ask you -- I'm going to ask you a

5   few -- I'm going to ask you some information in regards

6   to Ms. Mason's allegations, and then I'm going to ask

7   you some questions about it.  This is paragraph 69, just

8   so that you understand what it is, of the first amended

9   complaint.  April Pavlik, PsyD, who taught Ms. Mason's

10  introduction to psychology class, routinely used

11  PowerPoint slides during class lectures that relied on

12  graphic material but did not describe or label the

13  graphics.  Thus, Ms. Mason was often prevented from

14  understanding Dr. Pavlik's lectures because she could

15  not see the slides used.

16       Now, do you recall using PowerPoint slides

17  during your psych 1 class in which Ms. Mason attended

18  which relied on graphic material that you did not

19  describe or label?

20       A.   Do I remember giving a PowerPoint presentation

21  that I did not explain?

22       Q.   That you -- graphic material that did not

23  describe or label the graphics.

24       MR. CLEELAND:  Well, that's not exactly what

25  the complaint says.



1          MS. BARBOSA:  I'm actually reading it right off

2     the thing.

3          MR. CLEELAND:  You misread the statement.  It

4     says -- the statement attributes to something the

5     witness did not do.  You just read that as something the

6     presentation did not have.  Those are two different

7     things.

8          MS. BARBOSA:  Well, I'm asking -- let me ask it

9     simpler.

10          MR. CLEELAND:  Thank you.

11    BY MS. BARBOSA:

12      Q.  Do you remember in 2016 during your psych 1

13    teaching lectures using PowerPoint presentations in

14    which you used graphics that you did not describe and

15    which were not labeled on the PowerPoint?

16      A.  No, I do not remember that.

17      Q.  And do you have the PowerPoint presentations as

18    they were provided in -- in 2016 in the psych 1 class?

19      A.  Those -- they may not be the exact ones that

20    were offered.  I transition them and change them each

21    semester based on feedback that I get, so I don't have

22    the exact ones, no.

23      Q.  Okay.

24      A.  He's trying to get your attention.

25      Q.  Let's take a 10-minute break.  We're almost



1    done, but he needs to change the tape.

2            THE VIDEO OPERATOR:  This marks the end of

3    media No. 2.  The time is 1:10 P.M.  We are off the

4    record.

5            (Recess.)

6            THE VIDEO OPERATOR:  This marks the beginning

7    of media No. 3.  The time is 1:25 P.M.  We are on the

8    record.

9    BY MS. BARBOSA:

10       Q.  Dr. Pavlik, apart from the discussion that we

11   had earlier about Ms. Mason's communication with her,

12   did Ms. Mason communicate any of the difficulties that

13   she had in understanding or doing the work for your

14   introduction to psychology in 2016?

15       A.  I don't recall her bringing those concerns to

16   me.

17       Q.  And since you became aware of this lawsuit,

18   have you made any changes in the manner in which you are

19   providing in-class materials or resources to students

20   who have visual disabilities?

21       A.  Not because of this suit, no.

22       Q.  I didn't say because of.  Since --

23       A.  No, not since.

24       Q.  All right.  So since you found out about this

25   lawsuit in the summer of 2017, you have not made any



1  changes in the manner in which you provide instructional

2  material or resources to blind students in your classes;

3  is that correct?

4      A.  So the assumption is that I have blind students

5  in my class and I haven't done anything different since

6  I learned about this?

7      Q.  It was my --

8      A.  I don't have blind students in my class now, so

9  I wouldn't have changed anything.

10     Q.  All right.  So do you have any plans to change

11 any of the manner in which you provide instructional

12 material or resources to blind or visually impaired

13 students who take your classes?

14     A.  I think it's always important to update your

15 material.

16     Q.  I'm actually asking a different question.  Do

17 you have any plans to use a different kind of format for

18 any of the materials that you provide to blind students

19 or visually impaired students in classes in the future?

20     A.  I do not have any plans at this time, no.

21     Q.  Are you expected to continue teaching in the

22 winter of 2018?

23     A.  I don't know if I'm teaching a course or not.

24     Q.  Do you teach -- you teach three classes this

25 semester; is that correct?



APRIL PAVLIK                                         October 03, 2017
PAYAN vs LOS ANGELES COMMUNITY COLLEGE                           113

1        A.  No, I teach four.

2        Q.  Four.  Dr. Pavlik, thank you for your time.  I

3   have no further questions at this time.

4        A.  Thank you.

5            THE VIDEO OPERATOR:  This concludes media No. 3

6   and the end of the videotaped deposition of April

7   Pavlik.  We are going off the video record on

8   October 3rd, 2017, at 1:28 P.M.

9            (The deposition concluded at 1:28 P.M.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



APRIL PAVLIK                                      October 03, 2017
PAYAN vs LOS ANGELES COMMUNITY COLLEGE                      114

1                REPORTER'S CERTIFICATION

2

3       I, Dawn Schetne, a Certified Shorthand Reporter in

4   and for the State of California, do hereby certify:

5

6       That the foregoing witness was by me duly sworn;

7   that the deposition was then taken before me at the time

8   and place herein set forth; that the testimony and

9   proceedings were reported stenographically by me and

10  later transcribed into typewriting under my direction;

11  that the foregoing is a true record of the testimony and

12  proceedings taken at that time.

13

14      IN WITNESS WHEREOF, I have subscribed my name this

15  10th day of October, 2017.

16

17                    _Dawn Schetne_

18  _____

19                    Dawn Schetne, CSR No. 5140

20

21

22

23

24

25



```
 1                    DEPOSITION ERRATA SHEET

 2

 3

 4    Our Assignment No. J0664430

 5    Case Caption:  Payan vs. Los Angeles Community College

 6    District

 7

 8          DECLARATION UNDER PENALTY OF PERJURY

 9          I declare under penalty of perjury

10    that I have read the entire transcript of

11    my Deposition taken in the above captioned matter

12    or the same has been read to me, and

13    the same is true and accurate, save and

14    except for changes and/or corrections, if

15    any, as indicated by me on the DEPOSITION

16    ERRATA SHEET hereof, with the understanding

17    that I offer these changes as if still under

18    oath.

19         Signed on the _____ day of

20    _____, 20_____ ,

21

22    _____

23                    April Pavlik

24

25
```



```
 1                 DEPOSITION ERRATA SHEET

 2   Page No._____Line No._____Change to:_____

 3   _____

 4   Reason for change: _____

 5   Page No._____Line No._____Change to:_____

 6   _____

 7   Reason for change: _____

 8   Page No._____Line No._____Change to:_____

 9   _____

10   Reason for change: _____

11   Page No._____Line No._____Change to:_____

12   _____

13   Reason for change: _____

14   Page No._____Line No._____Change to:_____

15   _____

16   Reason for change: _____

17   Page No._____Line No._____Change to:_____

18   _____

19   Reason for change: _____

20   Page No._____Line No._____Change to:_____

21   _____

22   Reason for change: _____

23

24   SIGNATURE:_____DATE_____

25                  April Pavlik
```



```
1              DEPOSITION ERRATA SHEET

2   Page No._____Line No._____Change to:_____

3   _____

4   Reason for change: _____

5   Page No._____Line No._____Change to:_____

6   _____

7   Reason for change: _____

8   Page No._____Line No._____Change to:_____

9   _____

10  Reason for change: _____

11  Page No._____Line No._____Change to:_____

12  _____

13  Reason for change: _____

14  Page No._____Line No._____Change to:_____

15  _____

16  Reason for change: _____

17  Page No._____Line No._____Change to:_____

18  _____

19  Reason for change: _____

20  Page No._____Line No._____Change to:_____

21  _____

22  Reason for change: _____

23

24  SIGNATURE:_____DATE_____

25              April Pavlik
```

