UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA


ROY PAYAN, PORTIA MASON, THE
NATIONAL FEDERATION OF THE
BLIND, INC., and THE
NATIONAL FEDERATION OF THE
BLIND OF CALIFORNIA, INC.,

          Plaintiffs,

    vs.                  No. 2:17-cv-01697
                            SVW(SKx)

LOS ANGELES COMMUNITY
COLLEGE DISTRICT, DR.
FRANCISCO C. RODRIGUEZ in
his official capacity as
chancellor of the Los
Angeles Community College
District and DOES 1 through
10, inclusive,

          Defendants.


DEPOSITION OF JON RICHARD GUNDERSON
November 6, 2017
Area Wide Reporting
301 W. White
Champaign, Illinois
10:00 a.m. (CT)


Barbara A. Glover: CSR #084-001223


1

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1    APPEARANCES:

2    Appearing for Plaintiff:

3            Brown Goldstein Levy
             Sharon Krevor-Weisbaum
4            120 E. Baltimore Street, Suite 1700
             Baltimore, Maryland   21202
5            (410) 962-1030
             skw@browngold.com
6

7    Appearing for Defendants:

8

             Haight Brown & Bonesteel LLP
9            Bruce Cleeland
             2050 Main Street, Suite 600
10           Irvine, California   92614
             (712) 426-4600
11           bcleeland@hbblaw.com

12

13                          I N D E X

14

15     EXAMINATION CONDUCTED BY:                  PAGE

16         By:  Ms. Krevor-Weisbaum              290

17                        E X H I B IT S

18
       EXHIBIT                                    PAGE
19
       Exhibits 100-101                           278
20

21

22

23

24

25

                                                     2

1

2                              STIPULATION

3

4           IT IS HEREBY EXPRESSLY STIPULATED AND

5    AGREED by and between the parties that the

6    deposition of JON RICHARD GUNDERSON may be taken

7    on November 6, 2017, at Area Wide Reporting, 301

8    W. White, Champaign, Illinois, pursuant to the

9    Rules of the Federal Court and the Rules of

10   Federal Procedure governing said depositions.

11          IT IS FURTHER STIPULATED that the

12   necessity for calling the Court Reporter for

13   impeachment purposes is waived.

14

15

16

17

18

19

20

21

22

23

24

25

                                                        3

1                    9:46 a.m.

2               JON RICHARD GUNDERSON

3    the deponent herein, called as a witness, after

4    having been first duly sworn, was examined and

5    testified as follows:

6

7          EXAMINATION CONDUCTED

8          BY:  MR. CLEELAND

9

10        Q.   Sir, could I have your full name,

11   please?

12        A.   Jon Richard Gunderson, J-o-n. I

13   noticed in the thing you had J-o-h-n so...

14        Q.   It's J-o-n?

15        A.   J-o-n, yes.

16        Q.   Thank you very much for that

17   correction.

18             And in what city do you live, sir?

19        A.   Champaign, Illinois.

20        Q.   Sir, have you ever had your deposition

21   taken before?

22        A.   No.

23        Q.   You probably have had a chance to

24   speak with counsel today, but I would like to

25   take just a few minutes to go over the guidelines

                                                    4

```
 1    that we're functioning under today.  Okay?

 2          A.   Okay.

 3          Q.   The court reporter has placed you

 4    under oath.  It's very similar to an oath you

 5    receive in a courtroom in front of a judge and a

 6    jury.  We don't have a judge.  We don't have a

 7    jury present, but I would ask that you treat

 8    today's testimony the same way you would in a

 9    courtroom.  Okay?

10          A.   Sure.  Yes.  Yes is important.

11          Q.   That's right.

12          A.   Yes and no.

13          Q.   Based upon that comment, my assumption

14    is that you've had the opportunity to speak with

15    plaintiff's counsel prior to today's deposition

16    regarding your deposition?

17          A.   Yes.

18          Q.   And when was that?

19          A.   Last week.  Was it Tuesday or

20    Wednesday?  Wednesday night.

21          Q.   Of last week?

22          A.   Yeah, I was in Washington, D.C., for a

23    conference, and I met at their Washington office.

24          Q.   Who did you meet during that visit?

25          A.   I met with Sharon, and I'm not good
```

5

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1   with names.  Epso.  The guy who was doing --

2            MS. KREVOR-WEISBAUM:  Joe Espo.

3   BY MR. CLEELAND:

4        Q.   Good enough.

5        A.   Joe Espo, yeah.

6        Q.   Well, you probably had an opportunity

7   to go over some of the rules and guidelines, but

8   I want to make sure you understand them today, so

9   I'll just take a moment or two to explain them to

10  you.  Okay?

11       A.   Sure.  Yes.

12       Q.   Again, the court reporter has given

13  you an oath.  We, therefore, ask that you give us

14  your testimony as you would in a courtroom the

15  same importance.

16            She will be taking down everything

17  that's said on the record today which creates the

18  opportunity for you to respond to the lawyer's

19  questions, and the potential for a couple of

20  issues that come up.

21            One, it's very difficult for a court

22  reporter to take more than one person speaking at

23  the same time, so when you and I may talk about

24  what occurred yesterday or some news event or

25  sporting events, chances are we'll probably

6

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1    interrupt each other during that conversation,

2    but we know where that conversation is going just

3    because of its nature.

4            Today I'd ask that you wait until I

5    complete my questions before you begin your

6    answers.  Okay?

7        A.   Yes.

8        Q.   I'll do my best to wait until you

9    complete your answers before I begin my next

10   question.  However, there might be some

11   exceptions.

12           Sometimes based upon the first few

13   words of your response it tells me that perhaps

14   my question wasn't as artfully drawn as necessary

15   or appropriate, so sometimes I'll interrupt

16   someone to qualify or rephrase the question.

17   Okay?

18       A.   Yes.

19       Q.   It's not intended to harass or

20   intimidate you but to save you time.  All right?

21       A.   Okay.

22       Q.   You've done very well so far, and that

23   is to answer audibly with words, such as yes or

24   no or whatever is appropriate.  Those are the

25   things the court reporter can take down.

7

1           She can't take down nods, gestures, or

2    things like that.  Such words as we use every day

3    such as uh-huh or huh-uh, while you and I may

4    know what it means today, when we read the

5    transcript some days later, it's difficult to

6    ascertain what that means.  Do you understand?

7           A.   Yes.

8           Q.   Sometimes the lawyers will even prod

9    you during an answer, and you'll say uh-huh or

10   nod your head, and the lawyer may say is that a

11   yes, or is that a no, and that's only for

12   purposes of clarifying the record.  All right?

13          A.   Yes.  Okay.

14          Q.   If you do not understand a question,

15   please let the lawyers know that, and I'm sure

16   we'll do our best to rephrase it.  Do you

17   understand?

18          A.   Yes.

19          Q.   If you answer a question, we will

20   assume that you understood the question as posed.

21   Do you understand?

22          A.   Yes.

23          Q.   You will likely have the opportunity

24   to make any changes or corrections to your

25   answers in the deposition transcript once it's

8

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1    completed and provided to you.  However, if you

2    do make any changes, anyone involved in the case

3    may bring it to the attention of the trier of

4    fact those changes.  Do you understand that?

5          A.   Yes.

6          Q.   And, of course, in identifying changes

7    to sworn testimony that may call into question

8    your honesty or veracity.  Do you understand

9    that?

10         A.   Yes.

11         Q.   There may be occasions where you

12   testify as to something specific, and you realize

13   a few minutes later perhaps that was an incorrect

14   answer, such as, oh, what day was I in Washington

15   D.C.?  Monday.  Then a few moments later you

16   might say, I'm sorry, it was a Tuesday.

17              If you think that's appropriate to

18   correct your testimony, feel free to do so.

19   Okay?

20         A.   Yes.

21         Q.   If you don't understand a question,

22   you just let us know that.  Okay?

23         A.   Yeah.

24         Q.   If you don't recall or remember

25   information responsive to that question, you just

9

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1    let us know that.  Okay?

2         A.   Okay.

3         Q.   Is there anything that would prevent

4    you from going forward with your deposition

5    today?

6         A.   No.

7         Q.   Are you presently taking any

8    medication which inhibits your ability to recall

9    or remember?

10        A.   No.

11        Q.   When were you first contacted

12   regarding this matter?

13        A.   I don't remember the exact date, but

14   it was sometime I think in June of 2017.

15        Q.   And how is it that you were contacted?

16   Was it oral, a phone call, face to face, a

17   letter, e-mail, something else?

18        A.   I don't recall specifically.  I think

19   it could have been an e-mail or a phone call.  I

20   believe it was a phone call, but I don't

21   remember.  It's been a while ago.

22        Q.   And did you keep any records of that

23   initial contact?

24        A.   No.

25        Q.   Did you take any records or create any

                                                    10

1    records as a result of that initial contact?

2         A.   No.

3         Q.   How long did that initial contact

4    take?

5         A.   I think it was I believe a telephone

6    conversation just wondering if I was interested

7    in being an expert witness on this case.

8    Probably 15 or 20 minutes.

9         Q.   Do you remember who you spoke with?

10        A.   I believe it was Sharon sitting next

11   to me.

12        Q.   During that conversation were you told

13   how it was that that person became aware of you?

14        A.   No, I don't recall how -- why they

15   picked me, but I've known Dan Goldstein for a

16   long time and have asked him to present at

17   different workshops to help raise awareness of IT

18   accessible aid, so I assume it was probably prior

19   contact with Dan Goldstein, but they didn't say

20   why they picked me.

21        Q.   You made reference to being an expert

22   witness in this case.

23        A.   Uh-huh.

24        Q.   What is your understanding as to what

25   an expert witness is?

11

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1          A.    Somebody that is familiar with the

2     technologies related to higher education and

3     people with disabilities.

4               I also am familiar with disability

5     accommodation procedures working in the

6     disability services office, so basically I think

7     -- understanding, you know, what the current

8     capabilities of technology and the current

9     practice in higher education for making

10    technology accessible.

11         Q.    Are there limitations to that

12    technology?

13         A.    I guess I don't understand the

14    question.

15         Q.    You said that there are current

16    capabilities, so your comment sounds like current

17    capabilities might be different from what the

18    capabilities were in the past.  Is that a correct

19    statement?

20         A.    Well, one of the issues of all

21    technology is technology continues to evolve or

22    technology that is used to build websites is

23    constantly evolving and the technologies to make

24    this accessible are constantly evolving too, so

25    there's -- there is no -- it's not like a

                                                      12

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1   wheelchair ramp or a curb cut that really haven't

2   changed that much over 50 years.

3           As technologies evolve, accessibility

4   technologies evolve.  There has to -- there is a

5   current practice, yes.

6       Q.   And does that current practice evolve

7   over time?

8       A.   Yes, technology evolves.  If

9   accessibility technology did not evolve, then

10  there would not -- we would have a lot more

11  inaccessible stuff.

12      Q.   Now, when you came in this morning

13  before we got started you were kind enough to

14  show me some information that you brought with

15  you.  One is your CV.  One is the report you

16  prepared dated October 2nd, 2017.  One is a

17  single page, page 2, of the deposition notice to

18  you, and another is six pages which are

19  identified as -- maybe I better ask you again

20  what do you call this packet of information,

21  report title LA City College?

22      A.   In the report I did an evaluation of

23  the LA Community College website using the

24  technology called Functional Accessibility

25  Evaluator, and this is just a summary page of the

                                              13

1    report.

2            It doesn't print out very well, but

3    we design FAE to basically share URLs, so it's

4    typically shared using a web browser as opposed

5    to paper.

6        Q.   Did you ever see a multiple-paged

7    document that identified itself as a deposition

8    notice for you?

9        A.   Yes.

10       Q.   And did you read the terms about

11   definitions and documents you were supposed to

12   bring today?

13       A.   I talked to -- these are the documents

14   that I thought I had to bring today so...

15       Q.   The question is did you read the

16   deposition notice to determine what documents you

17   were supposed to bring today?

18       A.   Yeah, I read it.

19       Q.   Okay.  Is there some reason -- well,

20   let me back up here.

21            Are there documents identified on the

22   deposition notice that you did not bring with you

23   today?

24       A.   Not that I'm aware of.

25       Q.   No. 1 asks for your most recent CV.

14

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1    You brought that.  Correct?

2         A.   Yeah.

3         Q.   No. 2 says the witness's entire file

4    regarding activity undertaken by the witness in

5    the furtherance of reaching their opinions or

6    conclusions.

7              Did you bring all that information

8    with you today?

9              MS. KREVOR-WEISBAUM:  I'm just going

10   to put on the record an objection to the fact

11   that there was no subpoena issued to

12   Dr. Gunderson, and we can go through each

13   document and talk about the rule of what he is

14   required to give you.

15             He's not required under the rule of

16   expert witnesses to give you his entire file

17   regarding -- you know, his entire file, even if

18   he has an entire file.

19             I think you'll ask him questions, and

20   you'll find he doesn't have very much.  If you go

21   through each one, a lot of this is in the report,

22   so he has given you what he believes he needs to

23   give you.

24   BY MR. CLEELAND:

25        Q.   Did someone tell you not to bring

15

1    something today?

2          A.    No.

3          Q.    Did someone tell you to bring

4    something today?

5          A.    I understood that we would be

6    reviewing my report, and my report lists all of

7    the documents that I reviewed.

8          Q.    Thank you.  I asked did someone tell

9    you to bring something today?

10         A.    Nobody told me to bring anything

11   specifically, but I brought the documents that I

12   thought were the documents that were requested in

13   the subpoena -- or in this.

14         Q.    Notice?

15         A.    Notice.  I guess I'm not familiar with

16   all the terms here.

17         Q.    Was it your attempt to comply with the

18   request within the notice?

19         A.    Yes.

20         Q.    So let's go back to the information

21   again.  Did you create a file regarding your

22   activity undertaken as a result of this

23   assignment?

24         A.    My report.

25         Q.    That's it?

                                                      16

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1      A.   In my report I list all of the
2   documents that I read.
3      Q.   Okay.  Where are they?
4      A.   Where are they?  They are on my
5   computer at home, and I printed some of them out,
6   and they're at my home.
7      Q.   Why didn't you bring those today?
8          MS. KREVOR-WEISBAUM:  He's not
9   required to bring the documents that he --
10          MR. CLEELAND:  Is that an objection?
11          MS. KREVOR-WEISBAUM:  Objection.  Yes.
12   BY MR. CLEELAND:
13      Q.   Okay.  Thank you.  I just asked a
14   simple question.  Why didn't you bring those?
15      A.   I thought you would have them.
16      Q.   Okay.  So you made a conclusion that
17   you didn't need to bring them.  Is that correct?
18      A.   I guess I haven't done this before, so
19   I thought you would have those documents too,
20   since they were given to me.
21      Q.   Okay.  Who gave them to you?
22      A.   They were sent to me by Sharon.
23      Q.   Okay.
24      A.   In an electronic format.
25      Q.   Did you make any notes of any of those

17

1    documents?

2         A.   I included the notes -- I used the

3    notes to generate the report, but I didn't work

4    them up.  I just highlighted certain passages.

5         Q.   I didn't ask that, sir.  I asked did

6    you take any notes as a result of looking at

7    those materials?

8         A.   I did take some notes.

9         Q.   Where are those notes?

10        A.   They're on my computer.

11        Q.   Is there some reason you didn't bring

12   your notes today?

13        A.   I used the notes to generate the

14   report so...

15        Q.   Exactly.  I'd like to know what the

16   report is based upon.  When you ask a student to

17   do an assignment and do research, you ask them to

18   identify the documents they relied upon.  Is that

19   correct?

20        A.   And I did do that.  I put them in the

21   report.

22        Q.   Every document you looked at?

23        A.   Yes.

24        Q.   So any document that's not listed in

25   there you didn't rely upon in reaching any

18

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1  opinions or conclusions, is that correct?

2      A.   That's correct.

3      Q.   Okay.  The next request is for the

4  entire file regarding this litigation.  What is

5  within your file regarding this litigation?

6      A.   The documents that I listed in the

7  report, plus there's been a few other depositions

8  that have come in after I did the report.

9      Q.   Okay.  Well, I need to know what those

10  are.  That's something that's not in your report,

11  so I need to know what came in afterwards that

12  you relied upon.

13      A.   I don't have that information in front

14  of me.

15          MS. KREVOR-WEISBAUM:  Can you

16  supplement -- he can certainly supplement what

17  depositions he was sent in addition to what he's

18  listed there, although they were not the basis of

19  the opinion.

20          MR. CLEELAND:  I'm just trying to

21  figure out what he relied upon in reaching his

22  opinion.

23          MS. KREVOR-WEISBAUM:  It's written

24  exactly on page 1 and 2 of his report.  That is

25  what he relied upon to reach his opinion.

19

1          MR. CLEELAND:  Well, actually, he told
2     me he looked at other things.
3          MS. KREVOR-WEISBAUM:  No, he didn't
4     say that.
5          MR. CLEELAND:  I think the transcript
6     will reveal that, but that's okay.
7          MS. KREVOR-WEISBAUM:  No -- excuse me,
8     you're wrong.
9          MR. CLEELAND:  I'll let you talk when
10    I finish.
11         MS. KREVOR-WEISBAUM:  He did not --
12    I'm just putting on the record --
13         MR. CLEELAND:  Why don't you talk now,
14    and I'll talk when you're done.
15         MS. KREVOR-WEISBAUM:  This will be a
16    pleasant deposition.
17         MR. CLEELAND:  It could be.
18         MS. KREVOR-WEISBAUM:  He did not --
19    what he just said was for the opinions he relied
20    upon what is on pages 1 and 2 of his report.
21         MR. CLEELAND:  And he also said he
22    looked at other things.  That's all I'm trying to
23    figure out.
24         MS. KREVOR-WEISBAUM:  He said he would
25    supplement and let you know the other things that

20

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1    he looked at.

2           MR. CLEELAND:  And that's all I

3    inquired of him, and you said he didn't so --

4           MS. KREVOR-WEISBAUM:  I didn't say

5    that he didn't.

6    BY MR. CLEELAND:

7        Q.   Well, you certainly indicated that.

8           But, sir, I'm trying to find out

9    everything you looked at, the universe of

10   information that you relied upon in reaching any

11   opinions or conclusions that you have, so if we

12   have to go through page by page, we'll do that.

13   That's not a problem.  I'm trying to figure out

14   what you relied upon.  Okay?

15       A.   Okay.

16       Q.   Now, I started an example when you

17   give a student an assignment, a research

18   assignment, you want to see what they relied upon

19   in reaching their opinions or conclusions.  Is

20   that correct?  And I did say a research

21   assignment.

22       A.   Well, in my position I don't really

23   have that many students doing research for me.  I

24   actually work in disability services, so students

25   who work for me are mainly doing technology

                                                  21

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1    related work, so they're building software and

2    related things, so I guess I don't have a basis

3    for your question.

4         Q.   If I can help you, you have on your CV

5    student project supervisor.

6         A.   Yes.

7         Q.   Those are assignments that students do

8    with you.  Is that correct?

9         A.   Right.

10        Q.   Now, in there, those assignments, do

11   any of them that are identified involve research?

12        A.   Most of those student projects that I

13   work with are technology related, so they're

14   building technology, and so we're looking at

15   software interfaces, design patterns, so I've had

16   a few students in the past who have done

17   research, and we've looked at the data that they

18   have collected.

19             I'm more -- in terms of web

20   accessibility, there isn't a lot -- at least when

21   I had some students doing research there wasn't a

22   lot of previous work in that area.

23        Q.   You looked at the data they acquired.

24        A.   Right.

25        Q.   That's important for you to know in

                                              22

1   assessing their work.  Is that correct?

2          A.    Right.  And data is important.

3          Q.    And I'm just trying to figure out the

4   data you relied upon in reaching your opinions or

5   conclusions.

6          A.    And I put it in the report the data I

7   relied on.

8          Q.    And nothing else, is that correct?

9          A.    Nothing else.

10         Q.    Okay.  If we can go back to the

11  deposition notice, all documents including but

12  not limited to articles, journal articles,

13  newspaper articles, and/or other authored

14  articles that the witness read or consulted in

15  his analysis of plaintiff's case.  Did you look

16  at any specific articles?

17         A.    No, I did not.

18         Q.    Relative to your assignment in this

19  case?

20         A.    No, I did not.

21         Q.    Thank you.  Six, a complete list of

22  all works presented at technical meetings.  Do

23  you believe your CV identifies that?

24         A.    Yes, I do.

25         Q.    Thank you so much.

                                                    23

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1              Seven, each and every document that

2     the witness relied upon in formulating an

3     analysis and/or opinions regarding this case.

4     Did you bring those?

5          A.   I did not bring them.

6          Q.   What didn't you bring today?

7          A.   The articles listed in the -- my

8     report.

9          Q.   Or the depositions, correct?

10         A.   The depositions, right.

11         Q.   Now, did you take any notes of those

12    depositions as you read them?

13         A.   I did take notes.

14         Q.   Where are those notes?

15         A.   On my computer.

16         Q.   Is there some reason you didn't bring

17    those?

18         A.   I synthesized the notes into the

19    report.

20         Q.   Is there some reason you didn't bring

21    the notes?

22         A.   There's no reason, I guess.  I didn't

23    understand that I needed to bring them.  That's

24    why I didn't bring them.

25         Q.   Now, the deposition transcripts that

                                                    24

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1  you read, did you make any notations on the copy

2  of the deposition transcript, be it electronic or

3  otherwise?

4        A.   I highlighted certain portions of them

5  and made -- wrote a key word.

6        Q.   Did you bring those documents with

7  you?

8        A.   No, I did not.

9        Q.   Why would you highlight something in a

10 deposition?

11       A.   I wanted to refer back to it as I was

12 developing the report.

13       Q.   Would that be helpful for someone

14 analyzing your report to determine what it is you

15 felt was important?

16       A.   That would be -- I don't know.  I'm

17 not the other person.

18       Q.   Sometimes you were the other person

19 when you look at other work by people.  Correct?

20       A.   Yes.

21       Q.   And when you investigate the research

22 done by others, you want to see the information

23 they relied upon?

24       A.   Sometimes, yes.

25       Q.   Perfectly normal, right?

                                                    25

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1        A.    Uh-huh.

2        Q.    Is that a yes?

3        A.    Yes.

4        Q.    Okay.  That was a good example of what

5    we do from time to time.  Thank you so much.

6              No. 8, all documents reviewed by the

7    witness in this case, including but not limited

8    to statements, photographs, correspondence,

9    reports, depositions, and/or notes.

10             Again, we're back to the notes.  You

11   didn't bring your notes with you today other than

12   a single page.  Correct?

13       A.    Correct.

14       Q.    No. 10, all documents by and/or

15   addressed to the witness concerning this case.

16             Did you have any correspondence

17   whatsoever between yourself to and/or from

18   plaintiff's counsel in this matter?

19       A.    There were e-mail correspondence, yes.

20       Q.    Did you bring that with you today?

21       A.    No, I did not.

22       Q.    Is there some reason you didn't bring

23   that with you today?

24       A.    I didn't know that I was supposed to

25   bring that.

                                                      26

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1      Q.    But it says so in the notice that you

2   had.  Right?

3          MS. KREVOR-WEISBAUM:  Objection.

4   There's no subpoena, and I think there's --

5   there's no requirement but proceed.

6   BY MR. CLEELAND:

7      Q.    Sir, you did have this notice.

8   Correct?

9      A.    I did.

10     Q.    And you read it.  Correct?

11     A.    Yes, I must have misunderstood it.

12     Q.    So when it talks about bringing notes,

13   you concluded you didn't have to bring all your

14   notes.  Correct?

15     A.    Correct.

16     Q.    And like the communication or the

17   correspondence, you didn't bring any of the

18   communication or correspondence between yourself

19   and plaintiff's counsel's office.  Is that

20   correct?

21     A.    That's correct.

22     Q.    How many documents are we talking

23   about with respect to correspondence?

24     A.    Ten.

25     Q.    When was the first one you received?

27

1        A.    Don't recall.

2        Q.    When was the last one you received?

3        A.    A few weeks ago to plan -- to talk --

4    discussing meeting last week in Washington, D.C.

5        Q.    When was the first correspondence you

6    sent to plaintiff's counsel?

7        A.    I don't recall.

8        Q.    When was the last correspondence you

9    sent to plaintiff's counsel?

10       A.    Probably acknowledging that we were

11   going to meet at 5:30 last Wednesday in

12   Washington, D.C.

13       Q.    No. 9 asks for all documents and/or

14   writings related to any and all contact with

15   anyone concerning the witness's opinions in the

16   case.

17            Do you have any materials that respond

18   to that category?

19       A.    No, I do not.

20       Q.    Well, you just said you had

21   communication that identified dates of meetings.

22       A.    Right.  Could you read the question

23   again, please?

24       Q.    All documents and/or writings related

25   to any and all contact with anyone concerning the

                                                      28

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1    witness's opinions in this case.

2         A.    What does that mean, I guess, in legal

3    terms?

4         Q.    Contact.

5         A.    All documents related to -- any and

6    all contacts with anyone concerning the witness's

7    opinions in this case, so the witness's --

8         Q.    Well, let's go through that sentence,

9    if it's confusing.

10        A.    What does it mean witness's opinion?

11        Q.    You're the witness.

12        A.    Okay.  So all documents relating to

13   any and all correspondence with anyone concerning

14   me in this case.

15        Q.    Concerning your opinions in the case.

16   You brought some?

17        A.    Yes.

18        Q.    You've got your report.  Anything

19   else?

20        A.    No, I didn't bring anything else.

21        Q.    Well, I'm not asking if you brought

22   them.  I'm asking if they exist.  We know you

23   didn't bring them.

24        A.    The notes that I took, so some of the

25   depositions.  I think we covered that already.

                                                      29

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1        Q.   Any and all documents and/or writings

2   related to any and all contact with anyone

3   concerning the witness's opinions in this case.

4        A.   So this is the e-mail correspondence I

5   had with --

6        Q.   It could be.

7        A.   Yeah.

8        Q.   But you didn't bring that.  Right?

9        A.   I didn't bring that, no.

10       Q.   No. 10, all documents by and/or

11  addressed to the witness concerning this case.

12            We've talked about that in response to

13  category 8.  You didn't bring any of those with

14  you today.  Did you?

15       A.   No, I did not.

16       Q.   And was that your decision not to

17  bring them?

18       A.   Yes.

19       Q.   No. 11, all reports and writings

20  prepared by the witness and/or at the witness's

21  request concerning this case including all drafts

22  and notes.

23            The report that you prepared, is it

24  the final document in that report?

25       A.   It's the final document.

                                                      30

1          Q.    Did it have any drafts or additions

2     prior to the final document?

3               MS. KREVOR-WEISBAUM:  Objection.

4               THE WITNESS:  Yeah, there were drafts.

5     BY MR. CLEELAND:

6          Q.    Did you bring those?

7          A.    I did not.

8          Q.    The report that you brought with you,

9     does it have the metadata in it?

10              MS. KREVOR-WEISBAUM:  Objection.  All

11    drafts under the federal rules are protected.

12    They're between attorney and the expert, and

13    they're not required to be disclosed.

14    BY MR. CLEELAND:

15         Q.    Thanks for your objection.  Do you

16    have those?

17         A.    Could you explain what you mean by

18    metadata?

19         Q.    Do you know what metadata is?

20         A.    Not in this context.

21         Q.    Okay.  We don't need to worry about

22    it.

23              All writings provided to the witness

24    by anyone involved in the case, and I think you

25    said earlier although you didn't bring them all,

                                                    31

1  everything you relied upon in reaching your

2  opinions or conclusions is specifically

3  identified in your report.   Is that correct?

4        A.    That's correct.

5        Q.    No. 13, all computer databases and/or

6  programs created and/or relied upon by the

7  witness in the course of reaching his testimony

8  and/or opinion.

9              To make it easier, do you identify all

10 of those databases within your report or

11 anywhere?

12       A.    The only tool software that I used was

13 the Functional Accessibility Evaluator, and I

14 provided a link in the report to the analysis it

15 provided.

16       Q.    Thank you.   No. 14, all memoranda,

17 telephone logs, telephone memoranda, or other

18 documents relating to any meetings and/or

19 conversations regarding any and all plaintiffs.

20       A.    I did not bring that.

21       Q.    Do you have such memoranda?

22       A.    I do not have telephone logs.

23       Q.    I didn't ask that.   Do you have such

24 memoranda?

25       A.    Could you reread the question again?

32

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1        Q.   All memoranda, telephone logs,

2    telephone memoranda, or other documents relating

3    to any meetings and/or conversations regarding

4    any and all plaintiffs.

5        A.   I didn't take any notes at the

6    telephone conversations.  There is no memoranda

7    that I have from our telephone conversations.

8        Q.   It also says meetings.  How about your

9    meetings, did you take any notes?

10       A.   I did not take notes.

11       Q.   Did anyone provide you information

12   during those meetings?

13           MS. KREVOR-WEISBAUM:  Objection.

14   Which meetings?

15   BY MR. CLEELAND:

16       Q.   Well, you've identified one face to

17   face.  You've identified conversations of about

18   ten or more.  Excuse me --

19           MS. KREVOR-WEISBAUM:  With counsel,

20   Not with the plaintiffs.  Objection.  This is

21   with plaintiffs?

22           MR. CLEELAND:  Regarding.  It says

23   regarding.

24           MS. KREVOR-WEISBAUM:  Objection to any

25   conversations between counsel and this expert.

                                              33

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1          MR. CLEELAND:  Really?  Any?  Any

2     conversations?  So if you give him information --

3          MS. KREVOR-WEISBAUM:  Except what he

4     has relied on.

5          MR. CLEELAND:  Thank you very much.

6     That's all I was asking about.  I just asked if

7     you have it, not what it is.  I'm asking if it

8     exists first.

9     BY MR. CLEELAND:

10         Q.   Does anything like that exist, notes

11    that you took during phone conversations or --

12         A.   I didn't take any notes during phone

13    conversations.

14         Q.   And then I asked did anybody provide

15    you information during those meetings.

16         A.   No new information was provided at

17    those meetings.

18         Q.   When I hear new information, that

19    tells me something.  I just asked if you were

20    provided any information during the meetings.

21         A.   There was no information provided.

22         Q.   So where did you get all this

23    information you relied upon?

24         A.   The reams of documents that were sent

25    to me.

                                                    34

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1        Q.    Okay.  So somebody did give you

2    information.  That's all I'm asking.

3        A.    Oh, well, sure, yeah, they sent me all

4    of the documents listed in the report.

5        Q.    Anything else?

6        A.    No.

7        Q.    Okay.  No. 15, all billings of the

8    witness for services rendered in connection with

9    the evaluation of any and all claims asserted in

10   this matter.  Do you have a billing?

11       A.    I sent a bill a week and a half ago.

12       Q.    Did you bring it with you?

13       A.    I did not bring it with me.

14       Q.    Is there some reason you didn't bring

15   it with you?

16       A.    I didn't understand that I needed to

17   bring that document, no.

18       Q.    But it says to bring these things.

19   Right?

20            MS. KREVOR-WEISBAUM:  We can certainly

21   give you the one bill that he has sent.

22   BY MR. CLEELAND:

23       Q.    I need to know.  You certainly read

24   this document.  Correct?

25       A.    Yes.

                                                    35

1        Q.   And it says to bring with you.

2    Correct?

3        A.   Yes.

4        Q.   And one of the things you were to

5    bring with you were the billings.  Correct?

6        A.   Correct.

7        Q.   And you didn't bring them with you.

8    Correct?

9        A.   Correct.

10       Q.   All right.  What is it that you charge

11   for your services in this matter?

12       A.   $225 an hour.

13       Q.   Is that for all services that you

14   rendered during your assignment in this matter?

15       A.   Yes.

16       Q.   And have you been paid at all in this

17   case?

18       A.   Not yet.

19       Q.   How much time have you spent in this

20   case?

21       A.   The first bill was for about 40 hours'

22   worth of work, and there's been some subsequent

23   time to that.

24       Q.   And when was the first bill sent?

25       A.   I sent it electronically about a week

                                                  36

1   ago Sunday.  I don't recall the date, off the top

2   of my head.

3        Q.   And what period of time did that bill

4   reflect?  In other words, when is the first entry

5   for billing and when is the last entry for

6   billing on that bill?

7        A.   I don't recall.

8        Q.   Well, was it front loaded or back

9   loaded?

10       A.   Back loaded mostly in October --

11  mostly in August and September.  I didn't get any

12  documents -- very many documents total, I guess.

13       Q.   Makes sense.  You said there's some

14  subsequent work from that bill submitted

15  approximately a week ago Sunday.  What kind of

16  work was performed after that first bill?

17       A.   There was a few other depositions I

18  believe sent to me, and I reread a lot of the

19  documents in preparation for today's deposition.

20       Q.   Do you remember which documents you

21  reread in anticipation for today's deposition?

22       A.   Yes.

23       Q.   What?

24       A.   B33 and B34, B100.  I reread the

25  deposition by Roy Payan, and I reread my CV and

                                                    37

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1    reread the report.  I reviewed my CV.  I didn't

2    read the whole thing, but I reread my report.

3         Q.   And how much time do you think you

4    invested on this post-billing -- or your first

5    invoice submitted approximately a week ago

6    Sunday?

7         A.   About six hours or seven.

8         Q.   And you didn't do any work analyzing

9    any claimed loss of earnings by the plaintiffs in

10   this case.  Did you?

11        A.   No, I did not.

12        Q.   Thank you.  And did you bring any

13   electronic copy of the materials you relied upon?

14        A.   I have them, yes, electronic copies.

15        Q.   Did you bring with you an electronic

16   copy?

17        A.   Yeah.  They're in my laptop -- oh, no,

18   I guess I did not.  They're in the car.  I did

19   not.

20        Q.   So you brought at least in your car to

21   the deposition site today a laptop that has the

22   electronic files that you either, one, relied

23   upon or, two, generated as a result of reaching

24   any opinions or conclusions in this matter?

25        A.   Yes, I did.

38

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1        Q.   Thanks.  You said you reread your

2   report since the first invoice until today.

3   About how much time did you spend rereading the

4   report?

5        A.   Half hour, 45 minutes, maybe an hour.

6        Q.   Do you know who Peter Bossley is?

7        A.   Yes.

8        Q.   Who is Peter Bossley, to your

9   understanding?

10       A.   Peter Bossley works at Ohio State

11   University.  He coordinates their IT

12   accessibility efforts.

13       Q.   Do you know Mr. Bossley personally?

14       A.   Yes.

15       Q.   How long have you known him?

16       A.   I've known Peter probably three or

17   four years.  We're colleagues.

18       Q.   Have you spoken with or communicated

19   with Mr. Bossley in any fashion regarding your

20   assignment in this matter?

21       A.   No.

22       Q.   Have you read anything from him?

23       A.   No.

24       Q.   Excuse me, regarding this matter?

25       A.   No.

39

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1       Q.   Okay.  Your report dated October 2nd,

2   2017, is there a title beyond just report?

3       A.   No.

4       Q.   So if we refer to your report in this

5   matter or your report of your expert findings,

6   unless we tell you otherwise we understand it

7   will be the October 2nd, 2017, report, a copy of

8   which you brought here today.  Okay?

9       A.   Okay.

10      Q.   And if at any time during the

11  questioning you need to look at it, please feel

12  free to do so.  Okay?

13      A.   Okay.

14      Q.   I noticed the report is dated October

15  2nd, 2017.  Do you know why it was created on

16  that day?

17      A.   No.

18      Q.   Do you know how many editions existed

19  prior to that report dated October 2nd, 2017?

20      A.   How many editions?

21      Q.   Revisions, I don't know what you

22  call --

23      A.   One, maybe.

24      Q.   Now, on the first page, and my copy is

25  a little bit different than yours because you

40

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1    have colored headings that didn't come out, so

2    that's okay, but it states at the request of

3    Sharon, and that's Sharon next to you.  Is that

4    correct?

5         A.   Sharon is next to me, yes.

6         Q.   Have you ever met counsel before

7    today?

8         A.   Yes.

9         Q.   Other than the meeting in D.C. on that

10   perhaps Tuesday or Wednesday, have you ever met

11   counsel?

12        A.   No.

13        Q.   On the first page, and your pagination

14   is going to be different than mine, so isn't that

15   fun?

16             If you can turn to the second page of

17   your document, a paragraph starts, "I have

18   served..."

19        A.   The paragraph starts I have served as

20   past chair, is that the one?

21             MS. KREVOR-WEISBAUM:  Where is it on

22   yours, counsel?

23             MR. CLEELAND:  Let's see.  Again,

24   unfortunately, the pagination is different.

25             MS. KREVOR-WEISBAUM:  Is it under

                                                    41

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1    opinion?

2    BY MR. CLEELAND:

3         Q.   Let's try that again.  I had the wrong

4    tab, I guess, for that, folks.

5              Under professional biography --

6         A.   Okay.

7         Q.   -- I have been the coordinator of the

8    accessible IT group in the Division of Disability

9    Resources and Education Services, DRES, at the

10   University of Illinois Champaign-Urbana,

11   Illinois, since 1996.  Has it always been the

12   same title?

13        A.   No.

14        Q.   What titles have you held at the

15   university since 1996?

16        A.   The title is Assistive

17   Communication -- let me see.  I'll get it out

18   here.  I didn't make up the title.

19             Like Assistive Communication and

20   Information Technology Accessing Coordinator, or

21   something like that.  It's not a title I like.  I

22   don't think it was very descriptive of what I

23   did.

24        Q.   They didn't ask your input on that

25   one.

                                                    42

1        A.   I was not asked for input on that one.

2        Q.   Since 1996 have you been involved with

3   the university's attempts to assist with

4   accessibility?

5        A.   Yes.

6        Q.   And between 1996 and the present have

7   you taught any courses in accessibility for the

8   university?

9        A.   Yes.

10       Q.   How many?

11       A.   There's two different courses that

12   I've developed.  LIS 490, it was a special topic

13   library information science, and then I had a

14   special topics course in computer science on

15   accessible web applications.  I don't recall what

16   the call number is.

17            I've also taught a number of online

18   courses that are more like workshops that --

19   basically for -- more for practicing

20   professionals on accessibility, especially

21   related to HTML5 -- HTML5 accessibility, and now

22   with the new ARIA technologies -- ARIA

23   technology, and we have a program right now in

24   badging that we're in the midst of teaching,

25   developing a more competency-based training

43

1     program.

2          Q.    Thank you.  The last full paragraph on

3     page 1 states:  In my current position at DRES I

4     am responsible for providing information

5     technology-related accommodations for students

6     with disabilities and for helping the University

7     of Illinois understand accessibility issues of

8     its online administrative and instructional

9     resources.

10          If I can go back to that sentence, I'm

11     responsible for providing information technology

12     accommodations, what things are we talking about

13     there?

14          A.    Probably the most pervasive thing we

15     do is we make sure assistive technology is

16     available in computer labs across campus, so we

17     have network licenses for Kurzweil 3000, JAWS,

18     ZoomText, and in the library we use a technology

19     called OpenBook which is a way for people to scan

20     books in and have them read to them, so those

21     four technologies are available in all the

22     instructional labs and in the resident halls, and

23     we help -- but we don't put them on.  We make the

24     software available and help people know when

25     there's updates available, and we maintain the

                                                      44

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1    license server for JAWS in our building.

2         Q.   Are each of those four technologies

3    utilized at each four-year university in the

4    United States?

5         A.   I have no idea.

6         Q.   Do you know how many universities

7    those four technologies are utilized at any

8    universities in the United States?

9         A.   Well, JAWS is probably the most

10   dominant in the country, so I assume JAWS is

11   probably in almost every university.

12             The Kurzweil 3000 is also very

13   popular.  I would assume that it's at a large

14   majority of universities.

15             The ZoomText is also the dominant

16   screen magnifier for Windows that's available, so

17   I assume many universities probably provide it.

18             I think most Big Ten universities,

19   which are the ones I'm familiar with, use that,

20   and OpenBook probably more related to assistive

21   technology labs and things like that.  It's

22   not...

23        Q.   This suite of four technologies that

24   you referred to, are you aware of any other

25   university that utilizes all four of them in

                                                    45

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1   their services?

2        A.   Not off the top of my head, no.

3        Q.   There are various products on the

4   market available to universities to assist in

5   sight-impaired students.  Is that correct?

6        A.   Different types of visual impairments,

7   there are other technologies, including like with

8   Apple OS 10 comes with a built-in magnifier and

9   zoom features, so in that case there aren't a lot

10  of technologies.

11             Most people just use the built-in

12  technologies which is great.  Universal access.

13       Q.   Perhaps I could change it to alternate

14  technologies.  There are alternate technologies

15  beyond the four that you mentioned.  Is that

16  correct?

17       A.   There are some, yes.

18       Q.   You continue on page 1:  I also work

19  with university vendors to help them understand.

20             What university vendors do you work

21  with?

22       A.   Well, there's a lot of vendors, but

23  we've worked -- in the past we've worked with

24  Blackboard, WebCT.  Currently work with Elsivier.

25       Q.   If I may, it's only you working with.

                                                    46

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1    Not someone on the staff, but I want to know what

2    you work with.

3         A.   In the past or right now?

4         Q.   Both.

5         A.   Well, let's see, in the past we've

6    worked with WebCT which was acquired by

7    Blackboard, and typically what we try to do when

8    we work with companies is to try to build a

9    consortium, so we try to get other people

10   involved, because the more people who are

11   interested in it usually give the companies more

12   impetus to participate.

13         We've worked with EBSCO a company that

14   does database work in the past.  I'm currently

15   working with Elsivier.

16         We help part of their accessibility

17   group.  We have a new project that we're

18   working -- starting to work with Coursera and

19   Slack and starting to participate in a

20   collaboration with Zoom.  That's technology used

21   for collaboration.

22         We work with some local vendors,

23   Surface 51 and Pixo, Pixo with accessibility

24   issues.  We've worked with -- in the past with

25   Banner a little bit.  It's an enterprise-wise

                                                    47

1   management system.

2          Q.   Okay, just to qualify.  You keep

3   referring to we.  I'm asking that you personally

4   work with.

5          A.   I personally have worked with these

6   companies.

7          Q.   I appreciate that.  Thank you.

8          A.   Oh, boy.  There's -- we've worked --

9   I've worked on Moodle accessibility issues.  It's

10  an open source content management system.

11               We've worked with campus IT

12  professionals to improve accessibility of some

13  websites that students who are blind have to use.

14  I've just worked on some modifications this

15  semester.

16               So we do a lot of consulting both on

17  campus with local vendors and with national

18  vendors on accessibility.

19          Q.   You continue in that paragraph:  I

20  work closely with our text conversion and media

21  captioning staff.

22               How is it that you work closely with

23  the groups?

24          A.   With any problems with technology and

25  text conversion.  Sometimes there's issues with

                                                    48

1    something not being read correctly, or I'll work

2    with them to figure out what the problem is.

3              There's a lot more intersection now

4    between text to -- electronic text and

5    instructional accessibility, so we work closely

6    with them, and we do both conversion of print

7    materials that we convert over 250 pages of print

8    materials a year to accessible formats.

9              We also do captioning, and we're

10   starting to do audio descriptions now for videos

11   so...

12        Q.   When you say we're starting to do

13   audio description for videos, when did that

14   start?

15        A.   Just starting this year so...

16        Q.   What did you do before that at the

17   university?

18        A.   For audio description?

19        Q.   Yes.

20        A.   There would have to be other types of

21   accommodations made, and I'm not the visually

22   impaired specialist.  The visually impaired

23   specialist would deal with those accommodations.

24        Q.   But you're the expert today, so I'm

25   trying to find out what you know.  Okay?

                                              49

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1           So your reference to audio description

2      starting this year, that being 2017.  Correct?

3           A.   Uh-huh.

4           Q.   Is that a yes?

5           A.   Yes.

6           Q.   What is it that your university did

7      for audio descriptions on video materials prior

8      to this 2017 year, if you know?

9           A.   I don't know.  I do know one thing.

10     When we did summer camps for kids with visual

11     impairment -- we haven't done that for about 14

12     years -- we would bring them to the Krannert

13     Center for Performing Arts for a play, and we

14     hired a professional audio describer to come in

15     and describe the plays for the visually impaired

16     students.

17          Q.   That's since about 2003, is that

18     correct?

19          A.   Somewhere in that area.

20          Q.   I'm not a math major, but I think I

21     can do that.

22               So while -- was that the university

23     that did that?

24          A.   Yes, we paid for it.

25          Q.   So the university did that up to 2003

                                                    50

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1    and then stopped.  Is that right?

2         A.   No, we just did it for summer camp.

3    You're talking about my experience?

4         Q.   Right.

5         A.   In my experience when we needed audio

6    description for these camps I was helping to

7    run we hired an audio describer for the plays

8    that we went to.

9         Q.   Are you aware of the camps doing that

10   at any time after 2003?

11        A.   The camps were discontinued due to

12   funding issues, so we only did it for two years,

13   unfortunately.

14        Q.   No, you were also involved with what

15   the university did.  Do you know what the

16   university did with respect to audio description

17   for video presentations prior to 2017?

18        A.   No, I don't.

19        Q.   Continuing in that first page on your

20   report it looks like the last full sentence of

21   the paragraph, "I work closely with our text

22   conversion media captioning," and then it

23   continues, "to provide equally effective

24   communication of electronic instructional

25   material."

51

1          What do you mean by equally effective

2    communication?

3          A.   We provide basically as much as

4    possible to make sure that the information that's

5    available in a textbook is equally available to

6    students who can't see that material, so one of

7    the resources we developed on campus is something

8    called eText at Illinois, and so we've worked

9    with them to make sure that the books that they

10   create, which are e-books, that the graphics are

11   equally -- are properly described for students

12   who can't see those images.

13         Q.   Again, the phrase equally effective

14   communication, is that a term of art?

15         A.   A term of art?  What does a term of

16   art mean exactly?

17         Q.   You're an engineer.  When we talk

18   about specific phrases, it means something to

19   someone in the profession.  It may also have an

20   independent meaning to the public.

21              If you're talking about computer

22   engineering, you refer to bytes.  It means

23   something to a computer engineer.

24              If you talk to a mother of a two-year

25   old and you use the word bites, it means

                                                    52

1    something completely different.  It's not a term

2    of art to that person.

3              So is the phrase effective

4    communication of electronic instructional

5    materials a term of art in your business?

6        A.   I think there are certain things that

7    are more standard ways to do things and more

8    complex things are probably a skill of art, but a

9    lot of the -- it depends on, I guess, the

10   complexity of the graphic whether it would be

11   considered art or if there would be a best

12   practice or a practice that would be considered

13   equally effective, so like, for example, if it's

14   a simple bar chart, a data table would be

15   effective.  If it was a more complex image, then

16   there would probably have to be more

17   interpretation.

18       Q.   You just used the phrase best

19   practices.  Is your report an attempt to identify

20   what you believe the best practices are for

21   higher education facilities in the United States

22   with respect to sight-impaired individuals?

23       A.   My report states what I think is

24   necessary for there to be equally effective

25   access to IT materials.

53

1        Q.   But you just used the word best

2    practices, so I'm trying to figure out is your

3    report identifying your opinion of something

4    or --

5        A.   What I was hired to do was to provide

6    my opinion.

7        Q.   Or identify what you believe to be the

8    standard of care or best practices within the

9    community?

10       A.   Could you rephrase the question?

11       Q.   Sure.

12       A.   I guess I'm not sure exactly what

13   you're asking.

14       Q.   And I appreciate the fact that you

15   said that.  If you don't understand, you let me

16   know, and I'll do my best to rephrase it.  I may

17   not be able to, but I'll try.

18            You've used the word effective

19   communication of electronic instruction

20   materials.  I'm trying to find out if that means

21   something in the community, or is it just a group

22   of words that you identified?

23            In asking that question you talked

24   about best practices, so I'm trying to find out

25   is your report an attempt to identify the best

                                                   54

1    practices and the standard of care within higher

2    education in the United States, or is it just

3    your opinion as to what should be done by a

4    facility?

5        A.   Could you --

6        Q.   Sure.  I'll try again.

7        A.    Well, this report is my -- what I see

8    needs to happen in higher education if we really

9    want to provide equal access to information

10   technology.

11            If that's what the goal is, I'm a

12   technocrat.  I'm not a lawyer, so what I'm trying

13   to do in this report is from what my experience

14   and what I've seen is effective for actually

15   making that happen is to -- so I'm not sure what

16   the difference between best practice and being an

17   effective way to make something happen.

18            I don't see a difference in those

19   terms, so we need to -- the things I put in the

20   report are the things -- the actions that I think

21   need to happen if you actually want to achieve

22   those goals.

23       Q.   And I'm only trying to understand your

24   language, your specific words.  You might be

25   using them interchangeably.  I'm trying to figure

                                                    55

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1   that out, so at any point if my question becomes

2   confusing, which is highly possible, you let me

3   know.  Okay?

4           Now, when you used the rephrase a few

5   moments ago best practices, what did you mean by

6   that?

7       A.   The practices that I've found most

8   effective in my work and what I've seen other

9   people within higher education do to actually

10  achieve higher levels of accessibility.

11      Q.   And those best practices you just

12  spoke about in your mind are those universally

13  accepted?

14      A.   Universally accepted by who?

15      Q.   The community of higher education in

16  the United States.

17      A.   I think for the people who have had to

18  deal with this issue, yes, they are universally

19  accepted.

20      Q.   Who are the people who have had to

21  deal with those issues?

22      A.   Penn State, Montana State are the ones

23  I'm most familiar with but...

24      Q.   Anybody else?

25      A.   There's been a lot of cases.  I wasn't

                                                    56

1    prepared here to come to the list of, you know,

2    litigation but...

3         Q.   Well, it doesn't need to be

4    litigation.  You told me best practices which

5    means by your definition the most effective, and

6    I asked if those best practices that you've

7    identified are universally accepted.

8              If I may, and I apologize, but if I

9    might help, an individual might think the best

10   practice is to do A, B, and C, but that might be

11   the only person who believes that.

12             The rest of the community, be it

13   business, education, medicine might say we don't

14   go along with those things, so when you say best

15   practices or most effective I asked if it was

16   universal, and you started to identify a list

17   with so far Penn State and Montana State?

18        A.   Well, I think it's universal within

19   the Big Ten university system.  I mean those are

20   the people who participate in the Big Ten

21   academic alliance.  These practices seem to be

22   being used by most of the campuses.

23             If you look at the California State

24   University system, Susan Cullen's program, these

25   practices, from my understanding, are the same

                                                    57

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1  practices that they're using, so I don't think

2  they're any different than any other group that's

3  trying to -- or university that's trying to

4  address these issues.

5      Q.   Have you done any work to determine

6  that?

7      A.   Other than participating in

8  collaborations.  I mean I work with these people

9  with other -- some of these collaboration groups

10 I participate in our -- for example, there's a

11 group called the EDUCAUSE IT Accessibility

12 Constituent Group.  They meet -- have a monthly

13 teleconference.

14      Christian Johansen from Penn State and

15 Susan Cullen from California State University

16 system are leaders of that group, and a lot of

17 those calls center around the same issues that I

18 brought up in the report and helping raise

19 awareness of those things.

20      We have another group in the Big Ten

21 called the Big Ten Academic Alliance, and these

22 same practices I discuss here are the same ones

23 we discuss in those calls.

24      Q.   How many two-year colleges are there

25 in the United States?

                                                58

1          A.   I don't know.

2          Q.   How many four-year colleges are there

3     in the United States?

4          A.   I don't know.

5          Q.   How many post-doctoral colleges are

6     there in the United States?

7          A.   I don't know.

8          Q.   How many doctoral colleges are there

9     in the United States?

10         A.   I don't know.

11         Q.   On page 2 of your report you indicate

12    that you are currently a participant in W3C, a

13    working group.  I think you casually mentioned

14    it.

15              What is it that you do in that working

16    group?

17         A.   The ARIA group right now is working on

18    two things that I participate in, something

19    called the ARIA Authoring Practices Guide, and

20    that is a way, a resource that's been developed

21    to help people understand how to use ARIA

22    technology, create accessible widget for the web.

23              The other part of the working group is

24    working on the testing of browsers or defining

25    the specification.  Right now in terms of the

                                                      59

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1  work the last six months it's been showing

2  browser implementation of the ARIA standard.

3          We've been involved with developing

4  some of the testing tools we've been using to

5  automatically test browsers for implementation of

6  ARIA.

7      Q.   With respect to the creation of

8  widgets and the work group that you're on --

9      A.   And the specification also talks about

10  how to use ARIA landmarks correctly.

11      Q.   Okay.  With respect to the widget

12  portion you talked about, has the working group

13  that you're involved with with ARIA developed

14  universally-accepted policies and procedures?

15      A.   The ARIA Authoring Practice Group is

16  not a policy and procedures.  It's a technical

17  document to help people understand the types of

18  keyboard interaction and how different types of

19  ARIA markup should be used with different types

20  of widgets.

21          Each category of widget we're

22  developing examples, and the University of

23  Illinois, myself or some of my students, have

24  probably developed over half of those examples

25  so...

60

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1      Q.    And is that the same meaning you're
2  involved with technical documentation for the web
3  browser users?
4      A.    The browser work we've done is
5  basically -- I assume you're probably not very
6  familiar with some of the technical aspects of
7  how assistive technology works.
8      Q.    I'm not familiar with a lot of things.
9  Ask my children.
10     A.    Okay.  Well, there's basically --
11     Q.    And if I can help you, I apologize, no
12  need to explain what it is.  You said it's not a
13  policy.
14     A.    They're not policies.  They're a
15  technical working group.
16     Q.    That's all I want to make sure with
17  respect to your work on the browser through the
18  ARIA working group, again, there is technical
19  documentation, correct, not policy?
20     A.    Correct.
21     Q.    On page 2, the second full paragraph
22  you talk about making presentations at national
23  conferences on information technology to promote
24  web accessibility.  What do you mean by that?
25     A.    Well, I attend several conferences, so

61

1    like in October I was at the HighEdWeb conference

2    in Hartford, Connecticut, talking about some data

3    in terms of implementation of accessibility in

4    higher education and also a new project that we

5    have been working on in the past year called A11Y

6    First.  It's a modification of the CKEditor

7    technology which is a WYSIWYG, what you call what

8    you see is what you get, editor.

9           That's used in a lot of content

10   management systems and course management systems,

11   so one of our biggest issues with accessibility

12   is even if -- like template, like if you have a

13   CMS, the templates may be accessible but -- or

14   they may be inaccessible, but a lot of the people

15   creating content aren't necessarily technical

16   people, people who understand HTML or the

17   accessibility feature of an HTML, so we've been

18   looking at how can we modify the interface to

19   help support accessible authoring for the proper

20   nesting of headers, adding of all text for images

21   to properly describe the images and link text, so

22   CKEditor, at least version 4, has a -- had an

23   accessibility plug-in to it where you could press

24   a button, and it would analyze your document for

25   accessibility which is nice, but people have to

62

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1   remember to press that button to check their

2   document or even know that that button exists.

3        Q.   Okay.   I apologize.   If I could, I was

4   just asking the phrase to promote web

5   accessibility.   What do you mean by that?

6        A.   Accessible authoring, helping raise

7   awareness for accessibility.

8             I was very -- last week I was at the

9   ICT accessibility conference in Washington, D.C.,

10  which was a conference that's looking at testing

11  technologies and procedures and tools for

12  accessibility.

13            Next month I'll be at the accessing

14  higher -- well, no, this month, next week, I will

15  be at the accessing higher ground conference.

16  I'll be giving a one-day workshop on web

17  accessibility evaluation, and then I'll be giving

18  a talk on the Illinois First technology and also

19  a talk on the ARIA Authoring Practices Guide, and

20  last spring I was at the CSUN conference talking

21  about -- well, it would have been our open source

22  tools, the inspector sidebar, and FAE 2.0.   I

23  believe it's last June.

24       Q.   So it sounds like you believe there's

25  a -- I apologize.   It sounds like you believe

                                              63

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1  there's a lot of work that needs to be done to

2  promote web accessibility?

3       A.   Yes, it does.

4       Q.   Continuing in that paragraph, you

5  participate in presentations, as you've just

6  recited some of them, on improving information

7  technology access in higher education.

8            So you believe there is a need to

9  improve information technology access in higher

10 education.  Is that correct?

11      A.   I do believe that, yes, very strongly

12 I think there's a huge gap between the capability

13 of technology being accessible and where it's

14 currently at.

15      Q.   On that same page 2 of your report

16 under the information review, and it goes over I

17 believe to page 3, and you're certainly welcome

18 to look at it, again, is this all of the

19 information that you looked at in reaching an

20 opinion in this matter?

21      A.   Yes.

22      Q.   And in fairness to you, other than the

23 materials that you were provided to you after the

24 report was prepared, correct?

25      A.   Correct.

64

1      Q.   And you've identified what those

2   materials are earlier in your deposition.

3   Correct?  You read a few deposition transcripts,

4   including Mr. Payan.  Anything else?

5      A.   Mr. Payan, I believe, was part of it.

6   Roy Payan, yeah.  Oh, academic for Roy Payan

7   and...

8      Q.   And, I apologize, I think you said you

9   went back and reread Mr. Payan's transcript?

10     A.   Right.  So I had Roy Payan's

11   deposition for this report.

12     Q.   But you've already told me about

13   everything else that you reviewed after you

14   prepared the report?

15          MS. KREVOR-WEISBAUM:  Objection.

16   BY MR. CLEELAND:

17     Q.   Hang on.  You've already told me

18   everything you viewed after you prepared the

19   report with respect to materials from

20   participants and as provided to you by counsel?

21          MS. KREVOR-WEISBAUM:  Objection.

22          THE WITNESS:  This was what I used to

23   write the report.

24   BY MR. CLEELAND:

25     Q.   I'm talking about afterwards now.

65

1    You've done the report.  It's over in the corner.

2    After it's done, you looked at some more things.

3    Right?  I want to make sure you've been given the

4    opportunity to tell me what you've looked at.

5    That's all.

6            MS. KREVOR-WEISBAUM:  Objection.  He

7    said he did not recall what he looked at after

8    the report.

9            THE WITNESS:  In preparation for

10   today -- after the preparation of today, I

11   reviewed Roy Payan.

12   BY MR. CLEELAND:

13       Q.   I agree.

14       A.   And I reread the B33, B34 and --

15   policy and --

16       Q.   I'm just looking for new material.

17       A.   And B100.

18       Q.   I'm looking for new material, sir.

19            MS. KREVOR-WEISBAUM:  Objection.

20   Confusing the witness.

21   BY MR. CLEELAND:

22       Q.   If you're confused, raise your hand

23   and say I'm confused.

24       A.   I'm really confused.

25       Q.   You told me that these are the

66

1  materials on page 2 and 3 that you relied upon in

2  reaching your opinions or conclusions in your

3  report.  We're done with the report for this

4  question.  Set it aside.

5      A.   Okay.

6      Q.   I asked if you looked at anything else

7  after you prepared the report with respect to

8  your assignment in this case.  You told me a

9  couple of things.

10         I just want to make sure that I've

11  gotten everything that you recall that you looked

12  at after you prepared the report that you didn't

13  have at the time of the report or didn't rely

14  upon at the time of the report and today.

15     A.   The only one I recall is Portia

16  Mason's deposition.

17     Q.   Thank you.

18         MS. KREVOR-WEISBAUM:  Objection.

19  You're really confusing the witness.  He had

20  already testified prior that he reviewed some

21  depositions.  He did not tell you what they were.

22         MR. CLEELAND:  I agree.  I'm just

23  saying I want to give him the chance.

24         MS. KREVOR-WEISBAUM:  He does not

25  recall which other depositions.

67

1           MR. CLEELAND:  Well, he just recalled

2    another one.

3           MS. KREVOR-WEISBAUM:  No.  Portia

4    Mason is on here.

5           MR. CLEELAND:  He said he read it

6    afterwards.  I'm just trying to give the

7    witness as much of an opportunity --

8           MS. KREVOR-WEISBAUM:  You're trying to

9    confuse the witness.

10   BY MR. CLEELAND:

11        Q.   Sir, I want to be very clear with you.

12   If you're confused, you tell me right away,

13   because I'm not here to confuse you.

14           I'm trying to find out what you did,

15   what conclusions you reached, and how you got

16   there.  That's it.  Okay?

17           So have you now told us about

18   everything you recall reading after you prepared

19   the report, such material that you didn't have at

20   the time of the report?

21        A.   That's all I recall.

22        Q.   Excellent.  I thought you said that

23   before.

24           Okay.  Page 2 of your report, all of

25   these depositions that you talked about, did you

68

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

```
 1    read all of those depositions?

 2         A.   Yes.

 3         Q.   Did anyone assist you in preparation

 4    of any of your opinions or conclusions in this

 5    matter?

 6         A.   No.

 7         Q.   Okay.  Did you read the depositions

 8    from cover to cover?

 9         A.   Yes.

10         Q.   And these one, two, three, four, five,

11    six, seven, eight, nine, 10, 11, 12, depositions

12    are included in your 40-hour bill submitted about

13    a week ago.  Correct?

14         A.   Uh-huh.

15         Q.   Is that a yes?

16         A.   Yes.

17         Q.   On the second bullet point under

18    information reviewed it says the deposition of

19    Everett Turner.  Do you know who that person is?

20         A.   I don't recall.

21         Q.   Was there any information in the

22    deposition of Everett Turner that you relied upon

23    in reaching the opinions or conclusions in this

24    matter?

25         A.   I don't recall.
```

69

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1        Q.    Do you know what case that deposition
2   was from?
3        A.    I don't recall.
4        Q.    And all of these were provided to you
5   by plaintiff's counsel.  Is that correct?
6        A.    Yes.
7        Q.    Did you ask plaintiff's counsel why
8   you were receiving these depositions?
9        A.    No.
10        Q.    Did you have an understanding why you
11   were receiving the depositions?
12        A.    Yes.
13        Q.    What was that understanding?
14        A.    To prepare a report.
15        Q.    And on page 3 you have a heading that
16   states opinion, and I don't see another bolded
17   heading until page 9, so are all of your opinions
18   identified on pages 3 through 9 in this report?
19        A.    Yes.
20        Q.    On page 3 under the heading opinion
21   you state:  It is my opinion to a reasonable
22   degree of professional certainty.  What does
23   reasonable degree of professional certainty mean
24   to you?
25        A.    It means that I think that that's

70

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1    the -- what needs to happen as an expert in my

2    experience and my knowledge to help for that

3    particular issue.  Can I read that?

4         Q.   Sure.  Why don't you read the whole

5    sentence?

6         A.   Where is that?

7         Q.   Under the word opinion, the first

8    paragraph it looks like one long sentence.

9    You're certainly welcome to read that.

10        A.   Yeah, it means based on my experience,

11   my knowledge of what practices have been

12   effective that these are the policies and

13   procedures and training to ensure that blind

14   students are provided effective assignments, so

15   I've been doing this for a long time, and I've

16   worked with a lot of people, and so these are

17   what I think needs to happen and what I've seen

18   work both here at the University of Illinois and

19   other places.

20        Q.   But I just want to know about the

21   phrase within that sentence reasonable degree of

22   professional certainty, what does that mean?

23        A.   I just tried to explain it.

24        Q.   Well, sir, you said that's what you

25   think should be done, but that's not what that

                                                       71

1    paragraph talks about.

2            It says it lacks sufficient policies.

3    It doesn't say should be done.  It says lacks

4    sufficient policies, so I'm trying to figure out

5    what you mean by the phrase reasonable degree of

6    professional certainty.

7        A.   It means that I don't think that they

8    had the policies and procedures and training that

9    they needed to help -- to ensure that blind

10   students are provided equally effective and

11   access to electronic information.  That's what it

12   means to me.

13       Q.   I understand what the paragraph says,

14   but if a doctor testifies, they will often say

15   within a reasonable degree of medical probability

16   or certainty, depending on the jurisdiction.

17   It's a qualifying phrase.

18           I'm just trying to figure out what

19   that qualifying phrase, a reasonable degree of

20   professional certainty, means to you?

21           MS. KREVOR-WEISBAUM:  Objection.

22   Asked and answered.

23           THE WITNESS:  Well, the depositions --

24   often I had a lot of questions after reading the

25   depositions, so there's probably information that

72

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1    I don't know that wasn't in the depositions.

2    BY MR. CLEELAND:

3         Q.   Okay.  But, again, I'm only asking --

4    that's a descriptive phrase, reasonable degree of

5    professional certainty.  That meant something to

6    you when you wrote that down.

7         A.   Yeah.

8         Q.   Where did you get that phrase from?

9         A.   It's a phrase that seemed to make

10   sense to me when I wrote it.  I can't recall

11   exactly where I got it from.

12        Q.   And I'm just trying to figure out what

13   it means to you.  A reasonable degree, let's

14   break it down.  What does a reasonable degree

15   mean to you?

16        A.   A reasonable degree?

17        Q.   Yes.

18        A.   It means that most people would come

19   to the same conclusion.

20        Q.   Most means majority.  Correct?

21        A.   Yeah.

22        Q.   So the majority of people would

23   believe this if they looked at that?  Is that

24   what you're saying?

25        A.   That was my belief when I wrote it.

73

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1       Q.   Did you talk to anybody else about

2    what their beliefs were about the actions and

3    policies of the LACC?

4       A.   No.

5       Q.   Okay.  Next it says, degree of

6    professional certainty.  What do you mean by

7    professional certainty?

8       A.   Professional, I've been doing this

9    work for a long time.  I've worked in higher

10   education and technology, and so I feel I'm a

11   professional in this field and that my experience

12   and knowledge in this area I feel I understand

13   what needs to happen to make information

14   technologies more accessible, and I didn't see

15   those features at LA Community College.

16           So I say professional certainty.  That

17   means this is the way I feel.  This is the way I

18   think and what I see at other places, so I don't

19   think my views would be out of line with other

20   people that do this work.

21       Q.   Have you attempted to determine that?

22       A.   No.

23       Q.   Okay.  What does the word certainty

24   mean to you in this paragraph?

25       A.   Certainty?

                                                    74

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1          Q.    Yeah.  It's your language there.

2          A.    Certainty means I'm confident.

3          Q.    Okay.  Now, you have never been a

4     retained expert witness for purposes of

5     litigation prior to this case.  Is that correct?

6          A.    That's correct.

7          Q.    Have you ever been a retained expert

8     consultant in any case?

9          A.    No.

10         Q.    Have you ever been retained by the

11    plaintiff's counsel's office to do any work in

12    any litigation anywhere?

13         A.    No.

14         Q.    So your -- continuing in this

15    paragraph:  The LA Community College District

16    lacks sufficient policies, do they lack

17    sufficient policies regarding accessibility?

18         A.    The only place I found the policy was

19    in the document related to text conversion, so I

20    didn't find any policies that I recall any other

21    place.  I think I quoted it later on.

22         Q.    If I may ask you the question is do

23    they lack specific policies?  That's what you

24    say.

25              MS. KREVOR-WEISBAUM:  Sufficient.

                                                  75

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1          MR. CLEELAND:  What did I say?

2          MS. KREVOR-WEISBAUM:  I thought you

3   said specific.

4   BY MR. CLEELAND:

5          Q.   I could have, and I apologize if I

6   said that.  If I make a misrepresentation, you

7   let me know.  Okay?  I don't mean to do it.

8          Again, the comment is lacks sufficient

9   policies.

10          A.   What I was thinking policies here,

11   they certainly have IT accessibility policies,

12   but they didn't have an implementation plan for

13   the policy, so I guess I was conflating policies

14   and implementation plan.

15          Sometimes -- I know oftentimes

16   something that's confusing to me, because I often

17   read people write policies, but they have no

18   implementation plans, so my understanding, at

19   least in my interpretation of policies that

20   includes implementation plan, so while they may

21   have had statements saying that they're supposed

22   to be accessible, policies didn't include an

23   implementation plan, at least that I could

24   discern from what I read.

25          Q.   Did you intend to conflate the issues?

                                                    76

1      A.   I didn't intend to, but I guess I'm
2    also an engineer not a linguist so...
3      Q.   That's okay.  When you write about
4    engineering, you try to be as precise as
5    possible.  Don't you?
6      A.   I try to.
7      Q.   And sometimes human beings fall a
8    little short.  Right?
9      A.   That happens.
10     Q.   So you are aware that there are
11   policies regarding accessibility for LACC.
12   Correct?
13     A.   Yes.
14     Q.   Did you read all of them?
15     A.   The ones that I could find, yes, and
16   the ones that were provided to me.
17     Q.   That's two different things.  What was
18   provided to you?
19     A.   The ones that were provided to me were
20   B33, B34, and administrative regulation B100 had
21   a little bit on accessibility, web IT
22   accessibility.
23     Q.   Okay.  And who provided those to you?
24     A.   Counsel, Sharon.
25     Q.   You also said provided and the ones

77

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1    you could find.  Which policies could you find?

2         A.   The one on the -- their Office of

3    Student Services, the alternative text production

4    center had a document that I quoted from, I

5    believe.

6              All instructional resources or

7    materials purchased or leased from a third-party

8    provider or created or substantially modified

9    in-house must be accessible to students with

10   disabilities, unless doing so would fundamentally

11   alter the nature of instructional activity or

12   result in undue financial administrative burdens

13   on the district.

14        Q.   And something I forget to do

15   sometimes, but when we read, we try to slow down,

16   because it helps her.  We tend to read faster

17   than we normally speak but thank you.

18             So you were able to find the policies.

19   Correct?

20        A.   Yes.

21        Q.   And the policies as identified, you

22   believe those adequately reflect the degree that

23   schools should be functioning on with

24   sight-impaired individuals, to a degree of

25   professional certainty.  Correct?

                                                      78

1              MS. KREVOR-WEISBAUM:  Objection.

2              THE WITNESS:  No, because it didn't

3      include an implementation plan.  How is it

4      supposed to happen?  People have policies but

5      without an implementation plan --

6      BY MR. CLEELAND:

7          Q.   Well, do you draw a distinction

8      between policies and implementation?

9          A.   No, not really.  Personally, I don't,

10     no.

11         Q.   Because you just said policies and

12     implementation.  Do you conflate those two?

13         A.   I do.

14         Q.   Okay.  I appreciate that.

15         A.   I apologize.

16         Q.   That's quite all right.  This is one

17     chance we get to ask you questions about your

18     material, other than in the courtroom, so I

19     apologize for being so detailed, but it's

20     important for me.  Okay.

21              You continue in that first paragraph:

22     To ensure that blind students are provided

23     equally effective and timely communication of

24     print and electronic instructional materials and

25     online administrative resources.

                                                      79

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1               What do you mean by the phrase equally

2    effective?

3         A.   Equally effective, well, obviously

4    some of the -- especially in the math class, you

5    know, there was graphs and things, so they would

6    have to be able to produce tactile graphics or

7    some type of text descriptions that would help

8    them understand what those relationships were.

9         Q.   What's the phrase equally effective

10   mean to you?

11        A.   Equally effective?  That means in a

12   form that helps the person understand the same

13   level of materials as somebody who can see it.

14        Q.   Do all visual capable students

15   perceive visual information in the same way?

16        A.   No.

17        Q.   Okay.  So, again, I'm worried about

18   this equally effective so --

19        A.   They should have access to the same

20   information in the graph.

21        Q.   Excellent, the same information.

22   Okay?

23        A.   In an effective -- equally effective

24   way.

25        Q.   And that's what I'm trying to get.

80

1    Equally effective could be different based upon

2    individuals.  Correct?

3          A.   Yes.

4          Q.   As a matter of fact, in accessibility

5    presentations you probably talk about the need of

6    the individual.  Is that correct?

7          A.   The need of the individual?

8          Q.   Sure.  If you have a group of

9    sight-impaired individuals, in your experience do

10   you find that some of them process and accept

11   information differently from other sight-impaired

12   individuals?

13         A.   Yes, just like sighted individuals --

14         Q.   Absolutely.

15         A.   -- see information differently or

16   perceive or even understand.

17         Q.   I agree with you.

18         A.   You're going over words here today.

19         Q.   Sir, that's all I've got for you.  You

20   gave me your report.

21         A.   Yeah.

22         Q.   Okay.  So the goal of providing

23   equally effective knowledge and to have the same

24   information delivered might require different

25   provision between two sight-impaired students.

                                             81

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1    Is that correct?

2         A.    Yes.

3         Q.    Thank you.  You continue on that page:

4    For blind students to be on equal footing, what

5    do you mean by the phrase equal footing in your

6    report?

7         A.    One of the things that concerned me is

8    the process in which the students had to get

9    access to course materials.

10              In the depositions that I read it

11   seemed like it was up to the student --

12   oftentimes stuff would be handed out in class,

13   and it was the responsibility of the student to

14   bring that to, I guess, either the tech

15   conversion centers, the High Tech Center, or I

16   noticed in the depositions for the library there

17   was scanning capability there to read

18   information, although depending on the format of

19   the material even if the student, you know,

20   scanned it in, it may not produce recognizable

21   text, but this whole process, you know, the

22   student -- you know, they're going to be

23   discussing something in class, but the student

24   didn't have access to it at that point.

25              They have to take it someplace else,

82

1    wait for it to be converted, then get it back

2    just seemed to always put the student who is

3    blind behind all of the other students in terms

4    of having access to this information.

5         Q.   Could you give me a specific instance

6    for Mr. Payan where that occurred?

7         A.   Boy -- well, the class --

8         Q.   That's a yes or no.

9         A.   Yes.

10        Q.   Now, I'd like to know what they are.

11        A.    In the math classes I know he was

12   getting -- like getting notes for the class.  It

13   took him a long time to get notes, and then I

14   believe in one of his other classes he reported

15   that --

16        Q.   I apologize, sir.  We were talking

17   about equal footing, and you said oftentimes

18   stuff is handed out in class.

19             That's what we're talking about now is

20   my understanding.

21        A.   Yeah.

22        Q.   So we're only talking about stuff

23   being handed out in class.

24        A.   Yeah.

25        Q.   I want to know specific examples of

                                                    83

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1   Mr. Payan not being on equal footing because of

2   stuff being handed out in class.

3          A.   Okay.  Well, let me -- can I review

4   this?

5          Q.   Absolutely.  If you need to take a

6   break, now would be a good time, but if you want

7   to go forward, we're happy to do that.

8          A.   Okay.  Reask the question again.

9               MR. CLEELAND:  Could you read that

10  back, please?

11              (At this point the court reporter read

12               aloud the requested portion of the

13               transcript.)

14              THE WITNESS:  I want to correct that.

15  I don't recall a specific class that he had

16  information handed out in the class, but I do

17  recall about Mr. Payan and his deposition was

18  that he had to rely on other people for notes in

19  the class and that often that he wouldn't get the

20  notes or the notes would be delayed by two or

21  three days.

22              The -- there was also issues with the

23  book and the book chapters not being available to

24  him when they were talking in class.  I believe

25  Mr. Payan was in an psychology course where there

84

1    were a number of --

2    BY MR. CLEELAND:

3         Q.   Are you confusing Ms. Mason?  We're

4    only talking about Mr. Payan right now.

5         A.   Mr. Payan.  That was the primary of --

6    also, with Mr. Payan there was the issue of the

7    software for the class that was being used and

8    the problems with using the software.

9         Q.   Okay.  And let's go back to what my

10   question was.  Stuff being handed out in class.

11        A.   I want to correct that.  I don't

12   recall that specific for Mr. Payan.

13        Q.   Okay.  So you know of no instance by

14   your research where Mr. Payan was deprived of

15   equal footing because of stuff being handed out

16   in class.  Is that correct?

17             MS. KREVOR-WEISBAUM:  Objection.

18             THE WITNESS:  I can't say that I

19   believe -- there may be instances.  I just don't

20   recall them right now.

21             MR. CLEELAND:  Could you read my

22   question, please?

23             (At this point the court reporter read

24             aloud the requested portion of the

25             transcript.)

                                                    85

1    BY MR. CLEELAND:

2          Q.   Yes or no?

3          A.   No.

4          Q.   It wasn't intended to be a negative --

5    a double negative.  Could you read that question

6    again?  I apologize.

7                (At this point the court reporter read

8                 aloud the requested portion of the

9                 transcript.)

10   BY MR. CLEELAND:

11         Q.   So the question is is that correct?

12         A.   Yes.

13         Q.   Thank you very much.  And I apologize

14   for the confusion on the question.

15              Now, you did bring up references to

16   notes for Mr. Payan.  Do all students take notes?

17         A.   I assume so.  I took notes.  Did you

18   take -- I mean most students take notes.

19         Q.   Have you done any studies on that?

20         A.   No.

21         Q.   Okay.  But the question was do all

22   students take notes?

23         A.   I do not know.

24         Q.   You also talked about the book was not

25   available.  What book are you talking about?

                                                    86

1          A.    Math 124A and B.

2          Q.    The book was available.  Correct?

3          A.    Not in an accessible format.

4          Q.    The book was available to students.

5     Is that correct?

6          A.    Yes.

7          Q.    Okay.  Before a book can be converted

8     does someone have to have legal title to that

9     book?

10         A.    Yes.

11         Q.    Did Mr. Payan have legal title to the

12    book in the math class you're talking about

13    before the dates of the class starting?

14         A.    I do not know.

15         Q.    Did Mr. Payan have legal title to that

16    book at the time he went to OSS and asked for a

17    conversion?

18         A.    I do not know.

19         Q.    But in your experience he needed to

20    have that title or right.  Correct?

21         A.    Yes.

22         Q.    There's certainly things called

23    copyright laws.  Is that correct?

24         A.    Yes.

25         Q.    Have you written any textbooks, sir?

                                                    87

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1      A.   No.

2      Q.   Have you written any copyrighted

3   material?

4      A.   Yes.

5      Q.   And do you wish to protect those

6   copyrighted materials to the extent you're

7   entitled to under the law when you own them?

8      A.   Yes.

9      Q.   Okay.  Now, are you familiar with

10  students at your school having to have books

11  converted for sight impairment?

12     A.   Yes.

13     Q.   And what is your understanding of the

14  process they must go through at your school to

15  get that book for them?

16     A.   They have to show a receipt for the

17  book.

18     Q.   Okay.  And Mr. Payan didn't do that.

19  Did he?

20     A.   I do not know.

21     Q.   Well, you don't know that he did that.

22  Do you?

23     A.   I don't know.

24     Q.   I'll rephrase it again.  You have no

25  knowledge that Mr. Payan showed a receipt to

88

1    anybody at OSS for that book.  Correct?

2         A.   Correct.

3         Q.   Now, if a student at one of your

4    schools, your school, were to go to the facility

5    that converts books and didn't have proof of

6    ownership, and you said receipt, would they

7    convert a book for them?

8         A.   No.

9         Q.   So if OSS doesn't convert the book at

10   LACC, they're doing -- because of lack of proof

11   of ownership, they're doing the exact same thing

12   that your university does.  Correct?

13        A.   Yes.

14        Q.   So that enforcement of ownership and

15   copyright is a best practice of the University of

16   Illinois.  Correct?

17        A.   Yes.

18        Q.   And, therefore, the same for LA City

19   College.  Correct?

20        A.   Yes.

21        Q.   And, therefore, the same for LACCD.

22   Correct?

23        A.   I do not know what their policies are.

24        Q.   I said if.

25        A.   Yes.

89

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1      Q.   Then you also said Mr. Payan -- we

2   talked about these notes.  We talked about the

3   book availability.

4           Anything else with respect to

5   Mr. Payan not being on equal footing in a class

6   related to class materials?

7      A.   The software in the MathLab.

8      Q.   And what class was that in?

9      A.   124A and B.

10     Q.   How -- do you know if Mr. Payan's

11  represented inability to use the software for

12  that class in any way affected his grade?

13     A.   Yes.

14     Q.   How?

15     A.   Software was provided to all students

16  to help them practice the assignments, and he was

17  denied that practice the other students had

18  access to.

19     Q.   And so it's access, not use.  Correct?

20     A.   My understanding, at least from

21  reading the deposition, is that assignments and

22  other things were required to be handed into that

23  software, so he was behind the other students or

24  would have difficulty handing in homework.

25     Q.   Does a blind student have difficulties

90

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1    a sighted student does not have when attending

2    school?

3         A.   Yes.

4         Q.   Whether there's discrimination against

5    that person or not.  Correct?

6         A.   Restate the question.

7         Q.   Sure.  A blind student is faced with

8    issues that a non-visually impaired student

9    doesn't face.  Correct?

10        A.   Correct.

11        Q.   Now, this relationship with the

12   software for class 124A and B, what was it about

13   the software that Mr. Payan couldn't use?

14        A.   I didn't have direct access to it, so

15   I only have what was available in the deposition,

16   but apparently it wasn't reading the equations or

17   one of the parts was he would type something into

18   one line, and he would come back to it, and at

19   least to him, it appeared blank, and so -- and I

20   believe there was a meeting with Ryan Kushner and

21   Payan with the company at one point to try to

22   resolve some of these issues, and it seemed that

23   after that meeting, at least it was reported

24   anecdotally, that it seemed to get worse instead

25   of better.

91

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1      Q.   So based upon what you've just said,

2   there were examples, to your knowledge, based

3   upon information you reviewed that the

4   university, or LA City College, didn't interact

5   with vendors to express the concerns of

6   non-sighted students using their product.  Right?

7      A.   That one instance, yes.

8      Q.   That's one you're aware of.  Correct?

9      A.   Right.

10      Q.   You don't know if there were others.

11   Do you?

12      A.   No.  It wasn't clear from the other

13   depositions whether they interacted with the

14   vendors or not.  There was no information whether

15   they talked to the vendors.

16      Q.   Were those questions asked in the

17   deposition?

18      A.   No.

19      Q.   Okay.  And you can only read what is

20   in the transcript.  Is that right?

21      A.   Right.

22      Q.   So if it wasn't asked, you don't get

23   to read that question.  Right?

24      A.   Right.

25      Q.   And if it wasn't asked, there's no

                                                      92

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1    answer to the question that was not asked.

2    Correct?

3          A.   I thought that that would have been

4    part of what they would have talked about in

5    terms of their policies and procedures, and when

6    they found accessibility issues, I thought one of

7    the administrators would have at least talked

8    about the relationship with vendors, and that's

9    part of the practice is for implementing their

10   accessibility policy, so it was kind of this big

11   hole.

12          I saw the whole process that there

13   wasn't this feedback to vendors on issues and

14   problems.

15          Q.   Well, there was feedback, because you

16   just told us about the situation with Mr. Payan.

17   Correct?

18          A.   That was one time.

19          Q.   Okay.  So there was some feedback that

20   you are personally aware of.  Right?

21          A.   Right, but I wasn't with any of the

22   administrators.  There was no reporting that any

23   of the administrators were present or even aware

24   that this interaction took place.

25          Q.   So it's necessary for an administrator

93

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1    to be there, in your calculus.  Is that correct?

2         A.   That, I think, is an important

3    feature.

4         Q.   I didn't ask that, sir.  Is it

5    necessary?

6         A.   Yes, I think it's necessary that they

7    be a part of that.

8         Q.   Okay.  Is that a written policy for

9    the University of Illinois?

10        A.   No.

11        Q.   Is it a written policy in your

12   department?

13        A.   No.

14        Q.   Is it a policy in your department?

15        A.   No.

16        Q.   Is it a policy at the University of

17   Illinois?

18        A.   No.

19        Q.   Is it best practice?

20        A.   I think it's a necessary practice.

21        Q.   That's a new phrase.  What do you mean

22   by necessary practice?

23        A.   Well, it's a best practice then, if

24   you want to call it that.

25        Q.   So the University of Illinois doesn't

94

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1    follow the best practices you identified today.

2    Correct?

3          A.   We follow the best practice whenever

4    we can.  We do have administrators involved with

5    talking to vendors and aware that vendors are

6    being discussed, but this isn't about the

7    University of Illinois.

8               I thought we were talking about Los

9    Angeles Community College.

10         Q.   That's why I spent so much time on

11   best practice.  It was important to you.  That's

12   why I spent so much time on reasonable degree of

13   professional certainty.  It's important to you,

14   so it's important to me.

15              Okay.  Have we now spoken about all of

16   the in class examples related to Mr. Payan where

17   he was not on equal footing?

18         A.   I believe the statistics class too was

19   an issue.

20         Q.   Okay.  What about the statistics

21   class, which I think is 227.  Is that right?

22         A.   Yeah.

23         Q.   So statistics class 227, please give

24   me the examples of where Mr. Payan was not on

25   equal footing with the other students.

                                                    95

1      A.   I believe parts of the class where

2   there were photographs and other things.  I

3   believe there was also another portion of the

4   class where he had a tutor, but he was limited to

5   the amount of time that tutor was available to

6   him, a math tutor to actually complete

7   assignments.

8      Q.   Should tutors be available 24 hours a

9   day to a student?

10     A.   No.

11     Q.   Okay.  So equal footing with a sighted

12  student is that their availability or access to

13  tutors could be limited by time.  Correct?

14     A.   So part of that question is that

15  there --

16     Q.   Thank you.

17          MS. KREVOR-WEISBAUM:  Objection.  Let

18  him finish the answer.

19          MR. CLEELAND:  It's a yes or no

20  question.

21          MS. KREVOR-WEISBAUM:  It might not

22  have been a yes or no question.  He didn't think

23  it was.  Let him finish.

24          MR. CLEELAND:  Well, let me get a

25  question, and then we'll talk about it.  Can you

96

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1  repeat the question?

2           (At this point the court reporter read

3           aloud the requested portion of the

4           transcript.)

5  BY MR. CLEELAND:

6      Q.   Do you think you answered that?

7      A.   Could you read it again?

8           (At this point the court reporter read

9           aloud the requested portion of the

10          transcript.)

11          THE WITNESS:  Yes, it can be limited

12  by time.

13  BY MR. CLEELAND:

14     Q.   All right.  So a sighted student and a

15  non-sighted student are on equal footing with

16  respect to the potential for lack of availability

17  for tutors on a continuous basis.  Correct?

18     A.   You're just talking about tutors?

19     Q.   That's what you said, so it's tutors?

20  Yes?

21     A.   Yes.

22     Q.   All right.  Anything other than --

23  let's see, we have the timing on tutors, and you

24  mentioned --

25     A.   Accessibility of the textbook.  The

                                                    97

1    lack of access to the graphs in the textbook and

2    in an equally effective format.

3        Q.   Anything else?

4        A.   Class notes were an issue in 127 that

5    he had to try to get his own notes or hire his

6    own note taker to get notes and the delay in

7    getting notes and the incomplete notes.

8        Q.   Is that the result of some action by

9    anyone other than Mr. Payan and the note taker?

10       A.   I don't know.

11       Q.   Thank you.  You spoke about lack of

12   access to graphs in the 227 course.  Did you read

13   the deposition of the professor for that course?

14       A.   Yes.

15       Q.   Okay.  What did he say about what he

16   did with Mr. Payan regarding the access to

17   graphic material?

18       A.   He described it.

19       Q.   Okay.  What did he say?

20       A.   I don't recall exactly what he said.

21       Q.   Okay.  When you read his description

22   of what he did was that an attempt to provide

23   information to a non-sighted student on an equal

24   footing with a sighted student?

25       A.   It was his attempt, yes.

98

```
 1          Q.   Was it effective?

 2          A.   Apparently not for Mr. Payan.

 3          Q.   Why?

 4          A.   Because he didn't do well in the

 5     course.

 6          Q.   What grade did he get in 227?

 7          A.   I believe he failed it.

 8          Q.   Did he take it again?

 9          A.   He tried to.

10          Q.   Did he take it again?

11          A.   He wasn't allowed to because the class

12     was full.

13          Q.   But he tried, but he didn't sign up

14     for it in time.  Did he?

15          A.   Apparently not.

16          Q.   And he didn't even have a textbook.

17     Did he?

18          A.   I can't recall.

19          Q.   Okay.  So anything else about 227 with

20     respect to Mr. Payan where you believe he was not

21     given opportunities on equal footing with

22     non-sighted students -- excuse me, with sighted

23     students?

24          A.   No.

25          Q.   So we've covered them all.  Right?
```

99

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1        A.    Could you read your list again for me?

2        Q.    Notes, graphs, accessibility to

3   textbooks.

4        A.    And the tutor time.

5        Q.    The tutor time.

6        A.    To -- I think he had to submit

7   assignments through some type of course

8   management system.  That was part of what the

9   tutor time was for.

10        Q.    Okay.  Have we covered them all?

11        A.    Yeah.

12        Q.    Now, you continue under your opinions

13   accessible versions of course-related books.  Are

14   you aware of any example where a student was not

15   provided with an accessible version of a course

16   related book where they otherwise met the policy

17   requirements of having ownership interests in the

18   book?

19        A.    Can you say that again?

20        Q.    Sure.  I'll read your sentence.  It

21   says:  For blind students to be on equal footing

22   with their sighted peers, they need to have

23   accessible versions of course-related books.

24        A.    Right.

25        Q.    Are you aware of any example where

100

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1  that was deprived of a non-sighted student,

2  Mr. Payan or Ms. Mason?

3       A.   According to the deposition, Mr. Payan

4  did not have the accessible versions of the

5  chapters of the book that they were talking about

6  the time he was in the math course.

7       Q.   What book?

8       A.   Book for 124.

9       Q.   Okay.  Did he have the book?

10      A.   I assume he had the book.

11      Q.   So he had the book, and at least some

12 was accessible but some was not?  Is that what

13 you're saying?

14      A.   My understanding from the deposition

15 that it was delayed.  He was not getting the

16 chapters at the same time students -- of what

17 they were talking about in that particular class,

18 so he had to wait to get the chapters that they

19 had already talked about.

20           He wasn't being given those books at

21 the same time the other students had access to

22 those chapters.

23      Q.   Do you mean the students were not

24 given the actual text as the sighted students, or

25 they were not given the assignment?

                                              101

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1          MS. KREVOR-WEISBAUM:  Objection.

2          THE WITNESS:  Basically my -- the

3    other sighted students had access to all the

4    chapters all the time, if they bought the book.

5    BY MR. CLEELAND:

6          Q.   That's my confusion.

7          A.   Okay.  So in Mr. Payan's case the

8    book -- and typically if it takes a long time to

9    convert a book, people don't get the book right

10   away.

11          I don't know the exact procedures that

12   they use at LACC for providing the book, but from

13   the depositions it sounded like they did it

14   chapters at a time.

15          He didn't get the whole accessible

16   book, and that when he did get chapters, they

17   were after the time they had talked about those

18   chapters, so he didn't have a chance to read

19   those chapters before they actually talked to

20   them about them in the class is my understanding.

21          Q.   I apologize.  Were you done?

22          A.   What?

23          Q.   Were you done?  I apologize.

24          A.   I'm done.

25          Q.   Okay.  What is the source of

102

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1    information you relied upon in reaching that

2    conclusion?

3         A.   Mr. Payan's deposition.

4         Q.   Have you ever spoken with Mr. Payan?

5         A.   No.

6         Q.   Is there anything that prevented you

7    from talking to Mr. Payan?

8         A.   No.

9         Q.   Have you ever spoken with Ms. Mason?

10        A.   No.

11        Q.   Is there anything that prevented you

12   from talking with Ms. Mason?

13        A.   No.

14        Q.   Now, the chapters, do you know what

15   Mr. Payan did to convert his textbook for his

16   use?

17        A.   My understanding was that he took it

18   to the OSS office for conversion.

19        Q.   And did he ask for conversion of the

20   book?

21        A.   I believe so.

22        Q.   Is there any indication the book was

23   not converted?

24        A.   No.

25        Q.   Okay.  So you have no information that

103

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1   the book was not converted in totality.  Is that

2   correct?

3           MS. KREVOR-WEISBAUM:  Objection.

4           THE WITNESS:  No, I don't know whether

5   the book was converted in totality or not.

6   BY MR. CLEELAND:

7       Q.   It talks about handouts.  Again, equal

8   footing, not accessible versions of

9   course-related handouts.  I think we've spoken

10  about all of the handouts in class with respect

11  to Mr. Payan already.  Right?

12      A.   Uh-huh.

13      Q.   Is that a yes?

14      A.   Yes.

15      Q.   How about Ms. Mason, do you know of

16  any examples or specific situations where there

17  were handouts provided to her in class that she

18  was unable to utilize due to her lack of sight?

19      A.   She reported an Abnormal Psychology

20  class where the professor had a number of -- I

21  guess a course packet that he puts together of

22  articles and things.

23      Q.   It's she, actually.  Professor Daniel?

24      A.   Professor Daniel, right.

25      Q.   It's a she.

                                              104

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1          A.   Oh, Professor Daniel.

2          Q.   Now, that handbook was a required text

3     for that course.  Is that correct?

4          A.   Right.  He used it or she used it as a

5     part of her class.  At least she reported that

6     she would pick articles on the day of the class

7     for students to read in class and discuss.

8          Q.   Professor Daniel said that?

9          A.   I believe so.  One of the professors

10    said that.

11         Q.   Okay.  Now, when you read Professor

12    Daniel's, singular possessive, there's no S on

13    her name, deposition, did she talk about her use

14    of in-course handouts provided on the day of the

15    lectures?

16         A.   As I recall -- from what I recall,

17    yeah.

18         Q.   What did she say about that?

19         A.   I don't remember exactly.

20         Q.   Did you read that she didn't use

21    handouts provided on the day of the course?

22         A.   I don't recall.

23         Q.   Do you remember there was one example

24    of a hand drawing by a young girl who was

25    involved in a sexual abuse case?

105

1        A.    I vaguely recall that.

2        Q.    And she explained to all the students

3    the content of that photo verbally.  Didn't she?

4        A.    I believe so.

5        Q.    All right.  So any other handouts in

6    class with respect to Ms. Mason where they were

7    not properly converted or explained to her?

8        A.    My main concern was the course where

9    they had the packet of information and it's the

10   professor reported that they would basically --

11   he would choose selections, and the students, I

12   guess, were supposed to bring this packet with

13   them, and then they would pick one out, and they

14   would discuss it in class, and it wasn't clear to

15   me whether those materials were available in

16   accessible format and whether, like for a blind

17   student would have access to be able to prepare.

18        I mean they're going to discuss

19   something in class, and they had -- she would

20   need to know ahead of time so she could have that

21   material available and probably pre-read it,

22   especially if it was quoting or something or --

23   she would need prior -- prior information if she

24   wanted to fully participate, because it would

25   probably be difficult for her to find that in the

                                        106

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1    stack of information.

2         Q.   Well, we're talking about handouts

3    which you described as handouts in class.  That's

4    all we're talking about is you used the word

5    handouts in your report.

6              MS. KREVOR-WEISBAUM:  Objection.

7    BY MR. CLEELAND:

8         Q.   Are there any other examples of

9    handouts to Ms. Mason that were not properly

10   converted to her use?

11        A.   Not that I recall.

12        Q.   So it's that one example I talked

13   about with the photograph.  Is that right?

14        A.   That was one of them, yes.

15        Q.   I need to know all of them.  Is that

16   the only one?

17        A.   I don't know.

18        Q.   Okay.  So then we talk about --

19             MS. KREVOR-WEISBAUM:  What page are

20   you on there?

21   BY MR. CLEELAND:

22        Q.   Page 3, still the same sentence we've

23   been talking about, any other instructional

24   materials.  Are you aware of the phrase any other

25   instructional materials as applied to Mr. Payan

                                                    107

1    specifically?

2         A.   Can you reread that again?

3         Q.   Sure.  At the end of this list of

4    things, you say, "and any other instructional

5    materials."

6              This line of questioning has been

7    asking for specific examples where that applied

8    to the individual plaintiffs, so are you aware of

9    any instances where any other instructional

10   materials provided to Mr. Payan were not made

11   accessible to him?

12        A.   No.

13        Q.   The same question with respect to

14   Ms. Mason?

15        A.   No, not that I recall.

16        Q.   What grade did Mr. Payan get in 124A

17   and B?

18        A.   Cs.

19        Q.   Did he take -- do you remember what

20   kind of a class that?

21        A.   124A and B?

22        Q.   Yes.

23        A.   They were Algebra classes.

24        Q.   Did he ever take an Algebra class

25   before that?

108

1          A.   I don't recall.

2          Q.   Did you look at his transcripts?  I

3     think you said in your paperwork you did.  Did

4     you look at his transcripts?

5          A.   Yes.

6          Q.   Do you recall seeing the grade he had

7     in Algebra years earlier?

8          A.   I don't recall, no.

9          Q.   He took an Algebra course when he was

10    fully sighted.  Do you know what grade he got in

11    that course?

12         A.   No, I don't.

13         Q.   Would it surprise you if he got a C?

14         A.   I don't have any basis for being

15    surprised.

16         Q.   Okay.  So you don't know if

17    Mr. Payan's skills, apart from his blindness,

18    were accurately reflected in the grade he

19    received in 124A and B.  Do you?

20         A.   Could you restate the question?

21         Q.   I'll try it again.  Excluding

22    Mr. Payan's blindness -- I'll even withdraw that.

23    That's a terrible question.

24              Did Math 124A and B properly assess

25    Mr. Payan's abilities in Algebra?

                                                  109

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1          A.   I do not know.

2          Q.   Continuing in your report, third

3     paragraph begins:  Audio recordings -- it's in

4     the body of the third paragraph -- audio

5     recordings are another typical accommodation

6     provided to enable blind students to take class

7     notes.

8               Was Mr. Payan allowed to take audio

9     recordings of his classes?

10         A.   I believe in some of his classes, he

11    was.

12         Q.   Any class where he couldn't?

13         A.   There was one class I know where the

14    professor stated that he wouldn't allow

15    recordings, anybody to record for -- in any form

16    the class, even for an academic accommodation.

17         Q.   Do you know who that person was?

18         A.   I don't recall the name, no.

19         Q.   Do you know if that was directed

20    towards Mr. Payan?

21         A.   I don't recall.

22         Q.   Did you see any accessibility

23    accommodation letters for Mr. Payan?

24         A.   Yes.

25         Q.   And on there it said he could record

                                                    110

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1    every class.  Didn't it?

2         A.   Yes.

3         Q.   Okay.  So you're not aware of any

4    class that he took that he was prevented from

5    taking audio recordings.  Are you?

6         A.   Not that I can recall right now.

7         Q.   How about Ms. Mason, was she prevented

8    from taking audio recordings of any class?

9         A.   I believe there was one class, but I

10   can't recall which one it was.

11        Q.   So, as you sit here today, you're not

12   able to tell me the name of any class she was

13   deprived from taking audio recordings.  Correct?

14        A.   Not a specific class, no.

15        Q.   Okay.  Do you know how it is that

16   professors become aware of a sight disabled

17   student in their class?

18        A.   Typically through an accommodation

19   letter.

20        Q.   Is that the -- I apologize.  I cut you

21   off.  Go ahead, sir.

22        A.   Typically through an accommodation

23   letter that a student presents the letter of

24   accommodation to the instructor typically at the

25   first class.  Sometimes students are more

                                              111

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1   proactive, and they will contact the professor

2   before class and discuss any academic

3   accommodation.

4          Q.   Is that the policy at the University

5   of Indiana?

6          A.   I don't know what the policies exactly

7   are at the University of Indiana.

8          Q.   Is that the policy in your department?

9          A.   In our department we provide students

10  who are registered students with disabilities an

11  accommodation letter, and they are required to

12  provide it to their instructors for -- to receive

13  the accommodation.

14         Q.   Is there a general policy at the

15  University of Illinois that instructors are not

16  to know the disabilities of a student until the

17  student elects to divulge those disabilities to

18  the instructor?

19         A.   Correct.

20         Q.   And that's what happened at LA City

21  College.  Correct?

22         A.   I believe so, yes.

23         Q.   And the same thing for LA Community

24  College District.  Correct?

25         A.   I'm not sure what the district college

                                                    112

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1   policy is.

2        Q.   At the end of that paragraph under the

3   opinion category it says:  When faculty learns to

4   correctly describe what they write during class,

5   it helps most students understand the

6   instructional content, whether they are blind or

7   sighted.

8             Are you aware of any instance with

9   respect to Mr. Payan where a faculty member did

10  not correctly describe what they wrote down

11  during a class?

12       A.   He reported several times in the math

13  class that he had to remind the instructor to --

14  the instructor I think was trying to do the best

15  job, but sometimes they forgot to write down what

16  was going on on the board.

17       Q.   Well, they write down what's on the

18  board.

19       A.   I mean describe what they were writing

20  on the board.

21       Q.   And have you ever had a student ask

22  you during a lecture to go over something to

23  assist them?

24       A.   Yes.

25       Q.   Sighted students?

                                                    113

1        A.    Uh-huh.

2        Q.    Is that a yes?

3        A.    Yes.

4        Q.    Unsighted students?

5        A.    Yes.

6        Q.    So that happens even with you, an

7   expert, who is able to state with a reasonable

8   degree of professional certainty about policies

9   and practices at higher education facilities.

10  Correct?

11       A.    Yes.

12       Q.    Okay.

13       A.    And questions -- students ask

14  questions all the time.  Even if they can see the

15  board, they ask questions.

16       Q.    I asked you specifically about

17  non-sighted students, and you said yes to that

18  also.

19       A.    Yes, they have questions too.

20       Q.    Just as Mr. Payan did.  Correct?

21       A.    Yes.

22       Q.    How about --

23            MS. KREVOR-WEISBAUM:  Objection.

24  BY MR. CLEELAND:

25       Q.    How about any examples with Ms. Mason

114

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1   where the faculty member didn't properly describe

2   what they were writing on the board during class?

3        A.   I don't recall off the top of my head

4   specific examples, no.

5        Q.   Well, I'll tell you what.  We've been

6   going for a little while now.  Why don't we take

7   a break, and you can think about that, if you

8   want, but, otherwise, we'll give the court

9   reporter and the parties a break.

10            We can go off record, please.

11            (At this point a short recess was

12            taken.)

13   BY MR. CLEELAND:

14        Q.   Sir, we're going to pick up on your

15   report again, so we're on page 3 still.  It's the

16   last paragraph.  It states:  It is clear that the

17   instructors at LACCD do not fully understand

18   their responsibilities in ensuring that their

19   course materials and in-class activities allow

20   blind students an equal opportunity to

21   participate and succeed.

22            If I can work backwards, the phrase

23   participate and succeed, are those two different

24   things?

25        A.   My intention there was basically I

115

1    felt that instructors didn't really understand

2    the need for especially students who are blind to

3    have materials ahead of time so that they could

4    participate in class discussions.

5         Q.   Okay.

6         A.   And part of participating in a class

7    will allow them to succeed in the class, so it

8    seemed like, at least from reading the

9    depositions, that the students, at least Roy

10   Payan, which is the primary one I had access to,

11   always felt he was behind.  He didn't have the

12   materials other students had, so it's just more

13   of a general impression I got from reading his,

14   and I didn't see in the faculty depositions that

15   they felt it was -- they had any responsibility

16   to or even knew about the need of these students

17   to have materials ahead of time in class.

18             It was kind of like, well, deal with

19   the OSS office in relationship to those

20   materials, so I guess that's what my intention

21   was with that particular phrase.

22        Q.   You said you had more access to

23   Mr. Payan.  What did you mean by that?

24        A.   I read his deposition before I wrote

25   the report.  I didn't have Ms. Mason's deposition

                                              116

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1    before I wrote the report.

2         Q.   Well, returning to the phrase

3    participate and succeed, those can be two

4    different things, correct?

5              Let me give you an example.  You might

6    have a walk-on athlete.  They participate in the

7    workouts.  They're never going to play.  If their

8    goal is to succeed at playing, those are two

9    different things.  Correct?

10        A.   Right.

11        Q.   Okay.  So I just want to make sure you

12   didn't intend by using the phrase participate and

13   succeed to differentiate between those two

14   situations?

15        A.   The intent was that faculty didn't

16   seem to understand the role of having materials

17   ahead of time so the students could prepare for

18   participation in class, and I guess it should

19   have been -- the opportunity to succeed would

20   have been much better.

21        Q.   I thank you for clarifying that,

22   because I think we've all seen students, I may

23   have been one, who participated in a course but

24   did not succeed.

25             Have you had that experience with

117

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1    students?

2         A.    You seem like a pretty smart guy.  I

3    bet on most of your courses you succeeded in.

4         Q.    You're much too kind.  I appreciate

5    that.

6              You also say in that same sentence:

7    It is clear that the instructors.  What is clear

8    about it?

9         A.    Well, it seemed like the depositions

10   of the instructors was that, you know, your OSS

11   students go and deal with them, they'll --

12   whatever they'll provide.

13              It didn't seem like the professors or

14   the instructors understood the process of the

15   text conversion and the time issues in creating

16   those issues and the software accessibility

17   issues.

18              It seemed like there was discussion.

19   I know that they talked about it in their -- when

20   they were picking things, but it just didn't seem

21   like -- that was my general impression that they

22   didn't understand the process for what students,

23   especially blind students, had to go through in

24   terms of having accessible versions of materials

25   that they were using in the class.

                                                    118

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1     Q.   And your impression is based solely

2   upon the information you were provided by

3   counsel.  Is that correct?

4     A.   Reading the depositions of the

5   instructors, how they interacted with the

6   students.

7     Q.   That was provided to you by counsel.

8   Correct?

9     A.   Yes.  Correct.

10    Q.   Yeah.  So continue:  They do not fully

11  understand their responsibilities in ensuring

12  that their course materials -- I want to stop

13  there -- allow blind students an equal

14  opportunity.

15          Are you talking about conversion of

16  course materials?

17    A.   Yes.

18    Q.   We talked about the handouts

19  previously.  Correct?

20    A.   Yes.

21    Q.   Now, I want to talk about the

22  textbooks regarding equal opportunity for the

23  blind students.

24          The responsibility of the professor is

25  not to understand how the materials are

119

1  converted.  Is it?

2       A.   I think what they need to understand

3  is that there's a process, and so that -- I mean

4  their responsibility, at least here at Illinois,

5  is to identify the materials so that they can be

6  converted in a timely manner.

7       Q.   And who did they identify it to?

8       A.   The OSS office, the students -- the

9  faculty need to identify the course materials.

10      Q.   I apologize.  When you say the

11  faculty, are we talking about the University of

12  Illinois, because that's what we're talking about

13  now.

14      A.   At the University of Illinois faculty

15  have to -- are supposed to identify books two

16  weeks in advance so that they can be converted in

17  time.  Actually, it's six weeks, six weeks in

18  advance of the course.

19           The text conversion people want the

20  books in syllabuses so that they can start

21  beginning the process of text conversion, so on

22  the first day of class whatever materials are

23  needed -- at least whatever materials are needed

24  on the first day of class based on the syllabus

25  will be available to the student.

120

1      Q.   Now, the text conversion you're

2   talking about at the University of Illinois is

3   every textbook for every class converted, whether

4   there's a need or not?

5      A.   Only for the ones that identify for a

6   particular class where a student has that as part

7   of their academic accommodation plan.

8      Q.   Okay.  So not every textbook is

9   automatically converted at the University of

10  Illinois.  Is it?

11     A.   No.

12     Q.   So textbooks are normally made

13  available, at least the names of the books, to

14  the students how long before classes begin at the

15  University of Illinois?

16     A.   The requirement is for OSS services is

17  we want the books six weeks ahead of time.

18     Q.   How about the bookstore on campus, how

19  far before the next semesters -- by the way, is

20  it quarters or semesters at U of I?

21     A.   Semesters.

22     Q.   How far before the next semester is it

23  that the textbooks for that next semester's

24  courses are displayed?

25     A.   I do not know.

121

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1        Q.    Do you know how long it is at LA City

2   College?

3        A.    I do not know.

4        Q.    Do you know how long it is at the

5   LACCD schools?

6        A.    I do not know.

7        Q.    Are you aware that the school

8   bookstore has a list of the books for the classes

9   for the ensuing courses before the semester

10  begins?

11       A.    I was not aware.

12       Q.    It wouldn't surprise you.  Would it?

13       A.    No.

14       Q.    Indeed, most students -- well, I

15  shouldn't ask you what most students do.

16            When you were a student, did you buy

17  your books before the first day of class?

18       A.    Yes.

19       Q.    Is that normal in your experience with

20  your students?

21       A.    In the classes that I've taught, we

22  haven't had books, because there weren't books

23  available for the topics that I was discussing,

24  so we used --

25       Q.    I apologize.  Are you aware of

                                                122

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1  anything that prevented Mr. Payan from buying his

2  books before courses started, sufficiently before

3  the courses started to have them converted by OSS

4  in time for day one of course study?

5      A.   No.

6      Q.   The same question for Ms. Mason.

7      A.   No.

8      Q.   Do you know when Mr. Payan bought his

9  books for those courses?

10      A.   No.

11      Q.   Do you know when Ms. Mason bought her

12  books for her courses?

13      A.   No.

14      Q.   And I think we discussed earlier that

15  the policy at UI and your understanding at LACC

16  is you have to show ownership right in the book

17  before it can be converted.  Right?

18      A.   Right.

19      Q.   And your experience at UI is only

20  books -- excuse me, only courses with people who

21  are sight disabled get converted and only upon

22  request to your Department of Student Services?

23      A.   No.

24      Q.   Where was I wrong in that?

25      A.   We have other types of disabilities we

123

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1    have books -- text conversion services for:

2    physical impairments and some types of learning

3    disabilities, so they may actually be able to

4    read -- or see the print material, or they may

5    have trouble manipulating the pages of print

6    material, so we also do text conversion services

7    for other types of disabilities.

8         Q.   I was casual in my question.  I

9    apologize.

10         Books for sight-impaired students are

11   converted only when your department or student

12   services, or whatever the title is, is made aware

13   that a particular student is going to need that

14   book.  Is that correct?

15        A.   Correct.

16        Q.   Okay.  Thanks for making me make the

17   question a little clearer.

18         You continue in that same paragraph:

19   The instructor depositions that I reviewed

20   suggested that they do not understand that they

21   are responsible.

22         What did you mean by the word

23   suggested?

24        A.   They didn't say they didn't understand

25   that, so maybe they did, but it didn't seem like

                                                    124

1    they in their depositions said it was clear that

2    they were -- that they understood that or they

3    didn't, but they didn't so...

4         Q.   So, to you, it's your conclusion that

5    by what you read the instructors did not

6    understand that they are responsible for those

7    provision of materials.  Correct?

8         A.   Correct.

9         Q.   Then you state:  Specifically, for

10   instance, Professor Blythe Daniel, who taught

11   Portia Mason's Abnormal Psychology class,

12   testified that she did not know if the textbook

13   or supplement handbook she used were accessible.

14           Did that provide any assistance to you

15   in reaching any opinions or conclusions in this

16   matter?

17        A.   Can I just reread that?

18        Q.   Sure.

19        A.   Yeah.  So she didn't -- she stated she

20   didn't know whether it was accessible or not.

21        Q.   Is that important for an instructor to

22   know?

23        A.   Yes.  I mean if I was an instructor

24   and one of my students needed access to textbooks

25   or other supplemental materials, that would

125

1   bother me, yes.

2        Q.   It would bother you.  How about your

3   best professional practices and your reasonable

4   degree of professional certainty, should every

5   professor know that every book they use is

6   accessible or not?

7        A.   I don't think every professor needs to

8   know whether the book is accessible or not, but I

9   think if I was -- in my professional opinion if I

10   was an instructor and I had a student who did

11   have an apparent disability and they didn't have

12   access to the textbook, I would be concerned

13   about that, and I'd want to know.

14        Q.   You just qualified it, if you had a

15   sight-disabled student.

16        A.   Right.

17        Q.   And when do you find out that you have

18   a sight-disabled student as an instructor at the

19   University of Illinois?

20        A.   When the accommodation letter is

21   provided.

22        Q.   I think earlier you said it's the

23   first day of school, unless the person is

24   particularly active, and they may see the

25   professor ahead of time.  Is that accurate?

126

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1        A.    Correct.

2        Q.    All right.  So whether a document is

3   accessible or not -- let me reverse it.  So if

4   the document is accessible, is it important for

5   the professor to know that?

6        A.    Yes.

7        Q.    Why is it important for the professor

8   to know it's accessible if it is, indeed, already

9   accessible?

10       A.    Well, that's the -- are you talking

11  about universal design then, that the materials

12  are accessible?

13       Q.    That's not what you said.  You said

14  she did not know, so it sounds like we're talking

15  about individual instructors.

16       A.    Right.  She said she didn't know

17  whether the materials were accessible or not.

18       Q.    And if the materials were accessible,

19  why would it be important for a professor to know

20  whether they were or were not?

21       A.    Well, she would know that her student

22  had access to the materials the rest of the class

23  had.

24       Q.    But the student does have access if

25  it's accessible.  Correct?

                                                    127

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1        A.   That's correct.

2        Q.   And so what difference does it make to

3   the professor?

4             MS. KREVOR-WEISBAUM:  Do you

5   understand his question?

6             THE WITNESS:  I guess are you asking

7   me whether I think a professor cares whether it's

8   accessible or not?

9   BY MR. CLEELAND:

10       Q.   No, it just said she did not know if

11  it was accessible.

12       A.   Right.

13       Q.   If the book or material is, indeed,

14  accessible, because we're worried about the

15  student, the sight-impaired student, if it's

16  accessible to that student, why is it important,

17  if at all, that the professor should know that?

18            MS. KREVOR-WEISBAUM:  Objection.

19            THE WITNESS:  Because the professor

20  would know that the student now has access to the

21  material just like all the other students.  I

22  think that would give the professor some

23  confidence that that student now had the same

24  learning materials as the other students.

25  BY MR. CLEELAND:

                                          128

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1          Q.   But you told us you don't use

2     textbooks in the courses you presented at the

3     University of Illinois.   Correct?

4               MS. KREVOR-WEISBAUM:   Objection.

5               THE WITNESS:   Because there was no

6     book.

7     BY MR. CLEELAND:

8          Q.   Right.

9          A.   That was available.

10         Q.   So how do you know the state of mind

11    of a professor, if you don't do that?

12         A.   It's not their state of mind.

13         Q.   I think you said that it would make

14    her feel better.

15         A.   Okay.

16         Q.   Okay.   Now, did Professor Daniel have

17    a textbook in her course that Ms. Mason attended?

18         A.   Yes.

19         Q.   What was the textbook?

20         A.   I don't recall the exact name.

21         Q.   Was it a textbook in addition to the

22    handbook?

23         A.   I don't recall.

24         Q.   Did the professor, Professor Daniel,

25    indicate that she understood that her handbook

                                                        129

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1    was accessible to the non-sighted students?

2        A.   I don't recall.

3        Q.   Now, the handbook is a complete

4    syllabus for Professor Daniel's course.  Is that

5    correct?

6        A.   I don't recall the details of the

7    course.

8        Q.   Did you see the handbook?

9        A.   I've not seen the handbook, no.

10       Q.   Now, that handbook explains what

11   courses will be taught on what day and what

12   materials are necessary for that given lecture.

13   Are you aware of that?

14       A.   I assume so.  I have not seen those

15   materials, so I can't state yes or no.

16       Q.   When you say I assume so, talking

17   about a course syllabus is it your experience

18   that professors tend to deliver syllabi to their

19   students to say this is what we're going to cover

20   in what order and on what dates?

21       A.   Yes.

22       Q.   So that's normal, in your experience.

23   Right?

24       A.   Yes.

25       Q.   Isn't that telling a student what's

                                              130

1   going to occur on a given date?

2        A.   Yes.

3        Q.   Thank you.  You identify in that same

4   paragraph:  Depending on the format of the

5   accessible version of the document, it may be

6   difficult for a blind person to find the part

7   referred to.

8             Are you aware of any instance where it

9   was, in fact, difficult for Mr. Payan to find any

10  materials in any course he took at LA City

11  College?

12       A.   Not aware.

13       Q.   Are you aware of Ms. Mason having

14  difficulty finding any portion of the materials

15  in Professor Daniel's course?

16       A.   Not aware.

17       Q.   Then you include:  Second, the reading

18  time for a blind student to read the article for

19  discussion may be longer than for a sighted

20  student.

21            That's just one of the effects of

22  blindness in certain students.  Correct?

23       A.   Yes.

24       Q.   It takes longer.  Is there any way to

25  put someone on an equal footing with a sighted

                                              131

1  student when it comes to a reading assignment for

2  a non-sighted student?

3      A.   Making sure that they are aware that

4  they will need to read the material before the

5  time that it's going to be used in the course.

6  Timing is important.

7      Q.   If a syllabus identifies it, does that

8  meet your requirement?

9      A.   Yes.

10      Q.   Now, again, it talks about the time

11  necessary, time consumed for a blind student to

12  read the article.  Is there a way to balance the

13  time between what it takes a sighted student to

14  read something and a non-sighted student to read

15  something to put them on an equal footing?

16      A.   No.

17      Q.   That's just the way it is.  Right?

18          MS. KREVOR-WEISBAUM:  Objection.

19          THE WITNESS:  There are ways to --

20  depending on how the information is formatted,

21  there may be ways to make searching and finding

22  topics easier or less easy, so you can improve

23  the searchability of documents or resources to

24  make it easier to read.

25  BY MR. CLEELAND:

                                                  132

1          Q.    You don't talk about searchability.

2    You talk about reading.

3          A.    Okay.

4          Q.    I specifically read the reading time

5    for blind students, so we're talking about

6    reading time, so if the material is exactly the

7    same and you have a sighted student and you have

8    an accessible document of that exact same

9    material of a non-sighted student, you believe it

10   will take longer for a blind student to read that

11   material than for a sighted student.  Correct?

12         A.    In some cases, yes.  Not all the time,

13   but there's variability depending on the material

14   and the format, so that's probably an overly

15   broad statement.

16         Q.    But it seems intuitive that a person

17   who is not hindered blind, a disability of lack

18   of sight, absent other issues is probably going

19   to be able to read the same material or content

20   faster than a non-sighted person.  Is that your

21   experience?

22              MS. KREVOR-WEISBAUM:  Objection.

23              THE WITNESS:  I don't have any data

24   that shows that.

25   BY MR. CLEELAND:

                                                    133

1        Q.    Fair enough.  Now, we're on page 4,

2   one of the most concerning actions of the

3   faculty.  Is it your concern of the actions of

4   the faculty or the faculty's concerns that we're

5   talking about?

6        A.    My concern.

7        Q.    Okay.  So one of the most concerning

8   actions to you of the faculty at LACC was when

9   Roy Payan reported that both his math instructor,

10  Kian Kaviani -- let's stop right there -- refused

11  to ask publishers for an accessible version of

12  the textbook.  Where did you see that

13  information?

14       A.    Mr. Payan reported that.

15       Q.    Anybody else?

16       A.    No.

17       Q.    Did anybody contest that story?

18       A.    I don't recall anybody.

19       Q.    Did you read Professor Kaviani's

20  deposition?

21       A.    Yes.

22       Q.    Did Professor Kaviani talk about that,

23  to your recollection?

24       A.    The only thing that I recall that they

25  talked about is that they discussed the

                                              134

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1   accessibility of the software in general terms.

2           I guess they had some junior faculty

3   when they were discussing what software they were

4   going to use, and -- but I don't recall them ever

5   talking about working with publishers or asking

6   publishers for accessibility.

7       Q.   Well, this reference is Mr. Payan

8   reported that Dr. Kaviani told Mr. Payan --

9       A.   He did.

10      Q.   -- that he refused to ask publishers

11  for an accessible version of the text.

12      A.   That's what he said in his deposition.

13      Q.   I'm saying that's the only source for

14  that information.  Correct?

15      A.   Yes.

16      Q.   Now, did you read Professor Kaviani's

17  deposition where he talked about that, his

18  communication with Mr. Payan?

19      A.   I don't recall him ever talking about

20  that issue with Mr. Payan, or he talked -- he --

21  the main thing I remember about that discussion

22  is trying to move him out of the class to a class

23  that didn't use the software, and I know that he

24  talked about how in general when they were

25  discussing books they have a group, apparently

                                                    135

1    some type of group that discusses the textbooks

2    and revising the software periodically.

3            They had generally talked about

4    accessibility, but I don't recall them ever

5    talking -- anybody mentioning talking to the

6    publishers about accessibility.

7        Q.   I'm not talking about the publishers.

8    I'm talking about communication between

9    Mr. Kaviani, Dr. Kaviani, K-a-v-a-i -- I

10   apologize, K-a-v-i-a-n-i.

11       A.   I don't recall Mr. Kaviani

12   specifically.  I don't remember his specific --

13   what he specifically said to Mr. Payan.  I don't

14   recall.

15       Q.   Do you recall what Dr. Kaviani said to

16   Mr. Payan about taking a different math course?

17       A.   I know that he recommended that he

18   switch to another math course that didn't use the

19   software.

20       Q.   Why did Dr. Kaviani make that

21   recommendation?

22       A.   I don't know.

23       Q.   Did Dr. Kaviani state in his

24   deposition the reason is with students that may

25   take additional time it is more beneficial to

                                                    136

1    them to split the 125 course into 124A and B?

2          A.   Right.  I remember that, yeah, he said

3    he recommended.  Apparently, there was some

4    inference that 124A and 124B was a way to

5    accommodate students with disabilities, although

6    I guess that was not stated in any course

7    materials.

8          Q.   An inference to accommodate, what do

9    you mean by that?

10         A.   It's designed for students with

11   special needs, I guess.

12         Q.   It used the same textbook as 125,

13   didn't it?

14         A.   Yeah.

15         Q.   Except it took two semesters to get

16   through it.  Didn't it?

17         A.   Right.

18         Q.   And you told us just moments ago that

19   it may take longer for a blind student to read

20   materials than for a sighted student.  Do you

21   still state that?

22         A.   Yeah, it can take longer.

23         Q.   So it was an accommodation to

24   Mr. Payan to say we're going to get you the same

25   materials and use the same book, but we're going

                                                    137

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1    to give you twice as much time to learn the

2    material.  Was it an accommodation?

3          A.    That's one accommodation, yes.

4          Q.    Was it reasonable?

5          A.    That's a discussion that has to happen

6    between the instructor and the student and the

7    OSS office.  I can't make that determination with

8    the information I have.

9          Q.    So that may be an individual question.

10   Is that right?

11         A.    Yes.

12         Q.    And what was the grade that Mr. Payan

13   got in that course?

14         A.    A C.

15         Q.    What was the grade he got in any prior

16   Algebra course?

17              MS. KREVOR-WEISBAUM:  Objection.

18              THE WITNESS:  I don't recall.

19   BY MR. CLEELAND:

20         Q.    So you can't compare the two, can you?

21         A.    No.

22         Q.    We're going to go back to that same

23   paragraph, and I split it, because you talked

24   about two people, and I want to ask questions

25   about the individuals.

                                                    138

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1           One of the most concerning actions of

2    faculty at LACC was when Roy Payan reported that

3    both his math instructor, Dr. Kaviani, and the

4    math department chair, Thelma Day, so we're going

5    to talk about Dean Day right now, so if I could

6    read that section, one of the most concerning

7    actions of faculty at LACC was when Roy Payan

8    reported that math department chair, Thelma Day,

9    refused to ask publishers for an accessible

10   version of the textbook and software used in Math

11   124A.

12           Where did you receive that

13   information?

14      A.   From Roy Payan's deposition.

15      Q.   Any other source?

16      A.   No.

17      Q.   Did you understand Mr. Payan was a

18   plaintiff in this case?

19      A.   Yes.

20      Q.   Did you read Dean Day's deposition?

21      A.   Yes.

22      Q.   And was that issue raised in the

23   deposition?

24      A.   I don't recall.

25      Q.   Okay.  So, in any event, this opinion

                                                    139

1   doesn't rely upon any information based in Dean

2   Day's deposition transcript.  Correct?

3        A.   No.

4        Q.   It's not correct?

5        A.   I read her deposition.  I didn't see

6   any information that -- I don't recall any

7   information that would contradict what I've

8   stated, no.

9        Q.   So your opinion is not in reliance of

10  any information in Dean Day's deposition

11  transcript?

12       A.   I didn't -- I don't recall any

13  information in her deposition that contradicted

14  mine, but I don't have a photographic memory

15  about Dean Day said so...

16       Q.   Do you have notes of what she said?

17       A.   I don't recall if I took notes.

18       Q.   Okay.  And you have your depo

19  transcript on your computer.  Do you know if you

20  highlighted any information in her transcript on

21  your computer?

22       A.   I don't recall.

23       Q.   Thank you.  Continuing in that

24  paragraph:  In my opinion, so we're now talking

25  about your opinion as an expert witness in this

140

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1   matter.  Right?

2          A.   Yep.

3          Q.   This is the easiest and most important

4   action a faculty member can make, even if an

5   accessible version is not available, and that's

6   to contact the publisher.  Right?

7          A.   Right.

8          Q.   Is there a methodology for doing that?

9          A.   Publishers, yeah, you can contact --

10  publishers have representatives that come to

11  universities.  Most faculty members have

12  relationships with publishers.  Universities have

13  relationships with publishers, but I don't

14  think -- in my opinion one of our biggest

15  problems in accessibility is nobody asks for it.

16         Q.   You don't think that people ask for

17  accessible materials from publishers?

18         A.   Not in my experience.

19         Q.   Are you aware of a California law

20  requiring that?

21         A.   No.

22         Q.   So if there's a California state law,

23  hypothetically, that required all publishers who

24  sell text materials to higher education

25  facilities operated by the state, would that

                                              141

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1    change your comment about you're not aware of

2    people communicating with publishers of the need

3    to create accessible materials?

4         A.   There are oftentimes laws that say

5    things should happen, but, as you know, you're a

6    lawyer.  It's people who actually make laws live,

7    and if people -- even if there's laws for certain

8    things, unless people actually enforce those laws

9    and ask for those things, a lot of times laws are

10   ignored.

11        Q.   Are you aware of any laws being

12   ignored in this case?

13        A.   No.

14        Q.   It continues:  If more instructors

15   would take this relatively simple step, and

16   that's contacting the publishers.  Right?

17        A.   Making -- yeah.

18        Q.   In this paragraph you're talking about

19   contacting the publishers?

20        A.   Okay.  Let me -- you should finish

21   your question before I answer.

22        Q.   If more instructors would make this

23   relatively simple step, the simple step in that

24   paragraph is contacting publishers.  Right?

25        A.   At least for the books that they're

                                                   142

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1    requiring for their classes and asking for them

2    to be provided in an accessible format, yes.

3         Q.   You continue:  Publishers would make

4    accessibility a higher priority.

5         A.   Yes.

6         Q.   Have you ever been a publisher?

7         A.   No.

8         Q.   Have you ever worked for a publishing

9    company?

10        A.   No.

11        Q.   Have you ever prepared any rules,

12   regulations, policies, or other outlines for

13   publishers?

14        A.   No.

15        Q.   Have you ever taught any courses to

16   publishers?

17        A.   Some -- well, it's more technical

18   people, probably not the administrators, who make

19   these types of decision.

20        Q.   I thought you said it's best to go to

21   the administration level when you deal with

22   publishers.

23        A.   There's lots of levels to

24   accessibility:  One is the policies and

25   procedures and getting administration -- you

143

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1    know, company priorities to create accessible

2    stuff, and then there's actual technical things,

3    how do you make stuff accessible?

4            Obviously, from my background I'm more

5    in the technical aspect of this, but I know one

6    of the -- I guess in my experience many times the

7    more people ask -- the more people you have

8    asking about an issue in general, whether it's

9    accessibility or something else, companies tend

10   to respond to that.  It raises the level of

11   priority for something, and when they talk about

12   equal access to books, I mean, to me, the ideal

13   would be we wouldn't have to have text conversion

14   services.

15           There would be accessible copies of

16   the book directly available from the publisher,

17   and all of these issues with descriptions and all

18   text and stuff would be handled by the publisher

19   where you have the best mind of the people who

20   created the book.

21       Q.   So you're putting the onus on the

22   publisher.  Correct?

23       A.   I think it's a relationship between

24   the consumer asking for a particular thing and a

25   publisher meeting that consumer demand, so, you

                                                144

1   know, I mean you're probably aware that it's more

2   than just unilateral things happening out there,

3   so I think publishers need to know that it's a

4   priority from faculty.

5          If California has a law, that's great.

6   And at least from the depositions that I read I

7   didn't see faculty advocating for that law to be

8   enforced.  Maybe they are.  I don't know.

9       Q.   And you're held captive by the

10  information provided to you.  Correct?

11          MS. KREVOR-WEISBAUM:  Objection.

12          THE WITNESS:  That's true.

13  BY MR. CLEELAND:

14      Q.   Mr. Payan was given additional time in

15  his accommodation letters to do homework.

16  Correct?

17      A.   I believe so.

18      Q.   And he was given additional time to do

19  testing.  Correct?

20      A.   Yes.

21      Q.   And Ms. Mason was given additional

22  time to do homework.  Correct?

23      A.   Yes.

24      Q.   Was Ms. Mason given additional time to

25  do testing?

                                              145

1     A.   Yes, I believe so.

2     Q.   Those are reasonable accommodations,

3  in your experience.  Is that correct?

4     A.   Actually, time is probably the most

5  prevalent accommodation given to students with

6  many types of disabilities.

7     Q.   On page 4 your report states:  None of

8  the deposition testimony indicated that LACCD

9  faculty are trained or encouraged to describe

10  what they write on the board during class.

11         What do you base that on?

12     A.   Information that was provided to me.

13     Q.   Did anybody ask the questions, what do

14  you do when you write things on the board?

15     A.   No.

16     Q.   So you just read answers to questions

17  that were posed to them.  Correct?

18     A.   Yes.

19     Q.   Now, you continue:  At least one of

20  Mr. Payan's instructors did not permit the

21  accommodation of recording lectures at all.  We

22  talked about that a little bit.

23         Was that ever Mr. Payan's instructor

24  that said that?

25     A.   To the best of my knowledge, yes.  I

146

1  can't remember which one.

2      Q.   Did Mr. Payan say he gave that person

3  an accommodation letter?

4      A.   I believe he gave accommodation

5  letters to all of his faculty members.

6      Q.   That wasn't my question.  Did

7  Mr. Payan give an accommodation letter to that

8  unnamed instructor?

9      A.   I can't recall.

10     Q.   Do you know?

11         MS. KREVOR-WEISBAUM:  Objection.  He

12  already answered it.

13 BY MR. CLEELAND:

14     Q.   No, he didn't.  He said I don't

15 recall.  I said do you know?

16     A.   I don't know.

17     Q.   Thank you.  Do you know why it was

18 that a professor didn't allow recording of

19 lectures?

20     A.   I don't know.

21     Q.   Okay.  Mr. Payan was encouraged to

22 switch to a different section of the course with

23 an instructor who will allow recording.  What did

24 you base that on?

25     A.   One of the depositions.  I can't

                                              147

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1    recall which one.

2         Q.   Do you think Mr. Payan said that?

3         A.   I can't recall.

4         Q.   It continues:  Thus placing the burden

5    on Mr. Payan to adjust his schedule to meet his

6    educational goals.

7              What were his educational goals?

8         A.   Well, he wanted to become a

9    rehabilitation counselor.

10        Q.   Okay.  Is he?

11        A.   A rehabilitation counselor?

12        Q.   Correct.

13        A.   I don't know.

14        Q.   When you read his deposition did you

15   determine that he knew how many units he needed

16   to take to get that degree?

17        A.   Yes.

18        Q.   Did he know?

19        A.   Yes.

20        Q.   How many?

21        A.   I can't recall.

22        Q.   Did he even know what school he was

23   going to go to?

24        A.   I believe he was -- from his

25   deposition, he said he was looking at several

148

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1   different schools.

2        Q.   He mentioned two:  USC and Cal State

3   LA.  Do you remember that?

4        A.   Could be.  I don't recall exactly on

5   school names.

6        Q.   Do you remember his testimony about

7   his knowledge, or lack thereof, of the number of

8   units that he needed to take at either of those

9   institutions?

10       A.   I don't recall.

11       Q.   Okay.  Then you continue in the next

12  paragraph:  Through certain course materials,

13  such as those in math, are easier for blind

14  students to learn using Nemeth Braille.

15            Is Ms. Mason trained in Braille?

16       A.   I think it was Roy Payan.

17       Q.   Is Ms. Mason trained in Braille?

18       A.   I don't recall.

19       Q.   Is Mr. Payan conversant in Braille?

20       A.   Yes.  He stated that he went to the

21  Braille Institute for two years, I believe.

22       Q.   Did he qualify his level of comfort

23  with Braille in the deposition testimony you

24  read?

25       A.   I don't know.

149

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1          Q.    Wouldn't it be important to know if a

2    consumer, in this case a sight-impaired student,

3    was conversant in a particular technology in

4    making the statement that none of the depositions

5    ever focused on providing instruction or class

6    materials in Braille?

7          A.    Yeah, I thought it was interesting

8    that there was never a discussion of that.

9          Q.    He never asked for Braille.  Did he?

10         A.    I don't know.

11         Q.    Have you ever seen in any of your

12   examples any classes, any contacts anywhere where

13   a non-sighted student asked for materials in

14   Braille and they were not provided with the

15   materials in Braille?

16         A.    No.

17         Q.    Did you ask anybody, hey, did

18   Mr. Payan know how to use Braille?

19         A.    No, I did not.

20         Q.    Would it be important for Mr. Payan to

21   know how to use Braille for him to be able to use

22   Nemeth Braille in class textbooks?

23         A.    Yes.

24         Q.    Because you can convert written

25   materials to Braille, yet if the consumer of that

                                                    150

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1  material in Braille doesn't read Braille, it's

2  not accessible to him, is it, in that format?

3       A.   No, and there's other forms of math

4  representation other than Nemeth.

5       Q.   I agree.  But you specifically made

6  reference to that.

7       A.   Okay.

8       Q.   You probably figured out I'm going

9  through your report using your statements and

10  your words just so I understand what you're

11  saying.  Okay?

12      A.   Okay.

13      Q.   You continue:  OSS also does not

14  specify in student case notes in what format

15  accessible textbook should be provided.

16           Isn't the format for conversion really

17  up to the consumer, the blind student?

18      A.   At least here at Illinois students

19  get -- there's different formats that we produce.

20  We can produce Word documents.  We can produce

21  Kurzweil 3000.  We can produce other formats too,

22  eBook formats, so I'm not sure what their

23  practices were.  I didn't get any information

24  from their website to know what were the options

25  available to students.

                                              151

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1      Q.   In your experience have you found that

2    non-sighted students have preferences in the

3    conversion that they utilize for learning?

4      A.   Word is a popular format here.

5      Q.   So there's a preference for certain

6    conversions over others?

7      A.   Also the quality of the conversion, so

8    like are you marking up headers and other types

9    of instructional material.

10           A lot of textbooks these days it's not

11    just Prose, unless it's like a literature class,

12    there's a lot of outcroppings and footnotes and

13    things, and those often require special handling

14    by text conversion services, and I don't know if

15    they did those types of things at LACC or not,

16    but -- there wasn't any information, but that

17    type of formatting might make a difference in

18    accessing the materials.

19      Q.   What did you understand your

20    assignment to be in this matter?

21      A.   My assignment?

22      Q.   Yes.

23      A.   To review the documentation and to

24    provide information about the information

25    technology access and the student accommodations.

152

1       Q.    You continue on your report:  An

2    eBook was an accommodation for Mr. Payan in both

3    math 124A and Math 124B, and are you comfortable

4    with the fact it was the same textbook utilized

5    as in 125?

6       A.    Yeah.

7       Q.    But then you say but not in Math 227.

8       A.    Yeah, there was nothing in the

9    accommodation letter about it, so that was

10   curious to me why wasn't there -- but why wasn't

11   there anything in the accommodation letter about

12   eBooks.  That was just a question.

13      Q.    Who was his professor in that class?

14      A.    I don't recall.

15      Q.    Did that professor use a textbook?

16      A.    I believe so, yes.

17      Q.    What textbook?

18      A.    I don't recall.

19      Q.    When you say you believe so, what do

20   you base that belief on?

21      A.    Well, in the deposition there was

22   information about the second half of that course

23   there was a lot of graphs and things, so I assume

24   that came out of a book.

25      Q.    Who said that?

                                                    153

1        A.    Roy Payan.

2        Q.    So Mr. Payan was aware that there was

3   graphs in the book that they was using?

4        A.    Yes.

5        Q.    How did he become aware of that?

6        A.    I don't recall.

7        Q.    Were they converted?

8        A.    I don't recall.

9        Q.    You talk in your report about

10  policies, and the faculty is to provide

11  instructional materials to blind students in an

12  accessible format.  The professors don't generate

13  accessible format.  Do they?

14       A.    No.

15       Q.    That's OSS.  Right?

16       A.    Well, some faculty -- well, some

17  faculty may produce accessible materials for

18  handouts.

19       Q.    That's a good point, and I appreciate

20  you qualifying that.

21       A.    So I know there's faculty who have

22  blind students who actually learn about how to

23  create accessible stuff so that they can send it

24  to their blind student.

25       Q.    Whenever you talked about practices

                                               154

1   requiring faculty to provide instruction

2   materials to blind students in an accessible

3   format, did you mean the document that he

4   generated could be converted or the information

5   they give to the students must be that conversion

6   or something else?

7            MS. KREVOR-WEISBAUM:  Objection.

8            THE WITNESS:  Could you reread my

9   statement again?

10  BY MR. CLEELAND:

11       Q.   Sure.  On page 4, the last paragraph,

12  it starts with, "even though," but I'm more

13  interested in the third line it talks about

14  requiring faculty to provide.

15            I'm trying to figure out if accessible

16  format means in a format that can be converted or

17  here's the conversion, student.  I'm giving it to

18  you right now.

19       A.   If the faculty has electronic -- it

20  already in electronic form rather than sending it

21  to OSS, they could send it to the student

22  directly.

23       Q.   Okay.

24       A.   If it has the correct accessibility

25  information, depending on what the content is.

155

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1        Q.   And in reading it several times I
2   realize there's a potential for --
3        A.   I don't think --
4        Q.   -- divergent answers.
5             It continues:  Providing at the same
6   time non-disabled students receive the
7   information.
8             Well, we've already talked about your
9   understanding of handouts for Mr. Payan and
10  Ms. Mason.  Correct?
11       A.   Uh-huh.
12       Q.   Is that a yes?
13       A.   Yes.
14       Q.   I apologize.  We've already talked
15  about all of your knowledge about those handouts
16  to these two students.  Correct?
17       A.   Yes.
18       Q.   And your knowledge as to handouts to
19  any students at LA City College.  Correct?
20       A.   Could you repeat that?
21       Q.   And your understanding as to handouts
22  of any students at LA City College?
23            MS. KREVOR-WEISBAUM:  Objection.
24            THE WITNESS:  Yes.
25  BY MR. CLEELAND:

                                              156

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1        Q.    And also at any LACCD campus.

2   Correct?

3              MS. KREVOR-WEISBAUM:   Objection.

4              THE WITNESS:  I don't know what they

5   do at other colleges.

6   BY MR. CLEELAND:

7        Q.    Which is the answer I expected.

8              It continues:  To timely provide it to

9   OSS.  Whose responsibility is it to get the

10  materials to OSS, the student or the instructor?

11       A.    It's the instructor's responsibility

12  if they know a student needs -- I mean they're

13  the ones who hold material.  OSS isn't aware of

14  the material.

15             The student doesn't necessarily,

16  unless it's part of the syllabus, know what the

17  materials are, so it's something that the

18  instructor knows about and is preparing.

19             Yes, they are responsible to make sure

20  that if they have a sight-impaired student in the

21  class that they make sure that that information

22  will be available at the same time it is to other

23  students, at least at the same time and

24  preferably before.

25       Q.    But you stated that course materials

                                                    157

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1    be accessible to students?

2         A.   Right.

3         Q.   So these are textbooks and handouts

4    and handbooks, things they have to buy.  Right?

5         A.   It could be things the professor also

6    creates on their own, like a syllabus.  It's

7    nothing that the professor or instructor hands

8    out or if it's other supplemental materials.

9         Q.   And syllabi are usually handed out on

10   the first day of class, I think you said that.

11   Right?

12        A.   Correct.

13        Q.   But the instructor may not know that

14   the sight -- a sight-disabled student will be in

15   their class until on or after the first day.

16   Right?

17        A.   Right.  And so here at the U of I one

18   of the things that we do is as students register

19   for classes they're asked to contact those

20   professors to get the syllabi ahead of time so we

21   can get text conversion and any other materials

22   available, so while it may be available -- so

23   this is a case where, again, timing is important

24   and instructors understanding that, hey, for

25   these students I may need to have a syllabi

                                              158

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1  available ahead of time so that we can get the

2  materials available in accessible format at or

3  before other students, so it's something faculty

4  have to be aware of if a system is going to work

5  that way.

6      Q.   On this example that you have of the

7  U of I where the student goes to the professor

8  it's the student's burden.  Correct?

9      A.   In partnership with their resource

10  facilitator.

11      Q.   The student has got to go to the

12  professor.  Correct?

13      A.   It's usually an e-mail or something.

14      Q.   Generated by the student?

15      A.   As soon as they get a copy of the

16  syllabus, then text conversion people can often

17  contact the instructor to follow up on materials.

18      Q.   When you say often, because earlier

19  you said should.  When a student notifies a

20  professor I'm sight impaired, the professor has

21  the materials for their class?

22      A.   Right.

23      Q.   In your example what does the

24  professor then do to make sure those materials

25  are accessible to that student?

159

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1      A.   If they are print materials, like you

2   mentioned textbooks or other things that students

3   get from other places, like sometimes it's from

4   the library reserves and things, that that

5   information is provided to text conversion.

6           The student provides the information

7   that they purchased the textbook, a receipt, and

8   then the book will be converted.

9           If there are print materials from

10   other locations, like reserve readings at the

11   library, copies will be procured to get those

12   converted.

13           But sometimes faculty produce things

14   that they hand out in class or are available

15   electronically, and faculty can send those

16   directly to students, if they're accessible.

17      Q.   We talked about your knowledge of

18   handouts and class materials related to these two

19   clients previously.  Right?

20      A.   Yes.

21      Q.   And you continue in that line:  To

22   provide to OSS so that the materials can be made

23   accessible in advance of class.

24      A.   Uh-huh.

25      Q.   Is that a yes?

160

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1       A.   Yes.

2       Q.   Whenever you say uh-huh, I prod you.

3    I apologize.

4            Have you ever had an example where a

5    student who is sight impaired signs up for a

6    class, notifies your department of a student's

7    issues, and the materials are converted and the

8    student doesn't go to the class, they just drop

9    it, don't take it, whatever?

10      A.   Yes, that happens.

11      Q.   And what do you do then with those

12   materials?

13      A.   Well, we have a just-in-time process

14   typically, so -- well, depending on the

15   materials, if the materials are fully converted,

16   they're stored for potential use or sharing with

17   other institutions.

18           There are mechanisms within higher

19   education to share converted materials.

20      Q.   But the student still needs to show

21   the ownership interest in the book or material.

22   Correct?

23      A.   Right.  Before it's converted, yeah,

24   they have to show ownership.

25      Q.   You mentioned just-in-time process.

                                                  161

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1    What do you mean by that?

2         A.   Since at the University of Illinois

3    there is like 250,000 pages converted each year,

4    it can take time to convert that to an accessible

5    format, so they have a process where they try to

6    get the materials.  They need to know exactly

7    when the materials are available to make sure

8    that they make the materials when the student

9    needs it.

10             Sometimes they get ahead, you know, so

11   the materials are available way ahead of the

12   time, but if there's a crunch for materials,

13   especially at the beginning of the semester, then

14   we have a mechanism where we use the Blackboard

15   system for students to get access to the

16   accessible electronic versions in a secure manner

17   so that other students don't have access to them

18   so...

19        Q.   Do you know who owns the literary

20   rights to textbooks?

21        A.   No, I don't.

22        Q.   In your opinion report you state:

23   Often course handouts have complex visual layouts

24   that will not convert.

25             Are you talking in general or as to

162

1    these two plaintiffs?

2         A.   In general.

3         Q.   Thank you.  Are blind students

4    considered to have a disability?

5         A.   Well, under the Americans With

6    Disabilities Act, yes.

7         Q.   You continue on page 5 in talking

8    about Mrs. Visquez's, V-i-s-q-u-e-z, deposition

9    that students are on their own to try to learn

10   the software problem solve issues with the

11   available technologies.

12             What do you base that on?

13        A.   It didn't sound -- I think my

14   recollection of what she exactly stated was that

15   only a few of the staff at the library were

16   trained in how to use these technologies, and as

17   Ryan Kushner was probably the most conversant in

18   Key Word Pro SS, so I guess my concern is if

19   students with disabilities came in and wanted to

20   try and do their own conversion, they might not

21   have people that could help them understand how

22   to do it.

23        Q.   But you qualify that by saying unless

24   Ryan Kushner of the OSS High Technology Center is

25   available, right?

                                          163

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1       A.   Yeah.  There was Ryan Kushner, and I

2  believe she said there were some other staff that

3  were somewhat familiar with, some of the workers

4  there were familiar with the technology.

5       Q.   Well, Mr. Kushner was more than

6  somewhat familiar with conversion technology.

7  Correct?

8       A.   I know he was -- he worked with the

9  JAWS students and had a lot of familiarity with

10  JAWS and the other assistive technologies.

11       I don't know what his relationship was

12  with the people who were doing text conversion.

13  I don't know what his knowledge was in that.

14       Q.   But in your report you indicate

15  unless Ryan Kushner of the OSS High Technology

16  Center is available.  Are you saying that

17  Mr. Kushner is able to help the students that

18  came to him?

19       A.   From his report, he tried to help the

20  students, and some of the technologies that were

21  available, like PDF files, if they had to read a

22  PDF file it could be loaded into the Acrobat

23  software, and Acrobat will attempt to try and do

24  a conversion, so he could have helped the

25  students understand how to do some of that, I

                                          164

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1   assume.

2       Q.   You continue that:  Taking resources

3   to the High Technology Center for conversion is

4   similarly inadequate, because it requires

5   additional time for blind students to get access

6   to instructional material.

7            Is additional time discriminatory?

8       A.   Could you restate the question?

9       Q.   Sure.  Your statement is:  Taking

10  resources to the High Technology Center for

11  conversion is simply inadequate because --

12           MS. KREVOR-WEISBAUM:  Similarly.

13  BY MR. CLEELAND:

14      Q.   You're right.  I apologize.  Similarly

15  inadequate, because it requires additional time

16  for blind students to get access to instructional

17  material.

18           The question is is additional time

19  discriminatory?

20      A.   In the context of this particular

21  statement when materials were handed out in class

22  the students had to take it to a High Tech

23  Center, get it converted before they had access

24  to it, so that's the basis of the statement that

25  it was discriminatory, because they had to wait

                                                165

1    two or three or four days maybe before they even

2    had access to the same materials the students had

3    in their class.

4         Q.    Do you qualify in that paragraph that

5    it's for handouts?

6         A.    I did not.

7         Q.    So why did you now just say it relates

8    to handouts?

9         A.    Because you read it to me, and you

10   obviously had -- were concerned about the

11   statement, and you asked me a question about

12   additional time, and the time factor in there was

13   related to information that were given to them in

14   class.

15        Q.    It doesn't say that here, though.

16        A.    No, it doesn't.

17        Q.    How am I supposed to know that when I

18   read your report?

19        A.    I don't know.

20        Q.    But the language that we read into the

21   record accurately, thanks to counsel's

22   correction, talks about additional time for blind

23   students.  Right?

24        A.    Right.

25        Q.    Again, the question is is additional

                                                    166

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1  time by itself discriminatory?

2          MS. KREVOR-WEISBAUM:  Objection.  He's

3  already answered your question.

4          THE WITNESS:  In the context of what I

5  meant in this sentence was that it was related to

6  materials that they would be receiving -- other

7  students were receiving, that they had to take

8  that material to the High Tech Center to get it

9  converted.

10          That was my -- but the additional time

11  in this context, at least in my meaning, I mean

12  I'm not sure in general additional time in the

13  whole world or what other context you want to put

14  it in, but it's related to a delay that they

15  would have in getting the materials that other

16  students had access to, so I apologize if my

17  language was not clear.

18  BY MR. CLEELAND:

19      Q.   But in fairness to the question, I

20  used exactly your words, additional time.  Right?

21  Is that accurate what you said, those words?

22      A.   Additional time?

23      Q.   Yeah.

24      A.   That's what I wrote, yes.

25      Q.   Thanks.

                                                167

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1          Under instructional technologies you

2     state that:  LACC and LACCD behaviors related to

3     information technology accessibility lead me to

4     conclude that they assume all electronic

5     materials are accessible to blind students.

6          What behaviors are we talking about

7     for LACC and LACCD?

8          A.   In the depositions that I read of the

9     administrators it seemed like none of them seemed

10    to have any protocol for evaluating the

11    accessibility of software or hardware or how that

12    was considered.

13         I know there was discussions by the

14    LACCD about equipment and captioning technology

15    seemed to be the most specific thing that they

16    talked about, but in terms of procuring software,

17    there didn't seem to be any process of evaluating

18    or rating the accessibility of it or providing

19    feedback to companies if there were accessibility

20    issues found or how accessibility was included in

21    the purchasing process.

22         It seemed like there was people, well,

23    I thought this person was taking care of that or

24    that person was taking care of it, and so I guess

25    I didn't see any of the administrators who were

168

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1    saying -- who discussed that, so maybe they do

2    have some, but I didn't see it in the

3    depositions.

4         Q.   And, again, you now describe what you

5    believe behaviors means in that sentence?

6         A.   Yeah.

7         Q.   Okay.  It continues to say:  Lead me

8    to conclude.  What did you rely upon to reach

9    that conclusion, what specifics?

10        A.   Well, they seemed to have a

11   complaint-driven process, so if a student

12   complained about accessibility, then there was

13   some type of reaction to it.

14             Typically it sounded like they

15   referred them to Ryan Kushner to see if Ryan

16   could help them to figure out how to use the

17   software, where the problems were, so if there

18   was a complaint or problem, then Ryan Kushner

19   seemed to be the person that they would go to to

20   try to resolve the issue.

21        Q.   That sentence continues:  They do

22   not -- I think we're talking about the district

23   -- they do not understand the role the software

24   or website played in assuring accessibility.

25             What website are we talking about?

                                                 169

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1        A.   There's a number of websites.  There

2   was the community college website was discussed

3   by one of the administrators, because it was

4   supposedly -- part of the RFP was that it was

5   supposed to be accessible, but there was

6   databases used for library research, the MathLab

7   software, Etudes software, Canvas was mentioned

8   as another technology that was used.

9             All of these technologies have to have

10  accessibility considered as a part of their

11  design or remediation to make them compatible to

12  technologies like JAWS.

13       Q.   Are all databases available to the

14  University of Indiana and accessible to blind

15  students?

16       A.   I'm not aware of what databases are

17  used at the University of Indiana.  Do you mean

18  Illinois?

19       Q.   I'm sorry, Illinois.  Okay.  Are all

20  of the databases at the University of Illinois

21  accessible to blind students?

22       A.   Yes.

23       Q.   And how long has that been true?

24       A.   For a long time, but we have processes

25  in place, and we do work with several publishers

                                              170

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1   on trying to improve the accessibility.

2   Accessibility of databases is a -- bibliographic

3   databases is a complex issue.

4        Q.   So you're attempting to improve the

5   accessibility.  Right?  Is that a correct

6   statement, you being the University of Illinois?

7        A.   Yes.

8        Q.   Are you able to state, with a

9   reasonable degree of professional certainty, that

10  not all of the databases at the University of

11  Illinois are accessible to blind students?

12       A.   Could you repeat the question?

13            MR. CLEELAND:  Could you read that,

14  please?

15            (At this point the court reporter read

16            aloud the requested portion of the

17            transcript.)

18            THE WITNESS:  Are not --

19  BY MR. CLEELAND:

20       Q.   Not accessible.

21       A.   Are not accessible, there are some

22  databases that are not accessible, yes.

23       Q.   Are you aware of any institution of

24  higher learning in the United States where every

25  database available to their students on campus

171

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1    and can say so with a reasonable degree of

2    professional certainty that those databases are

3    accessible?

4           A.   No, I don't know of any.

5           Q.   Not a single school?

6           A.   I don't know of any.

7           Q.   Thank you.  You continue in your

8    report:  They do not understand the role of

9    software or website -- I apologize.  I misread

10   it.

11          They do not understand the role

12   software or website plays in assuring

13   accessibility.  You're talking about LACC and

14   LACCD.

15          It appears from your CV that you teach

16   lots of seminars and courses and meetings and

17   interest group presentations.  Do the people in

18   those presentations understand the role software

19   or website plays in assuring accessibility?

20          A.   No, that's why they're taking the

21   courses.

22          Q.   Are they well attended, those courses?

23          A.   I'm not sure what you mean by well

24   attended.

25          Q.   How many people usually show up for

172

```
 1   you?
 2        A.   In my last badging course I had 24
 3   students.
 4        Q.   Okay.  And is that the average number
 5   you get in those presentations?
 6        A.   I've had as many as 80 in the past.
 7        Q.   You've been giving those presentations
 8   for how long?
 9        A.   Over ten years.
10        Q.   It sounds like hundreds, if not
11   thousands, of people who attend these
12   presentations who have a specific interest, per
13   your statement, do not understand the role that
14   software or website plays in assuring
15   accessibility.  Is that an accurate statement?
16             MS. KREVOR-WEISBAUM:  Objection.
17             THE WITNESS:  Could you repeat the
18   question again?
19             MS. KREVOR-WEISBAUM:  Why don't you
20   read the whole sentence too, not half the
21   sentence for your question.
22             MR. CLEELAND:  Why should I?
23             MS. KREVOR-WEISBAUM:  Because it's
24   misleading.  It's a misleading question.
25             MR. CLEELAND:  It is not.  It's the
```

173

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1    exact language, but I'll tell you what.  You get

2    to ask all the questions you want when this is

3    over.

4            MS. KREVOR-WEISBAUM:  I'm just putting

5    in the record it's a misleading question.

6            MR. CLEELAND:  Well, I'll put in the

7    record I read the exact language --

8            MS. KREVOR-WEISBAUM:  Half the

9    language.

10           MR. CLEELAND:  Thank you for cutting

11   me off.  I really appreciate it.

12           I stated the exact language,

13   qualifying attendees.  The attendees are not with

14   LACC or LACCD, but I have read the full paragraph

15   or, excuse me, the full sentence.

16           MS. KREVOR-WEISBAUM:  No, you haven't.

17   The first part of the sentence you ignored.

18           MR. CLEELAND:  No, it stops at the

19   word materials.  There's a period there.  Third

20   line, trying to use the materials.

21           MS. KREVOR-WEISBAUM:  No, you're

22   talking about the second sentence, sir.  That's

23   where you're reading from.

24           MR. CLEELAND:  I agree.  I said I read

25   the first sentence.  Did I read the first

                                              174

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1    sentence?

2            MS. KREVOR-WEISBAUM:  I'm talking

3    about the second.

4            MR. CLEELAND:  Excuse me, did I read

5    the first sentence?

6            MS. KREVOR-WEISBAUM:  No, I'm not the

7    deponent here.  I'm putting an objection that

8    you're misreading the sentence -- second sentence

9    to the witness.

10            MR. CLEELAND:  Okay.  I said you can

11    say that.  You said it three times now.

12            MS. KREVOR-WEISBAUM:  Thank you very

13    much.

14            MR. CLEELAND:  Okay.  Perhaps you

15    could read the question that I did ask.

16            (At this point the court reporter read

17            aloud the requested portion of the

18            transcript.)

19            THE WITNESS:  Can I ask for a

20    clarification?

21    BY MR. CLEELAND:

22        Q.   Sure.  Absolutely.

23        A.   Are you saying that people who come to

24    learn about accessibility don't understand this

25    before they come?

                                                  175

```
 1          Q.    I'll make it very clear.

 2          A.    Okay.

 3          Q.    You talked about presentations you

 4    make.  We're only talking about presentations you

 5    make at these various organizations and meetings.

 6          A.    Okay.

 7          Q.    So the attendees are the "they" in my

 8    question.

 9                So the attendees to your

10    presentations, many of them they do not

11    understand the role the software or website plays

12    in assuring accessibility.  Is that an accurate

13    statement?

14          A.    People who come to my presentations

15    don't understand the role of the website and

16    software plays in accessibility?

17          Q.    Yes.

18          A.    Yes, I think that's fair to say that

19    some don't.  That's why they come.

20          Q.    They're coming to learn.  Aren't they?

21          A.    Yes.

22          Q.    And you've been giving these

23    presentations for a long time.  Haven't you?

24          A.    Yes.

25          Q.    And people are still coming to learn.
```

                                                    176

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1    Aren't they?

2         A.   And they can go other places to learn

3    about it too.

4         Q.   And there are other sources available

5    to potential attendees.  Correct?

6         A.   Yes.

7         Q.   You continue in the next sentence:  In

8    cases where software or a website is partially

9    accessible, blind students may believe they have

10   all of the information related to a course but

11   may be missing important pieces that are not

12   available to a screen reader.

13            The comment "may be missing," what do

14   you base that on?

15        A.   Well, a lot of times people will just

16   rely on somebody with a screen reader going

17   through a website, and they find information,

18   maybe some accessibility issues, but they miss

19   whole sections, because that part of the website

20   wasn't available to the screen reader, because

21   there's pop-up information or other information

22   that they didn't know they had to interact with a

23   particular control to bring up that information,

24   so -- and I remember once a colleague of mine,

25   Hadi Rangin, now at the University of Washington,

177

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1    they were evaluating some Blackboard, and he was

2    going through the website giving things.

3            I said what about that widget up in

4    the upper right-hand corner that pops open and

5    there's all these menu options.

6            He said I didn't even know that

7    existed there, because there was no information

8    on the web page to say, hey, this thing has a

9    pop-up menu.

10           That's one example of where --

11   especially with information that's hidden and

12   requires some type of pointer interaction to

13   reveal that image that screen reader users won't

14   even know that that's information, unless it's --

15   the website is designed in such a way to make

16   that information available and interaction

17   techniques are provided that would allow them to

18   reveal the same information as other people.

19       Q.   But the comment "but may be missing

20   important pieces" also means it may or may not be

21   missing important pieces.  Correct?

22       A.   Correct.

23       Q.   So we just don't know.  Right?

24       A.   I don't know.

25       Q.   And that's a specific application to a

                                                    178

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1    specific consumer.  Correct?

2          A.    Correct.

3          Q.    Have you ever had students that are

4    really knowledgeable in an area of a course

5    you're giving so they don't need to spend much

6    time studying there?

7          A.    I'm not sure what the context of the

8    question is.

9          Q.    Have you ever had a student where in

10   the portion of the class you're teaching they're

11   really knowledgeable about some component of your

12   course, so they just don't spend much time

13   studying that, because they already know it?

14         A.    I'm sure that happens.

15         Q.    And in some cases a student determines

16   and dictates how much time they spend doing

17   something.  Correct?

18         A.    I believe that's correct in all

19   situations.  Individuals decide how much time

20   they're going to spend on one thing or another.

21         Q.    And merely because information is

22   available for consumption doesn't mean it will be

23   consumed.  Does it?

24         A.    No, but having the choice of being

25   able to choose to ignore or use information is

                                              179

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1    important, and in some websites screen readers

2    don't know that that information is even

3    available.

4        Q.   If a student falls asleep in class

5    and, therefore, doesn't get the lecture materials

6    provided orally by a professor, are they missing

7    an opportunity?

8        A.   Yes.

9        Q.   You continue in your report:  Further,

10   when sighted students have problems with

11   accessing electronic instructional materials

12   visually, they often can ask fellow students.

13            Can a blind student ask fellow

14   students if they're having trouble accessing

15   electronic instructional materials visually?

16       A.   They can ask, but sometimes the

17   students don't really understand how the screen

18   reader works, and so it's not usually as

19   effective, so if you have a sighted, you know,

20   another student asks another sighted student,

21   they'll say click here and do this.

22            Well, if the student doesn't

23   understand how a screen reader works, they'll

24   say, well, click over here and click over here.

25   Well, the student says I don't know how to click

                                                    180

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1    there.  I don't even know where there is, and

2    oftentimes depending on how the -- I mean I think

3    the most confusing thing that happens many times

4    with technology and software is that even though

5    things are hidden visually on a website, they

6    aren't hidden to the screen reader because of the

7    techniques that people have been using, so I know

8    that this has happened.

9              Screen reader users will say, well,

10   I'm interacting with this piece of information.

11   They say, well, I don't see that on the screen,

12   and so in that case this disconnection between

13   the user and the person helping and both are

14   getting frustrated, because they're saying I'm

15   hearing this, but I can't see that, and other

16   times they'll say, well, you just pop up this

17   menu over here.  Well, I can't pop it up, because

18   there's no keyboard way to do that.

19        Q.   In your personal experience, based

20   upon your educational career, when you needed

21   help from a student, one of your cohorts, did you

22   try to find one of the smart students?

23        A.   When I need help with --

24        Q.   When you were a student.

25        A.   Oh, when I was a student.  Wow, you're

                                                   181

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1   going far back now.

2         Q.   Well, that's okay.  There are things

3   we learn.

4              So when you were a student and you

5   needed help with problems, did you usually try to

6   find a smart student?

7         A.   I would either usually go to the

8   faculty member where the software was or I

9   would -- I would have friends in my classes.

10             I don't know if I considered them the

11  smartest students or not.  No, I didn't

12  necessarily go to the smartest student, no.

13        Q.   I said smart, not smartest.  You

14  didn't go to the dumbest guy in the class.  Did

15  you?

16        A.   I usually went to my friends.

17        Q.   You didn't go to the dumbest guy in

18  the class.  Did you?

19             MS. KREVOR-WEISBAUM:  Objection.

20             THE WITNESS:  I didn't go to the

21  dumbest guy in the class.

22  BY MR. CLEELAND:

23        Q.   Now, you comment at the end of that

24  sentence that:  While depositions indicate that

25  the primary person that can help blind students

                                              182

1    with technology accessibility problems is

2    Mr. Kushner.

3          A.   Yeah.

4          Q.   He's a smart guy.  Right?

5          A.   Seems to be, yeah.

6          Q.   Is there something wrong with going to

7    the guy who's most likely to have answers?

8          A.   There's no problem with that, just

9    availability, how often is he available to help

10   the student?

11         Q.   How often is he available?

12         A.   I'm not sure.

13         Q.   Would that be important in reaching a

14   conclusion as to whether or not he is available

15   at reasonable times?

16         A.   Yes.

17         Q.   Okay.  It also says:  Students can

18   talk to tutors.

19              Blind students can go talk to tutors.

20   Right?

21         A.   Yes.

22         Q.   It says that the students in the

23   classes can ask instructors for help.

24              Blind students can ask instructors for

25   help.  Right?

                                                  183

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1     A.   Yes.

2     Q.   So the accessibility to help isn't

3   hindered merely because they're blind.  Is it?

4     A.   The major issue with getting help is

5   people's understanding of how assistive

6   technology works and the design of the website.

7     Q.   You state:  When inaccessible software

8   is identified in a complaint-driven process, it

9   is usually too late in the semester to make the

10  relevant software accessible.

11        What do you base that on?

12    A.   My experience when there's

13  accessibility problems found in software,

14  especially if it's from a publisher like Pearson

15  I believe was the MathLab people, the time it

16  takes to contact the publisher, identify the

17  accessibility issues, get the engineers, the

18  technicians to come up with a solution, those

19  solutions should be tested for accessibility, you

20  know, it takes weeks, if not months of time.

21    Q.   And is accessibility in your example

22  limited solely to sight impaired?

23    A.   No.  We deal with -- with the advent

24  of new technologies, like TextHelp and Kurzweil

25  3000 and also low vision software, there's other

184

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1    issues related to accessibility.  Color contrast

2    is a big issue.

3         Q.   Includes students who aren't blind.

4    Correct?

5         A.   Students who aren't blind?

6         Q.   When inaccessible software is

7    identified in a complaint-driven process, it's

8    usually too late in the semester.  That's not

9    limited to blind students.  Is it?

10        A.   When you say -- I mean in this

11   particular case it's inaccessible to the blind

12   students.

13        Q.   There we go, but it can be

14   inaccessible to a non-blind student.  Correct?

15        A.   I don't know what that would mean.

16        Q.   Maybe a particular student has a color

17   vision issue.

18        A.   Yes.

19        Q.   Maybe a student has a tactile issue.

20   Maybe a student has a perception issue.  Maybe a

21   student doesn't get math very well, so there are

22   lots of inaccessible to the individual potential

23   beyond lack of sight.  Right?

24        A.   Well, what's your definition of how

25   you define inaccessible?

                                                  185

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1      Q.    You just said when inaccessible

2   software.

3      A.    In my case the context is to the

4   blind, but you're making a broader definition of

5   inaccessible.

6           Could you define what you mean by

7   inaccessible?

8      Q.    I didn't write the report.

9           MS. KREVOR-WEISBAUM:   Objection.

10           THE WITNESS:   I'm just defining my

11   context here.

12   BY MR. CLEELAND:

13      Q.    I appreciate that.  So this is limited

14   to --

15      A.    Blind students.

16      Q.    I appreciate that.  Thanks so much.

17           You continue there:  Often provided

18   with inferior or ad hoc alternatives to the

19   educational technology.

20           Can you give me an example of

21   Mr. Payan having that?

22      A.    Well, in terms of Mr. Payan he had to

23   have somebody help him with the MathLab software,

24   MyMathLab software to send him homework and

25   stuff, so he was limited by the amount of time

                                                186

1    the tutor was available, and there was additional

2    time for the tutor to read the information, for

3    him to respond, and to type it in.

4           I believe one of the other issues I

5    believe from Mr. Payan's testimony is some of the

6    students who were the tutors weren't familiar

7    with the math topic, so sometimes their

8    description of what the math was wasn't always

9    entirely accurate so...

10      Q.   And you now raise why I asked the

11   question 15 minutes ago.  Is additional time

12   discriminatory?  You just talked about additional

13   time.

14      A.   Is additional time a discrimination?

15      Q.   Is additional time discriminatory?  If

16   you want to say a discrimination, I'll even

17   accept that.

18           MS. KREVOR-WEISBAUM:  Objection.

19           THE WITNESS:  Additional time

20   discriminatory?

21   BY MR. CLEELAND:

22      Q.   That's a phrase you've now used twice.

23   I just want to make sure I understand your

24   understanding.

25           MS. KREVOR-WEISBAUM:  Objection.  Is

                                              187

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1   there a question on the table?

2           MR. CLEELAND:  Yeah.

3           MS. KREVOR-WEISBAUM:  What's the

4   question?

5           MR. CLEELAND:  Is additional time

6   discriminatory?

7           MS. KREVOR-WEISBAUM:  Objection.

8   Asked and answered previously.

9           THE WITNESS:  Additional time is a

10  common accommodation for students with

11  disabilities.

12  BY MR. CLEELAND:

13      Q.   Is it discriminatory?

14          MS. KREVOR-WEISBAUM:  Objection.

15          THE WITNESS:  I'm not a lawyer.  It

16  seems to be more of a legal question you're

17  asking.

18  BY MR. CLEELAND:

19      Q.   If you can't answer it, you just let

20  me know that.

21      A.   I can't answer that.

22      Q.   Thank you so much.

23          You talked about a blind student must

24  forego the benefit that a sighted student derives

25  from the technology in question.

188

1          Can you please give me examples that

2    you're aware of with respect to that occurring to

3    Mr. Payan?

4          A.   Well, the purpose of the MyMathLab

5    software, the instructor's perspective was that

6    it can provide a lot of repetitions, practice

7    Algebra problems, and he was denied that, because

8    he had to go through this -- basically I think it

9    became more of a hurdle for him rather than a

10   hindrance, because he had to use it to take tests

11   and hand in homework and stuff, so he didn't

12   derive the same benefit other students derived

13   from using the software.

14        Q.   He didn't get the same benefit, or it

15   took him more time to derive the benefit he

16   achieved?

17        A.   Well, for a student, again, if you're

18   talking about accommodation, he was accommodated

19   to use the software, but ideally what you want is

20   the software be accessible so students can

21   independently use that software just like the

22   other students in the class and so...

23        Q.   Can you say, with a reasonable degree

24   of professional certainty, that idealism is the

25   standard of practice of higher education

189

1   facilities in the United States with respect to

2   providing accessible materials for a

3   sight-impaired individual?

4           MS. KREVOR-WEISBAUM:  Objection.

5           THE WITNESS:  My understanding is --

6   the goal is to provide equal access to, from my

7   perspective, electronic resources so that

8   students can independently use them just like

9   other students.

10          That's, I think, the goal of higher

11  education is to design technologies that are

12  universally accessible and usable.

13  BY MR. CLEELAND:

14      Q.   Has that been achieved?

15      A.   No.

16      Q.   How long have you been trying to do

17  it?

18          MS. KREVOR-WEISBAUM:  Objection.

19          THE WITNESS:  How long have I been?

20  BY MR. CLEELAND:

21      Q.   To achieve that universal use.

22      A.   I think basically the -- since the

23  '90s when technology became more prevalent my

24  position was created here at the U of I because

25  the director saw that information technology was

190

1    becoming not just an option for students --

2    students or anybody, but that this was going to

3    be an emerging barrier for student's full

4    participation in higher education, so it is an

5    important issue that needs to be addressed, and I

6    mean, similarly, to like building facility

7    accessibility, there are standards that people

8    have to follow to make sure buildings are

9    accessible, and these same types of standards

10   need to be used in developing software and

11   websites to be accessible.

12        Q.   You're still working on it?

13        A.   I am still, and a lot of other people

14   are working on it, and we need more people

15   working on it.

16             In my opinion -- well, I think it's a

17   common opinion is that accessibility is a human

18   resource problem.  We don't have enough people

19   who understand these technologies and how to make

20   them accessible.

21             Like I said earlier in the deposition,

22   the ability to make technology accessible is way

23   below what we're currently doing now, and the

24   goal was how are we going to get from the current

25   state of accessibility to a current state of

                                                    191

1    where they could be.

2         Q.   What's the impediment to that?

3         A.   It's a human resource issue:  Are

4    people going to learn how to make the

5    technologies by creating more accessible --

6         Q.   I cut you off, I guess.  Go ahead.

7         A.   Are people going to make sure it's a

8    priority in terms of administrators saying how we

9    can do these things?  Are they going to allocate

10   the necessary resources?  Are we going to have

11   the feedback of companies that will support them

12   allocating resources towards accessibility.

13        Q.   And these allocating the necessary

14   resources does that include money?

15        A.   Sure.  Yes.

16        Q.   And I notice in your CV you identify a

17   number of grants or gifts for different tasks.

18   Where does that money go?

19             MS. KREVOR-WEISBAUM:  Objection.  Can

20   you be more specific what you're talking about?

21   BY MR. CLEELAND:

22        Q.   Sure.  It's in your CV.

23        A.   Do you want to pick one?

24        Q.   I'll do all of them, if you want?

25             MS. KREVOR-WEISBAUM:  Why don't you be

                                                    192

1    specific?

2    BY MR. CLEELAND:

3         Q.   I will be very specific.

4              Gibson grafts, 2013, title:  OpenAjax

5    ARIA Rules, Rulesets, Testsuite, and Examples

6    Development, funding agency, IBM corporation

7    gift, $20,000.  Where did that go?

8         A.   It went to support students who helped

9    develop the OpenAjax evaluation library.

10        Q.   Am I going to need to read all of

11   those now, or is it going to be the same answer?

12        A.   I think you'll have to read them all.

13        Q.   Okay.  2012, ARIA program, $20,000,

14   where did it go?

15        A.   We developed examples of the ARIA

16   practice.

17        Q.   So you spent it.  Right?

18        A.   Yes.

19        Q.   2011, OpenAjax, $20,000, what did you

20   use it for?

21        A.   I believe that was for examples,

22   building ARIA examples.

23        Q.   Did you make any -- did you receive

24   any compensation out of any of those gifts?

25        A.   I'm paid by the University of

                                              193

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1    Illinois.

2         Q.   I didn't ask that.  Did you receive

3    any compensation out of any of those gifts?

4         A.   No, I did not.

5         Q.   2010, OpenAjax, $20,000, what did you

6    do with that money?

7         A.   It was applied towards building the

8    OpenAjax library and building examples of

9    accessible widgets.

10        Q.   2009, Firefox accessibility, $50,000.

11        A.   We hired a developer to work on a

12   preliminary -- our first Firefox extension that

13   would allow people to expect accessibility

14   features.

15        Q.   So the money is spent on individuals

16   and material.  Is that correct?

17        A.   Most of our money that I receive has

18   gone to develop tools or to help raise awareness

19   of accessibility issues or to help people create

20   accessible content.

21        Q.   But you don't give money to a software

22   program.  You give money to individuals.  Right?

23   You give money to individuals.  Right?

24        A.   I give money?  I don't give money.

25        Q.   The gift.  It says that you are the

                                                  194

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1    foundation principal investigator.

2         A.   Right.  So we supported students or we

3    hire people.

4         Q.   Got it.  So the money, the cash goes

5    to individual people.  Is that correct?

6         A.   We pay them, yes.

7         Q.   Does it go to corporations?

8         A.   No.

9         Q.   Does it go to acquire access or actual

10   material, you buy widgets -- bad phrase in

11   computers, I guess.  You buy pieces of metal, you

12   buy folders, you buy laptops, stuff like that?

13        A.   We buy software tools, what we may use

14   for development.

15        Q.   Is any money left over at the end of

16   the year for the grant?

17        A.   We use up -- pretty much all of those

18   grants used up all of the money.

19        Q.   It's your intent to do that.  Right?

20        A.   Yeah.

21        Q.   So you spend that money on things or

22   people.  Correct?

23        A.   Yes.

24        Q.   That's all I asked.  Okay.

25             Any difference on any of these grants

                                                    195

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1    on your list as to where the money goes?

2        A.   No, it goes mostly to people.

3        Q.   Okay.  On page 6 of your report, the

4    first paragraph:  Similar accessibility issues

5    were found for online resources at the LACC

6    library.  According to deposition testimony,

7    there are some 60 online databases.  They're

8    always available to LACC students.

9            Is that limited, that information

10   limited solely to the depositions you read?

11       A.   Yeah.

12       Q.   The next to last line it states -- or

13   sentence:  The summary information is designed to

14   help determine if a resource is relevant enough

15   to read the full text.

16           You've done research to databases

17   before.  Correct?

18       A.   Yes.

19       Q.   And you've also done research

20   utilizing printed volumes to do these summaries.

21   Correct?

22       A.   Yes.

23       Q.   And those summaries are only as good

24   as the people who generate the summaries.  Right?

25       A.   Yes.

196

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1        Q.   Sometimes you've read a summary, and

2   when you go read the article it's like, holy

3   moly, it's not even the same thing.  Right?

4        A.   Yes.

5        Q.   So the accessibility to information,

6   the information may be accurate or inaccurate.

7   Correct?

8        A.   Yes.

9        Q.   Then the next paragraph you state:

10   Some databases were more accessible than others.

11   Is that an accurate statement?

12        A.   It's based on the depositions -- Ryan

13   Kushner apparently evaluated databases,

14   informally provided kind of the library with a

15   list of databases he felt were more and less

16   accessible so that when students -- I assume when

17   students came in who were blind or visually

18   impaired that they would be directed towards the

19   more accessible ones.

20        Q.   Is it an accurate statement?

21        A.   Could you reread the question again?

22        Q.   Some databases are more accessible

23   than others.

24        A.   According to the deposition, that's

25   what Ryan Kushner reported, yes.

                                              197

1        Q.   I didn't ask that.  I'm asking is it
2    accurate, to your knowledge?
3        A.   To my knowledge, it's accurate.
4        Q.   Based upon what?
5        A.   Ryan Kushner's report and my own
6    experience.
7        Q.   What databases did you look at at the
8    LACC library?
9        A.   I didn't look at any.
10       Q.   So I'm asking do you have any
11   independent knowledge that some databases were
12   more accessible than others at LACC?
13       A.   I'm basing mine on Ryan Kushner's --
14       Q.   Personal knowledge, sir.
15       A.   And my own experience I know some
16   databases are more accessible than others.
17       Q.   Did you look at any of them?
18            MS. KREVOR-WEISBAUM:  Objection.
19   Asked and answered.
20            THE WITNESS:  No, I did not.
21   BY MR. CLEELAND:
22       Q.   That's the answer.
23            MS. KREVOR-WEISBAUM:  For the third
24   time.
25

                                                  198

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1   BY MR. CLEELAND:

2        Q.   It happens when you tell me it that

3   way, I don't have to ask you again.

4             Now, at the University of Illinois are

5   some databases more accessible than others?

6        A.   Yes.

7        Q.   You then state that:  Apparently blind

8   students are guided to use the more accessible

9   databases.

10            Where do you get the definition or,

11   excuse me, the description of apparently?

12       A.   I recall reading in the depositions

13   that that was why the head of the library was

14   asking Ryan Kushner to evaluate them.

15       Q.   The last sentence states:  This

16   results in blind students having lower quality

17   materials than their sighted peers for learning

18   about a topic, writing papers, and completing

19   homework assignments.

20            Do you have any specific example of

21   that?

22       A.   No, I do not.

23       Q.   That's just a general statement?

24       A.   Yes.

25       Q.   The next paragraph:  The LACC library

                                                    199

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1  primarily uses the accessibility information

2  provided by Mr. Kushner to steer blind students

3  to databases that appear, based on Mr. Kushner's

4  admittedly imperfect assessment, to be more

5  accessible.

6         At the University of Illinois where

7  you work are you aware of any people who direct

8  sight-impaired students to more accessible

9  databases?

10      A.   For our students who are doing

11  research for our sight-impaired they typically

12  have people who can help do database searches for

13  them, if there's an accessibility issue.

14         We've had some graduate students that

15  the Department of Rehab Services has provided

16  them with a reader that has gone into the

17  library, and so they can basically -- they have a

18  surrogate do the database searches.

19         Materials that are identified are

20  either converted by the reader or they can be

21  sent to Disability Services, so there is support

22  available for the less accessible databases for

23  students to have access to those articles.

24         MR. CLEELAND:  Could you read my

25  question, please?

                                                    200

```
 1              (At this point the court reporter read

 2              aloud the requested portion of the

 3              transcript.)

 4              THE WITNESS:  No, I'm not aware.

 5    BY MR. CLEELAND:

 6         Q.   Okay.  Under PeopleSoft and LACC

 7    website you state:  The use of PeopleSoft and the

 8    LACC website also gives rise to accessibility

 9    concerns.  With respect to PeopleSoft,

10    Mr. Kushner testified that he has helped between

11    five and ten blind students do the basic task of

12    registering for classes.

13              Was it a mistake for Mr. Kushner to

14    help them?

15         A.   No.

16         Q.   Are you aware of anybody at the

17    University of Illinois assisting blind students

18    in registering for classes?

19         A.   No.

20         Q.   Do you know if that occurs where

21    personnel at the University of Illinois or

22    students assist sight-impaired students in

23    registering for classes?

24         A.   I do not know.

25         Q.   Are you trained or educated in
```

201

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1    PeopleSoft?

2         A.   No.

3         Q.   Do you know why it is that those five

4    to ten students ask Mr. Kushner for help?

5         A.   No.

6         Q.   You state:  It is my understanding

7    that the report of Peter Bossley addresses the

8    particular accessibility barriers with the

9    version of PeopleSoft license issued -- I'm

10   sorry, licensed to LACCD.

11            Have you read Mr. Bossley's report?

12        A.   No, but I know they use PeopleSoft at

13   Ohio State.

14        Q.   If you didn't read his report, what do

15   you base your understanding of his report on?

16        A.   One of my communications they said

17   that Peter would be covering PeopleSoft.

18        Q.   Who said?

19        A.   Sharon.

20        Q.   Okay.  So it's my understanding based

21   upon what the lawyers for the plaintiff told

22   you --

23        A.   Uh-huh.

24        Q.   -- that the report of Mr. Bossley

25   addresses the particular accessibility barriers

202

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1    with the version of PeopleSoft licensed to LACCD?

2         A.    Right.  And the only part that I knew

3    about was Ryan Kushner reporting that he had

4    helped five to ten students, so that kind of

5    raised accessibility concerns in my mind.  If

6    it's so accessible, why did so many blind

7    students need help accessing it?

8         Q.   Have you ever had an experience where

9    sighted individuals asked for help in signing up

10   for classes?

11        A.   No.

12        Q.   Did you ever have to ask for help when

13   you signed up for classes in college?

14        A.   I worked at registration.

15        Q.   Did you ask for help, go to your

16   supervisor and say, hey, how do I get in this

17   class?  It looks like it's full.

18        A.   No, I don't recall ever doing that.  I

19   was able to register before other people, because

20   I worked at registration.

21        Q.   Okay.  Did you receive any training

22   about registration?

23        A.   I guess I have a unique history in

24   registration.  My dad was a registrar at the

25   University of Wisconsin-Parkside, so as I was

                                                   203

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1  growing up I worked in the registration system,

2  and then when I went to Madison, I worked -- I

3  knew the system.

4       Q.   So you had unique experience in that?

5       A.   I guess I'm not a good person to ask

6  about that question.

7       Q.   You have unique experience that other

8  people may not have.  Correct?

9       A.   Yes.  And at that time everything was

10  done with computer cards, not online.

11       Q.   I remember them well.

12       A.   So we ran around to different

13  buildings.  You had to run around to different

14  buildings just to get cards, and if you wanted to

15  change a class, you had to run back to that

16  building and see what cards were available, and

17  when you got all of your cards together, you

18  brought them to one place, and that was your

19  registration system, so it was a little bit

20  different back then.

21       Q.   On page 7 you talk about a scan of the

22  LACC website using FAE 2.0, and you were kind

23  enough to put a link there.

24       A.   Yeah.

25       Q.   And as a result of that scan you came

204

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1    up with -- the software came up with a list of

2    accessibility issues?

3         A.   Yes.

4         Q.   No. 1 says:  191 pages with a form

5    control missing a label.  This means that the

6    form will be inaccessible to blind students since

7    the screen reading software cannot determine the

8    meaning of that form control.

9              When did you perform this scan?

10        A.   I believe it was in late July -- it's

11   on -- if you follow the link, you can get the

12   exact date.

13        Q.   Thank you.  Is there accessibility to

14   computerized information by means other than a

15   screen reader?

16        A.   For people who are blind?

17        Q.   Yes.  You told us of several:

18   Braille, Braille can make information accessible.

19   Readers can make it accessible.

20        A.   A screen reader for -- yeah, screen

21   readers are the only way -- screen readers can

22   output Braille.  They can produce refreshable

23   Braille.

24        Q.   I agree.  I just asked a simple

25   question is a screen reader the only way to

                                              205

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1    access electronic information for a blind person?

2         A.   Any electronic information or

3    web-based?

4         Q.   Access electronic information.  I'm

5    not limiting it to web.

6         A.   Oh, okay.  So for blind people, well,

7    for desktop operating systems I guess I have to

8    qualify it, because if you're using like a cell

9    phone or other pervasive technology, there's

10   other techniques.  I guess they're still

11   considered screen readers.

12        Q.   I'm not asking if it's only screen

13   readers.  I'm asking aren't there other

14   methodologies, other than screen readers, to

15   access electronic information for sight-impaired

16   individuals?

17        A.   So any electronic information?

18        Q.   Yeah.

19        A.   Are you talking about software that's

20   designed specifically for the blind to do the

21   tasks?

22        Q.   Is there a way for a blind person to

23   get information that's provided in an electronic

24   format other than by a screen reader?  And the

25   answer to that has to be yes.

                                            206

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

```
 1              MS. KREVOR-WEISBAUM:  No.  Objection.
 2              THE WITNESS:  Well, I guess one common
 3     example is DAISY books.
 4     BY MR. CLEELAND:
 5         Q.  How about a reader who sits next to
 6     the person and reads it to them that now makes it
 7     accessible to the student, correct?
 8              MS. KREVOR-WEISBAUM:  Objection.
 9              THE WITNESS:  Surrogates, yes.
10     BY MR. CLEELAND:
11         Q.  There we go.  So it can be surrogates,
12     it can be Braille, correct, not just a screen
13     reader?  It can be hard copy Braille.  Right?
14         A.  So convert the electronic materials to
15     another format.
16         Q.  How about that?  I just asked if there
17     were other methods.
18         A.  Yeah, there are other methods.
19         Q.  Okay.  Point 5 on page 7 you state:
20     The evaluation of six randomly selected PDF
21     documents.
22              How were they randomly selected, sir?
23         A.  Well, there were a lot of them.  FAEs
24     identifies the location of PDF documents.  That
25     doesn't necessarily tell you if they're
```

207

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1  accessible or not, so I tried to pick some

2  related to student services and financial aid,

3  because I figured that would be places that

4  students would go, more likely.

5      Q.   But it wasn't a random generator from

6  the computer.  Was it?

7      A.   No.

8      Q.   It was just you randomly selecting --

9      A.   Yeah, I just picked six.

10      Q.   Got it.  Only one of the six that you

11  selected was accessible through proper tagging of

12  the document content.  Right?

13      A.   Correct.

14      Q.   And that's in your report.  Correct?

15      A.   Yes.

16      Q.   The next paragraph with respect to

17  John, J-o-h-n, Al-Amin, A-l-A-m-i-n, testified

18  that the contract for developing the new website,

19  what website was that, sir?

20      A.   The LACC website.

21      Q.   Is it a particular program that

22  operates it?

23      A.   I believe it was just a general

24  website that when you go to the URL, you see the

25  web page.  That was my understanding.

208

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1      Q.    Based on what?

2      A.    His testimony.

3      Q.    Indicating developing the new website

4  required that it be accessible, but there was no

5  reported verification that the website was

6  accessible when it was delivered.

7            Was there a verification that it was

8  not accessible at the time it was delivered?

9      A.    There was no information on how they

10 verified it, and that's why I ran this report,

11 and I found accessibility issues that were fairly

12 easy to find form control labelling.

13           All automated tools will tell you if a

14 form control doesn't have a label.

15           It was unique, though, that all of the

16 all text had -- all of the images had all text,

17 so it seemed to be something that the developer

18 took as an accessibility issue so...

19     Q.    Do you know who developed it?

20     A.    I don't recall the name of the

21 developer, no.

22     Q.    Under MyMathLab, the first sentence

23 reads:  The limited documentation I could find

24 online about the accessibility features of

25 MyMathLab.  What did you find?

                                                    209

1     A.   I found a document related to screen

2  reader information using MyMathLab with a screen

3  reader, and I couldn't find the link again.  To

4  my detriment, I couldn't, so I don't know, it's

5  probably not very useful information, but it

6  talked about a command line interface and having

7  to use a lot of specialized formatting features

8  to get the screen reader to enter information

9  which seemed like it would require training.

10     Q.   How much time did you spend on trying

11  to find online accessibility features for

12  MyMathLab?

13     A.   I just went to the MyMathLab website.

14     Q.   How much time?

15     A.   Oh, probably a half hour, an hour the

16  first time, and I couldn't find the link again.

17          MR. CLEELAND:  Let me go off the

18  record for just a moment.

19          (At this point a short recess was

20          taken.)

21  BY MR. CLEELAND:

22     Q.   Under MyMathLab we spoke about your

23  ability to find limited documents, so on that

24  same paragraph it states:  It is also unlikely

25  that instructional assistive information

210

1   technology staff in the library is familiar with

2   this type of interaction with MyMathLab.

3            What's that based upon, that

4   statement?

5       A.   I just was reading the documentation,

6   and there was a lot of specialized character

7   input that had to be done.  I'm assuming it was

8   much different than what the other students -- I

9   couldn't imagine other students having to do

10  this, and so if it wasn't something that was

11  commonly done, it would probably require a

12  special skill, so that's what I based it on.

13      Q.   I apologize if I asked this question.

14  Have you spoken to Mr. Payan?

15      A.   No.

16      Q.   Have you spoken with Ms. Mason?

17      A.   No.

18      Q.   On page 8 we get back to this

19  recurring theme.  It states:  Mr. Payan was

20  encouraged to move to a section of his math

21  course that did not use MyMathLab even though

22  MyMathLab was considered important for students

23  in remedial math classes.

24            What course are we talking about

25  there, sir?

                                            211

1          A.    124A and B.

2          Q.    But he was asked to move from 125.

3    Right?

4          A.    Right, into 124A and B.

5          Q.    And we discussed that 124A and B

6    covers the same materials as 125 but over a

7    greater period of time.  Right?

8          A.    Right.

9          Q.    That's additional time for the

10   student.  Right?

11         A.    Right.

12         Q.    You continue, the next paragraph, you

13   read a portion of the paragraph, that being the

14   block quote earlier, but you state:  The

15   requirements are defined in the LACC Alternative

16   Media Production Policy which, based on viewing

17   the PDF properties, was first available in 2008.

18              Where did you get that information?

19         A.    I looked at the PDF that the document

20   came from.  I looked at the properties, and it

21   said 2008, so I assume that it was available

22   then, but there was no information in the

23   document saying was it made available or made

24   public or whatever, so that's how I found out

25   about it.

212

1      Q.   Thank you.  Below that quote you

2   state:  Despite these directives, I did not see

3   any policy or procedure that describes how

4   accessibility of instructional technology should

5   be evaluated as part of the procurement process

6   or whether accessibility is even considered in

7   procuring technology.

8           How much time did you spend on that

9   inquiry?

10      A.   I read all the depositions from the

11   administrators, and the only one I recall where

12   they talked about specifically concrete

13   accessibility issues was related to captioning

14   technology and making sure that -- specifically

15   hardware that would support captioning for

16   videos, if they were being projected by

17   projectors and things.

18           I was a little surprised that there

19   wasn't people talking about here's our procedures

20   for evaluating software, how we compare, if we

21   have problems how we talk to the -- whoever

22   produced the software to address problems and fix

23   it, and they also referred people like, okay, the

24   head of LACCD, the district, said he was

25   relying -- he thought it was really kind of the

213

1    job of the ADA coordinator for the district to be

2    handling these issues, and what's even more

3    surprising, he had actually been trained in how

4    to use screen reader technology.

5            He had taken some course through the

6    University of California Northridge and had

7    interacted with screen reader people or used

8    screen reader and still, I guess, didn't have --

9    at least he didn't state how, you know, the

10   importance of the software or a website having

11   features for accessibility.

12           I don't know if they covered that in

13   that course or not, but he seemed to have, at

14   least in the previous experience, intimate

15   knowledge of how a screen reader worked or

16   knowledge of people using screen readers.

17       Q.   You made one state chancellor very

18   happy, another one displeased, this California

19   State University Northridge?

20       A.   Okay.

21       Q.   Getting back to looking for the

22   policies and procedures from whatever source, how

23   much time did you actually spend looking for

24   policies and procedures?

25       A.   I read the depositions.  I didn't see

                                                    214

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1    any procedures, or when asked about it, they

2    basically said I thought somebody else was taking

3    care of it.

4         Q.   By policy do you mean a written

5    policy?

6         A.   Again, I guess my use of the word

7    policy includes both what you've described as

8    policy, I also call it implementation, so I guess

9    it would be -- what I would be looking for --

10   certainly LACC and LACCD had policies, but there

11   was no implementation plan that I found, and so,

12   in retrospect, I probably should have talked

13   about implementation plan rather than policy.

14   That's my...

15        Q.   You'll be cursing me for days, but we

16   do ask questions for that specific reason.

17             The same answer with respect to the

18   word procedure in that clause?

19        A.   Procedures I think would be more my

20   intent of implementation plan or how they

21   actually implemented the policy.  Okay, we have

22   this policy that information technology should be

23   accessible.

24             Well, how did you ensure to do that?

25   What were the procedures that you used?  How did

215

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1    you collect information from vendors?  How did

2    you verify that the information that you received

3    from vendors was correct?  Did you do testing

4    with actual people with disabilities to see if

5    there were functional accessibility issues, and

6    if there are issues, how was that fed back to

7    companies so that they were aware that they may

8    need to make corrections.

9         Q.   At the University of Illinois are you

10   aware of programs where actual instructors

11   observe blind students utilize accessible

12   technology?

13        A.   Are there times when instructors

14   actually observe people?  Yes.

15        Q.   What are the circumstances of that?

16        A.   We have several blind students, and

17   faculty members I know were aware and watch

18   them -- I don't have specific things off the top

19   of my head.

20        Q.   Did you ever observe an instructor

21   observe a student utilizing accessibility

22   software and that student was blind?

23        A.   Well, just a couple weeks ago we had a

24   meeting with a graduate student who is blind, and

25   they were -- we were looking at some software

                                                   216

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1    that they had used to help with tracking student

2    progress, and we had the person who was in charge

3    of that program --

4          Q.   I asked about instructors.

5          A.   I believe she was a faculty member.  I

6    didn't ask her specifically.

7          Q.   I'm just trying to truncate some of

8    these things, but if you need to give more

9    information, that is great.

10              Are you aware of any program at the

11   University of Illinois where it's structured that

12   in the acquisition of accessible software for

13   blind students instructors actually participate

14   in the selection and observe blind students

15   utilize that software before the software is

16   selected?

17         A.   This is software specifically for

18   blind people?

19         Q.   For blind people.

20         A.   I'm not sure of any software that's

21   purchased specifically for blind people.

22         Q.   Well, how about for use by blind

23   people?

24         A.   I'm not aware if faculty members have

25   observed that, no.

                                              217

1        Q.    Thanks.  On page 9, the second

2   paragraph it states:  Mr. Mata, Mr. Walden, it

3   starts there.  It says:  All testified that they

4   operate under the erroneous assumption.

5           They didn't say it was an erroneous

6   assumption, did they?

7        A.    No.

8        Q.    So you concluded it was an erroneous

9   assumption?

10       A.    Yes.

11       Q.    That electronic resources are

12  accessible unless they are advised to the

13  contrary.

14          Did anybody in that list say that?

15       A.    No.

16       Q.    You continue:  In my experience --

17  we're now talking about you.  Correct?

18       A.    Yeah.

19       Q.    The opposite is almost always true.

20  What do we mean by almost always?

21       A.    In my experience when we've had

22  opportunity to evaluate software before it's

23  purchased that all of the software options had

24  accessibility issues.

25       Q.    Every one of them?

218

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1        A.   Yes.

2        Q.   How about today, that's still true?

3        A.   Yes, it's still predominantly true.

4        Q.   When you say predominantly, what do

5   you mean by predominantly?

6        A.   Well, some people treat accessibility

7   as on/off.  It's either accessible or

8   non-accessible, which I think is a

9   mischaracterization of accessibility

10  oversimplification.  Maybe that happens in legal

11  roles a lot.  I don't know.

12       Q.   No, never.

13       A.   So it's an over -- so we work with

14  companies -- some companies have obvious

15  accessibility issues, sometimes called show

16  stoppers.  People just can't do the task.

17            Other things are more difficult, and

18  other things make it more -- make it easier, but

19  in general there's a lack of understanding, I

20  think, by the people creating this technology

21  what they need to do to make things accessible,

22  and so I think the longer term -- the real

23  solution is not necessarily, oh, there's a -- a

24  lot of people think -- I think there's an

25  overgeneralization that people think, oh, there's

219

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1    an accessible version of the software.  You just

2    didn't choose it.

3              And I've never found that to be true,

4    and -- at least in my experience, so the real

5    question to me is how do we start to build a

6    system where companies actually understand what

7    the accessibility issues are, which is what

8    universities have students with disabilities, so

9    the ability to articulate the problems and work

10   with companies and to make that a priority on

11   accessibility is I think where we need to go if

12   we actually want to provide this, you know, ideal

13   of creating -- having equal access to electronic

14   resources, so it's -- but, you know, I think

15   there's a lot of -- and I didn't see anywhere in

16   their testimony where -- what their procedures

17   were, what they did if they found accessibility

18   problems.

19             I mean the only thing I recall

20   specifically was when Ryan Kushner had a phone

21   call with the MathLab people to discuss

22   accessibility, and Ryan didn't decide to purchase

23   that software, you know, the math department did.

24             And while it sounded like there was

25   some consideration of accessibility, it wasn't

220

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1   clear how accessibility was considered as a part

2   of that process.

3        Q.   In your report you state that the

4   people creating and licensing those resources,

5   that being the accessibility software, have

6   little knowledge of accessibility.

7             What do you base that on?

8             MS. KREVOR-WEISBAUM:   What page are

9   you on?

10   BY MR. CLEELAND:

11        Q.   Still on the same page, the same

12   paragraph, three lines down.

13        A.   Maybe I -- at least they didn't state

14   any knowledge of accessibility in the

15   depositions.

16        Q.   Well, who is they?

17        A.   Okay.

18        Q.   It's one, two, three, fourth line,

19   five words in:  for people creating and licensing

20   those resources, it sounds like the publishers

21   have little knowledge of accessibility.

22        A.   Well, there was accessibility

23   problems, so I'm assuming that if they knew about

24   accessibility that they would have used those

25   features.

                                            221

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1      Q.   Well, are you talking about your

2    vendors, the publishers?

3      A.   The vendors, right.

4      Q.   So the people creating and licensing

5    those resources have very little knowledge of

6    accessibility.  Upon what do you base that

7    statement?

8      A.   The depositions of the accessibility

9    issues that were reported.

10     Q.   But the people who testified weren't

11   vendors and weren't publishers, correct?

12     A.   Okay.  Let me reread this.

13     Q.   Above that, the line right above that.

14     A.   So in terms of creating, it would be

15   the people creating the software.  Licensing are

16   the people who decide to purchase the software.

17          That was what I intended.  I'm sorry.

18     Q.   So you're saying the people who create

19   the software and the people who buy the

20   software --

21     A.   Yeah.

22     Q.   -- have little knowledge of

23   accessibility.  Okay.  I'll bifurcate the

24   licensing aspect.  I want to talk about creating.

25     A.   Okay.

222

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1          Q.   On what do you base your statement

2     that the people creating the software have little

3     knowledge of accessibility?

4          A.   I base it on the reports of the

5     accessibility issues that they found with the

6     software and the databases.

7          Q.   In this assignment?

8          A.   Yeah.

9          Q.   Anything else?

10         A.   No.  Well, personal experience I know

11    that most companies don't understand

12    accessibility, but -- so it's -- part of that

13    sentence is my own personal experience and

14    knowledge working with companies.

15         Q.   And by your own experience is it true

16    that most universities and colleges don't

17    understand accessibility?

18         A.   Yes, there's a lot of people that

19    don't understand accessibility in universities

20    and colleges too, but that's not in there.

21              Well, it is, it is in there.  That's

22    part of -- I think the problem here is that there

23    weren't enough people who understood what

24    accessibility was, either the client or the

25    people making the purchasing decisions.

                                                   223

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1      Q.   Do you understand all aspects of

2  accessibility for blind students and software?

3      A.   All aspects?

4      Q.   Yes, sir.

5      A.   I understand, yeah.

6      Q.   You understand all aspects?

7      A.   Some I know better than others, yes.

8      Q.   Are there any areas of accessibility

9  for blind students on software you don't

10 understand?

11     A.   I guess you don't know what you don't

12 know.

13     Q.   I agree.

14     A.   So there might be some I don't that

15 I'm just not aware of.

16     Q.   So your answer is limited to your

17 universe of knowledge.  Correct?

18     A.   Uh-huh, I'm just basing it on my

19 experience.

20          There may be other things that I don't

21 know about, so -- that maybe you do or other

22 people do that I don't know but...

23     Q.   It continues:  These vendors, these

24 are the people who market the software you're

25 talking about.  Correct?

                                            224

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1      A.    Yeah.

2      Q.    Need clients, including LACCD, to

3  clearly state their requirements that products be

4  accessible and receive specific feedback.

5           So I can take the first part of that:

6  To clearly state their requirements that products

7  be accessible.

8           Did you see the RFP for the software

9  in this case?

10     A.    I don't recall.

11     Q.    If it says that the product must be

12 accessible for blind students or disabled

13 students, would that meet the requirement to

14 clearly state the requirements the product be

15 accessible?

16     A.    Could you repeat the question?

17     Q.    Sure.  Again, back to your comment, it

18 says:  These vendors need clients, including

19 LACCD, to clearly state their requirements that

20 products be accessible.

21          If the request for proposal or

22 contract or whatever from the school in this case

23 says what we buy from you must be accessible,

24 does that language meet your statement identified

25 in this report?

                                              225

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1        A.   No.  It would have to have more

2   information on what the definition of

3   accessibility meant for that particular RFP, so

4   reference to a standard like W3C web content

5   accessibility guideline, or Section 508,

6   information technology accessibility standards,

7   or if the place like -- like the state of

8   Illinois has the Illinois Information Technology

9   Accessibility Act, those are a set of standards

10  or their own internal standards where they would

11  articulate what they consider accessibility

12  means.

13        When there's vague language, like must

14  be accessible to X, that leaves a wide range of

15  interpretation.  I actually think that when I

16  talk to companies and I say it's part of a

17  standard or something, I encourage people to put

18  in RFPs have you actually tested the software

19  with users of assistive technology, especially

20  screen readers, and if a company has done that,

21  then I know that they probably not only met the

22  letter of the law, but they're also actually

23  trying to figure out whether the software is

24  usable or not.

25        And the other question I asked of

226

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1   people that's not part of any standard or RFP,

2   but I encourage people to employ with people with

3   disabilities in their company so they actually

4   have people with disabilities in which to

5   understand more about the experience of

6   disability and how that impacts software design,

7   although I know those latter two things are not

8   something that people will put in an RFP, but

9   those are things I encourage people to do,

10   because that's really what we want people to

11   understand:  What is this experience of

12   disability and how do we design things to match

13   up to make the experience of disability as equal

14   as possible to people who don't use -- who aren't

15   using the assistive technology.

16          Q.   In your answer you made reference to

17   the state of Illinois and the alternative

18   standards.  Do different jurisdictions have

19   alternative standards?

20          A.   States are free to write their own

21   standards.  I think under -- many states have

22   their own accessibility standards.

23              For the state of Illinois they

24   developed the Illinois Information Technology

25   Standards that follow the Section 508

227

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1   requirements of everything except for web

2   accessibility where they developed a more hybrid

3   model between the minimal Section 508 standards

4   and the WCAG standards, which tend to be verbose,

5   and I know a lot of other people when they've

6   seen the Illinois state standards really like

7   them, because they provide a lot more clarity,

8   especially to developers in understanding how to

9   make stuff accessible.

10          The Illinois state standard is now

11   being updated to harmonize with the new Section

12   508 requirements, so they will be in sync

13   starting in January.

14      Q.   In that same paragraph you state:

15   There also appears to be no systemic feedback to

16   vendors regarding the accessibility issues

17   actually experienced by the student.

18          When you say there also appears, what

19   do you mean by that?

20      A.   Well, what I was just saying is I

21   didn't see anything in the depositions saying

22   that information on accessibilities had a path

23   back to these administrators or the

24   administrators had a path back to the companies

25   who were providing resources was my intent of

228

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1  those statements.

2       Q.   So your decisions are based upon what

3  was made available to you.  Correct?

4       A.   Yes.

5       Q.   Then you state:  Without this type of

6  administrative accountability, vendors will not

7  prioritize accessibility issues.

8            Are you such a vendor?

9       A.   Am I such a vendor?

10      Q.   Yep.

11      A.   No.

12      Q.   How do you know vendors will not

13  prioritize accessibility issues?

14      A.   Well, can I tell a story?

15      Q.   Sure.

16      A.   Well, back when we were working with

17  Blackboard, I don't remember the specific dates,

18  Hadi Rangin, my colleague and I were leading a

19  group talking to Blackboard about accessibility,

20  and we were trying -- we were mainly talking to

21  their user interface people and some of their

22  marketing people, and we were kind of getting

23  frustrated, because we couldn't talk to their

24  engineers about specific issues and how to fix

25  the issues.

                                                    229

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1             Then one day all of a sudden they said

2     we're bringing our engineers to the next call.

3     We were about ready to give up.  We didn't feel

4     we were making any progress.  They weren't taking

5     our feedback seriously.

6             I thought, well, wow, we must have

7     really done something on this last call to tell

8     them that, hey, we're -- you know, somehow

9     motivated them.  I don't know what it was.

10            But then I went to the CSUN

11    conference --

12            COURT REPORTER:  To the what

13    conference?

14            MR. CLEELAND:  C-S-U-N.

15            THE WITNESS:  California State

16    University at Northridge has a technology and

17    accessibility conference every year, and I

18    learned that the California State University

19    system had put Blackboard on the do not buy list

20    because of accessibility problems, so I mean I'm

21    not a big math genius, but I put two and two

22    together.

23            It really wasn't what we were telling

24    them.  It was because the California State

25    University system basically put them on a do not

                                                      230

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1   buy list, and now that was a concern to the

2   company.  They didn't want to be put on a do not

3   buy list, and all of a sudden accessibility and

4   learning about accessibility was a high priority

5   for them.

6            That was probably my biggest example

7   of where I've seen, you know, administration...

8   BY MR. CLEELAND:

9       Q.   Did anybody at Blackboard tell you

10  that that motivated them to do that?

11      A.   No.

12      Q.   So this is a conclusion you drew from

13  the material available to you.  Is that right?

14      A.   My poor math skills, yes.

15      Q.   I hope your math skills are better

16  than mine.  It wouldn't take much.

17           On that same page, the last full

18  paragraph talks:  From the review of documents

19  and deposition testimony, I was unable to

20  identify any person with training and knowledge

21  who was responsible for ensuing -- I guess it's

22  ensuring, I apologize, that the policy requiring

23  accessible technology and content is being

24  implemented and practiced.

25           Is that a conclusion based upon

                                              231

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1    materials you're aware of or a conclusion drawn

2    based upon the absence of information?

3         A.   I guess it's two places of

4    information.  I didn't see about any training or

5    things from the administrators.

6              They seem to rely on Ryan Kushner, and

7    then in his testimony what concerned me most is

8    he didn't feel like he was adequately trained to

9    actually do evaluations of the software.  I mean

10   he was familiar with assistive technologies, how

11   they worked, so I didn't see any information that

12   they had training or that they were getting

13   training or that they had specific standards or

14   features that they were using to evaluate and

15   rate software, and then when -- other than they

16   would refer things to Ryan Kushner and then in

17   his testimony he stated while he did those things

18   on kind of an informal basis, he stated at one

19   point that he didn't really feel qualified to be

20   doing these types of evaluation.

21        Q.   My inquiry is I was unable to

22   identify.

23        A.   Yeah.

24        Q.   That seems to me to say I didn't find

25   anything that said X.

232

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1        A.    Yeah.

2        Q.    Did you find anything that didn't say

3    X?

4        A.    Just the statement by Ryan Kushner.

5        Q.    Okay.  You continue:  The barriers

6    addressed in my report, that's the document that

7    consists of 11 pages and an attachment that we've

8    been talking about?

9        A.    Well, can I go back to your previous

10   question?

11       Q.    Sure.

12       A.    I think the person's name was Mata,

13   the LACC district guy.  He stated that he really

14   thought the accessibility stuff was the ADA

15   coordinator's job and that really wasn't part of

16   his job.

17             He talked a lot about his -- his

18   understanding of his responsibility was to make

19   sure that the assistive technology was in the lab

20   and network and working.  It didn't -- he didn't

21   say anything about his responsibility for making

22   sure the software that was put on the computer

23   had features that were accessible to people using

24   screen readers, so it's still an absence, but he

25   kind of -- from what I recall he thought that the

233

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1    ADA coordinator was responsible for this other

2    stuff.

3         Q.   So that's information that someone is

4    responsible.  Right?

5         A.   That was his -- but he said the other

6    person was.

7         Q.   I got it.  So that's information --

8    you were unable to identify any person.  You just

9    now told me there is a person who said somebody

10   is responsible for that.

11             MS. KREVOR-WEISBAUM:  Objection.

12   BY MR. CLEELAND:

13        Q.   Right?  Isn't that what you just told

14   me?

15        A.   From the deposition he said somebody

16   else was responsible.

17        Q.   Right.  So the comment you were unable

18   to identify any person is not accurate based upon

19   your work.  Is that correct?

20        A.   Correct.

21        Q.   Back to the bottom of that paragraph:

22   The barriers addressed in my report, that's the

23   report dated October 2nd, 2017, that we've been

24   talking about for these several hours.  Correct?

25        A.   Yeah.

                                             234

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1        Q.   And Peter Bossley's, I assume you're

2   referring to Mr. Bossley's report.  Right?

3        A.   Yep.

4        Q.   And you never read Mr. Bossley's

5   report?

6        A.   No, I haven't.

7        Q.   You're only relying upon what the

8   lawyers for the plaintiffs told you concerning

9   his report.  Right?

10       A.   Yes.

11       Q.   I apologize for dragging this out.

12            Inevitable, what do you mean by

13   inevitable?  Could happen?  Can't be avoided?

14       A.   Yeah.  It's going to continue to be a

15   problem, yeah.

16       Q.   Inevitable means it's going to happen?

17       A.   Right.  It's going to happen.

18       Q.   Can it be corrected?

19       A.   I hope so, yes.

20       Q.   So that is an inevitable?

21       A.   Unless there's a correction, yes.

22       Q.   LACCD cannot deliver equal access or

23   engage in equally effective communication.

24            In all circumstances?

25       A.   No.

                                              235

1      Q.   Okay.  Please tell me the

2  circumstances that LACCD cannot deliver equal

3  access or engage in equally effective,

4  communication with blind students.

5      A.   Electronic and online materials.

6      Q.   Okay.  Anything else?

7      A.   That statement was basically for the

8  administrative electronic materials, yes.

9      Q.   It says cannot deliver.  Cannot means

10  they're unable to deliver.  Is that what you

11  intended to say?

12      A.   Yes.

13      Q.   Okay.  So with the system that LACCD

14  presently has, they cannot deliver equal access

15  to a blind student.  Is that right?

16      A.   Yes.

17      Q.   And you told us of all the

18  circumstances you believe Mr. Payan was faced

19  with unequal access.  Correct?

20      A.   Yes.

21      Q.   Any others, that you're aware of?

22      A.   No.

23      Q.   And you told us about all of the

24  situations where Ms. Mason was faced with unequal

25  access.  Correct?

                                               236

1        A.   Yes.

2        Q.   Any other examples?

3        A.   No.

4        Q.   So we've got them all in your

5   deposition today.  Right?

6        A.   Yes.

7        Q.   Or engage in equally effective

8   communication.  What examples are there where the

9   LACCD failed to engage in equally effective

10   communication for blind students?

11        A.   Well, we talked about the registration

12   system and the Etudes and the Canvas and the

13   MyMathLab software are the ones that I'm aware

14   of.

15        Q.   Okay.  Registration --

16        A.   And the website had accessibility

17   problems with -- the LACC website had

18   accessibility problems.

19        Q.   Which website?

20        A.   The one I put in the report a link to

21   it.

22        Q.   It changed.  Which one did you

23   originally have?

24             MS. KREVOR-WEISBAUM:  Objection.

25

237

1          THE WITNESS:  It changed?

2     BY MR. CLEELAND:

3          Q.   Did you know that?

4          A.   Yeah, this morning I did review the

5     website.

6          Q.   So before you walked into this

7     deposition today, you knew that the LACC website

8     had changed during the time of your involvement

9     in this case.  Right?

10          MS. KREVOR-WEISBAUM:  Objection.

11          THE WITNESS:  Yes, I did.

12     BY MR. CLEELAND:

13          Q.   Okay.  So you knew.  And I'm just

14     asking you which one of the websites are you

15     talking about in your report?

16          A.   The previous one.

17          Q.   Okay.  So the prior website.  And how

18     was it unsuccessful in providing equal access or

19     equally effective communication to blind

20     students?

21          A.   I listed the specific items in the

22     report.

23          Q.   Was that the bullet points?

24          A.   No.  That would be some of them.

25     There's probably more.

238

1      Q.   I need to know all of them.

2      A.   Well, these are the ones that I

3    identified in the report.

4      Q.   Okay.  Are you aware of any others

5    beyond what's in your report?

6      A.   On the old website?

7      Q.   We're talking about the old website

8    now.

9      A.   No, I'm not aware of any others from

10   the old website.

11     Q.   How about the new website?

12     A.   I have not had time to completely

13   review all of the accessibility features.

14     Q.   Do you have any opinions with respect

15   to the present website for the LACC campus?

16     A.   I did run a report on FAE this morning

17   on it, and it looked like a lot of the

18   accessibility patterns were still present.

19          I did take some notes by analyzing the

20   homepage this morning, which I showed you earlier

21   today.

22     Q.   Did you bring that research analysis

23   that you did, the FAE?

24     A.   No, I didn't.

25     Q.   Okay.

239

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1      A.   I can send you the link, though, if
2    you'd like it.
3      Q.   Is there some reason you didn't bring
4    it with you today?
5      A.   That actually took a lot of time, so
6    it actually didn't complete until just about
7    before this, so I kind of looked at it briefly to
8    look to see -- compare the two reports before, so
9    I really didn't have that much time, but it
10   looked like for a lot of things there were
11   similar patterns, but I didn't have time.
12     Q.   When did you become aware of the fact
13   that there was a new website for LACC?
14     A.   This morning.
15     Q.   Is there some reason that you did
16   something that allowed you to gain that
17   information?
18     A.   Well, since I had a report on the
19   current website I thought you might be asking
20   questions about it, and one of the wonderful
21   things about the web is that it's constantly
22   evolving and changing things, and so a report two
23   or three months ago might be out of date,
24   depending on what happened in the intervening
25   time, so accessibility can be -- so I thought I

240

```
 1    would at least look to see how much would be

 2    changed or different.

 3              I have not had time to do a complete

 4    analysis of the accessibility issues of the new

 5    website, but some of the same problems still

 6    exist and somewhat misunderstandings about how

 7    accessibility worked -- or I found this stuff

 8    this morning.

 9         Q.   Are you aware of successful blind

10    students at LAC college?

11         A.   No.

12         Q.   Are you aware of people -- blind

13    students who are very successful on the very

14    courses that Mr. Payan took?

15         A.   No.

16         Q.   Are you aware of very successful

17    students that took the same courses that

18    Ms. Mason took?

19         A.   No.

20         Q.   In your studies, experience,

21    background, training, and abilities have you been

22    able to determine whether there is an explanation

23    for two students with the same disability, total

24    blindness, take the same course, have the same

25    material, and get different grades?
```

241

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1         A.    Do I know why that happens?

2         Q.    Have you done any work on that?

3         A.    No.

4         Q.    Okay.  Do you know why it happens?

5         A.    No.

6         Q.    Have you found that to be the case in

7    your courses, either taken or given?

8         A.    No.

9         Q.    Have you had any course either you

10   participated in as a student or that you taught

11   in any capacity where you had two blind students

12   in the class?

13        A.    No.

14        Q.    Have you ever had a course where you

15   had any blind students in the class?

16        A.    Yes.

17        Q.    How many times?

18        A.    I don't recall off the top of my head.

19        Q.    Okay.  More than two?

20        A.    Yes.

21        Q.    The same class?  The same course?

22        A.    No.

23        Q.    You never had a blind student or more

24   than one blind student take the same course

25   material, even though at different times?

242

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1          A.    No.

2          Q.    Because I think you said you taught

3     two courses by name.

4          A.    In the semester long courses I've not

5     had blind students in those courses, no.  I've

6     had -- in workshops and other things I've had

7     blind participants.

8          Q.    Do you give grades in those workshops?

9          A.    No.

10         Q.    Okay.  Let's limit this question or

11    group of questions to courses or presentations

12    where grades are given out.  Okay?  Have you ever

13    had a blind student in any course where you've

14    given a grade?

15         A.    No.

16         Q.    Have you done any studies to determine

17    the capacity of blind students to accept

18    information in different formats?

19         A.    No.

20         Q.    Have you ever been in a class where

21    one student, not necessarily blind, one student

22    did really well and another one didn't?

23         A.    Yes.

24         Q.    The same information was available to

25    both of them.  Did you still have the experience

                                                      243

1    where one did very well and one didn't?

2         A.   Yes.

3         Q.   Have you reached any conclusions as to

4    why this occurs?

5         A.   No.

6         Q.   Did you ever do well in a class when

7    your friends didn't?

8         A.   That's a long time ago.  There was

9    certainly large courses that I took.  I never

10   thought of the question that way.

11           My friends, I did better in some

12   courses, yes, than some of my friends, yes.

13        Q.   Okay.  Did you ever try to figure out

14   why you did better than those friends in those

15   courses?

16        A.   No.

17        Q.   Have you found that some students just

18   have inherent abilities that are greater than

19   other students?

20        A.   Yes.

21        Q.   Have you ever found that to be an

22   explanation as to why students get particular

23   grades?

24        A.   I don't know.

25        Q.   You've never given that any thought at

                                             244

1    all?

2          A.    No.

3          Q.    Have you ever wondered -- let me back

4    up.

5               When you took your educational

6    courses, did you take any courses where

7    professors explained their grading system?

8          A.    Yes.

9          Q.    So you knew what you had to do to get

10   a particular grade.  Is that right?

11         A.    Yes.

12         Q.    And in every case where the professor

13   told you what you needed to do to get a

14   particular grade did you do all those things?

15         A.    Yes.

16         Q.    In every course?

17         A.    In every course?

18         Q.    In other words, you take 30 courses

19   when you're in college or more.

20         A.    Yes.

21         Q.    And the professor said if you do this,

22   this, and this, you'll get a particular grade.

23               Did you always do everything the

24   professor told you to do to get the highest

25   possible grade?

                                                245

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1      A.   I don't recall a professor talking

2   about that.  They would talk about their grading

3   systems.  There was exams.  There was homework.

4   There were quizzes, and they would talk about how

5   they used that information to compute a grade for

6   the course.

7           I think -- so what I recall is that

8   typically there were some professors who were

9   much more explicit about that than others.  I was

10   in engineering classes mostly, so a lot of the

11   courses it was easier to grade with numerical

12   scores than it was with courses that were more --

13   required more interpretation, like writing

14   courses and things.

15      Q.   Because there's generally a right

16   answer in engineering.  Isn't there?

17      A.   When they give tests, yes, there's a

18   right answer, and there's a wrong answer, at

19   least the professor has a right and wrong answer.

20      Q.   And did you find any occurrences where

21   you gave an answer that the professor thought was

22   incorrect?

23           MS. KREVOR-WEISBAUM:  Objection.

24           THE WITNESS:  No.

25   BY MR. CLEELAND:

                                              246

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

```
 1          Q.   So you got a hundred percent on every
 2    score on every test in every class?
 3               MS. KREVOR-WEISBAUM:  Objection.
 4               THE WITNESS:  No.
 5    BY MR. CLEELAND:
 6          Q.   So, obviously, you provided
 7    information that some professors didn't give the
 8    highest grade to.  Right?
 9          A.   Yes.
10          Q.   Okay.  So there's information that you
11    have to give to the person who is providing a
12    grade?
13          A.   Yes.
14          Q.   And if you give all that -- in your
15    experience, if you gave all that information to
16    the person making the grade, did you always get
17    the highest grade in the course?
18          A.   I guess I don't understand the
19    question.
20          Q.   I can't figure out why it's difficult
21    for people to realize some students are smarter
22    than others.
23               MS. KREVOR-WEISBAUM:  Objection.
24    BY MR. CLEELAND:
25          Q.   Excuse me, there's no question yet.
```

247

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1    Some students do more --

2              MS. KREVOR-WEISBAUM:  That's the

3    point.

4    BY MR. CLEELAND:

5         Q.   There's no question yet, so he doesn't

6    have to answer yet.

7              Some people do more homework.  Some

8    people write more clearly.  Some people analyze

9    information more readily or accessible

10   information to make it consumable to their target

11   audience which is generally the professor.

12   Right?

13             Some students are better than other

14   students.  Is that a correct statement?

15        A.   I don't know.

16        Q.   You don't know that?  Is everybody in

17   every class that you've ever taught equal?

18        A.   I don't know the context that

19   you're --

20        Q.   Grades, we're talking about grades.

21   Does everybody get the same grade in every class

22   you've ever taught?

23        A.   No.

24        Q.   Okay.  So there's a delineation

25   between people in that course.  Right?

                                             248

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1          A.   Yes.

2          Q.   That's all I'm asking about.  Some

3    students get better grades than other students.

4    Is that right?

5          A.   Yes.

6          Q.   And some of those students have no

7    disabilities, yet they don't get as high a grade

8    as other students.  Is that correct?

9          A.   Yes.

10         Q.   Okay.  That's all I was asking for.

11              Back to the report, page 10, you start

12   by saying:  The following policies, procedures,

13   and training are necessary for post-secondary

14   school -- or a post-secondary school to provide

15   timely and equally effective communication to

16   blind students.

17              What do you mean by necessary?

18         A.   I believe I stated this before, they

19   have a big problem.  The capability of technology

20   to be accessible in its current level of

21   accessibility is a big gap, and the only way to

22   fill that gap is for people to learn more about

23   how to make technologies more accessible.

24         Q.   How about the capability of the

25   student?

249

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1          A.   My goal is --  I mean -- when

2     technology is more accessible or is accessible,

3     that allows the students to focus their energies

4     on learning the material rather than how to

5     figure out how the technology works, and so the

6     more time and effort the student has to figure

7     out what the -- how the technology works, what

8     it's supposed to be doing or if it works or

9     doesn't work is time that they can't spend

10    putting into the effort, so while there are

11    differences between students, I do know that if a

12    student is distracted and can't put their full

13    effort in the material, they're probably not

14    going to do as well in the course as if they can

15    put their full effort into learning the material,

16    so that's why accessibility to information

17    technologies is important, because a lot of

18    students have to be distracted with trying to

19    figure out whether they can access information or

20    trying to get access to information or to submit

21    information or to interact with the information.

22          Q.   Other than accessibility issues, was

23    Mr. Payan distracted during his time at LA City

24    College?

25          A.   I do not know.

                                                    250

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1          Q.    Other than her blindness, was

2    Ms. Mason distracted by anything while a student

3    at LA City College?

4          A.    I do not know.

5          Q.    The same question as to Mr. Payan for

6    any campus for the LA Community College District?

7          A.    I do not know.

8          Q.    The same for Ms. Mason.

9          A.    I do not know.

10         Q.    There are a lot of demands on a

11   student during the time that they're in school.

12   Right?

13         A.    Yes, so why make information

14   technology another one of them?

15         Q.    And there could be deaths in families.

16   Right?  Have you ever had a student with a death

17   in a family during a course?

18         A.    Not that I recall.

19         Q.    Okay.  Did you?

20         A.    Yes, my mom died when I was in

21   college.

22         Q.    Did that affect you in any fashion in

23   schooling?

24         A.    Yes.

25         Q.    Okay.  You would expect that, wouldn't

                                                      251

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

```
1    you?
2            Back to this necessary, so the
3    training -- procedures and training are
4    necessary.  Why is it necessary?
5            A.   I believe I just stated that there's a
6    big gap between how accessible technology can be
7    and what the current state is, so people have to
8    understand -- we have a human resource issue in
9    accessibility.  Not enough people understand
10   accessibility or the experience of disability, so
11   the only way I know for people to learn about
12   that is through training.
13           Q.   You mentioned a colleague up in
14   Washington State.  What was his name again.
15           A.   Hadi Rangin.
16           Q.   Is he blind?
17           A.   Yes.
18           Q.   How did he do in his courses?  Do you
19   know?
20           A.   I don't recall.
21           Q.   Does he have a professorship?
22           A.   No.
23           Q.   What does he do?
24           A.   He does a similar job that he did
25   here.  He works with vendors on accessibility of
```

                                                         252

 1    technology.

 2         Q.   And do you know what his educational

 3    level is?

 4         A.   He got a master's degree from Oregon

 5    State University.  He worked under Professor John

 6    Gardner there.

 7         Q.   Did he ever talk to you and say he was

 8    not given equal opportunity in school because he

 9    was blind?

10         A.   He did discuss issues of

11    accessibility, yes.

12         Q.   I said equal opportunity.

13         A.   I don't recall him talking about equal

14    opportunity, no.

15         Q.   Okay.  How long have you known him?

16         A.   Over ten years.

17         Q.   Have you talked to him about this

18    case?

19         A.   No.

20         Q.   On page 10 of your report, No. 11, you

21    state:  LACCD must perform an audit of current

22    educational technology and digital content to

23    determine where accessibility problems lie.

24              What do you mean by an audit?

25         A.   Basically review the current level of

                                               253

1    accessibility of the resources that are available

2    to students so that they can come to some

3    understanding of what their level of

4    accessibility is of these different technologies

5    and basically management.

6            Part of what management needs is to

7    understand, okay, where are our problems and to

8    develop a plan to remediate those problems.

9        Q.   You continue at No. 12:  LACCD must

10   develop and implement a remediation plan to

11   address the accessibility issues identified in

12   the audit.

13       A.   Yeah.

14       Q.   What's a remediation plan, in your

15   mind?

16       A.   Well, I think I've discussed this

17   earlier that basically you have to develop a

18   relationship with vendors of products where you

19   know there's accessibility problems, so you

20   understand the priority that you're placing on

21   fixing those problems and helping the vendor

22   understand where those problems lie, so

23   accessibility -- so if you want to fix the

24   problems, you need to, you know, know where they

25   are and develop a plan.

                                              254

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1          You've already mentioned that there

2    are resource issues involved with accessibility.

3    You mentioned that word resources several times.

4          Q.   So did you.

5          A.   And so LACC Community College I assume

6    has limited resources, but if this was a priority

7    for them to -- if the priority they have is

8    equally accessible -- well, -- well, I assume

9    management, they have plans and, you know, part

10   of being an administrator is developing plans to

11   fix problems when issues are identified, so in

12   addition to knowing that there's accessibility

13   you need a plan to be able to implement it, you

14   know, what's going to be our priority, what's the

15   biggest impact, and what kind of resources are we

16   going to need for each of these so...

17         Q.   When you talk about in No. 12

18   implementation -- I did it again, I apologize,

19   implement a remediation plan, is there a timeline

20   involved in that?

21         A.   The cases I'm familiar with that had

22   settlements there are timelines involved.

23         Q.   You're familiar with cases that there

24   have been settlements in?

25         A.   Penn State University is probably the

                                               255

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1    one I'm most familiar with.

2         Q.   How did you become aware of that?

3         A.   While they're part of the Big Ten

4    university I know Christian Johansen who is the

5    person that's kind of in charge of their

6    implementation plan.

7         Q.   What's your understanding as to the

8    timeline for Penn State?

9         A.   I believe it was -- I can't remember

10   off the top of my head, but I think it was a four

11   or five-year plan.

12        Q.   When did you become aware of that?

13        A.   That there was a plan?

14        Q.   Yes.

15        A.   2010, 2011.

16        Q.   That would seem the time for that plan

17   has passed.

18             Do you have any knowledge as to the

19   success of that remediation plan of Penn State?

20        A.   I've been to Penn State to do

21   workshops and for other events.  We had our Big

22   Ten academic alliance meeting there a few years

23   ago.

24             It seems like it's been pretty

25   successful, at least from what I know.

                                              256

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1          Q.   Pretty successful doesn't sound like

2     it was completely successful.  What did you mean

3     by pretty successful?

4          A.   Based on my knowledge, it's been

5     successful.  I guess if you want the details, you

6     would have to talk to Christian Johansen about

7     it, and I think he could give you a better

8     estimate of whether it's been successful or not

9     or other people at Penn State.

10         Q.   So you're not able to testify to

11    whether it was successful or not.  Correct?

12         A.   No.

13         Q.   Any other litigation that you're aware

14    of that had a timeline on it?

15         A.   No.

16         Q.   Okay.  So have you in your comment No.

17    12 talked about -- talking about implementation

18    of a remediation plan identified a timeline for

19    such a plan for this case?

20         A.   I did not.

21         Q.   On page 11 of your report, No. 15

22    states:  LACCD must ensure that college libraries

23    convert article and other inaccessible resources

24    to an accessible format for blind students when

25    requested.

                                                    257

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1              Do you have any example where
2   Mr. Payan asked for an article to be converted
3   that it wasn't converted?
4        A.   No.
5        Q.   Do you have any example of Ms. Mason
6   asking for an article to be converted where it
7   wasn't converted?
8        A.   No.
9        Q.   Do you have an example of any student
10  at the LACCD who requested a converted article
11  and it wasn't provided?
12       A.   No.
13       Q.   Why do you have No. 15 down here?
14       A.   I didn't see any policy.  Again, it's
15  the absence of information in the depositions.  I
16  didn't see any information in depositions of the
17  policy, what it was, what would happen if
18  somebody needed an article in the library, I need
19  an accessible version.
20              They did talk about having
21  technologies in the library for people to do it
22  themselves.  It didn't seem like there was any
23  process stated that people if they found an
24  article that was non-accessible to them a process
25  for getting that converted, since -- so it's an

                                              258

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1    absence of information.

2            And it's an important feature, I

3    think, because libraries are special places on

4    campus, because they're used by all students and

5    in a lot of classes, so that's why I put it in

6    there.

7        Q.   Under your publications the last I

8    could see was in 2007.  Have you had any

9    publications in the last decade?

10       A.   Yeah.  Last year I -- there was -- I

11   guess I don't have an exact term for

12   publications, but I did a paper with Jonathan

13   Lazar for a conference proceedings last year, and

14   like the conference I was in last week we had a

15   publication, Jonathan Lazar and I had a

16   publication related to accessibility, and there

17   was a proceedings from that conference, so those

18   are two in the last year.

19           I haven't had a lot of other

20   conference proceedings.  You can go over it, if

21   you want.

22       Q.   No, I think you've got it

23   chronological.

24       A.   I've been working a lot on tools

25   lately, so I haven't been doing as much.

                                              259

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

```
 1        Q.   It wasn't intended to be pejorative,
 2   just inquiring.
 3            But, also, the last one didn't
 4   identify a date.  If you give me this stuff, I
 5   tend to read it.
 6            So chapters, the last chapter you
 7   identified you prepared was in 2007, also about a
 8   decade.
 9        A.   Uh-huh.
10        Q.   Is that a yes?
11        A.   Yes.
12        Q.   It's entitled Web Accessibility:  A
13   Foundation for Research.  What did that deal
14   with?
15        A.   At that time I was working with
16   browser accessibility, so I was involved with the
17   user agent accessibilities guidelines.  I was the
18   chair of that working group for six years, I
19   think.
20            At that time the W3C web accessibility
21   initiative was first formed.  It was part of the
22   WC3 which is the worldwide web consortium.
23            Early on in that process accessibility
24   was identified as an issue that the worldwide web
25   consortium would be participating in as part of
```

260

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1    the development of web standards.

2            I guess how much do you want to know

3    about the worldwide web consortium?  I could go

4    on for a long time here.

5        Q.   I don't think I asked about the

6    consortium, but that's fine.

7            So, in other words, in 2007 there was

8    a concern with web accessibility.  Correct?

9        A.   Yes.

10       Q.   Are you still working on web

11   accessibility?

12       A.   Yes.

13       Q.   Are you still concerned about

14   accessibility for blind students on websites?

15       A.   Yes.

16       Q.   Has your specific recommendations for

17   web accessibility altered in any fashion between

18   2007 and today?

19       A.   Yes.

20       Q.   Why is that?

21       A.   Technology continues to change, both

22   the technology used to build websites and also

23   the technologies to make websites accessible.

24           The ARIA working group that I work on

25   has been working on the standards to make web

261

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1   technology accessible to people with

2   disabilities, and I think that started around

3   2002 by Rich Schwertdfeger at IBM, and that

4   continued -- it was originally proposed as a

5   repair language for fixing up web pages, but now

6   it's being fully integrated into HTML5

7   specifications as the way to describe

8   accessibility features on the web to people with

9   disabilities.

10          So it's been a very powerful

11   technology to define how browsers communicate

12   accessibility information to assistive

13   technology, and especially screen readers, and

14   it's important that people understand how this

15   technology works if it's actually going to

16   benefit people with disabilities.

17          Unfortunately, people only cherry pick

18   or don't completely understand how ARIA works and

19   start applying it without fully understanding it,

20   and so we have a lot of stuff that is becoming

21   less accessible probably because of people's

22   misapplication of this technology.

23      Q.   What you're talking about there is

24   communication between the computer presentation,

25   the screen, whatever, and the consumer, in this

262

1  case a blind student.  Right?

2       A.   Well, how the standards work is

3  that --

4       Q.   I apologize.  It relates to the

5  consumption of information presented in front of

6  a student or a consumer.  Correct?

7       A.   Could you restate the question?

8       Q.   Sure.  This doesn't deal with

9  communication between websites.  Does it?

10           MS. KREVOR-WEISBAUM:  What are you

11  pointing at?

12  BY MR. CLEELAND:

13       Q.   We've been talking about -- the whole

14  time about the 2007 chapter Web Accessibility:  A

15  Foundation for Research.  That's all we've been

16  talking about.

17           That talks about consumption by an

18  individual.  Correct?

19       A.   I'm sorry.  I misunderstood what we

20  were talking about.

21       Q.   It was my fault then.

22       A.   We got kind of off on some other

23  tangents.  It's been a while since I've looked at

24  that.  I believe it was talking about the role of

25  technology to make websites more accessible and

263

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1   the use of standards.

2       Q.   For consumption, right?

3       A.   Right.

4       Q.   Not website to website or server to

5   server?

6       A.   No.

7       Q.   Thank you.

8            The next article or chapter is

9   entitled Understanding National Research on Web

10  Accessibility for Persons with Disabilities.

11  Unfortunately, these aren't paginated, but

12  they're headed.

13           MS. KREVOR-WEISBAUM:  It's under

14  chapters.

15           THE WITNESS:  Under chapters.  Okay.

16  BY MR. CLEELAND:

17      Q.   There we go.  The second one,

18  International Research on Web Accessibility for

19  Persons with Disabilities, and the first author,

20  is this the person up in Washington?

21      A.   Terry Thompson, yeah.

22      Q.   I apologize, following the title it

23  says disabilities.  Is that the publisher or an

24  author, Mehdi --

25      A.   That's the editor.

264

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1       Q.    Got it.

2       A.    That was some -- basically Terry

3   Thompson used some of our FAE technology to

4   collect data on accessibility of higher education

5   websites, and he published it in this paper.

6       Q.    The next chapter was from 2004, and it

7   states Designing Universally Accessible WWW

8   Resources.

9       A.    That was related to how to create

10   accessible websites, all text for images, labels

11   for form controls, properties of headings.

12       Q.    And with the onward merging

13   technology, has that changed in the interim?

14       A.    Most of these basic things are still

15   important, but there's new technology now.

16       Q.    The same interest, new ways to do it,

17   right?

18       A.    Yes, and new ways to make things more

19   accessible too.

20       Q.    Further on in your list we have

21   workshops and presentations, and it starts with

22   2016.

23            Are these the kinds of things you

24   spoke about earlier where you have people in the

25   range between 24 and 80 people attend?

                                                265

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1      A.   No.   Those are for online classes I

2   would teach through the disability services

3   program.

4      Q.   For your workshops and presentation

5   courses, or whatever we call them, about how many

6   people attend these presentations you identified

7   in your paperwork?

8      A.   I don't take attendance, but the CSUN

9   room was filled, so there was probably 150 people

10   in there.

11      Q.   So another substantial audience of

12   people who are looking for information related to

13   accessibility.   Correct?

14      A.   Yes.

15      Q.   Do you take questions during these

16   presentations?

17      A.   Yes.

18      Q.   Do you usually get questions?

19      A.   Yes, people have questions.

20      Q.   On the page for 2014 it makes

21   reference to New Generation of Web Accessibility

22   Evaluation and Inspection Tools.   If I see new

23   generation, that makes me presume there's an old

24   generation.

25           Was there an old generation before

266

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1   2014 for web accessibility evaluation and

2   inspection?

3        A.   Well, I think one of the big changes

4   that's happened over the years early inspection

5   tools tend to look at the source code that was

6   provided by the server to find accessibility

7   problems, but with modern web applications source

8   code coming down from a server is not -- doesn't

9   accurately represent the content that the user

10  will get due to JAVA scripting and server side

11  requests to fill in content, and so one of the

12  big changes we did with the OpenAjax library

13  instead of analyzing the content that comes from

14  through the -- from the server, like the HTML, we

15  actually look at what's called a document object

16  model.

17            And then the document object model is

18  what is used to actually render graphically

19  what's on the screen, and so you can look at what

20  actually the user is seeing, so that's kind of

21  the new innovation there.

22       Q.   So web accessibility evaluation and

23  inspection tools continues to evolve.  Correct?

24       A.   Yes.

25       Q.   Under 2013 there's a presentation To

                                                      267

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1    Create Highly Accessible Web Resources.

2         A.   Yes.

3         Q.   What do you mean by highly accessible?

4         A.   They use the new ARIA technologies

5    correctly to accurately represent how people

6    interact with the website and to more efficiently

7    create interfaces that are more efficient and

8    representative of the information and the

9    interaction other people without sight

10   disabilities would be able to do.

11        Q.   Does that mean universally accessible?

12        A.   Well, the ARIA markup only goes so

13   far.  It's a technical specification.

14             In terms of universal, there's other

15   parts that go into that that includes

16   interpretation of all text for images,

17   alternative format information on the design and

18   layout and labelling of things.

19             These are the things that can't be

20   tested automatically, and so design -- for

21   something to be universally designed people have

22   to understand that, again, this experience of

23   disability, and the more people understand this

24   experience of disability, the more I think we'll

25   have more universally accessible websites, so the

268

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1  technical part of it in terms of how to apply the

2  technologies will relate to how universally

3  accessible something is.

4        Q.   Well, on this topic you were teaching

5  in 2013 or presenting to create highly accessible

6  web resources did that mean that they were

7  universally accessible?

8        A.   Just using ARIA by itself would not

9  guarantee that they were universally accessible.

10        Q.   Is there a universally accessible

11  program for all electronic communication?

12        A.   Is there a universally accessible

13  program --

14        Q.   Yeah.

15        A.   -- anybody in the world could use?

16        Q.   Yeah, I run the university, and I want

17  to be the best practices I can have.  I want to

18  make sure everybody gets everything, so I buy a

19  product.  I put it in, and everybody can access

20  everything in the world as long as it's available

21  electronically.

22            That doesn't exist.  Does it?

23        A.   No.

24        Q.   Okay.  Do you think it will ever

25  exist?

                                                   269

1      A.   Will it ever exist?  I think that's
2  the opposite of what you just said.  Will it
3  never exist or will it ever exist?
4      Q.   Let's say in your lifetime.
5      A.   I guess the reason why I hesitate is
6  when you bring into the -- bring into the
7  equation like cognitive disabilities and that,
8  you get into a lot of -- which is a big area.
9      Q.   I'm talking about blind students,
10  blind people.  Is there a program I can buy as
11  the head of the university that every electronic
12  item is now fully universally completely
13  accessible to blind people?
14      A.   I don't know of one you can buy today,
15  no.
16      Q.   Thank you.  Under 2012 the last entry
17  says Web Developer Accessibility Pitfalls and
18  Solutions.  Is there a universal solution to web
19  developer accessibility?
20      A.   A universal solution to web developers
21  being accessible?
22      Q.   Web developer accessibility pitfalls,
23  so that assumes that in designing a website or
24  information available through the web there are
25  problems, pitfalls that can occur?

270

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1       A.   Right.

2       Q.   Can you create a situation where

3  there's a universal solution to those

4  accessibility pitfalls?  I'm assuming that today

5  there are different pitfalls in addition to what

6  occurred then.

7       A.   Are there solutions to web

8  accessibility problems?

9       Q.   Universal solutions.  In other words,

10  flip the switch, and it's all taken care of.

11       A.   For people who are blind?

12       Q.   Limited to blind.

13       A.   In all situations?

14       Q.   In all situations.

15       A.   I would have to say no.

16       Q.   On the next page, under 2011,

17  presentations:  Litigation or Equal Access.

18       A.   Which one are you on?

19       Q.   2011, fifth one down, Litigation Or

20  Equal Access.

21           What are your disability-related IT

22  policies and practices leading you -- I guess

23  that's where, in Philadelphia.  Did you find it?

24       A.   Yeah, I think that was a panel

25  session.

271

1      Q.   Did you participate in the discussion
2  about litigation?
3      A.   I don't recall exactly who was on that
4  panel.  I think I was the moderator.
5      Q.   Best yet.  Do you recall any
6  discussion about litigation during that
7  presentation?
8      A.   I don't recall specifically, but, by
9  the title, I would assume there probably was.
10      Q.   Okay.
11      A.   And there was litigation at that time
12  so...
13           I assume it was discussed, but it's a
14  long time ago.
15      Q.   If you go down two it states:  State
16  of Web Accessibility in Illinois, 2011.  What was
17  the state of web accessibility in Illinois in
18  2011 as presented at that presentation?
19      A.   Where is that?
20      Q.   It's two below the litigation.
21      A.   This was at CSUN conference, yeah, so
22  we collected data, I think.
23      Q.   This one is in Illinois.
24      A.   Oh, Illinois.  Which one is this?
25      Q.   Do you see where it says Litigation Or

                                                    272

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1   Equal Access?  We just talked about it.

2          A.   Oh, state of web accessibility.  Yeah.

3   Okay.  Yeah.

4          Q.   What was the state of web

5   accessibility in Illinois in 2011?

6          A.   Some websites were more accessible

7   than others.

8          Q.   What was the state of website

9   accessibility in 2017?

10         A.   The last time we measured?

11         Q.   I guess.

12         A.   We still have accessibility problems,

13  yes.

14         Q.   What is the state of web accessibility

15  at the University of Illinois today?

16         A.   We have some websites that are better

17  than others.

18         Q.   And that's your job to make sure that

19  students have accessibility to electronic

20  information.  Correct?

21         A.   My job is to assist the university in

22  understanding and making that -- I'm not

23  responsible for making them --

24         Q.   Not the decision, but what are you

25  responsible for?

273

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1     A.   I work in disability services.  I help

2   the university understand where there's

3   accessibility problems, especially for our

4   students with disabilities.

5          I work with vendors to remediate

6   problems, whether they're on campus or off campus

7   developers.

8          I help develop standards so that we

9   have a practice that people can understand, a

10   model for accessibility, so a lot of my work I

11   spend in the W3C, one of the -- I don't think you

12   want the historical perspective of the University

13   of Illinois in accessibility, but I can give you

14   a brief history.

15          We were the first university in the

16   United States that did provide disability

17   services to students with disabilities, so we

18   have a long history of providing leadership in

19   accessibility.

20          My understanding is that 70 percent of

21   the current ADA building requirements were

22   developed here in the '50s to help make the

23   campus more accessible in our part of the

24   Americans With Disabilities Act, so when I was

25   hired, I was asked to help understand these

274

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1    issues and remediate them for students and also

2    to strategically look at what technologies we

3    need to do to make these things more accessible,

4    so I spend time on standards with the W3C, ARIA

5    working group, and the user agent accessibility

6    working group.

7            I work on communicating those

8    standards to people on campus.  I work with

9    specific accessibility issues we know for

10   students and try to remediate those accessibility

11   issues, so I guess I wear a lot of different

12   hats.

13       Q.   Do you make recommendations?

14       A.   When I'm asked to make

15   recommendations, I do.

16       Q.   Are all of your recommendations always

17   accepted?

18       A.   I don't know.

19       Q.   We've talked about preparing

20   specifications.  Are all of your specifications

21   always accepted by the university?

22       A.   The specifications that I work on

23   aren't necessarily for the university.  They're

24   for the W3C.

25       Q.   I'm asking about just the university.

275

1          A.    The standards I work on aren't a

2    policy, per se.  It's a means to implement

3    policy, so it's much more technical than policy

4    or implementation.

5          Q.    Well, does everything you work on, you

6    make recommendations on for the various

7    committees outside of school ultimately adopted

8    by the university?

9          A.    In terms of the technologies used to

10   make things more accessible does everybody use

11   what I tell them to do?

12         Q.    The university.

13         A.    No, they don't always use what I tell

14   them to do, no.

15         Q.    The next entry is:  The Status of Web

16   Accessibility in Higher Education.

17               Has the status of web accessibility in

18   higher education changed between 2011 and this

19   presentation and today?

20         A.    Yes.

21         Q.    What do you mean by status?

22         A.    Well, it's an imperfect process, but

23   we use our technologies to sample web pages, so

24   we pick up a few specific rules that we feel

25   highlight certain aspects of accessibility, so,

                                             276

1   for example, all text for images is a popular --

2   it's probably the posture child for

3   accessibility, especially for blind people, so

4   they're looking at the implementation of that

5   specific rule.  You would have some idea of how

6   many people who are using that are made aware --

7   aware of accessibility of, you know, so you can

8   track that over time some.

9           Form controls for labels is another

10  accessibility issue that's easy to test for, and

11  things like the main landmark technology which

12  main landmarks is one of these newer technologies

13  that's been around for six years now.

14          Still a lot of people don't understand

15  how to use that, so we look at a few marker

16  things to try to determine where people are --

17  where there needs to be an understanding of

18  accessibility, so that's not a complete

19  evaluation of a website or anything.

20          We're just trying to look at markers

21  and track changes in those markers.

22      Q.   Do you anticipate performing any

23  additional work in this assignment?

24      A.   I don't know.  This is the first time

25  I've done this.  Every day -- so it's a new day.

277

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1      Q.   Do you have any present plans to do

2   any additional work on this project?

3      A.   The only thing that I know that I may

4   be asked to do is to testify if this goes to

5   trial, and I believe they'll provide me with

6   dates of that currently scheduled trial.

7           MR. CLEELAND:  Okay.  Could we go off

8   the record for just a moment?

9               (At this point there was an off the

10              record discussion.)

11              (At this point the court reporter

12              marked Exhibits 100-101 for purposes of

13              identification.)

14   BY MR. CLEELAND:

15      Q.   Sir, we've identified as Exhibits 100

16   and 101 some materials we talked about today.

17           The reason -- this is for the record.

18   The reason for the numeration is there's also

19   another deposition taking place in California

20   concurrent with this one, so we don't know the

21   numeration on those exhibits, so we arbitrarily

22   decided to select a number, and the input was

23   100, so, again, the deposition notice for today

24   will be Exhibit 100, and the report prepared by

25   the witness of October 2nd, 2017, will be Exhibit

278

1   101.

2           And also, sir, during the deposition

3   you told us that you printed out an FAE 2.0

4   institutional version report of 11/5/17 at 8:44

5   p.m.

6           MS. KREVOR-WEISBAUM:  No.  I mean

7   incorrect, I believe.  Is that the -- you printed

8   it out today on that date, but I don't think it

9   reflects the website of today, or does it?

10          THE WITNESS:  No, it does not.

11          MS. KREVOR-WEISBAUM:  This is the link

12  to the report.  Is it not?

13          THE WITNESS:  Yeah.

14  BY MR. CLEELAND:

15      Q.   Yeah.  I was hopeful just identifying

16  when it was printed, so we can tell it was a

17  piece of paper.

18      A.   I printed it last night.

19      Q.   Right.

20          MS. KREVOR-WEISBAUM:  It's not a

21  report of that date.

22  BY MR. CLEELAND:

23      Q.   And why, again, did you print this

24  piece of paper?

25      A.   In case you would ask questions about

                                                279

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1    it.

2         Q.   And it reflects what?

3         A.   The evaluation of the website this

4    summer.

5         Q.   That you originally ran?

6         A.   The old website.

7         Q.   And you didn't bring the new one with

8    you.  Correct?

9         A.   It's available electronically right

10   now.  I could send you a URL.  Like I said, I

11   started the evaluation this morning and didn't

12   finish until shortly before this meeting.

13        Q.   And on the back of this packet of

14   information apparently consisting of six pages

15   there are some handwritten notes numbered 1

16   through 5?

17        A.   Yeah.

18        Q.   Is that in your handwriting, sir?

19        A.   Yes.

20        Q.   And why did you make those notes?

21        A.   I was going to go to the home page of

22   the website and look for certain accessibility

23   features.

24        Q.   And that's the current website?

25        A.   That's the current -- well, as of this

                                                    280

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1    morning.  It may have changed between now and

2    this morning, but, yeah, it's the web.

3         Q.   And No. 1 reads:  Keyboard focus

4    should use border not just background color.

5    Certainly very visible.

6              What did you mean by that?

7         A.   One of the things that you can't test

8    automatically for accessibility, at least I don't

9    know of any automated tools, is keyboard focus

10   tracking, so for keyboard only users you need to

11   be able to know where the keyboard focus is, so

12   the typical scenario is people tab through the

13   page, and it highlights links on the page or form

14   controls so people know what link they're going

15   to activate, and so it's important for people to

16   be able to see that.

17        Q.   No. 2 states:  No use of landmarks,

18   especially for navigation links and main content.

19        A.   Among the other changes in accessible

20   technology around 2011 or 2012 is the use of

21   landmarks to identify content.  This is

22   specifically beneficial to people using screen

23   readers, so the most important landmark is the

24   main landmark is actually now an HTML element

25   called main that generates a main landmark

                                                    281

1    automatically, so it's been integrated into the

2    HTML5 specifications.

3            The navigation landmark, since there's

4    a number of clusters of links on the page that

5    have different functional purposes, navigation

6    landmarks allow people to actually identify these

7    clusters of links and to put labels on them so

8    the visual position and grouping that people can

9    see can now also be made available to people

10   using screen reader technology, and one of the --

11   probably some of the less well-known parts of

12   WCAG are its requirements for website navigation

13   and the consistent use of structures on web pages

14   and consistent labelling of features on web

15   pages, so by using these things correctly you can

16   meet these WCAG requirements and provide a better

17   user experience and more accessible user

18   experience to people using screen reader

19   technology.

20       Q.   Could you read No. 3?  I'm afraid that

21   I'll miss some of the script in there.

22       A.   Improper use of menu board and menu

23   roles.  There is no associated keyboard support.

24            So this is one of the most common

25   problems that I see with the use of ARIA.  People

282

1    look at the ARIA specification, and they see

2    terms that they're familiar with that they refer

3    to that they use for describing features of their

4    website, and they think the ARIA specification

5    has adopted their understanding of those things,

6    but the ARIA specification has specific

7    requirements while the menu or menu bar would

8    tell a screen reader user what type of keyboard

9    interaction they can have with those elements, so

10   in this particular case those elements you could

11   only tab to them, and the menu bar pattern as

12   defined in the ARIA specification is to be able

13   to use the cursor keys to navigate between.

14          So it would be one tab stop for that

15   group of links, could use the arrow keys to move

16   in between them, so you can tab out, so you

17   wouldn't have to tab through each one.

18       Q.   No. 4 reads:  Headers are not used in

19   a semantic way.  Best practices would use H1 to

20   indicate start of main content, H2 to label

21   navigation menu.

22          What did you mean by that?

23       A.   So they do use headings on the web

24   page, but I think that, from what I recall, is

25   that that there was no H1 on the page, and H1 is

                                                   283

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1   considered the highest level heading on the page,

2   so by supporting the semantic use of HTML, that

3   typically would be the main content.  The most

4   important content would have the highest level

5   header, and screen reader commands have the

6   ability to navigate directly to the H1 element,

7   and so that, to me, is the best practice, to many

8   other people the best practice, and we have a lot

9   of examples of people doing that.

10          And then I think the first main

11   content started out with like an H3 or something

12   like that, and then there was some -- some levels

13   like H4, and then there were some H5s, but

14   typically you would go from H1 to H2 to H3 in a

15   structured way.

16          Another best practice for

17   implementation WCAG requirements is to put H2s

18   before these navigation bars, because that's one

19   of the things screen readers allow.  You can

20   navigate easily between headers on the page, so

21   by labelling these navigation bars with a label,

22   related navigation people understand better

23   navigation, saying, oh, here's going to be a list

24   of links I can use to find more information, and

25   if the headings are consistent on a page, people

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1  know, oh, I can skip over these.  I can go over

2  to this one.

3          So headings are an important feature

4  that -- and the proper use, again, consistent

5  use, I mean what they do would be consistent

6  that, you know, if we were looking at a page

7  visually, like some information down here would

8  have a great big heading, but the main content

9  would have a little heading, so where would you

10  eyes go?  Your eyes would go down here.  Okay.

11  So it would make the page look jumbled to people.

12      Q.   I appreciate continuity, and I

13  appreciate it when we come full circle.

14          You used the word best practices,

15  which we had a number of questions on very early

16  on.

17          What do you mean by best practices

18  here in No. 4?

19      A.   Best practices to me means how to --

20  the way that the technology was designed to be

21  used.  If you look at the HTML5, even the HTML4

22  specifications, there are certain constructs that

23  are available, and part of WCAG 4.11 Robust means

24  to use technologies as they were intended, and so

25  I call the WCAG requirement, so Section 508, for

285

1    example, doesn't really discuss headings at all,

2    so I don't know if that's standard, but the WCAG

3    does talk about headings, and so there are some

4    people who feel headings are not as important as

5    other people.

6            I guess I'm in the camp that says

7    headings are important and that they need to be

8    used if you want to provide an accessible

9    experience and used in a way that actually

10   facilitates and supports people understanding the

11   structure of the web page, not -- not just, okay,

12   I'm a developer and I say, well, I want something

13   small here.  I'll make this a small -- I'll use

14   an H5 for that.  Oh, I want this one bigger.

15   I'll use an H1 for that.

16           This kind of random use of headers I

17   think actually makes pages more confusing.

18       Q.   But in your handwritten notes, what do

19   you mean by the phrase best practices?

20       A.   The best way to achieve WCAG 2.0

21   requirements.

22       Q.   Thank you.  And No. 5, the last entry

23   on your notes, some form controls don't have

24   labels.  Select language -- no label.  Input is

25   using a label with display in one so label not

286

1    seen should use -- I'm stuck.

2         A.   I believe the search box --

3         Q.   I'm sorry.  Could you read exactly

4    what it says?

5         A.   Some form controls don't have labels.

6    Select language is a select box on the page, and

7    I didn't see any attempt to provide a label for

8    the select box.

9              The other form control that didn't

10   have a label was for the search functionality at

11   the beginning of the page.

12             It didn't seem like they attempted to

13   provide a label for that particular element.

14   They used I believe a --

15        Q.   I apologize for stopping you.  Have

16   you finished reading the text on the piece of

17   paper?  First, we need to have the whole thing

18   read.  I apologize.

19        A.   Okay.  Do you want me to reread the

20   whole thing?

21        Q.   If you could.  I apologize.  The

22   reason we do that is we can say this is what you

23   wrote there.

24        A.   Some form controls don't have labels.

25   Select language -- no label.  Input is using a

                                                    287

1   label with display none, so label not seen.

2   Should use ARIA label or title attribute.

3        Q.   That's where I got stuck.  Thank you

4   very much.  What did you mean by that entry?

5        A.   Which one?

6        Q.   No. 5.

7        A.   The whole thing?

8        Q.   Why did you write that down?  What was

9   your interest in that?

10        A.   The select box there's a language

11   option at the bottom of the page, and so there

12   was a select control used to allow people like us

13   to change language.

14            I didn't actually try to use it to

15   change language, but I assume it works, and there

16   was no labelling of that particular feature of

17   what -- if I activated this change language, what

18   would happen or what would be the effect?

19            So I wouldn't know why all of a sudden

20   there was a select box on this -- I assume the

21   country of probably English was there.

22            The other control was for the search

23   box, so in the search box there was an attempt

24   to -- it seemed to be -- well, there was an

25   attempt to create a label for that, but with the

288

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1   labels technology, the label that they used, the

2   actual label text they used a feature in CSS

3   called display none which basically hides that

4   element from assistive technologies, so that

5   element wouldn't have a label available to it, so

6   they did have markup that would have created a

7   label, if they would have styled it differently.

8         Where my notes were for what they were

9   doing probably what would have been a better

10   technique would be use the ARIA label attribute

11   or the title attribute, and they would have

12   achieved the same -- they would have achieved the

13   effect that they were trying to achieve by what

14   some people would consider a hidden label.

15         The hidden label could be made

16   accessible if you were using a different type of

17   technique to hide it which is off screen

18   positioning, so a lot of web accessibility

19   frameworks have specific classes to do that, so,

20   for example, the one I'm most follow with

21   Bootstrap is SR only which stands for screen

22   reader only, so if you want some extra text to be

23   available to a screen reader user, typically for

24   labels or sometimes hidden headings, you can use

25   this SR only feature.

```
 1              I use it in FAE, for example, to hide
 2    some headings, and so there's other techniques.
 3    They just happened to choose one that doesn't
 4    work.
 5              MR. CLEELAND:  Any questions?
 6              MS. KREVOR-WEISBAUM:  I have one.
 7    Just one question.
 8              MR. CLEELAND:  You can have more than
 9    one if you want.
10              MS. KREVOR-WEISBAUM:  But you're done,
11    sir?
12              MR. CLEELAND:  I have finished asking
13    questions for what I've got now.
14         EXAMINATION CONDUCTED
15         BY:  MS. KREVOR-WEISBAUM
16       Q.   Dr. Gunderson, there was a line of
17    questioning that I'm going to say I got confused
18    on, but I wanted to see what your answer --
19    understand your answer.
20              Probably midway through the deposition
21    counsel asked you -- I think he asked you are you
22    aware of any laws that have been violated?  Were
23    you -- first, do you remember that?
24              MR. CLEELAND:  I hope I didn't.
25              MS. KREVOR-WEISBAUM:  You did, because
```

290

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1   I wrote it down.  I don't know if there's a way.

2   Do you have a search --

3          (At this point there was an off the

4          record discussion.)

5   BY MS. KREVOR-WEISBAUM:

6      Q.   So, Dr. Gunderson, there was a

7   question that confused me, and I want to go back

8   to it.

9          It was are you aware of any laws that

10  have been ignored in this case.  Do you recall

11  that question?

12     A.   Yes.

13     Q.   And you answered no.  Can you tell me

14  were you referring -- or what you were referring

15  to there?  Were you referring to the California

16  law that counsel had just been talking to you

17  about?

18     A.   I'm not aware, so I don't -- so what

19  -- I wasn't sure what the question really meant,

20  so he asked me whether I knew a law was broken?

21  I said no.

22          There may have been ones broken, but

23  not being a lawyer, I'm not going to make that

24  interpretation.

25          I'm an engineer.  I try to help people

291

1    understand how to make stuff more accessible.  I

2    try to develop standards that will make people

3    more accessible.  I'm not a lawyer, and I don't

4    feel comfortable interpreting the law.

5              MS. KREVOR-WEISBAUM:  Thanks.  I don't

6    have any other questions.

7              MR. CLEELAND:  Okay.  Why don't we go

8    off the record for a moment?

9              (At this point there was an off the

10                 record discussion.)

11             MR. CLEELAND:  Do you want -- because

12    we're in a jurisdiction that has nothing to do

13    with this case, do you want to take the original

14    transcript?

15             MS. KREVOR-WEISBAUM:  Sure.

16             MR. CLEELAND:  Okay.  Do you want your

17    client to, the witness to have the opportunity to

18    read, review, correct, and sign?

19             MS. KREVOR-WEISBAUM:  Yeah, he should

20    do that.  Yes, we will review and sign.

21             MR. CLEELAND:  For purposes of the

22    record, we would ask the court reporter submit

23    the original transcript and exhibits to the

24    witness.  Do you want it made directly to him or

25    through you?

                                                    292

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1            MS. KREVOR-WEISBAUM:  You can mail it

2    to me.

3            MR. CLEELAND:  Forward it to counsel,

4    she'll get it to the witness.  The witness will

5    have the opportunity to read, review, correct,

6    and sign, consistent with the code, thereafter

7    returning the original transcript to plaintiff's

8    counsel for safekeeping.  Plaintiff's counsel

9    will notify us of the signature and any changes.

10   I think that's all we need.

11            (Deponent is excused at 3:39 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                              293

Jon Richard Gunderson, 11/6/2017
Roy Payan v. Los Angeles Community College District

1                       CERTIFICATE

2

3            I, BARBARA A. GLOVER, Certified
    Shorthand Reporter, do hereby certify that JON
4    RICHARD GUNDERSON, the deponent herein, was by me
    first duly sworn to tell the truth, the whole
5    truth and nothing but the truth in the
    aforementioned cause of action.
6            That the foregoing deposition was
    taken on behalf of the Defendant on November 6,
7    2017; that said deposition was taken down in
    stenograph notes and afterwards reduced to
8    typewriting under my instruction and said
    transcription is a true record of the testimony
9    given; and that it was agreed by and between the
    witness and attorneys that said signature on said
10   deposition would be not waived.
            I do hereby certify that I am a
11   disinterested person in this cause of action;
    that I am not a relative of any party or any
12   attorney of record in this cause, or an attorney
    for any party herein, or otherwise interested in
13   the event of this action, and am not in the
    employ of the attorneys for either party.
14           Dated this 11th day of November, 2017.

15

16                  _____
                    Barbara A. Glover, CSR, RPR,
17                  CRR, and CCR

18

19

20

21

22

23

24

25

                                                    294

```
1              UNITED STATES DISTRICT COURT
              CENTRAL DISTRICT OF CALIFORNIA
2

3  ROY PAYAN, et al.,
                     Plaintiffs,
4        vs.
   LOS ANGELES COMMUNITY COLLEGE DISTRICT, et al.,
5                    Defendants.

6

7          This is to certify that I have read

8  the transcript of my deposition taken in the

9  above-entitled cause, and that the foregoing

10 transcript taken on November 6, 2017, accurately

11 states the questions asked and the answers given

12 by me, with the exception of the corrections

13 noted, if any, on the attached errata sheet(s).

14

15                    _____

16                    JON RICHARD GUNDERSON

17 Subscribed and Sworn before

18 me this _____ day of

19 _____, 2017.

20 _____

21 Notary Public

22

23

24

25
                                              295
```