UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

- - -

Roy Payan, Portia Mason,      :
The National Federation of :
The Blind, Inc., and The      :
National Federation of The :
Blind of California, Inc.   :
          Plaintiffs,         :
                              :
     vs.                      :   Case No.
                         :  2:17-cv-01697-SVW(SKx)
Los Angeles Community         :
College District, Dr.         :
Francisco C. Rodriguez in  :
his official capacity as    :
Chancellor of the Los         :
Angeles Community College   :
District, and Does 1          :
through 10, Inclusive         :
          Defendants.    :

- - -

DEPOSITION

of Peter Bossley, taken before me, Valerie J.

Grubaugh, Registered Merit Reporter, and a Notary

Public in and for the State of Ohio, at the offices

of Armstrong & Okey, 222 East Town Street, Columbus,

Ohio, on Tuesday, November 7th, 2017, at 10:00 a.m.

- - -

ARMSTRONG & OKEY, INC.
222 East Town Street, Second Floor
Columbus, Ohio  43215-4620
(614) 224-9481 - (800) 223-9481

- - -

1

```
 1    APPEARANCES:

 2            Brown, Goldstein, Levy
              By Sharon Krevor-Weisbaum, Esq.
 3            120 East Baltimore Street, Suite 1700
              Baltimore, Maryland  21202
 4            Skw@browngold.com

 5                On behalf of the Plaintiffs.

 6            Haight, Brown & Bonesteel, LLP
              By Bruce Cleeland, Esq.
 7            2050 Main Street, Suite 600
              Irvine, California  92614
 8            Bcleeland@hbblaw.com
              Ydavis@hbblaw.com

 9
                  On behalf of the Defendants.
10
                        - - -
11

12

13

14

15

16

17

18

19

20

21

22

23

24
                                                    2
```

```
 1                         Tuesday Morning Session,

 2                         November 7th, 2017.

 3                         - - -

 4                    STIPULATIONS

 5            It is stipulated by and between counsel

 6      for the respective parties that the deposition of

 7      Peter Bossley, a witness called by the Defendants

 8      under the applicable Rules of Civil Procedure, may be

 9      reduced to writing in stenotype by the Notary, whose

10      notes thereafter may be transcribed out of the

11      presence of the witness; and that proof of the

12      official character and qualification of the Notary is

13      waived.

14                         - - -

15

16

17

18

19

20

21

22

23

24

                                                            3
```

Peter Bossley, 11/7/2017
Payan v. Los Angeles Community College District

```
 1                        INDEX

 2                        - - -

 3  WITNESS:                              PAGE

 4  Peter Bossley
       Examination by Mr. Cleeland        5
 5
                          - - -
 6
    DEPOSITION EXHIBITS                   IDENTIFIED
 7
    102 - Ohio State nav bar             292
 8  103 - Request for Alternative Access 292
       Exemption, Digital Accessibility
 9     Policy
    104 - University of Washington IT    293
10     Accessibility Guidelines
    105 - Miami University Public Library 295
11
                          - - -
12

13

14

15

16

17

18

19

20

21

22

23

24
                                              4
```

```
1                    Peter Bossley,
2    being by me first duly sworn, as hereinafter
3    certified, deposes and says as follows:
4                    EXAMINATION                      09:55:14
5    By Mr. Cleeland:                                 09:55:14
6         Q.  Good morning, sir.  Could I have your  09:55:15
7    name, please?                                    09:55:17
8         A.  It's Peter Bossley.  And as we were kind 09:55:18
9    of discussing before, it's actually B-o-s-s-l-e-y. 09:55:26
10        Q.  Thank you for that correction.         09:55:29
11             Sir, have you ever had your deposition 09:55:33
12   taken before?                                    09:55:34
13        A.  No.                                     09:55:34
14        Q.  When did you first become aware of the 09:55:38
15   fact that your deposition was scheduled to be taken 09:55:40
16   today?                                           09:55:42
17        A.  I was notified by the law firm a week -- 09:55:42
18   a couple weeks ago.                              09:55:50
19        Q.  And did you receive any materials      09:55:53
20   identifying the purpose of the deposition?       09:55:55
21        A.  You mean directly with the notice or -- 09:55:58
22   I'm a little unclear.                            09:56:04
23        Q.  I'm not quite sure what your experience 09:56:06
24   is in your background, so I'm happy to use the phrase 09:56:09
```

5

| | | |
|---|---|---|
| 1 | Notice of Deposition for you here today.  Is that a | 09:56:13 |
| 2 | yes? | 09:56:15 |
| 3 | A.  Yes. | 09:56:15 |
| 4 | Q.  Okay.  When did you receive that? | 09:56:16 |
| 5 | A.  I received it -- I don't recall the | 09:56:18 |
| 6 | exact date.  It's been a week or two. | 09:56:21 |
| 7 | Q.  And how did you receive that notice? | 09:56:24 |
| 8 | A.  It was sent to me by email. | 09:56:27 |
| 9 | Q.  Was it sent in a form that you could | 09:56:29 |
| 10 | use? | 09:56:32 |
| 11 | A.  Yes. | 09:56:32 |
| 12 | Q.  What was that form? | 09:56:32 |
| 13 | A.  Microsoft Word. | 09:56:34 |
| 14 | Q.  And did you use a conversion process? | 09:56:37 |
| 15 | A.  I did not. | 09:56:39 |
| 16 | Q.  Was it already converted for you when | 09:56:41 |
| 17 | you received it? | 09:56:43 |
| 18 | A.  Yes. | 09:56:43 |
| 19 | Q.  Do you know who converted it? | 09:56:44 |
| 20 | A.  I'm not aware. | 09:56:45 |
| 21 | Q.  Thank you. | 09:56:50 |
| 22 | Normally at the beginning of a | 09:56:53 |
| 23 | deposition, and certainly with a witness who hasn't | 09:56:55 |
| 24 | been deposed before, lawyers like to take just a few | 09:56:57 |

6

| | | |
|---|---|---|
| 1 | moments to explain to you the guidelines we'll be | 09:57:00 |
| 2 | functioning under today. | 09:57:02 |
| 3 | The Court Reporter has just placed you | 09:57:03 |
| 4 | under oath.  That's the same oath you'd receive in a | 09:57:06 |
| 5 | courtroom before a Judge and jury.  Do you understand | 09:57:08 |
| 6 | that? | 09:57:12 |
| 7 | A.  Yes, I do. | 09:57:12 |
| 8 | Q.  We don't have a Judge present, we don't | 09:57:12 |
| 9 | have a jury present.  We're not even in a courtroom. | 09:57:13 |
| 10 | However, you're obligated to give the best testimony | 09:57:16 |
| 11 | today under oath as you would in a courtroom.  Do you | 09:57:18 |
| 12 | understand that? | 09:57:20 |
| 13 | A.  Yes. | 09:57:21 |
| 14 | Q.  The Court Reporter will be taking down | 09:57:21 |
| 15 | everything that's said on the record during today's | 09:57:23 |
| 16 | proceeding.  That allows opportunities for both the | 09:57:25 |
| 17 | witness and the lawyers, and it has the potential for | 09:57:29 |
| 18 | creating perhaps a problem or two. | 09:57:31 |
| 19 | The opportunity, it allows the lawyers | 09:57:34 |
| 20 | to ask questions and for you to respond to those | 09:57:37 |
| 21 | questions.  Do you understand that? | 09:57:39 |
| 22 | A.  I do. | 09:57:40 |
| 23 | Q.  If you do not understand a question | 09:57:41 |
| 24 | that's posed to you, please let us know that, okay? | 09:57:44 |

7

```
 1          A.  Sure.                                        09:57:46

 2          Q.  If you answer a question I think the         09:57:47

 3    lawyers will assume that you understood the question   09:57:49

 4    as posed.  Do you understand that?                     09:57:52

 5          A.  Yes, I do.                                   09:57:53

 6          Q.  You've done very well so far, and that       09:57:53

 7    is to answer audibly with words or proper phrases      09:57:55

 8    such as "yes" or "no", or whatever the explanation.    09:57:58

 9          It's very difficult for the Court                09:58:02

10    Reporter to take down "uh-huh" and "uh-uh", or nods    09:58:03

11    of the head and give any importance to that            09:58:06

12    information on a written transcript.  Do you           09:58:08

13    understand that?                                       09:58:10

14          A.  I do.                                        09:58:11

15          Q.  So there may be occasions where, as most     09:58:11

16    of us who may say "uh-huh" or point to something, and  09:58:14

17    one of the lawyers may ask, "Did you mean by that a    09:58:17

18    yes," or, "Could you please provide a verbal           09:58:19

19    response."  It's not intended to harass or intimidate  09:58:22

20    you, but rather to make sure we have a clean record    09:58:24

21    today.  Do you understand that?                        09:58:26

22          A.  I understand.                                09:58:27

23          Q.  Is there any reason that you can't give      09:58:29

24    your best testimony today?                             09:58:31
```

8

| | | |
|---|---|---|
| 1 | A.  No. | 09:58:32 |
| 2 | Q.  Are you presently taking any medication | 09:58:33 |
| 3 | which inhibits your ability to recall or remember? | 09:58:36 |
| 4 | A.  I am not. | 09:58:39 |
| 5 | Q.  When the lawyers ask questions I would | 09:58:42 |
| 6 | ask that you wait until the lawyer has completed the | 09:58:44 |
| 7 | question, because the last few words of that question | 09:58:48 |
| 8 | may dramatically change your understand.  Do you | 09:58:50 |
| 9 | understand that? | 09:58:52 |
| 10 | A.  I do. | 09:58:53 |
| 11 | Q.  Also it allows for the Court Reporter to | 09:58:53 |
| 12 | get down the question before the answer begins, | 09:58:55 |
| 13 | therefore hopefully making for a clear record.  Do | 09:58:57 |
| 14 | you understand that? | 09:59:00 |
| 15 | A.  Sure. | 09:59:00 |
| 16 | Q.  I think the lawyers will do their best | 09:59:02 |
| 17 | to wait until you completed your answer before they | 09:59:04 |
| 18 | begin the next question.  However, there are usually | 09:59:06 |
| 19 | two caveats to that. | 09:59:09 |
| 20 | Sometimes the witness has a speaking | 09:59:10 |
| 21 | pattern that perhaps they take a breath or they are | 09:59:12 |
| 22 | thinking and the lawyer may think that the individual | 09:59:16 |
| 23 | is done answering the question.  If that happens | 09:59:18 |
| 24 | today, and you think you have additional information | 09:59:20 |

9

Peter Bossley, 11/7/2017
Payan v. Los Angeles Community College District

| | | |
|---|---|---|
| 1 | to provide, you let me know, okay? | 09:59:22 |
| 2 | A. I will. | 09:59:24 |
| 3 | Q. Also, sometimes the first few words of | 09:59:24 |
| 4 | your answer make it clear that perhaps my question | 09:59:28 |
| 5 | wasn't as accurate or precise as I would have hoped, | 09:59:30 |
| 6 | and I may interrupt you at that point to try to focus | 09:59:33 |
| 7 | you on the question. | 09:59:36 |
| 8 | It's not intended to disturb or upset | 09:59:37 |
| 9 | you, I just want to make sure we get the information | 09:59:39 |
| 10 | that's necessary today in, hopefully, an expeditious | 09:59:41 |
| 11 | and efficient manner to get you out of here. Okay? | 09:59:44 |
| 12 | A. Sure. | 09:59:46 |
| 13 | Q. Do you have any questions before you get | 09:59:47 |
| 14 | started today? | 09:59:48 |
| 15 | A. No. | 09:59:49 |
| 16 | Q. Did you do anything to prepare for your | 09:59:49 |
| 17 | deposition today? | 09:59:52 |
| 18 | A. We had a number of -- I had a number of | 09:59:52 |
| 19 | conversations with Sharon, counsel. And other than | 09:59:58 |
| 20 | the information that was provided in the expert | 10:00:04 |
| 21 | report as far as items that were reviewed, nothing | 10:00:08 |
| 22 | else was done. | 10:00:11 |
| 23 | Q. When did you first become aware of this | 10:00:12 |
| 24 | assignment? | 10:00:14 |

10

Peter Bossley, 11/7/2017
Payan v. Los Angeles Community College District

| | | |
|---|---|---|
| 1 | A.  I was contacted in May regarding | 10:00:15 |
| 2 | potentially being engaged as an expert on this case. | 10:00:21 |
| 3 | Q.  Who was it that contacted you? | 10:00:26 |
| 4 | A.  It was Sharon. | 10:00:29 |
| 5 | Q.  Had you spoken with Sharon before that | 10:00:31 |
| 6 | time? | 10:00:34 |
| 7 | A.  We had previously worked on other cases. | 10:00:35 |
| 8 | Q.  Okay.  So while you haven't been deposed | 10:00:37 |
| 9 | before, you've been retained as an expert in the | 10:00:41 |
| 10 | past? | 10:00:43 |
| 11 | A.  That is correct. | 10:00:44 |
| 12 | Q.  How many times? | 10:00:45 |
| 13 | A.  Twice in -- in -- with this firm. | 10:00:46 |
| 14 | Q.  And do you know the name of the firm? | 10:00:52 |
| 15 | A.  It's Brown, Goldstein & Levy. | 10:00:54 |
| 16 | Q.  Have you ever met anyone from that firm | 10:00:57 |
| 17 | other than Sharon, as you described? | 10:00:58 |
| 18 | A.  I have. | 10:01:01 |
| 19 | Q.  Who? | 10:01:01 |
| 20 | A.  I'm having trouble recalling their name. | 10:01:02 |
| 21 | There was a gentleman named Al, and I can't remember | 10:01:08 |
| 22 | anyone else at this time. | 10:01:18 |
| 23 | Q.  You bring up a good point.  It's not | 10:01:19 |
| 24 | unusual if the question is asked that a person, a | 10:01:21 |

11

Peter Bossley, 11/7/2017
Payan v. Los Angeles Community College District

| | | |
|---|---|---|
| 1 | witness, you, may not know a particular answer to | 10:01:23 |
| 2 | that, and if that's true, just let us know. | 10:01:25 |
| 3 | A.  Sure. | 10:01:28 |
| 4 | Q.  How many times have you discussed this | 10:01:31 |
| 5 | case with anyone from the law firm that you described | 10:01:33 |
| 6 | as counsel for Plaintiff? | 10:01:37 |
| 7 | A.  I don't know the exact number.  Maybe a | 10:01:38 |
| 8 | total of ten phone calls or so. | 10:01:47 |
| 9 | Q.  And are you charging for services | 10:01:56 |
| 10 | rendered in this matter? | 10:01:58 |
| 11 | A.  I am. | 10:01:59 |
| 12 | Q.  And what is the rate you're charging the | 10:02:01 |
| 13 | lawyers? | 10:02:02 |
| 14 | A.  $120 an hour. | 10:02:03 |
| 15 | Q.  And do you keep track of your time spent | 10:02:07 |
| 16 | on this matter? | 10:02:09 |
| 17 | A.  I do. | 10:02:10 |
| 18 | Q.  How do you do that? | 10:02:11 |
| 19 | A.  I keep track in a spreadsheet that I -- | 10:02:12 |
| 20 | that generates my invoices. | 10:02:17 |
| 21 | Q.  Have you submitted any invoices in this | 10:02:19 |
| 22 | case? | 10:02:21 |
| 23 | A.  Yes, sir, I have. | 10:02:21 |
| 24 | Q.  How many? | 10:02:22 |

12

| | | |
|---|---|---|
| 1 | A.  One so far. | 10:02:23 |
| 2 | Q.  And when was that submitted? | 10:02:25 |
| 3 | A.  The beginning of October. | 10:02:26 |
| 4 | Q.  And do you recall how much that invoice | 10:02:31 |
| 5 | was for? | 10:02:34 |
| 6 | A.  I don't recall off the top of my head. | 10:02:34 |
| 7 | I can obtain the information if you would like. | 10:02:37 |
| 8 | Q.  Do you have it with you on your | 10:02:40 |
| 9 | computer? | 10:02:42 |
| 10 | A.  Yes. | 10:02:42 |
| 11 | Q.  Well, we'll probably get to that a | 10:02:44 |
| 12 | little bit later. | 10:02:45 |
| 13 | A.  Okay. | 10:02:46 |
| 14 | Q.  Do you have an estimate as to how much | 10:02:50 |
| 15 | time you've spent on this assignment? | 10:02:52 |
| 16 | A.  Again, it would be a guess without | 10:02:55 |
| 17 | looking.  Somewhere in the vicinity of 80 hours. | 10:02:58 |
| 18 | Q.  When is the last time you read the | 10:03:14 |
| 19 | deposition notice? | 10:03:16 |
| 20 | A.  Last evening. | 10:03:17 |
| 21 | Q.  And on there did you notice that there | 10:03:19 |
| 22 | was a request for you to bring materials with you | 10:03:21 |
| 23 | today? | 10:03:23 |
| 24 | A.  I did. | 10:03:23 |

13

| | | |
|---|---|---|
| 1 | Q.  And did you bring those materials? | 10:03:25 |
| 2 | A.  I did bring them, yes. | 10:03:26 |
| 3 | Q.  And how are they provided today? | 10:03:28 |
| 4 | A.  I have just print copies. | 10:03:30 |
| 5 | Q.  Okay.  Could you bring those out, | 10:03:33 |
| 6 | please? | 10:03:35 |
| 7 | A.  Sure.  Here you go. | 10:03:36 |
| 8 | Q.  Thank you. | 10:03:47 |
| 9 | And you provided me with a UPS Express | 10:03:48 |
| 10 | envelope.  There's no address information on it.  And | 10:03:51 |
| 11 | in that envelope there appears to be a CV for you | 10:03:57 |
| 12 | consisting of three pages, an invoice dated | 10:04:05 |
| 13 | October 1st, 2017, consisting of one page, a packet | 10:04:11 |
| 14 | of information, the first page of which is stated Web | 10:04:20 |
| 15 | Accessibility Standards, and it refers to the Ohio | 10:04:24 |
| 16 | State nav bar, and appears to consist of 24 pages | 10:04:31 |
| 17 | with a print date of 11-6-2017, at 9:24 p.m., a | 10:04:34 |
| 18 | four-page docket -- document, excuse me, The Ohio | 10:04:42 |
| 19 | State University, Request For Alternate -- or | 10:04:49 |
| 20 | Alternative Access Exemption, Digital Accessibility | 10:04:52 |
| 21 | Policy, a three-page document entitled University | 10:04:55 |
| 22 | of Washington IT Accessibility Guidelines, a Miami | 10:05:10 |
| 23 | University Policy Library printout, printed on | 10:05:22 |
| 24 | November 6, 2017, at 9:48 p.m., consisting of five | 10:05:26 |

14

Peter Bossley, 11/7/2017
Payan v. Los Angeles Community College District

| | | |
|---|---|---|
| 1 | pages, a U.S. Department of Justice, U.S. Department | 10:05:33 |
| 2 | of Education letter dated June 29, 2010, consisting | 10:05:41 |
| 3 | of three pages, the deposition notice for your | 10:05:45 |
| 4 | appearance here today, and a letter dated May 31, | 10:05:49 |
| 5 | 2017, to you from the law firm of Brown, Goldstein & | 10:05:57 |
| 6 | Levy talking about this will confirm the arrangement | 10:06:08 |
| 7 | outlined below. | 10:06:10 |
| 8 | Do you believe that these are all the | 10:06:13 |
| 9 | documents that are responsive to the request | 10:06:14 |
| 10 | submitted to you? | 10:06:16 |
| 11 | A.  I do. | 10:06:16 |
| 12 | (Recess taken.) | 10:07:43 |
| 13 | MR. CLEELAND:  We can go back on the | 10:07:46 |
| 14 | record. | 10:07:47 |
| 15 | By Mr. Cleeland: | 10:07:48 |
| 16 | Q.  And, sir, looking at the Notice of | 10:07:48 |
| 17 | Deposition today, Item No. 1 asks for the production | 10:07:51 |
| 18 | of your most recent curriculum vitae or resume.  Do | 10:07:53 |
| 19 | you believe that's the document you provided me just | 10:07:57 |
| 20 | a moment ago? | 10:07:58 |
| 21 | A.  It is. | 10:07:59 |
| 22 | Q.  Request No. 2 was the witness' entire | 10:08:00 |
| 23 | file regarding activity undertaken by the witness in | 10:08:03 |
| 24 | the furtherance of reaching your opinions.  Did you | 10:08:06 |

15

Peter Bossley, 11/7/2017
Payan v. Los Angeles Community College District

| | | |
|---|---|---|
| 1 | bring your entire file today? | 10:08:09 |
| 2 | A. The only items that I didn't print | 10:08:10 |
| 3 | directly were transcripts of depositions. | 10:08:14 |
| 4 | Q. Did you prepare any notes? | 10:08:17 |
| 5 | A. Regarding those, no. | 10:08:21 |
| 6 | Q. Regarding anything in the case? | 10:08:23 |
| 7 | A. No. | 10:08:24 |
| 8 | Q. Did you maintain any electronic files | 10:08:25 |
| 9 | with information that you utilized for purposes of | 10:08:30 |
| 10 | being retained as an expert witness in this matter? | 10:08:36 |
| 11 | A. Again, the items that were listed in the | 10:08:40 |
| 12 | expert report as -- that were reviewed were the only | 10:08:42 |
| 13 | things that were kept -- that I kept. | 10:08:45 |
| 14 | Q. Well, I'm not worried about kept, I'm | 10:08:48 |
| 15 | worried about what you reviewed for purposes of | 10:08:51 |
| 16 | reaching your opinions or conclusions in this matter. | 10:08:53 |
| 17 | A. Sure. I understand. I -- I -- | 10:08:55 |
| 18 | everything that I relied on for my opinions was | 10:08:57 |
| 19 | specifically called out in the report. | 10:09:02 |
| 20 | Q. And did you bring all those things with | 10:09:03 |
| 21 | you today? | 10:09:06 |
| 22 | A. I have electronic copies of the | 10:09:07 |
| 23 | deposition transcripts that were sent to me, but they | 10:09:10 |
| 24 | were -- some of them were quite lengthy and I didn't | 10:09:13 |

16

| | | |
|---|---|---|
| 1 | want to print all that. | 10:09:17 |
| 2 | Q.  Did you read all of the material that | 10:09:17 |
| 3 | was provided to you by counsel? | 10:09:20 |
| 4 | A.  I did. | 10:09:21 |
| 5 | Q.  And how long did it take you to read the | 10:09:22 |
| 6 | depositions? | 10:09:24 |
| 7 | A.  I would have to look back for sure, but | 10:09:26 |
| 8 | my estimate is around 20 hours. | 10:09:38 |
| 9 | Q.  And during the time that you were | 10:09:41 |
| 10 | reading the depositions, or contemplating the | 10:09:42 |
| 11 | information contained in those depositions, did you | 10:09:45 |
| 12 | prepare any notes as to the content of the | 10:09:48 |
| 13 | depositions? | 10:09:51 |
| 14 | A.  I did not. | 10:09:51 |
| 15 | Q.  On the electronic copies did you make | 10:09:53 |
| 16 | any notations? | 10:09:54 |
| 17 | A.  No. | 10:09:56 |
| 18 | Q.  No. 4 asks for a complete list of any | 10:10:01 |
| 19 | and all articles, books, literature, authored, edited | 10:10:03 |
| 20 | and/or contributed to by the witness.  Have you | 10:10:08 |
| 21 | provided such a list? | 10:10:12 |
| 22 | A.  I haven't contributed to nor edited any | 10:10:13 |
| 23 | publications. | 10:10:16 |
| 24 | Q.  No. 5 asks for all documents, including | 10:10:19 |

17

Peter Bossley, 11/7/2017
Payan v. Los Angeles Community College District

| | | |
|---|---|---|
| 1 | but not limited to articles, journal articles, | 10:10:21 |
| 2 | newspaper articles, and/or other authored articles | 10:10:25 |
| 3 | that the witness read and/or consulted in his | 10:10:29 |
| 4 | analysis of Plaintiffs' case.  Have you given us such | 10:10:32 |
| 5 | a list? | 10:10:35 |
| 6 | A.  Other than the items that were listed in | 10:10:36 |
| 7 | the expert report, there's nothing additional. | 10:10:38 |
| 8 | Q.  And I notice that within the packet you | 10:10:42 |
| 9 | provided, there were several printouts from websites. | 10:10:45 |
| 10 | Did you utilize the information in those websites | 10:10:50 |
| 11 | that you provided today in reaching your opinions or | 10:10:53 |
| 12 | conclusions as an expert witness in this matter? | 10:10:56 |
| 13 | A.  I did. | 10:10:58 |
| 14 | Q.  No. 6 asks for a complete list of all | 10:11:03 |
| 15 | works presented at technical meetings.  Have you | 10:11:05 |
| 16 | brought such a list? | 10:11:07 |
| 17 | A.  I have not presented anything other than | 10:11:09 |
| 18 | the report at any technical meetings. | 10:11:16 |
| 19 | Q.  I'm not worried about presenting the | 10:11:19 |
| 20 | report at technical meetings, I'm asking about a | 10:11:21 |
| 21 | complete list of all works presented at technical | 10:11:23 |
| 22 | meetings, whatever their content. | 10:11:26 |
| 23 | A.  I'm a little unclear. | 10:11:32 |
| 24 | Q.  Okay.  Have you ever made any | 10:11:34 |

18

| | | |
|---|---|---|
| 1 | presentations at any technical meetings? | 10:11:35 |
| 2 | A.  Any technical meetings?  Can you clarify | 10:11:42 |
| 3 | what you mean by a technical meeting? | 10:11:45 |
| 4 | Q.  Sure.  You know what a meeting is? | 10:11:47 |
| 5 | A.  Yes. | 10:11:50 |
| 6 | Q.  Okay.  So technical meeting would seem | 10:11:51 |
| 7 | to be related to information related to your | 10:11:53 |
| 8 | expertise, specifically based upon your designation | 10:11:55 |
| 9 | as an expert witness in this matter.  Does that help | 10:11:58 |
| 10 | you? | 10:12:01 |
| 11 | A.  So you're -- are you asking me | 10:12:02 |
| 12 | information about any presentation I've presented in | 10:12:04 |
| 13 | any technology related meeting not -- even ones that | 10:12:08 |
| 14 | aren't related to this matter? | 10:12:13 |
| 15 | Q.  Absolutely? | 10:12:15 |
| 16 | A.  Okay.  Then I did not bring that | 10:12:16 |
| 17 | information with me. | 10:12:17 |
| 18 | Q.  Do you have an estimate as to how many | 10:12:20 |
| 19 | such presentations you've made? | 10:12:22 |
| 20 | A.  My best estimate would be there are | 10:12:30 |
| 21 | probably maybe a hundred or so of those kinds of | 10:12:33 |
| 22 | meetings that I've been to. | 10:12:40 |
| 23 | Q.  Not been to, but presented. | 10:12:42 |
| 24 | A.  Sure.  Probably still the same, around | 10:12:43 |

19

| | | |
|---|---|---|
| 1 | the same number. | 10:12:47 |
| 2 | Q.  Okay.  Were any of those presentations | 10:12:48 |
| 3 | to specific organizations? | 10:12:51 |
| 4 | A.  Yes. | 10:12:55 |
| 5 | Q.  Do you remember the names of those | 10:12:58 |
| 6 | organizations? | 10:13:00 |
| 7 | A.  I've done presentations for the Center | 10:13:01 |
| 8 | For Disability Empowerment, for many groups within | 10:13:04 |
| 9 | Ohio State University, at technology conferences | 10:13:09 |
| 10 | including Big 10 academic -- excuse me, sorry, Big 10 | 10:13:16 |
| 11 | Academic Alliance, the California State University at | 10:13:22 |
| 12 | Northridge, the eTech Ohio.  Those are all the ones I | 10:13:26 |
| 13 | can think of off the top of my head. | 10:13:34 |
| 14 | Q.  Thank you. | 10:13:37 |
| 15 | No. 7 asks for each and every document | 10:13:37 |
| 16 | which the witness relied upon in formulating analysis | 10:13:40 |
| 17 | and/or opinions regarding this case.  Have you | 10:13:44 |
| 18 | provided us with all of those documents? | 10:13:47 |
| 19 | A.  Other than the deposition transcripts, | 10:13:50 |
| 20 | the remaining items were here. | 10:13:53 |
| 21 | Q.  Thank you. | 10:13:55 |
| 22 | And No. 8 is all documents reviewed by | 10:13:56 |
| 23 | the witness in this case, including but not limited | 10:13:58 |
| 24 | to statements, photographs, correspondence, reports, | 10:14:01 |

20

| | | |
|---|---|---|
| 1 | depositions, and/or notes. | 10:14:06 |
| 2 | With the exception of actually bringing | 10:14:08 |
| 3 | a physical copy of the deposition transcripts | 10:14:10 |
| 4 | provided with you today, did you otherwise bring all | 10:14:16 |
| 5 | responsive documents? | 10:14:18 |
| 6 | A.  Yes. | 10:14:19 |
| 7 | Q.  No. 9 asks for all documents and/or | 10:14:19 |
| 8 | writings related to any and all contact with anyone | 10:14:22 |
| 9 | concerning the witness' opinions in this case.  Do | 10:14:25 |
| 10 | you have such documents? | 10:14:28 |
| 11 | A.  I don't believe so. | 10:14:30 |
| 12 | Q.  No. 10 asks for all documents by and/or | 10:14:33 |
| 13 | addressed to the witness concerning this case.  Have | 10:14:36 |
| 14 | you brought all those documents? | 10:14:39 |
| 15 | A.  Yes. | 10:14:41 |
| 16 | Q.  And that's the single document from | 10:14:41 |
| 17 | Plaintiffs' counsel to retain you; is that correct? | 10:14:47 |
| 18 | A.  Yes. | 10:14:50 |
| 19 | Q.  No. 11 asks for all reports, notes and | 10:14:50 |
| 20 | writings prepared by the witness or at the witness' | 10:14:57 |
| 21 | request concerning this case, including all drafts | 10:14:59 |
| 22 | and notes.  Did you bring that information? | 10:15:02 |
| 23 | A.  I did. | 10:15:03 |
| 24 | Q.  The report you prepared, how long did it | 10:15:04 |

21

Peter Bossley, 11/7/2017
Payan v. Los Angeles Community College District

| | | |
|---|---|---|
| 1 | take you to prepare that written report? | 10:15:08 |
| 2 | A.  My -- again, my best estimate is -- | 10:15:10 |
| 3 | without actually looking back at everything to | 10:15:17 |
| 4 | calculate, is somewhere between 40 and 50 hours. | 10:15:18 |
| 5 | Q.  Now, did you make any drafts of that | 10:15:22 |
| 6 | report? | 10:15:25 |
| 7 | A.  I did. | 10:15:27 |
| 8 | Q.  Did you submit any drafts for comments | 10:15:28 |
| 9 | by anyone before you prepared the final report? | 10:15:30 |
| 10 | A.  I did. | 10:15:32 |
| 11 | Q.  Who did you submit the draft or drafts | 10:15:33 |
| 12 | to? | 10:15:35 |
| 13 | A.  To lawyers at Brown, Goldstein, Levy. | 10:15:36 |
| 14 | Q.  And do you remember when it was you | 10:15:39 |
| 15 | submitted either a draft or drafts to them? | 10:15:41 |
| 16 | A.  It would have been somewhere in the week | 10:15:45 |
| 17 | preceding the deadline, November -- the deadline of | 10:15:53 |
| 18 | November 2nd, I believe it was. | 10:15:58 |
| 19 | Q.  I think the report was October 2nd. | 10:16:00 |
| 20 | A.  Sorry, October 2nd.  My apologies. | 10:16:02 |
| 21 | Q.  As a result of submitting those drafts | 10:16:04 |
| 22 | to Plaintiffs' counsel, did you make any corrections | 10:16:06 |
| 23 | to your report? | 10:16:08 |
| 24 | A.  I didn't make corrections. | 10:16:09 |

22

```
 1        Q.  Did you add additional information at          10:16:16

 2   the request of counsel?                                 10:16:19

 3        A.  I did.                                          10:16:20

 4        Q.  Do you remember what it was?                    10:16:23

 5        MS. KREVOR-WEISBAUM:  Objection.  You               10:16:25

 6   don't have to answer about the drafts, they are not     10:16:26

 7   discoverable.                                            10:16:28

 8        MR. CLEELAND:  That's not what I asked.             10:16:30

 9   I said did you add information to the draft for the      10:16:31

10   final report?  That means I've got it, he needs to      10:16:34

11   tell me what he added.  I didn't ask what the drafts    10:16:37

12   were.                                                    10:16:40

13        MS. KREVOR-WEISBAUM:  I think that's               10:16:41

14   about the same.                                          10:16:41

15        MR. CLEELAND:  I'm going to ask that                10:16:44

16   question.                                                10:16:45

17   By Mr. Cleeland:                                         10:16:46

18        Q.  Sir, after you spoke with Plaintiffs'          10:16:47

19   counsel or communicated -- after you gave them the      10:16:48

20   document, you just told me that you added information   10:16:51

21   to the report.  Do you recall what it was that you      10:16:53

22   added at the request of counsel?                        10:16:56

23        MS. KREVOR-WEISBAUM:  Objection, but you           10:16:57

24   can answer.                                              10:16:59
```

                                                                    23

Peter Bossley, 11/7/2017
Payan v. Los Angeles Community College District

| | | |
|---|---|---|
| 1 | MR. CLEELAND:  Thank you very much. | 10:17:00 |
| 2 | THE WITNESS:  I believe there was some | 10:17:01 |
| 3 | clarification regarding the details of what in my | 10:17:04 |
| 4 | opinion universities and colleges should be doing. | 10:17:13 |
| 5 | By Mr. Cleeland: | 10:17:16 |
| 6 | Q.  Can you specifically identify that | 10:17:17 |
| 7 | information? | 10:17:18 |
| 8 | MS. KREVOR-WEISBAUM:  Objection.  I | 10:17:19 |
| 9 | really don't think he needs -- this is, in essence, | 10:17:25 |
| 10 | asking for his drafts; it's the same thing. | 10:17:28 |
| 11 | MR. CLEELAND:  No, I'm looking at the | 10:17:31 |
| 12 | final document. | 10:17:32 |
| 13 | MS. KREVOR-WEISBAUM:  And that's -- | 10:17:33 |
| 14 | MR. CLEELAND:  You cut me off again, but | 10:17:35 |
| 15 | that's okay. | 10:17:37 |
| 16 | MS. KREVOR-WEISBAUM:  That's all -- | 10:17:37 |
| 17 | under federal rules you're entitled to his final | 10:17:37 |
| 18 | document, you're not entitled to drafts.  And in | 10:17:40 |
| 19 | essence what you're asking for is what did his drafts | 10:17:43 |
| 20 | look like versus what did the final document look | 10:17:46 |
| 21 | like. | 10:17:48 |
| 22 | MR. CLEELAND:  No, I'm asking what the | 10:17:48 |
| 23 | lawyers asked him to put in a report.  That clearly | 10:17:50 |
| 24 | is relevant and discoverable. | 10:17:52 |

24

Peter Bossley, 11/7/2017
Payan v. Los Angeles Community College District

| | | |
|---|---|---|
| 1 | MS. KREVOR-WEISBAUM:  I'm not sure | 10:17:55 |
| 2 | you're right on that. | 10:17:57 |
| 3 | MR. CLEELAND:  We could save everybody a | 10:17:58 |
| 4 | lot of time and fight about it later.  But I need to | 10:18:00 |
| 5 | know what is his information and what is the lawyer's | 10:18:02 |
| 6 | information.  That clearly is relevant and | 10:18:05 |
| 7 | discoverable. | 10:18:07 |
| 8 | MS. KREVOR-WEISBAUM:  Why don't ask you | 10:18:08 |
| 9 | him if the report is his information? | 10:18:09 |
| 10 | MR. CLEELAND:  He just told me he added | 10:18:10 |
| 11 | information at the request of the lawyers.  I just | 10:18:12 |
| 12 | asked what was that information. | 10:18:13 |
| 13 | MS. KREVOR-WEISBAUM:  And that's not | 10:18:15 |
| 14 | what he testified to. | 10:18:15 |
| 15 | MR. CLEELAND:  I'd like to hear that | 10:18:18 |
| 16 | back. | 10:18:18 |
| 17 | MS. KREVOR-WEISBAUM:  Me to. | 10:18:19 |
| 18 | MR. CLEELAND:  But I'll ask it straight | 10:18:20 |
| 19 | ahead. | 10:18:21 |
| 20 | By Mr. Cleeland: | 10:18:21 |
| 21 | Q.  Sir, did you add information to your | 10:18:21 |
| 22 | report which you said clarified, at the request of | 10:18:23 |
| 23 | counsel? | 10:18:26 |
| 24 | MS. KREVOR-WEISBAUM:  Continuing | 10:18:31 |

25

| | | |
|---|---|---|
| 1 | objection. | 10:18:31 |
| 2 | MR. CLEELAND:  That's fine.  I think | 10:18:32 |
| 3 | that's fair. | 10:18:33 |
| 4 | THE WITNESS:  I did. | 10:18:35 |
| 5 | By Mr. Cleeland: | 10:18:36 |
| 6 | Q.  I'm just trying to find out what you | 10:18:37 |
| 7 | added at the request of counsel. | 10:18:38 |
| 8 | MS. KREVOR-WEISBAUM:  I'm sorry. | 10:18:46 |
| 9 | Continuing objection, but you can -- if you know the | 10:18:47 |
| 10 | answer to that, you can answer.  And we'll fight | 10:18:49 |
| 11 | about it later, as he said. | 10:18:52 |
| 12 | THE WITNESS:  I don't recall -- I don't | 10:18:53 |
| 13 | recall the specifics.  There was -- there was a | 10:18:55 |
| 14 | number of requests that were, you know, could you | 10:19:00 |
| 15 | please clarify what you've said here. | 10:19:05 |
| 16 | By Mr. Cleeland: | 10:19:10 |
| 17 | Q.  And did you create a document or a | 10:19:11 |
| 18 | record of those requests? | 10:19:13 |
| 19 | A.  No. | 10:19:18 |
| 20 | Q.  How is it that you knew that your final | 10:19:19 |
| 21 | submitted report addressed the questions to clarify | 10:19:27 |
| 22 | as raised by counsel? | 10:19:31 |
| 23 | A.  I didn't. | 10:19:32 |
| 24 | Q.  After you added the information did you | 10:19:37 |

26

| | | |
|---|---|---|
| 1 | have any conversations with counsel? | 10:19:39 |
| 2 | A.  Yes. | 10:19:41 |
| 3 | Q.  Did they indicate that you resolved | 10:19:42 |
| 4 | their concern? | 10:19:45 |
| 5 | A.  They didn't specifically discuss their | 10:19:46 |
| 6 | concerns. | 10:19:52 |
| 7 | Q.  Well, they asked you to clarify, | 10:19:54 |
| 8 | correct? | 10:20:09 |
| 9 | MS. KREVOR-WEISBAUM:  You can answer | 10:20:10 |
| 10 | that.  Sorry, we were waiting. | 10:20:10 |
| 11 | THE WITNESS:  They did. | 10:20:12 |
| 12 | By Mr. Cleeland: | 10:20:14 |
| 13 | Q.  And what did you clarify? | 10:20:14 |
| 14 | A.  What I believed, in my opinion, colleges | 10:20:15 |
| 15 | and universities should be doing to address digital | 10:20:21 |
| 16 | accessibility. | 10:20:25 |
| 17 | Q.  You just said "my opinion".  Is "my | 10:20:27 |
| 18 | opinion" based upon anything? | 10:20:32 |
| 19 | A.  My knowledge and experience in the | 10:20:34 |
| 20 | field. | 10:20:36 |
| 21 | Q.  Okay.  Thank you very much. | 10:20:36 |
| 22 | No. 12 asks for all writings provided to | 10:20:38 |
| 23 | you by anyone involved in this case.  Have you | 10:20:51 |
| 24 | provided us with all of those materials, again, with | 10:20:53 |

27

| | | |
|---|---|---|
| 1 | the exception of the deposition transcripts? | 10:20:57 |
| 2 | A.  Yes. | 10:20:59 |
| 3 | Q.  No. 13 asks for all computer databases | 10:21:00 |
| 4 | and/or programs generated and/or relied upon by the | 10:21:05 |
| 5 | witness in the course of reaching his testimony | 10:21:09 |
| 6 | and/or opinion.  Have you brought that information | 10:21:12 |
| 7 | with you? | 10:21:14 |
| 8 | A.  I did not create any computer databases | 10:21:15 |
| 9 | or use any -- or use any computer databases in the | 10:21:19 |
| 10 | formation of my opinion. | 10:21:22 |
| 11 | Q.  Thank you for clarifying that. | 10:21:23 |
| 12 | So you didn't utilize any computer | 10:21:24 |
| 13 | databases in reaching your opinions or conclusions? | 10:21:26 |
| 14 | A.  No, sir, I did not. | 10:21:27 |
| 15 | Q.  Thank you. | 10:21:29 |
| 16 | No. 14 asks for all memoranda, telephone | 10:21:31 |
| 17 | logs, telephone memoranda, or other documents | 10:21:34 |
| 18 | relating to any meetings and/or conversations | 10:21:38 |
| 19 | regarding any and all plaintiffs.  Did such documents | 10:21:41 |
| 20 | exist at any time? | 10:21:45 |
| 21 | A.  No, sir. | 10:21:46 |
| 22 | Q.  Thank you. | 10:21:47 |
| 23 | No. 15 asks for all billings of the | 10:21:47 |
| 24 | witness for services rendered in connection with the | 10:21:50 |

28

| | | |
|---|---|---|
| 1 | evaluation of any and all claims asserted in this | 10:21:54 |
| 2 | matter.  And in the packet of information you gave us | 10:21:56 |
| 3 | today there appears to be a one-page invoice.  Is | 10:21:59 |
| 4 | that responsive to this request? | 10:22:03 |
| 5 | A.  That's the only thing that's been | 10:22:04 |
| 6 | submitted. | 10:22:06 |
| 7 | Q.  It doesn't ask for submitted, but | 10:22:07 |
| 8 | generated. | 10:22:09 |
| 9 | So in addition to the one-page invoice | 10:22:10 |
| 10 | beginning in October -- excuse me, dated October of | 10:22:13 |
| 11 | 2017, do you have any other invoices or storage | 10:22:15 |
| 12 | material reflecting the time you spent in this | 10:22:21 |
| 13 | matter? | 10:22:23 |
| 14 | A.  I do, yes. | 10:22:23 |
| 15 | Q.  What is that? | 10:22:24 |
| 16 | A.  I have essentially what is the next one | 10:22:25 |
| 17 | of that invoice, yes. | 10:22:30 |
| 18 | Q.  And did you bring that with you today? | 10:22:32 |
| 19 | A.  I didn't print a copy, but I do have it | 10:22:33 |
| 20 | with me. | 10:22:36 |
| 21 | Q.  Okay.  Could you take a look at that | 10:22:36 |
| 22 | document and tell us what the time frame for that | 10:22:38 |
| 23 | document is? | 10:22:41 |
| 24 | A.  So this runs from October 1st of 2017 | 10:22:53 |

29

| | | |
|---|---|---|
| 1 | until 11-6-17, and it has a total of another | 10:23:00 |
| 2 | 15-and-three-quarters hours listed on it. | 10:23:11 |
| 3 | Q.  And does it identify the work? | 10:23:15 |
| 4 | A.  Yes. | 10:23:19 |
| 5 | Q.  What is that? | 10:23:20 |
| 6 | A.  There's document review, report | 10:23:26 |
| 7 | formatting, subsequent review of the report, some | 10:23:30 |
| 8 | deposition review, consulting phone call, and | 10:23:37 |
| 9 | additional deposition preparation time. | 10:23:46 |
| 10 | Q.  The document review on this as yet | 10:23:55 |
| 11 | submitted invoice, how much time do you have entered? | 10:23:59 |
| 12 | A.  Can you clarify what you mean? | 10:24:04 |
| 13 | Q.  Well, you told me certain categories | 10:24:06 |
| 14 | within this -- can we call it a pending invoice? | 10:24:09 |
| 15 | A.  Correct.  Sure. | 10:24:12 |
| 16 | Q.  All right.  You identified several | 10:24:13 |
| 17 | categories within the pending invoice.  What is the | 10:24:14 |
| 18 | total time that you billed in that category of | 10:24:16 |
| 19 | document review on the pending invoice?  And if it | 10:24:20 |
| 20 | helps, are there multiple entries? | 10:24:27 |
| 21 | A.  Yes. | 10:24:29 |
| 22 | Q.  That's the problem.  Are you able to | 10:24:29 |
| 23 | total that? | 10:24:31 |
| 24 | A.  It looks like, ball-parking it, it's | 10:24:40 |

30

| | | |
|---|---|---|
| 1 | around ten hours. | 10:24:42 |
| 2 | MS. KREVOR-WEISBAUM:  Clarification. | 10:24:44 |
| 3 | MR. CLEELAND:  Sure. | 10:24:46 |
| 4 | MS. KREVOR-WEISBAUM:  I think you | 10:24:47 |
| 5 | asked -- did you ask document review, or did you ask | 10:24:48 |
| 6 | the whole number? | 10:24:51 |
| 7 | MR. CLEELAND:  I asked for document | 10:24:52 |
| 8 | review.  We're going to go through by category, if | 10:24:53 |
| 9 | that helps.  I'm pretty predictable, I tend to go | 10:24:56 |
| 10 | through methodically. | 10:25:00 |
| 11 | MS. KREVOR-WEISBAUM:  Let's go back, | 10:25:02 |
| 12 | because I think you were adding -- | 10:25:05 |
| 13 | THE WITNESS:  So I have half hour of | 10:25:05 |
| 14 | document review, but I guess I need to clarify what | 10:25:07 |
| 15 | you -- I need you to clarify what you mean by | 10:25:10 |
| 16 | documents.  Does documents mean the report, reviewing | 10:25:13 |
| 17 | the report as well, my written report? | 10:25:16 |
| 18 | By Mr. Cleeland: | 10:25:19 |
| 19 | Q.  Well, I'm just utilizing the phrase you | 10:25:19 |
| 20 | said.  You said document review. | 10:25:22 |
| 21 | A.  So document review, there's only a half | 10:25:23 |
| 22 | hour. | 10:25:25 |
| 23 | Q.  Okay. | 10:25:25 |
| 24 | A.  Sorry. | 10:25:26 |

31

Peter Bossley, 11/7/2017
Payan v. Los Angeles Community College District

| | | |
|---|---|---|
| 1 | Q.  And then you have report formatting. | 10:25:26 |
| 2 | How much time did you spend on that on this pending | 10:25:31 |
| 3 | invoice? | 10:25:35 |
| 4 | A.  Three-and-a-half hours. | 10:25:37 |
| 5 | Q.  And do you remember the -- can you tell | 10:25:39 |
| 6 | the dates that you incurred that expense? | 10:25:40 |
| 7 | MS. KREVOR-WEISBAUM:  I'm just -- I'm | 10:25:44 |
| 8 | just wanting to be absolutely clear, so when you get | 10:25:45 |
| 9 | this report it's clear. | 10:25:48 |
| 10 | MR. CLEELAND:  Sure.  Appreciate that. | 10:25:49 |
| 11 | MS. KREVOR-WEISBAUM:  Report -- this is | 10:25:51 |
| 12 | a little hard because it's not -- but could you, | 10:25:52 |
| 13 | Mr. Bossley, go back to report formatting, add up | 10:25:55 |
| 14 | what you have again?  I see two categories -- two | 10:25:59 |
| 15 | invoices. | 10:26:03 |
| 16 | THE WITNESS:  Yeah, there's -- I have | 10:26:05 |
| 17 | one-and-a-half hours, and an employee of mine spent | 10:26:08 |
| 18 | two hours on it. | 10:26:12 |
| 19 | MS. KREVOR-WEISBAUM:  That's a two-hour. | 10:26:15 |
| 20 | THE WITNESS:  Yes. | 10:26:16 |
| 21 | By Mr. Cleeland: | 10:26:17 |
| 22 | Q.  Someone assisted you in your assignment | 10:26:18 |
| 23 | in this matter? | 10:26:20 |
| 24 | A.  Someone assisted me with a portion of | 10:26:21 |

32

Peter Bossley, 11/7/2017
Payan v. Los Angeles Community College District

| | | |
|---|---|---|
| 1 | that. | 10:26:23 |
| 2 | Q.  Who is that? | 10:26:23 |
| 3 | A.  His name is Abdirahim Abdi, | 10:26:24 |
| 4 | A-b-d-i-r-a-h-i-m, A-b-d-i. | 10:26:32 |
| 5 | Q.  And who is that gentleman? | 10:26:35 |
| 6 | A.  He's -- he's an employee of mine. | 10:26:36 |
| 7 | Q.  And by "employee of mine", do you mean a | 10:26:42 |
| 8 | company employee? | 10:26:49 |
| 9 | A.  An employee of my company, Accessibility | 10:26:50 |
| 10 | Ally. | 10:26:57 |
| 11 | Q.  Did anyone other than Mr. Abdi work on | 10:26:57 |
| 12 | this assignment with you? | 10:27:03 |
| 13 | A.  No. | 10:27:05 |
| 14 | Q.  On the report formatting, can you tell | 10:27:10 |
| 15 | the dates of entry of that time? | 10:27:14 |
| 16 | A.  That would have been October 2nd, 2017. | 10:27:20 |
| 17 | Q.  Did they -- did -- the final report is | 10:27:23 |
| 18 | dated; is that correct? | 10:27:26 |
| 19 | A.  I believe that's correct. | 10:27:28 |
| 20 | Q.  Then you also identified the category of | 10:27:30 |
| 21 | subsequent review of report.  Is that the October 2nd | 10:27:33 |
| 22 | report you're talking about? | 10:27:37 |
| 23 | A.  It is. | 10:27:38 |
| 24 | Q.  And when was that entry made? | 10:27:39 |

33

1        A.   October 6th.                                    10:27:41

2        Q.   Is there some reason you were reviewing          10:27:43

3    the report days after you submitted it?                  10:27:45

4        A.   I find it useful to review things after         10:27:48

5    I've done them.                                          10:27:53

6        Q.   Did you make any corrections or changes         10:27:54

7    after that review on or about October 6th?               10:27:56

8        A.   No, sir.                                         10:27:59

9        Q.   Did you talk to anybody about your              10:28:01

10   review of October 6th?                                   10:28:02

11       A.   I did not.                                       10:28:05

12       Q.   Next entry you referred to was a depo           10:28:09

13   review.  When was that?                                  10:28:12

14       A.   That was 10-22.                                 10:28:18

15       Q.   Do you know which deposition or                 10:28:24

16   depositions you reviewed?                                10:28:26

17       A.   I don't recall offhand.  I would have to        10:28:28

18   look.                                                    10:28:35

19       Q.   Why were you reviewing a depo or                10:28:35

20   depositions on October 22nd, 2017?                       10:28:38

21       A.   These were depositions that I believe          10:28:41

22   were not available prior to the generation -- the        10:28:43

23   writing of the report.                                   10:28:50

24       Q.   And did any information within those            10:28:51

34

Peter Bossley, 11/7/2017
Payan v. Los Angeles Community College District

| | | |
|---|---|---|
| 1 | depositions you reviewed on or about October 22nd | 10:28:54 |
| 2 | change, alter, or support your opinions or | 10:28:57 |
| 3 | conclusions as identified in your written report? | 10:29:00 |
| 4 | A.  I don't believe so. | 10:29:02 |
| 5 | Q.  Next category referred to is consulting | 10:29:08 |
| 6 | phone call or calls.  How many phone calls are you | 10:29:10 |
| 7 | talking about? | 10:29:19 |
| 8 | A.  I believe there were two calls. | 10:29:19 |
| 9 | Q.  Do you know who they were to or with? | 10:29:24 |
| 10 | A.  They were with the law firm Brown, | 10:29:27 |
| 11 | Goldstein, Levy. | 10:29:30 |
| 12 | Q.  And when were those calls? | 10:29:30 |
| 13 | A.  10-23-2017 and 10-25-2017. | 10:29:33 |
| 14 | Q.  And the total amount of time for those | 10:29:41 |
| 15 | calls? | 10:29:43 |
| 16 | A.  I don't recall offhand. | 10:29:45 |
| 17 | Q.  Okay. | 10:29:57 |
| 18 | A.  I would have to go back and look.  The | 10:29:58 |
| 19 | reason I say that is because I now see there's a | 10:30:00 |
| 20 | blank spot in this spreadsheet, and then on the day | 10:30:04 |
| 21 | 10-23, the time I have listed was two-and-a-half | 10:30:11 |
| 22 | hours, but that was not all phone call time. | 10:30:16 |
| 23 | Q.  Was that the 10-25 conversation or | 10:30:20 |
| 24 | conversations? | 10:30:22 |

35

| | | |
|---|---|---|
| 1 | A.  10-23. | 10:30:23 |
| 2 | Q.  10-23.  So 10-23 went for about | 10:30:25 |
| 3 | two-and-a-half hours related to communication with | 10:30:28 |
| 4 | Plaintiffs' counsel; is that correct? | 10:30:31 |
| 5 | A.  There was a phone call and another | 10:30:32 |
| 6 | deposition review that day. | 10:30:34 |
| 7 | Q.  And was that deposition review related | 10:30:36 |
| 8 | to the phone call you had with counsel? | 10:30:38 |
| 9 | A.  No, it was not. | 10:30:40 |
| 10 | Q.  Do you remember whose deposition | 10:30:42 |
| 11 | transcript you reviewed on that date, October 23rd? | 10:30:43 |
| 12 | A.  I'm not a hundred percent sure.  I -- I | 10:30:48 |
| 13 | believe this may have been a final copy of one that | 10:30:53 |
| 14 | was only a rough draft that I had reviewed at an | 10:30:56 |
| 15 | earlier time. | 10:31:02 |
| 16 | Q.  And the last category you referred to | 10:31:04 |
| 17 | regarding this pending invoice was deposition prep | 10:31:06 |
| 18 | time.  How much time do you have for deposition | 10:31:10 |
| 19 | preparation? | 10:31:13 |
| 20 | A.  On October 31st, there was three hours, | 10:31:14 |
| 21 | and then on 11-6 there was an additional three hours. | 10:31:20 |
| 22 | Q.  And what was it that you did during the | 10:31:26 |
| 23 | October 31 preparation time of three hours? | 10:31:30 |
| 24 | A.  It was a conversation with Sharon from | 10:31:33 |

36

| | | |
|---|---|---|
| 1 | Brown, Goldstein, Levy. | 10:31:38 |
| 2 | Q. So you had another conversation with | 10:31:40 |
| 3 | counsel for Plaintiff; is that right? | 10:31:41 |
| 4 | A. That is correct. | 10:31:43 |
| 5 | Q. And during that three hours, what is it | 10:31:43 |
| 6 | that you spoke about with counsel? | 10:31:46 |
| 7 | A. We discussed the deposition process, and | 10:31:49 |
| 8 | went over any concerns I had. | 10:31:56 |
| 9 | Q. Did you have any concerns? | 10:31:58 |
| 10 | A. No, not really. | 10:32:00 |
| 11 | Q. Did you go over any concerns? | 10:32:03 |
| 12 | A. No. We didn't have -- I didn't have any | 10:32:06 |
| 13 | concerns that were addressed during that time. | 10:32:09 |
| 14 | Q. Well, I just heard you say that you went | 10:32:12 |
| 15 | over concerns you had. Is that just a misstatement? | 10:32:14 |
| 16 | A. It's not a misstatement. She was -- | 10:32:18 |
| 17 | Sharon was there to make sure I didn't have any | 10:32:21 |
| 18 | concerns, and address any that I did have, but there | 10:32:23 |
| 19 | were really none. | 10:32:26 |
| 20 | Q. Three-hour conversation is a pretty long | 10:32:28 |
| 21 | phone call, isn't it, for you? | 10:32:32 |
| 22 | A. I would say it's a fairly long time, | 10:32:33 |
| 23 | yeah. | 10:32:36 |
| 24 | Q. And do you remember any of the specifics | 10:32:37 |

37

Peter Bossley, 11/7/2017
Payan v. Los Angeles Community College District

| | | |
|---|---|---|
| 1 | you discussed during that phone call? | 10:32:40 |
| 2 | A. I don't. Actually, there was not a | 10:32:41 |
| 3 | phone call. | 10:32:46 |
| 4 | Q. Was it a face-to-face? | 10:32:47 |
| 5 | A. Yes. | 10:32:48 |
| 6 | Q. Where was that? | 10:32:48 |
| 7 | A. That was here in Columbus. | 10:32:51 |
| 8 | Q. Where was it, specifically? An office, | 10:32:53 |
| 9 | a restaurant? | 10:32:58 |
| 10 | A. An office. | 10:32:59 |
| 11 | Q. Whose office? | 10:33:00 |
| 12 | A. My office. | 10:33:01 |
| 13 | Q. Where is that address? | 10:33:02 |
| 14 | A. 113 West 12th Avenue. | 10:33:05 |
| 15 | Q. In Columbus? | 10:33:09 |
| 16 | A. Yes. | 10:33:10 |
| 17 | Q. Was anyone else present during that | 10:33:12 |
| 18 | conversation? | 10:33:14 |
| 19 | A. No. | 10:33:14 |
| 20 | Q. As a result of that conversation did you | 10:33:19 |
| 21 | conduct any additional work related to your retention | 10:33:21 |
| 22 | as an expert witness in this matter? | 10:33:24 |
| 23 | A. I reviewed my report an additional time, | 10:33:26 |
| 24 | and also reviewed my resume. | 10:33:34 |

38

1      Q.  And during this approximate three-hour          10:33:38

2   conversation, were you told what the positions of the   10:33:41

3   Defendants in this case were?                           10:33:44

4      A.  No.                                              10:33:44

5      Q.  You also have deposition preparation            10:33:45

6   time on November 6th.  Is that yesterday?               10:33:49

7      A.  Yes.                                             10:33:54

8      Q.  And was that a conversation                      10:33:54

9   face-to-face, or something else?                        10:33:58

10      A.  This was my personal preparation, there         10:33:59

11   was no conversation.                                   10:34:02

12      Q.  Thank you.                                      10:34:03

13          And what did you do during that three          10:34:04

14   hours of preparation for your deposition?              10:34:06

15      A.  This was when I spent time looking at           10:34:08

16   the report and my resume.                              10:34:13

17      Q.  As a result of the preparation time --         10:34:17

18   well, let me back up.                                  10:34:20

19          As a result of any activity you have           10:34:21

20   undertaken from the date of the preparation of your   10:34:24

21   report, which I believe is dated October 2nd, 2017,   10:34:26

22   have you considered making any changes to that        10:34:32

23   report?                                                10:34:35

24      A.  I have not.                                     10:34:36

39

| | | |
|---|---|---|
| 1 | Q.  You're not involved in determining any | 10:34:51 |
| 2 | claimed damages by the Plaintiffs, are you? | 10:34:53 |
| 3 | A.  No, sir. | 10:34:55 |
| 4 | Q.  Thank you. | 10:34:56 |
| 5 | What is your understanding as to what | 10:34:56 |
| 6 | your assignment was in this matter? | 10:34:59 |
| 7 | A.  My understanding was that I was to | 10:35:00 |
| 8 | provide my technical and professional expertise in | 10:35:05 |
| 9 | the areas of digital accessibility, and Americans | 10:35:10 |
| 10 | With Disability Act, and Section 504 compliance | 10:35:19 |
| 11 | issues. | 10:35:22 |
| 12 | Q.  Anything else? | 10:35:23 |
| 13 | A.  No. | 10:35:37 |
| 14 | Q.  If we could spend a little time with | 10:35:37 |
| 15 | your report, I have a few questions for you.  And for | 10:35:40 |
| 16 | purposes of the record, you have in front of you a | 10:35:45 |
| 17 | computer.  Does that computer have a copy of the | 10:35:48 |
| 18 | report that you can access? | 10:35:50 |
| 19 | A.  It does. | 10:35:52 |
| 20 | Q.  And if at any time during the deposition | 10:35:53 |
| 21 | you need a break, please let me know. | 10:35:55 |
| 22 | A.  Thank you. | 10:35:57 |
| 23 | Q.  And if at any time you need additional | 10:35:57 |
| 24 | information for a question to assist you, you let me | 10:36:00 |

ADVANCED DEPOSITIONS
www.advanceddepositions.com | 855.811.3376

Peter Bossley, 11/7/2017
Payan v. Los Angeles Community College District

| | | |
|---|---|---|
| 1 | know, okay? | 10:36:03 |
| 2 | A.  Thank you. | 10:36:05 |
| 3 | Q.  The document we were provided seems to | 10:36:09 |
| 4 | have as a first page, although it's not paginated, | 10:36:13 |
| 5 | the date October 2nd, 2017, Los Angeles County | 10:36:22 |
| 6 | Community College District Digital Accessibility | 10:36:29 |
| 7 | Report prepared by Accessibility Ally, A-l-l-y, Inc., | 10:36:33 |
| 8 | Peter Bossley, President. | 10:36:38 |
| 9 | Is that what you referred to previously | 10:36:40 |
| 10 | as your report? | 10:36:41 |
| 11 | A.  Yes. | 10:36:43 |
| 12 | Q.  Next line it says, "At the request of." | 10:36:43 |
| 13 | Did you understand that you were preparing this | 10:36:51 |
| 14 | report due to pending litigation? | 10:36:53 |
| 15 | A.  I did. | 10:36:55 |
| 16 | Q.  Did you understand that the parties | 10:36:56 |
| 17 | who -- excuse me -- the party requesting you to do | 10:36:58 |
| 18 | the work in this matter was the Plaintiff? | 10:37:01 |
| 19 | A.  I did understand that, yes. | 10:37:03 |
| 20 | Q.  Have you spoken with Mr. Payan? | 10:37:05 |
| 21 | A.  I have not. | 10:37:08 |
| 22 | Q.  Have you ever spoken with Ms. Mason? | 10:37:09 |
| 23 | A.  No, sir. | 10:37:10 |
| 24 | Q.  Have you ever spoken with any of the | 10:37:11 |

41

Peter Bossley, 11/7/2017
Payan v. Los Angeles Community College District

| | | |
|---|---|---|
| 1 | instructors of Mr. Payan? | 10:37:13 |
| 2 | A.  To the best of my knowledge, I have not. | 10:37:16 |
| 3 | Q.  Have you ever spoken with any of the | 10:37:18 |
| 4 | instructors of Ms. Mason? | 10:37:19 |
| 5 | A.  To the best of my knowledge, I have not. | 10:37:21 |
| 6 | Q.  Have you ever spoken with any | 10:37:23 |
| 7 | administrators at the Los Angeles County Community | 10:37:25 |
| 8 | College? | 10:37:29 |
| 9 | A.  To the best of my knowledge, I have not. | 10:37:29 |
| 10 | However, I am heavily involved in this topic, digital | 10:37:32 |
| 11 | accessibility topic, throughout my time at Ohio | 10:37:39 |
| 12 | State, and it's remotely possible. | 10:37:44 |
| 13 | Again, I don't recall any circumstances | 10:37:48 |
| 14 | where this might have taken place, but there may have | 10:37:50 |
| 15 | been some discussion on maybe one of the industry | 10:37:53 |
| 16 | emails list service. | 10:38:00 |
| 17 | Q.  And of course it's possible someone who | 10:38:02 |
| 18 | fits that category attended one of your | 10:38:06 |
| 19 | presentations? | 10:38:08 |
| 20 | A.  It's possible, but I don't recall any | 10:38:08 |
| 21 | circumstances. | 10:38:10 |
| 22 | Q.  And I think I was directing that to | 10:38:10 |
| 23 | recollection of specific conversations directed | 10:38:13 |
| 24 | towards an individual. | 10:38:15 |

42

Peter Bossley, 11/7/2017
Payan v. Los Angeles Community College District

| | | |
|---|---|---|
| 1 | A.  I do not have any recollection of any | 10:38:16 |
| 2 | conversations of that nature. | 10:38:18 |
| 3 | Q.  Thank you.  And I hope that helped a | 10:38:20 |
| 4 | little bit. | 10:38:23 |
| 5 | A.  Thank you. | 10:38:23 |
| 6 | Q.  On page 1 you talk about your | 10:38:24 |
| 7 | qualifications and background.  And specifically in | 10:38:27 |
| 8 | the second paragraph thereunder, you state, "I am | 10:38:31 |
| 9 | also Director of the Ohio State University's Digital | 10:38:36 |
| 10 | Accessibility Center (DAC)."  What is the Ohio State | 10:38:41 |
| 11 | University's Digital Accessibility Center? | 10:38:48 |
| 12 | A.  Ohio State's Digital Accessibility | 10:38:50 |
| 13 | Center is a collaboration between our office of | 10:38:54 |
| 14 | University Compliance and Integrity, and our Student | 10:38:57 |
| 15 | Life Disability Services Office.  We are responsible | 10:39:01 |
| 16 | for leading digital compliance accessibility efforts | 10:39:09 |
| 17 | for the university. | 10:39:13 |
| 18 | Q.  Is there a managing group of that | 10:39:14 |
| 19 | Digital Accessibility Center? | 10:39:24 |
| 20 | A.  I'm the Director of the unit. | 10:39:26 |
| 21 | Q.  Is there a committee that's involved | 10:39:28 |
| 22 | with that?  I'm trying to find out who manages the | 10:39:30 |
| 23 | various aspects of the DAC. | 10:39:35 |
| 24 | A.  I have day-to-day responsibility.  The | 10:39:37 |

43

Peter Bossley, 11/7/2017
Payan v. Los Angeles Community College District

| | | |
|---|---|---|
| 1 | administrative oversight is our ADA coordinator and | 10:39:42 |
| 2 | Section 504 coordinator. | 10:39:46 |
| 3 | Q. Who is that? | 10:39:48 |
| 4 | A. His name is Scott Lissner. His first | 10:39:48 |
| 5 | initial is L., but he goes by Scott. | 10:39:51 |
| 6 | Q. Could you spell his last name? | 10:39:54 |
| 7 | A. L-i-s-s-n-e-r. | 10:39:56 |
| 8 | Q. You continue in that report, "I lead the | 10:40:05 |
| 9 | University's digital accessibility compliance efforts | 10:40:07 |
| 10 | under the direction of the ADA coordinator/Section | 10:40:11 |
| 11 | 504 Compliance Officer." | 10:40:15 |
| 12 | What is it that you mean by digital | 10:40:17 |
| 13 | accessibility compliance efforts? | 10:40:20 |
| 14 | A. We have a number of efforts aimed at | 10:40:23 |
| 15 | compliance with state and federal regulations on | 10:40:29 |
| 16 | disability access. | 10:40:32 |
| 17 | Digital accessibility is a more narrow | 10:40:34 |
| 18 | interpretation of that, consisting of our online web | 10:40:36 |
| 19 | presence, online digital software that is procured by | 10:40:42 |
| 20 | the university, or otherwise managed on behalf of the | 10:40:48 |
| 21 | university, instructional technology used in the | 10:40:51 |
| 22 | classroom, and any other information conveyed through | 10:40:55 |
| 23 | digital means, like mobile applications, things of | 10:41:01 |
| 24 | that nature. | 10:41:05 |

44

Peter Bossley, 11/7/2017
Payan v. Los Angeles Community College District

1      Q.  And you indicated that this was related          10:41:11

2  to online presence?                                      10:41:13

3      A.  That is correct.  And anything related           10:41:15

4  to digital information or services.  So we define        10:41:18

5  that broadly as things that are done online or           10:41:23

6  through a computer.                                       10:41:27

7      Q.  Okay.  And that's why I want to find out         10:41:28

8  a little bit more.  Online web presence appears          10:41:31

9  fairly straightforward.  Can you give me some            10:41:38

10 examples of other electronic information or materials    10:41:39

11 that you are responsible for?                             10:41:45

12     A.  Sure.  So we have a mobile application           10:41:47

13 that our students -- staff and students use on their     10:41:51

14 Smartphones.  There are a number of applications that    10:41:56

15 are used by other parts of campus such as our dining     10:42:00

16 services.                                                 10:42:05

17         We have responsibility for electronic            10:42:09

18 documents, so that would be things that are created      10:42:11

19 for use in the classroom, or posted online for           10:42:16

20 download.                                                 10:42:21

21         Also any application that the campus             10:42:23

22 might use on -- and now I'm moving away from mobile      10:42:28

23 applications and talking more broadly about web          10:42:32

24 applications, so things like selecting your benefits     10:42:34

45

Peter Bossley, 11/7/2017
Payan v. Los Angeles Community College District

| | | |
|---|---|---|
| 1 | for staff, items of that nature. | 10:42:40 |
| 2 | Q.  Anything else? | 10:42:46 |
| 3 | A.  Not off the top of my head. | 10:42:47 |
| 4 | Q.  How about library services? | 10:42:53 |
| 5 | A.  Library services delivered through the | 10:42:55 |
| 6 | web would fall under that category as well. | 10:42:58 |
| 7 | Q.  How about not delivered through the web? | 10:43:00 |
| 8 | A.  Library services that are handled in | 10:43:02 |
| 9 | person would not be covered under my purview. | 10:43:05 |
| 10 | However, I would -- I would caveat that with if | 10:43:14 |
| 11 | there's a computer in the library that someone uses | 10:43:17 |
| 12 | to interact with library services, then it would. | 10:43:20 |
| 13 | Q.  Well, that's kind of where I'm | 10:43:24 |
| 14 | inquiring.  There are terminals within the university | 10:43:28 |
| 15 | libraries that allow access to library materials. | 10:43:30 |
| 16 | They are not web-based necessarily, they may be | 10:43:37 |
| 17 | hosted unilaterally or specifically by the library. | 10:43:39 |
| 18 | Are you responsible for that? | 10:43:45 |
| 19 | A.  I would have responsibility for | 10:43:46 |
| 20 | assisting that unit in making sure that those were | 10:43:49 |
| 21 | successful, yes. | 10:43:52 |
| 22 | Q.  Okay.  What is that responsibility? | 10:43:53 |
| 23 | A.  That responsibility is to advise the | 10:43:55 |
| 24 | unit on their responsibilities under our | 10:43:57 |

46

Peter Bossley, 11/7/2017
Payan v. Los Angeles Community College District

| | | |
|---|---|---|
| 1 | accessibility policies, and to provide them technical | 10:43:59 |
| 2 | assistance in meeting that obligation.  And if -- if | 10:44:04 |
| 3 | those things weren't happening, I would have | 10:44:11 |
| 4 | responsibility to make sure those issues were | 10:44:17 |
| 5 | escalated to senior leadership. | 10:44:19 |
| 6 |     Q.  Is there a name for that, either program | 10:44:21 |
| 7 | or capability of the library, that being the | 10:44:32 |
| 8 | computerized accessibility to library materials? | 10:44:37 |
| 9 |     A.  Really from a technology standpoint, it | 10:44:40 |
| 10 | falls under the same -- you know, the same kind of | 10:44:43 |
| 11 | challenges as -- as website and applications in other | 10:44:47 |
| 12 | context, it's not really unique in that sense. | 10:44:52 |
| 13 |     Q.  I'm not saying it is, I'm just trying to | 10:44:54 |
| 14 | find out if there's a name for it.  In other words, | 10:44:57 |
| 15 | Stanford University has a name for its programs.  The | 10:44:59 |
| 16 | United States Congress has a name for its programs. | 10:45:02 |
| 17 | The Library of Congress has a name for its program | 10:45:04 |
| 18 | availability.  I'm just trying to figure out if your | 10:45:07 |
| 19 | university does. | 10:45:10 |
| 20 |     A.  I don't believe so. | 10:45:11 |
| 21 |     Q.  Now, you said whatever that program is | 10:45:15 |
| 22 | that doesn't have a name that you're aware of, you | 10:45:18 |
| 23 | are to advise the unit of their obligations to comply | 10:45:21 |
| 24 | with certain regulations.  How do you do that? | 10:45:26 |

47

Peter Bossley, 11/7/2017
Payan v. Los Angeles Community College District

| | | |
|---|---|---|
| 1 | A.  We do it through a mixture of proactive | 10:45:32 |
| 2 | reviews, and through -- through complaint driven | 10:45:36 |
| 3 | processes. | 10:45:41 |
| 4 | Q.  Could you please describe what those | 10:45:43 |
| 5 | proactive reviews are that you just mentioned? | 10:45:45 |
| 6 | A.  We have a process where we select, every | 10:45:50 |
| 7 | year, a number of areas or issues to be examined, and | 10:45:53 |
| 8 | as we discover issues as part of that process we will | 10:46:01 |
| 9 | begin our -- our work with the unit on compliance | 10:46:06 |
| 10 | with all of our various accessibility policies. | 10:46:12 |
| 11 | Q.  Okay.  Again, this unit we're talking | 10:46:16 |
| 12 | about is the library materials, correct? | 10:46:19 |
| 13 | A.  Correct. | 10:46:21 |
| 14 | Q.  So we're just on that topic right now. | 10:46:21 |
| 15 | You also said a complaint driven component.  What did | 10:46:24 |
| 16 | you mean by that? | 10:46:28 |
| 17 | A.  If a library patron or students or staff | 10:46:30 |
| 18 | member has a problem accessing something and they | 10:46:36 |
| 19 | come to us and inform us that they are having | 10:46:40 |
| 20 | difficulty, we would immediately at that point | 10:46:42 |
| 21 | initiate a review of the issue in question -- | 10:46:44 |
| 22 | Q.  Now, you said -- | 10:46:49 |
| 23 | A.  -- and work to resolve it. | 10:46:50 |
| 24 | Q.  I apologize. | 10:46:51 |

48

1         A.   That's okay.                                   10:46:52

2         Q.   You said with respect to advising that         10:46:53

3    unit at the library, you conduct a proactive review      10:46:55

4    by selecting, every year, a certain number of            10:46:59

5    programs or -- I don't know if you had another title     10:47:03

6    for that.                                                10:47:07

7              How are those programs or available            10:47:08

8    materials selected to be subjected to this proactive     10:47:12

9    review?                                                  10:47:17

10        A.   So we have a method for identifying what       10:47:17

11   we consider to be high risk items, and we take a         10:47:24

12   number of the issues that are considered at the          10:47:32

13   highest risk level and work through those.               10:47:35

14        Q.   Could you please give me an example or         10:47:38

15   examples of high risk items?                             10:47:40

16        A.   High risk items, at least in our               10:47:44

17   institution's definition --                              10:47:49

18        Q.   Again, I apologize, we're talking about        10:47:51

19   this advice to the unit at the library system.           10:47:54

20        A.   So the library system has not been             10:47:59

21   reviewed as part of a proactive selection at this        10:48:01

22   time.                                                    10:48:04

23        Q.   Okay.  Again, my line of questioning the       10:48:05

24   last several minutes was related specifically to the     10:48:07

                                                         49

| | | |
|---|---|---|
| 1 | library, and you used the phrase unit.  So the | 10:48:10 |
| 2 | library unit, to your knowledge, is not subject to | 10:48:12 |
| 3 | this proactive every year selection of specific high | 10:48:14 |
| 4 | risk items; is that correct? | 10:48:20 |
| 5 | A.  In the time that I've been in this role, | 10:48:21 |
| 6 | they have not. | 10:48:23 |
| 7 | Q.  And how long have you been in this role? | 10:48:24 |
| 8 | A.  In this role for a year. | 10:48:25 |
| 9 | Q.  Okay.  Was there someone in this role | 10:48:28 |
| 10 | before you? | 10:48:32 |
| 11 | A.  There was. | 10:48:33 |
| 12 | Q.  Who was that? | 10:48:33 |
| 13 | A.  His name was Ken Petri, P-e-t-r-i. | 10:48:34 |
| 14 | Q.  And how long was Ken in that role? | 10:48:41 |
| 15 | A.  I believe, 11 years. | 10:48:43 |
| 16 | Q.  How long has this proactive review by | 10:48:46 |
| 17 | selecting every year high risk items been in effect? | 10:48:49 |
| 18 | A.  We have put it into effect in 2013. | 10:48:53 |
| 19 | Q.  Do you remember when in 2013? | 10:49:01 |
| 20 | A.  It would have been fall 2013. | 10:49:04 |
| 21 | Q.  So the fall of '13, the fall of '14, the | 10:49:06 |
| 22 | fall of '15, and '16 and '17, right? | 10:49:09 |
| 23 | A.  Correct. | 10:49:13 |
| 24 | Q.  So it's only been in effect for five | 10:49:13 |

50

Peter Bossley, 11/7/2017
Payan v. Los Angeles Community College District

| | | |
|---|---|---|
| 1 | years, and you've only been in charge of it for one | 10:49:15 |
| 2 | year, correct? | 10:49:17 |
| 3 | A.  That is correct. | 10:49:18 |
| 4 | Q.  And the advice -- excuse me.  The | 10:49:19 |
| 5 | library unit we talked about isn't subject to this | 10:49:23 |
| 6 | proactive review that you referred to, correct? | 10:49:26 |
| 7 | A.  Not at this time. | 10:49:28 |
| 8 | Q.  Is there a plan for it to be subject to | 10:49:29 |
| 9 | it at any time? | 10:49:32 |
| 10 | A.  There is currently a plan in progress | 10:49:33 |
| 11 | for every unit on campus to be subject to it. | 10:49:35 |
| 12 | Q.  I'm only asking about the library unit. | 10:49:38 |
| 13 | Is there a specific date for the library to be | 10:49:40 |
| 14 | included in the program? | 10:49:42 |
| 15 | A.  There's not a hard deadline at this | 10:49:43 |
| 16 | time.  I can estimate that it will be summer -- next | 10:49:45 |
| 17 | summer before we implement the requirements at that | 10:49:53 |
| 18 | scale. | 10:49:59 |
| 19 | Q.  And is there a soft deadline beyond the | 10:49:59 |
| 20 | summer of next year?  In other words, why do you | 10:50:02 |
| 21 | think it's summer of next year? | 10:50:08 |
| 22 | A.  We're currently in the process of a | 10:50:09 |
| 23 | policy refresh that will -- that will require this | 10:50:12 |
| 24 | process of everyone, including the library unit. | 10:50:15 |

51

Peter Bossley, 11/7/2017
Payan v. Los Angeles Community College District

| | | |
|---|---|---|
| 1 | Q.  Okay.  And you also said a component of | 10:50:19 |
| 2 | the services you provide is complaint driven.  Again, | 10:50:26 |
| 3 | we're only talking about the library unit at this | 10:50:31 |
| 4 | point in time. | 10:50:33 |
| 5 | A.  Okay. | 10:50:34 |
| 6 | Q.  Do you recall any specific complaints | 10:50:34 |
| 7 | directed against the library unit regarding | 10:50:38 |
| 8 | accessibility? | 10:50:40 |
| 9 | A.  I'm not aware of any complaints | 10:50:41 |
| 10 | regarding the library system. | 10:50:43 |
| 11 | Q.  But a complaint driven component is | 10:50:46 |
| 12 | acceptable to you? | 10:50:48 |
| 13 | MS. KREVOR-WEISBAUM:  Objection. | 10:50:50 |
| 14 | By Mr. Cleeland: | 10:50:52 |
| 15 | Q.  Is a complaint driven component in your | 10:50:53 |
| 16 | accessibility review a viable option? | 10:50:56 |
| 17 | A.  I would say it's not ideal. | 10:50:59 |
| 18 | Q.  Didn't say ideal.  I said viable. | 10:51:04 |
| 19 | A.  If it's handled properly, it's viable. | 10:51:08 |
| 20 | Q.  Thank you.  Back to your report. | 10:51:11 |
| 21 | You made reference to the ADA | 10:51:16 |
| 22 | coordinator/Section 504 compliance officer.  Who is | 10:51:17 |
| 23 | that person now? | 10:51:21 |
| 24 | A.  His name is Scott Lissner. | 10:51:21 |

52

Peter Bossley, 11/7/2017
Payan v. Los Angeles Community College District

| | | |
|---|---|---|
| 1 | Q.  You told me that.  I apologize.  Do you | 10:51:24 |
| 2 | regularly meet with Mr. Wistner (sic) regarding your | 10:51:26 |
| 3 | position as the Ohio State University's Digital | 10:51:29 |
| 4 | Accessibility Center? | 10:51:34 |
| 5 | A.  Sorry, it's actually Lissner, like an | 10:51:34 |
| 6 | "L". | 10:51:38 |
| 7 | Q.  You know, I had Wistner and I thought | 10:51:38 |
| 8 | you started with an L, so I do apologize.  I thought | 10:51:41 |
| 9 | boy, I just misunderstood it.  So it's Mr. Wistner, | 10:51:44 |
| 10 | is that correct? | 10:51:44 |
| 11 | A.  It's Lissner, it's "L" like "Lissner". | 10:51:49 |
| 12 | Q.  It is Lissner.  Then I did write it down | 10:51:51 |
| 13 | right? | 10:51:52 |
| 14 | A.  Yeah. | 10:51:52 |
| 15 | Q.  I just said it wrong.  I apologize. | 10:51:52 |
| 16 | Is there a regularly scheduled meeting | 10:51:57 |
| 17 | with Scott with you in your capacity as the Ohio | 10:52:00 |
| 18 | State University's Digital Accessibility Center | 10:52:04 |
| 19 | Director? | 10:52:07 |
| 20 | A.  Yes. | 10:52:07 |
| 21 | Q.  What is that? | 10:52:07 |
| 22 | A.  We meet -- we have organized time to | 10:52:09 |
| 23 | meet weekly. | 10:52:12 |
| 24 | Q.  And what do you mean "organized time"? | 10:52:14 |

53

Peter Bossley, 11/7/2017
Payan v. Los Angeles Community College District

1       A.  I mean we have a -- have a once-a-week          10:52:16

2   scheduled time for us to check in, although I would    10:52:20

3   say I see him more often than that.                     10:52:23

4       Q.  And this once-a-week schedule time, how         10:52:25

5   long is it scheduled for?                               10:52:27

6       A.  One hour.                                        10:52:28

7       Q.  And during this one hour of this                10:52:29

8   once-a-week schedule time, what is it that is           10:52:31

9   generally discussed?                                    10:52:35

10      A.  Generally speaking, I am surfacing              10:52:36

11  issues to his attention that require action on his      10:52:41

12  part, or floating decisions to him that need his        10:52:43

13  approval.                                               10:52:47

14      Q.  Are there a sufficient number of issues         10:52:48

15  that arise on a regular basis that you need to have     10:52:50

16  this weekly meeting?                                     10:52:53

17      A.  There are.                                       10:52:54

18      Q.  So it's an evolving issue on the campus;        10:52:55

19  is that correct?                                         10:52:58

20      A.  Yes.                                             10:52:58

21      Q.  Despite your best efforts, correct?            10:53:02

22      A.  That is correct.                                 10:53:04

23      Q.  Okay.  You continue in this report, "I         10:53:04

24  have responsibility for digital accessibility policy    10:53:08

                                                        54

| | | |
|---|---|---|
| 1 | implementation."  What is it that you mean by | 10:53:13 |
| 2 | "digital accessibility policy implementation"? | 10:53:16 |
| 3 | A.  I'm responsible for the technical | 10:53:19 |
| 4 | aspects of the policy rollout.  So that means I'm | 10:53:27 |
| 5 | responsible for determining what our standard is, | 10:53:30 |
| 6 | what our standard for compliance is.  I'm also | 10:53:34 |
| 7 | responsible for the final determination of whether a | 10:53:39 |
| 8 | piece of content meets that standard. | 10:53:40 |
| 9 | Beyond that, I have responsibility to | 10:53:45 |
| 10 | assist the various different units on campus in | 10:53:47 |
| 11 | rolling out their compliance to the policy | 10:53:52 |
| 12 | requirements. | 10:53:55 |
| 13 | Q.  Okay.  You made reference to technical | 10:53:55 |
| 14 | aspects of rollouts.  What do you mean by that? | 10:53:59 |
| 15 | A.  I mean a selection of tools to aid in | 10:54:04 |
| 16 | units' evaluation of their accessibility, in addition | 10:54:09 |
| 17 | to running evaluations of certain things. | 10:54:13 |
| 18 | I also mean that I'm responsible for | 10:54:17 |
| 19 | selection of training materials, and any other | 10:54:20 |
| 20 | contracted arrangements for various services like | 10:54:27 |
| 21 | captions, audio description. | 10:54:30 |
| 22 | Q.  When you made reference to selection of | 10:54:34 |
| 23 | tools, does that mean that you have a -- an array of | 10:54:36 |
| 24 | tools that can be utilized, and one of your jobs is | 10:54:42 |

55

| | | |
|---|---|---|
| 1 | to select which of those numerous tools should be | 10:54:48 |
| 2 | utilized for that assessment -- excuse me, that | 10:54:50 |
| 3 | particular assignment? | 10:54:52 |
| 4 | A.  Correct.  Yes, there are a number of | 10:54:53 |
| 5 | tools, and I am responsible for selecting them. | 10:54:55 |
| 6 | Q.  And what criteria do you utilize to | 10:54:59 |
| 7 | select given tools for a specific rollout? | 10:55:00 |
| 8 | A.  Other than the university mandated kind | 10:55:05 |
| 9 | of requirements that the tools meet our security | 10:55:11 |
| 10 | requirements, I'm -- I'm, you know, tasked with | 10:55:13 |
| 11 | selecting which tool provides us the best level of | 10:55:18 |
| 12 | information in assessing accessibility, as well as | 10:55:23 |
| 13 | which tools best meet the needs of the campus | 10:55:28 |
| 14 | community, so what tool is going to fit our | 10:55:32 |
| 15 | population best. | 10:55:34 |
| 16 | Q.  And what did you mean by "best meet"? | 10:55:36 |
| 17 | A.  No tool is perfect, and so you have to | 10:55:38 |
| 18 | pick a tool that is going to provide kind of the | 10:55:42 |
| 19 | widest group of people the information they need to | 10:55:47 |
| 20 | be successful. | 10:55:51 |
| 21 | Q.  And what do these tools do with respect | 10:56:00 |
| 22 | to your obligations under policy implementation | 10:56:02 |
| 23 | regarding rollouts? | 10:56:07 |
| 24 | A.  So the tools can evaluate a website for | 10:56:09 |

56

| | | |
|---|---|---|
| 1 | certain portions of conformance with accessibility | 10:56:17 |
| 2 | standards.  Excuse me. | 10:56:21 |
| 3 | Q.  Can you give me an example of that? | 10:56:36 |
| 4 | A.  A tool might be able to determine | 10:56:39 |
| 5 | whether a piece of text and its surrounding | 10:56:41 |
| 6 | background has sufficient color contrast to meet the | 10:56:45 |
| 7 | WCAG guidelines. | 10:56:50 |
| 8 | Q.  But that tool may not be able to | 10:56:51 |
| 9 | evaluate other aspects of policy; is that correct? | 10:56:54 |
| 10 | A.  I guess I need some clarification when | 10:57:01 |
| 11 | you say "other aspects of policy". | 10:57:05 |
| 12 | Q.  Well, you said you take the best tool -- | 10:57:06 |
| 13 | I'm sorry, the best -- you're trying to determine the | 10:57:09 |
| 14 | tool that is most appropriate for evaluating a given | 10:57:16 |
| 15 | program; is that right? | 10:57:21 |
| 16 | A.  Sure. | 10:57:22 |
| 17 | Q.  And you're the one who selects which | 10:57:23 |
| 18 | tool or tools should be used to do that, correct? | 10:57:27 |
| 19 | A.  I am. | 10:57:29 |
| 20 | Q.  And not every tool universally examines | 10:57:30 |
| 21 | all programs to determine their compliance; is that | 10:57:34 |
| 22 | correct? | 10:57:36 |
| 23 | A.  No tool. | 10:57:36 |
| 24 | Q.  That's even more absolute.  I appreciate | 10:57:38 |

57

1  that.                                                    10:57:42

2         You continue that, "I have                        10:57:43

3  responsibility for" -- and then there's a semi colon,    10:57:49

4  "selection, interpretation, and development of           10:57:53

5  technical standards."  What does that -- what does       10:57:56

6  that component of your position entail?                  10:58:02

7         A.  That means -- excuse me.  That means          10:58:04

8  that I am responsible for selecting the standard that    10:58:08

9  we use for assessing our compliance with applicable      10:58:12

10 provisions of nondiscrimination statutes.                10:58:22

11        Q.  Okay.  When you talked about you              10:58:25

12 select -- did you say the standards we use?              10:58:28

13        A.  That is correct.  What standard we            10:58:31

14 measure against.                                         10:58:33

15        Q.  And what kinds of standards are we            10:58:35

16 talking about?  Can you give some examples?              10:58:37

17        A.  So standards that are in the space right      10:58:39

18 now are Section 508 of the Rehabilitation Act, the       10:58:41

19 Web Content Accessibility Guidelines from the            10:58:47

20 Worldwide Web Consortium.  Other standards from the      10:58:54

21 Worldwide Web Consortium is wether accessibility         10:58:59

22 include WAIARIA, W-A-I-A-R-I-A, ATAG, A-T-A-G.  These    10:59:03

23 are probably the most applicable ones.                   10:59:18

24        Q.  But there are others, correct?               10:59:20

                                                    58

| | | |
|---|---|---|
| 1 | A.  There are others, yes. | 10:59:21 |
| 2 | Q.  So what process do you go through to | 10:59:23 |
| 3 | select the individual technical standards for a given | 10:59:25 |
| 4 | project? | 10:59:30 |
| 5 | A.  So I should be more clear that when I | 10:59:30 |
| 6 | say "select a standard", we select -- we select the | 10:59:34 |
| 7 | technical standards as a whole and not on a project | 10:59:38 |
| 8 | basis. | 10:59:41 |
| 9 | Q.  Thank you. | 10:59:44 |
| 10 | And you continue in that same clause, | 10:59:44 |
| 11 | "Selection, interpretation, and development of | 10:59:53 |
| 12 | technical standards."  Do you develop technical | 10:59:55 |
| 13 | standards for the university? | 10:59:59 |
| 14 | A.  Because of some vagaries how our policy | 11:00:00 |
| 15 | works, we have chosen on our campus to maintain our | 11:00:06 |
| 16 | standards internally, and so that we have the ability | 11:00:12 |
| 17 | to -- to change them as the space evolves. | 11:00:17 |
| 18 | Technology evolves so rapidly that we | 11:00:21 |
| 19 | felt that we needed the ability to -- to update our | 11:00:24 |
| 20 | standards without having to go through the full | 11:00:29 |
| 21 | policy refresh process. | 11:00:31 |
| 22 | So while I -- the short answer to your | 11:00:33 |
| 23 | question is yes, I developed the technical standard | 11:00:38 |
| 24 | that we use on campus. | 11:00:40 |

59

Peter Bossley, 11/7/2017
Payan v. Los Angeles Community College District

| | | |
|---|---|---|
| 1 | Q.  Now, you also made reference to the | 11:00:42 |
| 2 | vagaries of our.  Who is "our"? | 11:00:46 |
| 3 | A.  "Our" as in this context, Ohio State | 11:00:47 |
| 4 | University. | 11:00:51 |
| 5 | Q.  Thanks. | 11:00:51 |
| 6 | And within that same sentence there's | 11:00:52 |
| 7 | another clause following the semi colon; purchasing | 11:00:54 |
| 8 | controls.  What do you mean by responsible for | 11:00:57 |
| 9 | purchasing controls? | 11:01:01 |
| 10 | A.  Purchasing controls are basically our | 11:01:02 |
| 11 | way of -- fancy way of saying personnel policy, what | 11:01:06 |
| 12 | are people permitted to procure and what are they | 11:01:11 |
| 13 | not. | 11:01:14 |
| 14 | Q.  Are those purchasing controls exclusive? | 11:01:15 |
| 15 | In other words, if they don't meet the purchasing | 11:01:20 |
| 16 | controls, no matter who it is on campus is requesting | 11:01:22 |
| 17 | that program, can't buy it? | 11:01:26 |
| 18 | A.  In the arenas that we implemented | 11:01:27 |
| 19 | purchasing controls, they are exclusive, yes. | 11:01:30 |
| 20 | Q.  What are the arenas you've implemented | 11:01:32 |
| 21 | purchasing controls in? | 11:01:35 |
| 22 | A.  We have done so for items that are above | 11:01:36 |
| 23 | our Ohio bid threshold, so that is $50,000 per vender | 11:01:41 |
| 24 | per fiscal year. | 11:01:48 |

60

| | | |
|---|---|---|
| 1 | Q.  Anything else? | 11:01:51 |
| 2 | A.  And for any other selected item at any | 11:01:51 |
| 3 | time that we feel is, again, high risk.  So it can | 11:01:54 |
| 4 | be -- it can be below the bid threshold, but if it -- | 11:02:01 |
| 5 | if it's -- if it's determined to be high risk, then | 11:02:04 |
| 6 | they have to follow the process. | 11:02:07 |
| 7 | Q.  So in the absence of it being a high | 11:02:09 |
| 8 | risk issue, if it falls below this $50,000 per vender | 11:02:11 |
| 9 | per fiscal year threshold, your purchasing controls | 11:02:16 |
| 10 | don't apply, correct? | 11:02:20 |
| 11 | A.  That is correct. | 11:02:21 |
| 12 | Q.  Now, what is it that you, as the | 11:02:22 |
| 13 | Director of DAC, look for in determining whether a | 11:02:27 |
| 14 | program is high risk and therefore should be subject | 11:02:36 |
| 15 | to the purchasing controls? | 11:02:40 |
| 16 | A.  We look at the -- the audience that the | 11:02:42 |
| 17 | tool -- the software or the tool, whatever they are | 11:02:47 |
| 18 | buying, is going to be used by. | 11:02:50 |
| 19 | We look at the impact of that tool not | 11:02:53 |
| 20 | being accessible to someone, and we also look at | 11:03:01 |
| 21 | what -- what that impact is in reality.  Is it -- | 11:03:07 |
| 22 | does it effect their academics?  Is it used by all | 11:03:14 |
| 23 | students?  Those kinds of measures are used to judge | 11:03:20 |
| 24 | whether something is high risk. | 11:03:23 |

61

Peter Bossley, 11/7/2017
Payan v. Los Angeles Community College District

1      Q.  You stated that in determining high          11:03:30

2   risk, you looked to the audience.  Are those the    11:03:32

3   consumers of the project -- excuse me, the program? 11:03:35

4      A.  Correct.  That would be the people that      11:03:38

5   have to use it.                                      11:03:41

6      Q.  Generally students?                          11:03:42

7      A.  Students.  Sometimes it's faculty and        11:03:44

8   staff as well.                                       11:03:46

9      Q.  Then you talk about the impact that tool     11:03:49

10  may have.  So is it -- is it a sliding scale that you 11:03:54

11  address for high impact regarding -- let me start    11:04:01

12  again.                                               11:04:05

13      Is it a sliding scale that you use in            11:04:06

14  your high risk analysis regarding impact?            11:04:08

15      A.  Sliding scale?                               11:04:14

16      Q.  Well, it says impact of that tool not        11:04:17

17  being accessible.  That sounds like it's okay to have 11:04:21

18  it even if it is not completely accessible, depending 11:04:24

19  on the impact that tool will have.                   11:04:32

20      A.  So I -- I'm -- I kind of back up and         11:04:35

21  say --                                               11:04:41

22      Q.  Sure.                                        11:04:41

23      A.  -- not really, okay?  Some of these --       11:04:42

24  some of these distinctions are in place to resource  11:04:46

62

Peter Bossley, 11/7/2017
Payan v. Los Angeles Community College District

| | | |
|---|---|---|
| 1 | constraints.  We would, or I would, like to evaluate | 11:04:50 |
| 2 | everything, and have everything be subject to that | 11:04:56 |
| 3 | process.  I think that's the best way to do things. | 11:05:00 |
| 4 | But because we don't live in a perfect | 11:05:06 |
| 5 | world, we do -- we do do analysis of the type that | 11:05:12 |
| 6 | you are discussing, is what is the -- what is the | 11:05:15 |
| 7 | impact of purchasing this thing that's not | 11:05:18 |
| 8 | accessible. | 11:05:23 |
| 9 | Q.  Okay.  Again, in your report you said, | 11:05:24 |
| 10 | "I have responsibility for," and you identify a | 11:05:27 |
| 11 | number of things.  You just told me, "I would like to | 11:05:33 |
| 12 | evaluate everything."  And it sounds like you're not | 11:05:35 |
| 13 | responsible for evaluating everything in your | 11:05:39 |
| 14 | capacity as the DAC Director. | 11:05:41 |
| 15 | MS. KREVOR-WEISBAUM:  Objection.  You | 11:05:45 |
| 16 | can answer. | 11:05:46 |
| 17 | THE WITNESS:  I -- I am not responsible | 11:05:47 |
| 18 | for reviewing everything.  I have the freedom to | 11:05:52 |
| 19 | review anything that is deemed high risk. | 11:05:56 |
| 20 | By Mr. Cleeland: | 11:06:01 |
| 21 | Q.  But you said, "I would like to | 11:06:01 |
| 22 | review --", or evaluate everything, but you don't. | 11:06:03 |
| 23 | A.  That's accurate. | 11:06:06 |
| 24 | Q.  Okay.  Who determines what you don't | 11:06:07 |

63

Peter Bossley, 11/7/2017
Payan v. Los Angeles Community College District

| | | |
|---|---|---|
| 1 | evaluate? | 11:06:10 |
| 2 | A.  It depends.  There are times where I'll | 11:06:13 |
| 3 | make a decision, there are times where I will let my | 11:06:17 |
| 4 | boss make a decision.  I'll have a number of things | 11:06:23 |
| 5 | and say, you know, where do you want -- where do you | 11:06:25 |
| 6 | want us to spend our time. | 11:06:29 |
| 7 | Q.  Well, maybe I need to ask a better | 11:06:31 |
| 8 | question.  "I would like to evaluate everything." | 11:06:33 |
| 9 | Does that mean university-wide, or everything for the | 11:06:37 |
| 10 | Digital Accessibility Center? | 11:06:40 |
| 11 | A.  University-wide. | 11:06:41 |
| 12 | Q.  You'd be stepping on a lot of toes if | 11:06:43 |
| 13 | you did that, right? | 11:06:45 |
| 14 | A.  I'm okay with that. | 11:06:46 |
| 15 | Q.  But you would be stepping on a lot of | 11:06:48 |
| 16 | toes, wouldn't you? | 11:06:50 |
| 17 | A.  I would. | 11:06:51 |
| 18 | Q.  And you'd be exceeding the authority | 11:06:51 |
| 19 | that was granted to you in your capacity as the | 11:06:53 |
| 20 | Director of the Digital Accessibility Center; is that | 11:06:55 |
| 21 | correct? | 11:06:58 |
| 22 | A.  That is not correct. | 11:06:58 |
| 23 | Q.  Well, your duties are outlined in the | 11:06:59 |
| 24 | policies and procedures, correct? | 11:07:03 |

64

Peter Bossley, 11/7/2017
Payan v. Los Angeles Community College District

| | | |
|---|---|---|
| 1 | A.  Correct. | 11:07:04 |
| 2 | Q.  And your duties don't extend to programs | 11:07:06 |
| 3 | utilized by the entirety of the university? | 11:07:09 |
| 4 | A.  They do. | 11:07:12 |
| 5 | Q.  Even for research professors? | 11:07:14 |
| 6 | A.  Yes. | 11:07:17 |
| 7 | Q.  Have you ever examined -- excuse me. | 11:07:20 |
| 8 | Do you examine all electronic and | 11:07:22 |
| 9 | digital material university-wide to determine whether | 11:07:28 |
| 10 | they are compliant with standards? | 11:07:35 |
| 11 | A.  I do not. | 11:07:38 |
| 12 | Q.  Okay.  Why don't you? | 11:07:40 |
| 13 | A.  I don't have sufficient staff and | 11:07:41 |
| 14 | resources to be able to accomplish all of that. | 11:07:44 |
| 15 | Q.  Do you have the authority to do that? | 11:07:48 |
| 16 | A.  Yes. | 11:07:50 |
| 17 | Q.  So you can walk into the president of | 11:07:51 |
| 18 | the university and demand to look at all the software | 11:07:54 |
| 19 | he's using on his program -- or on his computer? | 11:07:58 |
| 20 | A.  Yes. | 11:08:00 |
| 21 | Q.  Is that written somewhere? | 11:08:01 |
| 22 | A.  Is that written -- it's written in our | 11:08:03 |
| 23 | policy. | 11:08:10 |
| 24 | Q.  What does the policy say your duties | 11:08:10 |

65

Peter Bossley, 11/7/2017
Payan v. Los Angeles Community College District

| | | |
|---|---|---|
| 1 | are? | 11:08:14 |
| 2 | A.  The policy says our duties are to advise | 11:08:14 |
| 3 | campus units on compliance on our web accessibility | 11:08:17 |
| 4 | policy. | 11:08:22 |
| 5 | Q.  Okay.  Is the president's office one of | 11:08:23 |
| 6 | the units you're responsible for? | 11:08:26 |
| 7 | A.  It is. | 11:08:28 |
| 8 | Q.  When is the last time you checked any | 11:08:29 |
| 9 | programs in the president's office? | 11:08:34 |
| 10 | A.  I don't recall ever having doing so. | 11:08:35 |
| 11 | Q.  Why not? | 11:08:37 |
| 12 | A.  There's never been any complaint | 11:08:37 |
| 13 | regarding the president's office. | 11:08:46 |
| 14 | Q.  So in the absence of the complaint, you | 11:08:48 |
| 15 | don't think it's necessary to examine the president's | 11:08:50 |
| 16 | program? | 11:08:54 |
| 17 | A.  I should also say the president also | 11:08:54 |
| 18 | hasn't purchased anything over the bid limit. | 11:08:56 |
| 19 | Q.  How do you know that? | 11:08:58 |
| 20 | A.  Because I'm advised of all software | 11:09:00 |
| 21 | purchases that are sent for RFP. | 11:09:02 |
| 22 | Q.  Does he have any high-risk programs? | 11:09:06 |
| 23 | A.  The president's office directly? | 11:09:09 |
| 24 | Probably not. | 11:09:11 |

66

Peter Bossley, 11/7/2017
Payan v. Los Angeles Community College District

| | | |
|---|---|---|
| 1 | Q.  Okay.  How do you know that? | 11:09:12 |
| 2 | A.  I don't -- I can't say I know for sure. | 11:09:16 |
| 3 | I haven't evaluated his entire software portfolio. | 11:09:18 |
| 4 | Q.  Could you do that? | 11:09:23 |
| 5 | A.  I could. | 11:09:25 |
| 6 | Q.  Now, you told me that you have | 11:09:26 |
| 7 | limitations of resources, but you'd like to evaluate | 11:09:28 |
| 8 | everything.  How is it you decide what to evaluate | 11:09:33 |
| 9 | faced with that desire and those resource | 11:09:38 |
| 10 | constraints? | 11:09:40 |
| 11 | A.  Like I kind of said before where | 11:09:42 |
| 12 | we're -- we evaluate based on what we perceive as | 11:09:44 |
| 13 | high-risk items. | 11:09:47 |
| 14 | Q.  How do you know they are high risk? | 11:09:52 |
| 15 | A.  Typically we have a conversation with | 11:09:54 |
| 16 | the person purchasing it and ask them what their | 11:09:57 |
| 17 | audience is, what it's going to be used for, what | 11:10:01 |
| 18 | their future plans are, and we make a determination | 11:10:05 |
| 19 | at that time. | 11:10:10 |
| 20 | Q.  So again, audience is a component of | 11:10:10 |
| 21 | your assessment, correct? | 11:10:12 |
| 22 | A.  It is. | 11:10:13 |
| 23 | Q.  Thanks. | 11:10:14 |
| 24 | Continuing with your report, you | 11:10:14 |

67

Peter Bossley, 11/7/2017
Payan v. Los Angeles Community College District

| | | |
|---|---|---|
| 1 | identify as a responsibility, accessibility of | 11:10:18 |
| 2 | internal and contracted development of websites. | 11:10:23 |
| 3 | What do you mean by that phrase? | 11:10:27 |
| 4 | A.  We have a number of groups on campus | 11:10:29 |
| 5 | that have web and application developers that build | 11:10:33 |
| 6 | websites and web applications for use on campus. | 11:10:36 |
| 7 | There are also a number of units who farm that work | 11:10:40 |
| 8 | out to contractors. | 11:10:43 |
| 9 | Q.  And the accessibility of that | 11:10:45 |
| 10 | information material, in your analysis of high risk, | 11:10:48 |
| 11 | does that also include the audience of those | 11:10:52 |
| 12 | websites? | 11:10:56 |
| 13 | A.  It does. | 11:10:57 |
| 14 | Q.  So some you're worried about being | 11:11:00 |
| 15 | accessible -- that's a poor phrase. | 11:11:02 |
| 16 | Some you enforce the accessibility | 11:11:04 |
| 17 | components, and some you don't? | 11:11:07 |
| 18 | MS. KREVOR-WEISBAUM:  Objection.  You | 11:11:09 |
| 19 | can answer. | 11:11:11 |
| 20 | THE WITNESS:  Some we vigorously enforce | 11:11:12 |
| 21 | accessibility requirements on, others we advise them | 11:11:18 |
| 22 | on making their product -- making their websites and | 11:11:23 |
| 23 | their aps accessible, but we may not conduct full | 11:11:27 |
| 24 | evaluations. | 11:11:31 |

68

| | | |
|---|---|---|
| 1 | By Mr. Cleeland: | 11:11:31 |
| 2 |     Q.  And you may not enforce if they do, | 11:11:31 |
| 3 | right? | 11:11:34 |
| 4 |        MS. KREVOR-WEISBAUM:  Objection. | 11:11:35 |
| 5 |        THE WITNESS:  We may not directly at | 11:11:38 |
| 6 | that time. | 11:11:40 |
| 7 | By Mr. Cleeland: | 11:11:40 |
| 8 |     Q.  Okay.  Is that a discretionary component | 11:11:41 |
| 9 | of your authority? | 11:11:46 |
| 10 |     A.  It's again more a resource constraint | 11:11:50 |
| 11 | than discretion. | 11:11:53 |
| 12 |     Q.  Well, sometimes in allocating resources, | 11:11:55 |
| 13 | you have to use your discretion. | 11:11:59 |
| 14 |     A.  Sure.  Then under that prism of | 11:12:00 |
| 15 | circumstance, then yes, we exercise discretion in | 11:12:06 |
| 16 | where we spend our time and effort. | 11:12:09 |
| 17 |     Q.  Thank you. | 11:12:10 |
| 18 |       In your report you state, "I have served | 11:12:12 |
| 19 | as a consulting expert in potential litigation for | 11:12:14 |
| 20 | the university."  What do you mean by "consulting | 11:12:18 |
| 21 | expert"? | 11:12:21 |
| 22 |     A.  I am the lead technical digital | 11:12:22 |
| 23 | accessibility expert on the campus, so any time there | 11:12:29 |
| 24 | are questions of digital accessibility issues, in | 11:12:33 |

69

| | | |
|---|---|---|
| 1 | concert with my boss, he and I are consulted by -- by | 11:12:39 |
| 2 | our general counsel's office and legal affairs office | 11:12:43 |
| 3 | on those items. | 11:12:46 |
| 4 | Q.  And is that boss L. Scott? | 11:12:47 |
| 5 | A.  It is. | 11:12:51 |
| 6 | Q.  Okay.  It continues that you've been a | 11:12:51 |
| 7 | consulting expert for the National Federation of the | 11:12:58 |
| 8 | Blind.  On how many occasions have you done that? | 11:13:02 |
| 9 | A.  Two other occasions. | 11:13:05 |
| 10 | Q.  Did either of those matters go to trial? | 11:13:06 |
| 11 | A.  I'm not aware of the disposition of one | 11:13:15 |
| 12 | of the two.  One of them was settled. | 11:13:19 |
| 13 | Q.  Are you aware that the National | 11:13:22 |
| 14 | Federation of the Blind is a party to this lawsuit? | 11:13:25 |
| 15 | A.  I am. | 11:13:26 |
| 16 | Q.  When did you become aware of that? | 11:13:27 |
| 17 | A.  When I was initially contacted regarding | 11:13:29 |
| 18 | engagement in this consulting project. | 11:13:33 |
| 19 | Q.  Now, on your report you indicate certain | 11:13:37 |
| 20 | documents were reviewed, and you identify bullet | 11:13:41 |
| 21 | points.  Deposition transcript of Barbara Vasquez. | 11:13:46 |
| 22 | Do you remember reading that deposition transcript? | 11:13:51 |
| 23 | A.  I do. | 11:13:53 |
| 24 | Q.  Did you take any notes of that | 11:13:54 |

70

Peter Bossley, 11/7/2017
Payan v. Los Angeles Community College District

| | | |
|---|---|---|
| 1 | deposition? | 11:13:56 |
| 2 | A.  I did not. | 11:13:56 |
| 3 | Q.  Did any of the information contained | 11:13:57 |
| 4 | within the deposition testimony of Ms. Vasquez -- was | 11:13:59 |
| 5 | any of that information utilized in reaching your | 11:14:06 |
| 6 | opinions or conclusions in this matter? | 11:14:09 |
| 7 | A.  I don't believe so. | 11:14:12 |
| 8 | Q.  Then next we have the deposition | 11:14:13 |
| 9 | transcript of John Al-Amin.  That's A-l-A-m-i-n.  Did | 11:14:15 |
| 10 | any of the information in Dr. Al-Amin's deposition | 11:14:20 |
| 11 | testimony prove useful in your assignment in this | 11:14:24 |
| 12 | matter? | 11:14:28 |
| 13 | A.  I don't believe so. | 11:14:28 |
| 14 | Q.  Next was the deposition of Kian Kaviani, | 11:14:31 |
| 15 | K-i-a-n, K-a-v-i-a-n-i.  Was there any information in | 11:14:38 |
| 16 | his deposition testimony which you relied upon in | 11:14:40 |
| 17 | performing your duties in this assignment? | 11:14:44 |
| 18 | A.  I believe there were -- there was some | 11:14:46 |
| 19 | information in one regarding interaction regarding | 11:14:50 |
| 20 | some software. | 11:14:54 |
| 21 | Q.  Do you remember what that was? | 11:14:56 |
| 22 | A.  I believe it was My Math Lab. | 11:14:57 |
| 23 | Q.  What about Dr. Kaviani's testimony with | 11:15:01 |
| 24 | respect to My Math Lab had anything to do with your | 11:15:04 |

<div align="center">71</div>

| | | |
|---|---|---|
| 1 | opinions or conclusions in this matter? | 11:15:06 |
| 2 | A.  The witness seemed to have a | 11:15:08 |
| 3 | misunderstanding regarding the accessibility of -- of | 11:15:14 |
| 4 | the software, and seemed to indicate that it had been | 11:15:18 |
| 5 | tested for accessibility by someone in the | 11:15:24 |
| 6 | institution. | 11:15:26 |
| 7 | Q.  Was it? | 11:15:27 |
| 8 | A.  I don't know. | 11:15:28 |
| 9 | Q.  Okay.  So you said he seemed to have a | 11:15:33 |
| 10 | misunderstanding, but you don't know whether his | 11:15:38 |
| 11 | statement is accurate or not, correct? | 11:15:44 |
| 12 | A.  His statement regarding the evaluation? | 11:15:46 |
| 13 | Q.  Just what you told me. | 11:15:49 |
| 14 | A.  Well, his understanding of the | 11:15:50 |
| 15 | accessibility of the software is -- is not correct, | 11:15:53 |
| 16 | in my opinion. | 11:15:57 |
| 17 | Q.  Well, what about it is incorrect? | 11:15:58 |
| 18 | A.  The software has very serious | 11:16:00 |
| 19 | accessibility issues. | 11:16:04 |
| 20 | Q.  So now we have got two points.  You told | 11:16:05 |
| 21 | me that you concluded that you thought it had been | 11:16:09 |
| 22 | tested by someone at the school, and now you say | 11:16:11 |
| 23 | there are serious limitations on the software based | 11:16:14 |
| 24 | upon your experience.  How is it that that testimony | 11:16:17 |

72

| | | |
|---|---|---|
| 1 | of Dr. Kaviani supports that statement? | 11:16:20 |
| 2 | A.  If I'm recalling the deposition | 11:16:24 |
| 3 | correctly, the testimony correctly, he felt that the | 11:16:29 |
| 4 | software was accessible -- | 11:16:33 |
| 5 | Q.  Okay. | 11:16:36 |
| 6 | A.  -- because of the evaluation. | 11:16:37 |
| 7 | Q.  Now, because you didn't take any notes | 11:16:39 |
| 8 | of any of the deposition testimony, how is it that | 11:16:43 |
| 9 | you find a particular section within the transcript | 11:16:46 |
| 10 | if you need to find it? | 11:16:49 |
| 11 | A.  It's pretty difficult.  I'd have to | 11:16:50 |
| 12 | review. | 11:16:56 |
| 13 | Q.  Would it have been helpful for you to | 11:16:57 |
| 14 | write down notes and page numbers? | 11:16:59 |
| 15 | A.  I suppose it may have been. | 11:17:02 |
| 16 | Q.  Okay.  Live and learn, right? | 11:17:05 |
| 17 | A.  Sure. | 11:17:07 |
| 18 | Q.  Is this a relatively new experience for | 11:17:07 |
| 19 | you? | 11:17:09 |
| 20 | MS. KREVOR-WEISBAUM:  Objection.  You | 11:17:10 |
| 21 | can answer. | 11:17:12 |
| 22 | THE WITNESS:  Yes. | 11:17:12 |
| 23 | By Mr. Cleeland: | 11:17:15 |
| 24 | Q.  Next we have the deposition transcript | 11:17:15 |

73

Peter Bossley, 11/7/2017
Payan v. Los Angeles Community College District

| | | |
|---|---|---|
| 1 | of Juan Mendoza, M-e-n-d-o-z-a.  What if any | 11:17:17 |
| 2 | information in the deposition of Mr. Mendoza did you | 11:17:23 |
| 3 | rely upon in reaching any opinions or conclusions in | 11:17:25 |
| 4 | this matter? | 11:17:32 |
| 5 | A.  I don't believe there was anything. | 11:17:32 |
| 6 | Q.  The next transcript is the deposition of | 11:17:33 |
| 7 | Donna Morley, M-o-r-l-e-y.  Was there any information | 11:17:35 |
| 8 | in the testimony and transcript of Donna Morley that | 11:17:41 |
| 9 | you relied upon in reaching your opinions or | 11:17:45 |
| 10 | conclusions in this matter? | 11:17:49 |
| 11 | A.  I don't believe so. | 11:17:50 |
| 12 | Q.  The next transcript is that of Randy | 11:17:50 |
| 13 | Anderson, A-n-d-e-r-s-o-n.  Is there any information | 11:17:53 |
| 14 | in the deposition testimony of Randy Anderson that | 11:17:56 |
| 15 | you relied upon in reaching the opinions or | 11:17:58 |
| 16 | conclusions in your capacity as an expert witness in | 11:18:02 |
| 17 | this matter? | 11:18:04 |
| 18 | A.  This was the individual that the -- one | 11:18:06 |
| 19 | of the previous witnesses, I can't recall the | 11:18:12 |
| 20 | gentleman's name right now, Mr. Kaviani had thought | 11:18:14 |
| 21 | that -- this is the individual that had -- they had | 11:18:25 |
| 22 | thought had done the accessibility evaluations and | 11:18:30 |
| 23 | was doing accessibility evaluations for the software | 11:18:33 |
| 24 | that was being used. | 11:18:36 |

74

| | | |
|---|---|---|
| 1 | Q.   Okay.   I'm just asking if there's any | 11:18:37 |
| 2 | information in the deposition testimony of | 11:18:40 |
| 3 | Mr. Anderson, his testimony, that you relied upon in | 11:18:42 |
| 4 | reaching any opinions or conclusions in your capacity | 11:18:46 |
| 5 | as an expert witness in this matter? | 11:18:48 |
| 6 | A.   There were. | 11:18:51 |
| 7 | Q.   What? | 11:18:53 |
| 8 | A.   His -- his testimony regarding how | 11:18:53 |
| 9 | accessibility evaluations were conducted or were not | 11:19:01 |
| 10 | conducted speaks to the institution's process around | 11:19:06 |
| 11 | accessibility evaluations. | 11:19:14 |
| 12 | Q.   When? | 11:19:15 |
| 13 | MS. KREVOR-WEISBAUM:   Objection. | 11:19:20 |
| 14 | THE WITNESS:   What do you mean when? | 11:19:22 |
| 15 | By Mr. Cleeland: | 11:19:23 |
| 16 | Q.   You said the school's policies.   When? | 11:19:24 |
| 17 | What time frame for those policies?   A year ago? | 11:19:28 |
| 18 | Five years ago?   20 years ago?   A week ago? | 11:19:33 |
| 19 | A.   His testimony seemed to be about more | 11:19:35 |
| 20 | recent. | 11:19:40 |
| 21 | Q.   How more recent? | 11:19:41 |
| 22 | A.   I don't recall specifically. | 11:19:45 |
| 23 | Q.   Wouldn't that be important to know what | 11:19:46 |
| 24 | he was talking about as to support any opinions or | 11:19:48 |

75

| | | |
|---|---|---|
| 1 | conclusions you had regarding the propriety of the | 11:19:52 |
| 2 | school's work regarding testing accessibility? | 11:19:56 |
| 3 | A.  Well, let's say that his testimony | 11:20:01 |
| 4 | seemed to be about more recent events, things within | 11:20:05 |
| 5 | the last five years. | 11:20:08 |
| 6 | Q.  Okay.  So within the five years, right? | 11:20:10 |
| 7 | A.  Yes. | 11:20:12 |
| 8 | Q.  And have the policies at The Ohio State | 11:20:13 |
| 9 | University Digital Accessibility Center changed over | 11:20:18 |
| 10 | the last five years regarding testing for | 11:20:21 |
| 11 | accessibility? | 11:20:23 |
| 12 | A.  They have. | 11:20:24 |
| 13 | Q.  How many times? | 11:20:25 |
| 14 | A.  More recently, within the last year, we | 11:20:27 |
| 15 | have begun policy revision. | 11:20:32 |
| 16 | Q.  So would it be important for you to know | 11:20:34 |
| 17 | when Mr. Anderson was talking about, what time frame, | 11:20:37 |
| 18 | and what policies were in effect at that time to | 11:20:40 |
| 19 | assess his actions or the school's actions regarding | 11:20:44 |
| 20 | testing of accessibility? | 11:20:49 |
| 21 | A.  Yes. | 11:20:54 |
| 22 | Q.  And you didn't bother to check on that, | 11:20:56 |
| 23 | correct? | 11:20:58 |
| 24 | MS. KREVOR-WEISBAUM:  Objection. | 11:20:58 |

76

Peter Bossley, 11/7/2017
Payan v. Los Angeles Community College District

| | | |
|---|---|---|
| 1 | THE WITNESS:  I don't recall the | 11:21:01 |
| 2 | specifics. | 11:21:03 |
| 3 | By Mr. Cleeland: | 11:21:03 |
| 4 | Q.  You didn't check on that, did you? | 11:21:05 |
| 5 | A.  I don't recall the specifics at this | 11:21:06 |
| 6 | time. | 11:21:08 |
| 7 | Q.  Did you check on it at any time? | 11:21:08 |
| 8 | MS. KREVOR-WEISBAUM:  Objection. | 11:21:10 |
| 9 | THE WITNESS:  I read the transcript. | 11:21:14 |
| 10 | By Mr. Cleeland: | 11:21:17 |
| 11 | Q.  Did you check on the school's policies, | 11:21:17 |
| 12 | their time frame, as compared to the testimony of | 11:21:20 |
| 13 | Mr. Anderson, so you knew what policy you were | 11:21:24 |
| 14 | talking about? | 11:21:26 |
| 15 | A.  Other than what I read in the policy, I | 11:21:28 |
| 16 | did not check any time frames. | 11:21:31 |
| 17 | Q.  Okay.  What policy did you read? | 11:21:33 |
| 18 | A.  In the document list there are the web | 11:21:35 |
| 19 | accessibility policies.  I believe it's B-33. | 11:21:39 |
| 20 | Q.  Okay.  We'll get there if it's on your | 11:21:44 |
| 21 | list. | 11:21:46 |
| 22 | The next deposition transcript you | 11:21:47 |
| 23 | referred to is that of Blythe Daniel.  Was there any | 11:21:50 |
| 24 | information within the deposition testimony of | 11:21:55 |

77

| | | |
|---|---|---|
| 1 | Professor Daniel that you utilized in reaching any | 11:21:55 |
| 2 | opinions or conclusions as a result of your retention | 11:21:59 |
| 3 | as an expert witness in this matter? | 11:22:03 |
| 4 | A.  I don't believe so. | 11:22:05 |
| 5 | Q.  The next transcript is David Sedghi, | 11:22:07 |
| 6 | S-e-d-g-h-i.  Is there any information contained | 11:22:11 |
| 7 | within the deposition testimony of David Sedghi that | 11:22:15 |
| 8 | you reviewed that you relied upon in reaching any | 11:22:18 |
| 9 | opinions or conclusions in your capacity as an expert | 11:22:21 |
| 10 | witness in this matter? | 11:22:23 |
| 11 | A.  I don't believe so. | 11:22:24 |
| 12 | Q.  The next is that of David Wayne Walden, | 11:22:25 |
| 13 | W-a-l-d-e-n.  Is there any information contained | 11:22:31 |
| 14 | within the deposition testimony of Mr. Walden that | 11:22:33 |
| 15 | you relied upon in reaching any opinions or | 11:22:36 |
| 16 | conclusions as a result of being retained as an | 11:22:38 |
| 17 | expert witness in this matter? | 11:22:43 |
| 18 | A.  I don't believe so. | 11:22:44 |
| 19 | Q.  The next is Kelvin Luong, L-u-o-n-g.  Is | 11:22:45 |
| 20 | there any information contained within the deposition | 11:22:49 |
| 21 | testimony of Mr. Luong that you relied upon in | 11:22:53 |
| 22 | reaching any opinions or conclusions in this matter | 11:22:55 |
| 23 | as a result of being retained as an expert witness? | 11:22:57 |
| 24 | A.  I don't believe in that one. | 11:22:59 |

78

Peter Bossley, 11/7/2017
Payan v. Los Angeles Community College District

| | | |
|---|---|---|
| 1 | Q.   The next name is Robert Dominick, | 11:23:04 |
| 2 | D-o-m-i-n-i-c-k.  Is there any information in the | 11:23:08 |
| 3 | deposition testimony of Mr. Dominick that you relied | 11:23:10 |
| 4 | upon in reaching any opinions or conclusions as a | 11:23:13 |
| 5 | result of being retained as an expert witness in this | 11:23:16 |
| 6 | matter? | 11:23:19 |
| 7 | A.   Can you refresh my memory on what | 11:23:19 |
| 8 | this -- what this individual's role was at the | 11:23:22 |
| 9 | college? | 11:23:25 |
| 10 | Q.   He's a counselor in the OSS. | 11:23:25 |
| 11 | A.   I don't believe so. | 11:23:28 |
| 12 | Q.   Then you have the deposition transcript | 11:23:35 |
| 13 | of Mr. Payan, P-a-y-a-n.  Is there any information | 11:23:37 |
| 14 | contained within the deposition testimony of | 11:23:40 |
| 15 | Mr. Payan that you reviewed that assisted you in | 11:23:43 |
| 16 | reaching any opinions or conclusions as a result of | 11:23:46 |
| 17 | being retained as an expert witness in this matter? | 11:23:48 |
| 18 | A.   Yes. | 11:23:51 |
| 19 | Q.   What? | 11:23:52 |
| 20 | A.   There were some descriptions of the | 11:23:52 |
| 21 | specific accessibility difficulties that Mr. Payan | 11:23:59 |
| 22 | was experiencing that I read as guidance in looking | 11:24:03 |
| 23 | at software. | 11:24:16 |
| 24 | Q.   Anything else in his deposition | 11:24:17 |

79

| | | |
|---|---|---|
| 1 | testimony that you relied upon? | 11:24:19 |
| 2 | A.  He described some difficulties with the | 11:24:21 |
| 3 | OSS at the college. | 11:24:29 |
| 4 | Q.  Anything else? | 11:24:36 |
| 5 | A.  Not that I recall at this time. | 11:24:40 |
| 6 | Q.  Okay.  With respect to the reference of | 11:24:43 |
| 7 | description of specific accessibility difficulties, | 11:24:47 |
| 8 | what is it you relied upon in Mr. Payan's deposition | 11:24:50 |
| 9 | testimony with respect to specific accessibility | 11:24:53 |
| 10 | difficulties? | 11:24:58 |
| 11 | A.  He discussed difficulty accessing the -- | 11:24:59 |
| 12 | I believe it was My Math Lab, and -- and I believe | 11:25:04 |
| 13 | also Etudes. | 11:25:14 |
| 14 | Q.  Anything else? | 11:25:15 |
| 15 | A.  Anything else regarding that or -- | 11:25:21 |
| 16 | Q.  That category, the specific description | 11:25:23 |
| 17 | of the accessibility difficulties. | 11:25:25 |
| 18 | A.  I don't believe so. | 11:25:27 |
| 19 | Q.  What were the difficulties with respect | 11:25:28 |
| 20 | to My Math Labs, again, relying upon your review of | 11:25:30 |
| 21 | Mr. Payan's deposition testimony? | 11:25:34 |
| 22 | A.  I don't recall specifically. | 11:25:36 |
| 23 | Q.  Generally? | 11:25:40 |
| 24 | A.  He expressed difficulty accessing the -- | 11:25:41 |

80

| | | |
|---|---|---|
| 1 | that software as a whole. | 11:25:47 |
| 2 |     Q.  Were you able to access My Math Labs? | 11:25:49 |
| 3 |     A.  I evaluated My Math Labs, yes. | 11:25:51 |
| 4 |     Q.  Okay.  Did you access it? | 11:25:55 |
| 5 |     MS. KREVOR-WEISBAUM:  Objection. | 11:25:58 |
| 6 | By Mr. Cleeland: | 11:26:00 |
| 7 |     Q.  Were you able to get into it? | 11:26:00 |
| 8 |     A.  I was. | 11:26:02 |
| 9 |     Q.  Okay.  When did you do that? | 11:26:03 |
| 10 |     A.  I don't recall specifically.  Sometime | 11:26:08 |
| 11 | in the -- I believe it was the last week of | 11:26:10 |
| 12 | September. | 11:26:14 |
| 13 |     Q.  Okay.  And is that identified anywhere | 11:26:14 |
| 14 | in your report? | 11:26:18 |
| 15 |     A.  Is -- | 11:26:21 |
| 16 |     Q.  Your access to My Math Labs, is it | 11:26:22 |
| 17 | identified anywhere in your report? | 11:26:24 |
| 18 |     A.  It is -- the information in my report is | 11:26:27 |
| 19 | as a result of that access. | 11:26:31 |
| 20 |     Q.  Is there a specific reference in your | 11:26:32 |
| 21 | report to your efforts to access My Math Labs? | 11:26:34 |
| 22 |     A.  I don't believe so. | 11:26:39 |
| 23 |     Q.  What about your access of My Math Labs | 11:26:40 |
| 24 | in any way supports the description by Mr. Payan of | 11:26:47 |

81

Peter Bossley, 11/7/2017
Payan v. Los Angeles Community College District

| | | |
|---|---|---|
| 1 | accessibility difficulties, if any? | 11:26:52 |
| 2 | A.  Should we go down to that section and | 11:26:56 |
| 3 | talk through it?  I have a whole section in the | 11:26:58 |
| 4 | report. | 11:27:02 |
| 5 | Q.  Okay.  We're only talking about My Math | 11:27:02 |
| 6 | Labs here. | 11:27:04 |
| 7 | A.  Sure. | 11:27:05 |
| 8 | Q.  If you think it's appropriate to wait | 11:27:06 |
| 9 | until then, I'm more than happy to do it. | 11:27:08 |
| 10 | With that caveat, you also indicated | 11:27:14 |
| 11 | that there was -- you believe there was testimony | 11:27:18 |
| 12 | regarding Mr. Payan's description of specific | 11:27:21 |
| 13 | accessibility difficulties with Etudes.  What if | 11:27:26 |
| 14 | anything do you recall about that? | 11:27:30 |
| 15 | A.  I don't recall the specifics of his | 11:27:36 |
| 16 | difficulties. | 11:27:38 |
| 17 | Q.  Based upon your experience, background, | 11:27:41 |
| 18 | training, and job assignment, have you ever found a | 11:27:45 |
| 19 | situation where the student couldn't access a program | 11:27:49 |
| 20 | due to errors by the student, not the program? | 11:27:56 |
| 21 | A.  I have. | 11:27:59 |
| 22 | Q.  Do you know if that happened with | 11:28:02 |
| 23 | Mr. Payan? | 11:28:03 |
| 24 | MS. KREVOR-WEISBAUM:  Objection. | 11:28:05 |

82

| | | |
|---|---|---|
| 1 | THE WITNESS:  I'm not aware of that. | 11:28:08 |
| 2 | By Mr. Cleeland: | 11:28:10 |
| 3 | Q.  Are you aware of it being true or not | 11:28:11 |
| 4 | true? | 11:28:12 |
| 5 | MS. KREVOR-WEISBAUM:  Objection. | 11:28:13 |
| 6 | By Mr. Cleeland: | 11:28:17 |
| 7 | Q.  See, I don't know what your answer was. | 11:28:18 |
| 8 | MS. KREVOR-WEISBAUM:  I don't know what | 11:28:20 |
| 9 | your question was.  Could you clarify it? | 11:28:21 |
| 10 | MR. CLEELAND:  I don't care if you know, | 11:28:22 |
| 11 | I want to know if the witness knows. | 11:28:24 |
| 12 | By Mr. Cleeland: | 11:28:26 |
| 13 | Q.  If you don't understand a question, | 11:28:26 |
| 14 | please let me know and I'll be happy to make it | 11:28:27 |
| 15 | clear. | 11:28:29 |
| 16 | A.  Can you repeat? | 11:28:29 |
| 17 | Q.  Sure.  Do you know what the cause of the | 11:28:31 |
| 18 | specific accessibility difficulties identified by | 11:28:35 |
| 19 | Mr. Payan was? | 11:28:38 |
| 20 | A.  I don't recall the specifics of his | 11:28:40 |
| 21 | difficulties. | 11:28:45 |
| 22 | Q.  Do you know if it was a result of | 11:28:45 |
| 23 | operator error, the operator being Mr. Payan? | 11:28:47 |
| 24 | A.  I do not. | 11:28:51 |

83

| | | |
|---|---|---|
| 1 | Q.  And you have found experiences and | 11:28:54 |
| 2 | examples where the result of lack of accessibility is | 11:28:56 |
| 3 | the result of operator error, correct? | 11:29:00 |
| 4 | A.  That is correct. | 11:29:03 |
| 5 | Q.  All right.  Now, Etudes.  Have you ever | 11:29:04 |
| 6 | experienced examples of Etudes being not accessible | 11:29:08 |
| 7 | due to operator error? | 11:29:16 |
| 8 | A.  Etudes? | 11:29:19 |
| 9 | Q.  Yes. | 11:29:21 |
| 10 | A.  Are you talking specifically about this | 11:29:22 |
| 11 | Etudes software? | 11:29:24 |
| 12 | Q.  You only gave me two categories for | 11:29:24 |
| 13 | Mr. Payan. | 11:29:27 |
| 14 | A.  I am not aware of circumstances or times | 11:29:28 |
| 15 | with -- where inaccessibility to Etudes was due to | 11:29:32 |
| 16 | user error. | 11:29:38 |
| 17 | Q.  But you don't know if the | 11:29:40 |
| 18 | inaccessibility issues raised by -- I'm sorry, | 11:29:40 |
| 19 | difficulties -- you used the word difficulty -- was a | 11:29:44 |
| 20 | result of Mr. Payan's operator error, do you? | 11:29:46 |
| 21 | A.  I don't.  I do not. | 11:29:50 |
| 22 | Q.  Thanks.  Any other material that you | 11:29:53 |
| 23 | derived from the deposition testimony of Mr. Payan | 11:29:56 |
| 24 | that you relied upon in reaching any opinions or | 11:30:00 |

84

| | | |
|---|---|---|
| 1 | conclusions as a result of being retained as an | 11:30:03 |
| 2 | expert witness in this matter? | 11:30:06 |
| 3 | A.  He just -- he did describe some -- some | 11:30:07 |
| 4 | problems obtaining accessible electronic information | 11:30:11 |
| 5 | in the classroom. | 11:30:17 |
| 6 | Q.  What? | 11:30:19 |
| 7 | A.  But that was more related to | 11:30:19 |
| 8 | disabilities.  OSS. | 11:30:21 |
| 9 | Q.  Do you remember what that was that he | 11:30:25 |
| 10 | couldn't access? | 11:30:27 |
| 11 | A.  I don't recall specifically, but I | 11:30:28 |
| 12 | believe it was in class notes used by professors, | 11:30:32 |
| 13 | outlines, powerpoints. | 11:30:39 |
| 14 | Q.  You mean presentations by instructors? | 11:30:40 |
| 15 | A.  Yes. | 11:30:43 |
| 16 | Q.  Do you know the names of those | 11:30:43 |
| 17 | instructors? | 11:30:44 |
| 18 | A.  I don't recall. | 11:30:45 |
| 19 | Q.  Do you know the names of the classes? | 11:30:46 |
| 20 | A.  I don't recall specifics. | 11:30:48 |
| 21 | Q.  Anything else related to the testimony | 11:30:49 |
| 22 | of Mr. Payan as categorized in your capacity as an | 11:30:53 |
| 23 | expert witness? | 11:30:58 |
| 24 | A.  No. | 11:31:00 |

85

Peter Bossley, 11/7/2017
Payan v. Los Angeles Community College District

| | | |
|---|---|---|
| 1 | Q.  Next transcript is that of Ryan Kushner, | 11:31:01 |
| 2 | K-u-s-h-n-e-r.  Is there any information that you | 11:31:06 |
| 3 | found in the deposition testimony of Mr. Kushner that | 11:31:09 |
| 4 | you relied upon in reaching any opinions or | 11:31:13 |
| 5 | conclusions in your capacity as an expert witness in | 11:31:15 |
| 6 | this matter? | 11:31:18 |
| 7 | A.  Yes, there were. | 11:31:18 |
| 8 | Q.  What? | 11:31:21 |
| 9 | A.  Mr. Kushner described evaluating My Math | 11:31:22 |
| 10 | Lab and Etudes, and he found them to be usable, I | 11:31:30 |
| 11 | think the words he used were cumbersome -- but | 11:31:39 |
| 12 | cumbersome. | 11:31:42 |
| 13 | Q.  Did you rely upon that information in | 11:31:45 |
| 14 | reaching any opinions or conclusion in this matter? | 11:31:47 |
| 15 | A.  I -- yes. | 11:31:52 |
| 16 | Q.  How? | 11:31:57 |
| 17 | A.  Because his position is in Disability | 11:31:57 |
| 18 | Services Office where knowledge of digital | 11:32:10 |
| 19 | accessibility issues should be present, it seemed to | 11:32:12 |
| 20 | indicate a lack of awareness. | 11:32:17 |
| 21 | Q.  Awareness of what? | 11:32:19 |
| 22 | A.  Of what digital accessibility really is. | 11:32:20 |
| 23 | Q.  Well, he said it was usable, which means | 11:32:28 |
| 24 | it's accessible, correct? | 11:32:31 |

86

| | | |
|---|---|---|
| 1 | A.  That was his assessment. | 11:32:32 |
| 2 | Q.  Is it yours? | 11:32:36 |
| 3 | A.  It is not. | 11:32:37 |
| 4 | Q.  Is usable in any way related to | 11:32:39 |
| 5 | accessible? | 11:32:41 |
| 6 | A.  It is. | 11:32:43 |
| 7 | Q.  Okay.  If something is usable, does that | 11:32:46 |
| 8 | mean that the person can access the information? | 11:32:53 |
| 9 | A.  I would say it does, yeah. | 11:33:00 |
| 10 | Q.  Okay.  So by the testimony you just | 11:33:02 |
| 11 | recited to me of Mr. Kushner that you relied upon, | 11:33:05 |
| 12 | you did say that the My Math Labs and Etudes software | 11:33:09 |
| 13 | was usable, correct? | 11:33:13 |
| 14 | A.  He did say that. | 11:33:15 |
| 15 | Q.  And then added the phrase, "but | 11:33:16 |
| 16 | cumbersome".  Did you have an understanding of what | 11:33:20 |
| 17 | Mr. Kushner was intending by use of the word | 11:33:23 |
| 18 | "cumbersome"? | 11:33:27 |
| 19 | A.  I don't know what he intended. | 11:33:29 |
| 20 | Q.  Okay.  Anything else in the deposition | 11:33:33 |
| 21 | testimony of Mr. Kushner that you relied upon in | 11:33:41 |
| 22 | reaching your opinions or conclusions in this matter | 11:33:44 |
| 23 | in your capacity as an expert witness? | 11:33:46 |
| 24 | A.  Not that I recall at this time. | 11:33:49 |

87

| | | |
|---|---|---|
| 1 | Q.  Then we have next deposition transcript | 11:33:51 |
| 2 | of Jorge, J-o-r-g-e, Mata, M-a-t-a.  Is there any | 11:33:58 |
| 3 | information that you found in the deposition | 11:34:05 |
| 4 | testimony of Mr. Mata that you relied upon in | 11:34:06 |
| 5 | reaching any opinions or conclusions in your capacity | 11:34:09 |
| 6 | as an expert witness in this matter? | 11:34:12 |
| 7 | A.  I don't believe so. | 11:34:15 |
| 8 | Q.  Below that you make reference to, "At | 11:34:19 |
| 9 | the time the report was drafted, the final certified | 11:34:22 |
| 10 | transcript of the deposition was not yet available. | 11:34:24 |
| 11 | If the final transcript contains any changes that | 11:34:28 |
| 12 | impact on the conclusions in this report, I reserve | 11:34:30 |
| 13 | the right to amend this report in light of such | 11:34:33 |
| 14 | changes." | 11:34:37 |
| 15 | Did you receive indication of any | 11:34:38 |
| 16 | changes that warranted changing your report? | 11:34:39 |
| 17 | A.  I did not. | 11:34:42 |
| 18 | Q.  The next transcript refers to the | 11:34:44 |
| 19 | deposition of Thelma Day.  Is there any information | 11:34:46 |
| 20 | that you found in the deposition testimony of Ms. Day | 11:34:51 |
| 21 | that you relied upon in reaching any opinions or | 11:34:54 |
| 22 | conclusions as a result of being retained as an | 11:34:57 |
| 23 | expert witness in this matter? | 11:35:01 |
| 24 | A.  I don't believe so. | 11:35:02 |

88

1       Q.  I think we have now made reference to          11:35:04

2   all the deposition testimony referenced in your        11:35:06

3   report.  Are you aware of any deposition testimony      11:35:08

4   that you looked at that we haven't talked about         11:35:11

5   today?                                                  11:35:13

6       A.  I am not.                                       11:35:13

7       Q.  Then it states materials you referred          11:35:17

8   to -- or excuse me, looked at.  "The Defendant Los      11:35:22

9   Angeles Community College District's responses to the   11:35:25

10  Plaintiff Portia Mason's first set of                   11:35:28

11  interrogatories."                                       11:35:31

12          Was there any information that you found        11:35:31

13  within the responses to interrogatories just            11:35:32

14  identified that you relied upon in reaching any         11:35:35

15  opinions or conclusions in your capacity as an expert   11:35:39

16  witness in this matter?                                 11:35:42

17      A.  I don't believe so.                             11:35:44

18      Q.  The next reference to materials reviewed        11:35:47

19  was, "Defendant Los Angeles Community College           11:35:49

20  District's responses to Plaintiff Roy Payan's first     11:35:53

21  set of interrogatories."                                11:35:57

22          Was there any information that you              11:35:58

23  identified within those responses that you relied       11:36:00

24  upon in reaching any opinions or conclusions in your    11:36:03

89

| | | |
|---|---|---|
| 1 | capacity as an expert witness in this matter? | 11:36:07 |
| 2 |     A.  I don't believe so. | 11:36:09 |
| 3 |       MR. CLEELAND:  If be could go off the | 11:36:14 |
| 4 | record for just a second. | 11:36:15 |
| 5 |       (Discussion off the record.) | 11:36:25 |
| 6 | By Mr. Cleeland: | 11:36:27 |
| 7 |     Q.  The next entry is, "The Ohio State | 11:36:28 |
| 8 | University Minimum Web Accessibility Standards."  Do | 11:36:31 |
| 9 | you have a copy of those standards with you today? | 11:36:36 |
| 10 |     A.  Yes.  Yes, sir.  It's in the packet. | 11:36:37 |
| 11 |     Q.  What information within the Ohio State | 11:36:41 |
| 12 | University Minimum Web Accessibility Standards" -- | 11:36:46 |
| 13 | that was a terrible question.  I apologize. | 11:36:50 |
| 14 |       Is there any information in The Ohio | 11:36:52 |
| 15 | State University Minimum Web Accessibility Standards | 11:36:54 |
| 16 | that you relied upon in reaching any opinions or | 11:36:57 |
| 17 | conclusions as a result of your capacity as an expert | 11:37:01 |
| 18 | witness in this matter? | 11:37:04 |
| 19 |     A.  I believe I -- I believe indirectly, | 11:37:07 |
| 20 | yes. | 11:37:20 |
| 21 |     Q.  What do you believe indirectly? | 11:37:21 |
| 22 |     A.  So what I mean by that is this document | 11:37:23 |
| 23 | is a large part of our -- my institution's stance on | 11:37:30 |
| 24 | what digital testimony compliance requires. | 11:37:41 |

90

```
1        Q.  Well, what within that accessibility        11:37:49

2   policy specifically are you relying upon in reaching  11:37:53

3   any opinions or conclusions in this matter?           11:37:58

4        A.  The requirements for accessibility.          11:38:02

5        Q.  What requirements?                           11:38:10

6        A.  The specific requirements.                   11:38:10

7        Q.  I need to know the specific ones.            11:38:12

8        A.  They were spread all over in this            11:38:16

9   report.  Maybe we can talk about them.               11:38:17

10       Q.  Do you think that you refer to them          11:38:19

11  specifically in later portions of the report?        11:38:21

12       A.  I did not refer to them specifically.        11:38:23

13       Q.  Okay.  What I want to do is be as fair       11:38:24

14  as possible to you.  I want to make sure you have the 11:38:27

15  opportunity to testify to all of your conclusions,   11:38:29

16  your opinions, everything you relied upon in         11:38:32

17  answering the questions by any of the lawyers in this 11:38:35

18  case.                                                 11:38:39

19       If you think it's prudent to defer it to        11:38:39

20  a later point of your report, that's fine.  I tend to 11:38:41

21  go linear because it's just more organized.  But I'm 11:38:45

22  asking for a specific reference.                     11:38:48

23       Is there a specific reference in any            11:38:51

24  portion of this report that identifies a specific OSU 11:38:53
```

91

Peter Bossley, 11/7/2017
Payan v. Los Angeles Community College District

| | | |
|---|---|---|
| 1 | web accessibility policy and standards? | 11:38:58 |
| 2 | A.   There's not. | 11:39:02 |
| 3 | Q.   Okay.  We'll get to that later. | 11:39:03 |
| 4 | Next, the documents, you referred to the | 11:39:07 |
| 5 | University of Washington IT accessibility guidelines. | 11:39:10 |
| 6 | What, if anything, within those guidelines did you | 11:39:14 |
| 7 | specifically rely upon in reaching any opinion or | 11:39:18 |
| 8 | conclusions as a result of being an expert witness in | 11:39:21 |
| 9 | this matter? | 11:39:24 |
| 10 | A.   I didn't -- did not rely on anything | 11:39:25 |
| 11 | specifically. | 11:39:28 |
| 12 | Q.   Those are just general references? | 11:39:28 |
| 13 | A.   That is correct.  These are general | 11:39:31 |
| 14 | references for how institutions approach this topic. | 11:39:33 |
| 15 | Q.   Are the Washington -- University of | 11:39:37 |
| 16 | Washington guidelines that you brought with you | 11:39:39 |
| 17 | identical to The Ohio State University guidelines? | 11:39:42 |
| 18 | A.   They are very similar, but they are not, | 11:39:44 |
| 19 | totally. | 11:39:47 |
| 20 | Q.   And you'd expect that, right? | 11:39:48 |
| 21 | A.   I would. | 11:39:50 |
| 22 | Q.   I did skip one, and I do apologize. | 11:39:53 |
| 23 | It says, "The Ohio State University | 11:39:55 |
| 24 | Request For Alternative Access Exception."  Is that | 11:39:57 |

92

Peter Bossley, 11/7/2017
Payan v. Los Angeles Community College District

| | | |
|---|---|---|
| 1 | referenced any where specifically in your report? | 11:40:02 |
| 2 | A.  Not specifically, no. | 11:40:06 |
| 3 | Q.  So it's more of an exemplar of the type | 11:40:07 |
| 4 | of a form? | 11:40:13 |
| 5 | A.  Correct. | 11:40:13 |
| 6 | Q.  Did you read any of the accommodation | 11:40:13 |
| 7 | request forms for any of the Plaintiffs in this case? | 11:40:15 |
| 8 | A.  I did not. | 11:40:19 |
| 9 | Q.  Were you provided with those forms? | 11:40:21 |
| 10 | A.  I don't believe so. | 11:40:22 |
| 11 | Q.  Did you ask for those forms? | 11:40:24 |
| 12 | A.  Did not. | 11:40:26 |
| 13 | Q.  Were you aware that such forms were | 11:40:27 |
| 14 | prepared on their behalves? | 11:40:29 |
| 15 | A.  I was aware through reading some of the | 11:40:32 |
| 16 | deposition testimony. | 11:40:35 |
| 17 | Q.  Including, specifically, Mr. Dominick, | 11:40:36 |
| 18 | correct? | 11:40:38 |
| 19 | A.  Correct. | 11:40:38 |
| 20 | Q.  The next item you reviewed was the Miami | 11:40:40 |
| 21 | University Accessible Technology Policy.  Is there | 11:40:45 |
| 22 | any specific reference in your report with respect to | 11:40:47 |
| 23 | opinions or conclusions where you relied upon | 11:40:51 |
| 24 | information contained in that specific policy? | 11:40:53 |

93

1        A.   There is not.                              11:40:57

2        Q.   And again, is it identical to The Ohio     11:40:59

3   State University policy?                             11:41:03

4        A.   It is not.  It's very similar, but it's    11:41:03

5   not identical.                                       11:41:06

6        Q.   And is it identical to the University      11:41:06

7   of Washington accessibility guidelines?              11:41:08

8        A.   No, sir, it's not.                         11:41:11

9        Q.   Next we have the Tennessee Board of        11:41:12

10  Regents Accessibility Initiative.  Is there a        11:41:15

11  specific reference anywhere in your report to the    11:41:18

12  Tennessee Board of Regents Accessibility Initiative  11:41:22

13  that is important to your opinions and conclusions?  11:41:25

14       A.   No.  Again, it's general background for    11:41:28

15  how campuses handle this topic.                      11:41:32

16       Q.   Thank you.                                 11:41:33

17            Is the Tennessee Board of Regents          11:41:34

18  Accessibility Initiative identical to any of the     11:41:36

19  other policies we just referred to?                  11:41:40

20       A.   It is not, no.                             11:41:41

21       Q.   Next we have the "Joint Dear Colleague     11:41:45

22  letter:  Electronic Book Readers, United States      11:41:49

23  Department of Education, Office for Civil Rights,     11:41:52

24  June 29, 2010."  Is that referenced specifically in  11:41:55

94

| | | |
|---|---|---|
| 1 | any portion of your report beyond this? | 11:41:59 |
| 2 | A.  It is. | 11:42:01 |
| 3 | Q.  Then we'll get to it. | 11:42:04 |
| 4 | The Los Angeles Community College | 11:42:05 |
| 5 | District Administrative Regulation B-33 Web | 11:42:08 |
| 6 | Accessibility Standards and Guidelines.  Do you have | 11:42:11 |
| 7 | specific reference in your report to the contents of | 11:42:16 |
| 8 | that regulation? | 11:42:18 |
| 9 | A.  Specifically to the contents, no. | 11:42:19 |
| 10 | Q.  Next is LACCD Administrative Regulation | 11:42:22 |
| 11 | B-34 ADA Self-Evaluation and Transition Plan 2015. | 11:42:26 |
| 12 | Is there a specific reference in your report to the | 11:42:33 |
| 13 | contents of that plan? | 11:42:35 |
| 14 | A.  To the contents directly, no. | 11:42:39 |
| 15 | Q.  The next document was the Los Angeles | 11:42:41 |
| 16 | Community College District Administrative Regulation | 11:42:44 |
| 17 | E-100. | 11:42:47 |
| 18 | Is there any information contained | 11:42:49 |
| 19 | within that document that you relied upon in reaching | 11:42:51 |
| 20 | any opinions or conclusions as a result of being | 11:42:55 |
| 21 | retained as an expert witness in this matter? | 11:42:57 |
| 22 | A.  There is. | 11:42:59 |
| 23 | Q.  Is it specifically identified in a | 11:43:01 |
| 24 | category? | 11:43:03 |

95

1     A.  Is it --                                        11:43:05

2     Q.  In other words, is there a particular          11:43:07

3  heading within your report?                            11:43:09

4     A.  It speaks to the conclusion.                    11:43:10

5     Q.  Is there --                                     11:43:16

6     A.  But there's not --                              11:43:17

7     Q.  I cut you off.                                  11:43:19

8     A.  There's not a specific -- there's not a         11:43:20

9  specific reference to this in the report.              11:43:25

10     Q.  Thank you.                                     11:43:27

11         It also makes reference that you read          11:43:28

12  the amended complaint in this matter.  Is there some  11:43:29

13  reason you read the amended complaint?                11:43:32

14     A.  It was provided to me for my                   11:43:34

15  consideration regarding my engagement in this         11:43:37

16  project.                                              11:43:40

17     Q.  And was anything in the amended                11:43:41

18  complaint relied upon by you in reaching any opinions 11:43:44

19  or conclusions in this matter?                        11:43:47

20     A.  No.                                            11:43:48

21     Q.  Just more reading, right?                      11:43:50

22     A.  That is correct.  Yes.  Sorry.                 11:43:52

23     Q.  And the last entry was Los Angeles City       11:43:56

24  College Alternate Media Production Policy.  Did you   11:43:58

                                                96

| | | |
|---|---|---|
| 1 | read that? | 11:44:02 |
| 2 | A.  I did. | 11:44:04 |
| 3 | Q.  And does anything in your report rely | 11:44:05 |
| 4 | upon the contents of that alternate media production | 11:44:08 |
| 5 | policy? | 11:44:11 |
| 6 | A.  Not directly.  But again, speaking to | 11:44:11 |
| 7 | the conclusion. | 11:44:14 |
| 8 | MR. CLEELAND:  Okay.  We have gotten to | 11:44:16 |
| 9 | the end of the list, so perhaps we should take a | 11:44:18 |
| 10 | deposition break right now. | 11:44:21 |
| 11 | (Recess taken.) | 11:55:42 |
| 12 | MR. CLEELAND:  Back on the record, | 11:55:42 |
| 13 | please. | 11:55:43 |
| 14 | By Mr. Cleeland: | 11:55:45 |
| 15 | Q.  Sir, are you completely blind? | 11:55:46 |
| 16 | A.  I have some vision. | 11:55:50 |
| 17 | Q.  Is there a description of the vision you | 11:55:52 |
| 18 | have? | 11:55:52 |
| 19 | A.  I have a limited, maybe 15-degree field | 11:55:53 |
| 20 | in my right eye.  With visual acuity day-to-day it | 11:55:56 |
| 21 | fluctuates between when I get measured, but it's | 11:56:02 |
| 22 | somewhere around 20 over 350. | 11:56:05 |
| 23 | Q.  And how long have you had that eyesight? | 11:56:07 |
| 24 | A.  Since birth. | 11:56:10 |

97

1    Q.  Returning to your report of October 2nd,      11:56:12

2    2017.  Now that we have gone through the laborious   11:56:16

3    list, and I apologize for that, we have a caption or  11:56:20

4    heading stating "Overview of the Evaluation          11:56:25

5    Methodology".  Now, what was the purpose of that     11:56:29

6    section, sir?                                        11:56:32

7        A.  To explain the methods that are used in     11:56:32

8    the industry to evaluate for accessibility, digital  11:56:42

9    accessibility.                                       11:56:47

10       Q.  Now, that's -- your understanding of an      11:56:48

11   industry standard is not necessarily what you did in 11:56:50

12   this case; is that correct?                          11:56:52

13       A.  This is what I did -- it is -- it is         11:56:55

14   both an industry standard and what I did in this     11:56:59

15   case.                                                11:57:01

16       Q.  Because it seems to be reciting things       11:57:01

17   that you may or may not have done in this case, so I  11:57:05

18   guess I'll have to go through it.                     11:57:07

19           Under the heading of, "Overview of           11:57:09

20   evaluation methodology," you state, "Evaluation of   11:57:11

21   the functional accessibility of digital contact --   11:57:14

22   content, including websites, web applications, and   11:57:18

23   online documents, was conducted against the World    11:57:23

24   Wide Web Consortium's Web Content Accessibility      11:57:29

98

| | | |
|---|---|---|
| 1 | guidelines (WCAG) 2.0 at conformance Level AA." | 11:57:30 |
| 2 | So is that the actual testing you did of | 11:57:39 |
| 3 | software in this case? | 11:57:41 |
| 4 | A.  Yes. | 11:57:42 |
| 5 | Q.  What software did you test under that | 11:57:42 |
| 6 | standard? | 11:57:45 |
| 7 | A.  The PeopleSoft Campus Solutions, the | 11:57:46 |
| 8 | LACCD website, the My Math Lab software, and Etudes. | 11:57:53 |
| 9 | Q.  It continues in that section -- and by | 11:58:03 |
| 10 | the way, are you the sole author of this report? | 11:58:12 |
| 11 | A.  I am. | 11:58:14 |
| 12 | Q.  Does that include your requested | 11:58:15 |
| 13 | information by Plaintiffs' counsel for clarification | 11:58:20 |
| 14 | purposes? | 11:58:23 |
| 15 | MS. KREVOR-WEISBAUM:  Objection. | 11:58:25 |
| 16 | THE WITNESS:  I don't understand what | 11:58:30 |
| 17 | you mean. | 11:58:31 |
| 18 | By Mr. Cleeland: | 11:58:32 |
| 19 | Q.  Well, I think you said that you were | 11:58:32 |
| 20 | requested to alter your report in some fashion for | 11:58:33 |
| 21 | clarification purposes. | 11:58:36 |
| 22 | MS. KREVOR-WEISBAUM:  Objection. | 11:58:38 |
| 23 | MR. CLEELAND:  You've got to let me | 11:58:39 |
| 24 | finish. | 11:58:40 |

99

Peter Bossley, 11/7/2017
Payan v. Los Angeles Community College District

| | | |
|---|---|---|
| 1 | By Mr. Cleeland: | 11:58:41 |
| 2 | Q.  Do you understand my question, sir? | 11:58:41 |
| 3 | A.  I do understand your question, and the | 11:58:46 |
| 4 | answer is yes, I am the author of everything. | 11:58:48 |
| 5 | Q.  My concern is specifically you were | 11:58:52 |
| 6 | asked to clarify something.  I want to know, is the | 11:58:55 |
| 7 | clarification solely your words, or are they the | 11:59:00 |
| 8 | words provided by others? | 11:59:04 |
| 9 | A.  They are solely my words. | 11:59:05 |
| 10 | Q.  Thank you. | 11:59:07 |
| 11 | It continues in your report, "The goal | 11:59:07 |
| 12 | of WCAG 2.0" -- and what do you mean by "goal"? | 11:59:13 |
| 13 | A.  I mean the purpose for its development. | 11:59:18 |
| 14 | Q.  Okay.  Does that mean that it will | 11:59:24 |
| 15 | occur? | 11:59:26 |
| 16 | A.  It does not. | 11:59:30 |
| 17 | Q.  Okay.  You continue that sentence, | 11:59:32 |
| 18 | "...is to ensure that online content is functionally | 11:59:34 |
| 19 | accessible to persons with disabilities..."  What do | 11:59:39 |
| 20 | you mean by "functionally accessible"? | 11:59:45 |
| 21 | A.  What I mean by functionally accessible | 11:59:49 |
| 22 | is that online resource, a website, a web | 11:59:51 |
| 23 | application, or a document is functionally usable. | 12:00:00 |
| 24 | It's clear and unambiguous to all users regardless of | 12:00:04 |

<center>100</center>

| | | |
|---|---|---|
| 1 | their ability. | 12:00:11 |
| 2 | Q.  So we now have two phrases; functionally | 12:00:13 |
| 3 | accessible and functionally usable.  Are they | 12:00:15 |
| 4 | interchangeable in your mind? | 12:00:18 |
| 5 | A.  They are. | 12:00:19 |
| 6 | Q.  And I notice it says accessible, but not | 12:00:23 |
| 7 | description beyond functional.  Is the phrase | 12:00:31 |
| 8 | functionally -- I can't talk today. | 12:00:34 |
| 9 | Is the phrase functionally accessible a | 12:00:37 |
| 10 | term of art in your industry? | 12:00:40 |
| 11 | A.  It is. | 12:00:42 |
| 12 | Q.  What does it mean as a term of art? | 12:00:45 |
| 13 | A.  It means that persons with disabilities | 12:00:47 |
| 14 | are able to fully access. | 12:00:49 |
| 15 | Q.  So there can't be partially accessible? | 12:00:52 |
| 16 | A.  There could be, but it wouldn't be | 12:00:57 |
| 17 | considered functionally accessible. | 12:01:00 |
| 18 | Q.  So functionally accessible means you | 12:01:01 |
| 19 | have to get what within the program? | 12:01:03 |
| 20 | A.  You have to be able to effectively and | 12:01:05 |
| 21 | efficiently use everything in a program. | 12:01:09 |
| 22 | Q.  Okay.  So functionally and efficiently. | 12:01:10 |
| 23 | What do you mean by "functionally"? | 12:01:17 |
| 24 | A.  I mean as -- as a user of whatever | 12:01:18 |

101

1    assistive technology because of a disability, a user          12:01:24

2    must be able to access the functions of a piece of            12:01:28

3    software or website and the information presented             12:01:31

4    there.                                                        12:01:33

5        Q.  And you said right after that,                        12:01:36

6    "everything in a program".  So if you can't access            12:01:38

7    everything in a program by your definition, does that         12:01:41

8    mean that it's not functionally accessible?                   12:01:44

9        A.  It does.                                              12:01:47

10       Q.  Do these programs have metadata?                      12:01:51

11       A.  You'll have to clarify what you mean by               12:01:55

12   "metadata".                                                   12:01:58

13       Q.  What do you think metadata is in the                  12:01:58

14   industry?                                                     12:02:01

15       A.  It's a little outside this wheelhouse,                12:02:01

16   but metadata is typically data attached to a file or         12:02:04

17   a piece of online content that provides more context         12:02:08

18   about it.                                                     12:02:12

19       Q.  Correct.  Now, do you have to be able                 12:02:12

20   to -- does a disabled person have to be able to              12:02:15

21   access the metadata in a program to make it                   12:02:17

22   functionally accessible?                                     12:02:20

23       A.  They do.                                              12:02:22

24       Q.  Why would you want to know about the                  12:02:24

                                                    102

| | | |
|---|---|---|
| 1 | metadata in a program? | 12:02:25 |
| 2 | A.  The same reason anyone else might want | 12:02:29 |
| 3 | to know about it. | 12:02:32 |
| 4 | Q.  Most people don't even know what | 12:02:33 |
| 5 | metadata is, so what do you use metadata for? | 12:02:35 |
| 6 | A.  Understanding when something was | 12:02:37 |
| 7 | created, perhaps, or who authored it. | 12:02:39 |
| 8 | Q.  Have you ever had a question from any | 12:02:41 |
| 9 | disabled student where they asked you gee, I wonder | 12:02:43 |
| 10 | when this was created; can you tell me how to find | 12:02:46 |
| 11 | that? | 12:02:49 |
| 12 | A.  I can't recall a specific circumstance | 12:02:49 |
| 13 | of that, no. | 12:02:53 |
| 14 | Q.  Okay.  So do you have to be able to | 12:02:54 |
| 15 | accept the metadata related to the color section of | 12:02:58 |
| 16 | header bars for it to be fully functional? | 12:03:01 |
| 17 | A.  I don't understand your question. | 12:03:06 |
| 18 | Q.  Okay.  And I appreciate you qualifying | 12:03:08 |
| 19 | that. | 12:03:10 |
| 20 | Somebody made a decision to put certain | 12:03:10 |
| 21 | colors in an article from time to time; you're aware | 12:03:14 |
| 22 | of that? | 12:03:18 |
| 23 | A.  Yes.  Yes, I'm aware of that. | 12:03:19 |
| 24 | Q.  You've done very well so far.  I | 12:03:20 |

103

| | | |
|---|---|---|
| 1 | appreciate that. | 12:03:23 |
| 2 | In every application that you've ever | 12:03:23 |
| 3 | looked at, did you need to find why that color bar -- | 12:03:25 |
| 4 | or that color was selected to accurately and | 12:03:32 |
| 5 | effectively and efficiently utilize the program? | 12:03:34 |
| 6 | A.  If the color in question -- the use of | 12:03:40 |
| 7 | the color in connection convey meaning, it would be a | 12:03:43 |
| 8 | violation of WCAG for that reason, because the color | 12:03:47 |
| 9 | could not be perceived by the blind user. | 12:03:49 |
| 10 | Q.  But it has to transmit meaning, correct? | 12:03:52 |
| 11 | A.  That is correct. | 12:03:54 |
| 12 | Q.  What happens if there was no meaning to | 12:03:55 |
| 13 | the color selection, it just happened to be | 12:03:58 |
| 14 | graphically pleasing? | 12:04:00 |
| 15 | A.  Then it's decorative information. | 12:04:02 |
| 16 | Q.  Right.  So you wouldn't need to have | 12:04:04 |
| 17 | access for it to be functionally accessible, at least | 12:04:06 |
| 18 | access to that information, correct? | 12:04:12 |
| 19 | A.  Only under the circumstance where that | 12:04:14 |
| 20 | color doesn't convey any meaning.  But that is | 12:04:16 |
| 21 | accurate in that circumstance. | 12:04:19 |
| 22 | Q.  Okay.  So there are examples where you | 12:04:20 |
| 23 | don't need full and complete access for something to | 12:04:22 |
| 24 | be functionally accessible, correct? | 12:04:27 |

104

Peter Bossley, 11/7/2017
Payan v. Los Angeles Community College District

| | | |
|---|---|---|
| 1 | A.  Yes. | 12:04:31 |
| 2 | Q.  Okay.  And you talked about efficiently | 12:04:35 |
| 3 | used.  What do you mean by that? | 12:04:39 |
| 4 | A.  Information in online resources and | 12:04:43 |
| 5 | digital resources needs to be conveyed in a way | 12:04:44 |
| 6 | that's -- that provides substantial equivalence. | 12:04:47 |
| 7 | Q.  Content information for a program, | 12:04:54 |
| 8 | correct? | 12:04:56 |
| 9 | A.  Information, correct.  Yes. | 12:04:56 |
| 10 | Q.  No, I just asked content information. | 12:04:58 |
| 11 | Is that correct? | 12:05:01 |
| 12 | A.  What -- I guess I don't understand the | 12:05:02 |
| 13 | question. | 12:05:04 |
| 14 | Q.  Well, many times if you purchase a book, | 12:05:05 |
| 15 | within the first several pages it has a bar that has | 12:05:08 |
| 16 | colors on it indicating the processes of color | 12:05:13 |
| 17 | utilized in the printing.  That doesn't convey | 12:05:16 |
| 18 | content for consumption by the consumer relative to | 12:05:22 |
| 19 | the program, does it? | 12:05:25 |
| 20 | A.  Under some circumstances it does because | 12:05:26 |
| 21 | there are -- there are circumstances where color is | 12:05:30 |
| 22 | used to convey meaning, and that's why they present | 12:05:33 |
| 23 | the color panel. | 12:05:36 |
| 24 | Q.  I agree, sir.  But the color panel is | 12:05:36 |

<div align="center">105</div>

Peter Bossley, 11/7/2017
Payan v. Los Angeles Community College District

1    just for the publisher to say all of the colors have        12:05:38

2    run in sequence.  Do you know that's what that's for?        12:05:42

3         A.  I'm not following you.  I don't use a               12:05:46

4    lot of print textbooks.                                      12:05:48

5         Q.  I understand that.  But some people do.             12:05:49

6    And your goal in this process is to make equal               12:05:53

7    accessibility for all students, right?  Is that a            12:05:55

8    yes?                                                         12:05:59

9         A.  Yes.                                                12:05:59

10        Q.  Okay.  So just because it's in a book               12:06:00

11   doesn't mean it conveys information related to the           12:06:03

12   content of a book; is that correct?                          12:06:06

13        A.  It does not necessarily mean that, that             12:06:08

14   is correct.                                                  12:06:10

15        Q.  And that's the same for an electronic               12:06:10

16   program, correct?                                            12:06:12

17        A.  That is correct.                                    12:06:13

18        Q.  All right.  You continue in that first              12:06:14

19   paragraph under Overview of Evaluation Methodology,          12:06:18

20   "Violations of WCAG present functional barriers for          12:06:25

21   persons with disabilities..."  Do all violations            12:06:31

22   present functional barriers?                                 12:06:33

23        A.  Any violation of WCAG presents a                    12:06:36

24   functional barrier to one population or another, to          12:06:40

106

Peter Bossley, 11/7/2017
Payan v. Los Angeles Community College District

| | | |
|---|---|---|
| 1 | some degree. | 12:06:44 |
| 2 | Q.  And that degree runs from di minimus to | 12:06:47 |
| 3 | complete? | 12:06:51 |
| 4 | A.  That is correct. | 12:06:52 |
| 5 | Q.  And it continues, "...and impact their | 12:06:55 |
| 6 | ability to acquire the same information..."  Again, | 12:06:57 |
| 7 | is the same information in a given program important, | 12:07:03 |
| 8 | or is the information intended to be conveyed what | 12:07:06 |
| 9 | you're concerned about? | 12:07:10 |
| 10 | A.  I don't understand the distinction. | 12:07:11 |
| 11 | Q.  Well, again, if you look at a book -- | 12:07:15 |
| 12 | and I understand your limitations.  Early in the book | 12:07:18 |
| 13 | it usually has a page with a lot of little type, and | 12:07:22 |
| 14 | talks about publishers' names and printing and all | 12:07:25 |
| 15 | kinds of stuff.  Is all of that information crucial | 12:07:28 |
| 16 | information to the consumer of that book? | 12:07:34 |
| 17 | A.  It is. | 12:07:37 |
| 18 | Q.  Crucial? | 12:07:38 |
| 19 | A.  May not be crucial. | 12:07:40 |
| 20 | Q.  Okay.  That was my question.  Crucial. | 12:07:41 |
| 21 | Is all the information on that page crucial to the | 12:07:45 |
| 22 | consumer of the book? | 12:07:47 |
| 23 | A.  No. | 12:07:50 |
| 24 | Q.  Okay.  So there's some information in | 12:07:52 |

107

| | | |
|---|---|---|
| 1 | textbooks that may not be necessary to utilize to | 12:07:55 |
| 2 | learn that subject for a sighted student; is that | 12:08:03 |
| 3 | correct? | 12:08:09 |
| 4 | A.  That is correct. | 12:08:09 |
| 5 | Q.  Is the same true for a nonsighted | 12:08:10 |
| 6 | student relying upon a program? | 12:08:12 |
| 7 | A.  Can you -- can you help me understand | 12:08:20 |
| 8 | what you're -- what you are asking? | 12:08:23 |
| 9 | Q.  Well, if a book has information that's | 12:08:26 |
| 10 | not crucial to the understanding, in our example, and | 12:08:28 |
| 11 | you make that book -- you convert it to an electronic | 12:08:32 |
| 12 | format for consumption by a nonsighted individual, | 12:08:38 |
| 13 | that same information that was noncrucial remains the | 12:08:41 |
| 14 | same information, correct? | 12:08:44 |
| 15 | A.  Yes, that is correct. | 12:08:46 |
| 16 | Q.  That's what I was interested in.  So | 12:08:49 |
| 17 | it's not crucial to the nonsighted student, also, | 12:08:52 |
| 18 | correct? | 12:08:55 |
| 19 | A.  It may not be. | 12:08:56 |
| 20 | Q.  You continue that a person with | 12:08:57 |
| 21 | disabilities have the, "...ability to acquire the | 12:09:08 |
| 22 | same information, engage in the same interactions, | 12:09:11 |
| 23 | and enjoy the same services as a person without a | 12:09:16 |
| 24 | disability."  Is that an absolute statement? | 12:09:19 |

108

Peter Bossley, 11/7/2017
Payan v. Los Angeles Community College District

| | | |
|---|---|---|
| 1 | A.  The statement as a whole? | 12:09:25 |
| 2 | Q.  Yes. | 12:09:28 |
| 3 | A.  It's not an absolute statement in every | 12:09:30 |
| 4 | case. | 12:09:32 |
| 5 | Q.  Right.  There's application to | 12:09:32 |
| 6 | individuals, correct? | 12:09:36 |
| 7 | A.  There is. | 12:09:38 |
| 8 | Q.  An individual's needs might be a little | 12:09:41 |
| 9 | different from another individual's needs, correct? | 12:09:42 |
| 10 | A.  Yes. | 12:09:45 |
| 11 | Q.  And the purpose of all these standards | 12:09:45 |
| 12 | we have been talking about is to make sure that | 12:09:47 |
| 13 | information is accessible to as many people as | 12:09:48 |
| 14 | possible, correct? | 12:09:51 |
| 15 | A.  That is correct. | 12:09:51 |
| 16 | Q.  And you indicated earlier that there are | 12:09:52 |
| 17 | limitations in electronic presentation of | 12:09:54 |
| 18 | information, and that remains true now, correct? | 12:09:56 |
| 19 | A.  Correct. | 12:09:59 |
| 20 | Q.  But that statement continues, "...in an | 12:10:01 |
| 21 | equally effective and equally integrated manner." | 12:10:03 |
| 22 | What does the phrase in your report "equally | 12:10:09 |
| 23 | effective" mean? | 12:10:12 |
| 24 | A.  It means that whatever result the | 12:10:16 |

109

| | | |
|---|---|---|
| 1 | student is attempting to get as their nondisabled | 12:10:23 |
| 2 | peer, that they are able to -- they are able to | 12:10:30 |
| 3 | achieve that same result in an equally effective way. | 12:10:32 |
| 4 | Q.  The same result that the student | 12:10:35 |
| 5 | expects? | 12:10:38 |
| 6 | A.  Not that the student expects, but the | 12:10:40 |
| 7 | same result. | 12:10:41 |
| 8 | Q.  Thank you. | 12:10:42 |
| 9 | A.  Yes. | 12:10:43 |
| 10 | Q.  Some students have a pretty low level of | 12:10:43 |
| 11 | expectation in a class.  I was often that student. | 12:10:46 |
| 12 | Okay.  So we have now described equally | 12:10:49 |
| 13 | effective.  What about the phrase "equally integrated | 12:10:52 |
| 14 | manner" as identified in your report, what does that | 12:10:57 |
| 15 | mean? | 12:10:59 |
| 16 | A.  That means that a student with a | 12:11:00 |
| 17 | disability not be offered an alternative that sets | 12:11:03 |
| 18 | them apart from their nondisabled peers. | 12:11:07 |
| 19 | Q.  Well, doesn't an electronic format set | 12:11:10 |
| 20 | them apart from a sighted person, because the sighted | 12:11:13 |
| 21 | person can read it out of a book? | 12:11:17 |
| 22 | A.  Not if that electronic option is truly | 12:11:18 |
| 23 | equivalent. | 12:11:22 |
| 24 | Q.  You didn't say equivalent, you said it | 12:11:22 |

110

Peter Bossley, 11/7/2017
Payan v. Los Angeles Community College District

| | | |
|---|---|---|
| 1 | sets them apart.  It sounds like you now need to | 12:11:26 |
| 2 | include the phrase equivalent.  What do you mean by | 12:11:29 |
| 3 | equally integrated manner? | 12:11:31 |
| 4 | A.  I mean that a student with a disability | 12:11:37 |
| 5 | not be given an alternative that causes them unequal | 12:11:41 |
| 6 | treatment. | 12:11:47 |
| 7 | Q.  Well, it's unequal treatment if a person | 12:11:47 |
| 8 | can read a book and a person can't read a book, | 12:11:50 |
| 9 | right? | 12:11:53 |
| 10 | MS. KREVOR-WEISBAUM:  Objection. | 12:11:54 |
| 11 | By Mr. Cleeland: | 12:11:55 |
| 12 | Q.  Is that an accurate statement? | 12:11:55 |
| 13 | A.  I don't agree. | 12:11:58 |
| 14 | Q.  Does it take a nonsighted person longer | 12:12:01 |
| 15 | to read braille than the average sighted person reads | 12:12:05 |
| 16 | a book? | 12:12:09 |
| 17 | A.  I don't understand that question. | 12:12:11 |
| 18 | Q.  Do you read braille? | 12:12:13 |
| 19 | A.  I do. | 12:12:15 |
| 20 | Q.  Do you also read electronic material? | 12:12:15 |
| 21 | A.  I do. | 12:12:17 |
| 22 | Q.  Which is faster? | 12:12:18 |
| 23 | A.  I don't -- for me? | 12:12:19 |
| 24 | Q.  That's what I'm asking. | 12:12:27 |

111

| | | |
|---|---|---|
| 1 | A. For me, electronic is faster. | 12:12:28 |
| 2 | Q. Okay. So there are two methodologies | 12:12:30 |
| 3 | made available. One of the two is faster than the | 12:12:33 |
| 4 | other? Is that a yes? | 12:12:38 |
| 5 | A. Yes. | 12:12:39 |
| 6 | Q. Okay. Have you read any studies that | 12:12:39 |
| 7 | talk about the average speed of reading of a college | 12:12:45 |
| 8 | student on textbook material? | 12:12:47 |
| 9 | A. I read an article about a month ago that | 12:12:49 |
| 10 | I saw that actually seemed to indicate that students | 12:12:54 |
| 11 | were able to read and comprehend print better and | 12:12:59 |
| 12 | faster than they were electronic. | 12:13:06 |
| 13 | Q. Okay. I'm not disagreeing with you. | 12:13:10 |
| 14 | But merely because it's not identical doesn't mean | 12:13:11 |
| 15 | it's not equal. Is that an accurate statement? | 12:13:20 |
| 16 | A. Yes. | 12:13:24 |
| 17 | Q. Okay. I wanted to draw that | 12:13:24 |
| 18 | distinction. I perhaps misunderstood what you said. | 12:13:26 |
| 19 | And then you indicated with | 12:13:29 |
| 20 | substantially equivalent ease of use. Is that a | 12:13:30 |
| 21 | standard somewhere? | 12:13:35 |
| 22 | A. It is not a standard, it is guidance | 12:13:36 |
| 23 | that we've seen in settlement agreements. | 12:13:43 |
| 24 | Q. Okay. That's a legal document, right? | 12:13:45 |

112

Peter Bossley, 11/7/2017
Payan v. Los Angeles Community College District

| | | |
|---|---|---|
| 1 | A.  It is. | 12:13:49 |
| 2 | Q.  It's not a standard that the university | 12:13:51 |
| 3 | that you work for has, is it? | 12:13:54 |
| 4 | A.  We have adopted it as a portion of our | 12:13:55 |
| 5 | standards. | 12:14:00 |
| 6 | Q.  When did you adopt it? | 12:14:00 |
| 7 | A.  Originally our standards were adopted in | 12:14:04 |
| 8 | 2003. | 12:14:06 |
| 9 | Q.  I'm only talking about substantially | 12:14:07 |
| 10 | equivalent ease of use, that specific phrase. | 12:14:09 |
| 11 | A.  I'm not aware when that was adopted at | 12:14:11 |
| 12 | Ohio State. | 12:14:15 |
| 13 | Q.  But you're sure that it's there now? | 12:14:15 |
| 14 | A.  I am certain it is there now. | 12:14:18 |
| 15 | Q.  Do you know who would have put that in? | 12:14:20 |
| 16 | A.  I believe it would have been my | 12:14:22 |
| 17 | predecessor, Mr. Petri. | 12:14:24 |
| 18 | Q.  Do you know why it was put in? | 12:14:26 |
| 19 | A.  I don't know specifically why. | 12:14:28 |
| 20 | Q.  Now, you spoke just a moment ago about | 12:14:31 |
| 21 | an article you recently read indicating that | 12:14:33 |
| 22 | consuming material electronically is faster than | 12:14:35 |
| 23 | physically reading it through another method. | 12:14:41 |
| 24 | A.  Actually, the article indicated that it | 12:14:44 |

113

Peter Bossley, 11/7/2017
Payan v. Los Angeles Community College District

| | | |
|---|---|---|
| 1 | was faster and better comprehension in print than | 12:14:46 |
| 2 | electronic. | 12:14:50 |
| 3 | Q.  Got it.  Does that example indicate that | 12:14:51 |
| 4 | print and electronic are substantially equivalent | 12:14:56 |
| 5 | ease of use? | 12:15:01 |
| 6 | A.  I guess I'm unclear in the question. | 12:15:07 |
| 7 | Q.  Well, I'm unclear in the statement. | 12:15:12 |
| 8 | Substantially equivalent ease of use.  It's easier to | 12:15:14 |
| 9 | read a book than it is to use electronic conversion; | 12:15:19 |
| 10 | is that correct? | 12:15:22 |
| 11 | A.  I guess I have probably a skewed | 12:15:22 |
| 12 | perspective.  I don't know that I would agree with | 12:15:29 |
| 13 | that. | 12:15:31 |
| 14 | Q.  Okay.  Have you ever read a book? | 12:15:31 |
| 15 | MS. KREVOR-WEISBAUM:  Objection. | 12:15:33 |
| 16 | THE WITNESS:  No. | 12:15:35 |
| 17 | By Mr. Cleeland: | 12:15:35 |
| 18 | Q.  Have you ever read a book with your | 12:15:35 |
| 19 | eyesight and not through electronic assistance? | 12:15:38 |
| 20 | A.  I have not. | 12:15:40 |
| 21 | Q.  I'm just trying to figure out what you | 12:15:41 |
| 22 | base the substantially equivalent ease of use | 12:15:42 |
| 23 | statement on. | 12:15:47 |
| 24 | A.  What -- what's the question? | 12:15:53 |

114

1    Q.  What do you rely upon to describe            12:15:57

2    substantially equivalent ease of use?  What does that    12:15:59

3    mean?                                             12:16:02

4    A.  We -- I rely on professional judgment         12:16:04

5    regarding what substantially equivalent ease means.    12:16:07

6    Q.  But your understanding based upon your        12:16:12

7    experience is reading a book by sight is faster than    12:16:15

8    an electronic consumption of the book for a       12:16:18

9    nonsighted person; is that correct?               12:16:22

10           MS. KREVOR-WEISBAUM:  Objection.          12:16:24

11           THE WITNESS:  I -- I don't believe        12:16:24

12   that's what I said.  If I -- if that's what you took    12:16:25

13   from what I said, that's no -- that wasn't my      12:16:30

14   intention.                                        12:16:33

15   By Mr. Cleeland:                                  12:16:34

16   Q.  Let me try again.                             12:16:35

17   A.  Sure.                                         12:16:36

18   Q.  Comparing, if you can from any                12:16:36

19   experience you have got, a sighted person reading a    12:16:39

20   textbook, compared to a nonsighted person consuming    12:16:42

21   that book via braille, which is the faster method, to    12:16:46

22   your knowledge?                                   12:16:56

23   A.  I would guess that reading a book in          12:16:56

24   print may be a little bit faster.                 12:17:01

                                                  115

| | | |
|---|---|---|
| 1 | Q.  So is reading a book and reading | 12:17:04 |
| 2 | braille, by your definition, substantially equivalent | 12:17:05 |
| 3 | ease of use? | 12:17:09 |
| 4 | A.  Yes. | 12:17:11 |
| 5 | Q.  Continuing in your report, you state it | 12:17:12 |
| 6 | has been adopted.  Again, this is -- how do | 12:17:24 |
| 7 | pronouce -- | 12:17:30 |
| 8 | A.  WCAG. | 12:17:30 |
| 9 | Q.  WCAG.  It sounds like a cheer at a | 12:17:31 |
| 10 | football game. | 12:17:35 |
| 11 | Referring to that you state, "It has | 12:17:36 |
| 12 | been adopted as the U.S. Federal Government standard | 12:17:38 |
| 13 | of compliance in Section 508 and will be required for | 12:17:41 |
| 14 | federal government organizations in January of 2018." | 12:17:47 |
| 15 | What are these federal government | 12:17:52 |
| 16 | organizations you refer to in that report? | 12:17:54 |
| 17 | A.  All federal agencies. | 12:17:56 |
| 18 | Q.  The very next sentence you say, "Many | 12:17:59 |
| 19 | institutions --" I'll identify them in a minute -- | 12:18:01 |
| 20 | "and others have either directly adopted WCAG 2.0 | 12:18:08 |
| 21 | conformance Level AA as their accessibility standard | 12:18:14 |
| 22 | or they base their technical standards of compliance | 12:18:18 |
| 23 | on conformance..."  What do you mean by directly | 12:18:22 |
| 24 | adopted WCAG 2.0? | 12:18:27 |

116

| | | |
|---|---|---|
| 1 | A.  Some institutions, in their accessible | 12:18:31 |
| 2 | technology policies or their web accessibility | 12:18:35 |
| 3 | policies, adopt WCAG 2.0 AA directly as their | 12:18:38 |
| 4 | technical standard for conformance. | 12:18:44 |
| 5 | Q.  Just a verbatim adoption? | 12:18:46 |
| 6 | A.  They just say -- Yes, some do. | 12:18:48 |
| 7 | Q.  I didn't mean to cut you off, I | 12:18:50 |
| 8 | apologize.  Go on. | 12:18:52 |
| 9 | A.  Some do that directly. | 12:18:53 |
| 10 | Q.  Does The Ohio State University do that? | 12:18:55 |
| 11 | A.  We do not.  So for -- as I kind of | 12:18:58 |
| 12 | previously stated, due to vagaries of our policy | 12:19:02 |
| 13 | process that I'd take the rest of the day to explain | 12:19:09 |
| 14 | to you, that we opted to base our technical standard | 12:19:14 |
| 15 | on WCAG, and have the option for -- for adding to | 12:19:18 |
| 16 | that as -- as needed, and being able to change that | 12:19:22 |
| 17 | standard. | 12:19:27 |
| 18 | Q.  Thank you. | 12:19:27 |
| 19 | And the second portion of that sentence | 12:19:28 |
| 20 | says, "...or they base their technical standards..." | 12:19:30 |
| 21 | What do you mean by base their technical standards? | 12:19:32 |
| 22 | A.  That means that they look at WCAG 2.0 AA | 12:19:36 |
| 23 | and they adapt their own technical standard to | 12:19:42 |
| 24 | meet -- meet or exceed. | 12:19:49 |

117

1    Q.  So do they -- by that do you mean they          12:19:51

2  take some of the WCAG standards and not all of them?  12:19:53

3    A.  I'm not aware of anybody that doesn't           12:19:58

4  take all of an AA.                                     12:20:00

5    Q.  Well, is that the totality of WCAG's            12:20:07

6  standards A and AA?                                    12:20:11

7    A.  No, there are a series of AAA success           12:20:13

8  criteria as well.                                      12:20:15

9    Q.  So my question again is, can they select        12:20:16

10  from WCAG standards -- the reference to base there,   12:20:18

11  technical standards, does that mean they are picking  12:20:23

12  and choosing some of the WCAG standards to adopt?     12:20:25

13    A.  Some may.                                       12:20:27

14    Q.  Okay.  It continues.  "Where the               12:20:28

15  standard does not directly apply."  And that's WCAG   12:20:34

16  standard, correct?                                    12:20:38

17    A.  That is correct.                               12:20:39

18    Q.  So there are things where WCAG doesn't         12:20:40

19  apply to, right?                                       12:20:41

20    A.  There are.                                     12:20:42

21    Q.  Can you give me some examples?                 12:20:43

22    A.  So the digital documents, like your            12:20:46

23  Microsoft Word or pdf documents, were not in the     12:20:53

24  scope when WCAG was developed, and so where -- where 12:20:56

                                             118

| | | |
|---|---|---|
| 1 | there are some concepts of WCAG that certainly apply | 12:21:04 |
| 2 | to digital documents, folks may -- may use some | 12:21:08 |
| 3 | guidance that the World Wide Web Consortium has on | 12:21:14 |
| 4 | applying WCAG to nonweb-based digital information and | 12:21:18 |
| 5 | services, but there is not -- like in the case of a | 12:21:22 |
| 6 | Word document, for example, there's not -- this is a | 12:21:28 |
| 7 | word accessibility standard. | 12:21:32 |
| 8 | Q.  Thank you. | 12:21:34 |
| 9 | Again, going back to your report, you | 12:21:36 |
| 10 | say, "Where the standard does not directly | 12:21:38 |
| 11 | apply...evaluation was based on accepted best | 12:21:42 |
| 12 | practices..."  Evaluation of what? | 12:21:45 |
| 13 | A.  Evaluation of the accessibility of the | 12:21:47 |
| 14 | document. | 12:21:51 |
| 15 | Q.  Again, are we talking about the specific | 12:21:53 |
| 16 | programs you earlier referred to at LACCD? | 12:21:54 |
| 17 | A.  Those programs are web based and would | 12:21:57 |
| 18 | fall directly under WCAG. | 12:21:59 |
| 19 | Q.  Well, again, I'm concerned about this | 12:22:01 |
| 20 | comment evaluation was based on.  Whose evaluation | 12:22:06 |
| 21 | are we talking about in your report? | 12:22:09 |
| 22 | A.  My evaluation. | 12:22:11 |
| 23 | Q.  Okay.  And you only evaluated those | 12:22:12 |
| 24 | programs for accessibility, correct? | 12:22:15 |

119

| 1 | A.  That is correct. | 12:22:19 |
| 2 | Q.  Thanks. | 12:22:20 |
| 3 | A.  There is -- there is one digital | 12:22:20 |
| 4 | document that was evaluated as part of the website, | 12:22:22 |
| 5 | so in the website section there's one pdf document | 12:22:27 |
| 6 | that was evaluated there. | 12:22:30 |
| 7 | Q.  Do you know who Dr. Gunderson is, | 12:22:41 |
| 8 | G-u-n-d-e-r-s-o-n? | 12:22:43 |
| 9 | A.  I'm familiar with John, yes. | 12:22:43 |
| 10 | Q.  Did you talk to John Gunderson about | 12:22:45 |
| 11 | this case? | 12:22:47 |
| 12 | A.  Not in any substantive terms. | 12:22:50 |
| 13 | Q.  Well, it sounds like you talked to him | 12:22:52 |
| 14 | about it.  I'm going to find out what the level was, | 12:22:54 |
| 15 | but did you talk to Dr. Gunderson about this case? | 12:22:58 |
| 16 | A.  Briefly. | 12:23:00 |
| 17 | Q.  Okay.  When? | 12:23:01 |
| 18 | A.  It would have been sometime in the | 12:23:02 |
| 19 | summer; maybe July. | 12:23:04 |
| 20 | Q.  Was it more than one conversation? | 12:23:06 |
| 21 | A.  Oh, certainly not. | 12:23:08 |
| 22 | Q.  How many conversations? | 12:23:12 |
| 23 | A.  One. | 12:23:13 |
| 24 | Q.  Okay.  So it was one conversation? | 12:23:14 |

120

Peter Bossley, 11/7/2017
Payan v. Los Angeles Community College District

| | | |
|---|---|---|
| 1 | A.  That is correct, it was one | 12:23:17 |
| 2 | conversation. | 12:23:18 |
| 3 | Q.  Thanks.  Was there any communication | 12:23:18 |
| 4 | beyond the conversation? | 12:23:21 |
| 5 | A.  There was not. | 12:23:23 |
| 6 | Q.  How long was that conversation? | 12:23:24 |
| 7 | A.  Maybe two minutes. | 12:23:27 |
| 8 | Q.  And what was mentioned during that | 12:23:28 |
| 9 | conversation about this case? | 12:23:30 |
| 10 | A.  It was a very simple, "Hey, I guess | 12:23:31 |
| 11 | we're working, you know, on this case.  Both of us | 12:23:35 |
| 12 | are working on this case," and that was it. | 12:23:40 |
| 13 | Q.  Is it your understanding that your | 12:23:42 |
| 14 | assignment was different than Dr. Gunderson's | 12:23:44 |
| 15 | assignment in this case? | 12:23:46 |
| 16 | A.  It is. | 12:23:48 |
| 17 | Q.  What is your understanding of | 12:23:49 |
| 18 | Dr. Gunderson's assignment? | 12:23:51 |
| 19 | A.  I don't have any understanding of his | 12:23:51 |
| 20 | assignment. | 12:23:54 |
| 21 | Q.  Okay.  What is your understanding of | 12:23:54 |
| 22 | your assignment? | 12:23:56 |
| 23 | A.  My understanding of my assignment was to | 12:23:58 |
| 24 | lend my professional and technical expertise | 12:24:00 |

121

Peter Bossley, 11/7/2017
Payan v. Los Angeles Community College District

| | | |
|---|---|---|
| 1 | regarding ADA and Section 504 compliance in digital | 12:24:03 |
| 2 | accessibility issues. | 12:24:08 |
| 3 |     Q.  If you didn't know Dr. Gunderson's | 12:24:09 |
| 4 | assignment, how did you reach the conclusion that | 12:24:11 |
| 5 | your assignment was different than his? | 12:24:14 |
| 6 |     A.  I don't understand. | 12:24:16 |
| 7 |     Q.  Well, if you don't know what he was | 12:24:18 |
| 8 | supposed to do, how can you say that your assignment | 12:24:20 |
| 9 | was different than his? | 12:24:25 |
| 10 |     A.  I guess I made an assumption. | 12:24:26 |
| 11 |     Q.  Okay.  Which is okay.  Back to your | 12:24:29 |
| 12 | report.  What does the phrase best practices mean to | 12:24:31 |
| 13 | you? | 12:24:39 |
| 14 |     A.  The best practices are really just | 12:24:39 |
| 15 | what -- what is the industry doing, what is the | 12:24:45 |
| 16 | higher education industry doing, what is the digital | 12:24:49 |
| 17 | accessibility industry doing to make things | 12:24:51 |
| 18 | accessible. | 12:24:55 |
| 19 |     Q.  Is there a complete agreement in the | 12:24:55 |
| 20 | industry as to what should be done for accessibility? | 12:24:58 |
| 21 |     A.  There is not complete agreement. | 12:25:01 |
| 22 |     Q.  Okay.  So -- | 12:25:04 |
| 23 |     A.  No. | 12:25:04 |
| 24 |     Q.  How is it that you determine in an | 12:25:05 |

122

Peter Bossley, 11/7/2017
Payan v. Los Angeles Community College District

| | | |
|---|---|---|
| 1 | industry, where there's not complete agreement, what | 12:25:07 |
| 2 | the best practices are? | 12:25:09 |
| 3 | A.   There are things that are generally | 12:25:10 |
| 4 | accepted that there is very little disagreement on. | 12:25:14 |
| 5 | Q.   Okay.  So the evaluation in your report | 12:25:18 |
| 6 | you're talking about was based on accepted best | 12:25:20 |
| 7 | practices, what were those accepted best practices | 12:25:24 |
| 8 | that were utilized for the evaluation? | 12:25:28 |
| 9 | A.   So again, when we look at this | 12:25:31 |
| 10 | particular -- when we're talking about best | 12:25:33 |
| 11 | practices, we're talking about the things where WCAG | 12:25:36 |
| 12 | doesn't directly apply, so there's a very -- that's a | 12:25:38 |
| 13 | really limited subset in this case, which is just the | 12:25:41 |
| 14 | pdf document. | 12:25:44 |
| 15 | Q.   So just pdf documents, that's what | 12:25:45 |
| 16 | you're talking about there, correct? | 12:25:47 |
| 17 | A.   In -- in the terms of best practices, | 12:25:48 |
| 18 | yes. | 12:25:52 |
| 19 | Q.   Thank you. | 12:25:52 |
| 20 | Then it continues, "...with the goal of | 12:25:53 |
| 21 | the functional accessibility," and I think you | 12:25:54 |
| 22 | defined goal previously.  Is it the same definition | 12:25:58 |
| 23 | now in this section? | 12:26:02 |
| 24 | A.   Yes. | 12:26:03 |

123

| | | |
|---|---|---|
| 1 | Q.  And it talks about functional | 12:26:04 |
| 2 | accessibility.  Again, I want to make sure I | 12:26:06 |
| 3 | understand that specific phrase, functional | 12:26:10 |
| 4 | accessibility.  What do you mean by that? | 12:26:12 |
| 5 | A.  Functional accessibility means can a | 12:26:13 |
| 6 | user with a disability efficiently access an | 12:26:16 |
| 7 | information resource, and is that access fully | 12:26:21 |
| 8 | available to them, are they able to access | 12:26:24 |
| 9 | everything. | 12:26:27 |
| 10 | Q.  Well, we're back to everything.  I think | 12:26:27 |
| 11 | you told me there was some information that doesn't | 12:26:30 |
| 12 | need to be accessed. | 12:26:32 |
| 13 | A.  Okay.  Everything that has any | 12:26:33 |
| 14 | informational value. | 12:26:34 |
| 15 | Q.  Or benefit to the presentation, right? | 12:26:36 |
| 16 | A.  Well, I think that's a slippery slope, | 12:26:40 |
| 17 | to be honest with you.  I think you have to provide | 12:26:44 |
| 18 | users with access to all the information, and decide | 12:26:47 |
| 19 | what information is useful to them. | 12:26:49 |
| 20 | Q.  Let me qualify.  You have a course that | 12:26:52 |
| 21 | has a textbook of which only one chapter is going to | 12:26:53 |
| 22 | be used.  It may cover a number of areas of biology, | 12:26:57 |
| 23 | and the professor is only going to use one small | 12:27:01 |
| 24 | section of that book. | 12:27:04 |

124

Peter Bossley, 11/7/2017
Payan v. Los Angeles Community College District

1       For purposes of delivering content to be          12:27:05

2   on the equal footing with a sighted student, you only  12:27:08

3   need access to the information being presented in the   12:27:11

4   course; is that correct?                               12:27:14

5       A.  I don't -- I don't agree with that.  I         12:27:17

6   don't agree that that's true.                          12:27:22

7       Q.  Well, let me give you an example.  Are         12:27:23

8   you familiar with the Encyclopedia Britannica?          12:27:25

9       A.  I am.                                           12:27:28

10      Q.  Do you remember how many volumes it had?       12:27:28

11      A.  I don't remember offhand how many              12:27:31

12  volumes it has.                                        12:27:33

13      Q.  I think the legal phrase is a boatload.        12:27:34

14      A.  Yeah, probably.                                12:27:37

15      Q.  And it talks about what several Scottish       12:27:37

16  gentlemen felt was the knowledge of the world.  And    12:27:41

17  the teacher says we're going to look at the            12:27:44

18  Encyclopedia Britannica to talk about their entry on   12:27:47

19  Darwin.                                                12:27:51

20      Does that mean the entirety of the                 12:27:52

21  Encyclopedia Britannica has to be converted to a       12:27:56

22  format that that specific student can consume to have  12:27:59

23  equal footing as the sighted students in that class    12:28:03

24  for utilizing that very specific entry in the          12:28:07

125

Peter Bossley, 11/7/2017
Payan v. Los Angeles Community College District

| | | |
|---|---|---|
| 1 | Encyclopedia Britannica? | 12:28:10 |
| 2 | A.  If the rest of the information in the | 12:28:12 |
| 3 | Encyclopedia Britannica would have been given to the | 12:28:15 |
| 4 | other students, then yes. | 12:28:17 |
| 5 | Q.  I didn't say give them to, I said the | 12:28:18 |
| 6 | professor says out of the entire encyclopedia we're | 12:28:19 |
| 7 | going to read these six pages. | 12:28:23 |
| 8 | Does that mean, in your analysis, that | 12:28:25 |
| 9 | the entire Encyclopedia Britannica has to be | 12:28:27 |
| 10 | converted into an electronic format accessible to | 12:28:33 |
| 11 | that nonsighted student to be on an equal footing | 12:28:34 |
| 12 | with the sighted students in their class? | 12:28:37 |
| 13 | A.  I don't think the fact pattern is | 12:28:41 |
| 14 | specific enough for me to speculate on that. | 12:28:46 |
| 15 | Q.  Well, where do you need more specifics? | 12:28:48 |
| 16 | A.  Well, for example, do the rest of the | 12:28:51 |
| 17 | students in the class -- could they maybe flip to the | 12:28:52 |
| 18 | next entry, and does that have any bearing on their | 12:28:55 |
| 19 | successes in the class? | 12:29:00 |
| 20 | Q.  Remember, I said the only topic was | 12:29:01 |
| 21 | Darwin.  The entry regarding Darwin in an | 12:29:03 |
| 22 | Encyclopedia Britannica in my example, I limited it | 12:29:08 |
| 23 | to six pages.  That's the hypothetical you're being | 12:29:10 |
| 24 | given right now. | 12:29:13 |

126

| | | |
|---|---|---|
| 1 | A.   In that particular example, under those | 12:29:14 |
| 2 | particular circumstances, converting the Darwin entry | 12:29:18 |
| 3 | alone would probably meet the requirement. | 12:29:22 |
| 4 | Q.   Thanks.  Because it places that student | 12:29:27 |
| 5 | on equal footing with the sighted students in that | 12:29:29 |
| 6 | course for the course content, right? | 12:29:33 |
| 7 | A.   Yes. | 12:29:36 |
| 8 | Q.   Thanks. | 12:29:40 |
| 9 | It continues with, "...the goal of | 12:29:40 |
| 10 | functional accessibility for screen reader-reliant | 12:29:42 |
| 11 | users." | 12:29:47 |
| 12 | Are you worried about any other | 12:29:47 |
| 13 | nonsighted students' consumption of information | 12:29:50 |
| 14 | beyond screen reader-reliant users? | 12:29:53 |
| 15 | A.   All nonsighted users would be using the | 12:29:56 |
| 16 | screen reader. | 12:29:59 |
| 17 | Q.   Some people prefer braille, right? | 12:29:59 |
| 18 | A.   That still -- electronic braille still | 12:30:02 |
| 19 | requires the use of a screen reader. | 12:30:05 |
| 20 | Q.   I didn't say electronic braille, I said | 12:30:06 |
| 21 | braille.  Some people like tactile braille sheets? | 12:30:09 |
| 22 | A.   Sure, I understand.  But so when we're | 12:30:12 |
| 23 | talking about this, we're still again talking about | 12:30:14 |
| 24 | that narrow circumstance of pdf documents that | 12:30:16 |

127

| | | |
|---|---|---|
| 1 | don't -- that WCAG doesn't apply directly to. | 12:30:18 |
| 2 | Q.  Got it.  But you told me earlier that | 12:30:24 |
| 3 | the goal in your industry is to assist the | 12:30:25 |
| 4 | individual, right? | 12:30:29 |
| 5 | A.  That is correct. | 12:30:30 |
| 6 | Q.  So here we're referring to a group of | 12:30:30 |
| 7 | people, but excluding an individual, that being one | 12:30:34 |
| 8 | who prefers tactile page braille.  You don't want to | 12:30:37 |
| 9 | do that, do you? | 12:30:41 |
| 10 | MS. KREVOR-WEISBAUM:  Objection. | 12:30:42 |
| 11 | THE WITNESS:  I don't agree that that's | 12:30:46 |
| 12 | what was done. | 12:30:48 |
| 13 | By Mr. Cleeland: | 12:30:49 |
| 14 | Q.  What was done where? | 12:30:50 |
| 15 | A.  I don't understand -- I guess I'm losing | 12:30:51 |
| 16 | the threads of your -- | 12:30:55 |
| 17 | Q.  It was a hypothetical.  If the consumer | 12:30:56 |
| 18 | prefers it in a different format, isn't your goal as | 12:31:01 |
| 19 | the Director to provide it in that format if it's | 12:31:04 |
| 20 | reasonably functional and reasonably available? | 12:31:10 |
| 21 | MS. KREVOR-WEISBAUM:  Objection.  You | 12:31:13 |
| 22 | can answer. | 12:31:19 |
| 23 | THE WITNESS:  If it is functionally | 12:31:20 |
| 24 | equivalent, if they ask for it in that format, it | 12:31:23 |

128

| | | |
|---|---|---|
| 1 | would. | 12:31:27 |
| 2 | By Mr. Cleeland: | 12:31:27 |
| 3 | Q.  Let's say it's not functionally | 12:31:28 |
| 4 | equivalent, but the consumer, that one individual, | 12:31:30 |
| 5 | says this is the way I want it.  Under your | 12:31:32 |
| 6 | guidelines as the Director, what do you do? | 12:31:35 |
| 7 | A.  You would have to give me more | 12:31:38 |
| 8 | information about what the functional limitation | 12:31:44 |
| 9 | would be in offering it to them in their preferred | 12:31:47 |
| 10 | format.  We would certainly have to make them aware | 12:31:49 |
| 11 | of anything that was -- that would inform -- inform | 12:31:52 |
| 12 | their decision. | 12:31:56 |
| 13 | Q.  Okay.  So how do you do that? | 12:31:57 |
| 14 | A.  We would have a meeting with the | 12:32:00 |
| 15 | students and say, "If you pick this format, these are | 12:32:06 |
| 16 | the things that you would be missing.  This is what | 12:32:09 |
| 17 | we can provide to you in this format." | 12:32:18 |
| 18 | Q.  By the way, your understanding in your | 12:32:19 |
| 19 | capacity as the Director of your department, do you | 12:32:22 |
| 20 | have to provide nonsighted students with a format | 12:32:24 |
| 21 | that the nonsighted student wants, or just one | 12:32:28 |
| 22 | functionally equivalent option? | 12:32:33 |
| 23 | A.  With certain limitations related to | 12:32:37 |
| 24 | someone's disability, we would have to provide them | 12:32:43 |

129

Peter Bossley, 11/7/2017
Payan v. Los Angeles Community College District

| | | |
|---|---|---|
| 1 | with what they wanted, unless what they wanted was | 12:32:45 |
| 2 | not needed by their underlying medical documentation | 12:32:52 |
| 3 | and a really complicated analysis that may not be | 12:33:00 |
| 4 | worth explaining everything. | 12:33:03 |
| 5 |      Q.  Okay.  Well, for purposes of today, in | 12:33:05 |
| 6 | your capacity as the Director of your department, a | 12:33:08 |
| 7 | student says, "I want this material in hard copy | 12:33:11 |
| 8 | braille," and you say, "Well, we have got it | 12:33:14 |
| 9 | electronically available to you," and they say, "No, | 12:33:17 |
| 10 | I want it in hard copy braille," what do you do? | 12:33:20 |
| 11 |      A.  We give them a hard copy braille. | 12:33:23 |
| 12 |      Q.  Okay.  So even if you believe the more | 12:33:27 |
| 13 | efficient method for delivery of information is | 12:33:31 |
| 14 | something other than what the student wants, you give | 12:33:35 |
| 15 | the student what they request; is that your policy? | 12:33:37 |
| 16 |      A.  Yes. | 12:33:39 |
| 17 |      Q.  Back to your report.  You continue on | 12:33:43 |
| 18 | page 3, "In addition to code reviews..."  So did you | 12:33:45 |
| 19 | review code of any of the software at issue in this | 12:33:49 |
| 20 | case? | 12:33:52 |
| 21 |      A.  I did. | 12:33:53 |
| 22 |      Q.  How did you do that? | 12:33:54 |
| 23 |      A.  Via inspection of the document object | 12:33:54 |
| 24 | model. | 12:33:58 |

130

1    Q.   Okay.  What sections of the programs did          12:33:58

2    you check code on?                                     12:34:02

3        A.   The sections that we submitted the            12:34:03

4    report on here that we -- when I was evaluating it,    12:34:07

5    we would look at the code on some of the items to      12:34:11

6    ensure that what we were seeing on -- on the testing   12:34:18

7    was -- were accurately being described.                12:34:22

8        Q.   How did you determine which of some of        12:34:25

9    the items were selected?                               12:34:27

10       A.   If there was a piece of content that          12:34:29

11   wasn't being announced correctly, we would inspect     12:34:33

12   the code to ensure that the announcement -- the lack   12:34:38

13   of announcement was a true problem with the            12:34:44

14   application itself.                                     12:34:46

15       Q.   And your reference to "we", was that          12:34:48

16   your employee you talked about?                        12:34:50

17       A.   He was assisting me, yes.                     12:34:52

18       Q.   Anybody else?                                 12:34:54

19       A.   No.                                           12:34:55

20       Q.   So, "In addition to code reviews,             12:34:56

21   evaluation was complemented by testing..."  What were  12:35:01

22   you evaluating, was it those programs you previously   12:35:05

23   mentioned?                                             12:35:06

24       A.   Yes.                                          12:35:07

                                                       131

| | | |
|---|---|---|
| 1 | Q.  You indicate, "...evaluation is | 12:35:07 |
| 2 | complemented by testing with current screen readers | 12:35:16 |
| 3 | in common use by blind students..."  And by "screen | 12:35:19 |
| 4 | readers", you mean the actual electronic equipment, | 12:35:22 |
| 5 | not the individuals consuming the information, right? | 12:35:25 |
| 6 | A.  Yes, the screen reader technology. | 12:35:31 |
| 7 | Q.  Got it.  You continue, "The reviews | 12:35:34 |
| 8 | below were conducted on publicly available websites, | 12:35:39 |
| 9 | access provided through discovery, or through the use | 12:35:43 |
| 10 | of plaintiffs' logon credentials."  Did you use both | 12:35:46 |
| 11 | of the plaintiffs' logon credentials? | 12:35:54 |
| 12 | A.  I don't recall specifically.  I believe | 12:35:56 |
| 13 | we used Ms. Mason's. | 12:35:59 |
| 14 | Q.  Okay.  And were you able to log on to | 12:36:03 |
| 15 | all of the programs you wanted to get into? | 12:36:06 |
| 16 | A.  We were able to access some things, not | 12:36:08 |
| 17 | everything. | 12:36:11 |
| 18 | Q.  Were you aware she wasn't a student when | 12:36:12 |
| 19 | you did the testing? | 12:36:14 |
| 20 | A.  I was not. | 12:36:15 |
| 21 | Q.  Okay.  Did your inability to get into | 12:36:16 |
| 22 | certain programs form a basis for any opinions | 12:36:19 |
| 23 | related or offered in this matter? | 12:36:27 |
| 24 | A.  No. | 12:36:28 |

132

1    Q.  Under the, "Technical concepts," you          12:36:32

2    have, "Labels:  Interactive form fields on the web   12:36:35

3    can be associated with a label to denote what the    12:36:39

4    interactive form field is in reference to.  Without  12:36:43

5    these labels present, users may experience           12:36:47

6    significant confusion..."                            12:36:50

7         When we hear the word "may", we worry           12:36:52

8    about the alternative.  So users may experience      12:36:56

9    significant confusion.  Does that also mean they may 12:36:59

10   not experience significant confusion?               12:37:02

11   A.  Some screen reading technology, if a            12:37:03

12   label is not present, will like to make what I call a 12:37:10

13   wild guess about what the label might be, and those  12:37:14

14   guesses sometimes happen to be accurate.            12:37:19

15        And so in those circumstances a user           12:37:23

16   might not notice the problem, but oftentimes that's  12:37:26

17   not the case.  Oftentimes the guess will be          12:37:31

18   incorrect, and it will actually -- the screen will   12:37:34

19   actually read something that's totally false, and    12:37:36

20   that presents even more serious confusion.           12:37:40

21   Q.  Could, correct?                                 12:37:43

22   A.  I would think that if you went in on a          12:37:47

23   field that says it's your last name, but it's        12:37:50

24   actually your first name, that's a problem.          12:37:52

133

| | | |
|---|---|---|
| 1 | Q.  But it could be in a less crucial field, | 12:37:54 |
| 2 | correct? | 12:37:58 |
| 3 | A.  I suppose it could be in a less crucial | 12:37:59 |
| 4 | field. | 12:38:01 |
| 5 | Q.  Have you ever gone on a website and just | 12:38:01 |
| 6 | kind of browsed around and looked? | 12:38:03 |
| 7 | A.  Sure. | 12:38:05 |
| 8 | Q.  One thing leads to another, pretty soon | 12:38:05 |
| 9 | you're pretty distal from where you started; ever do | 12:38:09 |
| 10 | that? | 12:38:12 |
| 11 | A.  Yeah. | 12:38:12 |
| 12 | Q.  But whenever I see may -- it says, | 12:38:12 |
| 13 | "...users may experience significant confusion..." | 12:38:15 |
| 14 | Did you do any testing to confirm that users would | 12:38:17 |
| 15 | experience significant confusion? | 12:38:20 |
| 16 | A.  Yes. | 12:38:23 |
| 17 | Q.  What? | 12:38:24 |
| 18 | A.  Given my 20 years of reliance on these | 12:38:25 |
| 19 | very same assistive technologies, I can state | 12:38:30 |
| 20 | unequivocally that users -- where things are not | 12:38:33 |
| 21 | properly, they will experience significant confusion. | 12:38:36 |
| 22 | Q.  Every time? | 12:38:44 |
| 23 | A.  Do you want me to speculate on a | 12:38:45 |
| 24 | percentage? | 12:38:47 |

134

| | | |
|---|---|---|
| 1 | Q. That's my concern; you're speculating | 12:38:48 |
| 2 | now. | 12:38:49 |
| 3 | A. Not every time, but I would say a large | 12:38:50 |
| 4 | majority of the times. | 12:38:52 |
| 5 | Q. Have you done any analytical research on | 12:38:53 |
| 6 | that? | 12:38:55 |
| 7 | A. I have not. | 12:38:56 |
| 8 | Q. So sometimes we hear the phrase "a | 12:38:58 |
| 9 | scientific wild ass guess."  Is that what we're | 12:39:01 |
| 10 | talking about now? | 12:39:04 |
| 11 | MS. KREVOR-WEISBAUM:  Objection. | 12:39:06 |
| 12 | THE WITNESS:  I don't agree with that | 12:39:07 |
| 13 | characterization. | 12:39:09 |
| 14 | By Mr. Cleeland: | 12:39:10 |
| 15 | Q. Okay.  What information are you relying | 12:39:10 |
| 16 | upon besides your personal experience? | 12:39:13 |
| 17 | A. Also five years working with students | 12:39:15 |
| 18 | who are experiencing difficulties accessing things. | 12:39:21 |
| 19 | Q. How frequently did that come up? | 12:39:25 |
| 20 | A. Nearly in every case, there's some level | 12:39:27 |
| 21 | of things not being properly labeled. | 12:39:30 |
| 22 | Q. How many cases are we talking about | 12:39:33 |
| 23 | where the user experienced significant confusion | 12:39:34 |
| 24 | without labels being present? | 12:39:38 |

135

```
 1          A.  My best estimate is 30, 40, maybe.         12:39:39

 2          Q.  Thirty or 40 people in five years; is      12:39:44

 3   that correct?                                         12:39:49

 4          A.  That is correct.                           12:39:49

 5          Q.  How many sight-impaired students           12:39:49

 6   attend The Ohio State University?                     12:39:54

 7          A.  I don't have a firm number.                12:39:57

 8          Q.  Do you have an estimate?                   12:40:03

 9          A.  It varies between none and five.           12:40:05

10          Q.  So there have been experiences at The      12:40:11

11   Ohio State University where there have been no        12:40:13

12   sight-impaired students enrolled?                     12:40:15

13          A.  Occasionally that happens.                 12:40:19

14          Q.  How many students are there at The Ohio    12:40:20

15   State University now?                                 12:40:23

16          A.  Undergraduate student enrollment is        12:40:24

17   around 63,000, and then we have another 25,000        12:40:27

18   nontraditional and graduate and professional          12:40:30

19   students.                                             12:40:33

20          Q.  I heard a number in the 48,000 range.      12:40:34

21   Is that incorrect these days?                         12:40:36

22          A.  It's not correct anymore.  We're around    12:40:37

23   60,000 now.                                           12:40:39

24          Q.  You guys have gone down?                   12:40:40
```

136

Peter Bossley, 11/7/2017
Payan v. Los Angeles Community College District

| | | |
|---|---|---|
| 1 | A.  Sixty, 6-0. | 12:40:41 |
| 2 | Q.  I thought you said 16.  So there are | 12:40:44 |
| 3 | approximately 60,000 students at the university? | 12:40:47 |
| 4 | A.  There are. | 12:40:49 |
| 5 | Q.  And there have been times in your | 12:40:49 |
| 6 | capacity where there has not been a single visually | 12:40:54 |
| 7 | impaired student on campus? | 12:40:56 |
| 8 | A.  Yes.  Well, can I -- | 12:40:59 |
| 9 | Q.  Sure. | 12:41:04 |
| 10 | A.  Visually impaired as distinguished from | 12:41:05 |
| 11 | blind. | 12:41:07 |
| 12 | Q.  Well, how about visually impaired that | 12:41:07 |
| 13 | seek your assistance? | 12:41:09 |
| 14 | A.  So I'm not sure there hasn't been a time | 12:41:12 |
| 15 | when we haven't had someone with some level of | 12:41:15 |
| 16 | impaired. | 12:41:18 |
| 17 | Q.  That's why I qualified, visually | 12:41:19 |
| 18 | impaired and sought your assistance? | 12:41:22 |
| 19 | A.  No, there hasn't been a time. | 12:41:23 |
| 20 | Q.  So there's never been a time where there | 12:41:25 |
| 21 | has been no one who was visually impaired and sought | 12:41:28 |
| 22 | your assistance during your time there? | 12:41:37 |
| 23 | MS. KREVOR-WEISBAUM:  Objection.  You | 12:41:41 |
| 24 | can answer if you understand it. | 12:41:42 |

137

| | | |
|---|---|---|
| 1 | By Mr. Cleeland: | 12:41:42 |
| 2 | Q. I'm concerned that we have reversed it | 12:41:44 |
| 3 | here because I think you said -- and I'll rephrase | 12:41:46 |
| 4 | the question. | 12:41:48 |
| 5 | But I think you said there are times | 12:41:49 |
| 6 | when there were no blind students on campus, and | 12:41:51 |
| 7 | other times there were perhaps five. We did start | 12:41:56 |
| 8 | using the words visually impaired, because someone | 12:42:02 |
| 9 | who wears corrective lenses is technically visually | 12:42:04 |
| 10 | impaired. | 12:42:07 |
| 11 | A. Correct. | 12:42:08 |
| 12 | Q. So to your knowledge, during your tenure | 12:42:09 |
| 13 | at The Ohio State University, have there been | 12:42:12 |
| 14 | occasions when no blind student sought assistance | 12:42:18 |
| 15 | from your department? | 12:42:20 |
| 16 | A. No. | 12:42:23 |
| 17 | Q. So there's always at least one blind | 12:42:23 |
| 18 | student seeking assistance? | 12:42:25 |
| 19 | A. Can we clarify, are you talking blind, | 12:42:30 |
| 20 | or some kind of vision impairment? So when I hear | 12:42:33 |
| 21 | blind, I hear no usable vision. | 12:42:35 |
| 22 | Q. And I specifically used the word blind. | 12:42:39 |
| 23 | A. Okay. There have been times when there | 12:42:43 |
| 24 | are no blind students. | 12:42:49 |

138

Peter Bossley, 11/7/2017
Payan v. Los Angeles Community College District

1    Q.  I'm concerned about the phrase "visually        12:42:51

2  impaired" because, again, I think corrective lenses   12:42:53

3  could qualify.  But do you have a term of art within   12:42:57

4  your industry as to what visually impaired means?     12:43:00

5    A.  We typically consider visual impairment         12:43:04

6  to be at the level of legal blindness and beyond.     12:43:06

7    Q.  Okay.  Has there ever been an occasion          12:43:10

8  during the time that you've been at The Ohio State     12:43:13

9  University where your department has not worked with   12:43:16

10  visually impaired students?                           12:43:20

11    A.  No, not to my knowledge.                        12:43:22

12    Q.  And what is the average number of vision        12:43:25

13  impaired students that have worked with your          12:43:28

14  impairment over your tenure, on a semester basis?     12:43:30

15    A.  It's usually around three, but it's gone        12:43:34

16  as high as five, or maybe a few more than that at     12:43:37

17  times.                                                12:43:40

18    Q.  If we can go back to your report.  You          12:43:48

19  talk of, "Accessibility of student-facing software    12:43:50

20  deployed at LACCD," and you have PeopleSoft Campus    12:43:53

21  Solutions.  When did you become aware that the campus 12:43:57

22  was using PeopleSoft?                                 12:44:00

23    A.  I don't recall the date specifically.  I        12:44:03

24  believe it was sometime in the early October -- no,   12:44:11

139

Peter Bossley, 11/7/2017
Payan v. Los Angeles Community College District

| | | |
|---|---|---|
| 1 | sorry, September.  September.  I keep getting my | 12:44:15 |
| 2 | months mixed up.  My apologies. | 12:44:19 |
| 3 | Q.  That's quite all right. | 12:44:20 |
| 4 | And again, in fairness to you, if | 12:44:22 |
| 5 | sometime during the deposition you realized, "I'm | 12:44:24 |
| 6 | sorry, I just said October, I meant September," or | 12:44:26 |
| 7 | anything like that, if you feel it's appropriate to | 12:44:28 |
| 8 | make your testimony as accurate as possible, you just | 12:44:31 |
| 9 | let me know, okay? | 12:44:34 |
| 10 | A.  Thank you. | 12:44:34 |
| 11 | Q.  Does LACC still utilize PeopleSoft | 12:44:42 |
| 12 | Campus Solutions? | 12:44:45 |
| 13 | A.  I don't know the answer to that question | 12:44:46 |
| 14 | for sure, although from my experience I would say | 12:44:48 |
| 15 | they probably are still using it. | 12:44:51 |
| 16 | Q.  What about your experience says they | 12:44:57 |
| 17 | probably still are using it? | 12:44:59 |
| 18 | A.  That particular piece of software is | 12:45:00 |
| 19 | very complicated to -- to implement, so it wouldn't | 12:45:02 |
| 20 | be a simple matter to move away from it. | 12:45:07 |
| 21 | Q.  In other words, it's hard stuff to | 12:45:11 |
| 22 | implement a program, right? | 12:45:12 |
| 23 | A.  It can be challenging, yes. | 12:45:13 |
| 24 | Q.  And it can be challenging to keep it | 12:45:16 |

140

Peter Bossley, 11/7/2017
Payan v. Los Angeles Community College District

| | | |
|---|---|---|
| 1 | current, correct? | 12:45:18 |
| 2 | A.  That is correct. | 12:45:18 |
| 3 | Q.  And it can be challenging to keep it | 12:45:18 |
| 4 | accessible, correct? | 12:45:21 |
| 5 | A.  It can be a challenge, correct. | 12:45:22 |
| 6 | Q.  Continuing in the report, it says | 12:45:24 |
| 7 | PeopleSoft used by educational institutions.  Are you | 12:45:30 |
| 8 | aware of any educational institution other than L.A. | 12:45:33 |
| 9 | City College that uses PeopleSoft Campus Solutions? | 12:45:37 |
| 10 | A.  I am. | 12:45:39 |
| 11 | Q.  What?  Who? | 12:45:40 |
| 12 | A.  I know, for example, that my institution | 12:45:44 |
| 13 | uses it; Ohio State. | 12:45:47 |
| 14 | Q.  Anybody else? | 12:45:53 |
| 15 | A.  It's in wide usage in the higher | 12:45:54 |
| 16 | education space.  I can't say for sure.  So maybe | 12:45:56 |
| 17 | University of Minnesota, I know at one point was | 12:46:00 |
| 18 | implementing it.  I can't think of any others off the | 12:46:04 |
| 19 | top of my head. | 12:46:06 |
| 20 | Q.  Okay.  Under "General Issues", you | 12:46:08 |
| 21 | state, "The application --" this is back to | 12:46:11 |
| 22 | PeopleSoft, I assume -- "has minimal heading and | 12:46:13 |
| 23 | landmark structure, making effective navigation by | 12:46:16 |
| 24 | screen reader-reliant users impossible."  What do you | 12:46:20 |

<div align="center">141</div>

Peter Bossley, 11/7/2017
Payan v. Los Angeles Community College District

| | | |
|---|---|---|
| 1 | mean by the word "impossible"? | 12:46:24 |
| 2 | A.  I mean it's not possible for screen | 12:46:30 |
| 3 | reader users to efficiently navigate and interface | 12:46:32 |
| 4 | with minimal heading and landmark structure. | 12:46:38 |
| 5 | Q.  Okay.  So now it's efficiently used, | 12:46:38 |
| 6 | correct, by your definition? | 12:46:40 |
| 7 | A.  Correct. | 12:46:42 |
| 8 | Q.  It can be used, it's just not as | 12:46:43 |
| 9 | efficient as other available resources, correct? | 12:46:45 |
| 10 | A.  I don't understand what you mean. | 12:46:52 |
| 11 | Q.  Okay.  Is there any replacement program | 12:46:53 |
| 12 | for PeopleSoft Campus Solutions that is more -- | 12:46:59 |
| 13 | excuse me, provides more effective navigation by | 12:47:02 |
| 14 | screen reader-reliant users? | 12:47:05 |
| 15 | A.  I'm not familiar with everything on the | 12:47:11 |
| 16 | market.  There are certainly things that people tell | 12:47:12 |
| 17 | me are better. | 12:47:18 |
| 18 | Q.  Did any testing on those things? | 12:47:20 |
| 19 | A.  I have not. | 12:47:22 |
| 20 | Q.  So you have no personal knowledge if | 12:47:23 |
| 21 | there is indeed a product on the market that is more | 12:47:26 |
| 22 | effective -- provides for more effective navigation | 12:47:29 |
| 23 | by screen reader users than PeopleSoft, correct? | 12:47:32 |
| 24 | A.  I don't have any personal knowledge -- I | 12:47:37 |

142

Peter Bossley, 11/7/2017
Payan v. Los Angeles Community College District

| | | |
|---|---|---|
| 1 | do not have any personal knowledge, that is correct. | 12:47:39 |
| 2 | Q.  And you don't have any research | 12:47:40 |
| 3 | knowledge on that, do you? | 12:47:42 |
| 4 | A.  Scientifically valid research methods, | 12:47:44 |
| 5 | no. | 12:47:50 |
| 6 | Q.  Okay.  I like that qualification. | 12:47:50 |
| 7 | As a footnote to your report, it reads, | 12:48:38 |
| 8 | "At trial, I would try to do a live demonstration of | 12:48:40 |
| 9 | how a screen reader works and the barriers described | 12:48:44 |
| 10 | in this report.  However, in the event that is not | 12:48:49 |
| 11 | possible, I would make use of the charts in this | 12:48:53 |
| 12 | report as trial exhibits." | 12:48:56 |
| 13 | The charts you just referred to, who | 12:48:58 |
| 14 | generated those charts? | 12:49:06 |
| 15 | A.  My colleague/employee Rahim, under my | 12:49:07 |
| 16 | direction. | 12:49:13 |
| 17 | Q.  And how did he generate those charts? | 12:49:13 |
| 18 | A.  When we were doing evaluations of the | 12:49:15 |
| 19 | software, he would take a screen shot and imitate the | 12:49:17 |
| 20 | screen shot. | 12:49:23 |
| 21 | Q.  Okay.  How do you know that the screen | 12:49:24 |
| 22 | shot in your report of these charts is indeed | 12:49:26 |
| 23 | accurate to the screen shot -- excuse me, to the | 12:49:31 |
| 24 | website representation of those charts? | 12:49:37 |

143

```
 1        A.  Because I was there.  I was present       12:49:40

 2   during the creation of them and I was the one doing  12:49:42

 3   the testing on the website itself.                  12:49:46

 4        Q.  I'm sorry.  Did you visually compare the   12:49:49

 5   two?                                                12:49:51

 6        A.  I did not.                                 12:49:52

 7        Q.  Okay.  That's my concern.  How do you      12:49:53

 8   know -- personally know that the depiction you have 12:50:00

 9   in your report is the depiction that was on the     12:50:02

10   screen in the website?                              12:50:06

11        A.  They were created under my direction.      12:50:08

12        Q.  But can you tell me that they are          12:50:11

13   identical?                                          12:50:14

14        A.  Yes.                                       12:50:17

15        Q.  How do you know that?                      12:50:18

16        A.  Because I was present when they were       12:50:24

17   created.                                            12:50:27

18        Q.  Well, students are present when a          12:50:27

19   professor makes a lecture, that doesn't mean they   12:50:30

20   understand it.  So I want to know how you           12:50:32

21   personally --                                       12:50:33

22             MS. KREVOR-WEISBAUM:  Objection.          12:50:34

23             MR. CLEELAND:  There's no question.       12:50:36

24             MS. KREVOR-WEISBAUM:  Objecting to the    12:50:38
```

144

| 1 | commentary. | 12:50:38 |
| 2 | MR. CLEELAND:  It's laying the | 12:50:39 |
| 3 | foundation for the question.  I think I'm entitled to | 12:50:40 |
| 4 | do that.  I could be wrong. | 12:50:42 |
| 5 | By Mr. Cleeland: | 12:50:42 |
| 6 | Q.  Sir, I'm trying to figure out how you | 12:50:43 |
| 7 | can ensure to me that the charts in your report are | 12:50:45 |
| 8 | identical to the charts that you believe were on the | 12:50:48 |
| 9 | LACC website. | 12:50:52 |
| 10 | A.  The screen shots are directly taken from | 12:50:56 |
| 11 | our testing. | 12:50:59 |
| 12 | Q.  But I thought you told me that sometimes | 12:50:59 |
| 13 | in conversion things look differently? | 12:51:01 |
| 14 | A.  You'll have to refresh my memory on what | 12:51:06 |
| 15 | context I was talking about that. | 12:51:09 |
| 16 | Q.  Well, you talked about printing pages, | 12:51:10 |
| 17 | and sometimes when you print pages off a website it | 12:51:12 |
| 18 | doesn't come out on the page exactly like it looks on | 12:51:16 |
| 19 | the screen.  Is that an accurate statement? | 12:51:19 |
| 20 | A.  That's accurate.  Paper size isn't the | 12:51:21 |
| 21 | same as the screen size. | 12:51:24 |
| 22 | Q.  And sometimes the font is different; is | 12:51:25 |
| 23 | that correct? | 12:51:29 |
| 24 | A.  I'm not aware of a circumstance where | 12:51:29 |

145

Peter Bossley, 11/7/2017
Payan v. Los Angeles Community College District

1    the fonts would be different.                          12:51:31

2         Q.  You've never heard of that?                   12:51:32

3         A.  No.                                           12:51:35

4         Q.  Okay.                                         12:51:37

5         A.  But in the case of these screen shots,        12:51:40

6    these weren't printed, they were screen shots taken    12:51:42

7    directly from the website.                             12:51:45

8         Q.  But I thought that you told me in             12:51:46

9    certain conversion programs you can't take an image    12:51:48

10   and guarantee it looks exactly the same on a screen    12:51:55

11   reader.                                                12:51:58

12        A.  There were no conversions.                    12:51:58

13        Q.  I didn't say there were conversions.          12:51:59

14   I'm saying there are cases where you do convert --      12:52:01

15   not talking about your report now, but where you do    12:52:04

16   convert, and the converted material looks different    12:52:07

17   than the source material.  Is that an accurate         12:52:11

18   statement?                                             12:52:14

19        A.  I don't recall testifying to that, but       12:52:16

20   that is an accurate statement.                         12:52:18

21        Q.  Thanks.  On page 5 we have what look to       12:52:19

22   be some screen shots?  Who located those screen        12:52:28

23   shots?  Sorry.                                         12:52:28

24            Who located the images from which the         12:52:34

                                                      146

| | | |
|---|---|---|
| 1 | screen shots were taken? | 12:52:36 |
| 2 | A.  What page are we on? | 12:52:38 |
| 3 | Q.  Page 5. | 12:52:42 |
| 4 | A.  Is it My Dashboard? | 12:52:42 |
| 5 | Q.  It's under the caption General Issues, | 12:52:44 |
| 6 | and on my printout it's immediately below the | 12:52:48 |
| 7 | footnote.  That's the bottom of 4.  This is the top | 12:52:54 |
| 8 | of 5. | 12:52:56 |
| 9 | MS. KREVOR-WEISBAUM:  It's the third | 12:52:59 |
| 10 | bullet in that general -- | 12:52:59 |
| 11 | THE WITNESS:  Can you clarify the | 12:53:04 |
| 12 | question?  What do you mean by who located that? | 12:53:06 |
| 13 | By Mr. Cleeland: | 12:53:12 |
| 14 | Q.  How was it that this image was found on | 12:53:12 |
| 15 | the web? | 12:53:15 |
| 16 | A.  This was taken during our testing, it | 12:53:15 |
| 17 | wasn't found, we -- while we were testing we took the | 12:53:17 |
| 18 | image. | 12:53:22 |
| 19 | Q.  And did you access it over the website, | 12:53:22 |
| 20 | or did you obtain a copy of the program? | 12:53:24 |
| 21 | A.  We accessed it through the website. | 12:53:25 |
| 22 | Q.  Okay.  So these images went through an | 12:53:27 |
| 23 | electronic system from a server to whatever equipment | 12:53:30 |
| 24 | you were using, correct? | 12:53:34 |

147

Peter Bossley, 11/7/2017
Payan v. Los Angeles Community College District

| | | |
|---|---|---|
| 1 | A.  That is correct. | 12:53:35 |
| 2 | Q.  You and your employee, correct? | 12:53:35 |
| 3 | A.  Correct. | 12:53:37 |
| 4 | Q.  Who found this specific page? | 12:53:37 |
| 5 | A.  I found the page. | 12:53:44 |
| 6 | Q.  How did you find it? | 12:53:45 |
| 7 | A.  I believe I was given a link to it.  I | 12:53:47 |
| 8 | can't recall.  I might have had to find -- I can't | 12:53:58 |
| 9 | recall.  I believe I was -- when we were given the | 12:54:00 |
| 10 | Plaintiffs' credentials to log in, there may have | 12:54:03 |
| 11 | been a link to the log-in in there. | 12:54:07 |
| 12 | Q.  Okay.  Why was that link selected? | 12:54:10 |
| 13 | A.  Because this -- because this tool is | 12:54:13 |
| 14 | used for very important transactions with the school. | 12:54:18 |
| 15 | Q.  Like what? | 12:54:23 |
| 16 | A.  Things like course registration, | 12:54:23 |
| 17 | payment, searching the course catalog. | 12:54:29 |
| 18 | Q.  How do you know that? | 12:54:31 |
| 19 | A.  Because that's what the tool does. | 12:54:32 |
| 20 | Q.  What tool did you use? | 12:54:38 |
| 21 | A.  What -- I don't understand the question. | 12:54:39 |
| 22 | Q.  Well, you got to this page and you're | 12:54:44 |
| 23 | aware that it does certain things.  I'm trying to | 12:54:50 |
| 24 | figure out how you know it does those things. | 12:54:54 |

148

Peter Bossley, 11/7/2017
Payan v. Los Angeles Community College District

| | | |
|---|---|---|
| 1 | A.  Because I know what this software does. | 12:54:56 |
| 2 | Q.  Is this software at LACC identical to | 12:54:58 |
| 3 | the software that you know what it does, same | 12:55:01 |
| 4 | version, same content, same customer? | 12:55:05 |
| 5 | A.  Of course it's not. | 12:55:08 |
| 6 | Q.  Exactly.  So what you're familiar with | 12:55:09 |
| 7 | is different than the LACC software; is that an | 12:55:13 |
| 8 | accurate statement? | 12:55:17 |
| 9 | A.  Different in what way? | 12:55:18 |
| 10 | Q.  Well, it's not identical? | 12:55:24 |
| 11 | A.  It's not identical, that's true. | 12:55:25 |
| 12 | Q.  That's a more specific statement.  And | 12:55:27 |
| 13 | on here it says, "These menu items are not | 12:55:30 |
| 14 | accessible."  Who prepared that entry? | 12:55:35 |
| 15 | A.  The screen shot? | 12:55:40 |
| 16 | Q.  No, the statement, "These menu items are | 12:55:44 |
| 17 | not accessible." | 12:55:47 |
| 18 | MS. KREVOR-WEISBAUM:  On the screen | 12:55:49 |
| 19 | shot, right?  Is that what you're reading, sir?  You | 12:55:50 |
| 20 | need to tell him where you're reading.  These menu | 12:55:53 |
| 21 | items are not accessible.  I think he's referring to | 12:55:56 |
| 22 | the screen shot above the -- | 12:55:59 |
| 23 | By Mr. Cleeland: | 12:56:01 |
| 24 | Q.  Well, if you need your help, I'm happy | 12:56:02 |

149

| | | |
|---|---|---|
| 1 | to help you, but I'm just reading off your report. | 12:56:04 |
| 2 | This was not on the website, somebody added this | 12:56:07 |
| 3 | information that says, "These menu items are not | 12:56:09 |
| 4 | accessible." | 12:56:12 |
| 5 | A. That is correct. Mr. Abdi added that. | 12:56:12 |
| 6 | Q. So your office -- your company, I should | 12:56:15 |
| 7 | say, you or your employee, added that information; is | 12:56:18 |
| 8 | that correct? | 12:56:21 |
| 9 | A. That is correct. | 12:56:21 |
| 10 | Q. How was it determined that these menu | 12:56:22 |
| 11 | items are not accessible? | 12:56:25 |
| 12 | A. Through our testing of the website. | 12:56:26 |
| 13 | Q. "Our testing" meaning you, or our | 12:56:28 |
| 14 | testing meaning your employee? | 12:56:31 |
| 15 | A. Mine. | 12:56:33 |
| 16 | Q. How was it that you even knew those menu | 12:56:33 |
| 17 | items existed, if they are not accessible? | 12:56:35 |
| 18 | A. When I got to the top level, the top of | 12:56:39 |
| 19 | the level of the menu and nothing happened, I asked | 12:56:43 |
| 20 | my colleague. | 12:56:47 |
| 21 | Q. Got it. So you're getting the | 12:56:48 |
| 22 | assistance from somebody? That's what I'm trying to | 12:56:50 |
| 23 | find out. This isn't solely your work, is it? This | 12:56:52 |
| 24 | screen shot is not solely your work, is it? | 12:56:58 |

150

Peter Bossley, 11/7/2017
Payan v. Los Angeles Community College District

| | | |
|---|---|---|
| 1 | A.  That is correct. | 12:57:00 |
| 2 | Q.  So someone concluded that the menu items | 12:57:02 |
| 3 | are not accessible.  Who was the person who concluded | 12:57:04 |
| 4 | that? | 12:57:08 |
| 5 | A.  I concluded that the menu items are not | 12:57:08 |
| 6 | accessible. | 12:57:10 |
| 7 | Q.  Did your employee conclude that, also? | 12:57:11 |
| 8 | A.  Yes. | 12:57:13 |
| 9 | Q.  Did your employee assist you in reaching | 12:57:13 |
| 10 | that conclusion? | 12:57:15 |
| 11 | A.  Only in that he described that something | 12:57:16 |
| 12 | appeared that I wasn't able to perceive. | 12:57:20 |
| 13 | Q.  Okay.  So you're relying upon a sighted | 12:57:22 |
| 14 | person to tell you something that you can't confirm, | 12:57:24 |
| 15 | is that right? | 12:57:27 |
| 16 | A.  Yes. | 12:57:29 |
| 17 | Q.  Thanks. | 12:57:31 |
| 18 | You continue -- there are some bullet | 12:57:33 |
| 19 | points.  Are these bullet points -- there's one, two, | 12:57:35 |
| 20 | three -- four before the next delineation.  Are those | 12:57:38 |
| 21 | the bullet points off the website? | 12:57:47 |
| 22 | MS. KREVOR-WEISBAUM:  Objection.  You | 12:57:50 |
| 23 | can answer if you understand. | 12:57:53 |
| 24 | THE WITNESS:  I don't understand. | 12:57:54 |

151

| | | |
|---|---|---|
| 1 | By Mr. Cleeland: | 12:57:55 |
| 2 | Q.  Okay.  We have a banner and it says | 12:57:56 |
| 3 | LACCD, and then on page 5 there is text, there are | 12:57:58 |
| 4 | images, and there are clearly additions.  We talked | 12:58:03 |
| 5 | about the additions; these menu items are not | 12:58:07 |
| 6 | accessible.  We know who added that, you told us | 12:58:10 |
| 7 | that. | 12:58:14 |
| 8 | Short -- or other than that information, | 12:58:14 |
| 9 | these menu items are not accessible, is the | 12:58:17 |
| 10 | information contained on this page of your report an | 12:58:20 |
| 11 | accurate verbatim representation of the webpage? | 12:58:24 |
| 12 | MS. KREVOR-WEISBAUM:  Objection.  You | 12:58:33 |
| 13 | can answer. | 12:58:36 |
| 14 | THE WITNESS:  The bullets are discussion | 12:58:37 |
| 15 | of the next -- | 12:58:43 |
| 16 | By Mr. Cleeland: | 12:58:45 |
| 17 | Q.  Okay.  So are the bullets your language, | 12:58:45 |
| 18 | or the website's language? | 12:58:49 |
| 19 | A.  I'm not understanding what bullets | 12:58:54 |
| 20 | you're talking about, so you'll have to be -- | 12:58:56 |
| 21 | Q.  I'll read through it, and again, please | 12:58:58 |
| 22 | feel free to let me know you don't understand.  I | 12:59:00 |
| 23 | don't mind presumptions, and I know every question I | 12:59:06 |
| 24 | ask is brilliant. | 12:59:08 |

152

| | | |
|---|---|---|
| 1 | Under the heading "LACCD", and the | 12:59:08 |
| 2 | information that was inserted on this page by you and | 12:59:11 |
| 3 | your office, "These menu items are not accessible," | 12:59:15 |
| 4 | there's a bullet point, it says the academics and | 12:59:17 |
| 5 | finance menus must -- excuse me, I'll start again. | 12:59:19 |
| 6 | "The academics and finances menus have | 12:59:23 |
| 7 | the same issues as above."  Is that your language or | 12:59:26 |
| 8 | the website's language? | 12:59:30 |
| 9 | A.  That's my language. | 12:59:32 |
| 10 | Q.  All right.  How do I know, just by | 12:59:33 |
| 11 | looking at this page, what is the web's language and | 12:59:37 |
| 12 | what is you or your company's language? | 12:59:40 |
| 13 | A.  There's no language from the website in | 12:59:44 |
| 14 | the report except that that is displayed in the | 12:59:50 |
| 15 | screen shots. | 12:59:54 |
| 16 | Q.  Okay.  So all of this verbiage in here, | 12:59:54 |
| 17 | other than the image, is yours or your company's, | 12:59:58 |
| 18 | correct? | 01:00:03 |
| 19 | A.  That is correct. | 01:00:03 |
| 20 | Q.  Did you say that in your report? | 01:00:05 |
| 21 | MS. KREVOR-WEISBAUM:  Objection. | 01:00:07 |
| 22 | THE WITNESS:  Can you repeat the | 01:00:14 |
| 23 | question? | 01:00:15 |
| 24 | By Mr. Cleeland: | 01:00:16 |

153

1        Q.  Did you say that in your report?          01:00:16

2        A.  No.                                        01:00:18

3        Q.  Okay.  How is it that the reader of this   01:00:18

4    information knows it was something that was on the  01:00:24

5    webpage, or it's something that was generated by you 01:00:27

6    or your company?                                   01:00:29

7        A.  I don't know.                              01:00:39

8        Q.  Fair enough.  Under My Dashboard -- what   01:00:40

9    does your reference to My Dashboard mean?          01:00:47

10       A.  My Dashboard is the main page of the       01:00:49

11   application when you want in.                      01:00:53

12       Q.  So now you're making editorial comments    01:00:54

13   on the page; is that correct?                      01:00:57

14       A.  I'm talking about the problems with that   01:00:59

15   interface, yes.                                    01:01:01

16       Q.  Right.  Bullet point, "The screen reader   01:01:02

17   users are unable to access the links to any holds  01:01:08

18   presented in the dashboard view."  What do you mean 01:01:13

19   by "any holds"?                                    01:01:17

20       A.  There's a section of the screen that       01:01:22

21   displays any holds that that individual in question 01:01:23

22   has under account with the school, and there's a   01:01:26

23   series of links that allow them to view more       01:01:28

24   information about any of those given holds.         01:01:32

                                                    154

| | | |
|---|---|---|
| 1 | Q.  But what does the word "holds" mean to | 01:01:34 |
| 2 | you? | 01:01:37 |
| 3 | A.  Holds is a term used by campuses to talk | 01:01:37 |
| 4 | about things that are impediments to the student, | 01:01:40 |
| 5 | like they owe money, or they are -- excuse me, their | 01:01:44 |
| 6 | financial aid hasn't come through, or any number of | 01:01:51 |
| 7 | issues that create a hold for the student. | 01:01:55 |
| 8 | So a hold is like a hold on their | 01:01:57 |
| 9 | ability to sign up for new classes, or different | 01:01:59 |
| 10 | campuses implement it differently, but typically they | 01:02:03 |
| 11 | are things that stop you from signing up for classes. | 01:02:07 |
| 12 | Q.  How do you know if there's a hold when | 01:02:10 |
| 13 | you examine a website? | 01:02:17 |
| 14 | A.  I don't understand that question. | 01:02:18 |
| 15 | Q.  Well, you're making reference to access | 01:02:19 |
| 16 | to links to any holds.  How do you know, based on | 01:02:21 |
| 17 | your research for this specific application, that | 01:02:25 |
| 18 | there were any holds on that webpage for your access | 01:02:28 |
| 19 | information? | 01:02:34 |
| 20 | A.  My employee told me that there were a | 01:02:41 |
| 21 | series of holds on the page, and described where they | 01:02:43 |
| 22 | were. | 01:02:48 |
| 23 | Q.  They are not reflected in the page | 01:02:48 |
| 24 | information on page 5; is that correct? | 01:02:50 |

ADVANCED DEPOSITIONS
www.advanceddepositions.com | 855.811.3376

Peter Bossley, 11/7/2017
Payan v. Los Angeles Community College District

| | | |
|---|---|---|
| 1 | MS. KREVOR-WEISBAUM:  Objection.  Go | 01:02:54 |
| 2 | ahead. | 01:02:56 |
| 3 | THE WITNESS:  They are in the picture. | 01:02:56 |
| 4 | By Mr. Cleeland: | 01:02:58 |
| 5 | Q.  Okay.  How many? | 01:02:58 |
| 6 | A.  I don't recall the specifics. | 01:03:01 |
| 7 | Q.  Can you tell by looking at your screen | 01:03:03 |
| 8 | now? | 01:03:05 |
| 9 | A.  I cannot. | 01:03:05 |
| 10 | Q.  Why can't you? | 01:03:06 |
| 11 | MS. KREVOR-WEISBAUM:  Objection. | 01:03:08 |
| 12 | By Mr. Cleeland: | 01:03:08 |
| 13 | Q.  Does it mean it's not accessible by your | 01:03:12 |
| 14 | program? | 01:03:14 |
| 15 | A.  Because I'm not able to see the links to | 01:03:14 |
| 16 | the holds. | 01:03:17 |
| 17 | Q.  So you can't see the page of your | 01:03:19 |
| 18 | report; is that correct? | 01:03:21 |
| 19 | A.  I cannot. | 01:03:22 |
| 20 | Q.  Okay.  So how can you tell me today that | 01:03:25 |
| 21 | the page that I've been given is an accurate | 01:03:29 |
| 22 | recitation of your report? | 01:03:32 |
| 23 | MS. KREVOR-WEISBAUM:  Objection. | 01:03:37 |
| 24 | Getting into a pretty ridiculous line of questions. | 01:03:38 |

156

Peter Bossley, 11/7/2017
Payan v. Los Angeles Community College District

| | | |
|---|---|---|
| 1 | MR. CLEELAND:  Well, I don't know if | 01:03:40 |
| 2 | it's accurate, and he doesn't know if it's accurate, | 01:03:41 |
| 3 | that's all.  No one has represented to me this is | 01:03:44 |
| 4 | accurate. | 01:03:46 |
| 5 | MS. KREVOR-WEISBAUM:  Did you get this | 01:03:47 |
| 6 | through a disclosure from our law firm? | 01:03:48 |
| 7 | MR. CLEELAND:  Is it under oath? | 01:03:51 |
| 8 | MS. KREVOR-WEISBAUM:  He's under oath | 01:03:53 |
| 9 | right now. | 01:03:54 |
| 10 | MR. CLEELAND:  Is this document under | 01:03:56 |
| 11 | oath, yes or no? | 01:03:58 |
| 12 | MS. KREVOR-WEISBAUM:  It was provided | 01:03:59 |
| 13 | through the normal channels of giving you an expert | 01:04:00 |
| 14 | disclosure. | 01:04:02 |
| 15 | MR. CLEELAND:  And would it be | 01:04:02 |
| 16 | admissible in a courtroom? | 01:04:04 |
| 17 | MS. KREVOR-WEISBAUM:  No, but he will | 01:04:04 |
| 18 | be. | 01:04:04 |
| 19 | MR. CLEELAND:  Thank you.  I'm trying to | 01:04:06 |
| 20 | find out what he knows versus the report.  This | 01:04:06 |
| 21 | gentleman has told me he can't read the physical | 01:04:09 |
| 22 | pages of the report.  I'm just trying to find out. | 01:04:11 |
| 23 | And you're accusing me of doing something nefarious | 01:04:13 |
| 24 | for perusing it. | 01:04:16 |

157

| | | |
|---|---|---|
| 1 | MS. KREVOR-WEISBAUM:  I think it's | 01:04:19 |
| 2 | rather inappropriate. | 01:04:19 |
| 3 | MR. CLEELAND:  It's inappropriate for me | 01:04:19 |
| 4 | to confirm information on the report consistent with | 01:04:20 |
| 5 | information he has available to him today -- | 01:04:23 |
| 6 | MS. KREVOR-WEISBAUM:  He's under oath. | 01:04:26 |
| 7 | MR. CLEELAND:  I'm not done. | 01:04:27 |
| 8 | -- in a format that he can access, and | 01:04:28 |
| 9 | he's under oath and he said he can't tell.  Thank | 01:04:31 |
| 10 | you.  That's the first we have heard of that.  And | 01:04:33 |
| 11 | yes, he is under oath. | 01:04:35 |
| 12 | MS. KREVOR-WEISBAUM:  A continuing | 01:04:37 |
| 13 | objection.  Mr. Bossley, you can proceed in answering | 01:04:39 |
| 14 | his questions. | 01:04:41 |
| 15 | MR. CLEELAND:  Sure.  Do you remember my | 01:04:42 |
| 16 | last question? | 01:04:42 |
| 17 | (Question read back.) | 01:04:42 |
| 18 | MS. KREVOR-WEISBAUM:  Objection. | 01:05:14 |
| 19 | By Mr. Cleeland: | 01:05:14 |
| 20 | Q.  Can you answer that question? | 01:05:15 |
| 21 | A.  I can't say with one hundred percent | 01:05:19 |
| 22 | certainty, but I'd be happy to print this for you. | 01:05:20 |
| 23 | Q.  Well, I appreciate your answer.  And | 01:05:23 |
| 24 | that's all I was looking for. | 01:05:25 |

158

```
1          Now, if we go to My Dashboard, again on          01:05:28
2    page 5, it states, "The links to any holds presented   01:05:31
3    on the dashboard view; in fact, they are entirely      01:05:36
4    unaware of their existence."  "They" meaning a screen  01:05:42
5    reader user; is that correct?                          01:05:46
6          A.  That is correct.                             01:05:47
7          Q.  And you draw that conclusion based on        01:05:49
8    what?                                                   01:05:51
9          A.  Based on my testing of that interface.       01:05:51
10         Q.  Okay.  But it did come up on the screen       01:05:58
11   shot, correct?                                          01:06:01
12         A.  That is correct.                             01:06:02
13         Q.  Do you know why that is?                      01:06:05
14         A.  I do.                                         01:06:06
15         Q.  What?                                         01:06:08
16         A.  When we created the screen shot we drew       01:06:09
17   a box around the links that couldn't be accessed, and   01:06:12
18   took that picture.                                      01:06:16
19         Q.  Okay.  But was that information               01:06:17
20   available on the screen of the webpage on the          01:06:19
21   computer that was used to access the website?          01:06:24
22         A.  They were.                                    01:06:26
23         Q.  Below My Dashboard there's another            01:06:32
24   image, and it states, "These links are inaccessible."   01:06:36
```

159

| | | |
|---|---|---|
| 1 | That's information provided by either you or your | 01:06:40 |
| 2 | office, correct? | 01:06:42 |
| 3 | A.  That is correct. | 01:06:43 |
| 4 | Q.  So that's not an accurate representation | 01:06:44 |
| 5 | of the webpage as it exists on the website, correct? | 01:06:46 |
| 6 | MS. KREVOR-WEISBAUM:  Objection.  Go | 01:06:52 |
| 7 | ahead. | 01:06:54 |
| 8 | THE WITNESS:  Other than the addition of | 01:06:54 |
| 9 | the, "These links are not accessible," it is an | 01:06:58 |
| 10 | accurate representation. | 01:06:58 |
| 11 | By Mr. Cleeland: | 01:06:59 |
| 12 | Q.  Okay.  You've now limited the question. | 01:07:00 |
| 13 | If you remove information, it becomes accurate, | 01:07:01 |
| 14 | right? | 01:07:04 |
| 15 | A.  Correct. | 01:07:05 |
| 16 | Q.  But the information in your report is | 01:07:06 |
| 17 | not an accurate recitation of the page as it existed | 01:07:08 |
| 18 | on the website when you took the screen shot, is it? | 01:07:12 |
| 19 | A.  I disagree with that conclusion. | 01:07:15 |
| 20 | MS. KREVOR-WEISBAUM:  Objection. | 01:07:17 |
| 21 | By Mr. Cleeland: | 01:07:17 |
| 22 | Q.  Well, who put in these links are | 01:07:18 |
| 23 | inaccessible? | 01:07:19 |
| 24 | A.  We did. | 01:07:21 |

160

Peter Bossley, 11/7/2017
Payan v. Los Angeles Community College District

| | | |
|---|---|---|
| 1 | Q.  Okay.  So the school didn't, did they? | 01:07:21 |
| 2 | A.  No, they did not. | 01:07:27 |
| 3 | Q.  And so that's not on the school's | 01:07:28 |
| 4 | version of the screen, is it? | 01:07:30 |
| 5 | A.  It is not. | 01:07:32 |
| 6 | Q.  The arrows that point to the different | 01:07:36 |
| 7 | categories, you or your company added those arrows, | 01:07:38 |
| 8 | didn't they? | 01:07:42 |
| 9 | A.  That is correct. | 01:07:43 |
| 10 | Q.  So those arrows weren't put on there by | 01:07:43 |
| 11 | the school, were they? | 01:07:46 |
| 12 | A.  They were not. | 01:07:46 |
| 13 | Q.  So the existence of the arrows is not an | 01:07:47 |
| 14 | accurate representation of the webpage as it existed | 01:07:49 |
| 15 | on the school website, correct? | 01:07:53 |
| 16 | A.  That is correct. | 01:07:54 |
| 17 | Q.  Thank you. | 01:07:56 |
| 18 | The second bullet underneath that image, | 01:07:58 |
| 19 | the table in my account section -- I apologize, I | 01:08:00 |
| 20 | misread that. | 01:08:05 |
| 21 | "The table in the My Account section has | 01:08:05 |
| 22 | improper header ID association."  What do you mean by | 01:08:09 |
| 23 | that? | 01:08:12 |
| 24 | A.  I mean that the cells within that table | 01:08:14 |

161

Peter Bossley, 11/7/2017
Payan v. Los Angeles Community College District

| | | |
|---|---|---|
| 1 | are not coded in a way that screen readers would | 01:08:21 |
| 2 | understand what data they are viewing. | 01:08:27 |
| 3 | Q.  What do you mean by "understand"? | 01:08:28 |
| 4 | A.  They aren't able to determine easily | 01:08:30 |
| 5 | what they are on.  They don't know -- they don't know | 01:08:35 |
| 6 | what column they are in, what the head -- what the | 01:08:37 |
| 7 | header over top the column they are in is. | 01:08:40 |
| 8 | Q.  But they know there's a header, correct? | 01:08:43 |
| 9 | A.  They might assume that there's a header, | 01:08:45 |
| 10 | but they don't know that. | 01:08:47 |
| 11 | Q.  Well, you said they don't know | 01:08:48 |
| 12 | something.  I'm trying to figure out what they do | 01:08:50 |
| 13 | know. | 01:08:52 |
| 14 | A.  They know they have hit a table with | 01:08:53 |
| 15 | some contents in it, and as they move around the | 01:08:57 |
| 16 | table they don't know what that content is. | 01:08:59 |
| 17 | Q.  On the next page, page 6 of your report, | 01:09:08 |
| 18 | we have some images, and then we have those arrows | 01:09:10 |
| 19 | again. | 01:09:13 |
| 20 | Under the first image above the category | 01:09:14 |
| 21 | "Search Classes", there's an arrow with language that | 01:09:18 |
| 22 | says, "Improperly coded table leads to confusing | 01:09:20 |
| 23 | navigation."  That's all added by you or your office, | 01:09:25 |
| 24 | correct? | 01:09:28 |

162

| | | |
|---|---|---|
| 1 | A.   That is correct. | 01:09:28 |
| 2 | Q.   And upon what do you base the conclusion | 01:09:30 |
| 3 | that there was confusing navigation? | 01:09:32 |
| 4 | A.   Based on my experience testing the | 01:09:36 |
| 5 | application. | 01:09:38 |
| 6 | Q.   Okay.  And how long did you spend | 01:09:39 |
| 7 | testing that application on that page? | 01:09:40 |
| 8 | A.   I don't recall specifically. | 01:09:42 |
| 9 | Q.   More than a minute? | 01:09:44 |
| 10 | A.   Yes. | 01:09:45 |
| 11 | Q.   Less than ten minutes? | 01:09:46 |
| 12 | A.   No. | 01:09:47 |
| 13 | Q.   Less than an hour? | 01:09:49 |
| 14 | A.   Yes. | 01:09:50 |
| 15 | Q.   Okay.  And this is the first time you | 01:09:51 |
| 16 | went to that website; is that correct? | 01:09:55 |
| 17 | A.   It's the first time I went to this | 01:09:58 |
| 18 | website, yes. | 01:10:03 |
| 19 | Q.   Did you take any tutorials before you | 01:10:03 |
| 20 | went to the specific pages so you knew how to operate | 01:10:07 |
| 21 | it? | 01:10:09 |
| 22 | A.   I'm familiar with this software. | 01:10:09 |
| 23 | Q.   Thank you.  Did you take any tutorials | 01:10:11 |
| 24 | so you knew how to operate it? | 01:10:14 |

163

Peter Bossley, 11/7/2017
Payan v. Los Angeles Community College District

| | | |
|---|---|---|
| 1 | A.  I did not. | 01:10:15 |
| 2 | Q.  Okay.  Were you aware there were | 01:10:15 |
| 3 | tutorials on the webpage? | 01:10:18 |
| 4 | A.  I was not. | 01:10:20 |
| 5 | Q.  Did you look for it? | 01:10:22 |
| 6 | A.  I did not. | 01:10:24 |
| 7 | Q.  Is it unusual to have tutorials on an | 01:10:25 |
| 8 | educational institution's web pages? | 01:10:28 |
| 9 | A.  No, it is not. | 01:10:31 |
| 10 | Q.  Okay.  You begin under the "Search | 01:10:32 |
| 11 | Classes" bullet point, "Many of the fields throughout | 01:10:36 |
| 12 | this interface lack properly associated labels." | 01:10:38 |
| 13 | What do you mean by "properly associated"? | 01:10:43 |
| 14 | A.  I mean that the form fields don't have | 01:10:45 |
| 15 | labels associated -- many of the form fields in that | 01:10:49 |
| 16 | interface do not have labels associated with them. | 01:10:52 |
| 17 | Q.  So not all of them, but some of them? | 01:10:55 |
| 18 | A.  That is correct. | 01:10:58 |
| 19 | Q.  And then it says "properly associated | 01:10:58 |
| 20 | labels".  Does that mean that there are labels, but | 01:11:01 |
| 21 | not properly associated labels? | 01:11:03 |
| 22 | A.  I don't recall. | 01:11:05 |
| 23 | Q.  Thank you. | 01:11:09 |
| 24 | It continues, "...leading to screen | 01:11:10 |

164

Peter Bossley, 11/7/2017
Payan v. Los Angeles Community College District

| | | |
|---|---|---|
| 1 | reader users being unable to identify their purpose." | 01:11:12 |
| 2 | How many people tested that website for the purposes | 01:11:17 |
| 3 | of your report? | 01:11:20 |
| 4 | A.  One. | 01:11:21 |
| 5 | Q.  Okay.  So do you intend it to be | 01:11:21 |
| 6 | singular or plural users? | 01:11:25 |
| 7 | MS. KREVOR-WEISBAUM:  Objection.  You | 01:11:28 |
| 8 | can answer. | 01:11:30 |
| 9 | THE WITNESS:  I mean it to be plural. | 01:11:32 |
| 10 | By Mr. Cleeland: | 01:11:32 |
| 11 | Q.  Because you're assuming that other | 01:11:34 |
| 12 | people will be faced with the same issues you were | 01:11:36 |
| 13 | faced with, correct? | 01:11:37 |
| 14 | A.  I'm quite certain. | 01:11:38 |
| 15 | Q.  Why are you certain? | 01:11:40 |
| 16 | A.  I am certain, because I have significant | 01:11:41 |
| 17 | knowledge and experience in how the technology works. | 01:11:49 |
| 18 | Q.  But not on that website, correct? | 01:11:52 |
| 19 | A.  This technology works the same way on | 01:11:54 |
| 20 | any website. | 01:11:58 |
| 21 | Q.  Thank you, sir.  But not on that | 01:11:58 |
| 22 | website, correct? | 01:12:00 |
| 23 | A.  Again, the technology works the same on | 01:12:00 |
| 24 | any website. | 01:12:05 |

165

1      Q.  Sir, the question was, you had no prior          01:12:06

2   experience on that website?                             01:12:08

3      A.  On this particular website, I did not            01:12:09

4   have experience.                                        01:12:12

5      Q.  That was my only question.                       01:12:12

6         Then below that we have more entries,             01:12:14

7   apparently by your office, you or your office, and      01:12:16

8   arrows.  "Each check box is unlabeled," with an         01:12:19

9   arrow.  That wasn't on the website as you accessed      01:12:23

10  it, was it?                                             01:12:26

11     A.  It was not.                                      01:12:27

12     Q.  And then below that it says, "Every              01:12:28

13  input field lacks a label," and arrows.  And that       01:12:31

14  wasn't on the webpage as you accessed it, was it?       01:12:34

15     A.  Where are we here?                               01:12:39

16     Q.  Page 6, below bullet point "Search              01:12:41

17  Classes".                                               01:12:44

18        MS. KREVOR-WEISBAUM:  It's in the --              01:12:46

19  within the screen shot.                                 01:12:48

20        THE WITNESS:  That is correct.                    01:12:51

21  By Mr. Cleeland:                                        01:12:54

22     Q.  And again, it's your editorial comment           01:12:54

23  within the screen shot, it's not the screen shot as     01:12:57

24  you took it from the webpage; is that correct?          01:12:59

166

Peter Bossley, 11/7/2017
Payan v. Los Angeles Community College District

```
 1           A.   That is correct.                          01:13:01

 2           Q.   And below that there's another bullet      01:13:02

 3    point that says, "The select subject interface is      01:13:03

 4    inaccessible to screen readers."  You mean completely  01:13:06

 5    inaccessible?                                          01:13:08

 6           A.   Can you repeat that?  Sorry.               01:13:14

 7           Q.   Sure.  You write -- because you were the   01:13:20

 8    author of this report?                                 01:13:23

 9           A.   I was, yes.                                01:13:24

10           Q.   You write, "The select subject interface  01:13:25

11    is inaccessible to screen reader users," and stop      01:13:27

12    there.  Do you mean completely inaccessible?           01:13:32

13           A.   No.                                        01:13:35

14           Q.   Okay.  And it continues, "...because the   01:13:36

15    links to select a subject, are all," quote, select,    01:13:38

16    close quote.  What do you mean by that?                01:13:45

17           A.   I mean that users who are looking          01:13:46

18    through the list of links on the page would see a      01:13:50

19    series of select, instead of select arts and          01:13:56

20    sciences, select whatever other subject they might     01:14:00

21    want to select.                                        01:14:02

22           Q.   Thank you.                                 01:14:03

23           It continues, "Screen reader users would        01:14:04

24    be unable to determine what they were selecting."      01:14:06
```

                                  167

| | | |
|---|---|---|
| 1 | What do you base that upon? | 01:14:10 |
| 2 | A.  The lack of link -- sufficiently | 01:14:12 |
| 3 | descriptive link text.  The links simply say select. | 01:14:20 |
| 4 | Select what? | 01:14:24 |
| 5 | Q.  So they would know they are making a | 01:14:25 |
| 6 | selection, correct? | 01:14:27 |
| 7 | A.  That is correct. | 01:14:27 |
| 8 | Q.  They just don't know what they are | 01:14:28 |
| 9 | selecting; is that right? | 01:14:30 |
| 10 | A.  That's right. | 01:14:31 |
| 11 | Q.  If we turn to page 7, again, it appears | 01:14:32 |
| 12 | like we have portions of a screen shot with some | 01:14:36 |
| 13 | editorial comment. | 01:14:39 |
| 14 | At the top of the page under "American | 01:14:40 |
| 15 | Sign Language," that's the first I can read, there's | 01:14:43 |
| 16 | the comment, "All links to this select a course read | 01:14:46 |
| 17 | as select."  That's a comment put in the report by | 01:14:50 |
| 18 | you or your office, correct? | 01:14:54 |
| 19 | MS. KREVOR-WEISBAUM:  It's on page? | 01:14:59 |
| 20 | MR. CLEELAND:  7. | 01:15:01 |
| 21 | MS. KREVOR-WEISBAUM:  The next page. | 01:15:08 |
| 22 | MR. CLEELAND:  It's page 7 -- | 01:15:14 |
| 23 | MS. KREVOR-WEISBAUM:  The top of page 7. | 01:15:16 |
| 24 | By Mr. Cleeland: | 01:15:18 |

168

```
1          Q.  Screen shot, group arrows, some          01:15:20

2     language, and the first real text is, "Select," but 01:15:21

3     over in the center it says, "American Sign Language." 01:15:23

4     The comment, "All links to select a course read as   01:15:28

5     'select'".  That was added by you or your office,    01:15:32

6     correct?                                             01:15:34

7          A.  That is correct.                           01:15:34

8          Q.  And those arrows that point from it        01:15:35

9     towards the left, those were added by your office,   01:15:37

10    correct?                                             01:15:40

11         A.  The arrows that indicate, yes.             01:15:40

12         Q.  Who put the arrows there?                  01:15:42

13         A.  My employee.                               01:15:43

14         Q.  What did you -- did you instruct your      01:15:46

15    employee what to do with the arrows?                01:15:48

16         A.  I did.                                      01:15:50

17         Q.  What did you tell him?                     01:15:51

18         A.  I instructed him to point at a few         01:15:53

19    examples of the links that just say "Select".       01:15:55

20         Q.  So a few examples, is that what you told   01:15:58

21    him?                                                 01:16:03

22         A.  Yes.                                        01:16:03

23         Q.  Okay.  Below that the bullet point, "The   01:16:03

24    additional search criteria expand/collapse is not   01:16:06
```

169

| | | |
|---|---|---|
| 1 | usable by screen reader users..."  Again, not usable | 01:16:10 |
| 2 | at all? | 01:16:16 |
| 3 | A.  Can you clarify the question? | 01:16:31 |
| 4 | Q.  Sure.  You state, "The additional search | 01:16:33 |
| 5 | criteria expand/collapse is not usable by screen | 01:16:34 |
| 6 | reader users..."  By that do you mean it's not usable | 01:16:38 |
| 7 | at all? | 01:16:41 |
| 8 | A.  No. | 01:16:44 |
| 9 | Q.  Okay.  You're qualifying the limitation | 01:16:44 |
| 10 | of use, correct? | 01:16:47 |
| 11 | A.  I'm -- I am stating here that it doesn't | 01:16:49 |
| 12 | report that it's -- that it has -- that it has a | 01:16:53 |
| 13 | state of expanding and collapse. | 01:16:58 |
| 14 | Q.  Right.  You're qualifying the limitation | 01:16:59 |
| 15 | on usability; is that correct? | 01:17:04 |
| 16 | A.  That is correct. | 01:17:05 |
| 17 | Q.  And you continue by stating, "...because | 01:17:05 |
| 18 | it does not report its state..."  That's what you | 01:17:07 |
| 19 | were talking about, right? | 01:17:13 |
| 20 | A.  That is correct. | 01:17:13 |
| 21 | Q.  Thank you. | 01:17:14 |
| 22 | Below that again, we have what appears | 01:17:15 |
| 23 | to be a screen shot, and I can't tell whether it's | 01:17:17 |
| 24 | the same screen and you've inserted text, or it's | 01:17:20 |

170

| | | |
|---|---|---|
| 1 | just a different page. | 01:17:22 |
| 2 | But it states, "This control does not | 01:17:24 |
| 3 | report its state (e.g. expanded, collapsed)."  That's | 01:17:28 |
| 4 | language inserted by you or your company, correct? | 01:17:34 |
| 5 | A.   That is correct. | 01:17:37 |
| 6 | Q.   And that arrow that goes from the left | 01:17:37 |
| 7 | to the box, "Additional Search Criteria," that arrow | 01:17:39 |
| 8 | is added by your company, correct? | 01:17:42 |
| 9 | A.   Correct. | 01:17:43 |
| 10 | Q.   Below that there's a bullet point, and | 01:17:46 |
| 11 | it states "Beyond this, each class section is | 01:17:48 |
| 12 | arranged in a table of its own, making comparison | 01:17:52 |
| 13 | between available options impossible or extremely | 01:17:55 |
| 14 | difficult..." | 01:18:00 |
| 15 | Between those two, what is the accurate | 01:18:01 |
| 16 | statement? | 01:18:04 |
| 17 | MS. KREVOR-WEISBAUM:  Objection. | 01:18:06 |
| 18 | THE WITNESS:  Can you -- can you give me | 01:18:07 |
| 19 | a like clarification -- | 01:18:20 |
| 20 | By Mr. Cleeland: | 01:18:23 |
| 21 | Q.   Sure.  Absolutely.  The sentence reads, | 01:18:24 |
| 22 | "Beyond this, each class section is arranged in a | 01:18:27 |
| 23 | table of its own, making comparison between available | 01:18:29 |
| 24 | options impossible or extremely difficult..." | 01:18:34 |

171

| | | |
|---|---|---|
| 1 | It would seem that extremely difficult | 01:18:38 |
| 2 | is not impossible.  It would seem that impossible | 01:18:40 |
| 3 | doesn't allow for extremely difficult.  I'm just | 01:18:44 |
| 4 | trying to figure out what you meant in there. | 01:18:47 |
| 5 | Did you mean it's impossible, or that it | 01:18:48 |
| 6 | was extremely difficult? | 01:18:51 |
| 7 | A.  I meant under most circumstances it | 01:18:52 |
| 8 | would be impossible.  If you were reviewing maybe two | 01:18:56 |
| 9 | comparing options, then navigating to another table | 01:18:59 |
| 10 | to view the next option, and, you know, if you could | 01:19:02 |
| 11 | keep that information in your head about what was up | 01:19:05 |
| 12 | above, then maybe comparing two options, extremely | 01:19:08 |
| 13 | difficult, not impossible.  Any more than that, it | 01:19:13 |
| 14 | gets to the impossible realm. | 01:19:17 |
| 15 | Q.  Okay.  Did you try to do that? | 01:19:18 |
| 16 | A.  What do you mean? | 01:19:20 |
| 17 | Q.  You said you could compare two.  Did you | 01:19:23 |
| 18 | try that? | 01:19:26 |
| 19 | A.  Yeah. | 01:19:27 |
| 20 | Q.  Okay.  Were you able to do that? | 01:19:29 |
| 21 | A.  Was I able to compare two of them? | 01:19:33 |
| 22 | Yeah, without -- yeah, as long as I wrote down what | 01:19:35 |
| 23 | was in the first set of columns. | 01:19:38 |
| 24 | Q.  Okay.  On your screen reader, can you | 01:19:41 |

172

| | | |
|---|---|---|
| 1 | minimize one page when you go to a next page? | 01:19:44 |
| 2 |     A.  Yes. | 01:19:49 |
| 3 |     Q.  Okay.  So you can have more than one | 01:19:50 |
| 4 | page open at a time on a screen reader, correct? | 01:19:52 |
| 5 |     A.  That is correct. | 01:19:55 |
| 6 |     Q.  And when you do that, you don't have to | 01:19:56 |
| 7 | write down the information because it's in front of | 01:19:57 |
| 8 | you, right? | 01:20:00 |
| 9 |     A.  Sure. | 01:20:03 |
| 10 |     Q.  Okay.  So you could have done that, but | 01:20:04 |
| 11 | you chose not to, correct? | 01:20:06 |
| 12 |        MS. KREVOR-WEISBAUM:  Objection. | 01:20:08 |
| 13 |        THE WITNESS:  That's not really a valid | 01:20:10 |
| 14 | comparison methodology in this circumstance. | 01:20:13 |
| 15 | By Mr. Cleeland: | 01:20:13 |
| 16 |     Q.  That's not what I said. | 01:20:15 |
| 17 |        Well, you told me, other than a few very | 01:20:16 |
| 18 | limited examples, it's impossible.  You came up with | 01:20:19 |
| 19 | an example where it was possible.  You apparently | 01:20:22 |
| 20 | didn't bother to use the option of a two-page | 01:20:26 |
| 21 | presentation on one screen at the same time, but that | 01:20:29 |
| 22 | would be possible, correct? | 01:20:32 |
| 23 |     A.  Putting two screens on one -- | 01:20:35 |
| 24 |     Q.  Excuse me. | 01:20:37 |

173

| | | |
|---|---|---|
| 1 | -- and doing the task you were talking | 01:20:38 |
| 2 | about in your bullet point? | 01:20:41 |
| 3 | A.  No, that wouldn't be possible. | 01:20:42 |
| 4 | Q.  Why? | 01:20:43 |
| 5 | A.  Because you would have to find your | 01:20:44 |
| 6 | place on both pages, and then switch back and forth | 01:20:48 |
| 7 | between them. | 01:20:51 |
| 8 | Q.  Is there something that prevents you | 01:20:52 |
| 9 | switching back and forth between pages? | 01:20:54 |
| 10 | A.  No. | 01:20:56 |
| 11 | Q.  On page 8, at the top of the page, we | 01:21:00 |
| 12 | have what appears to be a screen shot, and again, | 01:21:03 |
| 13 | there appears to be an editorial comment which reads, | 01:21:06 |
| 14 | "These are all individual tables.  It's impossible | 01:21:10 |
| 15 | (or at least extremely difficult) for screen reader | 01:21:15 |
| 16 | users to make comparisons." | 01:21:20 |
| 17 | Is this the same thing we were talking | 01:21:22 |
| 18 | about on page 7? | 01:21:23 |
| 19 | A.  It is. | 01:21:24 |
| 20 | Q.  Now, you have arrows that are drawn on | 01:21:27 |
| 21 | this image.  Those arrows were added by you or your | 01:21:29 |
| 22 | office, correct? | 01:21:32 |
| 23 | A.  That is correct. | 01:21:33 |
| 24 | Q.  And the image that you have identified, | 01:21:35 |

174

Peter Bossley, 11/7/2017
Payan v. Los Angeles Community College District

| | | |
|---|---|---|
| 1 | what -- what does that image depict? | 01:21:37 |
| 2 | A.  A series of classes in a class search. | 01:21:41 |
| 3 | Q.  So you were able to compare classes | 01:21:47 |
| 4 | there? | 01:21:49 |
| 5 | A.  No. | 01:21:49 |
| 6 | Q.  Why couldn't you compare the classes on | 01:21:49 |
| 7 | that screen shot? | 01:21:51 |
| 8 | A.  Because there were too many -- there was | 01:21:55 |
| 9 | no ability to compare the options with each other | 01:21:57 |
| 10 | given the layout of the page. | 01:22:00 |
| 11 | Q.  Well, what are you comparing? | 01:22:02 |
| 12 | A.  You're comparing, perhaps, the time that | 01:22:03 |
| 13 | they are offered. | 01:22:06 |
| 14 | Q.  Well, looking at that -- and it has the | 01:22:06 |
| 15 | times for these classes and there's one, two, three, | 01:22:09 |
| 16 | four, five, six.  They are all there, correct? | 01:22:11 |
| 17 | A.  Yes. | 01:22:14 |
| 18 | Q.  You can compare those times, which was | 01:22:16 |
| 19 | one of the categories you wanted.  Any other | 01:22:19 |
| 20 | categories that you couldn't compare? | 01:22:22 |
| 21 | A.  You can compare those times. | 01:22:24 |
| 22 | Q.  Well, it's on the screen shot, correct? | 01:22:25 |
| 23 | A.  That is correct. | 01:22:27 |
| 24 | Q.  Are you telling me that the information | 01:22:29 |

175

| | | |
|---|---|---|
| 1 | contained within that rectangle is not available on a | 01:22:30 |
| 2 | screen reader? | 01:22:35 |
| 3 | A.  I'm telling you that the ability to move | 01:22:36 |
| 4 | between the sections where the classes are offered is | 01:22:38 |
| 5 | not available to a screen reader. | 01:22:42 |
| 6 | Q.  I didn't ask that. | 01:22:43 |
| 7 | The example you give, the screen shot, | 01:22:45 |
| 8 | it has "Mathematics of Accounting", through | 01:22:48 |
| 9 | "Comparative Education - Accounting", a series of | 01:22:51 |
| 10 | classes. | 01:22:55 |
| 11 | Could you, on your screen reader when | 01:22:55 |
| 12 | you were doing this work, access the material and | 01:22:57 |
| 13 | contents of that image? | 01:23:00 |
| 14 | A.  Yes. | 01:23:02 |
| 15 | Q.  Okay.  So you could compare all of the | 01:23:03 |
| 16 | courses contained on that page, correct? | 01:23:05 |
| 17 | A.  Not correct. | 01:23:08 |
| 18 | Q.  Well, you talked about time.  Each one | 01:23:10 |
| 19 | of these courses has time on it, and this is an image | 01:23:13 |
| 20 | that you said you accessed on your computer through | 01:23:17 |
| 21 | your screen reader, correct? | 01:23:19 |
| 22 | A.  That is correct. | 01:23:20 |
| 23 | Q.  Okay.  So that information was there for | 01:23:21 |
| 24 | you to consume, correct? | 01:23:23 |

176

| | | |
|---|---|---|
| 1 | A.  It was. | 01:23:24 |
| 2 | Q.  Okay.  What else couldn't you compare? | 01:23:25 |
| 3 | A.  Any of the items listed in the table; | 01:23:30 |
| 4 | the course name, the time, the rooms -- | 01:23:32 |
| 5 | Q.  I apologize. | 01:23:35 |
| 6 | A.  -- instructors. | 01:23:36 |
| 7 | Q.  All of these list course number.  Each | 01:23:37 |
| 8 | one on your image has that. | 01:23:40 |
| 9 | A.  I understand. | 01:23:43 |
| 10 | Q.  Excuse me.  And that was all accessible | 01:23:43 |
| 11 | to you on a screen reader, correct? | 01:23:46 |
| 12 | A.  Yes. | 01:23:48 |
| 13 | Q.  Okay.  So all of this information that's | 01:23:48 |
| 14 | on the image, you could compare to everything on that | 01:23:51 |
| 15 | page, correct? | 01:23:54 |
| 16 | A.  That's not correct. | 01:23:54 |
| 17 | Q.  What was incorrect about that? | 01:23:57 |
| 18 | A.  The ability to compare. | 01:23:58 |
| 19 | Q.  On that page?  What stops you from | 01:24:01 |
| 20 | looking at this image that you said you could access | 01:24:05 |
| 21 | on your screen reader, and you could read -- and this | 01:24:08 |
| 22 | is an accurate depiction of what you could read -- | 01:24:11 |
| 23 | what stops you from comparing the information on that | 01:24:14 |
| 24 | shot? | 01:24:16 |

177

1      A.  Because screen reader users are unable                01:24:16

2    to compare the available options.                           01:24:19

3      Q.  What do you mean by "compare"?  I think               01:24:22

4    maybe that's where I'm having my difficulty.                01:24:24

5      A.  I'm -- a screen reader user is not able               01:24:26

6    to jump from one to the next.                               01:24:30

7      Q.  I didn't ask that.  I just said you                   01:24:32

8    could compare the information on this image?                01:24:33

9         MS. KREVOR-WEISBAUM:  Objection, asked                 01:24:36

10   and answered four times already.                            01:24:38

11        MR. CLEELAND:  Well, he doesn't think                  01:24:39

12   he's answered it.                                           01:24:40

13        MS. KREVOR-WEISBAUM:  No, he thinks he                 01:24:41

14   has answered it.  You don't think he has answered it.       01:24:43

15   He has answered it four times.                              01:24:45

16   By Mr. Cleeland:                                            01:24:47

17     Q.  Can you look at this image right now on               01:24:47

18   your computer?                                              01:24:49

19     A.  It doesn't do me any good to look at the              01:24:49

20   image on the computer.                                      01:24:52

21     Q.  Can you look at the image on the                      01:24:52

22   computer?                                                   01:24:55

23     A.  I can.                                                01:24:55

24     Q.  Okay.  On the examples that you put in                01:24:56

                                                        178

your report, how many courses are listed? 01:24:58
A. Well, sir, I'm not able to see the image 01:25:01
in any -- details. 01:25:03
Q. I agree with that a hundred percent. 01:25:05
MS. KREVOR-WEISBAUM: So how are you 01:25:07
asking him to do what you're asking him to? 01:25:09
MR. CLEELAND: Because I need to know if 01:25:12
he's looking at this information. 01:25:13
MS. KREVOR-WEISBAUM: He can't visually 01:25:15
see it. What are you talking about, sir? 01:25:16
MR. CLEELAND: Stop. Please stop. I 01:25:18
said information. Information. You've got to listen 01:25:18
to the questions I ask. I make lots of mistakes. I 01:25:20
need to know what he's relying upon to make this 01:25:23
document. That's all I'm asking. 01:25:27
By Mr. Cleeland: 01:25:27
Q. How is it that you know that you can't 01:25:31
compare the information on this image? 01:25:33
A. I was the one that performed the 01:25:36
analysis. 01:25:37
Q. Okay. But the image that you have in 01:25:38
your report, it lists information related to classes? 01:25:40
A. Okay. We have gone over this imaging 01:25:43
about five times. 01:25:45

```
1        Q.  I'm not talking about imaging now, sir.      01:25:45
2            MS. KREVOR-WEISBAUM:  Yes, you are, sir.      01:25:48
3            MR. CLEELAND:  Could you read my             01:25:51
4    question?  It says "this information".  Do you want   01:25:52
5    to hear it back, or do you take my word for it?       01:25:53
6            MS. KREVOR-WEISBAUM:  Why don't you read     01:25:59
7    it back?                                              01:26:00
8            (Question read back.)                         01:26:00
9            MR. CLEELAND:  So I'm talking about the       01:26:16
10   information that you could access.  That's all I'm    01:26:16
11   talking about.                                        01:26:18
12           MS. KREVOR-WEISBAUM:  Is there a              01:26:21
13   question?                                             01:26:22
14           MR. CLEELAND:  Yeah.                          01:26:23
15           MS. KREVOR-WEISBAUM:  What's the             01:26:24
16   question?                                             01:26:24
17   By Mr. Cleeland:                                      01:26:24
18       Q.  The image on your report has information      01:26:24
19   about class number and name and date and time and    01:26:28
20   instructor, et cetera.  Did you have access to that  01:26:32
21   information?                                          01:26:36
22       A.  I did.                                        01:26:37
23       Q.  Okay.  Now, when you accessed it on your     01:26:38
24   screen reader, was the information in the same order 01:26:41
                                                180
```

| | | |
|---|---|---|
| 1 | as the image in your report? | 01:26:46 |
| 2 | A. Yes. | 01:26:48 |
| 3 | Q. So that identified one, two, three, | 01:26:48 |
| 4 | four, five, six courses on the image that's in your | 01:26:52 |
| 5 | report, correct? | 01:26:57 |
| 6 | A. Correct. There were more on the page | 01:26:58 |
| 7 | than that, but yes. | 01:27:00 |
| 8 | Q. I'm talking about the report. | 01:27:01 |
| 9 | A. Okay. | 01:27:03 |
| 10 | Q. So you could access the information | 01:27:03 |
| 11 | identified in the image, correct? | 01:27:07 |
| 12 | A. Correct. | 01:27:09 |
| 13 | Q. And you could compare that information | 01:27:10 |
| 14 | to the courses identified on the same page, correct? | 01:27:12 |
| 15 | A. Not correct. | 01:27:15 |
| 16 | Q. How could you not compare it? | 01:27:17 |
| 17 | A. Because it's not arranged in such a way | 01:27:18 |
| 18 | that it can be compared. | 01:27:21 |
| 19 | Q. Well, does it have a class name? | 01:27:22 |
| 20 | A. Well, sir, it might be visually arranged | 01:27:24 |
| 21 | in a way that you can compare, but that's not my | 01:27:27 |
| 22 | entire point. | 01:27:29 |
| 23 | Q. I appreciate that. Did it have a class | 01:27:30 |
| 24 | name? | 01:27:32 |

181

| | | |
|---|---|---|
| 1 | A.  Yes, sir, it did. | 01:27:32 |
| 2 | Q.  So every class on that form which we see | 01:27:33 |
| 3 | as an image, you see as a different format, has a | 01:27:38 |
| 4 | class name, right? | 01:27:41 |
| 5 | A.  That is correct. | 01:27:43 |
| 6 | Q.  Is there anything that prevents you from | 01:27:43 |
| 7 | comparing those class names to each other in your | 01:27:45 |
| 8 | format? | 01:27:48 |
| 9 | A.  Yes, sir, there is. | 01:27:48 |
| 10 | Q.  What? | 01:27:49 |
| 11 | A.  The coding in the webpage and the table. | 01:27:50 |
| 12 | Q.  I'm not talking about a table, I'm | 01:27:52 |
| 13 | talking about class names. | 01:27:54 |
| 14 | MS. KREVOR-WEISBAUM:  Objection.  At | 01:27:56 |
| 15 | this point let's take a break, and I will put on the | 01:27:57 |
| 16 | record I think we have done enough on this and we'll | 01:27:59 |
| 17 | wait for trial for him to do it through a screen | 01:28:01 |
| 18 | reader software. | 01:28:04 |
| 19 | MR. CLEELAND:  Well -- | 01:28:04 |
| 20 | MS. KREVOR-WEISBAUM:  No, there is | 01:28:05 |
| 21 | nothing more that he can answer.  He has given you | 01:28:06 |
| 22 | asked and answered it now five times. | 01:28:09 |
| 23 | MR. CLEELAND:  No, he hasn't said asked | 01:28:10 |
| 24 | and answered but once, you continually said -- | 01:28:12 |

182

| | | |
|---|---|---|
| 1 | MS. KREVOR-WEISBAUM:  No, he has | 01:28:14 |
| 2 | answered your question at least five times. | 01:28:14 |
| 3 | THE WITNESS:  Well, you want to keep | 01:28:17 |
| 4 | asking me the question, we'll keep having the same | 01:28:19 |
| 5 | answer, that's fine with me. | 01:28:20 |
| 6 | By Mr. Cleeland: | 01:28:21 |
| 7 | Q.  Sure, I'll be happy to do it. | 01:28:21 |
| 8 | How is this information displayed to | 01:28:23 |
| 9 | you? | 01:28:25 |
| 10 | A.  That's a better question.  The | 01:28:25 |
| 11 | information is displayed in a series of individual | 01:28:30 |
| 12 | tables.  So while visually it appears to you to be a | 01:28:34 |
| 13 | single grid, from a screen reader user's perspective, | 01:28:38 |
| 14 | it is not. | 01:28:45 |
| 15 | Q.  And those individual tables, are they | 01:28:46 |
| 16 | displayed only one table at a time -- | 01:28:49 |
| 17 | A.  They are. | 01:28:50 |
| 18 | Q.  Excuse me. | 01:28:51 |
| 19 | -- on your screen, or more than one? | 01:28:52 |
| 20 | A.  They are displayed for the purposes of a | 01:28:53 |
| 21 | screen reader user one table at a time. | 01:28:55 |
| 22 | Q.  And can you get more than one table at a | 01:28:58 |
| 23 | time on your screen reader page? | 01:29:01 |
| 24 | A.  You cannot. | 01:29:03 |

183

Peter Bossley, 11/7/2017
Payan v. Los Angeles Community College District

| | | |
|---|---|---|
| 1 | Q.  What prevents you from doing that? | 01:29:04 |
| 2 | A.  Screen readers don't operate that way. | 01:29:05 |
| 3 | Q.  Are you state-of-the-art screen reader | 01:29:07 |
| 4 | on your computer? | 01:29:10 |
| 5 | A.  Yes. | 01:29:11 |
| 6 | Q.  And your state-of-the-art screen reader | 01:29:11 |
| 7 | can't do that? | 01:29:14 |
| 8 | A.  That is correct. | 01:29:15 |
| 9 | Q.  Okay.  Thanks.  If you'd like to take a | 01:29:16 |
| 10 | break, I'm happy to do it, but otherwise we can | 01:29:18 |
| 11 | continue. | 01:29:21 |
| 12 | A.  I'm fine. | 01:29:22 |
| 13 | Q.  Underneath that image you have something | 01:29:24 |
| 14 | called -- "Canvas" is the title.  What do you mean by | 01:29:26 |
| 15 | Canvas, C-a-n-v-a-s? | 01:29:29 |
| 16 | A.  Canvas is a learning management system | 01:29:31 |
| 17 | that was -- my understanding, that the college is now | 01:29:34 |
| 18 | switching to or in the process of switching to. | 01:29:39 |
| 19 | Q.  Okay.  You state, "Although the Canvas | 01:29:41 |
| 20 | Learning Management System itself is generally | 01:29:43 |
| 21 | accessible, the institution must take care to | 01:29:47 |
| 22 | implement it properly to fully ensure that the entire | 01:29:50 |
| 23 | experience for students is accessible." | 01:29:53 |
| 24 | Are you aware of any examples of use of | 01:29:57 |

184

| | | |
|---|---|---|
| 1 | campuses at LACC, or LACCD, where it is not fully | 01:30:01 |
| 2 | accessible to students? | 01:30:05 |
| 3 | A. No, sir, I'm not. | 01:30:10 |
| 4 | Q. They just have to be aware of that in | 01:30:11 |
| 5 | the future; is that correct? | 01:30:13 |
| 6 | A. It's a little more complicated than | 01:30:14 |
| 7 | that. | 01:30:16 |
| 8 | Q. Well, if you just say the institution | 01:30:18 |
| 9 | must take care to implement it properly, have they | 01:30:21 |
| 10 | implemented it properly? | 01:30:24 |
| 11 | A. I have no knowledge of that. | 01:30:25 |
| 12 | Q. Did you do any testing on that? | 01:30:28 |
| 13 | A. I did not. | 01:30:29 |
| 14 | Q. And it continues, "...to fully ensure | 01:30:31 |
| 15 | that the entire experience for students is | 01:30:32 |
| 16 | accessible." And you believe that's an ongoing | 01:30:36 |
| 17 | obligation? | 01:30:39 |
| 18 | A. I do. | 01:30:40 |
| 19 | Q. Do you feel that the school has | 01:30:40 |
| 20 | performed properly in its implementation of Canvas? | 01:30:42 |
| 21 | A. I have no opinion about their | 01:30:45 |
| 22 | implementation of Canvas. | 01:30:48 |
| 23 | Q. No opinion one way or the other? | 01:30:49 |
| 24 | A. I have no knowledge, therefore I have no | 01:30:51 |

185

Peter Bossley, 11/7/2017
Payan v. Los Angeles Community College District

| | | |
|---|---|---|
| 1 | opinion. | 01:30:54 |
| 2 | Q.  It continues, "Canvas supports a wide | 01:30:54 |
| 3 | variety of third party integrations through Learning | 01:30:56 |
| 4 | Tools Interoperability (LTI).  LTI is a standard | 01:30:59 |
| 5 | created by IMS Global Learning Consortium..."  Who is | 01:31:08 |
| 6 | that, IMS Learning Consortium? | 01:31:12 |
| 7 | A.  It's a consortium of public and private | 01:31:15 |
| 8 | interests that wanted to develop a way for learning | 01:31:17 |
| 9 | management systems and external third party tools to | 01:31:20 |
| 10 | more easily interoperate, and so they developed a | 01:31:25 |
| 11 | standard for kind of your -- basically allowing a | 01:31:29 |
| 12 | plug-in for campus. | 01:31:36 |
| 13 | Q.  And if it helps you, when the Court | 01:31:40 |
| 14 | Reporter asks you for something, she's not asking you | 01:31:43 |
| 15 | to explain it, she just wants to hear your verbatim, | 01:31:44 |
| 16 | if that's helps at all. | 01:31:48 |
| 17 | A.  Sure. | 01:31:49 |
| 18 | Q.  So LTI is a standard -- is that | 01:31:50 |
| 19 | generally accepted, limitedly accepted, broadly | 01:31:54 |
| 20 | accepted? | 01:32:00 |
| 21 | A.  It's a broadly accepted standard. | 01:32:00 |
| 22 | Q.  And then you state, "The accessibility | 01:32:03 |
| 23 | of any given LTI tool is not guaranteed..."  What do | 01:32:05 |
| 24 | you mean by that? | 01:32:08 |

186

1     A.   LTI is simply a standard that defines a          01:32:09

2   method for third party tools to integrate with an       01:32:12

3   existing learning management system.                    01:32:19

4        So any developer of any given LTI based            01:32:21

5   application must ensure its accessibility because --     01:32:23

6   since it's simply a plug-in, Canvas has no control       01:32:27

7   over that.                                               01:32:30

8     Q.   Okay.                                             01:32:31

9     A.   Does that answer the question?                    01:32:34

10     Q.   Yes.  Thank you.                                 01:32:35

11        You state, "Canvas allows faculty and             01:32:37

12   instructors to upload a variety of types of digital    01:32:40

13   documents, as well as allowing them to imbed audio     01:32:44

14   and video content in their courses."                   01:32:48

15        Do you know if any of the Plaintiffs              01:32:51

16   used any instructors who utilized Canvas?              01:32:54

17     A.   I'm not aware.                                   01:32:58

18     Q.   And that portion of the report                  01:33:02

19   continues, "As a result, institutions must implement   01:33:04

20   appropriate training for instructional staff such      01:33:07

21   that they understand their obligation to provide       01:33:10

22   accessible digital content and appropriate             01:33:13

23   accommodations..."                                      01:33:17

24        Does that mean that there are -- excuse           01:33:18

                                                             187

| | | |
|---|---|---|
| 1 | me -- there's more than one accommodation? | 01:33:22 |
| 2 | A.  Can you be more specific?  More than one | 01:33:27 |
| 3 | accommodation in what context? | 01:33:29 |
| 4 | Q.  In the phrase that to provide accessible | 01:33:30 |
| 5 | digital content and appropriate accommodations.  So | 01:33:34 |
| 6 | there's not one accommodation covers every | 01:33:38 |
| 7 | conceivable issue with respect to electronic and | 01:33:40 |
| 8 | screen readers, correct? | 01:33:44 |
| 9 | A.  No. | 01:33:45 |
| 10 | Q.  So we go back to that concept we | 01:33:45 |
| 11 | discussed earlier, if we try to make the application | 01:33:48 |
| 12 | most effective for the individual, correct? | 01:33:51 |
| 13 | A.  That is correct. | 01:33:53 |
| 14 | Q.  Who determines the appropriate | 01:33:56 |
| 15 | accommodations as described in that sentence? | 01:33:58 |
| 16 | A.  It depends on the institution. | 01:34:00 |
| 17 | Q.  Well, who does it at your institution? | 01:34:03 |
| 18 | A.  It's a collaboration between our | 01:34:08 |
| 19 | Disability Services Office, and if the issues aren't | 01:34:11 |
| 20 | resolved at that level, rises to the level of our ADA | 01:34:15 |
| 21 | coordinator. | 01:34:18 |
| 22 | Q.  Who does it at L.A. City College? | 01:34:20 |
| 23 | A.  I don't have any information about that. | 01:34:26 |
| 24 | Q.  Who does it at L.A. City -- excuse me, | 01:34:28 |

188

Peter Bossley, 11/7/2017
Payan v. Los Angeles Community College District

| | | |
|---|---|---|
| 1 | L.A. Community College District? | 01:34:30 |
| 2 | A.  I don't know. | 01:34:32 |
| 3 | Q.  Then you continue in your report at the | 01:34:33 |
| 4 | bottom of page 8, "LACCD Website".  I suppose this is | 01:34:36 |
| 5 | a category, you're not talking about that website. | 01:34:41 |
| 6 | "The website in general lacks a robust heading and | 01:34:44 |
| 7 | landmark structure."  What do you mean robust heading | 01:34:48 |
| 8 | and landmark structure? | 01:34:52 |
| 9 | A.  What I mean by that is the landmark | 01:34:54 |
| 10 | structure encapsulates all the contents on the page, | 01:34:56 |
| 11 | and that there are sufficient headings for screen | 01:35:00 |
| 12 | reader users to understand the contents outlined on | 01:35:02 |
| 13 | the page. | 01:35:05 |
| 14 | Q.  What do you mean by robust? | 01:35:06 |
| 15 | A.  Robust?  What I mean by robust is that | 01:35:09 |
| 16 | it conveys rich information to users about where they | 01:35:12 |
| 17 | are located in the contents of the page. | 01:35:19 |
| 18 | Q.  And you state, "in general it lacks". | 01:35:20 |
| 19 | Does that mean in some areas it does have a robust | 01:35:22 |
| 20 | heading and landmark structure? | 01:35:25 |
| 21 | A.  I didn't examine every page of the site, | 01:35:27 |
| 22 | so that's why I said in general. | 01:35:30 |
| 23 | Q.  How many pages did you examine? | 01:35:31 |
| 24 | A.  Rough guess would be half a dozen. | 01:35:52 |

189

Peter Bossley, 11/7/2017
Payan v. Los Angeles Community College District

| | | |
|---|---|---|
| 1 | Q.  How many pages are there of the website? | 01:35:55 |
| 2 | A.  I have no way of knowing that. | 01:35:57 |
| 3 | Q.  Did you try to find out? | 01:35:59 |
| 4 | A.  Of course I didn't try to find out. | 01:36:03 |
| 5 | Q.  Okay.  Well, how many web -- how many | 01:36:05 |
| 6 | pages are on The Ohio State University website? | 01:36:07 |
| 7 | A.  I have no way of knowing that, either. | 01:36:10 |
| 8 | Q.  More than a million? | 01:36:14 |
| 9 | A.  I think it's likely. | 01:36:15 |
| 10 | Q.  Okay.  Do you think it's likely that the | 01:36:17 |
| 11 | L.A. City College website -- or excuse me, the L.A. | 01:36:20 |
| 12 | Community College website has more than a million | 01:36:23 |
| 13 | pages? | 01:36:26 |
| 14 | A.  I don't know. | 01:36:26 |
| 15 | Q.  Okay.  I'm trying to figure out how you | 01:36:28 |
| 16 | determined the pool for testing.  You said you looked | 01:36:31 |
| 17 | at how many pages, seven? | 01:36:37 |
| 18 | A.  Around that; maybe a little more. | 01:36:39 |
| 19 | Q.  Why seven pages instead of one or | 01:36:40 |
| 20 | 300,000? | 01:36:43 |
| 21 | A.  When we decide to look at a website we | 01:36:44 |
| 22 | typically look at key interfaces.  So the homepage is | 01:36:50 |
| 23 | one interface that we always look at. | 01:36:53 |
| 24 | And I guess I should more accurately say | 01:36:57 |

190

1    I always look at the homepage.  I also typically will          01:37:01

2    look at disabilities, like a disability-specific page          01:37:05

3    on any site that I'm looking for in order to kind of           01:37:10

4    gauge the general level of knowledge of accessibility          01:37:13

5    of on organization.                                            01:37:17

6         Q.  Well, with all these industry standards               01:37:20

7    we have talked about, LTI and WCAG, do they have a             01:37:22

8    protocol for selection in testing?                             01:37:29

9         A.  I'm not deeply familiar with LTI, so I                01:37:31

10   can't say.  WCAG does not have a specific testing              01:37:35

11   protocol.                                                      01:37:38

12        Q.  It continues in that paragraph, "Where                01:37:40

13   headings do exist, they are usually not sufficient to          01:37:43

14   provide a screen reader user with a robust navigation          01:37:47

15   aid..."  Back to the word robust.  Same definition as          01:37:52

16   above?                                                         01:37:55

17        A.  Yes.                                                  01:37:55

18        Q.  And "usually not sufficient", does that               01:37:58

19   mean some of them are sufficient --                            01:37:59

20        A.  Yes.                                                  01:38:01

21        Q.  -- and some of them aren't sufficient?               01:38:01

22        Did you do a comparison between the                       01:38:04

23   approximate seven pages you looked at to determine             01:38:06

24   the numeration of each side of that?                           01:38:08

191

Peter Bossley, 11/7/2017
Payan v. Los Angeles Community College District

| 1 | A. I did not. | 01:38:11 |
| 2 | Q. And it continues that because of this -- | 01:38:16 |
| 3 | "In addition, headings sometimes do not logically --" | 01:38:19 |
| 4 | I apologize, I'll try it again. | 01:38:24 |
| 5 | "In addition, headings sometimes do not | 01:38:26 |
| 6 | descend logically, leading to additional confusion as | 01:38:29 |
| 7 | to the organization and relationship of content | 01:38:34 |
| 8 | areas." | 01:38:37 |
| 9 | This headings descending logically, is | 01:38:38 |
| 10 | that applicable to a sighted user? | 01:38:43 |
| 11 | A. No. | 01:38:47 |
| 12 | Q. Is there some reason that the headings | 01:38:48 |
| 13 | do not descend logically relates to one group but not | 01:38:52 |
| 14 | another? | 01:38:56 |
| 15 | A. Users who use -- who don't rely on | 01:38:56 |
| 16 | assistive technology don't use headings to understand | 01:39:05 |
| 17 | the hierarchical outline of a webpage. | 01:39:08 |
| 18 | Q. We better get a description on the | 01:39:11 |
| 19 | record what you mean by headings. | 01:39:13 |
| 20 | A. So headings is an HTML programatic term | 01:39:15 |
| 21 | to represent a series of tags in HTML. | 01:39:21 |
| 22 | Q. So you're using it as a term of art in | 01:39:24 |
| 23 | this report? | 01:39:26 |
| 24 | A. Yes, term -- can you explain to me what | 01:39:27 |

192

| | | |
|---|---|---|
| 1 | terms of art means? | 01:39:30 |
| 2 | Q.  Term of art is many times, in | 01:39:31 |
| 3 | engineering or in medicine, rather than giving a long | 01:39:32 |
| 4 | explanation, there's a phrase that's used such as a | 01:39:35 |
| 5 | robust heading, or -- I'm trying to pull one out of | 01:39:38 |
| 6 | here and I can't find it right now. | 01:39:45 |
| 7 | It's a shortcut that you utilize, and | 01:39:48 |
| 8 | it's basically understood by definition within your | 01:39:50 |
| 9 | industry. | 01:39:52 |
| 10 | A.  That is correct. | 01:39:52 |
| 11 | Q.  On page 9 there's a bullet point that -- | 01:39:58 |
| 12 | and these bullet points on all of these pages, they | 01:40:02 |
| 13 | are generated by you or your office, correct? | 01:40:05 |
| 14 | A.  That is correct. | 01:40:07 |
| 15 | Q.  It talks about throughout the site, and | 01:40:08 |
| 16 | this is the -- how many pages are we talking about? | 01:40:11 |
| 17 | A.  We -- guessing, half a dozen. | 01:40:17 |
| 18 | Q.  Okay.  So when you talk about the site, | 01:40:21 |
| 19 | that analysis is based upon looking at half a dozen | 01:40:23 |
| 20 | or seven pages, correct? | 01:40:26 |
| 21 | A.  That is correct. | 01:40:28 |
| 22 | Q.  "Throughout the site, logical semantic | 01:40:29 |
| 23 | structuring of content is not used..."  It's not used | 01:40:32 |
| 24 | at all? | 01:40:36 |

193

Peter Bossley, 11/7/2017
Payan v. Los Angeles Community College District

1      A.  Sorry, can you repeat?                      01:40:38

2      Q.  Sure.  "Throughout the site, logical        01:40:42

3  semantic structuring of content is not used..."  The   01:40:43

4  question is, is it not used at all?                01:40:47

5      A.  In the pages that I identified in the       01:40:49

6  vast majority of times, it was not.  Some places it   01:40:54

7  was.                                               01:40:57

8      Q.  So the vast majority of six or seven        01:40:57

9  pages, right?                                      01:41:00

10      A.  Correct.                                   01:41:01

11      Q.  "Throughout the site, logical semantic     01:41:01

12  structuring of contents is not used to allow screen   01:41:05

13  reader users to have information about content     01:41:08

14  relationships..."  What do you mean by the phrase   01:41:11

15  content relationships?                             01:41:13

16      A.  So we -- we talk about it here --          01:41:15

17  actually when we get a little further down here,   01:41:18

18  we're talking about a series of news items that are   01:41:21

19  displayed on the homepage, and these news items are   01:41:24

20  not arranged in a fashion programatically that a   01:41:29

21  screen reader understands as one grouping.         01:41:34

22          So a user might hit those news items and   01:41:36

23  be like I'm done with the news items, when in fact   01:41:41

24  they aren't, because the news items haven't been   01:41:44

                                                    194

| | | |
|---|---|---|
| 1 | grouped appropriately. | 01:41:47 |
| 2 | Q.  So it's the potential for confusion, | 01:41:48 |
| 3 | correct? | 01:41:50 |
| 4 | A.  That is correct. | 01:41:51 |
| 5 | Q.  On the image, which I assume is a screen | 01:41:52 |
| 6 | shot, there's text which looks to be done by you or | 01:41:54 |
| 7 | your office, because it's the same font used | 01:41:59 |
| 8 | throughout. | 01:42:01 |
| 9 | It reads, "All of these news items are | 01:42:02 |
| 10 | their own lists, leading to potentially confusing | 01:42:06 |
| 11 | navigation."  That's by you or your company, correct? | 01:42:09 |
| 12 | A.  That is correct. | 01:42:12 |
| 13 | Q.  Then at a bullet point, which is your | 01:42:12 |
| 14 | language, "Some links on the homepage lack any --" | 01:42:14 |
| 15 | try it gain. | 01:42:19 |
| 16 | "Some links on the homepage lack any | 01:42:20 |
| 17 | descriptive alternative text..."  Does that mean that | 01:42:23 |
| 18 | some links did? | 01:42:25 |
| 19 | A.  Yes. | 01:42:26 |
| 20 | Q.  What was the percentage between pages | 01:42:27 |
| 21 | that did and did not have links that had descriptive | 01:42:31 |
| 22 | alternative texts? | 01:42:36 |
| 23 | A.  I didn't measure that directly. | 01:42:37 |
| 24 | Q.  Now, on some of these pages, the six or | 01:42:43 |

195

| | | |
|---|---|---|
| 1 | seven that you looked at, were there links that would | 01:42:45 |
| 2 | not have descriptive alternative text anyway? | 01:42:49 |
| 3 | A.  I'm not -- I'm not understanding -- | 01:42:53 |
| 4 | Q.  Does every link on every website have | 01:42:59 |
| 5 | somewhere in its programming or code a descriptive | 01:43:02 |
| 6 | text? | 01:43:08 |
| 7 | A.  Yes. | 01:43:09 |
| 8 | Q.  Okay.  So you're worried about | 01:43:10 |
| 9 | descriptive alternative text; is that right? | 01:43:13 |
| 10 | A.  That is correct.  That's another term of | 01:43:16 |
| 11 | art, speaking about graphical links. | 01:43:17 |
| 12 | Q.  And we just saved lots of time.  I | 01:43:22 |
| 13 | appreciate that. | 01:43:23 |
| 14 | Underneath that paragraph there is | 01:43:25 |
| 15 | another, it looks like a screen shot, and it makes -- | 01:43:26 |
| 16 | I was going to say it makes reference to, but that | 01:43:34 |
| 17 | would be confusing, but it's entitled "References", | 01:43:37 |
| 18 | so I didn't want a double use on that word.  And it's | 01:43:41 |
| 19 | entitled, "District Citizens Oversight Committee | 01:43:44 |
| 20 | Annual Report." | 01:43:49 |
| 21 | That's what a sighted person sees, | 01:43:52 |
| 22 | right? | 01:43:55 |
| 23 | A.  That is correct. | 01:43:55 |
| 24 | Q.  Now, you state, "This link does not have | 01:43:56 |

<div align="center">196</div>

| | | |
|---|---|---|
| 1 | a descriptive label."  Doesn't the link have the | 01:43:59 |
| 2 | title of the document in it? | 01:44:04 |
| 3 | A.  It does not. | 01:44:06 |
| 4 | Q.  Does it describe it in any fashion? | 01:44:07 |
| 5 | A.  It does not. | 01:44:09 |
| 6 | Q.  Do you get a recitation or | 01:44:12 |
| 7 | representation of any image in your conversion? | 01:44:15 |
| 8 | A.  You do not. | 01:44:18 |
| 9 | Q.  Okay.  Again, you utilized all of your | 01:44:20 |
| 10 | editorial comments in the assertion on the webpage | 01:44:34 |
| 11 | screen shots in the same fonts, correct? | 01:44:36 |
| 12 | A.  Yes. | 01:44:38 |
| 13 | Q.  On page 13, the bullet point reads, "The | 01:44:47 |
| 14 | tab panel that presents a single --" | 01:44:52 |
| 15 | MS. KREVOR-WEISBAUM:  Hold on a minute. | 01:44:55 |
| 16 | Get to 13. | 01:44:56 |
| 17 | MR. CLEELAND:  Sure. | 01:44:57 |
| 18 | THE WITNESS:  Can you tell me the | 01:45:01 |
| 19 | heading it's under? | 01:45:02 |
| 20 | By Mr. Cleeland: | 01:45:03 |
| 21 | Q.  The first bullet point under the top of | 01:45:03 |
| 22 | the page reads, "The tab panel that presents a single | 01:45:06 |
| 23 | panel of content at a time..." | 01:45:09 |
| 24 | MS. KREVOR-WEISBAUM:  In answer to your | 01:45:20 |

197

| | | |
|---|---|---|
| 1 | question, Mr. Bossley, it's under, "My Courses from | 01:45:21 |
| 2 | Pearson," and that is on the one, two -- looks like | 01:45:25 |
| 3 | the third bullet under that he was reading from. | 01:45:30 |
| 4 | THE WITNESS:  I got it. | 01:45:38 |
| 5 | By Mr. Cleeland: | 01:45:39 |
| 6 | Q.  Your electronic version that you're | 01:45:41 |
| 7 | accessing on your computer, is it paginated? | 01:45:43 |
| 8 | A.  It's not. | 01:45:46 |
| 9 | Q.  Is there some reason it's not paginated? | 01:45:47 |
| 10 | A.  No. | 01:45:52 |
| 11 | Q.  Could you have paginated it? | 01:45:54 |
| 12 | A.  I could have. | 01:45:56 |
| 13 | Q.  Is there some reason you chose not to? | 01:46:05 |
| 14 | A.  I didn't even consider it. | 01:46:08 |
| 15 | Q.  Okay.  On page 13 there appears to be a | 01:46:09 |
| 16 | screen shot, and it reads, "Active", "Inactive", | 01:46:18 |
| 17 | "Announcements", with your text added, "There is no | 01:46:22 |
| 18 | notification provided to screen reader users when any | 01:46:25 |
| 19 | of these tab items are selected." | 01:46:32 |
| 20 | The arrows that are there from the text | 01:46:34 |
| 21 | to the left were added by you or your office, | 01:46:35 |
| 22 | correct? | 01:46:38 |
| 23 | A.  Correct. | 01:46:38 |
| 24 | Q.  There's a screen shot below that, two | 01:46:39 |

198

| | | |
|---|---|---|
| 1 | bullets points, and the dark bullet point is just a | 01:46:43 |
| 2 | plain heading and an empty bullet point, meaning a | 01:46:47 |
| 3 | circle with no coloration inside, is a subpart of the | 01:46:50 |
| 4 | above bullet point; is that correct? | 01:46:54 |
| 5 | A.  Correct. | 01:46:56 |
| 6 | Q.  And it reads, "This control lacks a | 01:46:56 |
| 7 | descriptive label as to its purpose," and then it | 01:47:00 |
| 8 | points to something.  Again, that arrow was added by | 01:47:02 |
| 9 | you or your company, correct? | 01:47:05 |
| 10 | A.  Correct. | 01:47:07 |
| 11 | Q.  Same on page 14, there are two screen | 01:47:08 |
| 12 | shots, text, and the same fonts, and the arrow from | 01:47:13 |
| 13 | each of them to the left.  Those arrows were added by | 01:47:19 |
| 14 | you or someone from your company, correct? | 01:47:20 |
| 15 | A.  Correct. | 01:47:22 |
| 16 | Q.  And then we come to a busy page, which | 01:47:23 |
| 17 | is page 15, reference to My Math Lab.  "Course Home". | 01:47:25 |
| 18 | A.  Okay. | 01:47:35 |
| 19 | Q.  Do you know the source of that document? | 01:47:35 |
| 20 | A.  I don't understand what you mean. | 01:47:38 |
| 21 | Q.  Well, the course on page 15 for My Math | 01:47:41 |
| 22 | Lab, where did you get it? | 01:47:45 |
| 23 | A.  It was provided through discovery. | 01:47:46 |
| 24 | Q.  Was it from the LACC website?  Was it | 01:47:48 |

199

| | | |
|---|---|---|
| 1 | from the Pearson Company website?  Where did it come | 01:47:51 |
| 2 | from? | 01:47:55 |
| 3 | MS. KREVOR-WEISBAUM:  He's on page -- | 01:48:01 |
| 4 | you said 15, sir, didn't you? | 01:48:04 |
| 5 | MR. CLEELAND:  I have page 15. | 01:48:06 |
| 6 | THE WITNESS:  Where it says My Math Lab | 01:48:08 |
| 7 | homepage? | 01:48:10 |
| 8 | By Mr. Cleeland: | 01:48:10 |
| 9 | Q.  My Math Lab * Course Home.  That's what | 01:48:11 |
| 10 | I've got at the top of the page. | 01:48:15 |
| 11 | A.  I've got it. | 01:48:18 |
| 12 | Q.  Do you know if this is an LACC website | 01:48:21 |
| 13 | page, an LACCD website page, or some other source? | 01:48:23 |
| 14 | A.  Everything under this section, the My | 01:48:28 |
| 15 | Math Lab area, appears in webpage. | 01:48:33 |
| 16 | Q.  Thank you.  Now, this talks about "2017 | 01:48:35 |
| 17 | Fall - Math 125 mml."  Do you know what that means? | 01:48:41 |
| 18 | A.  I do not. | 01:48:49 |
| 19 | Q.  Did Ms. Mason take any math courses, to | 01:48:52 |
| 20 | your knowledge? | 01:48:56 |
| 21 | A.  I don't recall. | 01:48:56 |
| 22 | Q.  Did Mr. Payan take any math courses, to | 01:48:56 |
| 23 | your knowledge? | 01:49:00 |
| 24 | A.  I believe that he did. | 01:49:00 |

200

Peter Bossley, 11/7/2017
Payan v. Los Angeles Community College District

```
 1          Q.  Did Mr. Payan take any math courses in        01:49:01
 2   the 2017 fall semester?                                  01:49:06
 3          A.  I don't believe so.  I don't recall,          01:49:08
 4   though.                                                  01:49:11
 5          Q.  Do we know why we're using this page in       01:49:11
 6   your report?                                             01:49:14
 7          A.  It was what was provided to us via our        01:49:15
 8   discovery request.                                       01:49:19
 9          Q.  "Our discovery request."  You're hired        01:49:20
10   by the law firm?                                         01:49:22
11          A.  Okay.  The law firm's discovery request.      01:49:23
12          Q.  We get sensitive about that sometimes.        01:49:26
13   So this was given to you by the law firm; is that        01:49:30
14   correct?                                                 01:49:32
15          A.  That is correct.                              01:49:32
16          Q.  How about all these other pages in here,      01:49:33
17   what were the sources for those pages?  You said six     01:49:37
18   or seven were from the LACCD website that you            01:49:40
19   accessed?                                                01:49:43
20          A.  Right.  So everything under the LACCD         01:49:44
21   website heading there is -- was through the website.     01:49:47
22   The Canvas Solutions, PeopleSoft Campus Solution, all    01:49:51
23   those were via the Plaintiffs' login credentials.       01:49:58
24   This My Math Lab section, and the Etude section, were    01:50:02
```

201

| | | |
|---|---|---|
| 1 | provided via discovery. | 01:50:07 |
| 2 | Q. So you don't know the source of those | 01:50:09 |
| 3 | last two? | 01:50:12 |
| 4 | A. What last two? | 01:50:14 |
| 5 | Q. In other words, do they come from the | 01:50:15 |
| 6 | company's website, on educational institution's | 01:50:17 |
| 7 | website? | 01:50:21 |
| 8 | A. The My Math Lab and Etudes? | 01:50:21 |
| 9 | Q. Right. | 01:50:25 |
| 10 | A. They came from the company's website. | 01:50:26 |
| 11 | Q. And again, you use the same font when | 01:50:28 |
| 12 | you make editorial comment on the My Math Lab website | 01:50:30 |
| 13 | page, correct? | 01:50:36 |
| 14 | A. Correct. | 01:50:37 |
| 15 | Q. And the arrows that are on there, unless | 01:50:38 |
| 16 | I find one that looks like it was there originally on | 01:50:41 |
| 17 | the website, that's why I'm going through all the | 01:50:44 |
| 18 | arrows individually, the arrows identified on page 15 | 01:50:48 |
| 19 | were added by you or someone at your company; is that | 01:50:51 |
| 20 | correct? | 01:50:54 |
| 21 | A. That is correct. | 01:50:54 |
| 22 | Q. On page 19 of your report, the top of | 01:51:12 |
| 23 | the page reads, "Homework:  HW 0:  Topics from first | 01:51:14 |
| 24 | day handout (Exam 1)."  I'll let you find that. | 01:51:20 |

202

| | | |
|---|---|---|
| 1 | A.  Are we still on My Math Lab? | 01:51:35 |
| 2 | Q.  I believe that it is.  We went through a | 01:51:38 |
| 3 | lot of pages without any questions here. | 01:51:43 |
| 4 | MS. KREVOR-WEISBAUM:  Yes, it's under My | 01:51:49 |
| 5 | Math Labs still. | 01:51:51 |
| 6 | THE WITNESS:  So My Math Lab | 01:51:53 |
| 7 | assignments. | 01:51:55 |
| 8 | By Mr. Cleeland: | 01:51:55 |
| 9 | Q.  Well, it says Homework:  HW 0: Topics | 01:51:56 |
| 10 | from first day... | 01:52:01 |
| 11 | MS. KREVOR-WEISBAUM:  If I could | 01:52:02 |
| 12 | suggest, sir, give him -- since that's an image, give | 01:52:04 |
| 13 | him the description on the first bullet after it, and | 01:52:07 |
| 14 | then he can get back to it. | 01:52:10 |
| 15 | MR. CLEELAND:  The bullet immediately | 01:52:12 |
| 16 | below is a subheading.  It reads, "The text | 01:52:14 |
| 17 | descriptions that represent complex graphs are not | 01:52:16 |
| 18 | sufficient..." | 01:52:24 |
| 19 | MS. KREVOR-WEISBAUM:  So he's referring | 01:52:25 |
| 20 | to right above that. | 01:52:25 |
| 21 | THE WITNESS:  Go ahead. | 01:52:26 |
| 22 | By Mr. Cleeland: | 01:52:26 |
| 23 | Q.  And I'll try to do that in the future. | 01:52:29 |
| 24 | That was helpful. | 01:52:30 |

203

1          Okay.  This information, I believe, is                01:52:33

2   from the publisher's website, correct?                       01:52:34

3       A.  That is correct.                                     01:52:36

4       Q.  Information meaning the screen shots,                01:52:38

5   the text outside of the screen shot is you or your           01:52:42

6   office, correct?                                             01:52:46

7       A.  That is correct.                                     01:52:46

8       Q.  Now, it states your editorial comment,              01:52:48

9   exam 1 handout, "The text input box -- boxes lack            01:52:53

10  descriptive labels and read as 'edit' (edit what?)           01:52:58

11         Now, is this actually an exam to be                   01:53:06

12  given, or is this an example of an exam, or something        01:53:09

13  else?                                                        01:53:13

14      A.  I don't know.                                        01:53:13

15      Q.  Okay.  Did Mr. Payan have assistance for             01:53:16

16  testing when he was taking these math courses?               01:53:20

17      A.  I don't have direct information about                01:53:24

18  that.                                                        01:53:29

19      Q.  Okay.  Would that change any information             01:53:29

20  that you added to this page if you knew that he had a        01:53:34

21  course reader and scrivener?                                 01:53:38

22      A.  No, it would not.                                    01:53:41

23      Q.  Well, it says as an example, "The text               01:53:42

24  descriptions that represent complex graphs are not           01:53:45

                                               204

Peter Bossley, 11/7/2017
Payan v. Los Angeles Community College District

| | | |
|---|---|---|
| 1 | sufficient for students to efficiently understand the | 01:53:49 |
| 2 | layout of the graph." | 01:53:53 |
| 3 | If you have a reader, the reader is | 01:53:54 |
| 4 | giving you the opportunity to sufficiently lay out -- | 01:53:58 |
| 5 | sufficiently describe the layout of the graph, | 01:54:01 |
| 6 | correct? | 01:54:02 |
| 7 | A.  If you have a reader for testing, that | 01:54:03 |
| 8 | is correct. | 01:54:07 |
| 9 | Q.  Okay.  So you don't know whether this is | 01:54:07 |
| 10 | the testing material that was provided to a | 01:54:09 |
| 11 | nonsighted student or not, correct? | 01:54:12 |
| 12 | A.  I don't know that.  I don't have direct | 01:54:14 |
| 13 | information about that. | 01:54:17 |
| 14 | Q.  Okay.  And if this is just an example of | 01:54:18 |
| 15 | the materials provided by the company, not accessible | 01:54:23 |
| 16 | from the school's website, and a nonsighted student | 01:54:26 |
| 17 | was given a reader and a scrivener, that comment | 01:54:30 |
| 18 | about description of graphs would not be pertinent to | 01:54:33 |
| 19 | this matter, would it? | 01:54:37 |
| 20 | A.  I don't agree. | 01:54:38 |
| 21 | Q.  Why? | 01:54:39 |
| 22 | A.  This same interface is used for homework | 01:54:39 |
| 23 | assignments. | 01:54:43 |
| 24 | Q.  But it says "exam". | 01:54:43 |

205

| | | |
|---|---|---|
| 1 | A.  Correct.  But this interface, this | 01:54:47 |
| 2 | similar presentation of problems and solutions, is | 01:54:50 |
| 3 | also used in the homework assignments. | 01:54:54 |
| 4 | Q.  How do you know that? | 01:54:57 |
| 5 | A.  Because this is not the first time I've | 01:54:59 |
| 6 | seen this software. | 01:55:01 |
| 7 | Q.  Well, I asked you if you knew the source | 01:55:02 |
| 8 | of this information and you said it was from the My | 01:55:05 |
| 9 | Math Labs publisher's website. | 01:55:08 |
| 10 | A.  That is correct. | 01:55:10 |
| 11 | Q.  You didn't look at the My Math Labs | 01:55:10 |
| 12 | website for the city college, did you? | 01:55:13 |
| 13 | A.  This My Math Lab site was provided by | 01:55:16 |
| 14 | the college. | 01:55:22 |
| 15 | Q.  Listen to my question again.  You think | 01:55:23 |
| 16 | this is a source from the My Math Labs publisher, | 01:55:26 |
| 17 | correct? | 01:55:31 |
| 18 | A.  That is correct. | 01:55:31 |
| 19 | Q.  Do you know if this was posted on the | 01:55:32 |
| 20 | L.A. City College website? | 01:55:34 |
| 21 | A.  I don't know. | 01:55:36 |
| 22 | Q.  Okay.  On page 22 we now go into text. | 01:55:36 |
| 23 | Looks like it's the culmination of your report.  It | 01:55:48 |
| 24 | begins, "How higher education institutions can | 01:55:54 |

<div align="center">206</div>

Peter Bossley, 11/7/2017
Payan v. Los Angeles Community College District

| | | |
|---|---|---|
| 1 | meet..." | 01:55:58 |
| 2 | A.  I'm with you. | 01:55:59 |
| 3 | Q.  Okay.  It says, "How higher education | 01:56:00 |
| 4 | institutions can meet their obligations to provide | 01:56:04 |
| 5 | accessibility in online and digital content."  That's | 01:56:07 |
| 6 | a heading for information you're about to provide, | 01:56:11 |
| 7 | correct? | 01:56:14 |
| 8 | A.  That is correct. | 01:56:14 |
| 9 | Q.  It states, referring to the Dear | 01:56:15 |
| 10 | Colleague Letter, a quote, "Requiring use of an | 01:56:20 |
| 11 | emerging technology in a classroom environment when | 01:56:23 |
| 12 | the technology is inaccessible to an entire | 01:56:26 |
| 13 | population of individuals with disabilities - | 01:56:29 |
| 14 | individuals with visual disabilities - is | 01:56:33 |
| 15 | discrimination prohibited by the Americans With | 01:56:36 |
| 16 | Disabilities Act..."  You're familiar with that | 01:56:40 |
| 17 | language, correct? | 01:56:41 |
| 18 | A.  I am. | 01:56:42 |
| 19 | Q.  Now, the language that says emerging | 01:56:42 |
| 20 | technology in a classroom environment when the | 01:56:51 |
| 21 | technology is inaccessible to an entire population of | 01:56:55 |
| 22 | individuals with disabilities, does that mean | 01:56:57 |
| 23 | everybody within that category? | 01:57:00 |
| 24 | A.  I assume that is -- I assume that means | 01:57:01 |

207

| | | |
|---|---|---|
| 1 | what it says; an entire population of students with | 01:57:12 |
| 2 | disabilities, blind students. | 01:57:15 |
| 3 |     Q.  All blind students, correct? | 01:57:17 |
| 4 |     A.  Correct. | 01:57:23 |
| 5 |     Q.  And there is then a paragraph below that | 01:57:24 |
| 6 | which is not blocked, I believe it's your language, | 01:57:30 |
| 7 | but I want to make sure. | 01:57:34 |
| 8 |     "Although this letter was in response in | 01:57:35 |
| 9 | particular to the use of an inaccessible electronic | 01:57:38 |
| 10 | book reader, it is clear this stance applies to the | 01:57:43 |
| 11 | use of educational technology as a whole." | 01:57:47 |
| 12 |     A.  That was our language -- my words. | 01:57:50 |
| 13 |     Q.  Is that taken from any other source? | 01:57:52 |
| 14 |     A.  It is not. | 01:57:55 |
| 15 |     Q.  Then there's a reference to the letter | 01:57:57 |
| 16 | again.  And below that nonblocked, it starts, "In | 01:58:01 |
| 17 | response to this letter, and in compliance with ADA | 01:58:06 |
| 18 | Title II..."  Again, is this your language? | 01:58:10 |
| 19 |     A.  It is. | 01:58:13 |
| 20 |     Q.  "In response to this letter, and in | 01:58:15 |
| 21 | compliance with ADA Title II and Section 504, | 01:58:17 |
| 22 | colleges and universities should adopt policies | 01:58:21 |
| 23 | requiring that technology, including that used in the | 01:58:25 |
| 24 | classroom, must either be accessible, or an equally | 01:58:29 |

208

Peter Bossley, 11/7/2017
Payan v. Los Angeles Community College District

| | | |
|---|---|---|
| 1 | effective alternative must be provided to students | 01:58:34 |
| 2 | with disabilities and they must receive equal | 01:58:37 |
| 3 | treatment as their nondisabled peers in the use of | 01:58:40 |
| 4 | that alternative."  Did L.A. City College do that? | 01:58:45 |
| 5 | A.  I don't believe so. | 01:58:54 |
| 6 | Q.  Did LACCD do that? | 01:58:55 |
| 7 | A.  I don't believe so. | 01:58:57 |
| 8 | Q.  Okay.  It states in the section, and in | 01:58:58 |
| 9 | your own sentence, colleges and universities should | 01:59:03 |
| 10 | adopt policies requiring that technology be | 01:59:06 |
| 11 | accessible.  Doesn't LACC have a policy that the | 01:59:10 |
| 12 | technology be accessible? | 01:59:15 |
| 13 | A.  They do. | 01:59:16 |
| 14 | Q.  Doesn't LACCD have a policy that the | 01:59:18 |
| 15 | programs be accessible? | 01:59:22 |
| 16 | A.  They do. | 01:59:23 |
| 17 | Q.  You state later, "In addition to written | 01:59:30 |
| 18 | policy requirements..."  So you draw the distinction | 01:59:32 |
| 19 | between policies and implementation, correct? | 01:59:35 |
| 20 | A.  I do. | 01:59:38 |
| 21 | Q.  "Active compliance programs, monitoring, | 01:59:41 |
| 22 | and oversight procedures should be implemented to | 01:59:43 |
| 23 | ensure the policy is adhered to."  Should be | 01:59:48 |
| 24 | implemented, whose language is that? | 01:59:51 |

209

| | | |
|---|---|---|
| 1 | A.  That's my language. | 01:59:52 |
| 2 | Q.  Okay.  Is that mandatory? | 01:59:53 |
| 3 | A.  It's not mandatory. | 01:59:55 |
| 4 | Q.  Thank you. | 01:59:59 |
| 5 | Then we have a bullet point below that, | 02:00:01 |
| 6 | and it talks about Web/Digital Accessibility | 02:00:03 |
| 7 | Coordinator.  And you're identifying who should be | 02:00:07 |
| 8 | involved in these programs; is that correct? | 02:00:11 |
| 9 | A.  That is correct. | 02:00:12 |
| 10 | Q.  Is that based upon any model that you're | 02:00:13 |
| 11 | aware of or comfortable with? | 02:00:15 |
| 12 | A.  It's based upon the model that is | 02:00:17 |
| 13 | typically adopted by colleges and universities. | 02:00:20 |
| 14 | Q.  Is it the model at The Ohio State | 02:00:24 |
| 15 | University? | 02:00:28 |
| 16 | A.  It is. | 02:00:28 |
| 17 | Q.  "A staff member should be delegated the | 02:00:29 |
| 18 | responsibility and authority for ensuring that the | 02:00:33 |
| 19 | college or university complies with their obligations | 02:00:37 |
| 20 | for technology accessibility."  Who is that person at | 02:00:41 |
| 21 | The Ohio State University? | 02:00:45 |
| 22 | A.  That would be my boss, the ADA | 02:00:46 |
| 23 | coordinator, and Section 504 compliance officer. | 02:00:52 |
| 24 | Q.  Whose name is? | 02:00:55 |

210

Peter Bossley, 11/7/2017
Payan v. Los Angeles Community College District

```
 1        A.  L. Scott Lissner.                       02:00:56

 2        Q.  "This person should be granted          02:00:58

 3   sufficient authority and resources to implement a 02:01:04

 4   robust, proactive compliance program."           02:01:06

 5            Is L. Scott given sufficient authority   02:01:11

 6   to implement a robust, proactive compliance program? 02:01:14

 7        A.  I believe he is.                         02:01:20

 8        Q.  Is L. Scott given sufficient resources  02:01:28

 9   to implement a robust, proactive compliance program? 02:01:34

10        A.  No.                                      02:01:38

11        Q.  So The Ohio State University doesn't    02:01:44

12   comply with the recommendations for the position of 02:01:46

13   Web/Digital Accessibility Coordinator that you    02:01:52

14   recommend; is that correct?                      02:01:53

15        A.  That is correct.                         02:01:54

16        Q.  Do you know of any university that      02:01:56

17   complies with the definition for a Web/Digital   02:01:58

18   Accessibility Coordinator as described in your   02:02:04

19   report?                                          02:02:05

20        A.  I know of universities that are further 02:02:05

21   along in the process.                            02:02:10

22        Q.  Didn't ask that.  I said that complies  02:02:11

23   with your report.                                02:02:14

24        A.  I believe that University of Washington 02:02:15

                                            211
```

| | | |
|---|---|---|
| 1 | does. | 02:02:19 |
| 2 | Q.  Okay.  So the University of Washington | 02:02:19 |
| 3 | has a person in charge of Web/Digital Accessibility | 02:02:21 |
| 4 | Coordinator who has the authority to implement a | 02:02:26 |
| 5 | robust, proactive compliance program? | 02:02:28 |
| 6 | A.  They do. | 02:02:31 |
| 7 | Q.  Does the University of Washington have | 02:02:31 |
| 8 | a -- provide sufficient resources to implement a | 02:02:35 |
| 9 | robust, proactive compliance program? | 02:02:39 |
| 10 | A.  They do. | 02:02:41 |
| 11 | Q.  And does the University of Washington | 02:02:41 |
| 12 | have programs that fail to comply with accessibility | 02:02:43 |
| 13 | standards? | 02:02:47 |
| 14 | A.  I don't know the answer to that | 02:02:48 |
| 15 | question. | 02:02:50 |
| 16 | Q.  Do you expect that they don't? | 02:02:51 |
| 17 | A.  I don't know. | 02:02:52 |
| 18 | Q.  Okay.  So you can't offer an opinion as | 02:02:55 |
| 19 | to whether the University of Washington complies | 02:02:57 |
| 20 | completely universally with access to electronic | 02:03:02 |
| 21 | programming for educational purposes, correct? | 02:03:06 |
| 22 | A.  I'm not comfortable speculating on | 02:03:08 |
| 23 | information I don't have direct knowledge of. | 02:03:10 |
| 24 | Q.  Wouldn't that be important to know, if | 02:03:12 |

212

Peter Bossley, 11/7/2017
Payan v. Los Angeles Community College District

| | | |
|---|---|---|
| 1 | they had sufficient resources to implement a robust, | 02:03:14 |
| 2 | proactive compliance program? | 02:03:16 |
| 3 | A.  I don't understand the question. | 02:03:21 |
| 4 | Q.  Well, what's the purpose of a robust, | 02:03:22 |
| 5 | proactive compliance program? | 02:03:24 |
| 6 | A.  To comply with nondiscrimination | 02:03:28 |
| 7 | provisions of the law. | 02:03:30 |
| 8 | Q.  A hundred percent compliance? | 02:03:31 |
| 9 | A.  A hundred percent compliance, of course, | 02:03:32 |
| 10 | is always the goal. | 02:03:35 |
| 11 | Q.  University of Washington doesn't have a | 02:03:36 |
| 12 | hundred percent compliance with accessibility, do | 02:03:38 |
| 13 | they? | 02:03:40 |
| 14 | A.  I don't know that information. | 02:03:40 |
| 15 | Q.  We continue, "This person," again | 02:03:47 |
| 16 | talking about the Web/Digital Accessibility | 02:03:51 |
| 17 | Coordinator, "must either possess sufficient | 02:03:52 |
| 18 | knowledge and skill to evaluate technology for | 02:03:54 |
| 19 | conformance with accessibility standards and best | 02:03:56 |
| 20 | practices, or should have appropriate staff with this | 02:04:01 |
| 21 | expertise." | 02:04:05 |
| 22 | At the university -- excuse me, The Ohio | 02:04:06 |
| 23 | State University, which of those two options has the | 02:04:13 |
| 24 | university followed? | 02:04:14 |

213

Peter Bossley, 11/7/2017
Payan v. Los Angeles Community College District

| | | |
|---|---|---|
| 1 | A.  Having appropriate staff. | 02:04:15 |
| 2 | Q.  Okay.  Who is the staff? | 02:04:17 |
| 3 | A.  That's myself and my team. | 02:04:19 |
| 4 | Q.  Okay.  So how many people on your team? | 02:04:21 |
| 5 | A.  I have two full-time employees and a 75 | 02:04:23 |
| 6 | percent graduate student. | 02:04:29 |
| 7 | Q.  And with that available to the | 02:04:31 |
| 8 | university, it still doesn't have a hundred percent | 02:04:35 |
| 9 | compliance with accessibility; is that correct? | 02:04:37 |
| 10 | A.  That is correct. | 02:04:40 |
| 11 | Q.  You continue, "Compliance programs have | 02:04:41 |
| 12 | a mix of the below elements," and then we talk about | 02:04:43 |
| 13 | those.  One is annual training on the policy.  What | 02:04:47 |
| 14 | is the annual training on the policy provided at Ohio | 02:04:51 |
| 15 | State University? | 02:04:56 |
| 16 | A.  We don't currently have an annual | 02:04:56 |
| 17 | training on policy. | 02:05:00 |
| 18 | Q.  So your university and the department | 02:05:01 |
| 19 | you head doesn't comply with the standards you think | 02:05:03 |
| 20 | are applicable; is that right? | 02:05:05 |
| 21 | A.  We are working to implement it, but at | 02:05:07 |
| 22 | this time we do not have annual training. | 02:05:10 |
| 23 | Q.  Got it.  Do you know anybody who does? | 02:05:11 |
| 24 | A.  I believe that Miami University and | 02:05:13 |

214

Peter Bossley, 11/7/2017
Payan v. Los Angeles Community College District

| | | |
|---|---|---|
| 1 | University of Washington both have active annual | 02:05:21 |
| 2 | training programs. | 02:05:26 |
| 3 | Q.  How many universities are there in the | 02:05:26 |
| 4 | United States? | 02:05:28 |
| 5 | A.  I have no idea. | 02:05:28 |
| 6 | Q.  So you're aware of two of them that meet | 02:05:29 |
| 7 | this requirement that you identify, correct? | 02:05:31 |
| 8 | MS. KREVOR-WEISBAUM:  Objection.  You | 02:05:34 |
| 9 | can answer. | 02:05:35 |
| 10 | THE WITNESS:  I am personally only aware | 02:05:37 |
| 11 | of two. | 02:05:39 |
| 12 | By Mr. Cleeland: | 02:05:40 |
| 13 | Q.  Okay.  That's all I'm asking for, is | 02:05:40 |
| 14 | what you know, sir. | 02:05:42 |
| 15 | Then you continue, "Guidance on | 02:05:45 |
| 16 | obtaining or conducting evaluations of prospective | 02:05:47 |
| 17 | purchases, or internally developed technology..." | 02:05:51 |
| 18 | What do you mean by that? | 02:05:54 |
| 19 | A.  When people are looking to purchase | 02:05:55 |
| 20 | something and they have a policy requirement that | 02:06:03 |
| 21 | they ensure that that be accessible, there should be | 02:06:05 |
| 22 | guidance given to them on how they determine whether | 02:06:11 |
| 23 | something is accessible or not. | 02:06:13 |
| 24 | Q.  Well, you're worried about compliance | 02:06:17 |

215

Peter Bossley, 11/7/2017
Payan v. Los Angeles Community College District

| | | |
|---|---|---|
| 1 | with accessibility standards, correct? | 02:06:19 |
| 2 | A.  Correct. | 02:06:21 |
| 3 | Q.  Do you know any universities in the | 02:06:23 |
| 4 | United States of America that has one hundred percent | 02:06:23 |
| 5 | success at acquiring universally accessible | 02:06:27 |
| 6 | programming? | 02:06:34 |
| 7 | A.  I don't know what other universities are | 02:06:36 |
| 8 | doing or what they have.  As a general rule, I don't | 02:06:38 |
| 9 | know everything about what everyone else is doing. | 02:06:41 |
| 10 | Q.  I didn't ask for everything, I asked for | 02:06:43 |
| 11 | this very specific comment you have in your report. | 02:06:45 |
| 12 | Do you know of any university that does that? | 02:06:48 |
| 13 | A.  Can you ask the question again? | 02:06:51 |
| 14 | Q.  Sure.  It says, "Guidance on obtaining | 02:06:53 |
| 15 | or conducting evaluations on prospective purchases, | 02:06:58 |
| 16 | or internally developed technology, for compliance | 02:06:59 |
| 17 | with accessibility standards." | 02:07:04 |
| 18 | So there is the operative clause in the | 02:07:04 |
| 19 | question; for compliance with accessibility | 02:07:06 |
| 20 | standards. | 02:07:09 |
| 21 | Are you aware of any university in the | 02:07:09 |
| 22 | United States of America that has one hundred percent | 02:07:12 |
| 23 | compliance in obtaining and providing accessible | 02:07:15 |
| 24 | electronic programming? | 02:07:19 |

216

Peter Bossley, 11/7/2017
Payan v. Los Angeles Community College District

1        A.  I'm not.                                      02:07:20

2        Q.  Have you looked for one?                      02:07:23

3        A.  I talk to other campuses sometimes to         02:07:24

4    see what they are doing, but I'm not out there        02:07:28

5    searching.                                            02:07:33

6        Q.  Okay.  But you're not aware of anybody        02:07:33

7    that meets this standard that you identified,         02:07:37

8    correct?                                              02:07:39

9        MS. KREVOR-WEISBAUM:  Objection.                  02:07:40

10   Objection.  Mischaracterization of the standard that  02:07:42

11   he's recommending.  Total mischaracterization.        02:07:43

12   By Mr. Cleeland:                                       02:07:47

13       Q.  You can answer.                               02:07:48

14       MS. KREVOR-WEISBAUM:  Why don't you read          02:07:50

15   the standard -- the recommendation?                   02:07:51

16       MR. CLEELAND:  I'll read it again.                02:07:53

17       MS. KREVOR-WEISBAUM:  Okay.  But you              02:07:55

18   mischaracterized the standard, sir, twice.  So let's  02:07:57

19   read it.                                              02:07:59

20   By Mr. Cleeland:                                       02:07:59

21       Q.  Okay.  "Guidance on obtaining or              02:08:00

22   conducting evaluations of prospective purchases..."   02:08:02

23   Did I get that right?  Are you following along, sir?  02:08:05

24       A.  Yes.                                          02:08:09

                                               217

Peter Bossley, 11/7/2017
Payan v. Los Angeles Community College District

| | | |
|---|---|---|
| 1 | Q.  Okay.  So I was accurate when I read | 02:08:09 |
| 2 | that, correct? | 02:08:11 |
| 3 | A.  Yes, but what you asked about was | 02:08:12 |
| 4 | different from -- | 02:08:15 |
| 5 | Q.  I haven't gotten there yet.  "...or | 02:08:15 |
| 6 | internally developed technology..."  Have I read that | 02:08:18 |
| 7 | accurately? | 02:08:21 |
| 8 | A.  Yes. | 02:08:22 |
| 9 | Q.  "...for compliance with accessibility | 02:08:22 |
| 10 | standards."  That was my question. | 02:08:26 |
| 11 | MS. KREVOR-WEISBAUM:  What is your | 02:08:30 |
| 12 | question? | 02:08:30 |
| 13 | By Mr. Cleeland: | 02:08:30 |
| 14 | Q.  Are you aware of any university in the | 02:08:30 |
| 15 | United States of America that complies with this | 02:08:34 |
| 16 | statement for accessibility standards at a level of | 02:08:38 |
| 17 | one hundred percent for electronic programming? | 02:08:43 |
| 18 | A.  I am aware of campuses who do provide | 02:08:45 |
| 19 | guidance. | 02:08:48 |
| 20 | Q.  Didn't ask for guidance. | 02:08:49 |
| 21 | A.  I said success in obtaining accessible | 02:08:50 |
| 22 | electronic programming. | 02:08:56 |
| 23 | MS. KREVOR-WEISBAUM:  Objection.  You | 02:08:58 |
| 24 | can answer, but I believe you have mischaracterized | 02:08:59 |

218

| | | |
|---|---|---|
| 1 | his opinion, his recommendation. | 02:09:02 |
| 2 | MR. CLEELAND:  I just read it verbatim. | 02:09:05 |
| 3 | MS. KREVOR-WEISBAUM:  No, sir. | 02:09:07 |
| 4 | MR. CLEELAND:  Excuse me.  Did I tread | 02:09:08 |
| 5 | it verbatim? | 02:09:09 |
| 6 | MS. KREVOR-WEISBAUM:  Yes, but your | 02:09:11 |
| 7 | characterization -- | 02:09:12 |
| 8 | MR. CLEELAND:  Okay.  Thanks.  That's | 02:09:13 |
| 9 | all I said. | 02:09:14 |
| 10 | MS. KREVOR-WEISBAUM:  What a | 02:09:15 |
| 11 | mischaracterization.  Objection. | 02:09:15 |
| 12 | MR. CLEELAND:  Hang on.  Now you're | 02:09:16 |
| 13 | making statements about what I intended, which is | 02:09:16 |
| 14 | fine. | 02:09:18 |
| 15 | MS. KREVOR-WEISBAUM:  No -- | 02:09:19 |
| 16 | MR. CLEELAND:  I just read exactly what | 02:09:20 |
| 17 | he wrote. | 02:09:21 |
| 18 | THE WITNESS:  But, sir, your question | 02:09:22 |
| 19 | was about am I aware of any college in the United | 02:09:23 |
| 20 | States that obtains one hundred percent compliance | 02:09:26 |
| 21 | with obtaining accessible software.  That's a | 02:09:29 |
| 22 | different question. | 02:09:32 |
| 23 | By Mr. Cleeland: | 02:09:33 |
| 24 | Q.  No, accessible standards for electronic | 02:09:33 |

<div align="center">219</div>

Peter Bossley, 11/7/2017
Payan v. Los Angeles Community College District

| | | |
|---|---|---|
| 1 | software.  I'm using your words. | 02:09:36 |
| 2 |      MS. KREVOR-WEISBAUM:  Objection. | 02:09:39 |
| 3 | By Mr. Cleeland: | 02:09:39 |
| 4 |     Q.  Do you understand that question? | 02:09:39 |
| 5 |     A.  I do not understand the question. | 02:09:40 |
| 6 |     Q.  Just let me know that, I'll be happy to | 02:09:41 |
| 7 | withdraw it.  Okay? | 02:09:43 |
| 8 |     The whole category here is the following | 02:09:45 |
| 9 | oversight procedures should be implemented to ensure | 02:09:48 |
| 10 | that the policy is adhered to, right?  That's why you | 02:09:52 |
| 11 | wrote this, right? | 02:09:55 |
| 12 |     A.  Correct. | 02:09:56 |
| 13 |     Q.  And I've gone down through several | 02:09:56 |
| 14 | bullet points and I read them verbatim. | 02:09:58 |
| 15 |     Under the category of the Web/Digital | 02:10:01 |
| 16 | Accessibility Coordinator you have a subpoint | 02:10:06 |
| 17 | defining that purpose -- or that person to provide | 02:10:07 |
| 18 | guidance on obtaining or conducting evaluations of | 02:10:10 |
| 19 | prospective purchases, correct? | 02:10:14 |
| 20 |     A.  Yes. | 02:10:16 |
| 21 |     Q.  Okay.  Then you have a ", or", which | 02:10:20 |
| 22 | means it's an alternate, internally developed | 02:10:23 |
| 23 | technology, and then a comma.  So we have categorized | 02:10:27 |
| 24 | the purchases of technology, correct? | 02:10:32 |

220

| | | |
|---|---|---|
| 1 | A.  Correct. | 02:10:35 |
| 2 | Q.  And it's for compliance with | 02:10:37 |
| 3 | accessibility standards.  That's the purpose -- or | 02:10:40 |
| 4 | that's the basis for my question. | 02:10:44 |
| 5 | Are you aware of any university in the | 02:10:47 |
| 6 | United States of America that has achieved a hundred | 02:10:49 |
| 7 | percent compliance with accessibility standards for | 02:10:53 |
| 8 | the category under Web/Digital Accessibility | 02:10:57 |
| 9 | Coordinator in your report? | 02:11:01 |
| 10 | MS. KREVOR-WEISBAUM:  Objection.  You | 02:11:03 |
| 11 | may answer. | 02:11:04 |
| 12 | THE WITNESS:  I'm not aware. | 02:11:07 |
| 13 | By Mr. Cleeland: | 02:11:07 |
| 14 | Q.  Thanks. | 02:11:09 |
| 15 | Then you continue as a subpoint again to | 02:11:11 |
| 16 | the Web/Digital Accessibility Coordinator that you're | 02:11:13 |
| 17 | defining here, "Procurement controls requiring that | 02:11:16 |
| 18 | technology be purchased" -- I apologize.  Let me back | 02:11:20 |
| 19 | up. | 02:11:25 |
| 20 | Procurement -- | 02:11:26 |
| 21 | MS. KREVOR-WEISBAUM:  Getting tired? | 02:11:30 |
| 22 | MR. CLEELAND:  I just can't talk. | 02:11:32 |
| 23 | By Mr. Cleeland: | 02:11:33 |
| 24 | Q.  "Procurement controls requiring that | 02:11:33 |

221

Peter Bossley, 11/7/2017
Payan v. Los Angeles Community College District

| | | |
|---|---|---|
| 1 | technology being purchased be evaluated for | 02:11:35 |
| 2 | compliance with the accessibility policy prior to | 02:11:39 |
| 3 | purchase." | 02:11:45 |
| 4 | Can you tell me any university in the | 02:11:46 |
| 5 | State -- excuse me, in the United States of America | 02:11:47 |
| 6 | that complies with that statement relative to | 02:11:50 |
| 7 | Web/Digital Accessibility Coordinator on a one | 02:11:58 |
| 8 | hundred percent basis? | 02:11:59 |
| 9 | A.  I am not aware of anyone. | 02:12:00 |
| 10 | Q.  Again, a subpoint to that category, "A | 02:12:05 |
| 11 | clearly defined exception process..."  What do you | 02:12:09 |
| 12 | mean by "exception process"? | 02:12:12 |
| 13 | A.  I mean an exception process for when a | 02:12:16 |
| 14 | piece of technology is not accessible and the campus | 02:12:23 |
| 15 | would still like to purchase it. | 02:12:29 |
| 16 | Q.  So that's exceptions to the rules you're | 02:12:32 |
| 17 | identifying, correct? | 02:12:35 |
| 18 | A.  That's correct. | 02:12:36 |
| 19 | Q.  Okay.  So, "A clearly defined exception | 02:12:37 |
| 20 | process when inaccessible software is considered for | 02:12:39 |
| 21 | purchase or is otherwise discovered via user | 02:12:42 |
| 22 | complaints."  Are you aware of any instance where | 02:12:48 |
| 23 | that occurred? | 02:12:51 |
| 24 | A.  I don't understand what you mean. | 02:12:52 |

222

| 1 | Q.  Well, an exception process, that's to | 02:12:53 |
| 2 | acquire software, correct? | 02:12:58 |
| 3 | A.  Correct. | 02:12:59 |
| 4 | Q.  Where it's inaccessible for all users | 02:13:01 |
| 5 | for purchase, or is otherwise discovered via user | 02:13:07 |
| 6 | complaints, are you aware of anything that falls | 02:13:10 |
| 7 | within that sentence? | 02:13:12 |
| 8 | A.  I am. | 02:13:13 |
| 9 | Q.  What? | 02:13:14 |
| 10 | A.  Ohio State, we have an exception | 02:13:14 |
| 11 | process. | 02:13:17 |
| 12 | Q.  And that means that Ohio State can | 02:13:18 |
| 13 | choose to purchase software programs even though they | 02:13:21 |
| 14 | are not completely accessible; is that correct? | 02:13:24 |
| 15 | A.  Within strict guidelines, yes. | 02:13:27 |
| 16 | Q.  Even though they are not completely | 02:13:30 |
| 17 | accessible, correct? | 02:13:31 |
| 18 | A.  That is correct. | 02:13:32 |
| 19 | Q.  Where is the strict guideline | 02:13:33 |
| 20 | identification for The Ohio State University | 02:13:35 |
| 21 | exception policy? | 02:13:38 |
| 22 | A.  In your -- in the packet that I brought | 02:13:38 |
| 23 | with me there's a form that we use for people to | 02:13:41 |
| 24 | document those requests. | 02:13:44 |

223

| | | |
|---|---|---|
| 1 | Q.  Got it.  We're going to go over that. | 02:13:47 |
| 2 | So does that mean that in your | 02:13:49 |
| 3 | understanding there are programs that are not | 02:13:51 |
| 4 | completely accessible to nonsighted students, or is | 02:13:54 |
| 5 | this in general, or is it limited to nonsighted | 02:13:59 |
| 6 | students? | 02:14:02 |
| 7 | A.  In general. | 02:14:02 |
| 8 | Q.  Okay.  Is it your statement that there | 02:14:03 |
| 9 | are programs which are not otherwise accessible to | 02:14:05 |
| 10 | disabled students of whatever category that warrant | 02:14:10 |
| 11 | acquisition by an institution of higher education? | 02:14:13 |
| 12 | A.  Under limited circumstances, yes. | 02:14:19 |
| 13 | Q.  Okay.  And that's contained within the | 02:14:21 |
| 14 | information you brought with you today? | 02:14:23 |
| 15 | A.  And in the bullet points underneath this | 02:14:24 |
| 16 | section that we talked about. | 02:14:27 |
| 17 | Q.  So we continue, "This process should | 02:14:28 |
| 18 | include..."  Doesn't say must.  What do you mean by | 02:14:33 |
| 19 | should? | 02:14:36 |
| 20 | A.  I mean the exception process is -- is | 02:14:36 |
| 21 | accepting a certain amount of risk on behalf of the | 02:14:43 |
| 22 | institution, and that in order for us to not violate | 02:14:47 |
| 23 | the nondiscrimination provisions of federal law we | 02:14:52 |
| 24 | have some actions we have to take if we want to go | 02:14:56 |

<div align="center">224</div>

Peter Bossley, 11/7/2017
Payan v. Los Angeles Community College District

| | | |
|---|---|---|
| 1 | down the road of buying something that's not | 02:14:59 |
| 2 | accessible. | 02:15:01 |
| 3 | Q.  Well, how is it you avoid the wrath of | 02:15:03 |
| 4 | the federal government if you accept a nonaccessible | 02:15:05 |
| 5 | program? | 02:15:10 |
| 6 | A.  The nondiscrimination provision of the | 02:15:12 |
| 7 | federal law says we have to make our programs and | 02:15:20 |
| 8 | activities available in Section 504. | 02:15:22 |
| 9 | Title II says we must provide | 02:15:24 |
| 10 | communication as effective as is provided to others. | 02:15:26 |
| 11 | And if we can do that we lessen our risk. | 02:15:29 |
| 12 | ADA Title II, I mean, we -- we lessen | 02:15:36 |
| 13 | our risk.  We don't eliminate it entirely, but we | 02:15:43 |
| 14 | lessen our risk, and that is the goal of the | 02:15:45 |
| 15 | exception process, is to provide a bridge until | 02:15:48 |
| 16 | things can become more accessible. | 02:15:55 |
| 17 | By Mr. Cleeland: | 02:26:20 |
| 18 | Q.  Sir, I believe we were just about to go | 02:26:20 |
| 19 | into the -- I think I turned the page, I apologize. | 02:26:25 |
| 20 | Okay.  I think we were just starting to | 02:26:44 |
| 21 | talk about the exception policy, and the components | 02:26:48 |
| 22 | for the exception. | 02:26:50 |
| 23 | And I read the bullet point, "A clearly | 02:26:53 |
| 24 | defined exception process when inaccessible software | 02:26:55 |

225

| | | |
|---|---|---|
| 1 | is considered for purchase or is otherwise discovered | 02:26:59 |
| 2 | via user compliance.  This process should include:" | 02:27:02 |
| 3 | and now we're going to go into your bullet points. | 02:27:05 |
| 4 | "Information regarding the access | 02:27:08 |
| 5 | barriers in the software, their severity, and the | 02:27:10 |
| 6 | estimated impacted population(s)." | 02:27:18 |
| 7 | With respect to that bullet point, what | 02:27:23 |
| 8 | are you talking about there? | 02:27:26 |
| 9 | A.  That would be the accessibility issues | 02:27:28 |
| 10 | or defects, or whatever you would like to call them, | 02:27:30 |
| 11 | in the software. | 02:27:32 |
| 12 | Q.  And by talking about those barriers, are | 02:27:34 |
| 13 | you including severity of that barrier to the user | 02:27:41 |
| 14 | population? | 02:27:45 |
| 15 | A.  Sure.  Yes. | 02:27:46 |
| 16 | Q.  And we talked about that previously, | 02:27:48 |
| 17 | right? | 02:27:50 |
| 18 | A.  We did. | 02:27:50 |
| 19 | Q.  It continues, "their severity."  By that | 02:27:56 |
| 20 | do you mean if it's just a little barrier it might be | 02:27:58 |
| 21 | accessible, whereas a larger barrier might not be | 02:28:03 |
| 22 | accessible? | 02:28:09 |
| 23 | A.  The barrier impacts are analysis of how | 02:28:09 |
| 24 | we build an equally effective alternative access for | 02:28:12 |

226

| | | |
|---|---|---|
| 1 | that individual, not -- it doesn't impact our | 02:28:23 |
| 2 | assessment of whether something is accessible or not. | 02:28:26 |
| 3 | Q.  And we talked a little bit earlier about | 02:28:28 |
| 4 | information which is otherwise available, and I | 02:28:29 |
| 5 | apologize for going on that rambling tone about the | 02:28:32 |
| 6 | Encyclopedia Britannica, but their severity might | 02:28:36 |
| 7 | mean that there is indeed a barrier, but it's not in | 02:28:40 |
| 8 | an area that's going to be utilized in a given course | 02:28:43 |
| 9 | that utilizes that software; is that correct? | 02:28:47 |
| 10 | A.  It's possible, yeah. | 02:28:49 |
| 11 | Q.  And then you talk about the estimated | 02:28:50 |
| 12 | impact on populations.  What do you mean by that? | 02:28:53 |
| 13 | A.  Estimating impact to populations is an | 02:28:56 |
| 14 | estimate of the populations impacted.  So that's how | 02:29:06 |
| 15 | many students with disabilities would be impacted by | 02:29:11 |
| 16 | this particular barrier. | 02:29:14 |
| 17 | Q.  I apologize.  And these categories, are | 02:29:17 |
| 18 | they on that form that you previously discussed? | 02:29:19 |
| 19 | A.  The form is more about -- is more about | 02:29:22 |
| 20 | documenting the request, so some of it does -- some | 02:29:25 |
| 21 | of it does that, yes. | 02:29:28 |
| 22 | Q.  Now, the estimated impact to population. | 02:29:29 |
| 23 | Have you ever had an experience in your position with | 02:29:41 |
| 24 | the University of -- or Ohio State University, where | 02:29:44 |

227

Peter Bossley, 11/7/2017
Payan v. Los Angeles Community College District

| | | |
|---|---|---|
| 1 | software was going to be specifically utilized by an | 02:29:48 |
| 2 | audience which would not contain disabled students? | 02:29:57 |
| 3 | A.  We have. | 02:30:05 |
| 4 | Q.  And that's something you'd consider in | 02:30:09 |
| 5 | this exception policy, correct? | 02:30:12 |
| 6 | A.  We would consider that in the context of | 02:30:13 |
| 7 | this exception policy request, yes. | 02:30:17 |
| 8 | Q.  And it sounds like this review policy is | 02:30:18 |
| 9 | relatively fluid, because the circumstances of an | 02:30:21 |
| 10 | individual case may dictate greater latitude or | 02:30:24 |
| 11 | lesser latitude, correct? | 02:30:29 |
| 12 | A.  I'm not sure -- I'm not sure I would | 02:30:30 |
| 13 | characterize it like that. | 02:30:35 |
| 14 | Q.  Okay.  How would you characterize it? | 02:30:40 |
| 15 | A.  I would say that under some very limited | 02:30:41 |
| 16 | circumstances -- and there are sometimes -- there is | 02:30:47 |
| 17 | sometimes a case that we aren't going to see an | 02:30:53 |
| 18 | impacted individual because of the very nature of | 02:31:00 |
| 19 | what we're looking at. | 02:31:04 |
| 20 | And so my -- my example is a piece of | 02:31:06 |
| 21 | flight simulation software that's used in pilot | 02:31:11 |
| 22 | training is not going to be used by a blind person. | 02:31:15 |
| 23 | Q.  That was almost going to be one of my | 02:31:19 |
| 24 | examples.  So thanks for pulling that up. | 02:31:22 |

ADVANCED DEPOSITIONS
www.advanceddepositions.com | 855.811.3376

| | | |
|---|---|---|
| 1 | In your exception review you identified | 02:31:26 |
| 2 | another point; information regarding the availability | 02:31:30 |
| 3 | of a more acceptable alternative? | 02:31:33 |
| 4 | MS. KREVOR-WEISBAUM:  Accessible. | 02:31:37 |
| 5 | MR. CLEELAND:  Accessible.  It has been | 02:31:41 |
| 6 | a long day. | 02:31:42 |
| 7 | By Mr. Cleeland: | 02:31:42 |
| 8 | Q.  Information regarding the availability | 02:31:43 |
| 9 | of a more accessible alternative.  That indicates | 02:31:45 |
| 10 | that even more accessible, it might not be | 02:31:49 |
| 11 | universally accessible, correct? | 02:31:53 |
| 12 | A.  No, I -- I -- I don't really -- I don't | 02:31:55 |
| 13 | really agree with that.  I think what this is | 02:32:03 |
| 14 | referring to is if there is a more accessible | 02:32:06 |
| 15 | alternative, then we have a problem. | 02:32:12 |
| 16 | And so the exception request makes a | 02:32:14 |
| 17 | request that the unit tell us about any evaluations | 02:32:17 |
| 18 | they did of other alternatives. | 02:32:22 |
| 19 | Q.  Wouldn't more accessible also be short | 02:32:25 |
| 20 | of universally accessible? | 02:32:28 |
| 21 | A.  Potentially in this context yes. | 02:32:33 |
| 22 | Q.  Unless it's universally accessible, it | 02:32:36 |
| 23 | would be an exception? | 02:32:38 |
| 24 | A.  If it's universally accessible, then | 02:32:39 |

229

Peter Bossley, 11/7/2017
Payan v. Los Angeles Community College District

| | | |
|---|---|---|
| 1 | they would not need an exception. | 02:32:42 |
| 2 | Q.  Hopefully if it's not universally | 02:32:44 |
| 3 | accessible, but I may not have said that. | 02:32:47 |
| 4 | Okay.  It continues, "A plan for | 02:32:51 |
| 5 | bringing the software into compliance over time." | 02:32:53 |
| 6 | And you were kind enough to give us an example, that | 02:32:56 |
| 7 | being the aviation simulator where you don't need to | 02:32:59 |
| 8 | worry about bringing it into accessibility for a | 02:33:05 |
| 9 | blind student, because a blind student, I assume, | 02:33:08 |
| 10 | would never meet the minimum qualifications for such | 02:33:12 |
| 11 | a course, correct? | 02:33:15 |
| 12 | A.  That is correct. | 02:33:16 |
| 13 | Q.  "Exceptions should be temporary in | 02:33:17 |
| 14 | nature, unless compliance is not technically possible | 02:33:19 |
| 15 | or would present an undue hardship to the | 02:33:23 |
| 16 | institution." | 02:33:26 |
| 17 | At the start of that, "Exceptions should | 02:33:27 |
| 18 | be temporary in nature..."  Is that because you | 02:33:29 |
| 19 | should look for a program that is more accessible, if | 02:33:31 |
| 20 | you could? | 02:33:35 |
| 21 | A.  Or you should move your existing program | 02:33:35 |
| 22 | selection towards being compliant. | 02:33:38 |
| 23 | Q.  And by compliant, do you mean | 02:33:40 |
| 24 | universally acceptable, or compliant within the | 02:33:44 |

230

| | | |
|---|---|---|
| 1 | exceptions identified in the rules? | 02:33:46 |
| 2 |     A.  I mean universally accessible, or | 02:33:48 |
| 3 | accessible -- meeting our accessibility standards. | 02:33:51 |
| 4 |     Q.  Good qualification. | 02:33:55 |
| 5 |         Within that same sentence, "...unless | 02:33:57 |
| 6 | compliance is not technically possible."  Would your | 02:33:58 |
| 7 | example of the pilot and the aviation training | 02:34:01 |
| 8 | simulator be an example? | 02:34:07 |
| 9 |     A.  With current technology it is not | 02:34:09 |
| 10 | technically feasible to make something like that | 02:34:11 |
| 11 | nonvisually accessible, so yes. | 02:34:14 |
| 12 |     Q.  Well, let's say you could make it | 02:34:17 |
| 13 | nonvisually accessible for purposes of a course, but | 02:34:21 |
| 14 | there was no way that a person could ever achieve a | 02:34:24 |
| 15 | profession in aviation. | 02:34:29 |
| 16 |         Do you think the university still has an | 02:34:32 |
| 17 | obligation to provide a class to a sight limited | 02:34:34 |
| 18 | individual? | 02:34:41 |
| 19 |     A.  Unless -- unless doing so would present | 02:34:41 |
| 20 | a safety hazard, yes. | 02:34:44 |
| 21 |     Q.  So even though it's not going to lead to | 02:34:46 |
| 22 | fruition in the individual student's educational | 02:34:50 |
| 23 | experience -- or excuse me, educational pursuit, it | 02:34:53 |
| 24 | would still need to be accessible under that example? | 02:34:56 |

<div align="center">231</div>

```
1        A.  Yes.                                        02:34:59

2        Q.  And then it continues, "...or would        02:35:00

3   present an undue hardship to the institution."  Is  02:35:02

4   that a term of art, undue hardships?               02:35:05

5        A.  It's maybe a term of art in the ADA        02:35:11

6   field.                                              02:35:14

7        Q.  And what did you mean by utilizing it in   02:35:14

8   your report, undue hardship to the institution?    02:35:16

9        A.  What I meant was an undue hardship in      02:35:20

10  the context of either -- either a cost burden or a  02:35:23

11  fundamental alteration to the program.             02:35:30

12       Q.  And you continue on page 24, again, this   02:35:35

13  is under the category Web/Digital Accessibility     02:35:38

14  Coordinator, "Exceptions granted for software with a 02:35:43

15  plan to move toward future compliance should be    02:35:45

16  monitored for progress towards compliance."        02:35:49

17       How do you establish that?                     02:35:53

18       A.  Our -- from our institution, we grant      02:35:56

19  exceptions for a limited period of time, and we     02:35:59

20  periodically review once -- if you want to get to   02:36:02

21  that, we'll eventually get to it.                  02:36:08

22       But when we talk about their plan             02:36:10

23  towards making the software accessible, there are -- 02:36:11

24  there are going to be timelines in there, and we will 02:36:15

                            232
```

Peter Bossley, 11/7/2017
Payan v. Los Angeles Community College District

| | | |
|---|---|---|
| 1 | check in on those timelines to ensure that they are | 02:36:17 |
| 2 | meeting those commitments they have made to us, | 02:36:21 |
| 3 | whether that be an internal entity or external entity | 02:36:25 |
| 4 | or whatever. | 02:36:28 |
| 5 | Q.  Has that ever occurred at The Ohio State | 02:36:28 |
| 6 | University? | 02:36:30 |
| 7 | A.  It has. | 02:36:30 |
| 8 | Q.  How many occasions? | 02:36:32 |
| 9 | A.  How many occasions have we granted | 02:36:34 |
| 10 | exceptions, or have we done review processes, or what | 02:36:38 |
| 11 | are -- | 02:36:40 |
| 12 | Q.  Well, part of granting the exception is | 02:36:40 |
| 13 | a review process, right? | 02:36:43 |
| 14 | A.  Sure.  In our more formalized process | 02:36:45 |
| 15 | that we have adopted now, it's happened maybe ten | 02:36:49 |
| 16 | times. | 02:36:52 |
| 17 | Q.  Do you remember what the courses were? | 02:36:56 |
| 18 | A.  These were not classroom technologies. | 02:37:01 |
| 19 | The -- the technology that's in question here were | 02:37:05 |
| 20 | more technology purchases that weren't classroom | 02:37:10 |
| 21 | related. | 02:37:14 |
| 22 | Q.  And the sub bullet point in that | 02:37:16 |
| 23 | subcategory, "In all cases, exceptions should be | 02:37:22 |
| 24 | periodically reviewed on the effectiveness of their | 02:37:25 |

233

Peter Bossley, 11/7/2017
Payan v. Los Angeles Community College District

| | | |
|---|---|---|
| 1 | equally effective alternative access plan..."  How do | 02:37:28 |
| 2 | you do that? | 02:37:32 |
| 3 | A.  Well, sometimes we send someone to be a | 02:37:36 |
| 4 | test and see how the unit performs under its plan | 02:37:38 |
| 5 | that they have to provide us when they request an | 02:37:43 |
| 6 | exception. | 02:37:45 |
| 7 | Other than that, we typically will ask | 02:37:47 |
| 8 | the people in charge of implementing that plan to | 02:37:50 |
| 9 | give us details of how many people requested it, how | 02:37:54 |
| 10 | many people requested a set accomodation, how quickly | 02:37:59 |
| 11 | they responded, did they run into any issues. | 02:38:03 |
| 12 | And so when the exception comes up for | 02:38:06 |
| 13 | review, we do look at all of those things before we | 02:38:08 |
| 14 | talk about whether this is going to continue forward. | 02:38:12 |
| 15 | Q.  And how often are exceptions reviewed? | 02:38:14 |
| 16 | A.  Exceptions are reviewed no less than | 02:38:17 |
| 17 | annually. | 02:38:20 |
| 18 | Q.  Now, on this one when you would send a | 02:38:21 |
| 19 | student to do testing, sending that student, was that | 02:38:24 |
| 20 | surreptitious, or out in the open, or what? | 02:38:26 |
| 21 | A.  We will sometimes simply just ask one of | 02:38:29 |
| 22 | our students, "Would you go see how this works for | 02:38:31 |
| 23 | you?" | 02:38:36 |
| 24 | Q.  And we still appear to be under the | 02:38:39 |

234

| | | |
|---|---|---|
| 1 | Web/Digital Accessibility Coordinator with a new | 02:38:41 |
| 2 | heading of, "An equally effective alternative access | 02:38:43 |
| 3 | plan that ensures the student is provided an equal | 02:38:47 |
| 4 | opportunity to the educational benefits of the | 02:38:52 |
| 5 | software with substantially equivalent ease of use, | 02:38:54 |
| 6 | that would equal treatment in the use of the | 02:38:58 |
| 7 | alternative." | 02:39:02 |
| 8 | So that calls out for a lot of things. | 02:39:03 |
| 9 | We'll try to bring it down.  "An equally effective | 02:39:06 |
| 10 | alternative access plan that ensures...", what do we | 02:39:09 |
| 11 | mean by ensures? | 02:39:12 |
| 12 | A.  We mean a plan that is designed and | 02:39:13 |
| 13 | calculated to provide all of the following. | 02:39:18 |
| 14 | Q.  Do you mean guarantees? | 02:39:24 |
| 15 | A.  Nothing is guaranteed in life. | 02:39:26 |
| 16 | Q.  Absolutely correct. | 02:39:28 |
| 17 | It continues, "That the student is | 02:39:30 |
| 18 | provided..."  Is that word provided important in the | 02:39:33 |
| 19 | sense that the obligation is to provide something, | 02:39:36 |
| 20 | not guarantee something? | 02:39:40 |
| 21 | A.  I don't understand your meaning. | 02:39:43 |
| 22 | Q.  Well, the student is provided an equal | 02:39:46 |
| 23 | opportunity, and I'm worried about the word | 02:39:48 |
| 24 | "provided".  I'm inquiring about the word provided. | 02:39:50 |

235

1          So if the student is provided an equal          02:39:52

2    opportunity, they are not guaranteed an equal          02:39:55

3    opportunity, are they?                                02:39:58

4          A.  I don't see a distinction in the -- in      02:40:01

5    the way I'm using the term here.                      02:40:06

6          Q.  That's why I need to qualify.               02:40:07

7          A.  Okay.                                       02:40:12

8          Q.  In undergrad my wife was in a class full    02:40:14

9    of doctors, or doctor-wanna-bes.  In Chem 1A the      02:40:17

10   average score on the quiz each week was five out of a 02:40:20

11   hundred.  That's pretty tough.                        02:40:23

12         That doesn't -- just because you're             02:40:28

13   entitled to be in that class doesn't guarantee that   02:40:30

14   you're going to succeed, does it?                     02:40:32

15         A.  Of course not.                              02:40:34

16         Q.  And that's what I'm trying to draw the      02:40:35

17   conclusion here.                                      02:40:37

18         By your statement that the student is           02:40:38

19   provided an equal opportunity doesn't mean that they  02:40:40

20   will have an equal opportunity -- excuse me, doesn't  02:40:43

21   mean they are guaranteed success, correct?            02:40:47

22         A.  That is correct.                            02:40:49

23         Q.  And some students are better than other     02:40:50

24   students, right?                                      02:40:52

                                                        236

Peter Bossley, 11/7/2017
Payan v. Los Angeles Community College District

| 1 | A.  That is correct. | 02:40:52 |
| 2 | Q.  So to provide an equal opportunity to | 02:40:54 |
| 3 | the educational benefits, what do you mean by "the | 02:40:57 |
| 4 | educational benefits"? | 02:41:00 |
| 5 | A.  That means the learning -- the learning | 02:41:03 |
| 6 | benefits of the software that's being used, or the | 02:41:09 |
| 7 | information that's being provided. | 02:41:15 |
| 8 | Q.  And that's just an opportunity to be | 02:41:16 |
| 9 | exposed to those benefits, not necessarily reap the | 02:41:18 |
| 10 | benefits, correct? | 02:41:22 |
| 11 | A.  That is correct. | 02:41:23 |
| 12 | Q.  Again, it relates to the individual | 02:41:24 |
| 13 | students; some work harder than others, right? | 02:41:26 |
| 14 | A.  I need to be clear that that means that | 02:41:29 |
| 15 | the alternative needs to be available to them. | 02:41:33 |
| 16 | Whether they -- whether the student takes advantage | 02:41:36 |
| 17 | of that opportunity or not is not germane to the | 02:41:39 |
| 18 | conversation. | 02:41:43 |
| 19 | They have to be able -- they have to be | 02:41:44 |
| 20 | provided it, and that's the -- you know, that's the | 02:41:46 |
| 21 | requirement of the exception process.  It must be | 02:41:52 |
| 22 | available to them, and they must know it's available | 02:41:57 |
| 23 | to them. | 02:42:00 |
| 24 | Q.  And what they do with it after that is | 02:42:00 |

237

| 1 | their issue, correct? | 02:42:02 |
| 2 | A.  So long as the process is followed, yes. | 02:42:04 |
| 3 | Q.  It continues with, "...substantially | 02:42:10 |
| 4 | equivalent ease of use."  So substantially equivalent | 02:42:12 |
| 5 | means what in your mind? | 02:42:16 |
| 6 | A.  This means you can't, for example, ask a | 02:42:17 |
| 7 | student to come into the office and have someone help | 02:42:21 |
| 8 | them with something when every other student can -- | 02:42:26 |
| 9 | has the opportunity and the ability to do things -- | 02:42:31 |
| 10 | do their homework at 3:00 a.m. at home. | 02:42:33 |
| 11 | Q.  Even if it's a benefit to the student? | 02:42:36 |
| 12 | A.  It can be a benefit to the student, | 02:42:39 |
| 13 | but -- but they -- substantially equivalent ease of | 02:42:41 |
| 14 | use requires that they not be disadvantaged in the | 02:42:47 |
| 15 | types and places and manners in which they can access | 02:42:51 |
| 16 | things. | 02:42:53 |
| 17 | Q.  So the operative word is | 02:42:54 |
| 18 | "disadvantaged", correct? | 02:42:56 |
| 19 | A.  That is correct. | 02:42:56 |
| 20 | Q.  They can be given a greater advantage | 02:42:57 |
| 21 | with those limitations, correct? | 02:43:00 |
| 22 | A.  That is correct.  A greater advantage is | 02:43:02 |
| 23 | not -- is not prohibited, but they also cannot be | 02:43:04 |
| 24 | required to take greater advantage as a condition of | 02:43:09 |

238

| | | |
|---|---|---|
| 1 | receiving the alternative. | 02:43:13 |
| 2 | Q.  And it continues in that sentence, | 02:43:15 |
| 3 | "...and with equal treatment in the use of the | 02:43:29 |
| 4 | alternative."  What do you mean by that? | 02:43:32 |
| 5 | A.  That means that if an alternative is | 02:43:35 |
| 6 | provided, that instructors and anyone else at the | 02:43:37 |
| 7 | institution involved in the process not treat the | 02:43:44 |
| 8 | student any differently as a result of them needing | 02:43:47 |
| 9 | that alternative or using that alternative. | 02:43:51 |
| 10 | Q.  Any differently or to their detriment? | 02:43:52 |
| 11 | A.  Right.  To their detriment.  My fault. | 02:43:56 |
| 12 | Q.  We're going to redraft that policy, | 02:44:01 |
| 13 | aren't we? | 02:44:04 |
| 14 | We go to the next sub bullet point that | 02:44:05 |
| 15 | says, "A complaint process for internal resolution." | 02:44:08 |
| 16 | We have already talked about that, right? | 02:44:12 |
| 17 | A.  I don't recall. | 02:44:14 |
| 18 | Q.  We talked about somebody's brought it to | 02:44:15 |
| 19 | their attention and there's a followup, you send | 02:44:19 |
| 20 | students to check on the software and the | 02:44:21 |
| 21 | accessibility? | 02:44:24 |
| 22 | A.  Well, I think this is a little bit -- | 02:44:25 |
| 23 | this is a little bit of a different stream. | 02:44:28 |
| 24 | This may be -- some institutions that | 02:44:33 |

239

| | | |
|---|---|---|
| 1 | don't have a proactive program around this, may not | 02:44:36 |
| 2 | know what issues are present in their environments, | 02:44:41 |
| 3 | and so someone may bring something to their | 02:44:45 |
| 4 | attention, and that's -- that's kind of different | 02:44:48 |
| 5 | than testing and establishing a plan. | 02:44:50 |
| 6 | Q.  I was trying to save time, but you're | 02:44:54 |
| 7 | actually correct, there are components that are | 02:44:57 |
| 8 | different. | 02:44:58 |
| 9 | One under the complaint process is you | 02:44:59 |
| 10 | referred to a timeline for the institution to respond | 02:45:01 |
| 11 | to a complaint.  What is the timeline at The Ohio | 02:45:04 |
| 12 | State University? | 02:45:09 |
| 13 | A.  We will acknowledge an individual's | 02:45:09 |
| 14 | complaint within one business day.  Within ten | 02:45:12 |
| 15 | business days an investigation will have been | 02:45:14 |
| 16 | conducted or we will advise the student or the | 02:45:16 |
| 17 | constituent that we need more time to evaluate their | 02:45:19 |
| 18 | complaint.  And those are the only established | 02:45:22 |
| 19 | timelines. | 02:45:27 |
| 20 | Within one business day -- within one | 02:45:29 |
| 21 | business day units are required to forward us any | 02:45:31 |
| 22 | complaints they have, and within one day of us | 02:45:33 |
| 23 | receiving the complaint we will advise the student of | 02:45:36 |
| 24 | the process and make sure they understand how we are | 02:45:39 |

240

| | | |
|---|---|---|
| 1 | going to proceed. | 02:45:41 |
| 2 |     Q.   Where are the complaints initially | 02:45:42 |
| 3 | lodged? | 02:45:44 |
| 4 |     A.   Complaints can be initially lodged with | 02:45:44 |
| 5 | any office on campus.  We have a complaint process | 02:45:47 |
| 6 | that's handled through both our Disability Services | 02:45:50 |
| 7 | Office, and my office. | 02:45:53 |
| 8 |     Q.   Then you have a timeline for completing | 02:46:01 |
| 9 | the investigation.  Have you told me about that? | 02:46:03 |
| 10 |     A.   That is correct.  There's a ten-day | 02:46:05 |
| 11 | window for completing an investigation, or in rare | 02:46:07 |
| 12 | circumstances, advising the student that ten days | 02:46:11 |
| 13 | wasn't enough time. | 02:46:14 |
| 14 |     Q.   You identify the accessibility policy | 02:46:16 |
| 15 | should be periodically reviewed along with technical | 02:46:18 |
| 16 | standards adopted to ensure the considerations for | 02:46:23 |
| 17 | new and emerging technologies are accounted for in | 02:46:27 |
| 18 | the policy. | 02:46:30 |
| 19 |       How is it that new and emerging | 02:46:31 |
| 20 | technologies affect your area of interest at the | 02:46:34 |
| 21 | university? | 02:46:38 |
| 22 |     A.   As I'm sure you're well aware, | 02:46:38 |
| 23 | technology evolves at a very rapid rate, and so while | 02:46:42 |
| 24 | today we're not seeing very much augmented reality, | 02:46:46 |

241

| | | |
|---|---|---|
| 1 | virtual reality, aps on phones that kind of add | 02:46:50 |
| 2 | layers to the environment around you, we see that as | 02:46:54 |
| 3 | something that's going to be in heavy common use in | 02:46:58 |
| 4 | five years. | 02:47:02 |
| 5 | And so the -- the recommendation is that | 02:47:03 |
| 6 | every so often you look at your policy and your | 02:47:06 |
| 7 | accessibility technical standards and you say what | 02:47:09 |
| 8 | new technologies haven't we considered in drafting | 02:47:12 |
| 9 | this policy, and what do we need to think about | 02:47:15 |
| 10 | putting in place as we look towards future | 02:47:17 |
| 11 | technologies. | 02:47:20 |
| 12 | Q.  What is the review calendar or policy in | 02:47:21 |
| 13 | your department? | 02:47:27 |
| 14 | A.  Ohio State's policies are reviewed -- at | 02:47:27 |
| 15 | least our digital accessibility -- web accessibility | 02:47:31 |
| 16 | policy is reviewed every five years. | 02:47:35 |
| 17 | Q.  When was the last time it was reviewed? | 02:47:36 |
| 18 | A.  I'm currently in the process of revising | 02:47:38 |
| 19 | it.  So it was reviewed last fall when I took over | 02:47:41 |
| 20 | management of the team. | 02:47:44 |
| 21 | Q.  So that would mean that four years from | 02:47:46 |
| 22 | now it's going to be reviewed again, at least within | 02:47:49 |
| 23 | four years? | 02:47:52 |
| 24 | A.  That is correct. | 02:47:53 |

242

Peter Bossley, 11/7/2017
Payan v. Los Angeles Community College District

| | | |
|---|---|---|
| 1 | Q.  You continue, "A plan to conduct | 02:47:54 |
| 2 | periodic reviews of existing Legacy software."  What | 02:47:56 |
| 3 | do you mean by that phrase? | 02:47:59 |
| 4 | A.  So that phrase is essentially what we | 02:48:01 |
| 5 | discussed earlier, when looking at -- you have a | 02:48:08 |
| 6 | large amount of software on campus, and you have to | 02:48:10 |
| 7 | start somewhere. | 02:48:13 |
| 8 | And when you look at -- so I put in -- I | 02:48:14 |
| 9 | put in a process to handle new purchases, but what do | 02:48:17 |
| 10 | I do about all the things that I already have, and | 02:48:20 |
| 11 | all the things that people are already using. | 02:48:22 |
| 12 | And so there should be a process to look | 02:48:25 |
| 13 | at the campus landscape, what do you have on campus | 02:48:28 |
| 14 | and where are potential problems, and let's start | 02:48:32 |
| 15 | looking at those and see -- you know, let's go | 02:48:34 |
| 16 | through the process, the policy compliance process, | 02:48:37 |
| 17 | with these existing pieces. | 02:48:39 |
| 18 | Q.  In an example where you have Legacy | 02:48:41 |
| 19 | software, it may even be outdated based on current | 02:48:44 |
| 20 | technologies, but it has some value perhaps for | 02:48:49 |
| 21 | historic reasons, and it was replaced by accessible | 02:48:53 |
| 22 | software, what do you do with the Legacy software? | 02:48:58 |
| 23 | A.  In our -- the way we handle it at Ohio | 02:49:02 |
| 24 | State is our policy defines Legacy software as things | 02:49:08 |

243

Peter Bossley, 11/7/2017
Payan v. Los Angeles Community College District

| | | |
|---|---|---|
| 1 | that were present and implemented before the | 02:49:11 |
| 2 | effective date of any policy revision. | 02:49:14 |
| 3 | And the provisions regarding Legacy | 02:49:16 |
| 4 | software are that if it's subject to a records | 02:49:19 |
| 5 | retention plan and it's not being actively used | 02:49:22 |
| 6 | anymore, that it doesn't have to be made accessible, | 02:49:24 |
| 7 | but that if an eligible person or a representative of | 02:49:28 |
| 8 | an eligible person were to request an accessible -- | 02:49:32 |
| 9 | were to request an accessible version of anything | 02:49:42 |
| 10 | that was contained in that software. | 02:49:44 |
| 11 | So what we particularly see is record | 02:49:46 |
| 12 | systems like transcripts and things like that.  If | 02:49:51 |
| 13 | someone were to request information that they have | 02:49:55 |
| 14 | standing to access, then there's a ten-day timeline | 02:49:56 |
| 15 | to provide them with an accessible version of that | 02:50:00 |
| 16 | information.  But that's only software that's not -- | 02:50:02 |
| 17 | not being used anymore, and is only in archive or | 02:50:07 |
| 18 | Legacy status. | 02:50:11 |
| 19 | Q.  But that's access to the data, not | 02:50:12 |
| 20 | access to the program, right? | 02:50:15 |
| 21 | A.  That is correct. | 02:50:16 |
| 22 | Q.  Thank you. | 02:50:18 |
| 23 | And it continues in the subheading, | 02:50:21 |
| 24 | "Legacy software and websites in use by the | 02:50:24 |

<center>244</center>

| | | |
|---|---|---|
| 1 | institution should be established to monitor ongoing | 02:50:27 |
| 2 | compliance with policy, or when the technical | 02:50:31 |
| 3 | standards or accessible development practices | 02:50:35 |
| 4 | evolve." | 02:50:40 |
| 5 | Are accessible development practices | 02:50:40 |
| 6 | evolving at educational institutions in the United | 02:50:42 |
| 7 | States? | 02:50:47 |
| 8 | A.  It's evolving in the industry as a | 02:50:47 |
| 9 | whole, yes. | 02:50:49 |
| 10 | Q.  And how does that affect what you do? | 02:50:50 |
| 11 | A.  It sometimes gives us more tools and | 02:50:53 |
| 12 | more ways to make things accessible that may have | 02:50:56 |
| 13 | been more challenging or difficult to make accessible | 02:50:59 |
| 14 | previously. | 02:51:03 |
| 15 | Q.  It appears we have now talked about all | 02:51:07 |
| 16 | of the components of your Web/Digital Accessibility | 02:51:10 |
| 17 | Coordinator under your caption of "Oversight | 02:51:15 |
| 18 | Procedures Should Be Implemented". | 02:51:20 |
| 19 | Do you want to add anything else with | 02:51:22 |
| 20 | respect to your perception of what a Web/Digital | 02:51:24 |
| 21 | Accessibility Coordinator should do to meet your | 02:51:29 |
| 22 | representation as to best policies? | 02:51:31 |
| 23 | A.  If you don't have any more questions, I | 02:51:36 |
| 24 | don't have anything to add. | 02:51:38 |

245

Peter Bossley, 11/7/2017
Payan v. Los Angeles Community College District

1          Q.   Okay.  I think you're pretty thorough on        02:51:40

2     that.  The next heading is "Disability                    02:51:42

3     Services/Office of Accessibility".  Do you recall         02:51:45

4     that portion of your report?                              02:51:48

5          A.   I do.  I'm reading it here, too.                 02:51:49

6          Q.   Good.  It continues, "student-facing            02:51:52

7     offices."  What is a student-facing offices?              02:51:54

8          A.   So these offices are -- in the terms of         02:51:56

9     LACCD there, it's their OSS.  These offices are           02:52:01

10    responsible for interfacing with students and helping     02:52:05

11    them -- helping determine what accommodations they        02:52:08

12    need and are entitled to, and helping them navigate       02:52:12

13    that process at the institution.                          02:52:17

14         Q.   But the specific phrase student-facing          02:52:18

15    offices, that's just individuals who deal with the        02:52:22

16    student population, correct?                              02:52:25

17         A.   That is correct.                                02:52:26

18         Q.   It states they will be responsible for          02:52:26

19    providing reasonable accommodations.  What does           02:52:28

20    reasonable accommodations mean?                           02:52:31

21         A.   So in the context -- it differs from            02:52:35

22    context to context, but in the context you're talking     02:52:39

23    about, it's an accommodation that -- a change in the      02:52:42

24    way things are done, policies and procedures, a           02:52:47

                                    246

Peter Bossley, 11/7/2017
Payan v. Los Angeles Community College District

1    change in practices that will allow a student to have    02:52:49

2    a student with a disability to have substantially    02:52:59

3    equivalent access to a classroom or a classroom -- a    02:53:05

4    classroom and its associated parts, not the physical    02:53:10

5    classroom kind of thing.  I'm talking the book, the    02:53:14

6    instructional materials, everything.    02:53:17

7        Q.  Okay.  So the phrase reasonable    02:53:24

8    accommodations doesn't mean all available    02:53:26

9    accommodations, correct?    02:53:30

10       A.  It does not.    02:53:31

11       Q.  And the phrase reasonable, how is it    02:53:33

12   that you determine whether something is reasonable or    02:53:35

13   not in your capacity?    02:53:37

14       A.  That is not really in my position    02:53:42

15   description.  I don't have -- I do not determine    02:53:46

16   student accommodations.    02:53:51

17       Q.  At The Ohio State University who does?    02:53:52

18       A.  That is our Disability Services Office.    02:53:56

19   We have a series of what we call access specialists    02:53:59

20   who do that work.    02:54:03

21       Q.  And are there guidelines that they    02:54:05

22   follow to determine what's a reasonable accommodation    02:54:07

23   for an individual student?    02:54:11

24       A.  There are.    02:54:12

247

Peter Bossley, 11/7/2017
Payan v. Los Angeles Community College District

| | | |
|---|---|---|
| 1 | Q.  Did you bring those with you today? | 02:54:12 |
| 2 | A.  I did not. | 02:54:14 |
| 3 | Q.  Okay.  Are they accessible somewhere? | 02:54:15 |
| 4 | A.  I don't -- I honestly don't know. | 02:54:19 |
| 5 | Q.  But that's beyond your pay grade, right? | 02:54:25 |
| 6 | A.  It is, to whatever degree.  Yeah, I | 02:54:29 |
| 7 | mean, I'm not -- I have no responsibility for | 02:54:33 |
| 8 | determining student accommodations. | 02:54:36 |
| 9 | Q.  When I hear reasonable accommodations, | 02:54:37 |
| 10 | that sounds like it's somewhat flexible.  Do you have | 02:54:40 |
| 11 | any understanding about reasonable accommodations | 02:54:44 |
| 12 | being anything other than flexible? | 02:54:49 |
| 13 | A.  It's -- it's -- again, it's outside my | 02:54:52 |
| 14 | sphere of professional expertise. | 02:54:57 |
| 15 | Q.  Okay.  The person, that Disability | 02:54:59 |
| 16 | Services Office of Accessibility -- and by the way, | 02:55:07 |
| 17 | what is the title at The Ohio State University? | 02:55:09 |
| 18 | A.  Our office is called Office of Student | 02:55:12 |
| 19 | Life Disability Services. | 02:55:14 |
| 20 | Q.  So under that category, students with | 02:55:17 |
| 21 | disabilities should have -- the individual who holds | 02:55:19 |
| 22 | that position, I apologize -- should have strong | 02:55:22 |
| 23 | relationships with the Web/Digital Accessibility | 02:55:26 |
| 24 | Coordinator.  And that's the one we were just talking | 02:55:30 |

248

Peter Bossley, 11/7/2017
Payan v. Los Angeles Community College District

| | | |
|---|---|---|
| 1 | about on pages 23 and 24, correct? | 02:55:32 |
| 2 | A.  That is correct. | 02:55:35 |
| 3 | Q.  And the complaint and exception process | 02:55:36 |
| 4 | should be available through this office and should be | 02:55:45 |
| 5 | triggered when accessibility issues are brought to | 02:55:47 |
| 6 | the attention of the office or institution.  Are | 02:55:50 |
| 7 | there any other options for that program or policy? | 02:55:52 |
| 8 | A.  I don't understand your meaning. | 02:56:00 |
| 9 | Q.  Well, it says, the exception process | 02:56:01 |
| 10 | should be available through this office, it doesn't | 02:56:03 |
| 11 | say must, and the office should be triggered when | 02:56:05 |
| 12 | accessibility issues -- so it sounds like it's an | 02:56:13 |
| 13 | alternative to something else.  I'm trying to figure | 02:56:16 |
| 14 | out if you know what that something else is. | 02:56:18 |
| 15 | A.  The alternative is that there shouldn't | 02:56:19 |
| 16 | ever be a need for them to come and find out about | 02:56:22 |
| 17 | things after the fact. | 02:56:27 |
| 18 | Q.  Or is the alternative that the process | 02:56:28 |
| 19 | for exceptions and complaint should be through | 02:56:30 |
| 20 | somebody other than Disability Services/Office of | 02:56:30 |
| 21 | Accessibility? | 02:56:38 |
| 22 | A.  Well, I guess I was -- I was unclear | 02:56:38 |
| 23 | that the exception process should be owned.  The | 02:56:40 |
| 24 | exception process and the complaint process should | 02:56:44 |

249

Peter Bossley, 11/7/2017
Payan v. Los Angeles Community College District

| | | |
|---|---|---|
| 1 | not be owned by disability services.  They should | 02:56:46 |
| 2 | make those processes available to students, but they | 02:56:49 |
| 3 | shouldn't be the ones administering it.  That really | 02:56:53 |
| 4 | belongs under the Web and Digital Accessibility | 02:56:56 |
| 5 | Coordinator area. | 02:56:59 |
| 6 | Q.  Or an independent panel, how is that? | 02:57:01 |
| 7 | A.  Or an independent panel. | 02:57:03 |
| 8 | Q.  Under the disability services, I'm not | 02:57:09 |
| 9 | going to continue to repeat the full reference, | 02:57:12 |
| 10 | disability services section of your report, you | 02:57:15 |
| 11 | state, "When the students with disabilities enroll in | 02:57:18 |
| 12 | a class, the Disabilities Services Office should | 02:57:22 |
| 13 | ensure that any technology planned for use in the | 02:57:25 |
| 14 | class has been evaluated for compliance with the | 02:57:27 |
| 15 | instructor's -- excuse me -- the institutions's | 02:57:30 |
| 16 | accessibility policy." | 02:57:34 |
| 17 | At your university are the instructors | 02:57:37 |
| 18 | entitled to know who the students are with | 02:57:45 |
| 19 | disabilities and what those disabilities are, without | 02:57:49 |
| 20 | the permission of the student? | 02:57:52 |
| 21 | A.  They are not. | 02:57:54 |
| 22 | Q.  Okay.  So when students with | 02:57:55 |
| 23 | disabilities enroll in a class, not first attend, but | 02:57:57 |
| 24 | enroll in a class, you want this Disability Services | 02:58:01 |

250

| | | |
|---|---|---|
| 1 | Office to go to the instructors and make sure certain | 02:58:05 |
| 2 | things comply with the needs of the student, correct? | 02:58:09 |
| 3 | A.  We do do that, yes. | 02:58:12 |
| 4 | Q.  Okay.  How is it that you get the | 02:58:14 |
| 5 | student's permission to do that? | 02:58:16 |
| 6 | A.  We don't -- we don't -- we don't tell | 02:58:17 |
| 7 | the instructor anything about the student in | 02:58:22 |
| 8 | particular. | 02:58:26 |
| 9 | Q.  So you just say you're going to have a | 02:58:26 |
| 10 | student with this disability? | 02:58:27 |
| 11 | A.  We don't even say that.  We say, "You | 02:58:28 |
| 12 | will have a student with disability registered for | 02:58:30 |
| 13 | your class.  These are the actions we need you to | 02:58:33 |
| 14 | take." | 02:58:36 |
| 15 | Q.  Does anybody contest to that policy in | 02:58:40 |
| 16 | the sense that it's revealing that somebody in that | 02:58:43 |
| 17 | universe of these students is disabled and you just | 02:58:45 |
| 18 | revealed potentially private information about that? | 02:58:49 |
| 19 | A.  I haven't revealed anything. | 02:58:51 |
| 20 | Q.  No, you've revealed a student in a | 02:58:53 |
| 21 | limited universe, the attendees in a given class, one | 02:58:55 |
| 22 | of them or more has a certain disability, and you're | 02:59:00 |
| 23 | telling the professor how they need to act to address | 02:59:05 |
| 24 | that disability. | 02:59:08 |

251

Peter Bossley, 11/7/2017
Payan v. Los Angeles Community College District

| | | |
|---|---|---|
| 1 | A.  I haven't identified any disability in | 02:59:09 |
| 2 | particular. | 02:59:12 |
| 3 | Q.  Well, are you going to need electronic | 02:59:13 |
| 4 | screen reader accessibility for a person who is | 02:59:18 |
| 5 | limited by a disability because they utilize a | 02:59:20 |
| 6 | wheelchair but otherwise have sight? | 02:59:24 |
| 7 | A.  No. | 02:59:25 |
| 8 | Q.  Okay.  So by telling the professor that | 02:59:25 |
| 9 | we're going to have a need for screen reader | 02:59:28 |
| 10 | accessibility, you basically told the professor or | 02:59:30 |
| 11 | instructor that a student in that class is going to | 02:59:37 |
| 12 | fall into the category of visually impaired? | 02:59:39 |
| 13 | A.  I have. | 02:59:42 |
| 14 | Q.  Okay.  Does that conflict with other | 02:59:43 |
| 15 | policies at the university? | 02:59:44 |
| 16 | A.  It does not. | 02:59:45 |
| 17 | Q.  Do you know what the policies are in the | 02:59:48 |
| 18 | State of California on that? | 02:59:49 |
| 19 | A.  I am not aware. | 02:59:50 |
| 20 | Q.  So you have no opinion one way or the | 02:59:53 |
| 21 | other whether such an action would violate California | 02:59:55 |
| 22 | statutes? | 03:00:01 |
| 23 | A.  I have very little familiarity with | 03:00:02 |
| 24 | California law. | 03:00:04 |

<div align="center">252</div>

Peter Bossley, 11/7/2017
Payan v. Los Angeles Community College District

| | | |
|---|---|---|
| 1 | Q.  That's fine.  Okay. | 03:00:04 |
| 2 | It continues in that subsection, "A | 03:00:06 |
| 3 | software plan for use in the class was not evaluated, | 03:00:09 |
| 4 | or inaccessible software is being used that does not | 03:00:14 |
| 5 | already have an exception and equally effective | 03:00:18 |
| 6 | alternative access plan, the instructor should be | 03:00:21 |
| 7 | informed that they will need to comply with | 03:00:25 |
| 8 | applicable provisions of the institution's | 03:00:29 |
| 9 | accessibility policy."  So they can't use that | 03:00:31 |
| 10 | software under that circumstance? | 03:00:34 |
| 11 | A.  They cannot use that software at that | 03:00:36 |
| 12 | time under that circumstance until they satisfy the | 03:00:41 |
| 13 | requirements of the policy. | 03:00:47 |
| 14 | Q.  Well, what happens if -- and this is -- | 03:00:50 |
| 15 | I just need to know out of interest. | 03:00:52 |
| 16 | You have a class and there are 50 | 03:00:55 |
| 17 | students, and there's going to be one sight impaired | 03:00:57 |
| 18 | student, and under this policy you recommend, | 03:01:02 |
| 19 | somebody from this Disability Services Office goes to | 03:01:04 |
| 20 | the instructor of that course, and says you're going | 03:01:06 |
| 21 | have a sight impaired student, so you need to do | 03:01:10 |
| 22 | whatever with respect to accessibility, and the | 03:01:15 |
| 23 | software that the professor was using doesn't meet | 03:01:18 |
| 24 | the full requirements of accessibility for a sight | 03:01:21 |

253

Peter Bossley, 11/7/2017
Payan v. Los Angeles Community College District

| | | |
|---|---|---|
| 1 | impaired student. | 03:01:25 |
| 2 | The sight impaired student doesn't even | 03:01:26 |
| 3 | show up to class, they dropped the class.  Can the | 03:01:29 |
| 4 | professor reinstitute the policy -- I mean the | 03:01:35 |
| 5 | programs that he utilized before? | 03:01:40 |
| 6 | A.  We haven't had that exact fact pattern, | 03:01:41 |
| 7 | so I don't know what our compliance stance would be | 03:01:45 |
| 8 | under those circumstances. | 03:01:49 |
| 9 | Q.  That's a pretty good answer.  I accept | 03:01:54 |
| 10 | your candor. | 03:01:56 |
| 11 | The next subpoint, "Since these issues | 03:01:59 |
| 12 | may be discovered close to the beginning of a term, | 03:02:02 |
| 13 | or during a class term, extreme priority should be | 03:02:04 |
| 14 | put on rapidly initiating the process to determine if | 03:02:09 |
| 15 | an equally effective alternative access plan can be | 03:02:12 |
| 16 | established." | 03:02:16 |
| 17 | What happens if an equally effective | 03:02:18 |
| 18 | alternative access plan can't be established? | 03:02:20 |
| 19 | A.  In any case, use of the software should | 03:02:26 |
| 20 | be suspended until that determination is made.  But | 03:02:28 |
| 21 | if it's not possible, then the software shouldn't be | 03:02:31 |
| 22 | used. | 03:02:33 |
| 23 | Q.  Okay.  So we're in class -- a semester | 03:02:33 |
| 24 | is 16 weeks at your university? | 03:02:36 |

254

1    A.   Approximately.  It might be 17, I'm not          03:02:39

2  a hundred percent.  It's been a long time since I've    03:02:42

3  been in school.                                          03:02:44

4    Q.   So let's say they run 16 or 17 weeks,            03:02:45

5  and 14 weeks into the semester an accessibility issue    03:02:48

6  pops up that no one anticipated, but there it is.        03:02:53

7         What do you do then with respect to              03:02:58

8  providing testing on the material that was provided      03:03:07

9  by that software that eventually turned out to have      03:03:09

10  an accessibility issue?                                 03:03:12

11    A.   I'm not clear.  How could -- the               03:03:13

12  scenario doesn't make sense.                            03:03:18

13    Q.   Last chapter of the book -- maybe you          03:03:19

14  got to the last chapter and it doesn't convert.         03:03:22

15  You've gone through the whole class.  You as a sight    03:03:25

16  impaired student had no problem whatsoever, but now     03:03:28

17  we got to the last chapter, the last three weeks of     03:03:31

18  the semester, and that software violates this program   03:03:34

19  we have been talking about and they can't rely upon     03:03:39

20  it, the instructor, for the course.                     03:03:41

21         Does that mean even the testing that was        03:03:44

22  otherwise accessible for most of the course?            03:03:47

23    A.   Then the instructor would need to              03:03:49

24  decouple that last chapter from anything that they      03:03:52

255

Peter Bossley, 11/7/2017
Payan v. Los Angeles Community College District

| | | |
|---|---|---|
| 1 | were doing. | 03:03:55 |
| 2 | Q.  Does that put a tremendous burden on the | 03:03:57 |
| 3 | professor to do something that wasn't discovered | 03:03:59 |
| 4 | until a unique situation arose, not even a nonsighted | 03:04:02 |
| 5 | student knew about it? | 03:04:07 |
| 6 | A.  That's why we recommend proactive | 03:04:08 |
| 7 | compliance programs to find out about this stuff | 03:04:11 |
| 8 | sooner. | 03:04:13 |
| 9 | Q.  Well, the professor did everything he | 03:04:14 |
| 10 | could.  Maybe they added a new chapter because they | 03:04:16 |
| 11 | had an extra week that was available for instruction. | 03:04:19 |
| 12 | I'm trying to figure out what happens | 03:04:25 |
| 13 | when the software comes up, it's a unique situation, | 03:04:27 |
| 14 | do you just wash everything clean from that point? | 03:04:30 |
| 15 | A.  We do. | 03:04:32 |
| 16 | Q.  What happens to the other students in | 03:04:34 |
| 17 | the class? | 03:04:35 |
| 18 | A.  They get washed clean, too. | 03:04:36 |
| 19 | Q.  Okay.  So all of their effort and study | 03:04:40 |
| 20 | is for not under that scenario? | 03:04:42 |
| 21 | A.  If you would like to characterize it | 03:04:45 |
| 22 | with that, I suppose that's an accurate statement. | 03:04:50 |
| 23 | Q.  For not, meaning they don't get college | 03:04:52 |
| 24 | classes for it? | 03:04:57 |

256

| | | |
|---|---|---|
| 1 | MS. KREVOR-WEISBAUM:  Objection. | 03:04:58 |
| 2 | By Mr. Cleeland: | 03:04:59 |
| 3 | Q.  College classes always have a benefit | 03:04:59 |
| 4 | because you learn something. | 03:05:01 |
| 5 | A.  So my statement was that -- | 03:05:02 |
| 6 | MS. KREVOR-WEISBAUM:  You can answer. | 03:05:05 |
| 7 | THE WITNESS:  My statement wasn't that | 03:05:05 |
| 8 | they scrap the class all together, my statement was | 03:05:07 |
| 9 | that last piece that's not accessible can't be used. | 03:05:10 |
| 10 | By Mr. Cleeland: | 03:05:14 |
| 11 | Q.  Okay.  I was hoping that's what I asked | 03:05:14 |
| 12 | from the beginning, and I thought you said you had to | 03:05:17 |
| 13 | get rid of everything.  I apologize.  I misunderstood | 03:05:20 |
| 14 | what you were saying. | 03:05:24 |
| 15 | A.  No, that's what I meant when I said they | 03:05:24 |
| 16 | have to decouple that last chapter.  That last | 03:05:26 |
| 17 | chapter has to be discarded from any testing, any | 03:05:29 |
| 18 | future testing, anything that that is -- but the rest | 03:05:33 |
| 19 | of it can stand on its own. | 03:05:37 |
| 20 | If the student didn't have any trouble | 03:05:38 |
| 21 | accessing chapters 1 through 14, then they can | 03:05:41 |
| 22 | operate on chapters 1 through 14. | 03:05:43 |
| 23 | Q.  But the text was not accessible under | 03:05:45 |
| 24 | the guidelines of the university.  Even though it was | 03:05:49 |

<div align="center">257</div>

| | | |
|---|---|---|
| 1 | a little, tiny part, the text was not accessible in | 03:05:51 |
| 2 | the guidelines you discussed, does that create a | 03:05:56 |
| 3 | problem? | 03:05:59 |
| 4 | A.  Have we moved on to something different? | 03:06:00 |
| 5 | Q.  No, we're still on the same category of | 03:06:04 |
| 6 | disability services. | 03:06:06 |
| 7 | A.  If it's -- if it's a simple piece of | 03:06:08 |
| 8 | text that we can give to the student, then if we can | 03:06:11 |
| 9 | make that text accessible to them, then there's not a | 03:06:15 |
| 10 | problem. | 03:06:19 |
| 11 | Q.  So you're talking about an | 03:06:19 |
| 12 | accommodation, correct? | 03:06:21 |
| 13 | MS. KREVOR-WEISBAUM:  Objection.  You | 03:06:23 |
| 14 | can answer. | 03:06:24 |
| 15 | THE WITNESS:  I'm talking about an | 03:06:26 |
| 16 | accommodation, yes. | 03:06:27 |
| 17 | By Mr. Cleeland: | 03:06:28 |
| 18 | Q.  Okay.  Within the same category of | 03:06:29 |
| 19 | disability services, the next bullet point, "A | 03:06:34 |
| 20 | grievance process should be available to any student | 03:06:38 |
| 21 | who is dissatisfied..."  And we have talked about the | 03:06:41 |
| 22 | grievance program before, correct, or process? | 03:06:45 |
| 23 | A.  This -- this is a little -- so this is a | 03:06:50 |
| 24 | little different.  So when we talk about a complaint | 03:06:53 |

258

Peter Bossley, 11/7/2017
Payan v. Los Angeles Community College District

| | | |
|---|---|---|
| 1 | process, that's -- that's a complaint about the | 03:06:55 |
| 2 | inability to be able to access something. | 03:06:59 |
| 3 | This would -- what this is referring to | 03:07:04 |
| 4 | is a grievance process specifically regarding the | 03:07:08 |
| 5 | performance of the disabilities services group. | 03:07:10 |
| 6 | Q.  As to a prior complaint? | 03:07:12 |
| 7 | MS. KREVOR-WEISBAUM:  Objection.  You | 03:07:16 |
| 8 | can answer. | 03:07:17 |
| 9 | THE WITNESS:  As to any duty that that | 03:07:23 |
| 10 | office performs. | 03:07:25 |
| 11 | By Mr. Cleeland: | 03:07:27 |
| 12 | Q.  Well, I'm trying to figure out, is a | 03:07:27 |
| 13 | complaint separate from a grievance? | 03:07:29 |
| 14 | A.  In this context, yes. | 03:07:31 |
| 15 | Q.  If you file a complaint as a student, | 03:07:32 |
| 16 | and you don't feel that it was resolved to your | 03:07:36 |
| 17 | satisfaction, does that allow you to proceed to this | 03:07:38 |
| 18 | grievance process you're referring to? | 03:07:41 |
| 19 | A.  They are two distinct -- they are not | 03:07:45 |
| 20 | the same -- it's not the same arena. | 03:07:47 |
| 21 | Q.  I agree.  But you didn't get | 03:07:50 |
| 22 | satisfaction with your complaint, you now have the | 03:07:52 |
| 23 | opportunity to go to the grievance procedure; is that | 03:07:53 |
| 24 | what you're talking about? | 03:07:55 |

259

Peter Bossley, 11/7/2017
Payan v. Los Angeles Community College District

| | | |
|---|---|---|
| 1 | A.  Yes, but the grievance procedure is also | 03:07:56 |
| 2 | not limited to previous complaints, it's regarding | 03:07:59 |
| 3 | anything that the -- the Disability Services | 03:08:02 |
| 4 | Office -- | 03:08:08 |
| 5 | Q.  Well, not anything.  You can't go off to | 03:08:08 |
| 6 | the grievance office and say I've got a grievance for | 03:08:13 |
| 7 | anything, it has to fall within the authority of the | 03:08:15 |
| 8 | grievance officer, correct? | 03:08:18 |
| 9 | A.  Correct. | 03:08:20 |
| 10 | Q.  I thought that's what you meant. | 03:08:20 |
| 11 | "The process should be administered by a | 03:08:22 |
| 12 | campus administrator who is not directly involved in | 03:08:24 |
| 13 | the day-to-day operations of the office..."  That | 03:08:26 |
| 14 | means the Office of Disability Services, correct? | 03:08:30 |
| 15 | A.  Correct. | 03:08:37 |
| 16 | Q.  Still within that category talking about | 03:08:37 |
| 17 | who should hear this grievance, "Students should be | 03:08:40 |
| 18 | informed of the existence of this process through a | 03:08:45 |
| 19 | communications plan, intake interviews, and through | 03:08:48 |
| 20 | regular communications throughout their association | 03:08:50 |
| 21 | with the institution." | 03:08:52 |
| 22 | We're only talking about grievances | 03:08:57 |
| 23 | related to accessibility issues, right? | 03:08:58 |
| 24 | A.  Related to disability services, yes. | 03:09:02 |

260

Peter Bossley, 11/7/2017
Payan v. Los Angeles Community College District

| | | |
|---|---|---|
| 1 | Q.  "While this process should not replace | 03:09:04 |
| 2 | more informal dispute resolution methods, in the case | 03:09:08 |
| 3 | where a dispute cannot be resolved, a formal process, | 03:09:13 |
| 4 | including a formal documented investigation and | 03:09:16 |
| 5 | resolution, is a best practice." | 03:09:19 |
| 6 | So that's -- we're talking about the | 03:09:23 |
| 7 | grievance issue, correct? | 03:09:24 |
| 8 | A.  Correct. | 03:09:25 |
| 9 | Q.  Then we get to the heading | 03:09:41 |
| 10 | "Conclusions", which is a good thing to hear in a | 03:09:43 |
| 11 | deposition.  Is this an attempt by you to recap your | 03:09:47 |
| 12 | report and findings? | 03:09:53 |
| 13 | A.  It's an attempt to sum up my | 03:09:55 |
| 14 | conclusions. | 03:09:59 |
| 15 | Q.  Okay.  You state, "It is my opinion to a | 03:09:59 |
| 16 | reasonable degree of professional certainty..."  What | 03:10:01 |
| 17 | is a reasonable degree of professional certainty? | 03:10:05 |
| 18 | A.  A reasonable degree of professional | 03:10:08 |
| 19 | certainty means that in my opinion as a professional | 03:10:10 |
| 20 | in this space, with all the information I have | 03:10:15 |
| 21 | available to me, I believe reasonably about the -- I | 03:10:18 |
| 22 | reasonably believe the following, the conclusions | 03:10:24 |
| 23 | that I'm about to state. | 03:10:29 |
| 24 | Q.  So you reasonably believe the following | 03:10:30 |

261

| | | |
|---|---|---|
| 1 | statements, correct? | 03:10:33 |
| 2 | A.  Correct. | 03:10:34 |
| 3 | Q.  Now, the reasonable degree of | 03:10:34 |
| 4 | professional certainty, did someone tell you to use | 03:10:36 |
| 5 | that phrase? | 03:10:38 |
| 6 | A.  It was told to me, yes. | 03:10:40 |
| 7 | Q.  By whom? | 03:10:41 |
| 8 | A.  I don't recall. | 03:10:42 |
| 9 | Q.  Was it a lawyer? | 03:10:44 |
| 10 | A.  I believe it was, yes. | 03:10:46 |
| 11 | Q.  Was it a lawyer who represents the | 03:10:47 |
| 12 | Plaintiffs in these cases? | 03:10:49 |
| 13 | A.  I believe it was, yes. | 03:10:50 |
| 14 | Q.  Do you remember when you were told to | 03:10:53 |
| 15 | put that language in? | 03:10:54 |
| 16 | A.  I was not instructed to put the language | 03:11:00 |
| 17 | in.  I was asked does this accurately represent, so I | 03:11:02 |
| 18 | want to make that clear. | 03:11:10 |
| 19 | Q.  I'm sorry.  Does -- the question does | 03:11:11 |
| 20 | this accurately represent.  I didn't see that | 03:11:13 |
| 21 | statement anywhere in your report. | 03:11:16 |
| 22 | I'm talking about the phrase reasonable | 03:11:18 |
| 23 | degree of professional certainty.  Who used those | 03:11:20 |
| 24 | words, if anyone, other than you? | 03:11:24 |

262

Peter Bossley, 11/7/2017
Payan v. Los Angeles Community College District

| | | |
|---|---|---|
| 1 | A.  I don't recall, specifically.  It was an | 03:11:28 |
| 2 | attorney from -- from the law firm representing the | 03:11:33 |
| 3 | Plaintiffs. | 03:11:37 |
| 4 | Q.  And was that recommendation given to you | 03:11:37 |
| 5 | done after you provided a draft of your materials to | 03:11:44 |
| 6 | the lawyers? | 03:11:51 |
| 7 | MS. KREVOR-WEISBAUM:  Objection.  You | 03:11:51 |
| 8 | may answer. | 03:11:52 |
| 9 | THE WITNESS:  It was. | 03:11:53 |
| 10 | By Mr. Cleeland: | 03:11:54 |
| 11 | Q.  So someone told you to add information | 03:11:55 |
| 12 | to the report for purposes of the report? | 03:11:57 |
| 13 | A.  No, sir, that's not correct. | 03:11:59 |
| 14 | Q.  Well, why did you add it? | 03:12:01 |
| 15 | A.  It was suggested as a possible way to | 03:12:02 |
| 16 | make the report clear. | 03:12:08 |
| 17 | Q.  And you added it because it was | 03:12:10 |
| 18 | suggested, correct? | 03:12:12 |
| 19 | A.  I added it because it was suggested. | 03:12:13 |
| 20 | Q.  Okay.  And this is the exact language -- | 03:12:15 |
| 21 | A.  It is not the exact language. | 03:12:19 |
| 22 | Q.  Hang on.  This is the exact language | 03:12:21 |
| 23 | utilized by Dr. Gunderson, did you know that? | 03:12:23 |
| 24 | A.  I was not aware of that. | 03:12:27 |

263

Peter Bossley, 11/7/2017
Payan v. Los Angeles Community College District

| | | |
|---|---|---|
| 1 | Q.  All right.  So I just was curious as to | 03:12:28 |
| 2 | the exact language being used by two people many | 03:12:31 |
| 3 | miles apart. | 03:12:34 |
| 4 | Number 1.  "Notwithstanding LACCD's | 03:12:38 |
| 5 | written policy on website accessibility, Regulation | 03:12:42 |
| 6 | B-33..."  So LACCD does have a written policy | 03:12:45 |
| 7 | regarding website accessibility, correct? | 03:12:48 |
| 8 | A.  They do. | 03:12:53 |
| 9 | Q.  "...the software and website described | 03:12:55 |
| 10 | above present significant accessibility barriers." | 03:13:00 |
| 11 | Do the software and website materials | 03:13:03 |
| 12 | described above prevent absolute barriers to | 03:13:04 |
| 13 | accessibility by sight impaired students? | 03:13:13 |
| 14 | A.  Did you ask me a question? | 03:13:19 |
| 15 | Q.  Yeah. | 03:13:20 |
| 16 | MR. CLEELAND:  Why don't you read it | 03:13:21 |
| 17 | back, please? | 03:13:22 |
| 18 | (Question read back.) | 03:13:22 |
| 19 | THE WITNESS:  I believe they do. | 03:14:04 |
| 20 | By Mr. Cleeland: | 03:14:05 |
| 21 | Q.  What do you mean by "absolute"? | 03:14:06 |
| 22 | A.  I believe that screen reader users would | 03:14:07 |
| 23 | have an absolute inability to use a number of those | 03:14:10 |
| 24 | interfaces. | 03:14:13 |

264

| | | |
|---|---|---|
| 1 | Q.  Well, you just said a number of.  I'm | 03:14:14 |
| 2 | talking about the software and websites you described | 03:14:17 |
| 3 | in your report. | 03:14:21 |
| 4 | Do they prevent access, complete access, | 03:14:22 |
| 5 | by a -- well, that's a bad phrase.  Do they | 03:14:29 |
| 6 | prevent -- absolutely prevent access by sight | 03:14:33 |
| 7 | impaired students? | 03:14:35 |
| 8 | A.  Some of them do, yes. | 03:14:36 |
| 9 | Q.  Well, that's the problem.  You said some | 03:14:38 |
| 10 | of them.  You just casually said the software and | 03:14:40 |
| 11 | website described above.  So that's everything in | 03:14:42 |
| 12 | your report, right? | 03:14:45 |
| 13 | MS. KREVOR-WEISBAUM:  Objection. | 03:14:47 |
| 14 | THE WITNESS:  Is there a question? | 03:14:54 |
| 15 | By Mr. Cleeland: | 03:15:00 |
| 16 | Q.  Yeah.  The software and website | 03:15:01 |
| 17 | described above -- this is your report.  So the | 03:15:03 |
| 18 | software and website described above and your | 03:15:05 |
| 19 | conclusions talk about all of the software you | 03:15:08 |
| 20 | referred to in your written report; is that correct? | 03:15:10 |
| 21 | A.  That is correct. | 03:15:13 |
| 22 | Q.  Okay.  So that says the software and | 03:15:14 |
| 23 | website described above present significant | 03:15:19 |
| 24 | accessibility.  I asked is it an absolute bar to | 03:15:21 |

265

Peter Bossley, 11/7/2017
Payan v. Los Angeles Community College District

| | | |
|---|---|---|
| 1 | sight impaired students? | 03:15:26 |
| 2 | A.  Not in all cases, no. | 03:15:27 |
| 3 | Q.  Okay.  It continues that the, | 03:15:28 |
| 4 | "...significant accessibility barriers that prevent | 03:15:40 |
| 5 | students with disabilities, including blind students, | 03:15:42 |
| 6 | from having access to the information..." | 03:15:45 |
| 7 | Is that all information in all of the | 03:15:47 |
| 8 | software and webs referred to in your report? | 03:15:49 |
| 9 | A.  Not all. | 03:15:53 |
| 10 | Q.  It continues, "...transactions, and | 03:15:53 |
| 11 | benefits available from these sources equal to that | 03:15:55 |
| 12 | available to their nondisabled peers."  Not as to all | 03:15:58 |
| 13 | components of the software and website, correct? | 03:16:03 |
| 14 | A.  Correct. | 03:16:08 |
| 15 | Q.  At No. 2 you state, "LACCD lacks the | 03:16:10 |
| 16 | necessary procedures and policies to ensure that the | 03:16:14 |
| 17 | software and website are, in fact, accessible and | 03:16:17 |
| 18 | that they will be maintained in an accessible | 03:16:21 |
| 19 | fashion." | 03:16:24 |
| 20 | So if we can go back to the components, | 03:16:25 |
| 21 | LACCD lacks the necessary procedures and policies to | 03:16:28 |
| 22 | ensure that the software and website are accessible. | 03:16:31 |
| 23 | What are those policies and procedures to ensure that | 03:16:35 |
| 24 | the software and website are, in fact, accessible? | 03:16:39 |

266

| 1 | A.  All of the items that we have discussed | 03:16:44 |
| 2 | above in the previous section. | 03:16:49 |
| 3 | Q.  And as limited by your testimony, | 03:16:51 |
| 4 | correct? | 03:16:52 |
| 5 | MS. KREVOR-WEISBAUM:  Objection. | 03:16:53 |
| 6 | THE WITNESS:  What does that mean, as | 03:16:55 |
| 7 | limited -- | 03:16:58 |
| 8 | By Mr. Cleeland: | 03:16:59 |
| 9 | Q.  Well, just the words out of your mouth. | 03:17:00 |
| 10 | As an example, most recently, on the prior page, we | 03:17:02 |
| 11 | talked about significant accessibility is not | 03:17:06 |
| 12 | absolute accessibility to barriers. | 03:17:08 |
| 13 | So by your testimony you've limited | 03:17:13 |
| 14 | either your report or testimony, or expanded on your | 03:17:14 |
| 15 | report or testimony.  That's all I'm asking. | 03:17:16 |
| 16 | A.  I don't follow. | 03:17:21 |
| 17 | Q.  Well, LACCD lacks the necessary | 03:17:23 |
| 18 | procedures and policies to ensure that the software | 03:17:26 |
| 19 | and website are, in fact, accessible.  The software | 03:17:28 |
| 20 | is -- some of the software is accessible, correct? | 03:17:32 |
| 21 | A.  I wouldn't characterize any of that | 03:17:37 |
| 22 | software as accessible. | 03:17:38 |
| 23 | Q.  None of the software that you looked at | 03:17:43 |
| 24 | in this assignment was accessible to any degree by a | 03:17:45 |

267

| | | |
|---|---|---|
| 1 | sight impaired student? | 03:17:50 |
| 2 | A.  I didn't say that.  You said is it | 03:17:51 |
| 3 | accessible. | 03:17:54 |
| 4 | Q.  I said in any way accessible.  That's | 03:17:54 |
| 5 | what I said, sir. | 03:17:58 |
| 6 | A.  Can you repeat the question again? | 03:18:00 |
| 7 | Q.  Sure.  LACCD lacks the necessary | 03:18:03 |
| 8 | procedures and policies to ensure that the software | 03:18:07 |
| 9 | and website are, in fact, accessible.  You don't say | 03:18:10 |
| 10 | universally acceptable, totally acceptable, | 03:18:15 |
| 11 | absolutely acceptable. | 03:18:19 |
| 12 | MS. KREVOR-WEISBAUM:  Not "acceptable", | 03:18:22 |
| 13 | "accessible". | 03:18:25 |
| 14 | MR. CLEELAND:  I apologize, that was my | 03:18:28 |
| 15 | fault. | 03:18:30 |
| 16 | By Mr. Cleeland: | 03:18:30 |
| 17 | Q.  So some of the software is accessible to | 03:18:30 |
| 18 | sight impaired students? | 03:18:33 |
| 19 | A.  I don't agree. | 03:18:34 |
| 20 | Q.  Well, we're going to spend a lot of time | 03:18:36 |
| 21 | then, because I've got to go back to what you | 03:18:39 |
| 22 | testified to. | 03:18:41 |
| 23 | MS. KREVOR-WEISBAUM:  Why don't ask you | 03:18:47 |
| 24 | him how he defines accessible? | 03:18:48 |

268

Peter Bossley, 11/7/2017
Payan v. Los Angeles Community College District

| | | |
|---|---|---|
| 1 | MR. CLEELAND:  I've asked him that | 03:18:51 |
| 2 | several times.  And I don't want to get the objection | 03:18:52 |
| 3 | that's asked and answered, but I'll be happy to do | 03:18:55 |
| 4 | that. | 03:18:57 |
| 5 | By Mr. Cleeland: | 03:18:57 |
| 6 | Q.  I'm going to read the sentence to you | 03:18:58 |
| 7 | again, and I want your definition of a word in here. | 03:19:00 |
| 8 | "LACCD lacks the necessary procedures | 03:19:03 |
| 9 | and policies to ensure that the software and website | 03:19:06 |
| 10 | are, in fact, accessible, and that they will be | 03:19:09 |
| 11 | maintained in an accessible fashion."  Would you tell | 03:19:13 |
| 12 | me what you mean by the word "accessible" in that | 03:19:17 |
| 13 | sentence? | 03:19:19 |
| 14 | A.  I mean functionally accessible. | 03:19:20 |
| 15 | Q.  Now we have changed it, so it's now | 03:19:23 |
| 16 | functionally accessible, correct? | 03:19:25 |
| 17 | MS. KREVOR-WEISBAUM:  Objection.  You | 03:19:28 |
| 18 | can answer. | 03:19:29 |
| 19 | THE WITNESS:  We haven't changed it. | 03:19:31 |
| 20 | By Mr. Cleeland: | 03:19:33 |
| 21 | Q.  Well, sir, you didn't write functionally | 03:19:33 |
| 22 | accessible in there, did you? | 03:19:35 |
| 23 | A.  I did not. | 03:19:39 |
| 24 | Q.  And you used the word functionally | 03:19:39 |

269

| | | |
|---|---|---|
| 1 | accessible throughout your testimony, correct? | 03:19:42 |
| 2 | A.  Yes. | 03:19:45 |
| 3 | Q.  Okay.  So is there some reason you | 03:19:45 |
| 4 | didn't write functionally accessible in this specific | 03:19:47 |
| 5 | paragraph No. 2 under the heading "Conclusions"? | 03:19:50 |
| 6 | A.  I don't know. | 03:19:53 |
| 7 | Q.  Is any of the software that you looked | 03:19:57 |
| 8 | at, as a result of being retained as an expert | 03:19:59 |
| 9 | witness in this matter, accessible to screen readers? | 03:20:03 |
| 10 | A.  No. | 03:20:08 |
| 11 | Q.  Nothing?  How did you get into there for | 03:20:10 |
| 12 | taking the screen shots? | 03:20:13 |
| 13 | A.  Well, as you are aware, I had some help. | 03:20:15 |
| 14 | Q.  Okay.  Did you open the websites, or did | 03:20:18 |
| 15 | somebody else do it? | 03:20:22 |
| 16 | A.  I opened the website. | 03:20:23 |
| 17 | Q.  Okay.  So you had accessibility to those | 03:20:24 |
| 18 | websites, didn't you? | 03:20:28 |
| 19 | A.  I think you're misconstruing the term | 03:20:30 |
| 20 | "accessible". | 03:20:32 |
| 21 | Q.  Well, you qualified it as functional | 03:20:32 |
| 22 | accessibility.  I'm just using accessible.  Is | 03:20:37 |
| 23 | functional accessibility a component of accessible? | 03:20:39 |
| 24 | Let me give you an example.  All squares | 03:20:45 |

270

| | | |
|---|---|---|
| 1 | are rectangles, but not all rectangles are squares. | 03:20:47 |
| 2 | Is all functional accessibility accessible, and is | 03:20:51 |
| 3 | all accessibility functional? | 03:20:55 |
| 4 | A.  I'm still not following the logic of the | 03:20:59 |
| 5 | question. | 03:21:02 |
| 6 | Q.  Okay.  Then you tell me how it is that | 03:21:03 |
| 7 | you can get into the website without assistance to | 03:21:05 |
| 8 | get screen shots that you put in your report that you | 03:21:07 |
| 9 | can say that the software, that website, is not | 03:21:09 |
| 10 | accessible. | 03:21:16 |
| 11 | A.  I had help. | 03:21:23 |
| 12 | Q.  Sir, you just told me that you opened | 03:21:25 |
| 13 | the website. | 03:21:28 |
| 14 | A.  I didn't do -- I didn't independently | 03:21:28 |
| 15 | create all the screen shots. | 03:21:31 |
| 16 | Q.  Didn't ask that, sir.  You told me you | 03:21:32 |
| 17 | were able to access by yourself to open that website. | 03:21:34 |
| 18 | That's all I'm talking about. | 03:21:38 |
| 19 | A.  Being able to open a website does not | 03:21:39 |
| 20 | constitute accessibility on any level, sir. | 03:21:42 |
| 21 | Q.  On no level whatsoever? | 03:21:45 |
| 22 | A.  None. | 03:21:46 |
| 23 | Q.  So that you could access that front | 03:21:47 |
| 24 | page, isn't that accessibility to some degree? | 03:21:49 |

271

1        A.  No, sir, it is not.                          03:21:52

2        Q.  Can you find a description in any of the     03:21:52

3    materials you brought here today that supports that  03:21:56

4    statement?                                           03:21:59

5        A.  If you would look in the OSU Minimum Web     03:22:01

6    Accessibility Standards, we talk about what          03:22:05

7    accessibility means.                                 03:22:08

8        Q.  We'll get there.  Paragraph 3 under your     03:22:09

9    Conclusions, "Notwithstanding LACCD Administrative   03:22:11

10   Regulation B-34, LACCD lacks a robust, proactive     03:22:17

11   compliance program necessary to ensure that web and  03:22:25

12   digital technology, including educational            03:22:28

13   technology..."                                       03:22:33

14          Then you qualify it, "...required for         03:22:34

15   success in the classroom, acquired, purchased,       03:22:37

16   developed, or otherwise managed by or on behalf of   03:22:40

17   the college, is accessible to students with          03:22:44

18   disabilities, including blind students."  What do you 03:22:46

19   base that statement on?                              03:22:50

20       A.  If there were a proactive compliance         03:23:00

21   program to ensure that technology was accessible,    03:23:02

22   there wouldn't be an accessible technology being     03:23:05

23   widely used without any effective alternative in     03:23:05

24   place.                                               03:23:10

                                                   272

| | | |
|---|---|---|
| 1 | Q.  You just told me that The Ohio State | 03:23:10 |
| 2 | University has a robust, proactive program, yet there | 03:23:12 |
| 3 | are programs that are not completely and universally | 03:23:16 |
| 4 | accessible at your university. | 03:23:19 |
| 5 | A.  I said no such thing.  I didn't say we | 03:23:20 |
| 6 | had a robust, proactive compliance program. | 03:23:23 |
| 7 | Q.  How about the University of Washington, | 03:23:25 |
| 8 | you said that.  You remember that? | 03:23:27 |
| 9 | A.  I do remember that, yes, sir. | 03:23:28 |
| 10 | Q.  And you didn't know whether there were | 03:23:30 |
| 11 | programs that were not accessible there, correct? | 03:23:31 |
| 12 | A.  That is correct. | 03:23:33 |
| 13 | Q.  Okay.  So I'm just trying to figure out, | 03:23:35 |
| 14 | how it is we're selecting language from time to time | 03:23:37 |
| 15 | here? | 03:23:39 |
| 16 | MS. KREVOR-WEISBAUM:  Objection. | 03:23:40 |
| 17 | MR. CLEELAND:  It's not a question. | 03:23:41 |
| 18 | MS. KREVOR-WEISBAUM:  I can object to | 03:23:43 |
| 19 | your commentary. | 03:23:43 |
| 20 | MR. CLEELAND:  I don't think so.  I look | 03:23:45 |
| 21 | at the evidence code, I don't think that's in there. | 03:23:47 |
| 22 | MS. KREVOR-WEISBAUM:  Keep looking. | 03:23:48 |
| 23 | MR. CLEELAND:  Keep looking?  Okay.  I | 03:23:49 |
| 24 | will. | 03:23:51 |

273

| | | |
|---|---|---|
| 1 | MS. KREVOR-WEISBAUM:  Yes. | 03:23:52 |
| 2 | By Mr. Cleeland: | 03:23:53 |
| 3 | Q.  No. 3 again, notwithstanding the | 03:23:53 |
| 4 | regulation, the lack of robust, proactive compliance | 03:23:56 |
| 5 | program. | 03:24:00 |
| 6 | Have you told us during the deposition | 03:24:00 |
| 7 | today what you believe a robust compliance program | 03:24:02 |
| 8 | is, proactive compliance program? | 03:24:08 |
| 9 | A.  It's in the report, yes, sir. | 03:24:09 |
| 10 | Q.  No. 4, "LACCD has failed to meet its | 03:24:12 |
| 11 | obligation to provide equally effective alternative | 03:24:15 |
| 12 | access to inaccessible education technologies in | 03:24:18 |
| 13 | order for students with disabilities, including blind | 03:24:23 |
| 14 | students, to have an equal opportunity to obtain the | 03:24:26 |
| 15 | educational benefits of the technology, even when the | 03:24:28 |
| 16 | institution is notified of the inaccessibility of | 03:24:33 |
| 17 | such technology." | 03:24:37 |
| 18 | Can you tell me each and every example | 03:24:40 |
| 19 | of when the institution was notified of | 03:24:42 |
| 20 | inaccessibility if the technology? | 03:24:45 |
| 21 | A.  I cannot. | 03:24:49 |
| 22 | Q.  Can you give me any example? | 03:24:50 |
| 23 | A.  I believe Mr. Payan testified to several | 03:24:52 |
| 24 | examples. | 03:24:56 |

274

| | | |
|---|---|---|
| 1 | Q.  So you got one Plaintiff, Mr. Payan. | 03:24:56 |
| 2 | Anybody else? | 03:24:58 |
| 3 | A.  Not that I am aware of. | 03:25:00 |
| 4 | Q.  Okay.  So now this whole report talks | 03:25:01 |
| 5 | about one individual, not the total student body, | 03:25:03 |
| 6 | correct? | 03:25:09 |
| 7 | A.  That is correct. | 03:25:09 |
| 8 | Q.  And so should Paragraphs No. 3 and 4 | 03:25:10 |
| 9 | have been limited to the one individual to be an | 03:25:13 |
| 10 | accurate statement? | 03:25:16 |
| 11 | MS. KREVOR-WEISBAUM:  Objection.  Go | 03:25:18 |
| 12 | ahead. | 03:25:20 |
| 13 | THE WITNESS:  I feel one individual's | 03:25:20 |
| 14 | experience is simply a microcosm for the rest. | 03:25:22 |
| 15 | By Mr. Cleeland: | 03:25:26 |
| 16 | Q.  Or perhaps an aberration; is that | 03:25:27 |
| 17 | correct? | 03:25:30 |
| 18 | A.  Anything is possible. | 03:25:30 |
| 19 | Q.  You're right. | 03:25:31 |
| 20 | No. 5, "LACCD has failed to sufficiently | 03:25:33 |
| 21 | train its faculty and staff on the institution's | 03:25:37 |
| 22 | obligation under applicable nondiscrimination | 03:25:41 |
| 23 | provisions of the Americans with Disabilities Act and | 03:25:43 |
| 24 | Section 504." | 03:25:46 |

275

| | | |
|---|---|---|
| 1 | Upon what do you base that statement? | 03:25:48 |
| 2 | A.  I base that statement upon the testimony | 03:25:51 |
| 3 | regarding what was offered to the students as | 03:25:54 |
| 4 | alternatives. | 03:25:58 |
| 5 | Q.  Well, this talks about training the | 03:25:59 |
| 6 | faculty and staff, not the students. | 03:26:02 |
| 7 | A.  That is correct. | 03:26:04 |
| 8 | Q.  So LACCD has failed to sufficiently | 03:26:05 |
| 9 | train its faculty and staff on the institution's | 03:26:08 |
| 10 | obligations.  What has that got to do with the | 03:26:11 |
| 11 | student's testimony? | 03:26:14 |
| 12 | A.  It wouldn't have been necessary for the | 03:26:16 |
| 13 | students to have the problem if faculty and staff | 03:26:18 |
| 14 | were aware of their obligations. | 03:26:20 |
| 15 | Q.  Do you think the students know | 03:26:22 |
| 16 | everything that the teachers were trained on? | 03:26:24 |
| 17 | A.  I'm sure they don't. | 03:26:26 |
| 18 | Q.  Okay.  So the only person you're relying | 03:26:29 |
| 19 | upon is Mr. Payan; is that correct? | 03:26:33 |
| 20 | A.  That and the testimony -- the testimony | 03:26:41 |
| 21 | that was in depositions. | 03:26:43 |
| 22 | Q.  Okay.  But you told me which depositions | 03:26:44 |
| 23 | you relied upon and which ones you didn't in reaching | 03:26:46 |
| 24 | opinions or conclusions, so we already have that, | 03:26:49 |

276

| | | |
|---|---|---|
| 1 | right? | 03:26:52 |
| 2 | A.   Maybe I misstated which ones I relied | 03:26:58 |
| 3 | on. | 03:27:00 |
| 4 | Q.   Well, I just took your testimony under | 03:27:00 |
| 5 | oath, so if you think you need to change that sitting | 03:27:02 |
| 6 | here today, feel free to do so, because if you make a | 03:27:05 |
| 7 | change to the testimony after today's deposition, | 03:27:07 |
| 8 | anyone involved in this case may bring to the | 03:27:11 |
| 9 | attention of the trier of the fact the change in that | 03:27:14 |
| 10 | testimony, and that may reflect poorly on your | 03:27:16 |
| 11 | honesty or veracity.  Do you understand that? | 03:27:19 |
| 12 | A.   I understand. | 03:27:23 |
| 13 | Q.   And you were being honest when you | 03:27:23 |
| 14 | answered my questions before, weren't you? | 03:27:23 |
| 15 | A.   I may have misremembered. | 03:27:26 |
| 16 | Q.   Okay.  But you were trying to be honest | 03:27:27 |
| 17 | at the time, correct? | 03:27:32 |
| 18 | A.   Yes. | 03:27:33 |
| 19 | Q.   And you gave me what you recalled at the | 03:27:33 |
| 20 | time; is that correct? | 03:27:35 |
| 21 | A.   Yes.  To the best of my recollection, | 03:27:36 |
| 22 | yes. | 03:27:38 |
| 23 | Q.   Are recollections sometimes faulty in | 03:27:42 |
| 24 | your experience? | 03:27:44 |

277

| | | |
|---|---|---|
| 1 | MS. KREVOR-WEISBAUM:  Objection.  You | 03:27:45 |
| 2 | can answer. | 03:27:46 |
| 3 | THE WITNESS:  They can be. | 03:27:46 |
| 4 | By Mr. Cleeland: | 03:27:49 |
| 5 | Q.  Do you have any reason to believe your | 03:27:49 |
| 6 | recollection was faulty in any of your testimony | 03:27:50 |
| 7 | today? | 03:27:52 |
| 8 | A.  I don't know.  I don't believe so. | 03:27:53 |
| 9 | Q.  Okay.  Do you presently anticipate | 03:27:55 |
| 10 | performing additional work in this matter? | 03:28:00 |
| 11 | A.  I believe there may be a potential | 03:28:11 |
| 12 | trial. | 03:28:13 |
| 13 | Q.  I asked do you anticipate performing | 03:28:13 |
| 14 | additional work in this matter? | 03:28:16 |
| 15 | A.  I believe so.  I may be called to | 03:28:17 |
| 16 | testify. | 03:28:20 |
| 17 | Q.  Has someone told you that? | 03:28:20 |
| 18 | A.  No one has told me that specifically. | 03:28:21 |
| 19 | Q.  Okay.  Generally? | 03:28:24 |
| 20 | A.  But I understood that to be a potential | 03:28:25 |
| 21 | outcome. | 03:28:28 |
| 22 | Q.  Okay.  Within the materials you were | 03:28:28 |
| 23 | kind enough to bring today we have a one-page invoice | 03:28:32 |
| 24 | dated October 1, 2017, with entries for yourself and | 03:28:35 |

278

1   Mr. Abdi, and they total approximately -- well,        03:28:41

2   exactly $6,600.                                         03:28:47

3         Do you believe that was an accurate              03:28:50

4   recitation of the work that you performed in this       03:28:53

5   matter up to this date?                                 03:28:56

6         A.  Up to the date at the end of that             03:28:57

7   invoice, yes, sir.                                      03:29:00

8         Q.  Yes, sir.  We have within that packet a       03:29:01

9   four-page document entitled Web Accessibility           03:29:14

10  Standards to The Ohio State University, printed on      03:29:18

11  November 6, 2017 at 9:24 p.m., and if you want to       03:29:23

12  pull it up, please feel free to do so.                  03:29:28

13        MS. KREVOR-WEISBAUM:  He has that.                03:29:48

14  By Mr. Cleeland:                                        03:29:52

15        Q.  And why is it that you put this material      03:29:52

16  in your file?                                           03:29:54

17        A.  This speaks to the institution I'm            03:29:56

18  employed at, our stance on this topic.                  03:30:03

19        Q.  And when did you first specifically           03:30:04

20  refer to this particular document for purposes of       03:30:12

21  this specific assignment?                               03:30:15

22        A.  I apologize, I can't really recall the        03:30:17

23  exact date.                                             03:30:22

24        Q.  Okay.  Earlier than 11-6 of 2017?             03:30:23

                                                       279

Peter Bossley, 11/7/2017
Payan v. Los Angeles Community College District

| | | |
|---|---|---|
| 1 | A.  Yes. | 03:30:26 |
| 2 | Q.  Okay. | 03:30:26 |
| 3 | A.  It would have been early in the -- in | 03:30:31 |
| 4 | the -- it would have been early.  It wouldn't have | 03:30:36 |
| 5 | been within the last four weeks.  I just printed it | 03:30:38 |
| 6 | last night because it was asked for in the deposition | 03:30:46 |
| 7 | notice. | 03:30:51 |
| 8 | MS. KREVOR-WEISBAUM:  It's listed in | 03:30:55 |
| 9 | what he had reviewed. | 03:30:56 |
| 10 | MR. CLEELAND:  I just asked when. | 03:31:00 |
| 11 | By Mr. Cleeland: | 03:31:18 |
| 12 | Q.  Well, on page 3 of 24 of this document, | 03:31:18 |
| 13 | that being the OSU Web Accessibility Policy and | 03:31:22 |
| 14 | Standards, and in meeting that, it states, "Users | 03:31:29 |
| 15 | with severe visual impairments typically use screen | 03:31:33 |
| 16 | readers." | 03:31:36 |
| 17 | It continues, "Screen readers identify | 03:31:39 |
| 18 | not only text, but alternative text for images."  Is | 03:31:41 |
| 19 | that an accurate statement? | 03:31:45 |
| 20 | A.  That is correct. | 03:31:46 |
| 21 | Q.  It continues, "They facilitate full | 03:31:47 |
| 22 | interaction with webpage contents and objects." | 03:31:49 |
| 23 | What's the "they" part in there, they facilitate? | 03:31:53 |
| 24 | A.  Screen readers.  Screen reader | 03:31:56 |

ADVANCED DEPOSITIONS
www.advanceddepositions.com | 855.811.3376

| | | |
|---|---|---|
| 1 | technology. | 03:31:59 |
| 2 | Q. Thank you. | 03:31:59 |
| 3 | "And they allow users to skip between | 03:32:00 |
| 4 | chunks of contents by link."  Did the LACC website | 03:32:02 |
| 5 | allow readers to skip between chunks of content by | 03:32:09 |
| 6 | link? | 03:32:13 |
| 7 | A. They do. | 03:32:13 |
| 8 | Q. Did the LACCD website allow users to | 03:32:14 |
| 9 | skip between chunks of contents by link? | 03:32:18 |
| 10 | A. I'm sorry? | 03:32:22 |
| 11 | Q. Did you look at the LACC website? | 03:32:25 |
| 12 | A. The LACCD website, yes. | 03:32:28 |
| 13 | Q. Okay.  And did the LACCD website allow | 03:32:30 |
| 14 | users of screen readers to skip between chunks of | 03:32:33 |
| 15 | contents by link? | 03:32:36 |
| 16 | A. But I thought that was the last question | 03:32:37 |
| 17 | you asked as well. | 03:32:38 |
| 18 | Q. No, that was for LACC. | 03:32:39 |
| 19 | A. So I apologize, I didn't examine LACC. | 03:32:41 |
| 20 | Q. Okay.  It continues in this document | 03:32:45 |
| 21 | from Ohio State University, "They facilitate by | 03:32:48 |
| 22 | allowing users to skip between headings." | 03:32:58 |
| 23 | Did the LACC website allow users of | 03:33:02 |
| 24 | screen readers to skip between headings? | 03:33:06 |

281

| | | |
|---|---|---|
| 1 | A.  If there were headings, yes. | 03:33:08 |
| 2 | Q.  Okay.  And the next section is Form | 03:33:10 |
| 3 | Element.  Did the LACC website allow users to skip | 03:33:15 |
| 4 | form element? | 03:33:21 |
| 5 | A.  Yes. | 03:33:21 |
| 6 | Q.  Did the LACC website allow web screen -- | 03:33:21 |
| 7 | or screen reader users to skip content block? | 03:33:27 |
| 8 | A.  Yes. | 03:33:35 |
| 9 | Q.  So it allowed everything that is | 03:33:35 |
| 10 | required by The Ohio State University policy with | 03:33:38 |
| 11 | respect to skipping between chunks of content, | 03:33:43 |
| 12 | correct? | 03:33:45 |
| 13 | A.  That's not correct. | 03:33:50 |
| 14 | Q.  Well, it did all the things that your | 03:33:51 |
| 15 | program requires, according to this document, | 03:33:53 |
| 16 | correct? | 03:33:57 |
| 17 | MS. KREVOR-WEISBAUM:  Objection. | 03:33:57 |
| 18 | By Mr. Cleeland: | 03:33:58 |
| 19 | Q.  I'll go over it again. | 03:34:03 |
| 20 | A.  It allowed everything in that sentence. | 03:34:04 |
| 21 | Q.  That's all I asked, sir. | 03:34:08 |
| 22 | A.  Where those things were present. | 03:34:11 |
| 23 | Q.  That's all I asked. | 03:34:13 |
| 24 | It states, "The screen reader used most | 03:34:19 |

<div align="center">282</div>

Peter Bossley, 11/7/2017
Payan v. Los Angeles Community College District

| | | |
|---|---|---|
| 1 | on campus..."  That's the OSU campus, right? | 03:34:21 |
| 2 | A.  That is correct. | 03:34:24 |
| 3 | Q.  "... is Freedom Scientific JAWS."  But | 03:34:24 |
| 4 | it adds, "We're also seeing significant use of | 03:34:28 |
| 5 | VoiceOver?  So there are alternative screen user | 03:34:31 |
| 6 | available to your university, correct? | 03:34:35 |
| 7 | A.  There are. | 03:34:39 |
| 8 | Q.  And also to the public at large, | 03:34:39 |
| 9 | correct? | 03:34:42 |
| 10 | A.  That is correct. | 03:34:42 |
| 11 | Q.  Beginning on page 5 of that document, | 03:35:24 |
| 12 | there's a reference to MWAS.  Do you know what that | 03:35:28 |
| 13 | is? | 03:35:31 |
| 14 | A.  That's this document. | 03:35:31 |
| 15 | Q.  And there are links to different | 03:35:33 |
| 16 | categories.  Did you access all of these links at | 03:35:39 |
| 17 | some time in your career? | 03:35:46 |
| 18 | A.  Can you tell me what links specifically | 03:35:48 |
| 19 | you are referring to? | 03:35:50 |
| 20 | Q.  Well, there's a whole bunch of them. | 03:35:51 |
| 21 | Did you read this document carefully enough before | 03:35:53 |
| 22 | you came in here today to know what those links are? | 03:35:56 |
| 23 | A.  I'm -- I'm responsible for managing this | 03:35:59 |
| 24 | document, so I'm aware of the document.  But if you | 03:36:03 |

ADVANCED DEPOSITIONS
www.advanceddepositions.com | 855.811.3376

| | | |
|---|---|---|
| 1 | want to ask me if I've accessed a link, you've got to | 03:36:07 |
| 2 | tell me what link you're talking about. | 03:36:09 |
| 3 | Q.  Well, you have the report in front of | 03:36:10 |
| 4 | you in an accessible format. | 03:36:13 |
| 5 | MS. KREVOR-WEISBAUM:  What is your | 03:36:16 |
| 6 | question? | 03:36:16 |
| 7 | MR. CLEELAND:  Did he read all of these. | 03:36:17 |
| 8 | That's all I want to know.  It's an easy question. | 03:36:19 |
| 9 | MS. KREVOR-WEISBAUM:  Maybe he didn't | 03:36:21 |
| 10 | understand it. | 03:36:22 |
| 11 | MR. CLEELAND:  Well, I'm trying to get | 03:36:23 |
| 12 | around it.  I can't get any more direct than that. | 03:36:24 |
| 13 | MS. KREVOR-WEISBAUM:  So ask your | 03:36:27 |
| 14 | question again. | 03:36:28 |
| 15 | By Mr. Cleeland: | 03:36:29 |
| 16 | Q.  Did you read all of these links that are | 03:36:29 |
| 17 | identified in this document that you brought today? | 03:36:31 |
| 18 | A.  I don't know that I read every single | 03:36:33 |
| 19 | one of them.  I probably have at one point. | 03:36:35 |
| 20 | Q.  Did you rely upon any of the information | 03:36:37 |
| 21 | in any of those links in reaching any opinions or | 03:36:39 |
| 22 | conclusions in your capacity as an expert witness in | 03:36:41 |
| 23 | this matter? | 03:36:43 |
| 24 | A.  I did rely on description of | 03:36:44 |

284

Peter Bossley, 11/7/2017
Payan v. Los Angeles Community College District

| | | |
|---|---|---|
| 1 | accessibility standards, yes. | 03:37:01 |
| 2 | Q.  And that's in this document? | 03:37:04 |
| 3 | A.  Yes. | 03:37:05 |
| 4 | Q.  Do you remember where it is? | 03:37:06 |
| 5 | A.  If you go down to the table grid there. | 03:37:13 |
| 6 | Q.  Okay. | 03:37:16 |
| 7 | A.  I relied on information in this table. | 03:37:33 |
| 8 | Q.  Which one of the tables? | 03:37:37 |
| 9 | A.  The table where it says "Minimum Web | 03:37:39 |
| 10 | Accessibility Standard Compliance Table". | 03:37:41 |
| 11 | Q.  Does that have a number in front of it? | 03:37:44 |
| 12 | MS. KREVOR-WEISBAUM:  Counselor, look at | 03:37:47 |
| 13 | page 3, I think, OSU Minimum Web Standards Compliance | 03:37:48 |
| 14 | Table, page 3 of that document.  I believe that's | 03:37:52 |
| 15 | what -- that's what he means by the table. | 03:37:56 |
| 16 | MR. CLEELAND:  Well, I asked about | 03:38:00 |
| 17 | websites. | 03:38:01 |
| 18 | By Mr. Cleeland: | 03:38:01 |
| 19 | Q.  What websites did you read? | 03:38:04 |
| 20 | A.  The Web Content Accessibility Guideline | 03:38:06 |
| 21 | 2.0. | 03:38:09 |
| 22 | Q.  Okay.  But there are a bunch of links in | 03:38:10 |
| 23 | this document.  You said you relied upon your | 03:38:13 |
| 24 | experience in reaching some of your conclusions.  I'm | 03:38:16 |

285

Peter Bossley, 11/7/2017
Payan v. Los Angeles Community College District

| | |
|---|---|
| 1 | trying to find out everything you relied upon to get | 03:38:18 |
| 2 | to these conclusions. | 03:38:20 |
| 3 |     A.  So I'm not understanding what -- | 03:38:26 |
| 4 |     Q.  Well, do you recall answering questions | 03:38:29 |
| 5 | where you said you relied upon your experience and | 03:38:31 |
| 6 | familiarity with the industry and the community? | 03:38:33 |
| 7 |     A.  Yes. | 03:38:35 |
| 8 |     Q.  Okay.  I'm trying to find out what level | 03:38:35 |
| 9 | that is, the knowledge of the community.  So if | 03:38:37 |
| 10 | you've read all these, great.  If you haven't, I need | 03:38:43 |
| 11 | to know.  If you only read some of them, I need to | 03:38:47 |
| 12 | know. | 03:38:50 |
| 13 |     A.  I've read Section 508.  I have read the | 03:38:50 |
| 14 | Web Content Accessibility Guidelines. | 03:38:54 |
| 15 |     Q.  Those are the ones you recall? | 03:39:01 |
| 16 |     A.  And keep in mind that a lot of these | 03:39:03 |
| 17 | links inside these tables just link to subportions in | 03:39:06 |
| 18 | WCAG and 508. | 03:39:13 |
| 19 |     Q.  Got it.  But they have some other text | 03:39:13 |
| 20 | beyond WCAG and 508, right? | 03:39:15 |
| 21 |     A.  It's not really linked to much else | 03:39:19 |
| 22 | besides WCAG and 508 in the table. | 03:39:21 |
| 23 |     Q.  IIT AA 8.2? | 03:39:29 |
| 24 |     A.  I didn't specifically rely on those -- | 03:39:36 |

286

| | | |
|---|---|---|
| 1 | Q.  Okay. | 03:39:38 |
| 2 | A.  -- for this. | 03:39:39 |
| 3 | Q.  That helps me.  I appreciate that. | 03:39:40 |
| 4 | So you think the ones related to 508 and | 03:39:43 |
| 5 | WCAG -- | 03:39:46 |
| 6 | A.  Yes. | 03:39:47 |
| 7 | Q.  I appreciate that clarification. | 03:39:48 |
| 8 | On page 19 of this document, under | 03:40:01 |
| 9 | Suggested Purchasing Procedures and Contact -- excuse | 03:40:06 |
| 10 | me -- Contract Language to Help Meet MWAS, reads as | 03:40:10 |
| 11 | follows:  "When evaluating third party products, we | 03:40:16 |
| 12 | sometimes find accessibility has not been fully | 03:40:21 |
| 13 | addressed." | 03:40:24 |
| 14 | Is that an accurate statement to your | 03:40:25 |
| 15 | experience at the university? | 03:40:26 |
| 16 | A.  It is. | 03:40:27 |
| 17 | Q.  But it does say in your policy you're | 03:40:29 |
| 18 | supposed to fully access software before purchase, | 03:40:31 |
| 19 | correct? | 03:40:39 |
| 20 | A.  What -- | 03:40:39 |
| 21 | Q.  The policy of the university is to fully | 03:40:40 |
| 22 | evaluate accessibility before you purchase software, | 03:40:43 |
| 23 | correct? | 03:40:46 |
| 24 | A.  That is correct. | 03:40:46 |

287

Peter Bossley, 11/7/2017
Payan v. Los Angeles Community College District

| | | |
|---|---|---|
| 1 | Q.  So this is acknowledging that they don't | 03:40:46 |
| 2 | always follow their policies, correct? | 03:40:48 |
| 3 | A.  This is acknowledging that when we look | 03:40:51 |
| 4 | at software, we often times find accessibility gaps. | 03:40:55 |
| 5 | Q.  This says, "...when evaluating third | 03:40:58 |
| 6 | party products we sometimes find accessibility has | 03:41:00 |
| 7 | not been fully addressed." | 03:41:03 |
| 8 | A.  Correct. | 03:41:05 |
| 9 | Q.  That's all. | 03:41:05 |
| 10 | A.  This is when we're evaluating | 03:41:07 |
| 11 | technology. | 03:41:08 |
| 12 | Q.  Correct.  "In making a selection it is | 03:41:09 |
| 13 | advisable..."  Doesn't say mandatory, correct? | 03:41:11 |
| 14 | MS. KREVOR-WEISBAUM:  I'm sorry, I lost | 03:41:20 |
| 15 | where you were. | 03:41:21 |
| 16 | MR. CLEELAND:  Page 19 under the heading | 03:41:23 |
| 17 | Suggested Purchasing Procedures. | 03:41:26 |
| 18 | MS. KREVOR-WEISBAUM:  Thank you.  Peter, | 03:41:26 |
| 19 | can you find where he is? | 03:41:34 |
| 20 | THE WITNESS:  I'm here, yes. | 03:41:36 |
| 21 | By Mr. Cleeland: | 03:41:38 |
| 22 | Q.  Do you remember my question? | 03:41:39 |
| 23 | A.  I don't, sorry. | 03:41:40 |
| 24 | Q.  It states, "In making a selection it is | 03:41:40 |

288

Peter Bossley, 11/7/2017
Payan v. Los Angeles Community College District

| | | |
|---|---|---|
| 1 | advisable to choose..."  It doesn't say it's | 03:41:43 |
| 2 | mandatory, correct? | 03:41:45 |
| 3 | A.  This document says it is advisable, yes. | 03:41:47 |
| 4 | Q.  Just want to make sure I got it right. | 03:41:50 |
| 5 | "...to choose the most accessible product."  It | 03:41:52 |
| 6 | doesn't say the universally acceptable product, but | 03:41:56 |
| 7 | rather the most accessible product between choices, | 03:42:00 |
| 8 | correct? | 03:42:03 |
| 9 | A.  That's correct, it does say that. | 03:42:03 |
| 10 | Q.  It acknowledges that there are going to | 03:42:05 |
| 11 | be products that are not fully accessible, not | 03:42:07 |
| 12 | universally acceptable --  or accessible, but can | 03:42:12 |
| 13 | still be acquired by your university, right? | 03:42:14 |
| 14 | A.  It does say that, yes. | 03:42:15 |
| 15 | Q.  Good.  "However, not always will there | 03:42:16 |
| 16 | be an accessible choice."  So your university that | 03:42:18 |
| 17 | you've been working at for how many years? | 03:42:21 |
| 18 | A.  I've been working here for 11 years. | 03:42:23 |
| 19 | Q.  You've been working at the university | 03:42:27 |
| 20 | for 11 years, and they acknowledge in their written | 03:42:28 |
| 21 | policies and procedures that there will be | 03:42:32 |
| 22 | accessible -- there will not always be an accessible | 03:42:35 |
| 23 | choice, right? | 03:42:39 |
| 24 | A.  Yes. | 03:42:39 |

289

| | | |
|---|---|---|
| 1 | Q.  It continues, "...or the most accessible | 03:42:39 |
| 2 | choice may not align with other down selection | 03:42:46 |
| 3 | criteria."  So that means the most accessible choice | 03:42:49 |
| 4 | might violate other components in the selection | 03:42:53 |
| 5 | criteria, correct? | 03:42:55 |
| 6 | A.  That is correct. | 03:42:56 |
| 7 | Q.  So in other words, the university is | 03:42:57 |
| 8 | going to have to make a decision by balancing things; | 03:42:59 |
| 9 | is that correct? | 03:43:01 |
| 10 | A.  That is correct. | 03:43:01 |
| 11 | Q.  All right.  Then it states, and I think | 03:43:03 |
| 12 | you alluded to this, "In cases where a product with | 03:43:17 |
| 13 | limited accessibility has been purchased..."  So that | 03:43:20 |
| 14 | acknowledges it has occurred, right? | 03:43:24 |
| 15 | A.  Yes. | 03:43:25 |
| 16 | Q.  "...demonstrating that OSU is working | 03:43:25 |
| 17 | with the vender, and that a time frame for working | 03:43:28 |
| 18 | accessibility has been established in partnership | 03:43:34 |
| 19 | with the vender, may help minimize legal risk." | 03:43:35 |
| 20 | So do you understand that the university | 03:43:41 |
| 21 | is making a decision by balancing its legal risk with | 03:43:42 |
| 22 | utilizing software that's most beneficial for most | 03:43:45 |
| 23 | students? | 03:43:49 |
| 24 | A.  Yes, sir.  This is my job.  I do | 03:43:50 |

290

| | | |
|---|---|---|
| 1 | understand that. | 03:43:51 |
| 2 | Q.  So you do that all the time, don't you? | 03:43:52 |
| 3 | A.  We do. | 03:43:54 |
| 4 | Q.  It talks about, "An ADA exception is a | 03:44:06 |
| 5 | mechanism through which we hold ourself accountable | 03:44:09 |
| 6 | for the fact that we are rolling out software that | 03:44:12 |
| 7 | temporarily violates our own policy."  You're | 03:44:15 |
| 8 | involved in that process from time to time? | 03:44:20 |
| 9 | A.  I am. | 03:44:22 |
| 10 | Q.  Why is it that you accept software that | 03:44:22 |
| 11 | is not in compliance with the policy? | 03:44:25 |
| 12 | A.  Because there's not always an option | 03:44:28 |
| 13 | that does meet policy.  So to be clear, this ADA | 03:44:35 |
| 14 | exception we're talking about is the exception | 03:44:44 |
| 15 | process, and the form -- also the form is included in | 03:44:47 |
| 16 | the packet.  This is the exception process that has | 03:44:50 |
| 17 | previously been discussed. | 03:44:57 |
| 18 | MR. CLEELAND:  I'd like to mark as next | 03:45:04 |
| 19 | in order, which I believe is Exhibit 102, the | 03:45:05 |
| 20 | document we've just been addressing, which has a | 03:45:12 |
| 21 | cover page dated -- Web Accessibility Standards, The | 03:45:14 |
| 22 | Ohio State University, Page 1 of 24," so it's a | 03:45:19 |
| 23 | 24-page document, dated 11-6-2017 at 9:24 p.m. | 03:45:23 |
| 24 | (EXHIBIT MARKED FOR IDENTIFICATION.) | 03:45:44 |

291

| | | |
|---|---|---|
| 1 | By Mr. Cleeland: | 03:45:44 |
| 2 | Q.  We now finally get to that document you | 03:45:44 |
| 3 | talk about, which is "Request for Alternative Access | 03:45:48 |
| 4 | Exemption Digital Investment Policy," and it appears | 03:45:51 |
| 5 | to be a four-page document.  Are you involved with | 03:45:55 |
| 6 | these documents, sir? | 03:46:02 |
| 7 | A.  I am.  I am one of two people on campus | 03:46:04 |
| 8 | who has permission to approve these. | 03:46:08 |
| 9 | Q.  Have you ever approved a request for | 03:46:10 |
| 10 | alternative accessibility exemption? | 03:46:12 |
| 11 | A.  I have. | 03:46:14 |
| 12 | Q.  Have you ever denied such a request? | 03:46:15 |
| 13 | A.  We have not denied a request. | 03:46:16 |
| 14 | Q.  Okay.  How many requests have you | 03:46:17 |
| 15 | received? | 03:46:19 |
| 16 | A.  We have received roughly ten since we | 03:46:19 |
| 17 | formalized this process. | 03:46:22 |
| 18 | MR. CLEELAND:  We're going to mark this | 03:46:38 |
| 19 | document as next in order, which I believe would be | 03:46:40 |
| 20 | Exhibit 103.  Again, this is the Request For | 03:46:42 |
| 21 | Alternative Access Digital Accessibility Policy. | 03:46:43 |
| 22 | (EXHIBIT MARKED FOR IDENTIFICATION.) | 03:46:59 |
| 23 | By Mr. Cleeland: | 03:47:00 |
| 24 | Q.  What do you do when you receive one of | 03:47:00 |

292

| 1 | these documents, Exhibit 103? | 03:47:02 |
| 2 | A.  I read through the requests and any | 03:47:10 |
| 3 | accompanying attached accessibility evaluations that | 03:47:18 |
| 4 | may have been included with the requests. | 03:47:18 |
| 5 | Q.  Do you have to convert this document to | 03:47:20 |
| 6 | read it? | 03:47:22 |
| 7 | A.  It's been made accessible for me. | 03:47:23 |
| 8 | Q.  Including the images? | 03:47:30 |
| 9 | A.  Yes. | 03:47:32 |
| 10 | MS. KREVOR-WEISBAUM:  We made that 103? | 03:47:43 |
| 11 | MR. CLEELAND:  Yes. | 03:47:48 |
| 12 | I'd like to mark as next in order, | 03:47:50 |
| 13 | Exhibit 104 -- again, these documents were all from | 03:47:53 |
| 14 | the packet of information you provided today -- a | 03:47:57 |
| 15 | three-page document entitled University of Washington | 03:47:59 |
| 16 | IT Accessibility Guidelines. | 03:48:02 |
| 17 | (EXHIBIT MARKED FOR IDENTIFICATION.) | 03:48:02 |
| 18 | By Mr. Cleeland: | 03:48:02 |
| 19 | Q.  Is this the document you referred to | 03:48:05 |
| 20 | earlier in your testimony. | 03:48:07 |
| 21 | A.  In regards to? | 03:48:10 |
| 22 | Q.  Accessibility guidelines.  You said that | 03:48:15 |
| 23 | you brought within the packet the University of | 03:48:18 |
| 24 | Washington guidelines.  Is this that document? | 03:48:20 |

293

Peter Bossley, 11/7/2017
Payan v. Los Angeles Community College District

| | | |
|---|---|---|
| 1 | A.  Yes, sir. | 03:48:21 |
| 2 | Q.  And it states, "IT accessibility | 03:48:22 |
| 3 | guidelines were originally signed on May 1, 2015, by | 03:48:36 |
| 4 | Kelly Trosvig," T-r-o-s-v-i-g, "Vice-president for UW | 03:48:40 |
| 5 | information technology, and CIO."  Do you know what | 03:48:46 |
| 6 | predated this guideline, if anything? | 03:48:53 |
| 7 | A.  I'm not aware. | 03:48:57 |
| 8 | Q.  Do you know if they even had | 03:48:59 |
| 9 | accessibility guidelines at the University | 03:49:00 |
| 10 | of Washington before May 1, 2015? | 03:49:02 |
| 11 | A.  I believe they did, but I don't know the | 03:49:05 |
| 12 | specifics. | 03:49:07 |
| 13 | Q.  Okay.  You don't know specifically | 03:49:08 |
| 14 | whether they did, correct? | 03:49:09 |
| 15 | A.  I do not know. | 03:49:10 |
| 16 | Q.  And you don't know the content if they | 03:49:11 |
| 17 | did have such guidelines, correct? | 03:49:15 |
| 18 | A.  That is correct. | 03:49:16 |
| 19 | Q.  On page 2, heading No. 4 of this | 03:49:44 |
| 20 | document, under "Standards" it states, "Technologies | 03:49:46 |
| 21 | and standards evolve at a rapid pace."  You agree | 03:49:49 |
| 22 | with that, correct? | 03:49:51 |
| 23 | A.  I do. | 03:49:52 |
| 24 | Q.  It continues under "Progress and Plan". | 03:50:05 |

294

Peter Bossley, 11/7/2017
Payan v. Los Angeles Community College District

| | | |
|---|---|---|
| 1 | "The University of Washington has a lengthy history | 03:50:08 |
| 2 | of proactively addressing IT accessibility issues. | 03:50:11 |
| 3 | Its IT accessibility progress and plan describes past | 03:50:16 |
| 4 | efforts and future plans as it strives to ensure IT | 03:50:22 |
| 5 | developed, procured, and used at the UW is accessible | 03:50:27 |
| 6 | to individuals with disabilities."  Is that an | 03:50:32 |
| 7 | evolving program, to your understanding? | 03:50:37 |
| 8 | A.  It is. | 03:50:39 |
| 9 | Q.  And you know someone there who is | 03:50:40 |
| 10 | involved with the accessibility guidelines, correct? | 03:50:42 |
| 11 | A.  I do know several -- | 03:50:46 |
| 12 | Q.  Can you give me the names of those | 03:50:48 |
| 13 | people? | 03:50:49 |
| 14 | A.  Spelling is going to be a problem, | 03:50:50 |
| 15 | sorry.  Hadi Langdon, Dan Comden, and Cheryl | 03:50:53 |
| 16 | Burkstetler. | 03:51:07 |
| 17 | Q.  Thank you. | 03:51:08 |
| 18 | MR. CLEELAND:  And again, that would be | 03:51:08 |
| 19 | Exhibit 104. | 03:51:08 |
| 20 | (EXHIBIT MARKED FOR IDENTIFICATION.) | 03:51:08 |
| 21 | By Mr. Cleeland: | 03:51:22 |
| 22 | Q.  And I believe the last document we're | 03:51:22 |
| 23 | going to utilize out of your packet is entitled Miami | 03:51:24 |
| 24 | University -- might be one more -- "Miami University | 03:51:28 |

295

Peter Bossley, 11/7/2017
Payan v. Los Angeles Community College District

| | | |
|---|---|---|
| 1 | Policy Library, Accessible Technology Policy, Miami | 03:51:33 |
| 2 | University Policy Library, dated November 6, 2017, | 03:51:38 |
| 3 | 9:48 p.m.," and that's just a print time, correct? | 03:51:46 |
| 4 | A.  That is correct, sir. | 03:51:48 |
| 5 | Q.  Page 1 of 5, indicating a five-page | 03:51:49 |
| 6 | document. | 03:51:54 |
| 7 | Did you read specific content from this | 03:51:54 |
| 8 | document, which we'll mark as Exhibit 105, in | 03:51:57 |
| 9 | reaching any opinions or conclusions as a result of | 03:52:04 |
| 10 | being retained as an expert witness in this matter? | 03:52:06 |
| 11 | A.  I read this guideline to inform me of | 03:52:09 |
| 12 | the practices that are being -- the practices that | 03:52:14 |
| 13 | are in use at other institutions other than my own. | 03:52:16 |
| 14 | Q.  And was it specific -- did you read it | 03:52:21 |
| 15 | specifically for purposes of this assignment? | 03:52:25 |
| 16 | A.  I did. | 03:52:27 |
| 17 | Q.  So you never read it before then? | 03:52:31 |
| 18 | A.  I had read it before then, yes. | 03:52:32 |
| 19 | Q.  Was there any information contained in | 03:52:34 |
| 20 | Exhibit 105 that you relied upon in offering any | 03:52:36 |
| 21 | opinions or conclusions in your capacity as an expert | 03:52:41 |
| 22 | witness in this matter? | 03:52:44 |
| 23 | A.  I have -- in the past have read this | 03:52:54 |
| 24 | document to inform our policy update procedures.  In | 03:52:55 |

296

| | | |
|---|---|---|
| 1 | the context of this I looked at definitions. | 03:52:59 |
| 2 | Q.  By "this" do you mean this assignment? | 03:53:02 |
| 3 | A.  Yes, this assignment. | 03:53:04 |
| 4 | Q.  Okay.  Anything else? | 03:53:05 |
| 5 | A.  I don't recall anything else, | 03:53:08 |
| 6 | specifically. | 03:53:23 |
| 7 | Q.  Under Policy For Web Content, which is | 03:53:23 |
| 8 | on page 2 of this document, Exhibit 105. | 03:53:26 |
| 9 | A.  I got it. | 03:53:31 |
| 10 | Q.  It has a statement, "Beginning | 03:53:31 |
| 11 | December 14, 2016, all new and redeveloped web pages, | 03:53:33 |
| 12 | web applications, and web content created by Miami on | 03:53:38 |
| 13 | websites or subdomains used for Miami's academic | 03:53:44 |
| 14 | divisions, academic departments, and administrative | 03:53:48 |
| 15 | offices, shall conform to WCAG 2.0 AA."  When did | 03:53:51 |
| 16 | WCAG 2.0 AA roll out? | 03:53:59 |
| 17 | A.  WCAG 2.0 AA became a candidate | 03:54:03 |
| 18 | recommendation in 2008, I believe. | 03:54:06 |
| 19 | Q.  Now, by you reading -- or me reading to | 03:54:11 |
| 20 | you that long sentence, do you know what the | 03:54:13 |
| 21 | university -- or Miami University policy was with | 03:54:19 |
| 22 | respect to web pages, web applications, and web | 03:54:23 |
| 23 | content created by Miami on websites and subdomains | 03:54:26 |
| 24 | used for Miami's academic division, academic | 03:54:32 |

297

Peter Bossley, 11/7/2017
Payan v. Los Angeles Community College District

| | | |
|---|---|---|
| 1 | departments, and administrative offices would be for | 03:54:36 |
| 2 | materials created before December 14, 2016? | 03:54:39 |
| 3 | A.  I know that they -- that they did have | 03:54:43 |
| 4 | some work around that space, but I don't know the | 03:54:50 |
| 5 | details. | 03:54:54 |
| 6 | Q.  They didn't just wipe out all that | 03:54:55 |
| 7 | stuff, did they? | 03:54:57 |
| 8 | A.  They did not. | 03:54:57 |
| 9 | Q.  As a matter of fact, I think they call | 03:54:59 |
| 10 | it Legacy pages, right? | 03:55:00 |
| 11 | A.  Correct. | 03:55:03 |
| 12 | MR. CLEELAND:  Counsel, do you have any | 03:55:27 |
| 13 | questions? | 03:55:28 |
| 14 | MS. KREVOR-WEISBAUM:  I do not. | 03:55:29 |
| 15 | MR. CLEELAND:  Why don't we go off the | 03:55:30 |
| 16 | record for a moment? | 03:55:32 |
| 17 | (Recess taken.) | 03:56:41 |
| 18 | MR. CLEELAND:  We're back on the record. | 03:56:41 |
| 19 | We had a chance to discuss both at the start of the | 03:56:43 |
| 20 | depo and just now, we would ask that the Court | 03:56:46 |
| 21 | Reporter to prepare the original deposition | 03:56:49 |
| 22 | transcript and exhibits, submit it to Plaintiffs' | 03:56:50 |
| 23 | counsel, who will forward it to the witness. | 03:56:53 |
| 24 | The witness will have the opportunity to | 03:56:56 |

298

| | | |
|---|---|---|
| 1 | read, review, correct, and sign that transcript under | 03:56:57 |
| 2 | the penalty of perjury, thereafter returning the | 03:57:00 |
| 3 | original to Plaintiffs' counsel. | 03:57:02 |
| 4 | Counsel is to notify us of any and all | 03:57:04 |
| 5 | corrections, and signature.  Short of that, I think | 03:57:06 |
| 6 | that the Court Reporter has all the information she | 03:57:10 |
| 7 | needs. | 03:57:12 |
| 8 | MS. KREVOR-WEISBAUM:  Good.  Thank you | 03:57:14 |
| 9 | very much.  Off the record. | 03:57:15 |
| 10 | (Thereupon, the deposition concluded | |
| 11 | at 3:57 p.m.  Signature not waived.) | |
| 12 | - - - | |
| 13 | | |
| 14 | | |
| 15 | | |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |

299

```
1   State of Ohio              :
                               :  SS:
2   County of                 :

3

4           I, Peter Bossley, do hereby certify that
    I have read the foregoing transcript of my deposition
5   given on Tuesday, November 7th, 2017; that together
    with the correction page attached hereto noting
6   changes in form or substance, if any, it is true and
    correct.

7

8
                            _____
9                              Peter Bossley

10

11          I do hereby certify that the foregoing
    transcript of the deposition of Peter Bossley was
12  submitted to the witness for reading and signing;
    that after he had stated to the undersigned Notary
13  Public that he had read and examined his deposition,
    he signed the same in my presence on the _____ day of
14  _____, 2017.

15

16
                            _____
17                             Notary Public

18

19

20  My commission expires _____, _____.

21                      - - -

22

23

24
```

                                                    300

```
1                       CERTIFICATE

2    State of Ohio            :
                             :        SS:
3    County of Ross           :

4           I, Valerie J. Grubaugh, Registered Merit
     Reporter and Notary Public in and for the State of
5    Ohio, duly commissioned and qualified, certify that
     the within named Peter Bossley was by me duly sworn
6    to testify to the whole truth in the cause aforesaid;
     that the testimony was taken down by me in stenotype
7    in the presence of said witness, afterwards
     transcribed upon a computer; that the foregoing is a
8    true and correct transcript of the testimony given by
     said witness taken at the time and place in the
9    foregoing caption specified and completed without
     adjournment.
10
            I certify that I am not a relative,
11   employee, or attorney of any of the parties hereto,
     or of any attorney or counsel employed by the
12   parties, or financially interested in the action.

13          IN WITNESS WHEREOF, I have hereunto set
     my hand and affixed my seal of office at Columbus,
14   Ohio, on this 17th day of March, 2017.

15

16

17

18   _____
     Valerie J. Grubaugh
19   Registered Merit Reporter
     and Notary Public in and for
20   the State of Ohio.

21
     My commission expires August 11, 2021.
22

23

24
                                                    301
```