1 | Patricia Barbosa (SBN 125685)
pbarbosa@barbosagrp.com
2 | **BARBOSA GROUP**
606 Lake Street, #9
3 | Huntington Beach, California 92648
Phone: (714) 465-9486
4 |

5 | Sharon Krevor-Weisbaum
skw@browngold.com
6 | Jessica Weber
jweber@browngold.com
7 | Kevin D. Docherty
kdocherty@browngold.com
8 | Monica R. Basche
mbasche@browngold.com
9 | **BROWN, GOLDSTEIN & LEVY LLP**
120 East Baltimore Street, Suite 2500
10 | Baltimore, Maryland 21202
Phone: (410) 962-1030

11 | *Attorneys for Plaintiffs*

12 |

**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA**

14 | ROY PAYAN, PORTIA MASON, THE NATIONAL FEDERATION OF THE BLIND, INC., and THE NATIONAL FEDERATION OF THE BLIND OF CALIFORNIA, INC.,

Plaintiffs,

v.

LOS ANGELES COMMUNITY COLLEGE DISTRICT,

Defendant.

Case No.: 2:17-cv-01697-SVW(SKx)
**Civil Rights**

**PLAINTIFFS' RESPONSE TO DECLARATIONS FILED IN RESPONSE TO COURT'S JUNE 26, 2023, ORDER AND REQUEST FOR INJUNCTION**

Hearing Date: July 24, 2023
Time: 1:30 p.m.

1   After six years of litigation that has included a bench trial, two jury trials, an

2   appeal, and numerous hours of testimony from experts in the field of accessibility in

3   higher education, the Los Angeles Community College District ("LACCD") still

4   refuses to take the steps necessary to provide blind students an equal educational

5   opportunity. The conclusory declarations from Nicole Albo-Lopez and Carmen Lidz,

6   in which they avoid stating that the inaccessible websites and software are now fixed

7   and claim that many of Roy Payan's and Portia Mason's experiences were merely

8   one-offs requiring no changes at all, confirm that LACCD has not made any

9   meaningful progress towards complying with the Americans with Disabilities Act

10  ("ADA") by ensuring that its programs and services are accessible to blind students.

11  This Court can, and should, enter an injunction that builds off of the one entered in

12  2019, that requires LACCD to comply with the ADA.

13

14  **I.      Significant accessibility barriers persist at LACCD.**

15      As detailed below, Ms. Albo-Lopez's and Ms. Lidz's declarations demonstrate

16  that LACCD is still not complying with the ADA. The declarations contain notable

17  admissions that important programs and services are still inaccessible to blind

18  students and fail to answer critical questions about the accessibility of others. They

19  provide no basis for the Court to deny Plaintiffs' request for a permanent injunction.

20

21      **A.    The LACCD and LACC websites are still inaccessible in critical**
22          **areas.**

23      The jury found that the inaccessibility of the LACCD and LACC websites

24  violated the ADA. ECF No. 567, Question 1. In her declaration, Ms. Lidz states that

25  after Plaintiffs filed their lawsuit, the LACCD and LACC websites underwent a

26  redesign "that places all District websites on a single platform that supports Web

27

28
*PAYAN, et al. v. LACCD*, Case No.:  2:17-cv-01697 SVW(SKx)
PLAINTIFFS' RESPONSE TO DECLARATIONS FILED IN RESPONSE TO COURT'S
JUNE 26, 2023, ORDER AND REQUEST FOR INJUNCTION

2

1  Content Accessibility ('WCAG') WCAG.2.1 AA Level standards." Lidz Decl. ¶ 4,

2  ECF No. 583. Ms. Lidz further states that in "July 2020, the District introduced a

3  quality assurance tool, Monsido, to ensure monitoring of websites on a regular basis

4  and take corrective action as needed." *Id.* ¶ 5. She claims that the tool is "used to

5  produce monthly and on-demand reports that highlight errors and show compliance

6  progress." *Id.*

7          Notably, Ms. Lidz does not claim that the websites, in fact, comply with the

8  WCAG 2.1 AA standards. Her declaration only suggests that they can. She also does

9  not provide any compliance reports generated by the Monsido monitoring tool. That

10 is likely because significant accessibility barriers still exist across both the LACCD

11 and LACC websites. Plaintiffs' expert, Peter Bossley, reviewed the LACCD website

12 between June 19 and July 7, 2023—following the jury's verdict—and found multiple

13 serious or critical accessibility issues, each of which constitutes a failure to comply

14 with the WCAG requirements, including the following:

15          • Headings on the website do not have appropriate roles to describe the

16            content.

17          • Drop down menus are incorrectly coded.

18          • Links are not defined with specific purposes or destinations.

19          • Screen focus does not follow the logical visual presentation.

20          • PDF files available on the website are inaccessible.

21 Ex. 1-A, LACCD Website Accessibility Evaluation. Some of these barriers

22 completely block content for blind users and others render important functions, such

23 as searching for classes, exceedingly difficult. *Id.*; Ex. 1, Decl. of Peter Bossley

24 ("Bossley Decl.") ¶ 13. Plaintiffs' expert, Jon Gunderson, reviewed the LACC

25 website in early July 2023 and found similar issues. Ex. 2, Decl. of Jon Gunderson

26 ("Gunderson Decl.") ¶¶ 4–5.

27

28

*PAYAN, et al. v. LACCD*, Case No.:  2:17-cv-01697 SVW(SKx)
PLAINTIFFS' RESPONSE TO DECLARATIONS FILED IN RESPONSE TO COURT'S
JUNE 26, 2023, ORDER AND REQUEST FOR INJUNCTION

3

1    Mr. Bossley also examined PeopleSoft, LACCD's Student Information

2  System. Ex. 1-B, LACCD PeopleSoft (Student Information System) Accessibility

3  Evaluation; Ex. 1, Bossley Decl. ¶ 14. Ms. Lidz claims that PeopleSoft is accessible

4  because the company that built it, Oracle, provided a Voluntary Product Accessibility

5  Template ("VPAT") "confirming the support for WCAG 2.1 Level AA standards."

6  Lidz Decl. ¶ 6. But as Mr. Bossley notes, VPATs are a vendor's assessment of its

7  own product's accessibility and are notoriously unreliable. *See* Ex. 1, Bossley Decl. ¶

8  16. Indeed, a careful review of the VPAT Ms. Lidz identifies in her declaration shows

9  that PeopleSoft *does not* meet the WCAG requirements in key areas. *Id.* ¶ 17. For

10  example, certain tables, including those that identify student schedules or that allow

11  them to manage their classes, did not comply with WCAG. *See* PeopleSoft VPAT[1] at

12  1.3.1 Info and Relationships. Other pages where students apply for financial aid, and

13  view classes and grades do not have properly described links according to the VPAT.

14  *See* PeopleSoft VPAT 2.4.4 Link Purpose (In Context). The VPAT also shows that

15  PeopleSoft has not been tested for compliance with numerous other guidelines. *E.g.*,

16  PeopleSoft VPAT 1.3.5 Identify Input Purpose; 2.5.3 Label in Name. The proper

17  conclusion to be drawn from the PeopleSoft VPAT is that PeopleSoft is still not

18  accessible, not (as Ms. Lidz suggests) that it is. *See* Ex. 1, Bossley Decl. ¶ 17.

19    Mr. Bossley's independent testing of PeopleSoft in July 2023 confirms that it

20  continues to be inaccessible in several important areas. As he found, "[t]here are

21  several critical and serious issues that would likely prevent non-sighted users relying

22  on screen readers navigating the site from accessing content." Ex. 1-B at 1. As with

23  LACCD's websites, PeopleSoft contains inaccessible PDF files that make it

24  "impossible for users of assistive technology to consume the information." *Id.* at 2.

25  Improperly structured tables, non-functional navigational links that cannot be

26

27  [1] https://www.oracle.com/corporate/accessibility/templates/t2-10578.html.

28
*PAYAN, et al. v. LACCD*, Case No.:  2:17-cv-01697 SVW(SKx)
PLAINTIFFS' RESPONSE TO DECLARATIONS FILED IN RESPONSE TO COURT'S
JUNE 26, 2023, ORDER AND REQUEST FOR INJUNCTION

4

1    operated with a keyboard, information contained only through color, and incorrectly

2    coded screen focus that does not follow a logical reading order are only a sampling of

3    the many serious accessibility barriers that remain in the PeopleSoft application. *Id.* at

4    2-12.

5          Despite the continued inaccessibility of PeopleSoft, LACCD has not taken any

6    of the remedial actions recommended by Mr. Bossley both in his expert report and

7    declarations throughout this case and in his trial testimony: utilizing Application

8    Programming Interfaces ("APIs") to build accessible interfaces within PeopleSoft

9    and/or developing procedures to ensure equally effective access when technical

10   access barriers remain (such as a 24/7 Accessibility Help Line and policies to ensure

11   students are not penalized because of delays in access). Ex. 1, Bossley Decl. ¶ 19.

12   Moreover, with respect to both the LACCD website and PeopleSoft application,

13   many of the access barriers Mr. Bossley identified over the past month were familiar:

14   they were the same access barriers he identified six years ago in his 2017 evaluation

15   of the website and application. Ex. 1, Bossley Decl. ¶¶ 13–14. As Mr. Bossley has

16   explained, given that LACCD appears to be relying exclusively on an automated

17   monitoring tool, Monsido, to make it websites accessible, it is not surprising that

18   major access barriers remain. *Id.* ¶ 20. "[A]utomated testing tools are capable of

19   identifying only about 30% of potential WCAG violations" and "without any training

20   or procedures in place to ensure that individuals who create or modify content for the

21   websites understand how to do so in an accessible manner, a website that may start

22   out as accessible will quickly become inaccessible." *Id.*; *see also* Ex. 2, Gunderson

23   Decl. ¶¶ 7–10. The continued inaccessibility of LACCD's websites is the predictable

24   result of failing to implement any procedures, training, or human testing to ensure the

25   websites become and remain accessible.

26

27

28

---

*PAYAN, et al. v. LACCD*, Case No.: 2:17-cv-01697 SVW(SKx)
PLAINTIFFS' RESPONSE TO DECLARATIONS FILED IN RESPONSE TO COURT'S
JUNE 26, 2023, ORDER AND REQUEST FOR INJUNCTION

5

**B.     LACCD does not require professors and instructors to provide accessible course materials, including textbooks, in a timely manner.**

The jury found that the inaccessibility of handouts and PowerPoints at LACCD violated the ADA. ECF No. 567, Question 5. Just as this Court instructed the jury at trial, the ADA requires that auxiliary aids and services be provided in a *timely* manner. 28 C.F.R. § 35.160(b)(2). In her declaration, Ms. Albo-Lopez states that "handouts and powerpoints, and other similar classroom materials, *should be* provided to [blind students] with sufficient time, in coordination with OSS, for conversion to take place or with sufficient arrangements for accessibility." Albo-Lopez Decl. ¶ 18 (emphasis added). It is unclear how that process is different in any meaningful way from the process that was in place at the time Mr. Payan and Ms. Mason were enrolled at LACC. *See* Alternate Media Production Policy, ECF No. 48-21 (Pls.' trial exhibit 4).

Nothing in Ms. Albo-Lopez's declaration suggests that instructors are trained on their responsibilities or *required* to provide their materials to the Office of Special Services ("OSS") with sufficient time to allow them to be converted before blind students need them in class. As Dr. Gunderson testified at trial, professors at the University of Illinois are required to provide their materials to the conversion office directly (not to the student) as soon as a blind student has enrolled in their class. Ex. 2, Gunderson Decl. ¶ 19. From there, the materials are converted into accessible formats and distributed to the students through the school's learning management system (Blackboard, at University of Illinois or Canvas, at LACCD) as the semester progresses. *Id.* Dr. Gunderson testified that professors were prohibited from using materials in class that were not available in accessible formats. *Id.* ¶ 14. Notwithstanding that the ADA requires them to be provided in a timely manner (*i.e.*, at the same time, or before, they are used in class), Ms. Albo-Lopez's declaration

*PAYAN, et al. v. LACCD*, Case No.:  2:17-cv-01697 SVW(SKx)
PLAINTIFFS' RESPONSE TO DECLARATIONS FILED IN RESPONSE TO COURT'S
JUNE 26, 2023, ORDER AND REQUEST FOR INJUNCTION

6

1   suggests that the timely provision of accessible course materials continues to be

2   merely aspirational at LACCD.

3       The jury also found that the inaccessibility of Mr. Payan's math and

4   psychology textbooks was a violation of the ADA. ECF No. 567, Question 8. As with

5   handouts and PowerPoints, Ms. Albo-Lopez's declaration does not indicate that

6   instructors at LACCD are *required* to use only accessible textbooks or provide

7   textbooks for conversion to accessible formats well before classes start so that they

8   can be distributed to students in a timely manner. *See* Albo-Lopez Decl. ¶¶ 20–22.

9   Instead, Ms. Albo-Lopez describes an Equally Effective Alternative Access Plan

10  ("EEAAP") process that applies to "software and digital media," and that went into

11  effect in fall 2020. *Id.* ¶ 20. There is no indication that the EEAAP process Ms. Albo-

12  Lopez describes applies to textbooks or in-class materials. Moreover, as Mr. Bossley

13  explains, there are major shortcomings in LACCD's new EEAAP process: lack of

14  clarity on who determines the need for an EEAAP and how that determination is

15  made; reliance on third-party vendors to draft the EEAAPs without critical contextual

16  knowledge of the setting in which they are to be implemented; and a failure to

17  indicate the individual(s) with ultimate responsibility for evaluating and approving

18  EEAAP requests and for ensuring successful implementation of the EEAAP. Ex. 1,

19  Bossley Decl. ¶ 23. Without clearly defined lines of responsibility, blind students at

20  LACCD will continue to be deprived timely, accessible textbooks and course

21  materials.

22

23      **C.    There is no evidence that LACCD's student-use technology is
            accessible.**

24

25      The jury found that LACCD violated the ADA by using Etudes and

26  MyMathLab, both of which were inaccessible. ECF No. 567, Questions 3 & 4. In her

27

28

*PAYAN, et al. v. LACCD*, Case No.:  2:17-cv-01697 SVW(SKx)
PLAINTIFFS' RESPONSE TO DECLARATIONS FILED IN RESPONSE TO COURT'S
JUNE 26, 2023, ORDER AND REQUEST FOR INJUNCTION

7

declaration, Ms. Albo-Lopez states that MyMathLab is no longer used at LACC (she does not mention whether it is used elsewhere at LACCD) and identifies other programs that are: MyOpenMath, WebAssign, ALEKS, MS Excel, RGuroo, and MyLab Statistics. Albo-Lopez Decl. ¶ 11. The only claim that she makes about their accessibility is that each of them "has a VPAT confirming accessibility updates that take place regularly." *Id.* LACCD does not actually claim that any of these programs are in fact accessible, nor has it provided the VPATs themselves, or any accessibility testing results. Furthermore, as is evident from the VPAT for PeopleSoft, *supra* pp. 4-5, VPATs—vendors' own assessments of their products' accessibility—are often misleading. *See* Ex. 1, Bossley Decl. ¶ 16. There is no reason to believe, based on Ms. Albo-Lopez's declaration, that the programs that have replaced MyMathLab are accessible and Ms. Albo-Lopez does not describe any reasonable modifications that LACCD has made to ensure blind students can access the tools and features they provide.

In their declarations, both Ms. Albo-Lopez and Ms. Lidz discuss Etudes and state that it is no longer used at LACCD. Albo-Lopez Decl. ¶ 12; Lidz Decl. ¶ 8. Since the fall of 2018, LACCD has used a program called Canvas. Albo-Lopez Decl. ¶ 12; Lidz Decl. ¶ 8. Ms. Lidz states that Canvas is accessible "*unless* an instructor has uploaded content in an inaccessible format." Lidz Decl. ¶ 10 (emphasis added). Based on that statement, it is reasonable to believe that LACCD does not have any policy that requires professors to upload only accessible content to Canvas. As Dr. Gunderson explained at trial, LACCD could establish such a requirement—much like the requirement at University of Illinois that professors only use accessible materials in class. Ex. 2, Gunderson Decl. ¶ 19. It could also provide training to its instructors regarding the process for creating documents in accessible formats. *Id.* ¶ 20.

*PAYAN, et al. v. LACCD*, Case No.: 2:17-cv-01697 SVW(SKx)
PLAINTIFFS' RESPONSE TO DECLARATIONS FILED IN RESPONSE TO COURT'S
JUNE 26, 2023, ORDER AND REQUEST FOR INJUNCTION

8

Ms. Lidz states that if inaccessible content is uploaded to Canvas, "the DSPS office at the college will take appropriate action to ensure accessibility for sight-impaired students that needs [sic] to use the content." Lidz Decl. 10. Ms. Lidz does not explain in any detail what that action is or how LACCD ensures the materials are provided to blind students in a timely manner (*i.e.*, at the same time, or before, they are used by sighted students). *Id.* The "new" procedures described by Ms. Lidz are, in fact, the same ineffective procedures that LACCD has employed in the past that resulted in this lawsuit—procedures that put the burden on blind students to secure access rather than on LACCD to ensure that blind students have equally effective access from the start.

### D. LACCD has not made reasonable modifications to inaccessible library resources to ensure blind students have equally effective access to them.

The jury found that the inaccessibility of the LACC library violated the ADA. ECF No. 567, Question 2. Ms. Albo-Lopez states that "OSS and library personnel are available currently to assist sight-impaired students with any access" to the library's research databases, and that "[a]ccessibility training is available to all library staff." *Id.* ¶ 14. Ms. Albo-Lopez, however, does not state that accessibility training is *required* for all library staff or claim that a person who has had such training is available whenever the library is open. *See* Ex. 2, Gunderson Decl. ¶¶ 22–24. She also does not explain the process for converting inaccessible research materials into accessible formats—namely whether this is a service library staff can now perform quickly and accurately on their own or whether conversion is still solely within the domain of OSS, which Mr. Payan and Ms. Mason testified led to significant delays in receiving converted library materials. Ms. Albo-Lopez also states that "computer

*PAYAN, et al. v. LACCD*, Case No.:  2:17-cv-01697 SVW(SKx)
PLAINTIFFS' RESPONSE TO DECLARATIONS FILED IN RESPONSE TO COURT'S
JUNE 26, 2023, ORDER AND REQUEST FOR INJUNCTION

9

1   terminals in the library are currently equipped with JAWS," but does not explain how

2   many terminals are so equipped. Albo-Lopez Decl. ¶ 13. In addition, contrary to

3   LACCD's General Counsel's representations at the June 26, 2023, status conference,

4   neither of LACCD's declarations makes any claim that the library databases are now

5   accessible (or accessible with the exception of certain pictures). The continued

6   inaccessibility of many of the library's databases makes it all the more critical that

7   LACCD implement procedures for providing equally effective access to blind

8   students—procedures that, six years into this litigation, are still completely lacking.

9        Ms. Albo-Lopez further claims that it would be damaging to LACCD if it were

10  required to discontinue using certain library databases. Albo-Lopez Decl. ¶¶ 15–17.

11  But Plaintiffs are not requesting such relief—they are only requesting procedures for

12  ensuring that blind students get timely and effective access to library materials

13  through alternate means where necessary. *See* Ex. 2, Gunderson Decl. ¶¶ 24–25.

14

15       **E.    There is no evidence that blind students are informed of all available**

16  **accommodations or that their accommodation letters are accessible.**

17       The jury found that LACCD violated the ADA by failing to provide Mr. Payan

18  and Ms. Mason with accommodation letters in accessible formats. ECF No. 567,

19  Questions 11 & 12. Ms. Albo-Lopez claims that LACCD changed its process in

20  February 2020 and that it "is now state-of the-art among community colleges and for

21  higher education institutions." Albo-Lopez Decl. ¶ 12. According to Ms. Albo-Lopez,

22  accommodation letters (now called DSPS Accommodation Forms) "are prepared at

23  the request of the student for the courses in which they are enrolled," *id.* ¶ 8, after an

24  interactive process with "a DSPS Certificated Staff member," *id.* ¶ 7. "The form is

25  drafted in PeopleSoft and sent to the instructor," and the student receives an e-mail

26  that it has been sent to the instructor. *Id.* ¶ 8. The forms are available through

27

28

*PAYAN, et al. v. LACCD*, Case No.: 2:17-cv-01697 SVW(SKx)
PLAINTIFFS' RESPONSE TO DECLARATIONS FILED IN RESPONSE TO COURT'S
JUNE 26, 2023, ORDER AND REQUEST FOR INJUNCTION

PeopleSoft, *id.* ¶ 9, and by e-mail upon request, *id.* ¶ 10. According to Ms. Albo-Lopez the forms are "in electronic format, and accessible to the student through" programs like JAWS. *Id.*

Ms. Albo-Lopez does not provide any basis for her claim that the Accommodation Forms are accessible with JAWS. If LACCD should have learned anything from the last six years of litigation, it is that not all electronic formats are equal. Some are more accessible than others, and some electronic formats (*e.g.*, PDFs) may need significant work before they are accessible to blind users. Ex. 2, Gunderson Decl. ¶ 13. In addition, since PeopleSoft is not fully accessible to blind students, *supra* pp. 3-5, there is no basis for the Court to believe that blind students are able to access their Accommodation Forms through PeopleSoft as Ms. Albo-Lopez claims.

## F.   LACCD still does not provide notetakers to blind students.

The jury found that LACCD violated the ADA by failing to provide Mr. Payan with notetakers. ECF No. 567, Question 13. Ms. Albo-Lopez's declaration makes clear that LACCD still has not committed to providing blind students with notetakers. She states that "[t]he College's policy *allows* note takers," who may "be another student in the class who volunteers or can be someone else whom the student has arranged to take notes for them and who is permitted to attend the class to do so." Albo-Lopez Decl. ¶ 23. OSS will only arrange for a notetaker directly "if one is available at that time." *Id.* ¶ 24. As was the case when Mr. Payan attended LACCD, OSS's only commitment to ensuring effective communication in its courses through the provision of note taking assistance is a statement that it "provides authorization for volunteer note taking services." *Id.* Ms. Albo-Lopez does not explain what happens if no one volunteers to take notes for a blind student, yet she makes the

*PAYAN, et al. v. LACCD*, Case No.: 2:17-cv-01697 SVW(SKx)
PLAINTIFFS' RESPONSE TO DECLARATIONS FILED IN RESPONSE TO COURT'S
JUNE 26, 2023, ORDER AND REQUEST FOR INJUNCTION

11

1    conclusory assertion that Mr. Payan's experience "was a one-time situation from OSS

2    staffing in the 2015-2018 time period, and is not likely to recur." *Id.* ¶ 25. She has

3    identified no policy change or other facts, however, that would make recurrence of

4    this issue unlikely.

5

6       **G.      There is no evidence that LACCD requires instructors to allow blind

7                 students to audio record their classes.**

8           The jury found that LACCD violated the ADA by refusing to allow Mr. Payan

9    to record his math classes. ECF No. 567, Question 14. Ms. Albo-Lopez states that

10   allowing blind students to record classes is required by California law. Albo-Lopez

11   Decl. ¶ 26. But Ms. Albo-Lopez does not state that LACCD has a policy informing

12   instructors of their obligations under California law. Instead, she makes the factually

13   incorrect assertion that Mr. Payan's experience was limited to a "particular class

14   session" that "he had not registered to attend, did not request and did not have an

15   accommodation letter for the class, and did not notify the instructor that he was a

16   sight-impaired student," before claiming that "the incident of liability was a one-time

17   instance and should not recur under existing policies." *Id.* ¶ 27. In addition to

18   misstating the record, this assertion only reinforces that LACCD has taken no action

19   to ensure that instructors comply with blind students' approved accommodations.

20   LACCD has provided no evidence that it requires routine training of faculty on their

21   obligations to grant approved accommodations. At trial, instructor Blythe Daniel

22   testified that she had not received any training related to accommodations in more

23   than 20 years. Instructor David Sedghi testified at trial that, as of 2017, he had never

24   received formal training on or seen any policy governing effective communication

25   obligations pertaining to blind students. There is no evidence to support Ms. Lidz's

26

27

28
*PAYAN, et al. v. LACCD*, Case No.:  2:17-cv-01697 SVW(SKx)
PLAINTIFFS' RESPONSE TO DECLARATIONS FILED IN RESPONSE TO COURT'S
JUNE 26, 2023, ORDER AND REQUEST FOR INJUNCTION

12

1  claim that the denial of accommodations regarding the recording of classes is any less

2  likely today than it was six years ago.

3

4       **H.     LACCD has not changed its ineffective testing accommodations**

5              **procedures.**

6       The jury found that LACCD violated the ADA by failing to provide approved

7  testing accommodations to Mr. Payan and Ms. Mason. ECF No. 567, Questions 15–

8  16. Ms. Albo-Lopez asserts that their experiences were "one-time instances based on

9  how OSS was staffed and operated at that time," and claims that they "would be very

10 unlikely to recur." Albo-Lopez Decl. ¶ 29. Yet Ms. Albo-Lopez fails to identify a

11 single change to LACCD's policies or procedures to ensure that these types of

12 violations do not reoccur. She does not identify any changes to the way OSS is

13 staffed, or any policy changes (such as requiring instructors to provide exams and

14 quizzes to OSS in a timely manner) that affect the way students with disabilities

15 schedule and take their examinations. Ms. Albo-Lopez also does not mention any

16 policies or practices that relate to OSS's hiring of qualified proctors, which was a

17 significant issue for Mr. Payan's math examinations.

18

19      **I.     LACCD has made no changes to prevent future incidents of steering**

20             **blind students away from certain courses.**

21      The jury found that LACCD violated the ADA by steering Mr. Payan away

22 from certain math courses and sections because he is blind. ECF No. 567, Questions

23 17 & 19. In response, Ms. Albo-Lopez offers only that these incidents violated

24 LACCD's policy and were, once again, just more examples of one-off occurrences.

25 Albo-Lopez Decl. ¶¶ 30–31. There is no recognition that LACCD needs to do more to

26 ensure that its policies are actually followed—whether through increased oversight of

27

28
*PAYAN, et al. v. LACCD*, Case No.:  2:17-cv-01697 SVW(SKx)
PLAINTIFFS' RESPONSE TO DECLARATIONS FILED IN RESPONSE TO COURT'S
JUNE 26, 2023, ORDER AND REQUEST FOR INJUNCTION

13

1  student ADA issues by higher level officials or through regular staff training on

2  obligations under the ADA. Instead, LACCD simply claims that no changes are

3  required following the jury's findings of disparate treatment.

4

5  **II.**     **Because there is no accountability for accessibility, there is no reason to**
            **believe that Mr. Payan's and Ms. Mason's experiences were, or will be,**
6           **isolated events.**

7

8        Ms. Albo-Lopez and Ms. Lidz assert that Mr. Payan's and Ms. Mason's

9  experiences were one-time events and are not likely to recur. Albo-Lopez Decl. ¶¶ 14,

10 19, 25, 27, 29, 30, 31; Lidz Decl. ¶ 3. There is no reason the Court should accept

11 these unsupported, conclusory claims. Indeed, many of the barriers that remain on

12 LACCD's website and PeopleSoft application are the very same barriers Plaintiffs

13 identified six years ago, in Mr. Bossley's 2017 expert report. Ex. 1, Bossley Decl. ¶¶

14 13–14. Critically, there is no evidence that LACCD is taking its obligations under the

15 ADA seriously at a systemic level. Indeed, it is notable that LACCD has not

16 submitted declarations from any District or College level ADA Coordinator. No one

17 holding such a position is even identified by name in Ms. Albo-Lopez's or Ms. Lidz's

18 declarations. There is also no evidence that LACC has hired a "Dean of Educational

19 Technology"—the person who LACC's Alternate Media Production Policy says "will

20 review all instructional equipment purchase requisitions and contract requests to

21 ensure compliance with federal and state regulations regarding the purchasing and

22 leasing of instructional materials." *See* Alternate Media Production Policy at 1, ECF

23 No. 48-21 (Pls.' trial exhibit 4).

24       As Dr. Gunderson and Mr. Bossley explain, ensuring accessibility requires that

25 someone take charge and coordinate the effort among the various relevant

26 stakeholders (students, faculty, staff, vendors, etc.). *See* Ex. 1, Bossley Decl. ¶¶ 19–

27

28

*PAYAN, et al. v. LACCD*, Case No.: 2:17-cv-01697 SVW(SKx)
PLAINTIFFS' RESPONSE TO DECLARATIONS FILED IN RESPONSE TO COURT'S
JUNE 26, 2023, ORDER AND REQUEST FOR INJUNCTION

14

23; Ex. 2, Gunderson Decl. ¶¶ 9–10. Without that type of leadership, there is no reason to believe that LACCD will be able to comply with its obligations under the ADA, and every reason to believe that compliance will be addressed through the same, ineffective, complaint-driven process that has plagued LACCD and that the jury resoundingly determined led to LACCD's pattern of discrimination.

## III.   Injunctive relief building off of that ordered in 2019, is appropriate.

Given LACCD's ongoing failure to meet its obligations under the ADA, the Court should order injunctive relief similar to the injunction it entered in 2019, but with additional provisions requiring training and monitoring to ensure the proper implementation of policies and sufficient oversight. Given that many of the violations the jury found stem from LACCD's failure to establish practices to properly implement and oversee its existing policies, these additional terms are needed to ensure that LACCD adheres to its policies moving forward. Plaintiffs' proposed injunction is attached as Exhibit 3.

The Court can, and should, enter an injunction notwithstanding Ms. Albo-Lopez's and Ms. Lidz's claims that LACCD has abated its unlawful conduct. "It is the duty of the courts to beware of efforts to defeat injunctive relief by protestations of repentance and reform, especially when abandonment seems timed to anticipate suit, and there is probability of resumption." *United States v. Ore. Med. Soc.*, 343 U.S. 326, 333 (1952); *see also United States v. Odessa Union Warehouse Co-Op*, 833 F.2d 172, 176 (9th Cir. 1987); *SEC v. Koracorp Indus., Inc.*, 575 F. 2d 692, 698 (9th Cir. 1978) ("Promises of reformation and acts of contrition are relevant in deciding whether an injunction shall issue, but neither is conclusive or even necessarily persuasive, especially if no evidence of remorse surfaces until the violator is caught."). "An injunction should not be refused upon the mere *ipse dixit* of a

*PAYAN, et al. v. LACCD*, Case No.:  2:17-cv-01697 SVW(SKx)
PLAINTIFFS' RESPONSE TO DECLARATIONS FILED IN RESPONSE TO COURT'S
JUNE 26, 2023, ORDER AND REQUEST FOR INJUNCTION

15

defendant that, notwithstanding his past misconduct, he is now repentant and will hereafter abide by the law." *United States v. Hunter*, 459 F.2d 205, 220 (4th Cir. 1972). Rather, "[d]enial of an injunction is proper only in cases where . . . the judge is fully satisfied that the defendant will not continue his unlawful conduct." *Id.*

Ms. Albo-Lopez's and Ms. Lidz's declarations demonstrate that any changes LACCD made to its policies and practices occurred well into the pendency of this litigation, largely after the 2019 trials in this case (*i.e.*, after LACCD was "caught," *see Koracorp Indus., Inc.*, 575 F. 2d at 698). Lidz Decl. ¶ 5 (discussing website redesign project in July 2020); *id.* ¶ 6 (discussing changes to PeopleSoft "since the 2015-2018 time period of this case"); Albo-Lopez Decl. ¶ 6 (discussing changes to accommodations letters that were made in February 2020); *id.* ¶¶ 11–12 (discussing changes to math software and Canvass, which became "the exclusive platform for instruction . . . as of the fall of 2018"); *id.* ¶ 19 (describing problems with accessible course materials as "one-time occurrences from the time period of the lawsuit, 2015-2018, and are not likely to occur again."); *id.* ¶ 20 (describing EEAAP process that "went into effect in fall 2020"); *id.* ¶ 25 (claiming that failure to provide Mr. Payan with a notetaker "was a one-time situation from OSS staffing in the 2015-2018 time period, and is not likely to recur"); *id.* ¶ 27 (claiming that failure to allow Mr. Payan to audio record class "was a one-time instance, and should not recur under existing policies"); *id.* ¶ 28 (asserting that failure to provide testing accommodations "is not in conformity with policy, and now, some five years after the times covered by the lawsuit, based on how OSS operates, would be very unlikely to recur"); *id.* ¶¶ 30–31 (describing practice of steering Mr. Payan from certain courses as "the type of extremely rare incident that should not recur").

Even if the Court were to credit Ms. Albo-Lopez's and Ms. Lidz's claims that LACCD has changed its ways, injunctive relief is still appropriate since "cessation of

*PAYAN, et al. v. LACCD*, Case No.:  2:17-cv-01697 SVW(SKx)
PLAINTIFFS' RESPONSE TO DECLARATIONS FILED IN RESPONSE TO COURT'S
JUNE 26, 2023, ORDER AND REQUEST FOR INJUNCTION

16

1    violations does not itself foreclose issuance of an injunction," *Odessa Union*

2    *Warehouse Co-Op*, 833 F.2d at 176, and there is no reason to believe Ms. Albo-

3    Lopez's and Ms. Lidz's unsupported, conclusory assertions that the violations found

4    by the jury will not recur.[2]

5

6

7

8    _____

9    [2] Numerous courts have recognized that websites, in particular, are so easily changed
     that a defendant's claim that it has modified a website to comply with the ADA is
10   insufficient to deny injunctive relief. *See Long v. Live Nation Worldwide, Inc.*, No.
     C16-1961 TSZ, 2018 WL 3533338, at *4 (W.D. Wash. July 23, 2018) ("If anything,
11   Defendants' numerous changes to the Exchange Website since this lawsuit started
     showcases just how easy it is for Defendants to change their websites. Defendants
12   could just as easily abandon the Exchange Website at any point in the future and
     revert back to one of the earlier versions. Indeed, Defendants have made no attempt
13   to put forth any evidence to the contrary."); *Brooke v. A-Ventures, LLC*, No. 2:17-
     CV-2868-HRH, 2017 WL 5624941, at *3 (D. Ariz. Nov. 22, 2017) ("A change to a
14   website is akin to a change in policy, which courts have found are not sufficient to
15   meet the stringent standard for proving a case has been mooted by a defendant's
     voluntary conduct if the policy 'could be easily abandoned or altered in the
16   future.' . . .Defendant's website could easily be abandoned or changed in the future,
17   as could its new internal policy.") (internal citations omitted); *Brooks v. Lovisa Am.,
     LLC*, No. 220CV02493TLNKJN, 2022 WL 4387979, at *3 (E.D. Cal. Sept. 22, 2022)
18   ("Here, Defendant has not met its burden to show it is absolutely clear that the
19   allegedly wrongful behavior could not reasonably be expected to recur. . . . First, the
     Court notes the parties dispute whether the Website has been made compliant through
20   the removal of accessibility barriers. Second, even if the Website had the alleged
21   accessibility barriers removed and it was made compliant, it is not abundantly clear
     that the Website could not reasonably fall out of compliance."). These holdings are
22   consistent with Mr. Bossley's observation that "[w]ebsites at institutions of higher
23   education are typically updated frequently by a large number of different content
     creators, and thus institutions need policies and procedures in place—such as regular
24   training and user testing—to ensure their accessibility over time." Ex. 1, Bossley
25   Decl. ¶ 20.

26

27

28

*PAYAN, et al. v. LACCD*, Case No.:  2:17-cv-01697 SVW(SKx)
PLAINTIFFS' RESPONSE TO DECLARATIONS FILED IN RESPONSE TO COURT'S
JUNE 26, 2023, ORDER AND REQUEST FOR INJUNCTION

17

**IV.    Conclusion.**

For the foregoing reasons, Plaintiffs respectfully request that the Court enter their proposed permanent injunction attached as Exhibit 3, which requires the Defendant to comply with Title II of the ADA with respect to all of the violations identified by the jury.

Respectfully submitted,

Dated:  July 17, 2023          **BARBOSA GROUP**

*P Barbosa*
_____
Patricia Barbosa


**BROWN GOLDSTEIN & LEVY, LLP**

*[signature]*
_____
Sharon Krevor-Weisbaum
Jessica P. Weber
Kevin D. Docherty
Monica R. Basche

*Attorneys for Plaintiffs*

*PAYAN, et al. v. LACCD*, Case No.:  2:17-cv-01697 SVW(SKx)
PLAINTIFFS' RESPONSE TO DECLARATIONS FILED IN RESPONSE TO COURT'S
JUNE 26, 2023, ORDER AND REQUEST FOR INJUNCTION

18

**CERTIFICATE OF SERVICE**

I hereby certify that on July 17, 2023, copies of the foregoing, Plaintiffs'

Response to Declarations Filed in Response to Court's June 26, 2023, Order and

Request for Injunction were delivered by the Court's e-filing system to:

Richard E. Morton, Esquire
Yvette Davis, Esquire
HAIGHT BROWN & BONESTEEL LLP
2050 Main Street, Suite 600
Irvine, California 92614
rmorton@hbblaw.com
ydavis@hbblaw.com

*and*

David A. Urban, Esquire
Mark H. Meyerhoff, Esquire
Richard Daniel Seitz, Esquire
LIEBERT CASSIDY WHITMORE
A Professional Law Corporation
6033 West Century Boulevard, 5th Floor
Los Angeles, California 90045
durban@lcwlegal.com
mmeyerhoff@lcwlegal.com
dseitz@lcwlegal.com

*Attorneys for Defendant Los Angeles*
*Community College District*

_____
Jessica P. Weber

*PAYAN, et al. v. LACCD*, Case No.:  2:17-cv-01697 SVW(SKx)
PLAINTIFFS' RESPONSE TO DECLARATIONS FILED IN RESPONSE TO COURT'S
JUNE 26, 2023, ORDER AND REQUEST FOR INJUNCTION

19