# Exhibit 1

Patricia Barbosa (SBN 125685)
pbarbosa@barbosagrp.com
**BARBOSA GROUP**
606 Lake Street, #9
Huntington Beach, California 92648
Phone: (714) 465-9486

Sharon Krevor-Weisbaum
skw@browngold.com
Jessica Weber
jweber@browngold.com
Kevin D. Docherty
kdocherty@browngold.com
Monica R. Basche
mbasche@browngold.com
**BROWN, GOLDSTEIN & LEVY LLP**
120 East Baltimore Street, Suite 2500
Baltimore, Maryland 21202
Phone: (410) 962-1030

*Attorneys for Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ROY PAYAN, PORTIA MASON, THE NATIONAL FEDERATION OF THE BLIND, INC., and THE NATIONAL FEDERATION OF THE BLIND OF CALIFORNIA, INC.,<br><br>Plaintiffs,<br><br>v.<br><br>LOS ANGELES COMMUNITY COLLEGE DISTRICT,<br><br>Defendant. | Case No.: 2:17-cv-01697-SVW(SKx)<br>**<u>Civil Rights</u>**<br><br>**DECLARATION OF PETER BOSSLEY**<br><br>Hearing Date: July 24, 2023<br>Time: 1:30 p.m. |

I, Peter Bossley, declare:

1. I am more than 18 years old, am competent to be a witness, and testify from my own personal knowledge regarding the facts set forth in this Declaration.

**Qualifications**

2. From June 2019 through January 7, 2022, I served as the Deputy ADA Coordinator of Ohio State University ("OSU"). Before assuming that role, I was the Director of OSU's Digital Accessibility Center, a position I held from November 2016 through May 2019.[1] In these positions, I led the University's digital accessibility compliance efforts under the direction of the ADA Coordinator/Section 504 Compliance Officer. I was responsible for digital accessibility policy implementation; selection, interpretation, and development of technical standards; purchasing controls; accessibility of internal and contracted development of websites, applications, and any other digital information and services developed, acquired, purchased, or otherwise managed on behalf of the University; formation of accommodation plans to meet equally effective access requirements; under direction from the ADA Coordinator/Section 504 Compliance Officer, investigating and resolving complaints relating to web and digital accessibility; and evaluating and recommending approval or denial of exception requests

3. In my positions at OSU, I maintained, recommended changes to, and implemented OSU's Digital Accessibility Policy and select technical standard(s) for use in ensuring the University complied with applicable Federal and State laws and regulations. I also guided vendors and developers of digital information and services including web and mobile applications, computer software, and other digital

[1] The term Accessible, when used in this report, means the ability of a person with a disability to acquire the same information, engage in the same interactions, and enjoy the same services as a person without a disability in an equally effective and equally integrated manner, with substantially equivalent ease of use.

classroom content, e.g. audio and video, to bring them in compliance with digital accessibility standards and accessible development practices. I also designed and implemented training and purchasing controls to assist campus units in compliance with university standards. Further, I advised campus units of their obligations under the university Digital Accessibility Policy and led the selection and implementation of campus-wide accessibility tools and training.

4. From August 2013 until November 2016, I was an accessibility analyst at OSU. In that position I led the effort to adopt and implement a strategy to address accessibility in enterprise level deployed systems, applications, software, and related items. I planned evaluations based on system risk and usage – that is, evaluations were prioritized to make sure that those with a high risk of inaccessibility and those most frequently used were addressed first. I developed a process for accessibility evaluations of new purchases and existing systems and provided consulting services to internal and external development teams on compliance with accessibility standards to improve on functional accessibility of user interfaces.

5. Since leaving OSU in January 2022, I have served as Senior Manager of Accessibility at Thomson Reuters, where I am responsible for full cycle leadership (recruiting, hiring, coaching, and mentoring) a team of about 11 Accessibility Specialists at various levels supporting product management, design, and engineering efforts. In my current role, I collaborate and communicate closely with key stakeholders and leaders in design, product management, and engineering to manage accessibility activities throughout company process, justify decisions, and provide escalation management. I also serve as Thomson Reuters' Advisory Committee representative to the World Wide Web Consortium, and represent the company at the Accessibility Guidelines Working Group (W3C-AG), which is the group responsible for drafting the Web Content Accessibility Guidelines.

6. I am also the President of Accessibility Ally, Inc., a company that provides consulting services to organizations on development of accessible websites, applications, and online content; assists organizations including higher education customers in implementing a digital accessibility compliance program; and consults for private organizations in the finance, food, and electronics industries on website accessibility legal issues. In my role as President, I provide training to web and application developers on designing, coding, and testing of user interfaces for functional accessibility and usability for persons with disabilities.

7. For Accessibility Ally, Inc. I have provided remediation advice, evaluations, and code reviews for existing websites, web applications, and mobile applications for functional usability/accessibility and conformance with accepted industry standards for digital accessibility (Web Content Accessibility Guidelines ("WCAG") 2.1 Levels A and AA and Section 508). I assist clients in selection of accessible content management platforms and other web-based and digital systems.

8. I hold the following certifications: Certified Professional in Accessibility Core Competencies and Certified Professional in Web Accessibility, from the International Association of Accessibility Professionals (IAAP); Microsoft Certified IT Professional; Enterprise Administrator, Windows Server 2008; Microsoft Certified Technology Specialist: Windows Server 2008 Network Infrastructure, Windows Server 2008; Applications Infrastructure, Configuration, Windows Server 2008 Active Directory, Configuration; and Microsoft Certified Systems Engineer, (MCSE) Windows Server 2003.

9. I have personally performed, or supervised, at least 300 evaluations of software and websites for accessibility over the past 10 years.

10. I incorporate herein additional information I have testified to in this case regarding my qualifications, whether in the form of previously filed declarations or trial testimony.

**Evaluation of Current State of Digital Accessibility at LACCD**

11. I have previously provided expert opinions in this case regarding the accessibility of LACCD's website and PeopleSoft Campus Solutions Application.

12. From late June 2023 through the present, I again evaluated the accessibility of LACCD's current website and PeopleSoft Campus Solutions Application. A true and correct copy of a report I prepared summarizing the evaluation I performed on the website and my findings is attached as Exhibit A to this declaration. A true and correct copy of a report I prepared summarizing the evaluation I performed on the PeopleSoft Campus Solutions application and my findings is attached as Exhibit B to this declaration.

13. As I explain more fully in Exhibit A, I found that LACCD's website is still not accessible to blind individuals relying on screen readers and other assistive technologies. There are a number of moderate-to-critical accessibility issues on the website, several of which completely block content for blind users. As one example of remaining access barriers, every PDF file linked to on the website that I tested was inaccessible. Several of the accessibility barriers I recently identified are the same as those I previously identified in my initial expert report in this case in 2017.

14. With respect to LACCD's PeopleSoft Campus Solutions application, as explained more fully in Exhibit B, I found that it is still not accessible to blind individuals relying on screen readers and other assistive technologies. There are a number of moderate-to-critical accessibility issues in the application, several of which completely block content for blind users. As one example of remaining access barriers, PDF files linked from various portions of the PeopleSoft application are inaccessible. Again, many of the accessibility barriers I identified in the current version of the PeopleSoft application are the same as those I previously identified in my initial expert report in this case in 2017.

15. In addition to my evaluations, I also reviewed the July 5, 2023 Declaration of Carmen Lidz (ECF No. 583) and the July 6, 2023 Declaration of Nicole Albo-Lopez (ECF No. 584). For several reasons, these declarations do not indicate an understanding of how to ensure and maintain digital accessibility in a higher education setting.

16. First, both declarations rely heavily on technology vendors' Voluntary Product Accessibility Templates ("VPATs") as a means of confirming the accessibility of a product. A VPAT is a document template originally developed by the U.S. Access Board, originally intended to provide vendors with a standardized method to document technology conformance with Section 508 standards. These completed VPATs are also referred to as Accessibility Conformance Reports (ACRs). Over time, other entities than federal agencies have begun requesting a VPAT/ACR. In my experience, however, most vendor VPATs are not accurate because vendors often do not have the internal expertise to adequately conduct their own expert accessibility testing of their products. When I have reviewed a VPAT and then tested the product, I have generally found that the vendor's representations in the VPAT regarding conformance with WCAG or other accessibility criteria are often inaccurate. Even if the individual writing the VPAT accurately describes the product's compliance with WCAG success criteria, the information conveyed in the VPAT alone is usually not sufficient to determine exactly how a product does not conform with WCAG criteria. I would never rely solely on a vendor-provided VPAT to determine that a product is accessible. I always conduct my own expert accessibility testing, or procure testing from a qualified third-party who has the requisite expertise to evaluate a product for accessibility. In fact, the VPAT for PeopleSoft indicates, for example, that for Success Criteria 1.4.1 Use of Color, the application supports this criteria. However, in my evaluation, I found at least one violation of this success criteria in a filters indication. A similar thing is true

regarding Success Criteria 3.2.1, as the VPAT indicates this criteria is met, however, my evaluation found at least one violation of this criteria.

17. Even if one takes the VPAT at face value, the PeopleSoft VPAT states that it only "partially supports" or "does not support" a number of WCAG Success Criteria. This does not mean the program complies with WCAG or is fully accessible to blind users.

18. Because neither declaration attaches or provides links to VPATs for any other technology (besides Canvas) used by LACCD, I could not evaluate those VPATs. If these VPATs are provided, I reserve the right to supplement this declaration.

19. Second, although Ms. Lidz's declaration seemingly acknowledges that PeopleSoft is not fully accessible to blind users (she discusses "an effort to improve accessibility" in paragraph 7 of her declaration), there is no discussion of any efforts taken beyond working with the PeopleSoft vendor, Oracle, to provide blind users equally effective access to this software. As I testified at trial in this case though, there are important steps institutions of higher education can and should take to ensure equally effective access to programs like PeopleSoft when access barriers remain:

a. Institutions can utilize Application Programming Interfaces ("APIs") to build a custom accessible web or mobile application-based interface to provide students an interface that is different from that which is included by default in PeopleSoft Campus Solutions. At OSU, we used APIs to make some interfaces accessible to students within our PeopleSoft system.

b. Institutions should develop procedures for ensuring equally effective access when technical access barriers remain. At OSU, we utilized a 24-hour-a-day, 365-day-a-year Accessibility Help Line, which we

communicated to students with disabilities. This help line tracked requests for assistance and our process ensured that a student's issue was resolved with no adverse consequences in the event that they were unable to have their issue resolved immediately. For example, if an access barrier prevented a blind student from timely paying a bill to the university or registering for a class that later became full, we would work with the responsible university department to ensure that the student received the same outcome had the technology been accessible (*i.e.*, no late payment fees and ability to take class that later became full). Each request for assistance routed through this process was reviewed by me or the ADA Coordinator/Section 504 Compliance Officer to ensure that the process was implemented properly.

20. Third, paragraph 4 of Ms. Lidz's declaration states that LACCD's websites have been redesigned and are now "on a single platform that supports" WCAG 2.1 Level AA. Paragraph 5 of her declaration notes that LACCD, as of July 2020, now uses Monsido, an automated accessibility testing tool, to "identif[y][ errors" and produce reports that "highlight errors and show compliance progress." However, Ms. Lidz does not actually assert that LACCD's websites are now accessible (or compliant with WCAG 2.1) and my evaluation of the LACCD website has found that it is not. This is not surprising to me given that the only action LACCD appears to be taking to maintain an accessible website is using an automated scanning tool. Automated accessibility scans can be helpful, but are insufficient to create and maintain an accessible website. They cannot identify all access barriers in the way that human testing can. Indeed, automated testing tools are capable of identifying only about 30% of potential WCAG violations. Furthermore, without any training or procedures in place to ensure that individuals who create or modify content for the websites understand how to do so in an accessible manner, a website that may start

out as accessible will quickly become inaccessible. Websites at institutions of higher education are typically updated frequently by a large number of different content creators, and thus institutions need policies and procedures in place—such as regular training and user testing—to ensure their accessibility over time.

21. Fourth, beyond a single mention of "[a]ccessibility training," being "available" to library staff (paragraph 13 of Ms. Albo-Lopez's declaration), there is no mention of any other training—let alone mandatory training—regarding accessibility policies and procedures in either declaration. As I have previously testified in this case, training staff on compliance with digital accessibility policies is crucial for successfully providing equal opportunity to blind students. All staff and faculty should be made aware of accessibility policies, but special attention should be given to those responsible for web and application development, technology purchasing, educational technology, and instructional design. In particular, with LACCD's shift from Etudes to Canvas as its learning management system, it is critical that training be provided to all instructors who upload content to ensure that this content is accessible. Canvas is only accessible if the content uploaded to it is accessible. Training should be conducted annually and be tailored to the faculty or staff member's role in the organization. The training should include, at minimum:

a. Information on the institution's obligations under applicable non-discrimination provisions of state and federal regulations and laws;
b. The institution's expectations of all faculty and staff related to these obligations; and
c. Any other policy expectations specific to the individual's role in the organization.

22. Fifth, neither declaration describes any type of complaint process in place for internally resolving accessibility issues as they are discovered. Based on my experience in digital accessibility in higher education, it is my opinion that having an

established and publicized complaint process is critical to ensuring digital accessibility. In addition, having listened to the testimony at trial in this case, I believe this is particularly important here, where there is a history of students complaining about accessibility barriers in educational software and LACCD not taking appropriate action to remediate these problems. A complaint process should include:

a. A communications plan to ensure that faculty, staff, and students are aware of the process and have the necessary information to make use of the process;
b. A timeline for the institution to respond to a complaint;
c. A timeline for completing an investigation;
d. Investigations of the accessibility of a website, document, or software should be conducted by staff members or consultants with sufficient knowledge and skill to apply the technical standard(s) for accessibility; and
e. A resolution process for correcting any policy violations.

23. Sixth, the process for developing an Equally Effective Alternative Access Plan ("EEAAP"), as described in paragraphs 20-22 of Ms. Albo-Lopez's declaration, has several major shortcomings:

a. Ms. Albo-Lopez's declaration states that the EEAAP "policies require alternate plans for accessibility, any time they are needed, for procured software purchased by the District in order to ensure accessibility." But she does not explain what is meant by "any time they are needed." Since LACCD likely cannot predict the moment when a blind student may or may not need to access any software being procured, it may not be possible to determine need in advance. As described, the EEAAP policy

does not contain sufficient clarity on how the need for an EEAAP is determined and who makes that determination.

b. Ms. Albo-Lopez states that "one of LACCD's vendors" is the party charged with writing the EEAAP, after receiving a request form from LACCD, along with a VPAT or accessibility conformance report ("ACR"). However, since the vendor presumably does not have an expert understanding of how a particular software is planned to be used in a particular scenario within LACCD, the vendor is unlikely to be able to determine if a proposed alternative truly provides a student with equally effective access to the educational benefits of the technology.

c. While the described process names a number of staff members who must sign off on the request, it fails to indicate who is ultimately responsible for evaluating a request on its merits and approving or denying a request. The description of the process also does not state what if any evaluation criteria are considered in approving or denying a request. While the process indicates that the requester would implement the EEAAP, it does not name a responsible party for ensuring that the requester carries out the plan.

24. Based on my professional experience and knowledge in the fields of digital accessibility and policies and procedures to assess, achieve, and maintain accessibility in institutions of higher education, my previous reviews of evidence and trial testimony in this case, my evaluation of LACCD's current website and PeopleSoft Campus Solutions application, and review of Ms. Lidz and Ms. Albo-Lopez's July 2023 declarations, it is my opinion, to a reasonable degree of professional certainty, that LACCD has not implemented the policies and procedures necessary to provide blind students accessible digital technology or equally effective access going forward.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: July 13, 2023 By: Peter Bossley

Peter Bossley