# Exhibit 2

Patricia Barbosa (SBN 125685)
pbarbosa@barbosagrp.com
**BARBOSA GROUP**
606 Lake Street, #9
Huntington Beach, California 92648
Phone: (714) 465-9486

Sharon Krevor-Weisbaum
skw@browngold.com
Jessica Weber
jweber@browngold.com
Kevin D. Docherty
kdocherty@browngold.com
Monica R. Basche
mbasche@browngold.com
**BROWN, GOLDSTEIN & LEVY LLP**
120 East Baltimore Street, Suite 2500
Baltimore, Maryland 21202

*Attorneys for Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ROY PAYAN, PORTIA MASON, THE NATIONAL FEDERATION OF THE BLIND, INC., and THE NATIONAL FEDERATION OF THE BLIND OF CALIFORNIA, INC.,<br><br>Plaintiffs,<br><br>vs.<br><br>LOS ANGELES COMMUNITY COLLEGE DISTRICT,<br><br>Defendant. | Case No.: 2:17-cv-01697-SVW(SKx)<br>**Civil Rights**<br><br>**DECLARATION OF JON GUNDERSON, Ph.D.**<br><br>Hearing Date: July 24, 2023<br>Time: 1:30 p.m. |

I, Jon Gunderson, declare:

1. I am more than 18 years old, am competent to be a witness, and testify from my own personal knowledge regarding the facts set forth in this Declaration.

**Qualifications**

2. I have previously provided expert opinions and testimony in this case regarding the accessibility[1] of LACC's website, course materials, and library databases, as well as the policies, procedures, and training necessary to ensure that blind students have equal access to LACCD's programs and services.

3. I incorporate herein my prior testimony regarding my qualifications, whether in the form of previously filed declarations or trial testimony.

**Accessibility of LACC's Website**

4. In early July 2023, I again evaluated the accessibility of LACC's website. I found several critical accessibility barriers on the LACC website, including the following:

- Adobe PDF documents posted to LACC's website are inaccessible.
- The calendar[2] uses table markup in a complex way that is not accessible to people using screen readers.
- The page "Academic Year Calendars"[3] has eleven tables, none of which have an accessible name. Each of the eleven tables needs an accessible name to support table navigation by screen reader users.
- The page "Course and Equivalencies"[4] does not have proper table markup to identify header cells for data cells.

---

[1] The term "accessible," as used in this Declaration means the ability of a person with a disability to acquire the same information, engage in the same interactions, and enjoy the same services as a person without a disability in an equally effective and equally integrated manner, with substantially equivalent ease of use.

[2] https://www.lacitycollege.edu/campus-life/events

[3] https://www.lacitycollege.edu/academics/calendars

[4] https://www.lacitycollege.edu/student-services/counseling/courses-equivalencies

- When the main navigation menu is in small screen mode it does not correctly manage keyboard focus when the menu is expanded. Once the menu is open, both tabbing with the keyboard on a desktop and swiping on a mobile device does not move focus to the first item in the menu.
- Landmark regions are missing (or have ambiguous) names.
- The website uses the button role for items that should be coded as group labels.
- The left side button for showing/hiding related pages does not have an accessible name or identify that there are properties that allow showing/ hiding the group of links.

5. Each of these issues represents a violation of the Web Content Accessibility Guidelines ("WCAG") 2.0 A or AA.

6. In addition to evaluating the website, I reviewed the July 5, 2023, Declaration of Carmen Lidz and the July 6, 2023, Declaration of Nicole Albo-Lopez. For several reasons, these declarations reveal lack of understanding regarding ensuring and maintaining digital accessibility in a higher education setting.

7. First, Ms. Lidz attests that LACCD is now relying on Monsido, an automated accessibility evaluation tool, to identify accessibility problems with LACCD's website and the websites of all nine of LACCD's colleges, including LACC's website. In my experience as a user of automated accessibility evaluation tools like Monsido, such tools do not detect all accessibility issues with websites and are not a substitute for human testing. Automated tools are good at identifying missing alternative text for images and whether form controls have a label or not, but they cannot assess when alternative text accurately describes an image or if a form control label clearly identifies the purpose of the control. Their limitations are even more serious when they are used to evaluate custom interactive features of a website like the main navigation menu and the calendar widget. To make custom widgets

accessible they need to use certain HTML and ARIA coding practices based on design decisions on how to make a certain feature accessible. Automated tools cannot understand the purpose of the widget and the associate accessibility coding practices and keyboard support to make it accessible. This type of accessibility needs to be checked by humans who understand the purpose of the feature and what type of accessibility features are needed to make the custom widget accessible. In fact, testing by blind individuals or other expert users of assistive technologies would have uncovered the critical and serious problems with the main navigation menu, calendar widget, the left side related links button, and tables I identified above.

8. I know firsthand the limitations and the capabilities of automated testing tools through my own personal development of the Functional Accessibility Evaluators[5] ("FAE") and AInspector[6] for Firefox. These tools check accessibility against more than 120 rules found in the WCAG 2.0 A and AA requirements and when run on the LACC website, over half of them return a result of manual check, which means that the tool found something on the page that may or may not be an accessibility issue.[7] The user of the tool needs to understand the WCAG requirement and then manually inspect the page to see if the requirement has been satisfied or not. Relying solely on automated testing means that many important accessibility issues such as the ones I identified on LACC's website will go unchecked and uncorrected.

9. Second, the maintenance and creation of content for a website is typically decentralized with many people creating and updating content. Therefore, it is necessary to provide those individuals with training and tools to ensure that the content they are posting to a website is accessible. Ms. Lidz's declaration does not

[5] https://fae.disability.illinois.edu

[6] https://addons.mozilla.org/en-US/firefox/addon/ainspector-wcag.

[7] There was no information in the declarations, and I could not find any information on the Monsido website about how many WCAG requirements it tests. *See* https://monsido.com

contain any information about content managers and editors at LACC (*e.g.*, instructors, staff, administrators, etc.) are trained regarding accessibility or what tools, if any, they are provided to help them create accessible content.

10. Third, one of the main problems that I observed at LACCD is the lack of clear administrative responsibility for implementing its accessibility policies, which is essential to ensuring that web content is accessible. Ms. Lidz's declaration does not provide any information about who is responsible for the accessibility of the various online resources hosted by LACCD or LACC. To ensure that it is creating and maintaining accessible website content LACCD should: (a) hire and/or train staff with knowledge and experience in web accessibility; (b) hire and/or train staff so that they have the knowledge and skills to manually check website content for accessibility in ways that cannot be verified by automated tools; (c) hire and/or train staff to work with vendors to help them understand accessibility issues and to understand the options to improve accessibility; (d) train all individuals who are authorized to post content to LACCD's websites, including faculty, regarding electronic accessibility, especially PDF accessibility; and (e) provide tools that support the creation of accessible website content.

**Accessibility of Accommodations Letters**

11. Ms. Albo-Lopez's declaration describes the process through which LACCD generates accommodations letters in an electronic format, as opposed to the paper format LACCD previously employed. She states that the letters are now automatically generated through a form in PeopleSoft, which then transmits them to the instructors. Several critical steps are missing from Ms. Albo-Lopez's description of the process that would ensure the accommodation letters and the process surrounding their issuance are accessible to blind students.

12. First, Ms. Albo-Lopez does not describe how blind students know what accommodations options are available to them. At trial, Roy Payan testified that he

was not aware that Braille was an option for him for his math courses. In addition, as of the date of this declaration, there is nothing on LACC's website about the accommodations that it provides. In my experience, providing that type of information is standard practice for institutions of higher education. To meaningfully engage in the interactive process surrounding their request for accommodations, blind students must know what accommodations are available to them ahead of time.

13. Second, although Ms. Albo-Lopez attests that the accommodations letters are now in an electronic format and "accessible to a student through text-to-speech software programs like JAWS," Albo-Lopez Decl. ¶ 10, ECF No. 584—either via email or PeopleSoft, she does not state the specific format in which accommodations letters are provided to students or how LACCD knows that the letters are accessible to blind students. Some formats, like PDF documents, may require work to make them accessible. In addition, instead of automatically providing the student with a copy of the accommodations letter, it appears from Ms. Albo-Lopez's declaration that the student must request one. Based on my experience, it is standard practice for institutions of higher education to automatically provide students with copies of their accommodation letters, both before and after the instructor has signed it.

14. Third, Ms. Albo-Lopez's declaration does not identify what responsibilities the instructor has in the accommodation process. For example, there is no mention that instructors are informed of their obligation to provide course materials in an accessible format to blind students at the same time as sighted students, nor does Ms. Albo-Lopez describe any role for instructors in making their class materials accessible generally. Moreover, Ms. Albo-Lopez's declaration does not address what happens if an instructor does not acknowledge receipt of the accommodations letter or if they fail, or refuse, to provide the accommodations. Ms. Albo-Lopez does not identify who at LACCD or LACC is responsible for ensuring

that instructors actually provide the approved accommodations. As I testified at trial, the University of Illinois has removed an instructor who was unwilling to provide agree-upon accommodations.

15. To remedy these issues, LACCD should: (a) test accommodations letters with students who are blind for accessibility and provide a blank accessible fillable copy of the form on its website; (b) identify the available accommodations on its website; (c) include language in the accommodation letters explaining that instructors are responsible for providing the accommodations identified therein; (d) automatically provide students with a copy of their accommodation letter both before and after it is signed by the instructor in the student's requested format (*e.g.*, accessible electronic format, Braille, or large print) by e-mail; (e) promulgate policies that identify the actions LACCD will take if an instructor does not accept or acknowledge the accommodation letter, or otherwise refuses or fails to provide the accommodations identified therein.

**Accessibility of Instructional Software at LACCD**

16. In Paragraph 11 of her declaration, Ms. Albo-Lopez identifies multiple software programs that LACCD uses for its math courses: MyOpenMath, WebAssign, ALEKS, MS Excel, RGuroo, and MyLab Statistics. Ms. Albo-Lopez does not, however, state that these programs are accessible to blind students. Instead, she states that "[e]ach of the programs, including MyLab Statistics for March 2022, has a [Voluntary Product Accessibility Template ("VPAT")] confirming accessibility updates that take place regularly," meaning that LACCD is aware that the software vendors are working on the accessibility of their products, but that they currently have accessibility issues.[8]

[8] Because Ms. Albo-Lopez's declaration does not attach or provides links to VPATs for any of these software programs, I could not evaluate those VPATs. If these VPATs are provided, I reserve the right to supplement this declaration.

17. In paragraph 20 of her declaration, Ms. Albo-Lopez states that in fall 2020, an Equally Effective Alternative Access Plan ("EEAAP") went into effect for "software and digital media," but she does not describe the specific EEAAP procedures that are in place for the software programs she identified. Instead, she describes them in vague, general terms, stating "[i]f the software is not fully accessible, the EEAAP will identify barriers to access and provide information on alternatives to provide access to the information or assignment." Albo-Lopez Decl. ¶ 21. Further, LACCD appears to be relying on a third-party company to assess the software it is procuring to prepare the EEAAP's "based on the information available in the VPAT/[Accessibility Conformance Report]." In my experience, EEAAPs are only as effective as the human resources who carry them out. Instructors or staff need to have the knowledge to help blind students learn how to use the software and achieve the benefits it provides to other students. Without faculty and staff who understand the recommendations in the EEAAPs and how to implement them, blind students will not have equally effective access to their instructional software.

**Accessibility of Course Materials at LACCD**

18. One of the main issues at trial was the timely access to textbooks, course materials, and other print materials. As Mr. Payan and Portia Mason testified, they regularly fell behind their sighted peers because they had to wait for textbooks and course materials to be converted by the Office of Special Services ("OSS"). This lack of timely conversion of print materials limited their ability to participate in class discussions and keep pace with their sighed peers.

19. In her declaration, Ms. Albo-Lopez characterizes Mr. Payan's and Ms. Mason's experiences as "one-time occurrences" that are "not likely to occur again" and cites LACCD's current policy that classroom materials "should be provided to the student with sufficient time, in coordination with OSS, for conversion to take

place." I have not seen any evidence that instructors at LACCD are *required* to provide their materials to OSS directly (as opposed to the student), or that instructors are required to use only materials that are available in an accessible format. As I testified at trial, at the University of Illinois, instructors are required to provide their textbook and class materials directly to the conversion office (not the student) as soon as a blind student registers for their course and the accessible materials are then provided to the students on a rolling basis throughout the semester through the university's learning management software (Blackboard, at the University of Illinois) before, or at minimum, at the same time, they are provided to sighted students.[9] LACCD should establish similar processes and requirements.

20. Ms. Albo-Lopez also does not mention whether and how instructors are trained on their obligation to provide accessible course materials. Training instructors to create their own accessible course materials will give them more flexibility in creating or modifying materials for use in classes.

**Accessibility of LACC's Library**

21. At trial, Mr. Payan and Ms. Mason testified about difficulties they experienced while attempting to access library resources at LACC. Those accessibility issues have two components: (1) being able to access and search for articles in the databases; and (2) making sure that the full text articles and books that are distributed through the databases (often in PDF format) are accessible.

22. In Paragraphs 13 through 17 of her declaration, Ms. Albo-Lopez addresses the accessibility issues the jury found with LACC's library, but she does not describe any changes to LACCD's or LACC's processes and procedures that

[9] With regard to textbooks, specifically, it is my experience that given the rise of digital textbooks, textbooks rarely require conversion of a physical, print copy of the textbook. Instead, an accessible textbook can be obtained from existing shared repositories of accessible books or by obtaining an inaccessible digital version of the book from the publisher for conversion with Optical Character Recognition ("OCR") software.

would ensure blind students have equally effective access to the library's databases. Ms. Albo-Lopez states that "OSS is available to assist with prompt conversion of any materials stored in the library into accessible format, readable by text-to-speech software like JAWS," but she does not describe this process. In addition, Ms. Albo-Lopez states that "OSS and library personnel are available to currently assist sight-impaired students with access problems" with library databases, but she does not state how or when this assistance is available. Ms. Albo-Lopez states that "[a]ccessibility training is available to all library staff, whether full-time, adjuncts, or interns," but she does not state that such training is required.

23. It is my understanding from the testimony at trial that the library does not publish the names of the staff members who can assist blind students with accessing inaccessible databases or the hours that those staff members are available. Similarly, OSS has limited hours (for example, it is not open on the weekends), so it is unclear how LACCD can ensure that blind students have equally effective access to the library databases.

24. As I testified at trial, the University of Illinois has an EEAAP in place for its library databases because it knows that they have inaccessible content. Blind students at the University of Illinois can schedule meetings with research librarians to assist the students with locating relevant research materials and ensuring that those materials are timely converted for the students' use. The University of Illinois also has librarians on staff who are familiar with assistive technologies and document conversion procedures to make sure students can perform library searches as independently as possible and get timely access to accessible versions of documents. The University of Illinois also publishes information on its website regarding when these staff members are available.

25. In Paragraphs 15 through 17, Ms. Albo-Lopez implies that the only solution to LACC's inaccessibly library databases is to discontinue their use. But this

is not the case, as most institutions of higher education continue to use these databases, but like the University of Illinois, have processes and procedures in place to ensure that blind students have equally effective access to them. LACCD should establish processes and procedures similar to the University of Illinois and other institutions of higher education to make sure that library staff are trained to work with blind students and know how to use assistive technologies and can convert documents to accessible formats. LACCD should also establish policies and procedures that allow blind students to schedule times to work with research librarians to help them navigate inaccessible research materials. To aid LACCD in this process, the staff should join the American Library Association ("ALA") Universal Accessibility Interest Group,[10] which is an authority on accessibility issues in library settings.

26. Based on my education, training, and professional experience in the field of accessibility in higher education, I hold the opinions herein to a reasonable degree of professional certainty.

I declare under penalty of perjury that the foregoing is true and correct.

Date: ________________

Jon Gunderson (Jul 15, 2023 11:35 CDT)

Jon Gunderson, Ph.D.

[10] https://www.ala.org/acrl/aboutacrl/directoryofleadership/interestgroups/acr-igua